**E-FILED**
Wednesday, 13 August, 2008  02:59:36 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JON ROE MORGAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08-3118 |
| | ) | |
| DONALD HULICK, Warden, | ) | |
| Menard Correctional Center, | ) | The Honorable |
| | ) | Jeanne E. Scott, |
| Respondent. | ) | Judge Presiding. |

**ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, and this Court's May 23, 2008 order, respondent DONALD HULICK submits this answer to the petition for writ of habeas corpus filed in the above-captioned cause, and states as follows:

1.     Petitioner Jon Roe Morgan, identified as prisoner number K60696, is in the custody of respondent Donald Hulick, warden of the Menard Correctional Center.

2.     In September 1996, following a jury trial in the Circuit Court of Logan County, Illinois, petitioner was convicted of the first degree murder of Lila Cearlock (his grandmother) and the second degree murder of Keith Cearlock (his grandfather).  *See* Judgment, *People v. Morgan,* No. 95 CF 101 (Exhibit A); Opinion, *People v. Morgan*, No. 4-96-0996, 718 N.E.2d 206, 210 (Ill.App. 1999) (Exhibit B). Petitioner was sentenced to 58 years' imprisonment for Lila's murder and 17 years'

imprisonment for Keith's murder, to be served consecutively.  Exhibit B.  Petitioner shot and killed his grandparents following an argument and punishment over petitioner's detention at his high school.  *Id.*  At the time of the murders, petitioner was 14 years old.  *Id.*

3.    On direct appeal to the Illinois Appellate Court, Fourth District, petitioner raised the following claims:

(1)    The trial court erred in granting the State's motion to transfer petitioner from juvenile court and try him as an adult;

(2)    The trial court erred in admitting petitioner's initial statements to police because they were made during a custodial interrogation without *Miranda* warnings;

(3)    Petitioner's custodial statements were involuntary due to the coercive nature of the circumstances of the interrogations;

(4)    Petitioner did not knowingly and intelligently waive his *Miranda* rights;

(5)    The trial court erred in excluding testimony regarding the prior violent conduct of petitioner's grandparents;

(6)    The trial court erred in refusing to give an instruction on second degree murder as to the felony murder counts; and

(7)    The trial court erred in refusing to dismiss the felony murder counts.

*See* Pet. Br., *People v. Morgan,* No. 4-96-0996 (Exhibit C); State Br., *People v. Morgan,* No. 4-96-0996 (Exhibit D); Pet. Reply Br., *People v. Morgan,* No. 4-96-0996 (Exhibit E).

4.    On September 29, 1999, the state appellate court affirmed petitioner's second degree murder conviction, reversed his first degree murder conviction, and

2

remanded for a new trial as to the first degree murder charge regarding Lila. *See* Exhibit B. The appellate court held, among other things, that the trial court erred by not instructing the jury on second degree murder as to Lila's killing. *Id.* at 70. The State and petitioner filed respective petitions for leave to appeal (PLA) to the Supreme Court of Illinois. *See* State PLA, *People v. Morgan*, No. 88508 (Exhibit F); Pet. PLA, *People v. Morgan,* No. 88513 (Exhibit G).

5.    Leave to appeal was granted to both parties, and the appeals were consolidated. *See* State Br., *People v. Morgan,* Nos. 88508 & 88513 (cons.) (Exhibit H); Pet. Br., *People v. Morgan,* Nos. 88508 & 88513 (cons.) (Exhibit I); State Reply Br., *People v. Morgan,* Nos. 88508 & 88513 (cons.) (Exhibit J); Pet. Reply Br., *People v. Morgan,* Nos. 88508 & 88513 (cons.) (Exhibit K). The parties' briefs raised essentially the same claims that were raised in the appellate court. On October 18, 2001, the Illinois Supreme Court affirmed petitioner's second degree murder conviction, reversed the appellate court's ruling with respect to the first degree murder conviction of Lila, and affirmed the judgment of the trial court. *See* Opinion, *People v. Morgan,* 758 N.E.2d 813, 844 (Ill. 2001) (Exhibit L). Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court. *See* Pet. at 4.

6.    On June 26, 2002, petitioner filed in the Circuit Court of Logan County a petition for postconviction relief pursuant to 725 ILCS 5/122-1, *et seq. See* Postconviction Petition, *People v. Morgan,* No. 95 CF 101 (Exhibit M). In the

petition, petitioner raised due process and ineffective assistance of counsel claims.

Exhibit M.  In an amended postconviction petition, filed on January 5, 2005,

petitioner raised the following claims:

(1)    Petitioner was denied his right to counsel under the Fifth Amendment because he was subjected to custodial interrogation without the presence of an attorney;

(2)    Ineffective assistance of trial and appellate counsel for failing to preserve issues for appeal;

(3)    The trial court denied petitioner his right to present evidence at trial by not allowing petitioner to present testimony of his grandparents' purportedly abusive past;

(4)    Petitioner's consecutive sentences were improper; and

(5)    The cumulative effect of errors at trial, sentencing, and on appeal, violated his due process rights.

*See* Amended Postconviction Petition, *People v. Morgan,* No. 95 CF 101 (Exhibit N).

Following a hearing, the postconviction trial court denied the amended

postconviction petition.  *See* Docket Sheet, *People v. Morgan,* No. 95 CF 101 (Exhibit

O).  Petitioner appealed, arguing that his consecutive sentences were not authorized

under Illinois law and that his postconviction counsel rendered ineffective

assistance.  *See* Pet. Br., *People v. Morgan,* No. 4-05-0009 (Exhibit P); State Br.,

*People v. Morgan,* No. 4-05-0009 (Exhibit Q); Pet. Reply Br., *People v. Morgan,* No.

4-05-0009 (Exhibit R).  The appellate court affirmed.  *See* Rule 23 Order, *People v.

Morgan,* No. 4-05-0009 (Ill.App. 2007) (Exhibit S).  Petitioner filed a PLA to the

Supreme Court of Illinois that was denied on January 30, 2008.  *See* PLA, *People v.*

*Morgan*, No. 105718 (Exhibit T); Order Denying PLA, *People v. Morgan*, No. 105718 (Exhibit U).

7.      On May 20, 2008, petitioner filed the instant habeas petition pursuant to 28 U.S.C. § 2254, raising the following grounds for relief:

(1)     Petitioner was denied his 5th Amendment right against self-incrimination because he was subjected to custodial interrogation without *Miranda* warnings;

(2)     Petitioner's statements to police were involuntary;

(3)     Petitioner did not knowingly and intelligently waive his *Miranda* rights so his statements should not have been admitted;

(4)     The trial court erred in excluding testimony regarding prior violent conduct of Keith and Lila;

(5)     The trial court erred in refusing to give the jury second degree murder instructions as to the felony murder counts;

(6)     The trial court erred in refusing to dismiss felony murder counts based on the predicate felonies of aggravated battery and aggravated discharge of a firearm; and

(7)     Trial and appellate counsel rendered ineffective assistance for failing to object to consecutive sentences.

Pet. at 6-35.

8.      In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, respondent has electronically filed the following exhibits as attachments to this Answer:

Exhibit A:    Judgment, *People v. Morgan,* No. 95 CF 101;

Exhibit B:    Opinion, *People v. Morgan*, No. 4-96-0996, 718 N.E.2d 206 (Ill.App. 1999);

Exhibit C:    Pet. Br., *People v. Morgan,* No. 4-96-0996;

Exhibit D:    State Br., *People v. Morgan,* No. 4-96-0996;

Exhibit E:    Pet. Reply Br., *People v. Morgan,* No. 4-96-0996;

Exhibit F:    State PLA, *People v. Morgan*, No. 88508;

Exhibit G:    Pet. PLA, *People v. Morgan,* No. 88513;

Exhibit H:    State Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit I:    Pet. Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit J:    State Reply Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit K:    Pet. Reply Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit L:    Opinion, *People v. Morgan,* 758 N.E.2d 813 (Ill. 2001);

Exhibit M:    Postconviction Petition, *People v. Morgan,* No. 95 CF 101;

Exhibit N:    Amended Postconviction Petition, *People v. Morgan,* No. 95 CF 101;

Exhibit O:    Docket Sheet, *People v. Morgan,* No. 95 CF 101;

Exhibit P:    Pet. Br., *People v. Morgan,* No. 4-05-0009;

Exhibit Q:    State Br., *People v. Morgan,* No. 4-05-0009;

Exhibit R:    Pet. Reply Br., *People v. Morgan,* No. 4-05-0009;

Exhibit S:    Rule 23 Order, *People v. Morgan,* No. 4-05-0009 (Ill.App. 2007);

Exhibit T:    PLA, *People v. Morgan*, No. 105718; and

Exhibit U:    Order Denying PLA, *People v. Morgan*, No. 105718.

The entire state court record is not filed with this answer because the

petition can fairly and justly be disposed of based on the exhibits filed with this

6

Court.  *See Simental v. Matrisciano*, 363 F.3d 607, 612 (7th Cir. 2004) ("While the review of a state court transcript is occasionally necessary in habeas cases, it is certainly not required and is, in fact, quite rare. . . . [T]he decision of whether transcripts are necessary is left to the sound discretion of the district court.").

9.    Petitioner has exhausted his state court remedies for the claims raised in his habeas petition.  *See* 28 U.S.C. § 2254(b); *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (Illinois prisoner exhausts claim by raising it in the Illinois Appellate Court and the Illinois Supreme Court).

10.    For the reasons more fully set forth below, petitioner is not entitled to relief on his claim.  Upon the filing of this Answer, along with the attendant exhibits and any supplemental pleadings permitted by the Court, the petition should be denied in its entirety.

## STATEMENT OF FACTS

The state appellate and supreme courts set forth the following factual summaries of the evidence presented at petitioner's trial, which are "presumed correct," and "the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"  *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).  The following is from the state supreme court's opinion that affirmed petitioner's convictions on direct appeal:

> On April 27, 1995, around 8:30 p.m., officers responded to a report of shots fired at Seventh and Washington Streets in Lincoln, Illinois.  Upon arriving at the scene, Officer Tim Kerns observed an elderly woman lying facedown in the front yard of 1206 Seventh Street, with a gunshot

7

wound in her back.  Inside the home, Officer Kerns saw
an elderly man lying on his back with a gunshot would in
his left temple.  The man and woman, who later died of
their injuries, were identified as Keith and Lila Cearlock.

After the crime scene had been secured with tape around
the perimeter of the house, one of the officers, Deputy
Sheriff Bob Spickard, noticed a young man, later
identified as Jon, walking across the grass and through
the crime scene tape.  Spickard ordered Jon to stop, but
Jon nonetheless approached Spickard and handed him a
gun and a box of bullets.  Jon said to Spickard, "I did it.  I
killed them."  Upon hearing this, Spickard took Jon to the
front of the house, where Detective Michael Harberts and
other officers were standing.  Spickard told Harberts that
Jon had turned over the gun and ammunition and had
admitted to the shooting.  Harberts then asked Jon, "Why
did you shoot these two people?"  Jon responded, "They
pissed me off.  I couldn't take it anymore so I shot them."
Harberts then instructed Officer Kerns to arrest Jon.  Jon
was handcuffed and placed inside a squad car.  Before
being transported to the Logan County jail, Jon was
taken out of the squad car two separate times so that
witnesses could identify him.  At the jail, the officers
learned that Jon was 14 years old.

Around 9:05 p.m., Harberts interviewed Jon.  Jon told
Harberts that the deceased were his grandparents and
that they were his legal guardians.  Harberts attempted
to tape record the interview, but later discovered that the
tape had not recorded.  With Jon's consent, Harberts then
interviewed Jon a second time.

At trial, Jon testified that, on the day of the shootings, he
came home from school and fell asleep on his bed.  Keith
awakened Jon around 6:30 p.m., demanding an
explanation concerning a detention for tardiness that Jon
had received.  Keith screamed at Jon for 10 to 15 minutes.
Lila also yelled at Jon about the detentions.  Keith then
directed Jon to get Keith's razor strap, told Jon to bend
over and grab his ankles, and, using all his strength, hit
Jon with the razor strap across his buttocks five times.
Keith and Lila then continued to yell at Jon, so Jon yelled

8

back at them.  Keith then swung his fist at Jon.  Jon
jumped out of the way and ran to the bathroom.

Jon went into the bathroom, then went to Keith's closet
shelf to get a gun to protect himself from Keith.  Jon took
the gun and a box of ammunition back the bathroom and
loaded eight bullets into the gun.  At that point, Jon
started thinking about killing himself.  For some reason,
Jon fired at a bottle of Tilex cleaner that was on the
bathtub.  Jon then stepped out of the bathroom and saw
Lila screaming.  Jon claimed that although he then
became scared, he still was not thinking about killing his
grandparents.

Jon saw Keith coming around the corner and could see
that Keith was very angry.  Thinking that Keith was
going to beat him to death, Jon lifted the gun and shot
Keith so that Keith could not get to him.  After Jon shot
Keith, Lila started to turn around and run toward the
front door.  Jon thought Lila was just as dangerous as
Keith because Keith beat Jon only when Lila pressured
Keith to do so.  Jon followed Lila as she started to run out
the front door and shot Lila in the back.  Lila managed to
make it out the front door, but collapsed in the front yard.
Jon followed Lila out the door and attempted to shoot her
again, but his gun jammed.

Jon then went back inside the house and broke the lock
on the door to Lila's room in order to look for her gun.
When he could not find Lila's gun, Jon changed his
clothes and left the house, still carrying Keith's gun and
the box of bullets.  Jon walked toward a friend's house
and, as he was walking, attempted to unjam the gun.  The
gun accidentally discharged two times.  Jon testified that
he walked to his friend's house because he wanted some
help and needed to talk to someone.  When he learned
that his friend, Steve Powell, was not home, he decided to
walk back home.  Jon testified that he felt he needed
some help and thought that the police would be at his
house and could help him.  Jon said that he returned
home in order to turn himself in for the shootings.

9

Testimony concerning Jon's upbringing revealed that Jon was born on August 20, 1980, to Glenda and Roe Morgan. Roe drank heavily and was physically abusive toward his children.  When Jon was in kindergarten in Virginia, he was referred for a psychological evaluation for behavior problems at school, including impulsiveness, aggressiveness, and hyperactivity.  Jon was hospitalized at the Psychiatry Institute of Richmond (the Psychiatry Institute) from March 31, 1986, through May 16, 1986. Jon was diagnosed as suffering from Attention Deficit Disorder (ADD) and depression.  Jon was prescribed an antidepressant to target his depression and hyperactivity.

Jon was admitted to the Psychiatry Institute a second time on February 18, 1987, where he remained until March 29, 1987.  Jon's discharge summary indicated that Glenda claimed Jon had become so aggressive that he was unmanageable.  Jon was defiant toward parental authority, had dropped his newborn sister on the floor, and was aggressive toward his other siblings.  Jon again was diagnosed with ADD and depression.  Jon continued taking his antidepressant medication both during his hospitalization and upon discharge.  Following Jon's second discharge from the Psychiatric Institute, Glenda Ashworth decided to send Jon to live with her parents, Keith and Lila Cearlock, in Lincoln, Illinois.  At the time, the marriage of Glenda and Roe was breaking up, and Glenda felt that the Cearlocks offered a more stable home.  Jon had no contact with his father from the time of his parents' divorce until his arrest for the Cearlocks' murders.

Jon moved in with the Cearlocks when he was seven years old and began attending school at Park Meadows Baptist Church and Academy (Park Meadows).  The Cearlocks and the principal of Park Meadows agreed that Jon should be taken off his medication.  Jon testified that, when he got into trouble at Park Meadows, he would receive detentions or was paddled by the principal.  Jon also testified that Keith frequently beat him with a razor strap, usually at the urging of Lila.

10

Jon moved back home with Glenda, now remarried to Linwood Ashworth, for his fifth- and sixth-grade school years. Linwood, however, began drinking and became physically abusive toward Jon and his sisters, so Glenda sent Jon back to Lincoln to live with the Cearlocks. Jon testified that Keith and Lila were negative and constantly criticized Jon. Keith frequently told Jon if he ever fought back when Keith was beating him, Keith would kill Jon while Jon was sleeping. Jon believed Keith.

When Jon returned to the Cearlocks' home the second time, Jon again attended Park Meadows. Jon did well in school and was on the honor roll nearly every quarter. However, on February 7, 1995, Jon was expelled from Park Meadows after another student saw Jon kissing a girl outside the girl's house. According to school policy, students could be expelled for kissing. Despite the policy, Jon initially was told that he could serve a suspension. Jon refused to agree to the terms of the suspension. The principal of Park Meadows tried to arrange for Jon to attend a school in Oklahoma, but Keith would not agree. After Keith later changed his mind about the Oklahoma school, Jon refused to go.

Following Jon's expulsion, Glenda asked Keith to bring Jon home. Keith drove Jon to Virginia, but before Jon arrived, Glenda changed her mind and decided that she could not afford to have Jon in her home. When Keith and Jon arrived in Virginia, Glenda told Jon that he could not stay. Jon was very upset with this news. Keith and Jon returned to Lincoln, and Jon attended the public high school from March 17, 1995, until the time of the murders.

At his trial, Jon testified that he did not tell the police that Keith beat him because he did not want to disrespect his grandparents and did not want to reveal his personal problems. Jon admitted that he did not bring up the beatings until he met with Dr. Robert Chapman, who interviewed Jon at the request of the State to determine Jon's fitness to stand trial. Jon also agreed that he never told Harberts that Keith had threatened to kill him.

11

Exhibit L at 8-10.  The following is from the state appellate court's opinion on direct appeal:

> This case was originally filed in the juvenile court of Logan County.  The State file a petition, pursuant to section 5-4 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-4 (West 1994)), seeking to have Jon tried as an adult.  The juvenile court granted the State's petition after a hearing.
>
> Jon was subsequently indicted on eight counts.  Counts I and II charged first degree murder of Lila and Keith, respectively, with intent to kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 1994)); counts III and IV charged first degree murder of Lila and Keith, respectively, by knowingly committing an act causing great probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1994)); counts V and VII (Lila) and VI and VIII (Keith) charged first degree murder by attempting or committing a forcible felony (720 ILCS 5/9-1(a)(3) (West 1994)).  The predicate felony for counts V and VI was aggravated battery (720 ILCS 5/12-4(a) (West 1994)), and the predicate felony for counts VII and VIII was aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1994)).
>
> Defense counsel filed a motion to suppress certain statements made by Jon to the police at the crime scene and while in custody.  The motion was denied after a hearing.
>
> After defense counsel disclosed his intent to raise the affirmative defense of self-defense (720 ILCS 5/7-1 West 1994)) and the mitigating factor of "sudden and intense passion resulting from serious provocation" (720 ILCS 5/9-2(a)(1) West 1994)), the State sought to bar second degree murder instructions as to the felony murder counts.  The trial court initially denied the motion, but later reversed its ruling.  The trial court thereafter denied Jon's motion to dismiss the four counts of felony murder.
>
> At trial, the State sought to preclude Glenda Ashworth, Jon's mother, and Dr. Stuart Hart, defense expert, from testifying regarding prior violent conduct of the Cearlocks.

The trial court ruled in favor of the State and the defense made offers of proof.

The trial court instructed the jury on second degree murder (720 ILCS 5/9-2(a) (West 1994)) as to counts I through IV. The jury found Jon guilty of first degree murder as to Lila and second degree murder as to Keith. Jon was sentenced to consecutive terms of 58 and 17 years' imprisonment, respectively.

Exhibit B at 2-4.

## ARGUMENT

### I.     Standard of Review

### A.     Application of AEDPA.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) apply to petitioner's habeas corpus petition, which was filed in this Court on May 20, 2008. *Hardaway v. Young*, 302 F.3d 757, 761 (7th Cir. 2002).

### B.     Merits Review Under AEDPA.

The claims raised by petitioner in his habeas petition that were adjudicated on the merits in state court must be examined under the lens of AEDPA. Under AEDPA's deferential standard of review, this Court must deny habeas relief unless the decision, on the merits of an issue, by a state reviewing court is either "contrary to," or an "unreasonable application of," clearly established United States Supreme Court precedent, or was premised on an unreasonable determination of facts. 28 U.S.C. § 2254(d)(1)-(2). The burden of proof falls squarely on petitioner to show that he is entitled to relief under any of these theories. *Woodford v. Visciotti*, 537

13

U.S. 19, 25 (2002) (per curiam).  Further, this Court must presume that the state courts know and follow the rules of federal constitutional law.  *Id.* at 24.

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  This Court is obligated to deny habeas relief under the "contrary to" clause even if the state reviewing court's decision is not an exemplar of good legal drafting: "[a]voiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

With respect to the "unreasonable application" prong, the Supreme Court has instructed that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams*, 529 U.S. at 409.  The Court cautioned that "an unreasonable application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410 (emphasis in original).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

14

established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Put another way, where "the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).

## II.    Petitioner's Claims

### A.    Initial statements to police

Petitioner argues that his initial statement to Detective Harberts at the scene of the crime should have been suppressed because he was subjected to a custodial interrogation without proper *Miranda* warnings. Pet. at 8. After shooting his grandparents, petitioner walked toward a friend's house. When he discovered that his friend was not home, petitioner returned to his grandparents' home. Pet. at 7. Upon returning to his grandparents' home, petitioner approached Deputy Spickard, handed him the gun and ammunition, and said, "I did it. I killed them." Pet. at 8. Deputy Spickard then led petitioner to Detective Harberts, who was leading the investigation into the shootings. Detective Harberts asked petitioner why he shot his grandparents, and petitioner replied, "[b]ecause they pissed me off. I couldn't take it anymore so I shot them." Pet. at 8. Petitioner asserts that Detective Harberts's question was designed to elicit an incriminating response and, because this interrogation was conducted without *Miranda* warnings, it must be suppressed. Pet. at 8. The Illinois Supreme Court found that any error relating to petitioner's initial statement to Harberts was harmless:

15

We need not address whether the appellate court properly found that Harberts' question was interrogation and that Jon was in custody because we find that, even if the trial court erroneously denied Jon's motion to suppress his initial statement to Harberts, any error was, at most, harmless. During Jon's first and second interviews with Harberts, after Jon had received his *Miranda* warnings, Jon repeated the initial statement he had made to Harberts at the scene. Specifically, during the second, taped interview, the following exchange took place:

[Harberts]: OK. Then you walked over to me and [Spickard] told me that you had just walked up and said that you shot them or killed the, and, uh, you had given him the gun, and I asked you why. Can you tell my [sic] why?

[Jon]: Yes sir, I said cause they pissed me off. I was upset and sick and tired of being treated the way I was. I couldn't take it any longer.

Even if the initial statement to Harberts had been admitted into evidence erroneously, it is difficult to conceive of any prejudice to Jon when he repeated the statement to Harberts two more times after receiving his *Miranda* warnings. Although Jon claimed that any statements he made were coerced because he was conditioned to respond to authority, we find no evidence in the record that Jon's response to Harberts was not voluntary. It is noteworthy that the response came shortly after Jon of his own initiative confessed to Spickard that he was the shooter. Consequently, the subsequent reading of *Miranda* warnings cured the condition that the appellate court found made the initial voluntary but unwarned statement inadmissible. *See People v. Wilson,* 164 Ill.2d 436, 452, 207 Ill.Dec. 417, 647 N.E.2d 910 (1995) (reading of *Miranda* warnings cured prior voluntary but unwarned statement), citing *Oregon v. Elstad,* 470 U.S. 298, 311-12, 105 S.Ct. 1285, 1294-95, 84 L.Ed.2d 222, 233-34 (1985). * * *

Here, Jon's initial statement to Harberts was made shortly after Harberts arrived on the scene at 8:38 p.m. Jon received his *Miranda* warnings and was interviewed the first time from 9:05 p.m. until 9:37 p.m., and received the second set of

16

> *Miranda* warnings and was interviewed the second time from
> 11:07 p.m. until 11:30 p.m.  Jon was not subjected to police
> interrogation, force, threats or harassment prior to the first
> interview or between the time of the first and second
> interviews.  Jon was free to make his own decision of
> whether to repeat his initial statement during the first and
> second interviews.  As those statements, which repeated and
> in fact enlarged upon Jon's initial response to Harberts, were
> admissible, we find that any purported error in admitting
> Jon's initial statement to Harberts was harmless.

Exhibit L at 23-24.

The state court's adjudication was reasonable.  As the state supreme court
held, any error in admitting the statement to Harberts was harmless in light of
petitioner's later statements made after *Miranda* warnings were given at the police
station.  The court cited *Oregon v. Elstad* in support of its holding that any
purported error in admitting petitioner's initial statement to police was harmless.
In that case, police officers questioned Elstad, an 18-year-old burglary suspect, in
his parents' living room.  They did not give him *Miranda* warnings.  When asked if
he was involved in the burglary, Elstad replied, "Yes, I was there."  *See Elstad,* 470
U.S. at 301.  After the officers took Elstad to the police station and read him his
*Miranda* rights, he repeated his confession.  Elstad's motion to suppress the
statement was denied.  In affirming the denial, the Supreme Court held that "a
careful and thorough administration of *Miranda* warnings serves to cure the
condition that rendered the unwarned statement inadmissible.  The warning
conveys the relevant information and thereafter the suspect's choice whether to

exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 311.

In addition to correctly identifying the relevant Supreme Court precedent for analyzing petitioner's claim, the state supreme court reasonably applied that precedent. Similar to *Elstad,* petitioner's statement to Harberts was made at his home, and petitioner received *Miranda* warnings subsequent to this initial statement. Before each of his two statements, petitioner received *Miranda* warnings at the police station, and twice repeated his statement that he shot his grandparents because they "pissed [him] off." Thus, as the state supreme court explained, petitioner was free to make his own decision whether to repeat his initial statement during the first and second interviews, and the constitution does not forbid such *Mirandized* statements. Accordingly, the state supreme court reasonably held that any error in admitting petitioner's initial statement was harmless. Petitioner is not entitled to habeas relief on this claim.

## B.    Involuntary custodial statement

Petitioner argues that his custodial statements were involuntary due to the allegedly coercive nature of his encounter with police. In denying this claim, the state supreme court explained as follows:

> In reviewing a trial court's ruling concerning whether a confession is voluntary, the trial court's factual findings will be reversed only if those findings are against the manifest weight of the evidence. *In re G.O.,* 191 Ill.2d 37, 50, 245 Ill.Dec. 269, 727 N.E.2d 1003 (2000). However, a trial court's ruling on the ultimate question of whether the confession was voluntary is

18

reviewed *de novo. G.O.,* 191 Ill.2d at 50, 245 Ill.Dec. 269, 727 N.E.2d 1003.

In determining whether a confession is voluntary, courts look to the totality of the circumstances, including factors such as the party's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. *G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. Other factors include the duration and the legality of the detention, the duration of the questioning, as well as any mental or physical abuse by the police, including the existence of threats or promises on the part of the police. *G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. No single factor is dispositive. *G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession. *G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003.

Upon review, we agree with the trial court that the totality of the circumstances indicate that Jon's confession was voluntary. We first consider Jon's age, experience, and emotional characteristics. On this point, the record indicates that Jon was an average student with normal reading, writing and verbal skills. Jon was not physically or mentally abused by the police during his interviews, nor did the police make any threats or promises.

Although Dr. Chapman testified that Jon was unable to appreciate the gravity of the situation in waiving his *Miranda* right and was so conditioned to pleasing authority figures that he automatically would answer the officers' questions, there was ample evidence in the record to the contrary. For example, as the trial court noted, Jon did not hesitate in refusing to answer one of Harberts' questions concerning Jon's thoughts of killing others. Similarly, there was evidence that Jon had defied authority figures in the past. Jon had refused to serve his suspension for kissing a girl, and had refused to go the school in Oklahoma. Keith had told Pastor Davis that Lila was afraid of Jon, and Lila herself told Pastor Bryant that Jon had slammed her hand and had shoved her up against a wall. When Pastor Bryant told Jon not to turn his back on God, Jon

19

told Pastor Bryant that he would commit every sin he wanted to commit. Similarly, when the other students at Park Meadows asked Jon to reconsider serving his suspension, Jon refused, saying he now would do the hurting. In addition, as the trial court noted, Jon "indeed did seem to want to tell what had happened," both when he first walked up to Spickard at the crime scene and during his interviews with Harberts.

We next consider Jon's claim that the coercive nature of his encounter with the police establishes that his statements were not voluntary. In support of his claim that Jon's encounter with the police was coercive, Jon notes that he was handcuffed when he was taken from the crime scene to the police station, in violation of the Lincoln police department's policy that a juvenile should be handcuffed only when necessary to prevent violence or escape. Likewise, Jon observes that both the [Juvenile Court Act of 1987] and the policy of the Lincoln police department state that no minor under 16 years of age may be confined in jail or a place ordinarily used for the confinement of prisoners in a police station, and that when a minor of appropriate age is detained in a jail cell, he should be told the purpose of his detention, the time it is expected to last, and that the detention cannot exceed six hours. *See* 705 ILCS 405/5-7(2)(c)(iii), 2(c)(vi) (West 1994)[now 705 ILCS 405/5-410 (West 2000)]. Jon argues that, in violation of the Act and the policy, he was detained in a prisoner holding cell and was not told that his detention could not exceed six hours. Finally, Jon notes that he was not advised he could consult with his parents before being questioned, he was not advised that he could be tried as an adult, and Harberts did not make a reasonable attempt to notify Jon's parents or other person legally responsible for Jon's care or take Jon to the juvenile officer for jurisdiction, as required under the Act. *See* 705 ILCS 405/5-6(1) (West 1994).

The trial court found that the violations of the Act did not require suppression of Jon's statements, as Jon's waiver of *Miranda* was knowingly and intelligently made, and Jon had voluntarily confessed. We agree with the trial court. Although Jon was handcuffed when he first was taken to the police station from the crime scene, Harberts testified that at the time, he thought Jon was 18 or 19 years old. Likewise, although Jon was not told that his detention could not exceed

20

six hours, there is no evidence or allegation that Jon was detained for more than six hours. We do not deem any of these purported violations significant enough to render Jon's statements coerced or involuntary.

Possibly more significant in this case is the officers' failure to contact Jon's parents or a juvenile officer prior to questioning Jon. With regard to the confession of a juvenile, this court has recognized that the taking of such a confession is a "'sensitive concern.'" *G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003, quoting *People v. Prude,* 66 Ill.2d 470, 476, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977). Consequently, courts considering the voluntariness of juvenile confessions consider whether the juvenile had an opportunity to consult with an adult interested in his welfare, known as a "concerned adult," either before or during the interrogation. *G.O.,* 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. In determining whether a juvenile had an opportunity to confer with a "concerned adult," courts consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the attempts of a concerned adult to confer with the juvenile. *G.O.,* 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. The "concerned adult" factor is particularly relevant in situations where a juvenile has demonstrated trouble understanding the interrogation process, has asked to speak with either of his parents or a concerned adult, or where the police have prevented the juvenile's parents from speaking with him. *G.O.,* 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. Nonetheless, a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a concerned adult either before or during his interrogation. *G.O.,* 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003.

In *G.O.,* we found that a juvenile's confession was voluntary even though he was not provided with an opportunity to confer with a concerned adult because: the juvenile never requested to speak with a concerned adult; the police never frustrated an attempt by a concerned adult to speak with the juvenile; the juvenile's detention was valid; the juvenile was informed of his *Miranda* rights and indicated that he understood those rights; the juvenile was intelligent and did well in school; the juvenile was questioned only for a short period of time on three or four occasions; and no coercion or physical threats occurred, nor

21

were any promises made.  *G.O.,* 191 Ill.2d at 56, 245 Ill.Dec.
269, 727 N.E.2d 1003.

Based upon the foregoing considerations, we find that any
failure to contact Jon's parents or a juvenile officer prior to
questioning Jon did not render his statements involuntary.
With regard to Jon's parents, we note that Jon told Harberts
that his grandparents were his legal guardians.  As Harberts
believed that those legally responsible for Jon's care were
deceased, we do not attribute great weight to the fact that
Harberts did not immediately attempt to contact Jon's parents.
In fact, after Harberts had interviewed Jon the first time and
obtained information concerning Jon's mother, Harberts
telephoned Glenda.

In addition, as in *G.O.,* Jon never requested an opportunity to
speak with a concerned adult and the officers did not prevent
any concerned adult from speaking with Jon.  Jon's detention
was valid, and he was informed of his *Miranda* rights.  Further,
although Jon now claims that he did not understand those
rights, the trial court found, and we agree, that Jon did
understand his *Miranda* rights.  Pastor Bryant testified that
Jon was intelligent and did well in school.  Jon was not
handcuffed in the jail, and was questioned on only two
occasions for approximately 30 minutes each time.  No physical
coercion or threats occurred, and no promises were made.
Under the circumstances, we find that the totality of the
circumstances indicates that Jon's confession was the result of
his own decision and was not the result of compulsion or
inducement, nor was Jon's will being overborne at the time of
his confession.  For those reasons, we affirm the trial court's
decision denying Jon's motion to suppress the statements he
made while in custody.

Exhibit L at 21-23.

Federal habeas relief on this claim is unavailable because petitioner cannot

show that the state court adjudication of the claim was either contrary to, or an

unreasonable application of, clearly established federal law as determined by the

United States Supreme Court.  28 U.S.C. § 2254(d)(1).  First, the state supreme

court's decision was not contrary to clearly established federal law. *Williams,* 529

U.S. at 405. Here, the state supreme court applied the correct legal rule — the

totality of the circumstances test — in analyzing petitioner's involuntary confession

claim. The fact that the state court did not cite any United States Supreme Court

or federal case law for this point is immaterial; the key point is that "neither the

reasoning nor the result of the state court decision contradicts [Supreme Court

precedent]." *Early* 537 U.S. at 8. The state supreme court correctly identified the

governing test for assessing the voluntariness of confessions. As the Seventh

Circuit has stated,

> [i]n evaluating the voluntariness of a . . . confession, a
> court must consider the totality of the circumstances. *See*
> *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 [ ] (1973).
> Specifically, a confession is "involuntary" only if
> circumstances demonstrate that police coercion or
> overreaching overbore the accused's will and caused the
> confession. *See Dickerson v. United States*, 530 U.S. 428,
> 434 [ ] (2000) (discussing cases). . . . Put differently, a
> "confession is voluntary if, in light of the totality of the
> circumstances, the confession is the product of a rational
> intellect and free will and not the result of physical abuse,
> psychological intimidation, or deceptive interrogation
> tactics that have overcome the defendant's free will." In
> applying the totality test, we have identified a variety of
> factors which a court may consider to assess
> voluntariness, including but not limited to: whether the
> defendant was read his *Miranda* rights; the
> individualized characteristics of the defendant (*i.e.*, age,
> intelligence level, education, mental state); interrogation
> conditions (*i.e.*, duration, environment, access to restroom
> facilities and food); and the conduct of law enforcement
> officers (*i.e.*, use of physical punishment). *See generally*
> *Schneckloth*, 412 U.S. at 226, [ ] *quoted in Dickerson*, 530
> U.S. at 434 [ ].

23

*Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004) (some internal quotation marks and citations omitted); *see also Hardaway*, 302 F.3d at 732 ("The voluntariness of a confession . . . is evaluated on the basis of the totality of the circumstances surrounding that confession.") (citing *Schneckloth*, 412 U.S. at 226). This is precisely the test articulated by the state supreme court.  Exhibit L at 21.

Second, the state supreme court's decision was not an unreasonable application of clearly established federal law.  The state supreme court analyzed the facts in detail and reasonably concluded that, under the totality of the circumstances, petitioner's statements were freely made.  Although petitioner was 14 years old at the time, he was an average student with normal reading, writing, and verbal skills.  Petitioner was not physically or mentally abused during his custody, and the police did not make any threats or promises.  Petitioner was not handcuffed at the police station.  Petitioner was given *Miranda* warnings before each of his two interviews, and he indicated that he understood those rights.  The interrogation was relatively brief.  The state court's conclusion that petitioner's confession was voluntary was not objectively unreasonable. *Yarborough*, 540 U.S. at 5; *see also Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (state court decision is reasonable "if it is minimally consistent with the facts and circumstances of the case").  Accordingly, the state court's decision that petitioner's custodial statements were voluntary should not now be overturned.

24

## C.    Knowing and Intelligent Waiver

Petitioner also argues that he did not knowingly and intelligently waive his *Miranda* rights.  Pet. at 15-16.  Waiver of rights "may be inferred from [a] defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Sweeney v. Carter,* 361 F.3d 327, 331 (7th Cir. 2004).  Whether a defendant knowingly and intelligently waived his *Miranda* rights is a factual determination, and state court findings on this issue are presumed correct.  *Quadrini v. Clusen,* 864 F.2d 577, 582 (7th Cir. 1989); *Duffin v. United States,* No. 06-1026, at 6 (C.D. Ill. July 24, 2008).

Here, the state supreme court agreed with the trial court that petitioner's "waiver of *Miranda* was knowingly and intelligently made."  Exhibit L at 22. Petitioner was informed of his *Miranda* rights.  Petitioner knew he had the right to remain silent because at one point he refused to answer Harberts's question concerning petitioner's thoughts of killing others.  *Id.* at 21.  Petitioner's pastor testified that petitioner was intelligent and did well in school.  *Id.* at 23.  The supreme court noted that petitioner wanted to tell the police what had happened. The court thus determined that petitioner understood his *Miranda* rights and intelligently waived them.  *Id.*  Under the facts of this case, the state court's decision was reasonable.  *See Watson v. Hulick,* 481 F.3d 537, 542-43 (7th Cir. 2007) (state court's decision was reasonable where nothing in the record suggested the

25

petitioner did not knowingly and intelligently waive his *Miranda* rights). Petitioner

has not overcome the presumption of correctness to which the state court's finding

is entitled.

### D.    Prior violent conduct testimony

Next, petitioner argues that he was denied due process and his Sixth

Amendment right to present a defense when the trial court excluded testimony of

his mother (Glenda) and Dr. Hart regarding alleged prior violent conduct of

Glenda's parents, Keith and Lila. Pet. at 18. Following jury selection, but prior to

the commencement of trial, the State moved to exclude Glenda's testimony

concerning the physical and emotional abuse she suffered as a child from Keith and

Lila. Exhibit L at 28. Additionally, the State objected to any testimony concerning

Dr. Hart's interview with Glenda regarding the abuse. After the trial court

sustained the objection, petitioner presented a written offer of proof of Glenda's

testimony. In the offer of proof, Glenda detailed numerous instances of abuse

during her childhood, including: beatings with a belt or razor strap; Keith and Lila

constantly calling her stupid; spankings by Lila with a yardstick or flyswatter; and

Keith threatening to kill Glenda if she resisted the beatings. *Id.* at 29. In the offer

of proof concerning Dr. Hart's testimony, Dr. Hart testified, among other things,

that Glenda's physical and psychological mistreatment by her parents brought her

to the point of considering suicide. *Id.*

The state supreme court reversed the appellate court's ruling that the trial

court erred in excluding Glenda and Dr. Hart's testimony relating to Lila and

26

Keith's past conduct. The supreme court noted that a trial court may reject

evidence on the grounds of relevancy if the evidence is remote, uncertain or

speculative. Exhibit L at 30. Specifically, supreme court analyzed this claim as

follows:

> Here, . . . Jon was allowed to testify concerning his
> grandparents' aggressive and violent character. Jon also
> testified concerning how his knowledge of that violent and
> aggressive character affected his perceptions of and reactions
> to his grandparents' behavior after he fired the gun at the
> Tilex bottle. Jon claimed that when he saw Keith coming
> toward him, he thought Keith was going to beat him to death,
> and shot Keith "[s]o he couldn't get to me." Jon further
> claimed that he shot Lila because "[s]he was just as
> dangerous as my grandpa" and because Keith would never
> beat Jon without Lila forcing him into it. The trial jury
> apparently found Jon to be credible, as the jury found Jon
> guilty of second degree murder with respect to Keith.
>
> Although the appellate court claimed that the testimony of
> Glenda and Dr. Hart was not offered for either of the two
> purposes permitted by [*People v. Lynch,* 470 N.E.2d 1018
> (1984)], the testimony clearly was offered to corroborate Jon's
> claim of self-defense. With that in mind, we fail to see how
> Glenda's testimony concerning her childhood many years
> earlier was relevant to Jon's claim of self-defense. Under
> *Lynch,* one of the purposes for which the Cearlocks' violent
> and aggressive character could be introduced was to show
> how Jon's knowledge of their character affected his
> perceptions and reactions. Because there was no testimony
> that Jon was aware of his mother's childhood experiences,
> however, testimony concerning Glenda's childhood could not
> have affected Jon's perceptions and reactions.
>
> Likewise, the other purpose for which evidence of a victim's
> propensity for violence can be admitted under *Lynch* is to
> support a defendant's version of events where there are
> conflicting accounts of what happened. Here, too, the account
> of Glenda's childhood was not relevant to Jon's claim of self-
> defense because there were no conflicting accounts of what

had happened.  In fact, all accounts of what had happened
were based upon Jon's statements and testimony.

As noted, relevant evidence must have a tendency to make
the existence of any fact that is of consequence to the
determination of an action either more or less probable than
it would be without the evidence.  We agree with the trial
court that any nexus between testimony concerning Glenda's
childhood and Jon's claim of self-defense was remote at best.
Indeed, with regard to Lila, we fail to see how the information
concerning Glenda's childhood was relevant at all.

When Lila saw Jon with the gun, she screamed and began to
run out of the house, at which point Jon shot her in the back.
Jon then followed Lila as she made it out of the house, and
attempted to shoot her some more when she fell face forward
into the grass, but his gun jammed.  Jon then went inside the
house to look for Lila's gun, so that he could go back outside
and continue shooting her.  We find no nexus between
Glenda's childhood and Jon's pursuit of a fleeing Lila.  Even if
Jon feared Lila because she goaded Keith into beating Jon,
that threat had been removed when Keith was shot first.

Under the circumstances, we disagree with the appellate
court that the testimony of Glenda and Dr. Hart should have
been admitted to corroborate Jon's account of life in the
Cearlock home.

Exhibit L  at 30-31.

Petitioner has procedurally defaulted his due process/Sixth Amendment right
to present a defense claim because, as shown below, he did not fairly present it as a
federal constitutional claim to the state courts.  A federal court may not address the
merits of a claim brought in a habeas petition unless the state courts were given a
full and fair opportunity to review the claim.  *O'Sullivan v. Boerckel*, 526 U.S. 838,
845 (1999).  In order to preserve a claim for federal habeas review, a state prisoner

28

must present the federal constitutional claim through one complete round of the state's established appeals process.  *Id.* at 845-49.

In addition to presenting a claim fully to the state courts, a habeas petitioner must also have *fairly* presented the claim at each level of state court review.  The fair presentment doctrine requires a petitioner to alert the state court to the federal nature of his claim — by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal" — to give the court an opportunity to correct the claimed constitutional error.  *See Baldwin v. Reese*, 541 U.S. 27, 29, 32 (2004).  A petitioner who exhausts his state court remedies without properly asserting his federal claim at each level of state court review procedurally defaults that claim.  *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004).

A petitioner can avoid procedural default only if he can show (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Steward v. Gilmore*, 80 F.3d 1205, 1211-1212 (7th Cir. 1996).  To demonstrate "cause," the petitioner must show that "some objective factor external to the defense impeded [his] efforts" to pursue his claim in state court.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  And to satisfy the "prejudice" component, the petitioner "must 'shoulder the burden of showing . . . that the errors at his trial . . . worked to his actual and substantial

29

disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1050 (7th Cir. 2001) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis omitted).

The "fundamental miscarriage of justice" exception is limited to the "extremely rare" and "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see also House v. Bell*, 547 U.S. 518, 537 (2006). A petitioner who asserts "actual innocence" to excuse a procedural default "must *demonstrate* innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d 623, 627 (7th Cir. 2003) (emphasis original).

Here, petitioner failed to fairly present his due process/Sixth Amendment claim in the state courts. In his briefs to the state appellate and supreme courts, petitioner raised only a state law claim regarding the relevancy of the evidence. *See* Exhibits C & I. Petitioner did not raise a due process/Sixth Amendment right to present a defense claim, and cited only state law. *Id.* Moreover, the state courts decided the claim solely on state law with no mention of federal constitutional concerns. *See* Exhibits B & L. Accordingly, this claim is procedurally defaulted because petitioner failed to alert the state courts to the federal nature of his claim. *See Baldwin,* 541 U.S. at 29; *Lewis*, 390 F.3d at 1026.

Petitioner does not assert and cannot show cause and prejudice for this default. This claim was available to petitioner during his direct appeal, but petitioner simply failed to raise a federal constitutional claim. Nothing in the record shows any external factor that impeded petitioner from raising this claim as a federal claim in the state courts. Accordingly, he is not entitled to relief on this claim.

Moreover, the claim petitioner did raise in state court — that the trial court erred in excluding this evidence under state evidentiary law — is not cognizable on collateral review. *Perruquet v. Briley,* 390 F.3d 505, 511 (7th Cir. 2004) (because state court evidentiary rulings turn on state law, they are beyond the scope of federal habeas review). For these reasons, petitioner is not entitled to habeas relief on this claim.

### E.    Second degree murder instructions

Next, petitioner argues that he was denied due process under the Fourteenth Amendment when the trial court refused to give the jury second degree murder instructions as to the felony murder counts (counts V through VIII). Pet. at 23. The state supreme court rejected this claim on direct appeal:

> The primary rule in statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Hickman,* 163 Ill.2d 250, 261, 206 Ill.Dec. 94, 644 N.E.2d 1147 (1994). In addition, courts must give the language of a statute its plain and ordinary meaning. *People v. Tucker,* 167 Ill.2d 431, 435, 212 Ill.Dec. 664, 657 N.E.2d 1009 (1995). Here, the second degree murder statute states that a defendant commits second degree murder when he commits first degree murder as set forth in sections 9-1(a)(1) or (a)(2) of the Code

31

and certain mitigating factors are present.  Nowhere does the second degree murder statute reference section 9-1(a)(3) of the Code, felony murder.

In addition, in construing a legislative act, courts should consider each section in connection with other sections.  *Bubb v. Springfield School District 186,* 167 Ill.2d 372, 382, 212 Ill.Dec. 542, 657 N.E.2d 887 (1995).  Section 9-1(a)(3) of the Code states that a person commits first degree murder if in performing the acts which caused the death, "he is attempting or committing a forcible felony *other than second degree murder*."  (Emphasis added.)  720 ILCS 5/9-1(a)(3) (West 1996).  It would be anomalous, then, to give a second degree murder instruction with regard to a charge of felony murder.  Pursuant to the plain language of the statute, it is clear that the provocation defense of second degree murder is not available to a charge of felony murder.  Accordingly, we reverse the appellate court's finding that a second degree murder instruction should have been given on the charges of felony murder, and affirm the trial court's order declining to give that instruction.

Exhibit L at 28.

Petitioner failed to fairly present this as a federal claim in the state courts.

In his brief to the state appellate court, petitioner raised only a state statutory

claim that the trial court erred in granting the State's motion to bar second degree

murder instructions.  *See* Exhibits C.  Petitioner did not specifically raise his claim

of the denial of his Fourteenth Amendment right to due process and a fair trial.  *Id.*

Moreover, in his brief to the state supreme court, petitioner based his claim only on

the state's murder statutes, namely 720 ILCS 5/9-1(a) and 720 ILCS 5/9-2.  *See*

Exhibit I.  Further, the state supreme court's decision, as shown above, rested solely

on "[t]he primary rule in statutory construction" with no discussion of federal due

32

process concerns.  Exhibit L at 28.  Accordingly, this claim is procedurally

defaulted.  *See Baldwin,* 541 U.S. at 29; *Lewis*, 390 F.3d at 1026.

Procedural default aside, the state court's decision was not contrary to, or an

unreasonable application of, federal law because petitioner can point to no clearly

established Supreme Court precedent that states that there is a federal

constitutional right to have the jury instructed on second degree murder when

charged with felony murder.  *See Wright v. Van Patten,* 128 S.Ct. 743, 747 (2008)

(per curiam) (because there are no Supreme Court cases that clearly answer the

question presented, "it cannot be said that the state court 'unreasonabl[y] appli[ed]

clearly established Federal law'") (citing *Carey v. Musladin,* 127 S.Ct. 649, 654

(2006)); *Calloway v. Montgomery,* 512 F.3d 940, 944 (7th Cir. 2008) (denying habeas

relief because no clearly established Supreme Court precedent holds that a

defendant is entitled to a jury instruction on involuntary manslaughter).  To the

contrary, the Supreme Court has held that state trial courts are not constitutionally

required to instruct juries on offenses that are not lesser-included offenses of the

charged crime under state law.  *Hopkins v. Reeves,* 524 U.S. 88, 96-97 (1998).

*Reeves* held that Nebraska was not constitutionally required to give an instruction

on second degree murder because, under state law, second degree murder was not a

lesser-included offense of felony murder.  *Id.*  So too here.  The Illinois Supreme

Court held that under Illinois law, second degree murder instructions should not be

given when instructing the jurors on felony murder.  Under *Reeves,* this holding wsa

33

constitutionally permissible.  Accordingly, because petitioner cannot show clearly established Supreme Court precedent for his claim, he is not entitled to habeas relief on it.

**F.    Felony murder charges**

Next, petitioner argues that he was denied due process under the Fourteenth Amendment when the trial court refused to dismiss the felony murder charges which were based on the predicate felonies of aggravated battery and aggravated discharge of a firearm.  Pet. at 28.  Petitioner contends that by charging him with felony murder, the State deprived him of his right to present a second degree murder defense as to Lila.  Pet. at 31.

The state supreme court agreed that the trial court erred in instructing the jury on felony murder because the predicate felonies arose from, and were inherent in, the murder of Keith and Lila.  Exhibit L at 26.  However, the supreme court disagreed that the error constituted reversible error.  The supreme court noted that although petitioner was charged with two types of first degree murder [(1) knowing or intentional murder, and (2) felony murder], only general verdicts were used by the jury.  The supreme court then stated that when a general verdict is used and the defendant is charged with intentional, knowing, and felony murder, it is presumed that the jury found the defendant guilty of the most serious crime alleged, i.e., intentional murder.  *Id.*  Thus, the supreme court held that any error in instructing the jury on felony murder in this case was harmless because of the

presumption that petitioner was found guilty of knowing or intentional murder, not

felony murder.  With respect to the harmless analysis, the supreme court explained:

> In this case, although the jury was instructed that Jon had
> been charged with two types of first degree murder, knowing
> or intentional murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 1996))
> and felony murder (720 ILCS 5/9-1(a)(3) (West 1996)), only
> general verdict forms were used at Jon's trial.  The jury
> received three verdict forms for each victim: (1) not guilty; (2)
> guilty of first degree murder; and (3) guilty of second degree
> murder.  It is well settled that "'where an indictment contains
> several counts arising out of a single transaction, and a
> general verdict is returned[,] the effect is that the defendant is
> guilty as charged in each count * * *.'" *People v. Thompkins,*
> 121 Ill.2d 401, 455, 117 Ill.Dec. 927, 521 N.E.2d 38 (1988),
> quoting *People v. Lymore,* 25 Ill.2d 305, 308, 185 N.E.2d 158
> (1962).  Thus, a general verdict finding a defendant guilty of
> murder, where the defendant was charged with intentional,
> knowing, and felony murder, raises the presumption that the
> jury found the defendant committed the most serious crime
> alleged, intentional murder.  *Thompkins,* 121 Ill.2d at 456, 117
> Ill.Dec. 927, 521 N.E.2d 38.  In this case then, we must
> presume that the jury found Jon guilty of the most serious
> crime alleged, intentional or knowing murder, so that any
> error in instructing the jury on felony murder did not deprive
> Jon of a fair trial.  We therefore reverse the appellate court's
> finding that Jon's conviction must be reversed and remanded
> for a new trial.
>
> As a final matter, we note that our presumption that the jury
> found Jon guilty of intentional or knowing murder rather than
> felony murder is supported by the fact that the jury found Jon
> guilty of the second degree murder of Keith Cearlock.  As more
> fully set forth below, second degree murder instructions were
> given only on the charges of intentional or knowing murder
> and not on the felony murder charges.  Consequently, in
> convicting Jon of second degree murder, the jury must have
> believed that Jon was guilty of the intentional or knowing
> murder of Keith, but that one of the mitigating defenses set
> forth in the second degree murder statute was present.  *See*
> 720 ILCS 5/9-2(a)(1), (a)(2) (West 1996)).  The jury therefore
> rejected the State's felony murder theory as to Keith.

35

> Had the jury believed that Jon was guilty of first degree felony murder with regard to Lila, it would have followed that Jon was guilty of first degree felony murder with regard to Keith. The charges as to both Keith and Lila were identical. The felony murder charges were based upon the predicate felonies of aggravated battery and aggravated discharge of a firearm, felonies which were inherent in both killings. Thus, if the jury believed that the killing of Lila occurred while Jon was attempting or committing aggravated battery or aggravated discharge of a firearm, it would follow that Jon also killed Keith while attempting or committing aggravated battery or aggravated discharge of a firearm. Because the jury instead found Jon guilty of second degree murder with regard to Keith, we see no reason to disregard the presumption that Jon was found guilty of intentional murder with regard to Lila.

Exhibit L at 26-27.

Petitioner failed to fairly present his federal due process claim in the state courts. There, petitioner argued that he could not be found guilty of felony murder because the predicate felonies of aggravated battery and aggravated discharge of a firearm merged with the intentional and knowing murder charges. *See* Exhibits C & I. Petitioner failed to specifically raise a claim of the denial of his Fourteenth Amendment right to due process and a fair trial. *Id.* The state supreme court's decision rested on state law precedent regarding felony murder, with no discussion of federal due process concerns. Exhibit L at 25-26. Accordingly, this claim is procedurally defaulted. *See Baldwin,* 541 U.S. at 29; *Lewis*, 390 F.3d at 1026.

Petitioner does not assert and cannot show cause and prejudice for this default. This claim was available to petitioner during his direct appeal, but petitioner simply failed to raise a federal constitutional claim. Nothing in the record shows any external factor that impeded petitioner from raising this claim as

36

a federal claim in the state courts.  Accordingly, he is not entitled to relief on this claim.

Procedural default aside, the state supreme court reasonably concluded that any error in instructing the jury on felony murder was harmless.  The harmless error test that is applied on collateral review was articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), where the Court held that collateral relief is proper only if an error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Fry v. Pliler,* 127 S.Ct. 2321, 2327 (2007); *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003).  The *Brecht* standard is "less stringent" than the harmless-error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967), which is applied on direct, rather than collateral, review.  *See Brecht*, 507 U.S. at 643 (Stevens, J., concurring); *Aleman*, 320 F.3d at 690.  Here, the jury was not materially influenced by the felony murder instruction because, as the state supreme court held, the jury found petitioner guilty of second degree murder of Keith.  This means that it found the elements of knowing or intentional murder proved as to Keith.  This finding as to Keith would logically apply to Lila because the charges were identical.  The state supreme court explained:

> The felony murder charges were based upon the predicate felonies of aggravated battery and aggravated discharge of a firearm, felonies which were inherent in both killings.  Thus, if the jury believed that the killing of Lila occurred while Jon was attempting or committing aggravated battery or aggravated discharge of a firearm, it would follow that Jon also killed Keith while attempting or committing aggravated battery or aggravated discharge of a firearm.

Exhibit L at 27. The state supreme court's harmlessness holding was reasonable. Accordingly, petitioner is not entitled to relief on this claim.

### G.   Ineffective assistance of trial and appellate counsel

Finally, petitioner contends that he was denied effective assistance of trial and appellate counsel because they failed to argue that petitioner's consecutive sentences were improper. Pet. at 32-33. These claims are procedurally defaulted.

Here, petitioner failed to present his ineffective assistance claims through one complete round of the state's established appeals process. Petitioner never raised these claims during his direct appeal proceedings. In his amended postconviction petition — Exhibit N — petitioner raised ineffective assistance of trial and appellate counsel claims but failed to raise those claims on postconviction appeal. *See Cawley v. DeTella*, 71 F.3d 691, 694 (7th Cir. 1995) (failure to appeal claims raised in postconviction petition constitutes default on federal habeas review). On postconviction appeal, petitioner raised only two arguments: (1) his consecutive sentences were not authorized under Illinois law; and (2) his postconviction counsel rendered ineffective assistance. *See* Exhibit P at 6. In its order affirming the dismissal of petitioner's postconviction petition, the appellate court addressed petitioner's consecutive sentencing claim under Illinois statute and case law, not as a *Strickland* claim. *See* Exhibit S at 7-9. Although petitioner raised an ineffective assistance of *postconviction* counsel claim, that is a different claim than the one he is bringing now. In any event, to the extent his instant ineffective assistance of counsel claim includes postconviction counsel, it is well

38

settled that such a claim is not cognizable on federal habeas review and cannot supply "cause" to excuse his procedural default.  *See* 28 U.S.C. § 2254(i); *see also Steward v. Gilmore,* 80 F.3d 1205, 1212 (7th Cir. 1996) ("[i]neffective assistance of postconviction counsel is not itself a cognizable federal constitutional violation and may not serve as a cause for a procedural default").

Further, this claim of ineffective assistance of trial and appellate counsel is procedurally defaulted because petitioner failed to raise it in his postconviction PLA.  *See Guest*, 474 F.3d at 930 (to avoid procedural default "a petitioner must have [ ] appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court").  In his postconviction PLA, petitioner raised only the same two arguments he made in his appeal to the appellate court.  *See* Exhibit T at 2.  Accordingly, because the state courts were not given a full and fair opportunity to review petitioner's ineffective assistance of counsel claims, they are procedurally defaulted.

Petitioner has failed to allege or demonstrate cause and prejudice for the default, or that failure to consider these claims will result in a fundamental miscarriage of justice.  There was no external factor that impeded his bringing the claims in the state courts.  Indeed, petitioner did allege ineffective assistance of trial and appellate counsel — albeit vaguely — in his amended postconviction petition.  Yet petitioner abandoned these claims on appeal and in his PLA, resulting in procedural default of these claims.

39

## <u>CONCLUSION</u>

This Court should deny petitioner's petition for writ of habeas corpus. If this Court holds that any of petitioner's claims that were not answered on the merits are not procedurally defaulted, respondent requests 30 days from this Court's order in that regard to answer them.

August 13, 2008                         Respectfully submitted,

                                        LISA MADIGAN
                                        Attorney General of Illinois

                               By:      /s/ Dale M. Park
                                        DALE M. PARK, Bar # 6280822
                                        Assistant Attorney General
                                        100 W. Randolph Street, 12th Floor
                                        Chicago, Illinois 60601-3218
                                        PHONE: (312) 814-2197
                                        FAX: (312) 814-2253
                                        EMAIL: dpark@atg.state.il.us

## CERTIFICATE OF SERVICE

I certify that on August 13, 2008, I electronically filed respondent's **Answer To Petition For Writ Of Habeas Corpus** with the Clerk of the United States District Court for the Central District of Illinois, Springfield Division, using the CM/ECF system, and on the same date mailed copies of this document via the United States Postal Service to the following non-CM/ECF user:

Jon Roe Morgan, #K60696
Menard Correctional Center
711 Kaskaskia Street
P.O. Box 711
Menard, IL 62259

/s/ Dale M. Park
DALE M. PARK, Bar # 6280822
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-2197
FAX: (312) 814-2253
EMAIL: dpark@atg.state.il.us

E-FILED
Wednesday, 13 August, 2008  03:00:21 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

---

| | | |
|---|---|---|
| JON ROE MORGAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08-3118 |
| | ) | |
| DONALD HULICK, Warden, | ) | |
| Menard Correctional Center, | ) | The Honorable |
| | ) | Jeanne E. Scott, |
| Respondent. | ) | Judge Presiding. |

---

### INDEX OF EXHIBITS CITED IN RESPONDENT'S ANSWER

Exhibit A:  Judgment, *People v. Morgan,* No. 95 CF 101;

Exhibit B:  Opinion, *People v. Morgan*, No. 4-96-0996, 718 N.E.2d 206 (Ill.App. 1999);

Exhibit C:  Pet. Br., *People v. Morgan,* No. 4-96-0996;

Exhibit D:  State Br., *People v. Morgan,* No. 4-96-0996;

Exhibit E:  Pet. Reply Br., *People v. Morgan,* No. 4-96-0996;

Exhibit F:  State PLA, *People v. Morgan*, No. 88508;

Exhibit G:  Pet. PLA, *People v. Morgan,* No. 88513;

Exhibit H:  State Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit I:  Pet. Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit J:  State Reply Br., *People v. Morgan*, Nos. 88508 & 88513;

Exhibit K:  Pet. Reply Br., *People v. Morgan,* Nos. 88508 & 88513;

Exhibit L:  Opinion, *People v. Morgan,* 758 N.E.2d 813 (Ill. 2001);

Exhibit M:    Postconviction Petition, *People v. Morgan,* No. 95 CF 101;

Exhibit N:    Amended Postconviction Petition, *People v. Morgan,* No. 95 CF 101;

Exhibit O:    Docket Sheet, *People v. Morgan,* No. 95 CF 101;

Exhibit P:    Pet. Br., *People v. Morgan,* No. 4-05-0009;

Exhibit Q:    State Br., *People v. Morgan,* No. 4-05-0009;

Exhibit R:    Pet. Reply Br., *People v. Morgan,* No. 4-05-0009;

Exhibit S:    Rule 23 Order, *People v. Morgan,* No. 4-05-0009 (Ill.App. 2007);

Exhibit T:    PLA, *People v. Morgan*, No. 105718; and

Exhibit U:    Order Denying PLA, *People v. Morgan*, No. 105718.


Respectfully Submitted,

LISA MADIGAN
Attorney General of Illinois

By:    /s/ Dale M. Park
       DALE M. PARK, Bar # 6280822
       Assistant Attorney General
       100 W. Randolph Street, 12th Floor
       Chicago, Illinois 60601-3218
       PHONE: (312) 814-2197
       FAX: (312) 814-2253
       EMAIL: dpark@atg.state.il.us

E-FILED
Wednesday, 13 August 2008 03:01:10 PM
Clerk, U.S. District Court, ILCD

FILED

SEP 2 0 1996

Carla Bender
Clerk Of The Circuit Court
Logan County, Illinois

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
LOGAN COUNTY, LINCOLN, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,

                              Plaintiff

    VS.                                                     No. *95CF101*

Jon R. Morgan

                              Defendant

## JUDGMENT OF GUILTY
## AND
## ORDER SETTING SENTENCING HEARING AND FOR PRESENTENCE REPORT

Now on this _20th_ day of _September_, 19 _96_, the (Court) (Jury) having returned a (finding) (verdict) that the defendant _Jon R. Morgan_ is Guilty of the offense(s) of _1st Degree Murder as to Lila Gearlock_ _2nd Degree Murder as to Keith Gearlock_

It is, therefore, ORDERED AND ADJUDGED that the defendant _Jon R. Morgan_ is Guilty of _1st Degree Murder as to Lila Gearlock_ _2nd Degree Murder as to Keith Gearlock_ as charged in the (Indictment) (Information) (Complaint).

It is FURTHER ORDERED:
1.  Sentencing hearing shall be held _Nov. 7_, 19 _96_ at _1:30_ o'clock _P_m.;
2.  The Probation Officer shall prepare a presentence report in accordance with Article 3 of the Unified Code of Corrections;
3.  In addition to the matters to be included in the report under 730 ILCS 5/5-3-2, the report shall include:

ENTER: _9-20_, 19 _96_

_____
                              JUDGE

### RECEIPT AND ACKNOWLEDGMENT BY DEFENDANT

I, _____, defendant, acknowledge receipt of a true copy of this Judgment and Order. I understand that IT IS MY RESPONSIBILITY TO CONTACT the Probation Officer in person or by telephone within three (3) days of this date to arrange an appointment so that the Probation Officer may interview me to obtain information for the presentence report. The Probation Office is located on the first floor of Logan County Courthouse, Telephone No. (217) 732-2106.

_____
        (Street)

_____
(City)          (State)          (Zip)

_____
    (Area Code)   (Telephone No.)

Dated: _____, 19 ____

_____
                    (Signature)

EXHIBIT A

E-FILED
Wednesday, 13 August, 2008 03:02:16 PM
Clerk, U.S. District Court, ILCD



NO. 4-96-0996

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>　　　　　Plaintiff-Appellee,<br>　　　　　v.<br>JON R. MORGAN,<br>　　　　　Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from<br>Circuit Court of<br>Logan County<br>No. 95CF101<br><br>Honorable<br>Gerald G. Dehner,<br>Judge Presiding. |

JUSTICE GARMAN delivered the opinion of the court:

Defendant Jon R. Morgan was tried as an adult and convicted after a jury trial in the circuit court of Logan County of the first degree murder (720 ILCS 5/9-1(a) (West 1994)) of his grandmother and the second degree murder (720 ILCS 5/9-2(a)(1) (West 1994)) of his grandfather. He was sentenced to consecutive terms of imprisonment totalling 75 years. On appeal, he argues the trial court erred by (1) granting the State's motion to try him as an adult; (2) admitting certain statements into evidence; (3) excluding testimony regarding prior violent conduct by the victims; (4) refusing to dismiss the felony murder counts; and (5) refusing to give an instruction on second degree murder as to the felony murder counts. We affirm in part and reverse in part.

I. BACKGROUND

On an April day in 1995, 14-year-old Jon was late to class and received an in-school detention. According to Jon, he was asleep at about 6:30 p.m. on April 27, 1995, when his grandfather, Keith Cearlock, awakened him and demanded an explanation for

EXHIBIT B

the notice of detention he had received.  Keith berated Jon for 10 to 15 minutes.  Jon yelled back.  Keith punished Jon by having him bend over while Keith beat him on the buttocks with a razor strap. After enduring five strong blows, Jon went into the bathroom.  He knew where Keith kept a gun and decided to get the gun to kill himself.  Jon took a gun and box of ammunition from Keith's bedroom closet shelf, returned to the bathroom, loaded eight bullets into the gun, took aim, and fired at a bottle.  Because his grandfather had threatened in the past to kill him, he believed his firing the gun would provoke Keith to carry out the threat.  As Jon left the bathroom, he encountered Keith coming toward him and shot him. Lila Cearlock, his grandmother, was standing in the hallway scream-ing.  Jon shot Lila in the back as she ran out of the house.  He tried to fire another shot, but the gun jammed.

The Lincoln police department responded to an emergency call to the Cearlocks' address.  Minutes later, Jon approached one of the officers, holding a pistol and a box of bullets, saying, "I did it.  I killed them."  The officer took Jon to Michael Harberts, the officer in charge, who asked him why he did it.  Jon said, "[B]ecause they pissed me off.  I couldn't take it anymore so I shot them."  Jon was placed under arrest.

This case was originally filed in the juvenile court of Logan County.  The State filed a petition, pursuant to section 5-4 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-4 (West 1994)), seeking to have Jon tried as an adult.  The juvenile court granted the State's petition after a hearing.

Jon was subsequently indicted on eight counts.  Counts I and II charged first degree murder of Lila and Keith, respectively,

- 2 -

with intent to kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 1994)); counts III and IV charged first degree murder of Lila and Keith, respectively, by knowingly committing an act causing great probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1994)); counts V and VII (Lila) and VI and VIII (Keith) charged first degree murder by attempting or committing a forcible felony (720 ILCS 5/9-1(a)(3) (West 1994)). The predicate felony for counts V and VI was aggravated battery (720 ILCS 5/12-4(a) (West 1994)), and the predicate felony for counts VII and VIII was aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1994)).

Defense counsel filed a motion to suppress certain statements made by Jon to the police at the crime scene and while in custody. The motion was denied after a hearing.

After defense counsel disclosed his intent to raise the affirmative defense of self-defense (720 ILCS 5/7-1 (West 1994)) and the mitigating factor of "sudden and intense passion resulting from serious provocation" (720 ILCS 5/9-2(a)(1) (West 1994)), the State sought to bar second degree murder instructions as to the felony murder counts. The trial court initially denied the motion, but later reversed its ruling. The trial court thereafter denied Jon's motion to dismiss the four counts of felony murder.

At trial, the State sought to preclude Glenda Ashworth, Jon's mother, and Dr. Stuart Hart, defense expert, from testifying regarding prior violent conduct of the Cearlocks. The trial court ruled in favor of the State and the defense made offers of proof.

The trial court instructed the jury on second degree murder (720 ILCS 5/9-2(a) (West 1994)) as to counts I through IV.

- 3 -

The jury found Jon guilty of first degree murder as to Lila and second degree murder as to Keith. Jon was sentenced to consecutive terms of 58 and 17 years' imprisonment, respectively.

## II. ANALYSIS

### A. Transfer to the Adult Criminal Justice System

The material in this section is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

[The following material is not to be published pursuant to Supreme Court Rule 23.]

#### 1. Summary of Evidence

The transfer hearing occupied three days of testimony. Witnesses were Michael Harberts (detective sergeant, Lincoln police department), Thomas Edward Bryant (associate pastor and school principal, Park Meadows Baptist Church and Academy), Kim Turner (Logan County juvenile probation officer), Eric Gill (a Park Meadows student), Robert L. Spickard (a Logan County sheriff's deputy), Darrell Sisk (juvenile officer, Lincoln police department), and Glenda Ashworth (Jon's mother).

Harberts testified that, as he was investigating the crime scene, another officer brought Jon to him stating that Jon had admitted the shootings. Harberts asked Jon why he had done it and he responded, "'[B]ecause they pissed me off. I couldn't take it anymore, so I shot them.'"

Harberts also testified regarding his questioning of Jon at the police station. Jon admitted shooting his grandfather when he saw him in the hallway. According to Harberts, Jon said he shot his grandmother as she ran out the front door and "chased her[,] attempting to pull the trigger and shoot her more times, but [the

- 4 -

gun] began malfunctioning." Jon told Harberts he went back into the house and kicked in the locked door to his grandmother's bedroom. According to Harberts, Jon stated he was looking for a pistol he knew she kept there so that "he could shoot his grandmother some more." He felt the "urge" to change his clothes and, then, left the house by the back door, jumping the fence on his way to a friend's house. Jon felt he needed to tell his friend what had happened. As he walked, he tried to get the gun "unjammed" and accidently fired the gun twice, narrowly missing his head. After learning that his friend was not at home, Jon returned to his grandparents' house to "give himself up."

Harberts testified he asked Jon if he had ever thought about killing his grandparents and, if so, how he would do it. Jon responded that he "thought about it a few times" and that he would use a gun because there were guns in the house.

Harberts explained that he interviewed Jon a second time because the tape recorder malfunctioned and did not record the interrogation summarized above. The tape of the second interrogation was played at the transfer hearing. On the tape, Jon stated that after he shot his grandmother and chased her out of the house, his gun jammed. He was trying to get it unjammed as he came back into the house. Harberts asked him what he intended to do if he got the gun unjammed. Jon answered, "I don't know. I don't know what I would have done." Harberts asked, "Do you have any idea?" Jon responded, "No, sir." Jon also described searching for another gun in his grandmother's bedroom, but did not indicate that he wanted the gun for the purpose of shooting her again. Jon again explained that he went back to the house because he wanted to give himself up.

He gave the gun and ammunition to the officer and admitted shooting his grandparents "cause they pissed me off. I was upset and sick and tired of being treated the way I was. I couldn't take it anymore." He admitted that he had previously thought about killing them approximately three or four times in the preceding several months. He thought "somewhat" about how he would do it. He thought about using a gun, but not about which gun he might use. That night, he made "a spur of the moment" decision to use his grandfather's gun. Harberts asked about thoughts of killing other people, and Jon replied, "I don't want to talk about that any more."

Jon also agreed to participate in a "walk-through" of the crime scene with Harberts on the evening of his arrest. A videotape of the walk-through was played for the juvenile court. Jon also showed the officers the route he had taken to his friend's house. He was cooperative with requests for blood tests for drugs and alcohol and for photographs taken in his underwear.

Harberts further testified that the pastor of the Cearlocks' church contacted him with information regarding Jon and his grandparents. The pastor stated that after Jon's expulsion from the church school, he asked Keith how Jon was doing. Keith replied that Jon was not doing very well. Harberts testified:

> "[Keith] told Pastor Davis that *** Lila was in
> fear of physical danger from Jon. They were
> afraid that he was going to harm her, and
> [Keith] indicated to the pastor that he said
> that he told Jon *** if you hit me first, I'm
> not going to hit you back, but I'm getting you
> in your sleep."

- 6 -

On cross-examination, Harberts described Jon's demeanor throughout his questioning as "[v]ery calm" and "[v]ery coopera-tive."  During "the entire six hours that I was *** with him[,] he showed absolutely no emotion at any time."

Bryant testified that, in February, he waited in his car while several students from the school spoke to Jon at his grandpar-ents' home to try to persuade him to return to school after his suspension for kissing a girl.  Two of the students told Bryant when they came out of the house that Jon refused, saying, "I have been hurt all my life.  I'm not going to be hurt anymore.  From now on[,] I will do the hurting."  When Bryant met with Jon to discuss the terms of in-school suspension,  Jon refused to comply with the terms, and Bryant told him he would be expelled.  Bryant testified:

> "I think I said, my words were, Jon, don't turn
> your back on God, and he looked up at me and he
> said, Brother Bryant, I intend to commit every
> sin that I want to commit.  I'm going to do
> anything and everything I want to do, and when
> I hit rock bottom, then I will call on God, and
> at that point, he got up and walked out the
> door."

On cross-examination, Bryant explained that several incidents preceded Jon's expulsion from school.  He kissed a girl and, although the kiss did not take place at church or school, it alone would have been grounds for expulsion.  He also brought a "Playboy type" magazine to a basketball game in his duffel bag.

Bryant also testified that Jon was an angry boy who felt rejected by his mother and father.  He usually handled his anger by

- 7 -

clenching his fists and tightening his jaw and "kind of like ***
gulp[ing] down." He explained that the terms of Jon's suspension
would have required him to read a book about a missionary and write
a report on it, view 45 to 50 videotapes of preaching and take notes
on each one, and to be completely isolated from other students
during the suspension. Jon did not object to viewing the video-
tapes, but refused to read the book and objected to the isolation.
Bryant opined it would have taken Jon several weeks to complete the
suspension, if he worked diligently.

　　Bryant tried to make arrangements for Jon to go to a ranch
for "troubled young men." Initially, Jon wanted to go and Lila
supported the idea, but Keith refused. Later, Keith was in favor
and Jon did not want to go. Bryant did not want Jon to attend the
public high school. Jon was a good student, on the honor roll
almost every quarter. Bryant knew Keith used to punish Jon by
telling Jon to bend over and grab his ankles so he could spank him.
Bryant assumed Keith used a belt or a paddle. At school, Bryant
would punish students, including Jon, by having them grab their
ankles while he struck three to five blows on the buttocks with "a
paddle made out of a quarter[-]inch plywood" that was six or seven
inches wide and 1½- to 2-feet long.

　　Turner testified she prepared the social investigation
report ordered by the juvenile court. She interviewed Jon and his
parents, and reviewed the records of his two prior psychiatric
hospitalizations, the recent psychiatric evaluation, the police
reports, and school records. Jon began having emotional problems
when he was in kindergarten. He was hospitalized in Virginia at the
age of six and, again, when he was seven. The diagnosis was

- 8 -

attention deficit disorder (ADD) and medication was prescribed.  At age seven, his mother sent him to live with her parents, who discontinued his medication.  He has had no contact with his natural father since that time.  His parents subsequently divorced and his mother remarried.  His three younger sisters remain with his mother. He attended first through fourth grades in Lincoln, Illinois, but returned to Virginia for fifth and sixth grades.  He was expelled from school for fighting several days before the end of his sixth-grade year.  Jon returned to Lincoln and his grandparents' home at the beginning of seventh grade.  He attended church school until he was expelled.  In February 1995, Keith and Jon drove to Virginia, with the intention of Jon's living with his mother and family.  By the time they arrived, she had changed her mind about Jon's coming home to stay.  Jon returned to Lincoln with Keith and began attending public high school.

Turner testified that Jon had no support system.  He could not be placed with either parent.  She called one residential facility she thought might be appropriate for Jon, but they indicated they would not take him.  None of the sources she contacted offered a treatment plan for Jon.  Turner further testified, over defense objection, that she thought rehabilitation "unlikely."  According to Turner, the juvenile division of the Department of Corrections (DOC) can provide "any kind of counselling that the offender may require."

Eric Gill, a schoolmate of Jon's, testified that approximately two months before his expulsion from school, Jon made a statement in the locker room of the school.  According to Gill, Jon said, "'[S]ome[]day I wish I would kill them.'"  Gill did not know

- 9 -

to whom Jon was referring.  On cross-examination, Gill admitted he had been the one who told the pastor about Jon's having kissed a girl, which resulted in Jon's being expelled.

Ashworth testified Jon was diagnosed with ADD at the age of five.  He was treated with Ritalin, but his condition worsened, so he was admitted to a psychiatric institute, where he remained for 60 days.  He was treated with nortriptyline, which produced some improvement.  Jon scored above average on various skills tests but was described by the doctors as impulsive.

Jon's parents' marriage was troubled and his father, who was in the military, was often absent.  The family moved twice in the year after his first hospitalization, and Jon's home life lacked the stability he needed.  He was hospitalized for another 60 days the following year.  His dosage of nortriptyline was increased, and he improved.  He was also given Mellaril.  Ashworth became concerned that he had gone from one extreme to the other.  He was not acting like a normal five- or six-year-old child.

At this point, her parents intervened.  The Cearlocks did not approve of Jon's being on the medication.  They thought he should be in private school and that "God would take care of him."  Ashworth's marriage to Jon's father was ending, so she sent Jon to live with her parents.  Her father, Keith, was a stable presence in his life.  The Cearlocks enrolled Jon in Park Meadows Baptist Academy.  With Pastor Bryant, they decided to discontinue the medication.  He did well in school.

After Ashworth remarried, she sent for Jon.  He lived in Virginia with her, his stepfather, and his younger sisters during his fifth- and sixth-grade years.  After Jon's stepfather was laid

- 10 -

off, he began drinking and the tension in the household affected Jon. His grades dropped. Jon was physically abused by his stepfather, who also beat Ashworth. When Ashworth decided that she had to end the marriage, she again sent Jon to live with her parents.

With regard to her parents' home, Ashworth testified, "They were always threatening to move out on the other and they *** fought over money constantly. They were abusive physically and verbally to me." Her mother kept her bedroom door locked because she thought her husband "was snooping to find her money." She explained that she sent Jon to them because they "had me mentally" and she did not have the strength to resist their demands. Her parents would telephone her in Virginia and "fight over the phone." She knew the tension in the Cearlock household affected Jon. Her parents' religion did not allow divorce, but they frequently threatened to separate.

Ashworth testified that her parents did not agree on how to best discipline Jon. Lila "was always telling" Ashworth that Keith "wouldn't punish him as much as she thought he should." She was aware that Keith would punish Jon by beating him with a razor strap. She recalled that he had razor straps around the house.

Her parents were extremely upset about the kissing incident. The options they offered Jon after that event were in-school suspension, home schooling, or being sent to a boys' home. They were angry when Ashworth told Jon he could go to public school. The Cearlocks thought public school was "evil." They were concerned about "drugs and alcohol and gangs." Jon told her he was "tired of living in a home that was not Christian and having Christian stuffed

- 11 -

down his throat."

Ashworth recalled talking to Jon and her parents on a Thursday and telling them to bring Jon back home to her because he was so unhappy. By Friday afternoon, Jon and Keith were en route to Virginia. By the time they arrived on Saturday, Ashworth realized she couldn't keep her son. She did not have a bedroom for him. She could barely afford to give her three daughters real milk or to buy clothing for them from yard sales. If Jon came home, the family "would go back to the powdered milk days." When she told Jon he couldn't stay, he "cried at first a little bit, and then he went emotionless." She knew he was upset. Keith then made up his mind that he would finally leave Lila. He would get his own place and Jon could live with him. Jon was excited about the prospect.

Ashworth testified that she retained legal custody of Jon at all times. Her parents were not named his legal guardians because they "never wanted it." On cross-examination by the State, she was shown a notarized document, signed by her, purporting to be a grant of guardianship and custody to the Cearlocks. Ashworth explained that her "mother had it made so [Jon] would think it was a stable relationship." Her parents told her it "was never a legal document," but they needed it to get Jon into school and for medical purposes. To her knowledge, her parents did not file a petition for guardianship.

The report of Dr. Robert Chapman, who conducted a psychiatric evaluation of Jon on the joint motion of the State and the defense, was also admitted into evidence at the transfer hearing. Chapman reviewed Jon's school and psychiatric records and the police reports and interviewed Jon for a total of five hours.

The family history portion of Chapman's report reiterates much of the information summarized above.  In addition:

> "Jon said his grandparents were constantly negative and complaining, running him down, and comparing him to his mother whom they ran down as well.  They did not like his father because he was not 'Christian perfect.'  They often said his mother married to spite them.  His grandmother was always negative but put on a facade for the church[,] as did his grandfather.  He elaborated that his grandmother and grandfather did not get along.  They fought and argued all the time.  His grandfather often told him he was sorry he had married his grandmother and he only married her for sex."

Jon's description to Chapman of the events leading up to the shootings was consistent with the statement he gave to the police.  He also recalled having been beaten at various times by his father, stepfather, the pastor, and his grandfather and grandmother. His grandmother would use her fists or whatever was at hand.  Once she struck him with a pair of scissors.  "He sincerely believed his grandfather's threats that if he did hit back, his grandfather would kill him."

> Jon told Chapman he got the gun with the intention of killing himself.  He shot the bottle of bathroom cleaner on impulse.

> "He then knew[,] 'I had to do something.'  At that time he believed his grandfather would kill him.  If he did not shoot his grandfather

- 13 -

right away, his grandfather would kill him since he had shot the Tilex bottle[,] so he panicked and shot his grandfather immediately. His grandmother screamed[,] and he knew he had to shoot her to get everybody's attention.  At this point he cried and sobbed."

With regard to Jon's mental status, Chapman observed that he cried and appeared remorseful.  "He had difficulty concentrating, was impulsive, restless, and fidgety."

"He admitted to [having] intrusive thoughts that bother him and make him anxious. He stated he cannot get rid of them no matter how hard he tries.  This is true for [the date of the shootings].  The thoughts sometimes were about shooting people[,] mostly at the church[,] for the way they treated him."

Chapman concluded that Jon did not meet the legal definition of insanity and that he was competent to stand trial. He also stated:

"It is further my opinion that *** due to the product of the symptoms of [ADD] that included intolerance to frustration, impulsiv- ity, and the circumstances in which he per- ceived himself as being maltreated, abused physically and psychologically, and harboring the belief that he was in mortal danger from *** his grandfather, it is unlikely he acted in a premeditated manner at the time of the al-

- 14 -

leged shootings[,] but was acting in a state of
sudden and intense passion provoked by strong
provocation."

Evidence before the trial court at the transfer hearing
also included the records of Jon's psychiatric hospitalizations.

## 2. Underline Rules

Section 5-4(3)(b) of the Act (705 ILCS 405/5-4(3)(b) (West
1994)) requires the juvenile court to consider, "among other
matters," seven statutory factors when ruling on a petition to
permit prosecution of a minor under the criminal laws:

"(i) whether there is sufficient evidence upon
which a grand jury may be expected to return an
indictment; (ii) whether there is evidence that
the alleged offense was committed in an aggres-
sive and premeditated manner; (iii) the age of
the minor; (iv) the previous history of the
minor; (v) whether there are facilities partic-
ularly available to the Juvenile Court for the
treatment and rehabilitation of the minor; (vi)
whether the best interest of the minor and the
security of the public may require that the
minor continue in custody or under supervision
for a period extending beyond his minority; and
(vii) whether the minor possessed a deadly
weapon when committing the alleged offense."

In addition, the supreme court has held that a "critical
nonstatutory element" that must be considered in a case such as this
is that conviction of two or more first degree murders "would result

- 15 -

in a mandatory sentence of natural life imprisonment." <u>People v.</u> <u>Clark</u>, 119 Ill. 2d 1, 14, 518 N.E.2d 138, 144 (1987) (hereinafter <u>Gary Clark</u>).

Where the judge in the transfer proceeding considers evidence on each of the statutory factors and any other relevant matters, "the resulting decision is a product of sound judicial discretion which will not be disturbed on review." <u>Gary Clark</u>, 119 Ill. 2d at 14, 518 N.E.2d at 143-44. However, mere recitation in the record that all required factors have been considered is not a sufficient basis to affirm an order of transfer to criminal court. <u>Gary Clark</u>, 119 Ill. 2d at 18, 518 N.E.2d at 145. Rather, a reviewing court must determine that "sufficient evidence [is] in the record as to each statutory factor to support the transfer order." <u>Gary Clark</u>, 119 Ill. 2d at 18, 518 N.E.2d at 145. Where the record fails to support the juvenile court's "recitation that all statutory factors were considered, there is an abuse of discretion." <u>Gary Clark</u>, 119 Ill. 2d at 18, 518 N.E.2d at 146.

On the other hand, in a transfer proceeding, the judge is not required to enunciate a formal statement of reasons or conventional findings of fact to support the decision. Rather, he or she "must take care to preserve a record sufficiently explicit so that [the] exercise of discretion may be reviewed meaningfully." <u>People v. Taylor</u>, 76 Ill. 2d 289, 301, 391 N.E.2d 366, 371 (1979). No single factor is determinative, and the factors need not be given equal weight. Moreover, not all factors must be resolved against the minor to justify a transfer. <u>Taylor</u>, 76 Ill. 2d at 305, 391 N.E.2d at 373.

- 16 -

### 3. Judgment of the Juvenile Court

In the instant case, the juvenile court took note of the seven statutory factors, as well as the possible sentence. With regard to the first statutory factor, whether a grand jury would be expected to return an indictment, the juvenile court found it "pretty much a given."

The juvenile court also found the second factor, aggressiveness and premeditation of the alleged offense, weighed in favor of granting the State's petition. The shootings were, according to the juvenile court, "definitely" aggressive. The finding of premeditation was based on Jon's "talk[ing] about killing his grandparents in the past and [they] did end up dead at his hands."

The juvenile court observed that Jon was age 14 years, 8 months, at the time of the alleged offense and the transfer of the case to criminal court would have been "automatic" had he been four months older.

With regard to the fourth statutory factor, the previous history of the minor, the juvenile court commented:

> "He has had a very unusual life and it looks like a sad life, and he was shuffled back and forth between his mother and grandparents, not having contact with his natural father on any meaningful basis. He has had psychiatric problems with [ADD]. That unfortunately was not followed through by the parents to make sure that his medication was continued and [that he] continued to get treatment. That was at the age of five and six, and he is now 14.

That is something that others failed Jon by not
following through on."

The juvenile court also stated that no unique facilities
are particularly available to this juvenile that are not available
to an adult.  "In fact," the juvenile court observed, "if the minor
were transferred over and did stand convicted in an adult court, he
would go into the Juvenile Division to begin with anyway."

As to the sixth statutory element, whether Jon's best
interest and the security of the public may require his detention
beyond the date of his majority, the juvenile court commented:

"That is an interesting type situation here.
We have had a lot of argument whether or not
this young man could be rehabilitated in the
six years, four months [before] he would have
to be released if he stood convicted [as a
juvenile].  ***  If he was not rehabilitated,
he would be released anyway.  He would be out.
There would be no continued supervision beyond
age 21 if the minor went through the juvenile
court."

The final statutory element, whether Jon possessed a
deadly weapon while committing the alleged offense, was "given."

The juvenile court concluded:

"[A]fter considering the statutory factors as
well as being well aware that if the minor
stood convicted of a couple first degree mur-
ders, [a] sentence of mandatory imprisonment
would be imposed.  The court is [of] the opin-

- 18 -

ion that it is in the best interest of the
public that the minor be transferred to the
adult division."

### 4. Arguments on Appeal

Jon argues on appeal that the juvenile court misunder-
stood, misapplied, or failed to make a determination on all but two
of the factors discussed above.  The first and seventh statutory
factors (probability of indictment and possession of a deadly
weapon) are not at issue.  The cumulative effect of these errors,
according to Jon, is an abuse of discretion.

The State asks this court to reject the analytical
approach utilized in Jon's brief, which "compares the facts in
published opinions" with the facts of the instant case to suggest
transfer to criminal court was improper, arguing this court in prior
opinions has rejected a comparative approach to the analysis of
sentencing issues.  See People v. Bien, 277 Ill. App. 3d 744, 753-
55, 661 N.E.2d 511, 518-19 (1996); see also People v. Terneus, 239
Ill. App. 3d 669, 674-78, 607 N.E.2d 568, 571-74 (1992).  By analogy
to these decisions, the State reasons that it is improper for a
minor defendant to argue on appeal that his transfer to criminal
court was improper because persons who committed more egregious
crimes were not tried as adults or similarly situated persons were
not transferred to the criminal court.

Jon responds that the State's reliance on sentencing cases
is misplaced.  He characterizes his arguments as being in "the
established and time-honored tradition" of marshalling case
precedent in support of his position that the challenged decision
was an abuse of discretion.  Indeed, he notes, supreme court and

- 19 -

appellate court cases that interpret section 5-4 of the Act are controlling authority in this case.

The State's invitation to extend the reasoning of <u>Bien</u> and <u>Terneus</u> need not be decided here because we conclude, after thorough review and careful consideration of the case authority cited by Jon, that the trial court did not err.

We conclude the juvenile court was justified in finding Jon's conduct aggressive, where he shot and killed two unarmed elderly family members.  Further, even if his shooting of Keith was not premeditated in the sense that it was planned in advance, his shooting of Lila in the back as she fled from him, screaming, was properly deemed premeditated.

With regard to the age factor, the juvenile court was concerned that Jon could not be rehabilitated in the six years and four months remaining until his 21st birthday.  The juvenile court properly found Jon's age to be a factor weighing in favor of transfer where there was reason to be concerned that effective rehabilitation could not be accomplished before the juvenile reached the age where release from custody would be required.

A careful review of the juvenile court's comments regarding Jon's past history does not support a conclusion that the court weighed this factor against him.  The juvenile court was aware of, and concerned with, the difficulties in Jon's life.  We read the juvenile court's comments as concluding that, the sad and tragic circumstances of his upbringing notwithstanding, the other factors outweighed this concern.

> "[T]he statute requires that the juvenile judge
> receive and evaluate information about the type

of facilities available for the treatment or
rehabilitation of the minor.  Finally, the
statute requires that the judge determine the
likely effectiveness of these facilities in
light of the history and present circumstances
of the minor."  Gary Clark, 119 Ill. 2d at 17,
518 N.E.2d at 145.

Jon argues that the juvenile court did not engage in the
type of analysis required by Gary Clark.  Instead, he asserts, the
judge accepted the conclusions of the juvenile probation officer and
recalled that he was unaware of any unique facilities particularly
available to Jon that would not be available if he were tried as an
adult.

At the transfer hearing, Turner testified that none of the
sources to whom she had spoken suggested a treatment plan for Jon.
She concluded that rehabilitation was "unlikely," over defense
objection to the lack of foundation for her conclusion.  She further
testified that, based on her experiences and the reports she had
read, no plan of rehabilitation could be developed for Jon.  She
testified that the DOC had "any kind of counselling that the
offender may require" but, when asked specifically about treatment
for ADD, she replied, "Yes, and much more than that I'm sure."  She
also stated that there was no distinction between the adult and
juvenile facilities as to the treatment Jon would receive.  On
cross-examination, she acknowledged that Jon had previously
responded well to medication and that he had been taken off the
treatment regimen by his grandparents.

Jon argues on appeal that this testimony and the juvenile

court's analysis fall "far short" of the requirement stated in <u>Gary Clark</u>. There was no testimony regarding how Jon's ADD or emotional problems would be addressed in the juvenile and adult facilities. "It may well be that there are different theories of treatment" in the two facilities. Further, there was no consideration of the likely effectiveness of medication or other treatment.

Only in <u>People v. Langston</u>, 167 Ill. App. 3d 854, 522 N.E.2d 304 (1988), however, has transfer been found to be an abuse of discretion on the basis of this factor. This case cannot be compared to <u>Langston</u>, in which the juvenile court was provided with "no evidence whatsoever regarding the facilities available to the juvenile court for defendant's treatment or rehabilitation." <u>Langston</u>, 167 Ill. App. 3d at 859, 522 N.E.2d at 308. The juvenile court in this case heard lengthy testimony and strenuous cross-examination on this issue and was within its discretion to conclude that, because Jon, if convicted, would remain in a juvenile correc-tional facility until at least the age of 18, retention of juvenile jurisdiction would not affect the services available to him in the near future.

Jon also argues that the juvenile court failed to engage in any meaningful balancing of Jon's interests compared to society's interest in keeping him incarcerated beyond his 21st birthday. He notes his lack of criminal history and the fact that his problems are "related strictly to the family setting rather than society in general." He asserts that he and society in general would benefit by the juvenile court retaining jurisdiction.

Balanced against Jon, of course, are the lack of certainty that he would be rehabilitated before he reaches the age of majority

and the seriousness of his offenses.  The juvenile court did not abuse its discretion by giving substantial weight to these concerns.

Finally, Jon argues that the juvenile court misunderstood the potential sentence facing him if he were convicted in adult court and, thus, improperly weighed this factor.  The dispute arises because the juvenile court stated it was aware Jon faced "mandatory imprisonment" if he "stood convicted of a <u>couple</u> first degree murders."  (Emphasis added.)  Instead, as Jon points out, he faced a mandatory prison sentence if he were convicted of one first degree murder (730 ILCS 5/5-8-1(a) (West 1994)), and he faced mandatory <u>life</u> imprisonment if convicted of two first degree murders (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1994)).

The State responds that a trial court is presumed to know the law regarding potential sentences facing a defendant.  <u>People v. Ollins</u>, 231 Ill. App. 3d 243, 250, 606 N.E.2d 192, 198 (1992).  The State also notes that both counsel informed the juvenile court of the correct sentences, and the record, therefore, is sufficient to demonstrate that the juvenile court "did in fact consider the mandatory life sentence as a factor."

In <u>People v. Cooks</u>, 271 Ill. App. 3d 25, 38, 648 N.E.2d 190, 198 (1995), the court found the requirement that the juvenile court consider the potential mandatory life sentence was satisfied by a single mention in defense counsel's closing argument that the juvenile, if convicted, would spend the rest of his natural life in a penitentiary.

The State is correct, particularly given the general rule that the trial court is not required to make specific factual findings as to each factor.  <u>Cooks</u>, 271 Ill. App. 3d at 38, 648

N.E.2d at 198.

### 5. Conclusion

The record demonstrates that the juvenile court carefully considered each of the relevant factors.  Further, the record and the remarks of the juvenile court are "sufficiently explicit so that [the] exercise of discretion may be reviewed meaningfully." Taylor, 76 Ill. 2d at 301, 391 N.E.2d at 371.  Because no single factor is determinative and the factors need not be given equal weight (Taylor, 76 Ill. 2d at 305, 391 N.E.2d at 373) and given the deferential standard of review, we conclude that the juvenile court did not abuse its discretion by ceding jurisdiction to the criminal court, particularly in light of the seriousness of the offenses and the fact that Jon is not likely to be fully rehabilitated by the time he reaches the age of majority.

**[The preceding material is not to be published pursuant to Supreme Court Rule 23.]**

### B. Evidentiary Rulings

The material in this section is not to be published pursuant to Supreme Court Rule 23.

**[The following material is not to be published pursuant to Supreme Court Rule 23.]**

### 1. Defendant's Initial Response to Police Questioning

The admissibility of Jon's spontaneous admission to the first officer he encountered is not challenged.  Jon acknowledges he approached the armed and uniformed officer with the intention of "giv[ing] himself up."  He argues, however, that after the officer took the gun from him and led him by the arm to Detective Harberts, he was in custody and Harberts' question, "Why did you shoot those

people?", constituted custodial interrogation in the absence of Miranda warnings.  See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).  Thus, he argues, his answer to that question should not have been admitted into evidence.

The State responds that the answer was properly admitted, notwithstanding the lack of Miranda warnings, because the question was part of the general on-the-scene investigation by the police.

The trial court did not address the question of whether Jon was in custody at the time.  With regard to the interrogation prong of the Miranda rule, the trial court ruled:

> "[T]he single question that was asked by Offi-
> cer Harberts at the scene after the minor was
> presented to him by Officer Spickard does
> appear to have been an appropriate on-scene
> general investigative question and [his answer]
> will not be suppressed."

When reviewing the trial court's ruling on a motion to suppress, this court will not disturb the trial court's finding unless it is manifestly erroneous.  People v. Brown, 136 Ill. 2d 116, 125, 554 N.E.2d 216, 220 (1990).

a. On-the-Scene Investigative Questioning

In People v. Parks, 48 Ill. 2d 232, 237, 269 N.E.2d 484, 487 (1971), the supreme court held that Miranda warnings "are not *** necessary where the police conduct a general on-the-scene questioning as to facts surrounding the crime."  Parks did not attempt to define "the range of inquiries that come within permissible 'on-the-scene questioning'" (Parks, 48 Ill. 2d at 237, 269 N.E.2d at 487) but found the questions asked of the defendant in

that case "well within the scope" (<u>Parks</u>, 48 Ill. 2d at 237, 269 N.E.2d at 487) of permissible questioning.  The defendant, who was suspected of obtaining controlled drugs by fraud, was stopped as he left a pharmacy and asked his name, if he had made a purchase, and, if so, for whom.

In <u>People v. Laspisa</u>, 243 Ill. App. 3d 777, 612 N.E.2d 994 (1993), a divided court found manifest error in the suppression of defendant's answers to the officer who approached a parked car and asked the occupants if they had cocaine and where the cocaine was located.  The court ruled <u>Parks</u> applied and the questioning that led to the prearrest, pre-<u>Miranda</u> statements was permissible.  <u>Laspisa</u>, 243 Ill. App. 3d at 783, 612 N.E.2d at 998.

The State cites <u>Parks</u> and <u>Laspisa</u> in support of the general proposition that answers to on-the-scene investigatory questions are admissible and notes <u>Laspisa</u>'s reliance on <u>Berkemer v. McCarty</u>, 468 U.S. 420, 438-39, 82 L. Ed. 2d 317, 334, 104 S. Ct. 3138, 3149-50 (1984), which held that <u>Miranda</u> warnings are not required before the asking of a moderate number of questions during a routine traffic stop.

The State also cites <u>People v. Acebo</u>, 182 Ill. App. 3d 403, 537 N.E.2d 1113 (1989), as authority for its statement that "[n]o warnings were required before this question."  In <u>Acebo</u>, the officer reported to the scene of an accident and found an empty truck on the side of the road.  He pursued two persons, apprehended them, frisked them, and asked which one of them had been driving the truck at the time of the accident.  <u>Acebo</u>, 182 Ill. App. 3d at 404-05, 537 N.E.2d at 1114.  The trial court suppressed defendant's admission that he was the driver, but the reviewing court invoked

- 26 -

<u>Parks</u>, stating:

>"[W]hen a police officer is confronted with
>suspicious circumstances which might be re-
>solved with a satisfactory explanation from the
>person questioned, he is permitted to make
>inquiries of an investigative nature without
>first giving the <u>Miranda</u> warnings." <u>Acebo</u>, 182
>Ill. App. 3d at 405, 537 N.E.2d at 1114.

The State also cites <u>People v. Tripkovich</u>, 6 Ill. App. 3d
37, 45-46, 284 N.E.2d 323, 329 (1972), which noted "[a] defendant's
response to a single question, such as 'what happened?' is not the
product of a custodial interrogation requiring the <u>Miranda</u> warn-
ings."

Jon argues that Harberts' question was interrogation in
the <u>Miranda</u> sense:

>"'"Interrogation," as conceptualized in ***
><u>Miranda</u> ***, must reflect a measure of compul-
>sion <u>above</u> <u>and</u> <u>beyond</u> that inherent in custody
>itself.
>
>We conclude that the <u>Miranda</u> safeguards
>come into play whenever a person in custody is
>subjected to either express questioning or its
>functional equivalent. That is ***, any words
>or actions on the part of the police (<u>other</u>
><u>than</u> <u>those</u> <u>normally</u> <u>attendant</u> <u>to</u> <u>arrest</u> <u>and</u>
><u>custody</u>) that the police should know are rea-
>sonably likely to elicit an incriminating
>response from the suspect.' (Emphasis added.)"

> People v. Winchel, 159 Ill. App. 3d 892, 909,
> 512 N.E.2d 1298, 1308 (1987), quoting Rhode
> Island v. Innis, 446 U.S. 291, 300-01, 64 L.
> Ed. 2d 297, 307-08, 100 S. Ct. 1682, 1689-90
> (1980).

In Winchel, the police officer arrived on the scene of a double homicide and found two other officers handcuffing the defendant, who was on the ground with one officer's gun at his back. Winchel, 159 Ill. App. 3d at 907, 512 N.E.2d at 1307. The arriving officer asked, "'What happened?'"--a question he characterized as a "'general inquiry as to what was going on.'" Winchel, 159 Ill. App. 3d at 907, 512 N.E.2d at 1307. The defendant then stated, "'We went into the gangway and it [(the murders)] went down.'" Winchel, 159 Ill. App. 3d at 907, 512 N.E.2d at 1307. The trial court admitted the statement and the court affirmed, finding "[t]hat it came only after a question by a police officer does not vitiate the voluntariness of the statement." Winchel, 159 Ill. App. 3d at 909, 512 N.E.2d at 1308. Further:

> "Under Innis, we hold that the question, 'What
> happened?' asked by a police officer just
> arriving, unbeknownst to him, on the scene of
> a double murder, was a question normally atten-
> dant to his investigatory duties and the arrest
> and custody of a suspect found on the scene of
> the crime, and that it did not reflect a mea-
> sure of compulsion above and beyond that inher-
> ent in the defendant's custody itself. As
> such, it did not constitute express questioning

- 28 -

or its functional equivalent."  <u>Winchel</u>, 159
Ill. App. 3d at 909, 512 N.E.2d at 1308.
The court also noted the question was not directed specifically to
defendant.  <u>Winchel</u>, 159 Ill. App. 3d at 907, 512 N.E.2d at 1307.

In the instant case, the officer's question was addressed
to Jon.  It was not a general question.  The officer knew the young
man had admitted the shootings.  The "why" question was not designed
to give Jon the opportunity to provide a "satisfactory explanation"
(see <u>Acebo</u>, 182 Ill. App. 3d at 405, 537 N.E.2d at 1114 (discussing
a police officer's right to make inquiries of an investigative
nature when confronted with suspicious circumstances that may be
resolved with a "satisfactory explanation" from the person ques-
tioned)), but to determine his motive for the shootings.

This court vacated a suppression order in <u>People v. Fasse</u>,
174 Ill. App. 3d 457, 528 N.E.2d 1049 (1988), where a group of
minors was detained at the site of a drinking party and told to
split into two groups, those who had been drinking and those who had
not.  The officer smelled the breath of those who claimed not to
have been drinking and released them.  Those who admitted drinking
were arrested.  <u>Fasse</u>, 174 Ill. App. 3d at 459, 528 N.E.2d at 1050-
51.  They argued the testimonial act of stepping into the drinking
group was inadmissible because it resulted from custodial interroga-
tion that was not preceded by <u>Miranda</u> warnings.  This court found
the officer's asking the youths to split into two groups to be
traditional police investigation, not affected by the holding in
<u>Miranda</u>.  <u>Fasse</u>, 174 Ill. App. 3d at 461-62, 528 N.E.2d at 1052.

Detective Harberts' inquiry as to why Jon shot his
grandparents cannot be equated with the routine police work at issue

- 29 -

in _Fasse_.  For one thing, the detective not only considered Jon a suspect, but knew, prior to asking him the question, that he had admitted the shootings.   This weighs in favor of viewing the question as interrogation, not merely investigation.  See _People v. Maiden_, 210 Ill. App. 3d 390, 395, 569 N.E.2d 120, 123 (1991), discussing _People v. Hentz_, 75 Ill. App. 3d 526, 527-31, 394 N.E.2d 586, 587-89 (1979).  When an officer's investigation has focused on a particular suspect, the court "may consider that the suspect was subjected to questioning which in large part was meant to elicit incriminating remarks to the charge." _People v. V.S._, 244 Ill. App. 3d 478, 483, 612 N.E.2d 898, 902 (1993).

_People v. Clark_, 84 Ill. App. 3d 637, 405 N.E.2d 1192 (1980), was cited by Jon and is discussed below on the issue of custody.   _Clark_, however, also explores the distinction between investigation and interrogation.   The defendant was asked by the officer, "'What happened?'", and she answered, "'I shot my husband.'"  _Clark_, 84 Ill. App. 3d at 639, 405 N.E.2d at 1193.   "This single question qualified as general on-the-scene questioning; thus, defendant's response was not the product of custodial interrogation." _Clark_, 84 Ill. App. 3d at 640, 405 N.E.2d at 1194.   The officer then asked, "'What do you mean you shot your husband?  What happened?'" and she told him.  _Clark_, 84 Ill. App. 3d at 639, 405 N.E.2d at 1193.   Because he continued questioning, without giving the defendant _Miranda_ warnings, "even though he was then aware that defendant shot her husband" (_Clark_, 84 Ill. App. 3d at 640, 405 N.E.2d at 1194), the court found that "[a]t this point, the investigation obviously focused on her conduct involving the shooting." _Clark_, 84 Ill. App. 3d at 640, 405 N.E.2d at 1194.  The

court concluded that the "second question went beyond general on-
the-scene inquiry." Clark, 84 Ill. App. 3d at 640-41, 405 N.E.2d
at 1194.

The State distinguishes Clark, noting that the impermis-
sible question in Clark was the second question asked by the officer
and, in the present case, the challenged question was the first
question addressed to the suspect.  The State, thus, asks this court
to make its determination based on the number of questions asked,
rather than on the subject matter and intent of the question.  We
decline to do so.

Jon's initial admission was a voluntary and spontaneous
statement.  Harberts had precisely the same information at this
stage of the investigation as the officer in Clark had when he asked
the follow-up question that crossed the line between investigation
and interrogation.  Harberts' question was not asked merely to
obtain general background information, but focused on the suspect's
"conduct involving the shooting." Clark, 84 Ill. App. 3d at 640,
405 N.E.2d at 1194.  We conclude that the question posed to Jon by
Harberts was interrogation, rather than general on-the-scene
investigation.

### b. Custodial Interrogation

Having found that the question posed by Harberts was not
merely investigatory, we must also consider whether Jon was in
custody at the time.  If he was not in custody, the protections of
Miranda do not apply and the statement is admissible.  This court
will be addressing the question de novo, as the trial court did not
make a finding on this issue.  The facts pertinent to this issue are
not in dispute.

When Jon returned to the Cearlock home, intending to surrender to police, he found squad cars and ambulances with their lights flashing, police tape stretched around the yard, and numerous uniformed officers. He walked underneath the tape, approached Spickard, handed him the gun and ammunition, and said, "I did it. I killed them." Spickard realized he had a suspect in the shooting, so he took Jon by the elbow and directed him to "come with him." Jon described the officer's grip as firm; he did not feel as if he could walk away. In any event, Spickard would have stopped him if he had tried to leave. The deputy told another officer what had happened, and that officer called Detective Harberts to come over to the group. The second officer also testified he would have stopped Jon if he had tried to walk away. Jon was then with three officers, two of whom were armed. At least half a dozen other armed officers were in the yard. Harberts testified that he would not have allowed Jon to leave. When asked if the deputy was conveying Jon into his custody at that point, he stated that he could not "make that determination." After he asked Jon why he had shot the victims and Jon answered, Harberts instructed one of the officers to place him under arrest.

"<u>Miranda</u> warnings are required only when there has been such a restriction on a person's freedom as to render him, in effect, in custody." <u>Clark</u>, 84 Ill. App. 3d at 639, 405 N.E.2d at 1194. The determination of whether a person is in custody "depends on an objective evaluation of the circumstances surrounding the interrogation." <u>Clark</u>, 84 Ill. App. 3d at 640, 405 N.E.2d at 1194.

"The test is whether, under the circumstances,

a person would reasonably believe that he was

> not free to leave the scene of the questioning,
> so that he was deprived of his freedom of
> action in a significant way during the ques-
> tioning." Clark, 84 Ill. App. 3d at 640, 405
> N.E.2d at 1194.

Factors relevant to the determination include:

> "the location, length, mood[,] and mode of the
> interrogation; the number of police officers
> present; any indicia of formal arrest or evi-
> dence of restraint; the intentions of the
> officers; and the extent of knowledge of the
> officers and the focus of their investigation."
> Brown, 136 Ill. 2d at 124-25, 554 N.E.2d at
> 220.

Other factors to consider when the suspect is a juvenile are the
presence or absence of family or friends of the accused and his age,
intelligence, and mental makeup. People v. Savory, 105 Ill. App.
3d 1023, 1028, 435 N.E.2d 226, 230 (1982).

With regard to the state of mind of the suspect or the
officer, the Supreme Court has said:

> "A policeman's unarticulated plan has no bear-
> ing on the question whether a suspect was 'in
> custody' at a particular time; the only rele-
> vant inquiry is how a reasonable man in the
> suspect's position would have understood his
> situation." Berkemer, 468 U.S. at 442, 82 L.
> Ed. 2d at 336, 104 S. Ct. at 3151.

Jon cites these general rules and the additional concerns

raised in <u>Haley v. Ohio</u>, 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04 (1948), and <u>Gallegos v. Colorado</u>, 370 U.S. 49, 52-53, 8 L. Ed. 2d 325, 328, 82 S. Ct. 1209, 1212 (1962), which require special care in scrutinizing the record when a juvenile is involved.  He then cites <u>Clark</u> in support of his argument that, on these facts, he was in custody.  He was within the perimeter of the crime scene tape and had just made a voluntary statement implicating himself in the crime.  The yard was filled with officers and their squad cars.  The officers would not have allowed him to leave.  He was taken by the arm and led to the detective who questioned him. Jon asserts that he was in custody at the time Harberts questioned him because, in addition to these factors, no reasonable person would believe he was free to leave the scene of a shooting after turning over a gun and admitting the shooting.

The State distinguishes <u>Brown</u>, <u>Savory</u>, and <u>Gallegos</u> on their facts but, because Jon cited these cases for general rules, not for their facts, the State's analysis of these cases is not helpful.  The State also distinguishes <u>Clark</u>, but its discussion is limited to the nature of the questioning and does not address the issue of custody.

In <u>Clark</u>, the officer arrived on the scene to find a man shot to death in an automobile and two women, who identified themselves as the man's wife and a friend, standing on the curb. The wife was crying and upset.  The officer asked her if she would sit in the backseat of the squad car and allowed her friend to accompany her.  <u>Clark</u>, 84 Ill. App. 3d at 638-39, 405 N.E.2d at 1193.  After the wife responded to the "'What happened?'" question by admitting the shooting, the officer asked the other woman to

- 34 -

leave the car.  He then asked the follow-up question.  <u>Clark</u>, 84
Ill. App. 3d at 639, 405 N.E.2d at 1193.    The court found it
"significant that once defendant admitted that she shot her husband,
the officer asked [her] friend to leave the car."  <u>Clark</u>, 84 Ill.
App. 3d at 640, 405 N.E.2d at 1194.  Once this occurred, all further
questioning "took place when a person would reasonably have believed
that he was not free to leave the scene."  <u>Clark</u>, 84 Ill. App. 3d
at 640-41, 405 N.E.2d at 1194.

        Jon also cites the recent decision in <u>In re H.D.B.</u>, 301
Ill. App. 3d 234, 703 N.E.2d 951 (1998), in which this court found
the statement of a juvenile made in response to police questioning
inadmissible.  A police drug task force raided a trailer, pursuant
to a warrant, and handcuffed everyone found inside.  An officer
testified that, about 20 minutes later, he walked 16-year-old H.D.B.
to a back bedroom for a conversation that lasted about three
minutes.  H.D.B. was calm and admitted that he sold crack cocaine
from the trailer.  <u>H.D.B.</u>, 301 Ill. App. 3d at 236-37, 703 N.E.2d
at 952-53.  The minor testified he was crying, four officers were
present when he was questioned, and the officer questioning him told
him his girlfriend would be taken to jail and her baby taken away
if he did not admit his responsibility for the drugs found in the
trailer.  <u>H.D.B.</u>, 301 Ill. App. 3d at 238, 703 N.E.2d at 954.  The
trial court admitted the statements made by H.D.B. in the bedroom,
and this court reversed:

        "First, [he] was in custody.  Second, it
        is undisputed that [he] made the statement in
        response to [police] questioning.  Third, it is
        also undisputed that [he] was not advised of

- 35 -

his <u>Miranda</u> rights at that time." <u>H.D.B.</u>, 301

Ill. App. 3d at 239, 703 N.E.2d at 955.

Based on our analysis of the factors listed above, we conclude that Jon was in custody after the officer accepted the gun, listened to his admission, and took him by the arm to turn him over to the detective. The officers unequivocally stated that he would not have been allowed to leave. He did not feel free to leave. No reasonable person would have felt free to leave. Thus, the test for custody is met.

Because Jon was in custody and because the question was interrogatory in nature, the failure of the police to give <u>Miranda</u> warnings makes his answer to the question inadmissible.

2. <u>Defendant's Later Statements to the Police</u>

The challenged statements include the first station-house interview, which was not recorded but about which Harberts was permitted to testify at trial; the second tape-recorded interview; and the videotaped walk-through of the crime scene.

a. Evidence Adduced at the Suppression Hearing

Lincoln police officer Doug Grieser testified he was present at the crime scene and was later asked to be present at the station-house interviews. He was in uniform and had his service weapon. The interview took place in an office setting. The detective gave Jon the <u>Miranda</u> warnings and told him the interview was being tape-recorded. There were no threats, no promises, and no coercion. The detective was calm; Jon was "pretty at ease." The detective did not raise his voice. Jon did not ask for his parents or other family member. On cross-examination, Grieser confirmed his earlier statement that Jon displayed "no emotions." Defense counsel

- 36 -

asked, "Like a person who was in despair?"  Grieser answered, "Cor-
rect," and his answer was allowed to stand, over the State's
objections.  Jon was not asked if he wanted to speak with his
mother.

Lincoln    police    sergeant    Bill    Shelby's    testimony
corroborated Grieser's testimony.  He was present during the inter-
views, both he and Grieser were uniformed and armed, Jon was "very
calm," he agreed to the taping, he was given standard warnings, and
he did not ask for clarification.  On cross-examination, Shelby
stated no one told Jon he could speak to his mother or father.

Lincoln police department juvenile officer Darrell Sisk
testified he was called at about 10:30 p.m. by Officer Rawlins, "to
see if I knew a juvenile minor that they had as a suspect, and he
didn't even tell me what the crime was."  Sisk did not go to the
station because he "didn't know the kid."  Sisk is the only
"designated juvenile officer" in the Lincoln police department.  His
role, had he been asked to assist, would have included observing the
interviews.  On cross-examination, Sisk testified he was not asked
to come to the jail.  The officer who called only wanted to know if
Sisk "knew [Jon] personally" and if he "had a prior record."
Because Lincoln has only one juvenile officer, department policy is
that the shift commander acts as the juvenile officer when the
designated officer is unavailable. Harberts was the shift commander
that night.

Detective Harberts testified he initially estimated Jon's
age at 18 or 19.  Harberts instructed another officer to handcuff
Jon and place him in a squad car.  He was taken out of the car twice
so that he could be viewed by witnesses.  Jon was transported to the

county jail, placed in a holding cell, and the handcuffs were removed.  After their arrival at the jail, Harberts asked Jon his name, age, and relationship to the victims.  Harberts asked if the Cearlocks "had legal and lawful custody of him," and Jon said they did.  After learning Jon's age, Harberts spoke to the State's Attorney.

Harberts testified he then asked Jon "if he would be willing to come to my office for an interview."  He read Jon his rights, and Jon agreed to speak with him and to the taping of the interview.  Jon did not ask for clarification of his rights and responded, "Yes, sir," each time Harberts asked if he understood. Harberts testified in detail, over defense objections, to the contents of the interview.  During the interview, Jon denied any history of mental illness.  Harberts asked about his family and why he was living with his grandparents.  At this point, he obtained Jon's mother's name and telephone number.  Jon was returned to the holding cell at the conclusion of the interview, at 9:07 p.m. Harberts did not try to reach Glenda Ashworth, Jon's mother, until 10:45 p.m.  He left a message on her answering machine that there was an emergency involving Jon.  She returned his call at 3:20 a.m.

After attempting to reach Ashworth, Harberts played the tape of the interview and found the machine had not recorded.  He went to the holding cell and asked Jon if he would agree to tape a second interview.  The same two officers were present as observers. John was returned to the holding cell, where he remained until 12:45 a.m., when he was taken back to the scene and "led [Harberts and another detective] through a video[]taped re[]enactment of what had occurred earlier."  Harberts asked questions while the other

- 38 -

detective operated the camera.    They were not armed; Jon was not shackled.

After the walk-through at the house, Jon led the officers along the route he took when he went to his friend's house.    He then consented to be photographed in his underwear.    At no time did he request the presence of a lawyer or other adult.    Shortly after the photographs were taken, the officers from the Galesburg juvenile home arrived to take him into custody.

On cross-examination, Harberts recalled writing in his report that Spickard approached him with "the young man, identified as Jon R. Morgan, age fourteen."  He explained on redirect that he knew Jon's correct age at the time he wrote the report, but not at the time Jon was initially presented to him.  Harberts was aware of the policy prohibiting the use of handcuffs on juveniles unless needed to prevent violence or escape.  On redirect, he explained that he ordered Jon cuffed because he had just admitted shooting two people and might pose a danger to himself or others.

When he spoke to the State's Attorney on the scene, he told him that he believed Jon was 18 or 19, and the State's Attorney "requested that [he] go to the complex and attempt to interview the suspect."  Jon was placed in the only holding cell in the facility. It is the same cell used for adult prisoners.  Harberts made no effort to locate Jon's parents even after he learned Jon was 14. He accepted as true Jon's statement that his grandparents were his legal guardians.

Harberts agreed he did not inform Jon that he could be charged and tried as an adult.  He did not ask the whereabouts of Jon's mother before starting the first interview, and he did not

- 39 -

contact the juvenile officer.  He was aware of the policy requiring the police to contact parents and the juvenile officer when a minor is taken into custody.  He read the Miranda warnings in the same manner as he would to an adult.

With regard to the taped interview, Harberts could not explain the failure of the taping of the first interview.  He used the same machine and the same cassette to record the second interview.  There was no defect in either.

When he was unable to reach Jon's mother at home, he did not ask Jon if he knew of a work or other number at which she might be reached.  When she returned his call at 3:20 a.m., he told her she would have to talk to the State's Attorney about any specifics. He denied that she said she wanted a lawyer for Jon.  She told him about Jon's previous psychiatric history.  He also learned from Ashworth that she never relinquished custody of Jon.  On redirect, he said that, up to that point, he believed the Cearlocks were Jon's legal guardians.  When asked on redirect what he was attempting to do when he asked Jon about his lawful custodians--was he intending to comply with policy--he answered, "I believe that was my intention."

Ashworth testified on his behalf.  On the night of the shootings, she was working the 7 p.m. to 7 a.m. shift.  She received a call at work from one of her daughters at about 4 a.m., Eastern time.  Ashworth left work immediately and went home.  When she arrived, the phone was ringing.  Her sister-in-law was calling from Alaska to tell her about the shootings.  She then noticed the message on the answering machine, listened to the message from Harberts, and called him back immediately.  He wanted to know who

had custody of Jon.  She said she did.  He said he thought her parents had custody, and she explained that she never relinquished custody.  She also explained why Jon was living in Lincoln and his history, including his ADD.  "I asked him where my son was and if he had a lawyer, and he told me I'd have to get with [the State's Attorney], that *** I would have to call him at his office at nine o'clock that morning."  She asked to speak with Jon but was told he had already been taken to Galesburg.

The State objected that questions regarding Ashworth's actions after her call to Harberts were irrelevant to the suppression motion.  The defense was allowed to make an offer of proof regarding her efforts to obtain an attorney for Jon, to demonstrate that, had she been contacted earlier, Jon would have been represented by counsel.  She testified she made efforts throughout the following day to obtain a lawyer for Jon.  She asked the State's Attorney several times, but was told "it wasn't necessary until they got to Court."  Finally, she contacted an attorney in Virginia "to find out how I could make them give me a lawyer for Jon."  "He told me my rights, so then I called back to [the State's Attorney] and demanded a lawyer to speak to me within the hour, which [the public defender] did."

Jon testified at length about what he had been taught by his grandparents, and at church and school, about the need to obey those in authority.  If a student at the school did not obey, he was punished and treated as an outcast.  Punishment included paddling. He "learned to obey authority."

After the shootings, he went to his friend's house because he needed help.  He needed to talk to someone.  He went back to his

grandparents' house because he thought the police would be there and they would help him.  When Detective Harberts asked him why he shot his grandparents, he answered because he "didn't feel like [he] had a choice."  "He was there, and he wanted to know.  *** He had control of me at that point."  After he was handcuffed, [he] felt "like a robot."  "They had me under their authority and control, so I was just going along with what they said and they wanted to do. I didn't think about the consequences or any of that."  His only prior contact with the police was when officers visited his school to talk to the students.  He cooperated with the police by getting out of the car twice so two witnesses could view him.  He knew he "was supposed to do what they wanted without asking any questions."

Jon described the holding cell as 15 feet long, about 6- or 7-feet wide, with a concrete slab bench along the back wall and an open toilet.  The other prisoners asked him why he was there and other questions.  He went with Harberts when he was asked to because "he told me to" and because he would rather be with the detective than in the cell.

Harberts began to ask questions and Jon answered them, "[b]ecause he was the boss, and I was supposed to tell him what he wanted to know."  Jon did not consider the effect that answering the questions might have on him.  Harberts did not ask about his parents or tell him that a juvenile officer was supposed to be there.  If he had been given the chance, he would have talked to his mother or his father, even though he had not seen his father in a long time. He did not ask to speak to anyone.  He felt "that if they wanted me to talk to somebody else[,] he would have told me, he would have given me that option."  He was not told he could be tried as an

adult; he was not thinking of the criminal charges.  After the interview, he was put back in the holding cell, where one of the prisoners talked to him.

Harberts came back later to tell him the tape recorder had not been working.  As soon as they sat down for the second interview, Harberts read him the <u>Miranda</u> warnings.  Harberts asked if he understood each right, and he answered, "[Y]es, sir," to show his respect.  He was not asked if he wanted to give up each right, only if he understood.  The warnings did not mean anything to him.  He thought the warnings were "just a thing you saw on T.V."  He was not permitted to watch police shows very often, only at his mother's or at a friend's house.  He thought the warnings were part of the "entertainment."  He did not ask for a lawyer "[b]ecause I felt like if it was important he would have let me know."

At some point, the detective asked him how to reach his mother.  When he gave the detective the telephone number, he thought that he was going to be able to speak to her.

When Harberts approached him about making the video, it was not "an order, but it wasn't a question.    It was like a statement.  He was like telling me that he wanted to take me back." He did not think he had a choice.

On  cross-examination,  Jon  admitted  he  knew  he  had committed a crime and that he wanted to confess the crime, to get it off his chest.  Jon also admitted he was able to stand up to authority figures when he wanted to.  For example, he agreed that he stood up to the school principal, Bryant, by refusing the in-school suspension and he said, "I don't want to talk about that," to Harberts during the second interview.

Additional witnesses, whose testimony need not be detailed here, included Dr. Chapman for the defense, and Pastor Bryant, Nancy Wilkinson, and Kimberly Ball from the Park Meadows Academy, for the State.

### b. Trial Court's Ruling

In a lengthy docket entry, the trial court ruled on the motion to suppress.  The court noted that it was to look at the totality of the circumstances and that no single factor, "even a technical violation of State statute," is controlling.  The trial court concluded:

> "From the testimony, video[]tape, and audio, it would appear that there were no threats, no promises, no abuse of the minor during such interrogation and that he was never denied access to food, drink, the bathroom and, in fact, in one instance where the Defendant was reluctant to make further statement, he clearly articulated that to the officer and that par- ticular line of questioning was no longer pursued.  The officer's manner and demeanor during questioning and on the videos appeared to be very calm, non[]intimidating, non[]threatening[,] and respectful of the Defendant's age ***.  With regards to the violation of the [Act], the Courts certainly do not condone such violation[,] but higher Courts, on review, have made it clear that such a violation does not cause a _per_ _se_ suppression

- 44 -

***.    Although  it  does  appear  that  the
[j]uvenile was not told that he could be prose-
cuted as an adult, it does not appear that the
state of the law in Illinois requires such an
admonition.    ***    [F]rom  the  standards  set
forth  by  reviewing  [c]ourts,  it  would  also
appear  to  this  [c]ourt  that  the  [d]efendant's
confession was voluntarily made.  From the very
outset, when the minor first approached Officer
Spickard and made a gratuitous and spontaneous
declaration of an incriminating nature, it did
appear to the [c]ourt that the [d]efendant knew
what he was doing and that he indeed did seem
to want to tell what happened."

The trial court denied the motion to suppress in its entirety.

### c. Violations of the Act

"[C]ourts must be especially cautious in cases involving
juveniles because the coerciveness of a situation is thereby
enhanced." People v. Cole, 168 Ill. App. 3d 172, 179, 522 N.E.2d
635, 639 (1988).  Thus, the Act was adopted in response to "the
potential for abrogating the rights of juveniles." Cole, 168 Ill.
App. 3d at 179, 522 N.E.2d at 639.  The overriding purpose of the
Act "is to ensure that the best interests of the minor, the minor's
family, and the community are served." In re W.C., 167 Ill. 2d 307,
320, 657 N.E.2d 908, 915 (1995).  Proceedings under the Act "are
therefore protective in nature and the purpose of the Act is to
correct and rehabilitate, not to punish." W.C., 167 Ill. 2d at 320,
657 N.E.2d at 916.  Even so, parties in juvenile proceedings are

afforded due process safeguards, including the right to remain silent. W.C., 167 Ill. 2d at 320-21, 657 N.E.2d at 916.

> "[T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. *** If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright[,] or despair." In re Gault, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967).

Violation of the statute by the police does not per se constitute a denial of the juvenile defendant's rights. People v. McGhee, 154 Ill. App. 3d 232, 236, 507 N.E.2d 33, 35 (1987). Nevertheless, the statutory violation is one of the factors to be considered in a "totality of the circumstances" analysis to determine whether the juvenile defendant has been denied constitutional protections. McGhee, 154 Ill. App. 3d at 236-37, 507 N.E.2d at 35.

Jon argues the police violated the Act in several respects and these violations, which were acknowledged by the trial court, should weigh heavily in favor of finding his statements involuntary. The State argues the Act does not apply in this situation, where a minor has been taken into custody for suspicion of murder. We first address the applicability of the Act and then the violations of the

- 46 -

Act and their effect on voluntariness.

The State asserts that the protections guaranteed to a minor under section 5-6 of the Act (705 ILCS 405/5-6 (West 1994)) apply only when the minor is taken into custody pursuant to section 5-5 of the Act (705 ILCS 405/5-5(1)(a) (West 1994)), which permits a law enforcement officer to take a minor into temporary custody without a warrant, if the officer has reasonable cause to believe the minor is a delinquent minor.

The State cites People v. Daniel, 238 Ill. App. 3d 19, 33, 606 N.E.2d 94, 104 (1992), quoting People v. Visnack, 135 Ill. App. 3d 113, 126, 481 N.E.2d 744, 753 (1985), in which the first district held the Act did not apply to the 16-year-old defendant, because he was not arrested pursuant to a petition in the juvenile court, but for murder, "and was therefore subject to the jurisdiction of the criminal courts."  The first district earlier reached the same conclusion in People v. Sevier, 230 Ill. App. 3d 1071, 1084, 598 N.E.2d 968, 978 (1992), in a case involving a 17-year-old defendant.

The State acknowledges that People v. Pico, 287 Ill. App. 3d 607, 678 N.E.2d 780 (1997), contradicts its position.  In Pico, the first district expressly rejected its earlier holding in Sevier and held that a minor is entitled to the protections of the Act until he has been charged as an adult, "for until such time as the minor is charged, the State cannot know whether he will be tried pursuant to the Criminal Code [of 1961 (Criminal Code)] as an adult or as a delinquent minor under the Act."  Pico, 287 Ill. App. 3d at 612, 678 N.E.2d at 783.

We agree with the holding in Pico.

Jon argues several provisions of the Act were violated and

these violations contributed to his making statements that were not voluntary.  First, an officer taking a minor into custody is required to "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides."  705 ILCS 405/5-6(2) (West 1994).  Second, the officer is to surrender the minor to a juvenile police officer "without unnecessary delay."  705 ILCS 405/5-6(2) (West 1994).  Third, a minor is not to be confined in a county jail for more than six hours (705 ILCS 405/5-7(2)(C) (West 1994)), and

> "(ii) Any minor so confined *** shall not be permitted to come into or remain in contact with adults in custody in the building.  (iii) Upon placement in secure custody in a jail or lockup, the minor shall be informed of the purpose of the detention, the time it is expected to last[,] and the fact that it cannot exceed 6 hours."  (705 ILCS 405/5-7(2)(C)(ii), (iii) (West 1994)).

Jon cites <u>People v. Knox</u>, 186 Ill. App. 3d 808, 542 N.E.2d 910 (1989), in which the conviction of a 15 year old was reversed because the State failed to take steps to ensure that the juvenile had the opportunity to confer with an interested adult prior to interrogation, rendering his confession involuntary and inadmissible.  The court, however, specifically stated it was not basing its decision on a violation of the Act (<u>Knox</u>, 186 Ill. App. 3d at 815, 542 N.E.2d at 914), but noted that "the failure to have a juvenile officer present is material to determining the voluntariness of defendant's statements" (<u>Knox</u>, 186 Ill. App. 3d at 815, 542 N.E.2d

at 915).

In this case, the police did not substantially comply with the Act.  We agree with <u>Knox</u>, however, that this is one factor to be weighed in determining whether the challenged statements were made voluntarily.  See <u>Knox</u>, 186 Ill. App. 3d at 815, 542 N.E.2d at 915.  That is, our focus should be on the effect, if any, of the violations on Jon.  If the evidence supports the trial court's conclusion that Jon's statements were voluntary, these violations of the Act, standing alone, do not require that the statements be suppressed.

d. Other Factors Affecting Voluntariness

The State bears the burden of demonstrating that a confession was voluntarily made.  <u>People v. Lash</u>, 252 Ill. App. 3d 239, 242, 624 N.E.2d 1129, 1132 (1993).  The trial court need be convinced of the voluntary nature of the statement only by a preponderance of the evidence, and it is the province of the trial court to resolve any conflicts in the evidence and to assess the credibility of the witnesses.  <u>Lash</u>, 252 Ill. App. 3d at 242-43, 624 N.E.2d at 1132.  A reviewing court will limit its consideration to whether the trial court's finding is against the manifest weight of the evidence.  <u>Lash</u>, 252 Ill. App. 3d at 243, 624 N.E.2d at 1132.

The test is whether the statement was made freely, without compulsion or inducement of any sort, or whether defendant's will was overcome when he made the statement.  <u>Lash</u>, 252 Ill. App. 3d at 243, 624 N.E.2d at 1132.  Under the "totality of the circumstances" test, the court must consider the characteristics of both the accused and the circumstances of the interrogation.  <u>People v. M.S.</u>, 247 Ill. App. 3d 1074, 1084, 618 N.E.2d 623, 630 (1993).  Relevant

- 49 -

circumstances include the length and intensity of interrogation; the age, intelligence, experience, and physical condition of the defendant; and, if the defendant is a minor, whether his parents were present. M.S., 247 Ill. App. 3d at 1084, 618 N.E.2d at 630.

In addition to the violations of the Act, Jon argues that other circumstances contributed to the involuntariness of his statements. He was, because of his upbringing, predisposed to seeking approval from adults in authority. His ADD rendered him less capable of understanding the consequences of his actions. He was questioned "until the wee hours of the morning." The authorities completely disregarded his youth and treated him as they would an adult suspect, seeking only to elicit incriminating statements. He had no prior experience with the police and naively expected them to help him.

Jon notes that the mere lack of overt threats or coercion does not necessarily mean a statement was made voluntarily, citing In re L.L., 295 Ill. App. 3d 594, 693 N.E.2d 908 (second district). In L.L., the police frustrated the attempts of the parents to see the child and the juvenile officer "appear[ed] to have been adversarial and antagonistic toward respondent." L.L., 295 Ill. App. 3d at 603, 693 N.E.2d at 915. The court concluded:

> "The trial court tended to focus on the
> lack of overt coercion or threats. The absence
> of overt coercion or threats does not mean that
> the statement was voluntary under the circum-
> stances. While we believe the trial court was
> diligent in attempting to arrive at a correct
> ruling, we have taken a different view of the

factors and the evidence. We have had the
advantage of time to study the record in detail
and to consider the most recent case law in
arriving at our decision. Although we arrive
at our conclusion by considering several fac-
tors under the totality of the circumstances
test, we point out that the law enforcement
officers' conduct here in frustrating the
access of the parents to their child is a
material factor in our decision. The State did
not meet its burden of showing that respon-
dent's statements were voluntary." L.L., 295
Ill. App. 3d at 604, 693 N.E.2d at 915-16.

We need not list every case cited by Jon because the
pattern is clear. The cases in which confessions have been deemed
involuntary involve juveniles who were not permitted to see their
parents after their parents had been notified that the minor was in
custody. This fact, when present with some combination of low
intelligence, young age, psychological problems, mental retardation,
learning disabilities, absence of prior experience with the criminal
justice system, the lack of presence of a juvenile officer, or the
presence of a juvenile officer who did not appear interested in the
minor's rights, resulted in a finding that the statement was not
voluntary.

The question for this court is whether the lack of advice
from an interested adult, combined with violations of the statute,
Jon's personality traits, and his lack of prior experience with the
police, combined to make his statements involuntary. If the trial

- 51 -

court gave little weight to Jon's personality traits and past experience, this court should be guided by that finding, given the standard of review.  Looking at the totality of the circumstances, we must affirm the trial court's judgment that Jon's will was not overcome, particularly in light of his level of intelligence and his admitted desire to unburden himself by telling someone in authority what he had done.

### 3. Waiver of Constitutional Rights

With regard to the validity of Jon's waiver of his <u>Miranda</u> rights, the trial court ruled that the waiver "was knowingly and intelligently made."  Although the docket entry is addressed primarily to the question of voluntariness, several comments are relevant to the waiver inquiry.  The trial court considered Jon's:

> "apparent mental ability, familiarity with the English language, his age, education, experience, emotional complexion, any prior contacts with authorities which, in this case, there were none[.]  [The] [c]ourt also considers the disfunction [sic] with which [d]efendant is afflicted and the doctor's testimony.  ***  The evidence shows that the [d]efendant is of average intelligence, appeared emotionally stable, articulate[,] and familiar with the English language."

The court found it "apparent" that Jon "was well aware of his rights, that he understood them[,] and that he made a knowing and intelligent waiver of <u>Miranda</u>."

On appeal Jon argues that, given his lack of experience

with the police, the violations of the Act, his emotional makeup (including the excessive punishment he was taught to expect when he did not please adults in authority), and lack of notice to his mother, his purported waiver was not knowing and intelligent.  He did not understand the consequences of waiving any of the stated rights.  He was not told that he could be transferred to criminal court and tried as an adult.  The waiver process was procedurally inadequate because Harberts offered no explanation of the rights beyond merely reading the warning.  Jon was not asked to sign a written waiver; he was merely asked if he understood each warning, but was not asked if he wanted to give it up.  At the conclusion of the reading of the warnings, Harberts asked, "Knowing these rights, do you want to talk to me without having a lawyer present?"  This question, Jon argues, "is completely inadequate to demonstrate a knowing and intelligent waiver of <u>Miranda</u> warnings."

The question of a knowing and intelligent waiver is a separate inquiry from voluntariness.  <u>People v. Bernasco</u>, 138 Ill. 2d 349, 356, 562 N.E.2d 958, 961 (1990).  "[T]o waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail."  <u>Bernasco</u>, 138 Ill. 2d  at 363, 562 N.E.2d at 964.  The degree of knowledge required is cognizance of the State's intention to use one's statements to secure a conviction and of the fact that one may stand mute and request a lawyer.  <u>Bernasco</u>, 138 Ill. 2d  at 360, 562 N.E.2d at 962.  "The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision."  <u>People v. Turner</u>, 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30 (1973).

This inquiry, like the voluntariness inquiry, looks to the totality of the circumstances surrounding the purported waiver. People v. Henderson, 175 Ill. App. 3d 483, 489, 529 N.E.2d 1051, 1054 (1988).   "The particular facts and circumstances of each case[,] as well as the experience, conduct[,] and background of the accused[,] must be considered in determining whether a waiver is knowingly and intelligently made." Henderson, 175 Ill. App. 3d at 489, 529 N.E.2d at 1054.   If the defendant's limitations "did not interfere with his ability to comprehend the meaning of a voluntarily made statement or a right to counsel, his statement will not be suppressed." Henderson, 175 Ill. App. 3d at 489, 529 N.E.2d at 1054.   Further, "the police are not required, as a prerequisite to accepting a defendant's waiver, to conduct a mental examination of the defendant in order to ascertain his ability to comprehend his constitutional rights." People v. Phillips, 226 Ill. App. 3d 878, 886, 589 N.E.2d 1107, 1113 (1992).

The question of whether a defendant knowingly and intelligently waived his rights is "essentially a question of fact for the trial court." People v. Higgins, 239 Ill. App. 3d 260, 269, 607 N.E.2d 337, 343-44 (1993).   When the trial court has found a valid waiver, the reviewing court will not reweigh the evidence, but will consider only whether the decision was against the manifest weight of the evidence.   Higgins, 239 Ill. App. 3d at 269, 607 N.E.2d 343.

Jon cites People v. Travis, 122 Ill. App. 3d 671, 462 N.E.2d 654 (1984), which held that the juvenile defendant's statements made after he was read the Miranda warnings should have been suppressed.   The court noted the special care that must be

taken in scrutinizing the record where a juvenile is involved. <u>Travis</u>, 122 Ill. App. 3d at 674, 462 N.E.2d at 656. Another factor contributing to the result was the "failure of the police officers to make a reasonable attempt to notify defendant's parents that [he] was in custody." <u>Travis</u>, 122 Ill. App. 3d at 677, 462 N.E.2d at 658.

The State distinguishes <u>Travis</u>, noting that the decision turned, in large part, on the fact that the arrest itself was illegal because the police lacked probable cause. <u>Travis</u>, 122 Ill. App. 3d at 675, 462 N.E.2d at 657. <u>Travis</u> is inapposite, in any event, because the decision to suppress the statement was based on voluntariness principles, not waiver principles.

The State also cites <u>People v. Burke</u>, 164 Ill. App. 3d 889, 895, 518 N.E.2d 372, 376 (1987), in which the trial court found the defendant had made the requisite waiver of his rights, despite his "'great difficulty in reading and writing'" and his "'subnormal mentality.'" The court observed that "the trial court is in a better position than a court of review to evaluate a defendant's ability to understand his rights." <u>Burke</u>, 164 Ill. App. 3d at 896, 518 N.E.2d at 376.

The trial court in this case, as in <u>Burke</u>, had the opportunity to observe the defendant as he testified at the suppression hearing. The standard of review mandates that this court affirm the trial court's judgment as to waiver.

4. <u>Evidence</u> <u>of</u> <u>Prior</u> <u>Violent</u> <u>Conduct</u> <u>by</u> <u>the</u> <u>Victims</u>

After jury selection, but before the commencement of evidence, the trial court considered the State's motion to exclude certain testimony by Jon's mother. The defense made a written offer

of proof, in which Ashworth described being whipped and beaten with a razor strap as a child, in the same manner in which Jon claimed to have been beaten. She stated her parents "constantly" insulted and belittled her, as they did Jon. Lila would nag and berate her and would nag Keith until he beat her. At times, she had marks on her body, which her teacher noticed. Once her father beat her with a board until it broke. Keith would punch her full-force with his fist, with the knuckle of his middle finger extended. He was obsessed with the subject of sex and frequently talked to her about her mother's lack of interest in sex. Keith "told her hundreds of times that if she resisted him [sexually], he would kill her in her sleep, and she believed him."

Ashworth's offer of proof also described her knowledge of Jon's living conditions while with her parents. When she would call to talk to Jon, Lila would not let her speak to him, telling her Jon was not there. Ashworth would learn later that Jon had been at home when she called. Keith admitted to Ashworth that he beat Jon. She explained her decision to send Jon to live with her parents as motivated by her still looking for their approval. She warned them "that they better not do to Jon what they had done to her."

The trial court rejected the offer of proof based on the remoteness of the events Ashworth described, "the fact that one was a female [child] being raised [by the victims]. The other is a male," and the fact that "there is nobody [alive] now who can honestly *** rebut" Ashworth's allegations.

Later, during the testimony of defense expert psychologist Hart, the State objected to any testimony regarding his interview with Ashworth or the purposes of that conversation. The trial court

sustained the objection, and the defense again made an offer of proof.  Hart stated he interviewed Ashworth by telephone for about 1 hour and 45 minutes for the purpose of learning "about Jon's experiences with her parents and also *** her experiences as a child of the Cearlocks."  The information he obtained from Ashworth corroborated what Jon had told him, and he relied on the information in forming his opinion.  He described the Cearlocks' treatment of their daughter and grandson as displaying "a repetitive and persistent pattern," noting Keith's continued use of the razor strap and knuckle punch, the constant criticism, and unending discord between Keith and Lila.  Hart stated the significance of the information provided by Ashworth was that it "added credibility to Jon's description of his own life experiences."  When asked if the passage of time detracted from this significance, Hart responded, "In a sense, it would indicate that this was a long-standing pattern and less likely to be modified."

The trial court ruled:  "[T]he offer that was just made for the record is nothing the [c]ourt hasn't heard before, so it's denied."

The parties agree that when, as here, the theory of self-defense is raised, evidence of the victim's aggressive or violent character is relevant (1) to show that defendant's knowledge of the victim's behavior and tendencies affected his perceptions of, and reactions to, the victim's actions and (2) to support the defendant's version of the facts where there are conflicting accounts of what happened.  People v. Lynch, 104 Ill. 2d 194, 199-201, 470 N.E.2d 1018, 1020 (1984).  Thus, Jon was permitted to testify regarding his grandparents' use of whipping as punishment and his

grandfather's threats to kill him in his sleep.

The testimony of Ashworth and Hart was not offered, however, for either of the two purposes permitted by Lynch but, rather, to corroborate Jon's account of life in the Cearlock household.  Jon argues that the offered testimony meets the general test for the admissibility of evidence; that is, relevance.  People v. McGee, 211 Ill. App. 3d 641, 650, 570 N.E.2d 578, 583 (1991), overruled on other grounds by People v. Jackson, 149 Ill. 2d 540, 553, 499 N.E.2d 926 (1992).

> "Any circumstances that tend to make the propo-
> sition more or less probable may be put into
> evidence.  Evidence is therefore relevant where
> the fact or circumstance offered tends to prove
> or disprove a disputed fact or to render the
> matter at issue more or less probable."  McGee,
> 211 Ill. App. at 650, 570 N.E.2d at 583.

A trial court may reject offered evidence, on grounds of relevancy, if it has little probative value due to its remoteness, uncertainty, or potential for prejudice.  People v. Ward, 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702 (1984).  A decision on the admissibility of evidence is within the sound discretion of the trial court and will be affirmed on review absent a clear showing that the trial court abused its discretion.  Ward, 101 Ill. 2d at 455-56, 463 N.E.2d at 702.

Jon argues his mother's testimony was important corrobora-tion of his testimony, which was excluded to his prejudice.  He asserts the remoteness in time of his mother's experiences in the Cearlock household goes to the weight to be given her testimony by

- 58 -

the trier of fact, not to its admissibility, citing <u>People v. Illgen</u>, 145 Ill. 2d 353, 583 N.E.2d 515 (1991), in which the issue was the admissibility of evidence of prior bad acts of the defendant, for its discussion of remoteness.  <u>Illgen</u> stated a general rule that more recent acts have "more probative value" than less recent acts.  <u>Illgen</u>, 145 Ill. 2d at 370, 583 N.E.2d at 522.  Jon reasons from this statement that testimony may not be excluded on the <u>sole</u> basis of remoteness unless it can be said that it has virtually <u>no</u> probative value.  He also argues that the similarities between his experiences and his mother's at the hands of the Cearlocks increased the probative value of her testimony.  We agree.

The State does not respond to this argument of Jon's. Instead, the State analyzes the issue as if the question were the admissibility of evidence of Keith's and Lila's aggressive or violent character under <u>Lynch</u>.  The State argues, for example, that Jon was not aware of his mother's abuse as a child and that he made inconsistent statements regarding his own abuse.

However, Jon's knowledge, or lack of knowledge, of his mother's childhood experiences has no bearing on the purpose for which her testimony was offered.   Further, he was subject to impeachment upon cross-examination by the State about any inconsistent statements, and Ashworth could have been impeached by questions regarding bias and her motive to protect her son.

The State also argues that admission of Ashworth's testimony would have "necessitated a considerable mini-trial to determine whether the abuse had in fact taken place as she claimed." The State objects that it might have felt the need to rebut Ashworth's testimony.

- 59 -

When a defendant is attempting to prove self-defense, he "should be given substantial latitude."  People v. Robinson, 163 Ill. App. 3d 754, 773, 516 N.E.2d 1292, 1306 (1987).  In addition it is "generally a defendant's right to present evidence of a victim's character for violence when the defendant alleges that he acted in self-defense" because "such evidence tends to show circumstances confronting the defendant, the extent of his apparent danger, and the motive influencing him."  Robinson, 163 Ill. App. 3d at 773, 516 N.E.2d at 1306.

Jon cites Robinson, which applied these general rules and reasoned that the defendant, who had laid a proper foundation for his self-defense claim, should be allowed to present evidence of the violent character, not of the victim, but of the victim's companion. Robinson, 163 Ill. App. 3d at 774, 516 N.E.2d at 1307.  The court found:

> "no reason not to permit [defendant] to avail himself of the general rule allowing him to show his state of mind while allegedly acting in self-defense; and prior threats by anyone, attacker or not, may be relevant to such state of mind."  Robinson, 163 Ill. App. 3d at 774, 516 N.E.2d at 1307.

Further, the defendant's own account of these threats "could not have been as comprehensive or probatively as forceful as his witnesses' testimony, which therefore would not have been merely cumulative."  Robinson, 163 Ill. App. 3d at 774, 516 N.E.2d at 1307.

Robinson and the cases discussing the general issue of relevance favor the admission of Ashworth's corroborative testimony.

The ruling appears to have been based entirely on the remoteness in time of Ashworth's experience.  The State could address this concern both on cross-examination and in closing argument.  In addition, Hart's testimony suggests that the intergenerational nature of the victims' conduct makes Ashworth's testimony more credible, rather than less so.

Turning to Hart's offered testimony, Jon argues that Hart's inability to recount his reliance on his interview with Ashworth undermined his testimony as an expert in two ways.  First, the information he obtained from Ashworth "corroborated and supported Jon's version of the *** facts of his own abuse."  Second, "it provided important diagnostic insights into Jon's psychological makeup."   "Both the corroborative component and the diagnostic component were equally important to the jury's understanding of Jon's defense and were clearly relevant."

The State's only comment directly dealing with the limitation imposed on the doctor's testimony is:

> "The mere fact that the defense expert found the information from [Ashworth] to be relevant and helpful to him in making his evaluation of the defendant would not require the admission of this evidence since the court was not re-quired to accept Dr. Stuart Hart's opinion and was entitled to make his own determination as to whether the information would be helpful to the jury."

Jon approaches the analysis of the admissibility of Hart's testimony in terms of the rules of evidence regarding expert

testimony, citing Rule 703 of the Federal Rules of Evidence (28 U.S.C. app. Fed. R. Evid. 703 (1976)). In <u>People v. Sutherland</u>, 155 Ill. 2d 1, 21-22, 610 N.E.2d 1, 10 (1992), the supreme court noted that in <u>Wilson v. Clark</u>, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), it:

> "adopted Rule 703 of the Federal Rules of Evidence and held that an expert witness may base his or her opinion on information which has not been admitted into evidence so long as that information is reliable and is of a type reasonably relied upon by experts in that field."

Such testimony is admitted for the limited basis of explaining the basis for the expert's opinion and, thus, the rule does not create an exception to the hearsay rule. <u>Sutherland</u>, 155 Ill. 2d at 22, 610 N.E.2d at 10.

<u>Sutherland</u> and other cases applying this rule (see <u>People v. Pasch</u>, 152 Ill. 2d 133, 175, 604 N.E.2d 294, 310-11 (1992)) support Jon's argument that Hart should have been allowed to explain his reliance on the family history provided by Ashworth. "By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury in assessing the value of his opinion." <u>Pasch</u>, 152 Ill. 2d at 176, 604 N.E.2d at 311.

At trial, the State did not suggest that Hart be allowed to testify fully as to the bases for his opinion, but with a limiting instruction.

The excluded testimony was relevant to the defense theory of the case, admissible under the general rule, and capable of being impeached for bias or limited by a jury instruction. We hold it was

error to exclude the proffered evidence.

### 5. Harmless Error Analysis

The State argues that even if Jon's statement to Harberts was admitted in error, the error was harmless in light of the over-whelming evidence of guilt.

Jon rejects the harmless error claim, characterizing the phrase "they pissed me off" as a "prosecution mantra." Jon cites multiple references by the prosecutor to the statement. For example, in the State's closing argument, the quoted statement was used to refute the suggestion that Jon's shooting of Lila was based on his subjective, if unreasonable, belief that she represented a threat, or that his shooting of Keith was based on a reasonable belief in the need for self-defense. The erroneously admitted statement, according to the prosecutor's closing argument, was the "true expression of the emotion he felt at the time that he gunned down Keith and Lila Cearlock." Because "they pissed me off. I couldn't take it any more, so I shot them."

With regard to the exclusion of Ashworth's and Hart's proffered testimony, Jon states that his conviction "must be reversed" on the basis of the State's repeated emphasis in its closing on Jon's inability to corroborate the beatings and the legitimacy of his fear that Keith would kill him. The State does not consider the question.

During its closing argument, the State commented on the lack of corroboration "of any actual abuse of Jon Morgan by Keith and/or Lila Cearlock," stating that such evidence was "[j]ust not there." During its rebuttal, the State remarked, "[W]e don't know whether Keith and Lila failed Jon, because they couldn't tell you

how they treated Jon.  And how could they?  They're gone."  The State further commented that there was no evidence to support the allegations that the razor strap was ever used on Jon.

We conclude that the evidentiary errors--admission of Jon's statement and limiting his witnesses' testimony--were harmless with respect to the verdict of second degree murder as to Keith. The evidence of guilt of some form of murder was overwhelming, even according to Jon's own account.  There was no evidence that Keith presented an imminent threat of death or great bodily harm to Jon that would have justified his killing in self-defense.  In addition, the jury accepted the defense theory, at least in part, by finding either provocation or imperfect self-defense and rendering a verdict on second degree murder.

With respect to Lila, however, the excluded testimony went to the heart of the defense theory of the case and would have corroborated Jon's testimony, particularly regarding his fear of her.  The improperly admitted statement was not only prejudicial, but was repeatedly emphasized.  We conclude below, on other grounds, that Jon is entitled to a new trial on counts I and III.  We are confident that these errors will not be repeated.

**[The preceding material is not to be published pursuant to Supreme Court Rule 23.]**

### C. Felony Murder

The jury was instructed that Jon was charged with two types of first degree murder:  Type A (knowing or intentional) and Type B (felony).  Second degree instructions were given only as to Type A.  The State offered six verdict forms, three for each victim: (1) not guilty, (2) guilty of first degree murder, and (3) guilty

of second degree murder.

We first consider whether Jon preserved the felony murder issues for appeal. After he was denied second degree murder instructions on the felony murder counts, he made a motion to dismiss those counts, which was also denied. He raised the issues again in his posttrial motion. He did not, however, object to the use of general verdict forms.

In People v. Thurman, 223 Ill. App. 3d 196, 203, 584 N.E.2d 1069, 1074 (1991), the court held that even if the defendant was improperly charged with felony murder, his conviction would still stand, because "[i]t is well settled that a defendant convicted by a general verdict is guilty of any good count in the indictment to which proof is applicable." In Thurman, the defendant was charged with first degree murder under each of the three sections of the statute. The general guilty verdict indicated "an intention to convict the defendant of first degree murder under sections 9-1(a)(1) and 9-1(a)(2), as well as felony murder under section 9-1(a)(3)." Thurman, 223 Ill. App. 3d at 203, 584 N.E.2d 1074.

Thurman relied on People v. Baker, 127 Ill. App. 3d 565, 569, 469 N.E.2d 602, 605 (1984), in which the issue was whether the defendant could be sentenced for the underlying felony when he was convicted of multiple counts of murder, including felony murder, by a general verdict of guilty. Because defendant offered no reason why a conviction of home invasion could not stand with a murder conviction on the basis of sections 9-1(a)(1) or 9-1(a)(2), the sentence was affirmed. Baker, 127 Ill. App. 3d at 569, 469 N.E.2d at 606; see also People v. Scott, 148 Ill. 2d 479, 562, 594 N.E.2d

217, 253 (1992) (affirming sentence for underlying felony where general verdict supports murder conviction under intentional and knowing theories as well as felony murder).

We are reluctant to find an issue forfeited, however, where the defendant made the proper motions at trial and renewed his arguments in a posttrial motion. Our decision to address these issues on the merits is reinforced by the emphasis placed on the felony murder theory by the prosecutor during closing argument. The prosecutor argued repeatedly that the jury members should first consider the felony murder theory because, if they found the underlying felony proved, they need not deal with the considerable amount of evidence relating to defendant's mental state.

Our decision is also buttressed by the decision in People v. Shaw, 186 Ill. 2d 301, 329, 713 N.E.2d 1161, 1176 (1998), in which the supreme court rejected a claim of instructional error because the jury was completely and thoroughly informed of the three types of murder and "received separate verdict forms for each crime charged against defendant," including the underlying felony. In the present case, the jury was instructed to consider whether Jon committed either of the alleged felonies, but was not asked to render a verdict for each crime charged, including the underlying felony and each individual count of murder.

We also conclude the verdict of second degree murder as to Keith cannot have been based on Type B, because the second degree instruction was limited to Type A murder. However, it is not possible to determine whether the verdict of first degree murder as to Lila was based on Type A or Type B. As a result, the issues raised by the defendant with regard to felony murder affect only the

conviction of first degree murder for the shooting of Lila.

1. <u>Instructing</u> <u>the</u> <u>Jury</u> <u>on</u> <u>Felony</u> <u>Murder</u> <u>Regarding</u> <u>Lila's</u> <u>Death</u>

Jon repeatedly challenged the State's theory at trial that his shooting of Lila could constitute felony murder. He argued at trial--and repeats the argument on appeal--that, because aggravated battery and discharge of a firearm were inherent in his act of intentionally killing with a firearm, the trial court should not have instructed the jury on felony murder. He contends that under the facts of this case, the rationale of the felony murder rule, "to deter individuals from committing forcible felonies by holding them responsible for murder if death results" (<u>People v. Pugh</u>, 261 Ill. App. 3d 75, 77, 634 N.E.2d 34, 35 (1994)), does not apply. For the reasons that follow, we agree.

Any time a person commits intentional or knowing murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 1996)), he necessarily causes great bodily harm. The same conduct constitutes aggravated battery. 720 ILCS 5/12-4(a) (West 1996). If he uses a gun, he necessarily discharges the firearm in the direction of another, thereby committing aggravated discharge of a firearm. 720 ILCS 5/24-1.2(a)(2) (West 1996). Unless application of the felony murder rule is limited to cases in which a killing occurs during the commission of a felony consisting of conduct other than that inherent in the killing itself, <u>all</u> deliberate killings and all fatal shootings may be charged as felony murder. This would not only effectively eliminate the second degree murder statute in such cases, but would also eliminate the need for the State to prove an intentional or knowing killing in most murder cases. <u>People v. Kidd</u>, 295 Ill. App. 3d 160, 165, 692 N.E.2d 455, 459 (1998), <u>appeal</u> <u>denied</u>, 178 Ill. 2d

- 67 -

588, 699 N.E.2d 1035 (1998).

Scholarly writing and case law support exist for requiring the State to prove an independent felony when charging felony murder:

> "It is the rule in some jurisdictions that the felony[]murder doctrine does not apply unless the underlying felony is so distinct from the homicide as not to be an ingredient thereof, indictable therewith, or convictable thereunder. The felony murder doctrine does not apply where the felony is an offense included in the charge of homicide." 40 Am. Jur. 2d <u>Homicide</u> §66, at 520 (1999).

Thus, the "homicide must be committed in the perpetration of or an attempt to perpetrate a felony. The death must be caused by an act in course of or in furtherance of the felony." 40 Am. Jur. 2d <u>Homicide</u> §67, at 523 (1999).

> Professor LaFave notes some jurisdictions hold that: "the collateral felony must be a felony which is 'independent' of the conduct which kills; it must involve conduct separate from the acts of personal violence which constitute a necessary part of the homicide itself." W. LaFave & A. Scott, Jr., Criminal Law §7.5, at 638 (2d ed. 1986).

This approach could lead to a rule, which LaFave acknowledges Illinois rejected in <u>People v. Viser</u>, 62 Ill. 2d 568, 343 N.E.2d 903 (1975), that "aggravated battery toward the deceased will not do for

- 68 -

felony murder." W. LaFave & A. Scott, Jr., Criminal Law §7.5, at 638, see also n.104 (2d ed. 1986). However, a rule requiring proof of an independent felony need not entirely bar felony murder prosecutions based on aggravated battery.

For example, in California, a defendant may not be sentenced to death for first degree murder unless the jury finds "special circumstances," one of which is that he committed the act resulting in death (1) during the commission or attempted commission of one of five specified felonies (People v. Green, 27 Cal. 3d 1, 49, 609 P.2d 468, 497 (1980)) and (2) "in order to advance an independent felonious purpose" (Green, 27 Cal. 3d at 61, 609 P.2d at 505). If the underlying felony is "merely incidental to the murder" because "its sole object is to facilitate or conceal the primary crime" (Green, 27 Cal. 3d at 61, 609 P.2d at 505), felony murder does not apply.

People v. Jenkins, 190 Ill. App. 3d 115, 545 N.E.2d 986 (1989), offers an example of a proper case for the application of the felony murder rule predicated on aggravated battery. The defendant struggled with a police officer, whom he knew to be on duty at the time. He was also aware the officer was holding a cocked and loaded gun. The gun discharged, killing another officer. Jenkins, 190 Ill. App. 3d at 127, 545 N.E.2d at 994. The court held the defendant's conviction of felony murder was appropriate. Jenkins, 190 Ill. App. 3d at 127, 545 N.E.2d at 994. Similarly, felony murder is properly charged when the defendant commits the independent felony of aggravated discharge of a firearm by engaging in a gun battle and a bystander is killed by return fire. Pugh, 261 Ill. App. 3d at 78, 634 N.E.2d at 36.

- 69 -

In both <u>Jenkins</u> and <u>Pugh</u>, the defendant intended to commit an independent forcible felony and a death resulted from the use of violence.    Application of the felony murder rule in such cases advances the "legislature's concern for protecting the general populace and deterring criminals from acts of violence." <u>People v. Lowery</u>, 178 Ill. 2d 462, 469, 687 N.E.2d 973, 977 (1997).

One scholar suggests that a sensible rule is to permit a charge of felony murder only if the death results from assaultive conduct involving an independent felonious purpose:

> "If the alleged underlying purpose of the felony[]murder rule is to deter the commission of felonies in a dangerous fashion, the 'independent felonious purpose' merger rule serves as a plausible basis to identify the cases in which the felony[]murder rule is most likely to serve its deterrent purpose." J. Dressler, Understanding Criminal Law §31.07, at 469-70 (1987).

We agree and hold that the predicate felony underlying a charge of felony murder must involve conduct with a felonious purpose other than the killing itself. Because the record in this case fails to show the commission of a predicate felony that had an independent felonious purpose, we conclude that the trial court erred by instructing the jury that defendant could be convicted of first degree murder on a felony murder theory.

In so holding, we note that the points at trial during which the question of sufficiency of the State's evidence as to felony murder becomes ripe are after the State rests and, again,

- 70 -

after both sides have rested.  If the defendant makes a motion for directed verdict at the close of the State's case and the court at that point concludes the State's evidence was not sufficient to show an independent underlying felony, the motion should be granted.  If, after all of the evidence has been presented, the trial court concludes that the State's evidence is not sufficient, the court should refuse the felony murder instruction.  Instead, the court should simply instruct the jury on intentional or knowing murder. 720  ILCS  5/9-1(a)(1),  (a)(2)  (West 1996).  One advantage of proceeding in this fashion is to avoid hearings on motions to dismiss, at which the parties argue what they believe the evidence might or will show; instead, by deferring any ruling until the close of the State's case or the conference on instructions, the court does so in the context of what the evidence has shown.

We acknowledge that the decision we reach in this case may seem inconsistent with the 1975 supreme court decision in Viser. Viser, however, did not consider the question presented here-- whether the predicate felony underlying a charge of felony murder must have an independent felonious purpose.

In Viser, two off-duty police officers were having a conversation as they stood near the open driver's-side door of a car parked at the curb.  The defendants drove up in another car, stopped a few yards from the parked car, and jumped out and said, "'We'll teach those motherfuckers to block the road.'"  Viser, 62 Ill. 2d at 572, 343 N.E.2d at 905.  A fight ensued, and the attackers continued to kick and beat the officers after they fell to the ground.  Finally, defendant Viser twice jumped with both feet on the chest of one of the victims, who died as a result of his injuries.

- 71 -

<u>Viser</u>, 62 Ill. 2d at 575-76, 343 N.E.2d at 907.  The defendants were charged by indictment with intentional murder, knowing murder, or felony murder predicated on aggravated battery.  <u>Viser</u>, 62 Ill. 2d at 577, 343 N.E.2d at 907-08.  They argued on appeal that aggravated battery against the person who eventually dies may not be the underlying felony for a charge of felony murder, because battery is included in the offense of murder.  <u>Viser</u>, 62 Ill. 2d at 577, 343 N.E.2d at 908.  <u>Viser</u> held that an unjustified attack on the person killed may be the basis for a charge of felony murder, rejecting a <u>per se</u> rule that aggravated battery necessarily merges into the crime of murder.  <u>Viser</u>, 62 Ill. 2d at 579-80, 343 N.E.2d at 909.

This case raises a question that was not before the supreme court in <u>Viser</u>.  Further, our answer to the question is consistent with the holding in that case because the rule enunciated here does not preclude a conviction for felony murder on facts such as those in <u>Viser</u>, <u>Jenkins</u>, and <u>Pugh</u>.

We also note that subsequent to the decision in <u>Viser</u>, Illinois homicide law was amended to define the offenses of first and second degree murder, abolish the offense of voluntary man-slaughter, and reword the definition of felony murder to conform to these changes.  Pub. Act 84-1450, eff. July 1, 1987 (1986 Ill. Laws 4221).  These amendments did not affect the range of underlying felonies that may support a charge of felony murder.  As a result, under <u>Viser</u>, the homicide statute, and our decision here, aggravated battery and aggravated discharge of a firearm remain bases for a felony murder instruction as long as those crimes are not merely incidental to the murder itself.

## 2. <u>Jury Instructions</u>

Jon also argues he was improperly denied a second degree murder instruction as to the felony murder charges because (1) the trial court erred by failing to follow binding precedent, (2) refusal to give the requested instruction creates the possibility of inconsistent verdicts, (3) the plain language of the second degree murder statute requires that the instruction be given on these facts, and (4) denial of the requested instruction deprived him of a defense to the charge of first degree murder.  "Whether to issue a specific jury instruction is within the province of the trial court, and such a decision will not be reversed unless it is an abuse of discretion." <u>Kidd</u>, 295 Ill. App. 3d at 167, 692 N.E.2d at 460.

Jon relies primarily on <u>Kidd</u> to argue that where felony murder is charged and the evidence shows the intent to kill or use deadly force was formed <u>after</u> formation of a belief in the need for self-defense, a defendant is entitled to a second degree murder instruction.  In <u>Kidd</u>, the defendant was convicted of aggravated battery and felony murder after the trial court denied his tendered instruction for second degree murder based on provocation.  Relying on the earlier decisions of the supreme court in <u>Viser</u>, 62 Ill. 2d 568, 343 N.E.2d 903, and of this court in <u>People v. Williams</u>, 164 Ill. App. 3d 99, 517 N.E.2d 745 (1987), <u>Kidd</u> held that "where provocation occurs prior to the time that a defendant forms a felonious intent or commits an aggravated battery, defendant is entitled to the [second degree] defense." <u>Kidd</u>, 295 Ill. App. 3d at 165, 692 N.E.2d at 459.

The State attempts to distinguish <u>Kidd</u> (and <u>Williams</u>, upon

- 73 -

which <u>Kidd</u> relied) by noting that both cases involved claims of second degree murder based on provocation (720 ILCS 5/9-2(a)(1) (West 1994)), not imperfect self-defense (720 ILCS 5/9-2(a)(2) (West 1994)). The State offers no explanation for its reasoning that the holding of <u>Kidd</u> is limited to only one of the two mitigating defenses provided in the second degree murder statute, nor does it acknowledge our clear statement in <u>Kidd</u> that:

> "If there is evidence that[,] if believed by
> the jury[,] would reduce a crime from first
> degree murder to second degree murder, defen-
> dant's requested second degree murder instruc-
> tion must be granted." <u>Kidd</u>, 295 Ill. App. 3d
> at 167, 692 N.E.2d at 460.

The State also argues that our decisions in <u>Williams</u> and <u>Kidd</u> are contrary to the holding in <u>Thurman</u>, 223 Ill. App. 3d 196, 584 N.E.2d 1069, and, therefore, should not be followed here. We note <u>Thurman</u> was decided by another appellate district and is not binding on this court. <u>State Farm Fire & Casualty Co. v. Yapejian</u>, 152 Ill. 2d 533, 539, 605 N.E.2d 539, 542 (1992). In addition, <u>Thurman</u> not only predated <u>Kidd</u> by seven years, it addressed an entirely different issue. The defendant in <u>Thurman</u> argued that a charge of felony murder cannot be based on aggravated battery, "[b]ecause every murder involves an aggravated battery *** and defendants would be precluded from proving mitigating factors to reduce first degree murder to second degree murder." <u>Thurman</u>, 223 Ill. App. 3d at 202, 584 N.E.2d at 1074. The court rejected his argument that aggravated battery should always merge into murder as a lesser included offense. <u>Thurman</u>, 223 Ill. App. 3d at 202, 584

- 74 -

N.E.2d at 1074.  Thurman did not, however, consider the need for jury instructions on second degree murder in the circumstances presented here.

When a circuit court is "faced with conflicting decisions from the various appellate districts" and "the absence of controlling authority from its home district," it is "free to choose between the decisions of the other appellate districts."  State Farm, 152 Ill. 2d at 540, 605 N.E.2d at 542.  However, because of our system of precedent, the circuit court may not disregard binding authority from its home district.  State Farm, 152 Ill. 2d at 540, 605 N.E.2d at 542.  The trial court's disregard of the decision of this court in Kidd, therefore, constitutes error, particularly when the trial court found the evidence sufficient to warrant giving a second degree murder instruction as to the other counts.

### 3. Harmless Error Analysis

The State argues that, even if the trial court erred, the error was harmless because no reasonable juror could have found that Jon acted in an honest belief that Lila represented a threat.  The State confuses the standards for harmless instructional error and sufficiency of the evidence.  See People v. Dennis, 181 Ill. 2d 87, 95, 692 N.E.2d 325, 330 (1998).

The instructional error had the effect of preventing the jury from considering mitigating defenses to the charge of felony murder.  Had the jury been properly instructed, it would have been required to consider any evidence of provocation or imperfect self-defense as to each of the three theories of murder charged.  As a result, the improper felony murder charges would not have affected the outcome of the trial, because the jury's analysis would have

been the same whether it was proceeding under Type A, Type B, or both. Thus, we concluded above that the verdict of second degree murder as to Keith must stand. Reversal of the verdict of first degree murder as to Lila would not be necessary had the jury been properly instructed.

However, the State prevailed at trial on the jury instruction issue, thus preventing the jury from engaging in the required analysis. The State also presented general verdict forms, which obscure the basis for the jury's verdict, and repeatedly encouraged the jury to deal only with the felony murder counts and to disregard evidence of Jon's mental state. As a result, because it is impossible to discern the basis for the verdict, the question before this court is whether reversible error results when a defendant is convicted of felony murder in the absence of evidence of an independent felonious purpose.

We hold that it is reversible error for a trial court to deny a defendant's motion to dismiss a charge of felony murder where the State has failed to present evidence of an independent felonious purpose. In this case, the prosecutor succeeded in diluting the intent requirement for knowing or intentional murder by charging felony murder and, as a result, Jon was denied a fair trial.

### III. CONCLUSION

For the foregoing reasons, the judgment of the trial court convicting Jon Morgan of the second degree murder of Keith Cearlock is affirmed. His conviction for the first degree murder of Lila Cearlock is reversed and the cause remanded for a new trial. The judgment of the circuit court of Logan County is affirmed in part and reversed in part.

Affirmed in part and reversed in part; cause remanded with directions.

McCULLOUGH, J., concurs.

STEIGMANN, J., specially concurs.

STEIGMANN, J., specially concurring.

I agree completely with the majority opinion's analysis regarding the limits of the felony-murder rule and why it should not apply in this case. Another way to look at the key holding in this case--that the predicate felony underlying a charge of felony murder must involve conduct with a felonious purpose other than the killing itself--is that the predicate felony must involve conduct other than that inherent in the killing itself. I write this special concurrence because the majority opinion has the effect of seriously calling into question the continuing validity of the Kidd decision of this court. The basis for that statement follows.

Because the majority opinion initially appears inconsistent with the 1975 supreme court decision in Viser, the majority distinguishes Viser on the facts. Although the majority's effort has merit, it may prove unnecessary if the supreme court, upon further review, chooses to address the felony-murder rule as the majority does rather than adhering to Viser. (See, e.g., People v. Roy, 201 Ill. App. 3d 166, 185, 558 N.E.2d 1208, 1221 (1990), where this court declined to adhere to a long-standing standard of review in sex offense cases--that the evidence had to show, in addition to the requirements in any other criminal case in which the sufficiency of evidence is challenged on appeal, that the complainant's testimony was either clear and convincing or corroborated by other evidence--and implicitly concluded that the Supreme Court of Illinois, when it again considered the matter, would agree with the abandonment of that standard. That implicit prediction was proved correct in People v. Schott, 145 Ill. 2d 188, 202, 582 N.E.2d 690, 696-97 (1991).) The justification for this conclusion is twofold:

- 78 -

(1) the majority opinion does not hold that <u>no</u> aggravated battery or aggravated discharge of a firearm could ever serve as the predicate felony justifying the felony-murder instruction; and (2) Illinois homicide law has undergone a fundamental change since the <u>Viser</u> decision was rendered, and this change places the supreme court's continued adherence to <u>Viser</u> in doubt.

First, as the majority opinion makes clear, <u>some</u> aggravated batteries and aggravated discharges of a firearm will remain a basis for a felony-murder instruction as long as those crimes are not "merely incidental to the murder"--that is, where those crimes involve conduct other than that inherent in the killing itself. Examples where those crimes have served as a proper predicate for the felony-murder rule exist in both <u>Jenkins</u> and <u>Pugh</u>.

Second, Illinois homicide law underwent a fundamental change with the enactment in 1986 of Public Act 84-1450, which (1) changed the name of the offense of murder to first degree murder and (2) abolished the offense of voluntary manslaughter and substituted for it the offense of second degree murder. As the supreme court wrote in <u>People v. Jeffries</u>, 164 Ill. 2d 104, 111, 646 N.E.2d 587, 590 (1995), "[t]he intent of the legislature in enacting Public Act 84-1450 was to remedy the confusion and inconsistency that had developed in regard to the [previous] murder and voluntary manslaughter statutes." One of the means the legislature used in doing so was to change the burden of proof in section 9-2, which previously defined voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9-2). Under the old law, when the defendant in a murder case presented evidence of a factor in mitigation (either serious provocation or unreasonable belief) that must have been present to

reduce an offense of murder to voluntary manslaughter, the State had the burden to prove, beyond a reasonable doubt, the absence of a factor in mitigation in order to obtain a murder conviction. Jeffries, 164 Ill. 2d at 113-14, 646 N.E.2d at 591. However, under the current section 9-2, now defining the crime of second degree murder, the defendant bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation that must be present to reduce an offense of first degree murder to second degree murder, although the State still bears the burden to prove, beyond a reasonable doubt, the elements of first degree murder. 720 ILCS 5/9-2 (West 1996).

This revision constituted a fundamental change in Illinois law, as shown by the supreme court's recognition of a heretofore unknown legal entity: the lesser mitigated offense. In Jeffries, the court rejected the defendant's argument that second degree murder, like voluntary manslaughter, which it replaced, was a lesser included offense of first degree murder and instead concluded that "second degree murder is more accurately described as a lesser mitigated offense of first degree murder." (Emphasis in original.) Jeffries, 164 Ill. 2d at 122, 646 N.E.2d at 595. The court explained that second degree murder is a lesser offense because its penalties upon conviction are lesser, and it is a mitigated offense because it is first degree murder plus defendant's proof by a preponderance of the evidence that a mitigating factor was present. Jeffries, 164 Ill. 2d at 122, 646 N.E.2d at 595.

The new section 9-2, defining second degree murder, also differed from its predecessor section 9-2, defining voluntary manslaughter, by providing that a person commits second degree

murder "when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of [s]ection 9-1 of this Code" and either mitigating factor is present. 720 ILCS 5/9-2(a) (West 1996). Previously, section 9-2(a), defining voluntary manslaughter, simply stated that "[a] person who kills an individual without lawful justification commits voluntary manslaughter" if, at the time of the killing, he acted under serious provocation or imperfect self-defense. Ill. Rev. Stat. 1985, ch. 38, par. 9-2(a).

The only reason for this change in the defining language appears to be to eliminate the charge of felony murder as being a basis upon which a jury could be instructed that it could return a second degree murder conviction as a lesser mitigated offense. Yet, in Kidd, this court held that, "[i]n order to give some meaning to the second degree murder statute, there must be some limit on a prosecutor's ability to charge felony murder," and concluded that the legislature could not have intended to prohibit a defendant--no matter what the facts--from obtaining a second degree murder instruction when the State has charged only felony murder. Kidd, 295 Ill. App. 3d at 166, 692 N.E.2d at 459-60. In so concluding, this court cited Viser and seemed to be particularly troubled by the idea, as the majority discussed, that aggravated battery could in almost any case under Illinois law serve as the predicate felony for a felony-murder instruction, thus permitting "a prosecutor [to] avoid the provocation defense in an intentional or knowing murder case by charging felony murder based upon an aggravated battery upon the person killed." Kidd, 295 Ill. App. 3d at 165, 692 N.E.2d at 459.

Although I wrote a special concurrence in <u>Kidd</u> disagreeing with the majority's analysis of section 9-2 (<u>Kidd</u>, 295 Ill. App. 3d at 168-71, 692 N.E.2d at 461-63 (Steigmann, J., specially concurring)), I understood the concerns that prompted the majority opinion there.  However, the majority's concerns in <u>Kidd</u>, and the construction of section 9-2 of the Criminal Code that the majority gave in <u>Kidd</u> to avoid the "absurd results" about which <u>Kidd</u> expressed concern, are both fully addressed and assuaged by the majority opinion in this case, restricting the predicate felony to conduct with a felonious purpose other than the killing itself--that is, the predicate felony must involve conduct other than that inherent in the killing itself.

Thus, the judicial gloss given to section 9-2 of the Criminal Code by the majority opinion in <u>Kidd</u> may--and should--no longer be followed by the trial courts of Illinois.

ORIGINAL

E-FILED
Wednesday, 19 August, 2009 03:03:50 PM
Clerk, U.S. District Court, ILCD

FILED

OCT 1 3 1998

CLERK OF THE
APPELLATE COURT, 4th DIST.

## CASE NO. 4-96-0996

## IN THE APPELLATE COURT
## FOR THE FOURTH DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | On Appeal from the Circuit Court for the Eleventh Judicial Circuit Logan County, Illinois |
| Plaintiff-Appellee | ) | |
| v. | ) | Case No. 95-CF-101 |
| JON R. MORGAN, | ) | The Honorable Gerald Dehner Judge Presiding |
| Defendant-Appellant. | ) | |

---

# BRIEF OF APPELLANT,
# JON R. MORGAN

---

<u>*Counsel for Appellant*</u>:
D. Peter Wise
Gates, Wise & Schlosser, P.C.
Attorneys at Law
1225 South Sixth Street
Springfield, Illinois 62703
(217) 522.9010

---

## ORAL ARGUMENT REQUESTED

---

# TABLE OF CONTENTS

**Page**

POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 59, 62, 69, 73, 78, 88

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

## POINTS AND AUTHORITIES

I. **THE TRIAL COURT ABUSED ITS DISCRETION WHEN GRANTING THE STATE'S MOTION FOR TRANSFER TO THE CIRCUIT COURT AFTER FINDING THAT THE FACTS PRESENTED A TRAGIC SITUATION WHERE JON MORGAN HAD BEEN SHORT-CHANGED IN HIS LIFE, MOREOVER, THE COURT FAILED TO ADEQUATELY CONSIDER ALL STATUTORY FACTORS AND IGNORED EVIDENCE THAT REFLECTED FAVORABLY UPON JON MORGAN.**

**Page**

*People v. Clark*, 119 Ill.2d 1, 518 N.E 2d 138 (1987) . . . . . . . . . . . . . . . . . . . . . . . 36
Section 5-4(3)(b) of the Juvenile Court Act of 1987 . . . . . . . . . . . . . . . . . . . . . . . . 36
*People v. Taylor*, 76 Ill.2d 289, 303, 304, 391 N.E.2d 366, 367 (1979) . . . . . . . . . 36

A. The Juvenile Court Judge Relied on Only One Fact to Determine That the Alleged Offense Was Committed in an Aggressive and Premeditated Manner. However, the Fact Relied Upon by the Judge Did Not Exist in the Record. Moreover, the Evidence Established That Jon Morgan Acted out of Impulse, Fear and Panic When He Shot His Grandparents.

*705 ILCS 405/5-4(3)(b)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
*In Re J.O.*, 269 Ill.App.3d 287, 645 N.E. 2d 1035, 1038
    (1st Dist., 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*In Re D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873, (1st. Dist., 1990) . . . . . . . . 40
*People v. Beck*, 190 Ill.App.3d 748, 546 N.E.2d 1127(5th Dist., 1989) . . . . . 41
*People v. Hickman*, 143 Ill.App.3d 195, 492 N.E. 2d 1041 (5th Dist, 1986) . 42
*People v. Howard*, 42 Ill.App.3d 381, 355 N.E.2d 543 (1st Dist., 1976) . 42, 43

B. When Judge Coogan Considered the Statutory Factor Concerning Jon Morgan's Age, He Did Not Consider Jon's Age in Light of His Experiences Which Demonstrate That He Is a Troubled Adolescent Rather than a Hardened Adult, Therefore, the Trial Judge Abused His Discretion.

*In the Interest of L.J.*, 274 Ill. App.3d 977, 654 N.E.2d 671
    (1st Dist., 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367 (1984) . . . . . . . . . . . . . . . . . 44
*People v. Beck*, 190 Ill.App.3d 748, 546 N.E.2d 1127(5th Dist., 1989) . . . . . 44
*People v. D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990) . . . . . . 45
*In the Interest of Burns*, 67 Ill.App.3d 361, 385 N.E.2d 22
    (1st. Dist. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ii

C.    After Judge Coogan Found That Jon Morgan Had Lived a Sad, Unusual and Tragic Life, Shuffled Back and Forth Between His Mother and Grandparents Only to Have Them Neglect His Needs to Survive, the Court's Finding That He Should Be Prosecuted as an Adult, Constitutes an Abuse of Discretion.

*People v. Clark*, 119 Ill.2d 1, 518 N.E.2d 138, 145 (1987) . . . . . . . . . . . . . 46
*In Re the Interest of Burns*, 67 Ill.App.3d 361,
    385 N.E.2d 22 (1st. Dist. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
*In the Interest of R.L.L.*, 106 Ill.App.3d 209, 435 N.E. 2d 904
    (4th Dist.,1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
*People v. D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990) . . . . . . 51
*People v. Michael Cooks*, 271 Ill.App.3d 25, 648 N.E.2d 190 (1995) . . . . . . 51
*In the Interest of L.J.*, 274 Ill.App.3d 977, 654 N.E.2d 671
    (1st Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

D.    Judge Coogan Did Not Consider Jon Morgan's Potential for Rehabilitation Nor Did the Court Make Any Determination of the Likely Effectiveness of Any Facility Available for Treatment or Rehabilitation in Light of Jon Morgan's History and Present Circumstances.

*People v. Clark*, 119 Ill.2d 1, 518 N.E.2d 138, 145 (1987) . . . . . . . . . . . . . 52
*People v. D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990) . . . . . . 53
*In the Interest of Burns*, 67 Ill.App.3d 361, 385 N.E.2d 22, 29
    (1st. Dist. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
*In the Interest of R.L.L.* 106 Ill.App.3d 209, 435 N.E. 2d 904
    (4th Dist.,1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
*People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367, 374 (1984) . . . . . . . . . . . . 54

E.    The Juvenile Court Judge's Failure to Make Any Meaningful Analysis of Jon's Interests Compared to Society's Interests in Incarcerating Him for a Period of Time Beyond His Minority Was an Abuse of Discretion Especially in Light of the Court's Findings That Jon's Caretakers Had Not Provided Him with the Means to Survive and That He Was Short-changed in His Life.

*People v. Clark,* 119 Ill.2d 1, 518 N.E. 2d 138 (1987) . . . . . . . . . . . . . . . . . 56

F.    The Findings of the Juvenile Court Evidenced a Flawed Misunderstanding of the Non-statutory Factor Set Forth in People V. Clark.  Therefore, Granting the State's Motion to Transfer Was an Abuse of Discretion.

*People v. Clark,* 119 Ill.2d 1, 518 N.E.2d 138, 145 (1987) . . . . . . . . . . . . . 57

*730 ILCS 5/5-8-1(a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

II    THE TRIAL COURT ERRED WHEN RULING THAT JON MORGAN'S STATEMENTS TO DETECTIVE HARBERTS WERE NOT MADE DURING CUSTODIAL INTERROGATION REQUIRING *MIRANDA* WARNINGS.

*Miranda v. Arizona*, 386 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 62
*People v. Clark*, 84 Ill.App.3d 637, 405 N.E.2d 1192 (1st. Dist., 1980) . . . . . . . 60, 61
*People v. Brown*, 136 Ill.2d 116, 554 N.E.2d 216 (1990) . . . . . . . . . . . . . . . . . 60, 62
*People v. Savory*, 105 Ill.App.3d 737, 435 N.E.2d 226 (2nd Dist. 1982) . . . . . . 60,62
*Haley v. Ohio*, 332 U.S. 596 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
*Gallegous v. Colorado*, 370 U.S. 49 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

III.    DUE TO THE COERCIVE NATURE OF JON'S ENCOUNTER WITH THE POLICE, THE FAILURE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON'S PARENTS, THE CIRCUMSTANCES OF THE INTERROGATIONS AND JON'S LACK OF EXPERIENCE WITH THE POLICE, THE STATEMENTS MADE IN POLICE CUSTODY WERE NOT VOLUNTARY

*People v. Cole*, 168 Ill.App.3d 172, 522 N.E.2d 635, 639 (1988) . . . . . . . . . . . . . 62
*People v. McGhee*, 154 Ill.App.3d 232, 507 N.E.2d 33, 37 (1987) . . . . . . . . . . . . . 62
*Haley v. Ohio*, 332 U.S. 596 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
*In Re Gault*, 387 U.S. 1, 55 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
*Gallegos v. Colorado*, 370 U.S. 49, 54, (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
*In Re J.J.C*, 294 Ill.App.3d 227, 689 N.E. 2d 1172 (1998) . . . . . . . . . . . . . . . . . . . 64
*705 ILCS 405/5-7(2)(c)(vi)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
*705 ILCS 405/5-7(2)(c)(iii)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
*705 ILCS 405/5-6(1)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
*People v. Knox*, 186 Ill.App.3d 808, 542 N.E.2d 910 (1989) . . . . . . . . . . . . . 66,68
In *People v. R.B.*, 232 Ill.App.3d 583, 597 N.E.2d 879 (1992) . . . . . . . . . . . . . . . . 66
In *People v. Montanez*, 273 Ill.App.3d 844, 652 N.E.2d 1271 (1995) . . . . . . . . . . 66
*In Re Lashun H.*, 284 Ill.App.3d 545, 672 N.E. 2d 331, 334 (1996) . . . . . . . . . 67,68
*People v. Brown*, 169 Ill.2d 132, 144, 661 N.E. 2d 287 (1996) . . . . . . . . . . . . . . . 68
*In Re L.L.*, 295 Ill.App.3d 594, 693 N.E.2d 908 (1998) . . . . . . . . . . . . . . . . . . . . 69

**IV.   JON MORGAN DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS MIRANDA RIGHTS.**

*People v. Bernasco*, 138 Ill.2d 349, 562 N.E. 2d 958, 961 (1990) . . . . . . . . . . . . . . 69
*People v. Higgins,* 239 Ill. App. 3d 260, 607 N.E. 2d 337, 343
    (5th Dist., 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
*People v. Travis,* 122 Ill.App.3d 671, 462 N.E.2d 654, 659 (1st Dist., 1984) . . . 70, 72
*705 ILCS 405/5-7(2)(C)(ii)(vi)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*705 ILCS 405/5-7(2)(C)(iii)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**V.   THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY OF GLENDA ASHWORTH AND DR. STUART HART REGARDING THE PRIOR VIOLENT CONDUCT OF THE CEARLOCKS.**

*People v. Keefe,* 209 Ill.App.3d 744, 567 N.E.2d 1052, (1st Dist. 1991) . . . . . . . 73,76
*People v. Lynch*, 104 Ill.2d 194, 470 N.E.2d 1018, (1984) . . . . . . . . . . . . . . . . . . . . 74
*People v. Robinson* 163 Ill.App.3d 754, 773, 516 N.E.2d 1292 (1987) . . . . . . . . . 74
*People v. Ward*, 101 Ill.2d 443, 463 N.E.2d 696, (1984) . . . . . . . . . . . . . . . . . . . . . . 75
*People v. Illgen,* 145 Ill.2d 353, 583 N.E.2d 515, 522 (1991) . . . . . . . . . . . . . . . . . 75
*People v. Bartall*, 98 Ill.2d 294, 456 N.E.2d 59, (1983) . . . . . . . . . . . . . . . . . . . 75,76
Rule 703 of the Federal Rules of Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**VI.   THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO BAR SECOND DEGREE MURDER INSTRUCTIONS AS TO THE FELONY MURDER COUNTS.**

*720 ILCS 4/9-1(a)(1)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*720 ILCS 4/901(a)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*720 ILCS 5/9-1(a)(3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

A.   The Second Degree Murder Instruction On The Felony Murder
    Counts Was Required Because The Evidence Showed That Jon
    Morgan Formed The Intent To Kill After He Determined That
    Deadly Force Was Necessary To Protect Himself

*People v. Kidd*, 295 Ill.App.3d 160, 692 N.E.2d 455 (4th Dist. 1998) . . 80, 82
*People v. Williams*, 164 Ill.App.3d 99, 517 N.E. 2d 745, 751-52
    (4th Dist., 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
*People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903, 911 (1975) . . . . . . . . . . . . . 81
*People v. O'Neal*, 104 Ill.2d 481, 472 N.E.2d 441, 443 (1984) . . . . . . . . . . 83
*People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983) . . . . . . . . . . . . . . . . . 83
*People v. Drakeford*, 138 Ill.2d 206, 564 N.E.2d 792, 796 (1990) . . . . . . . . 84

B.    A Second Degree Murder Instruction On The Felony Counts Was Required To Avoid Inconsistent Verdicts And Prevent The State From Nullifying The Second Degree Murder Statute.

*People v. Drakeford*, 138 Ill.2d 206, 564 N.E.2d 792, 796 (1990) . . . . . 84, 86
*People v. Porter*, 168 Ill.2d 201, 659 N.E.2d 915 (1995) . . . . . . . . . . . . 84, 85
*People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983) . . . . . . . . . . . . . . . . 86

C.    A Second Degree Murder Instruction Was Required On The Felony Counts Pursuant To The Plain Language Of The Second Degree Murder Statute.

*720 ILCS 5/9-2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

VII.    **THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS UPON APPLICATION OF THE MERGER DOCTRINE TO THE PREDICATE FELONIES OF AGGRAVATED BATTERY AND AGGRAVATED DISCHARGE OF A FIREARM.**

*720 ILCS 5/24-1.2(a)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
*720 ILCS 5/9-1(a)(3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
*720 ILCS 5/2-8* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
*People v. O'Neal*, 104 Ill.2d 399, 472 N.E.2d 441, 445 (1984) . . . . . . . . . . . . . . . 89
*People v. Pugh*, 261 Ill.App.3d 75, 634 N.E.2d 34, 36 (5th Dist., 1994) . . . . . . . . . 89
*People v. Ireland,* 450 P.2d 580 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
People v. Wagner, 245 N.Y. 143, 156 N.E. 644 (1927) . . . . . . . . . . . . . . . . . . . . . . 90
*People v. Huter,* 184 N.Y. 237, 77 N.E. 6 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . 90
*The Doctrine of Merger in Felony-Murder and Misdemeanor Murder*,
    35 S. Jon's L.Rev. 109 (1960); Van Patton . . . . . . . . . . . . . . . . . . . . . . . . . 91
*Merger and the California Felony-Murder Rule*, 20 UCLA L.Rev. 250 (1972) . . . . 91

vi

## NATURE OF THE CASE

A petition to adjudicate the defendant a delinquent minor was filed in 95-J-39. Upon motion of the Logan County State's Attorney, the case was transferred for prosecution as an adult. The defendant was charged by information with the offense of first degree murder. Following a jury trial, he was convicted of the second degree murder of Keith Cearlock and convicted of the first degree murder of Lila Cearlock. The defendant was subsequently sentenced to a term of imprisonment of 75 years in prison.

# ISSUES PRESENTED FOR REVIEW

I.      WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN GRANTING THE STATE'S MOTION FOR TRANSFER TO THE CIRCUIT COURT AFTER FINDING THAT THE FACTS PRESENTED A TRAGIC SITUATION WHERE JON MORGAN HAD BEEN SHORT-CHANGED IN HIS LIFE, MOREOVER, THE COURT FAILED TO ADEQUATELY CONSIDER ALL STATUTORY FACTORS AND IGNORED EVIDENCE THAT REFLECTED FAVORABLY UPON JON MORGAN.

II.     WHETHER THE TRIAL COURT ERRED WHEN RULING THAT JON MORGAN'S STATEMENTS TO DETECTIVE HARBERTS WERE NOT MADE DURING CUSTODIAL INTERROGATION REQUIRING *MIRANDA* WARNINGS.

III.    DUE TO THE COERCIVE NATURE OF JON'S ENCOUNTER WITH THE POLICE, THE FAILURE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON'S PARENTS, THE CIRCUMSTANCES OF THE INTERROGATIONS AND JON'S LACK OF EXPERIENCE WITH THE POLICE, THE STATEMENTS MADE IN POLICE CUSTODY WERE NOT VOLUNTARY

IV.     WHETHER JON MORGAN KNOWINGLY AND INTELLIGENTLY WAIVED HIS *MIRANDA* RIGHTS.

V.      WHETHER THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY OF GLENDA ASHWORTH AND DR. STUART HART REGARDING THE PRIOR VIOLENT CONDUCT OF THE CEARLOCKS.

VI.     WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO BAR SECOND DEGREE MURDER INSTRUCTIONS AS TO THE FELONY MURDER COUNTS.

VII.    THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS UPON APPLICATION OF THE MERGER DOCTRINE TO THE PREDICATE FELONIES OF AGGRAVATED BATTERY AND AGGRAVATED DISCHARGE OF A FIREARM

## JURISDICTIONAL STATEMENT

This appeal is taken from a judgment of guilt of one count of first degree murder and one count of second degree murder entered by the Circuit Court for the Eleventh Judicial Circuit, Logan County, Illinois, after a jury trial on August 26, 1996. The defendant's post-trial motion was filed on October 25, 1996, and denied on November 26, 1996. This appeal was timely filed on December 16, 1996, and brought pursuant to Supreme Court Rules 602 and 603 of the *Illinois Compiled Statutes (1993)*.

## STATEMENT OF THE FACTS

### The Transfer Hearing

Jon Roe Morgan was born August 20, 1980, the same year that his mother, Glenda (Cearlock) Ashworth was married to Roe Morgan. The family lived in Jacksonville, Illinois, moved to Texas and then back to Illinois. (Supp.R. Vol. II, Resp. Ex. 2, Social Investigation Report p.1, 2) Roe Morgan was in the military which required him to move frequently. *Id.* The family's moves eventually landed them in the state of Virginia. While in Virginia, Jon's parents' relationship deteriorated. Roe Morgan drank heavily and was physically abusive to all of the children. Roe was transferred overseas and the marriage ended in divorce. (Supp.R. Vol. II, Resp. Ex. 2, p. 2, 3)

When Jon Morgan entered kindergarten, he was referred for a psychological evaluation for suspected hyperactivity and behavior problems at school. Jon's mother noticed that Jon was extremely active, distractable, easily frustrated, impulsive and aggressive. Jon's teacher observed the same behavior at school as his mother had noted at home. (Supp.R. Vol. II, Commonwealth of Virginia Department of Health Psychological Evaluation) Gail C. McGinnes, a clinical psychologist, performed the psychological evaluation on December 4, 1985, when Jon was five years and three months old. She described "Jonnie" as restless and fidgety during the evaluation. His attention to testing tasks was generally poor. The psychologist found that Jon was an anxious child who was concerned that "something will happen" to his parents. "He appears to be a somewhat insecure and overly sensitive child and, due to his poor impulse control, is likely to strike out aggressively when he feels threatened. In addition, Jon's impulsivity, hyperactivity and poor attention are likely to make school an even more frustrating and stressful situation for him..." *Id.*

Jon's problems in kindergarten resulted in a hospitalization at the Psychiatric Institute of Richmond. An evaluation was done by Dr. Waters on March 31, 1986. (Supp. R. Vol. II) Testing demonstrated that Jon Morgan was functioning in the average range of intelligence. His strengths were in visual perception and organizational skills. Jon was clearly unhappy about having been removed from his home. His affect when discussing home was sad and almost

-1-

wistful. Dr. Waters observed that there was a suggestion that, although Jon feels supported by his family and he would very much like to be the center of their attentions. *Id.*

Dr. Waters diagnosed Jonnie as suffering from situational depression accompanying his removal from his home. She concluded that:

> " Jon's behavior, while hospitalized, has improved dramatically in terms of his activity level. However, he continues to have difficulty with attention and concentration skills as noted during this evaluation. It may be that a combination of helping this family provide him with a more structured environment, as well as addressing his attention and concentration deficits through cognitive training and/or medication therapies would be the combination that would allow Jonnie to function more appropriately within the classroom environment." *Id.*

Jon was hospitalized at the Psychiatric Institute of Richmond because he displayed maladaptive behaviors in the classroom, was very hyperactive and was unable to concentrate for even a short period of time. Jon was also assaultive toward his classmates. He destroyed school property and had been drinking glue out of bottles and eating crayons. His mood was very withdrawn. (Supp.R. Vol. II, Psychiatric Institute of Richmond Discharge Summary prepared by Dr. Dennis L. Beshera, 5/16/86) When Jon was admitted, he was clinically hyperactive with an anxious and depressed affect. There was a great pervasive sense of hopelessness and despair. His concentration and judgment were impaired.

Dr. Beshera reviewed the family history noting that Mr. and Mrs. Morgan were 19 years old when Jon was born. They had not planned on having children so early in their marriage. Financial difficulties led to Mr. Morgan's enlistment in the Army in November of 1991 when Jon was 15 months old. There were two extended periods of time when Mr. Morgan was out of the home due to military assignments, four major moves and the birth of two siblings before Jon was four years old. Jon's parents acknowledged marital problems but denied any physical abuse within the family. It appeared to Dr. Beshera that Jon's environment had not offered consistency or stability due to the moves, parental absences and the birth of two siblings. He also observed that Jon's aggressive, tough behavior may be promoted at some level by his father's idea as to what a little boy should be. The family was very much concerned and interested in Jonnie's treatment. *Id.*

-2-

During this hospital stay, Jon and his family attended therapy sessions regularly. Jon's parents were overwhelmed by his maladaptive behaviors, especially at school. Nortriptyline, an anti-depressant, was prescribed for Jon. Gradually, Jon began to talk more openly about the situation at home and own sad feelings. His affect began to brighten somewhat and his appetite improved. He also talked about his anger toward his mother and father. His self-esteem was almost non-existent and there was a pervasive sense of hopelessness and despair. Jon's impulsive behavior improved once the anti-depressant reached the appropriate level in his blood stream. There was also strong clinical evidence of an attention deficit disorder with hyperactivity. He seemed to say more on task following the administration of medication. Throughout his hospital course, his condition improved. Upon discharge, Jon was no longer considered to be a danger to himself or others. *Id.* Dr. Beshera considered Jon's prognosis as fair indicating that much would depend on out-patient follow up. *Id.*

Jon Morgan was admitted a second time to the Psychiatric Institute of Richmond on February 18, 1987. Again, he was under the care of Dr. Dennis L. Beshera. (Supp.R. Vol. II, Discharge Summary of Dr. Dennis L. Beshera, Date of Admission 2/18/87, Date of Discharge 3/29/87) The reasons for Jon's second referral were similar to his first stay. He was aggressive toward his siblings and his peers and there was academic deterioration. In addition, he had some suicidal thoughts. When he was admitted, he demonstrated an anxious and depressed affect accompanied by hyperactivity. Jon admitted to attempting to harm others. His concentration and judgment were impaired and he came across as being quite impulsive. Jon's strengths and weaknesses were assessed. He valued being a family member. During the second hospital stay, he began to make progress and began to verbalize some of his feelings of sadness. The family attended family therapy sessions on a regular basis and was supportive of the treatment plan. Jon improved to the point where he was not considered to be a danger to himself or other and was discharged to his parents with a fair prognosis. *Id.* His diagnosis was major depression, single episode and attention deficit disorder. *Id.*

Each time Jon was discharged from the Psychiatric Institute of Richmond, his mother saw improvement in his behavior after he got home. After his first discharge, he was placed in an

-3-

EDS classroom. (R. Vol. VII, p. 343, Supp.R.Vol. II, Psychiatric Institute of Richmond Instructional Summary.) Jon was placed in an EDS classroom so that he could receive instruction in a small structured setting. *Id.* A Psychiatric Institute of Richmond educational therapist gave a good prognosis for school achievement if he received assistance in behavior and academic difficulties at an early age. *Id.*

When Jon came home, there was a lack of stability in the home. Glenda's marriage to Roe was falling apart and Roe was absent from the home a good deal of the time. This lack of stability and difficulty in school when kids teased him about being in an EDS class, caused Jon's anger and impulsiveness to surface again. (R.Vol. VII, p. 344)

After his second admission to the Psychiatric Institute of Richmond, Jon's mother described him as very mild and calm. She was very concerned about the effects of the medication because he wasn't running around like a normal little five or six year old. (R. Vol. VII, p. 346, 347) Glenda was in constant contact with her parents, Keith and Lila Cearlock. The Cearlocks were aware of Jon's hospitalization and medication.

Glenda decided to move Jon to Lincoln, Illinois, to live with his grandparents. Jon's grandparents did not want him to be on medication. They thought he should be in a private school and that God would take care of him. Keith and Lila were very religious. (R.Vol. VII, p. 346, 347) Glenda agreed to send Jon to live with Keith and Lila even though she knew that their relationship was bad. During Glenda's childhood and adolescence, her parents were always threatening to move out on the other and they blamed each other for their problems. They fought constantly about money. Most significantly, Lila and Keith Cearlock were physically and verbally abusive to Glenda as she was being raised in their home. (R.Vol. VII, p. 356)

Despite these conditions in the house when she was growing up, Glenda sent Jon to live with her parents. She did not have the strength to say no to them. She felt that her mother and father controlled her mentally and when they told her that Jon should live with them, she agreed. (R.Vol. VII, p.357, 358) As bad as things were in the Cearlock household, Glenda felt that with her marriage breaking up, her father's life was more stable. (R. Vol. VII, p. 347, 348)

-4-

Jon left his family to live with this grandparents when he was seven years old. (R. Vol. VII, p. 348)  He attended school at Park Meadows Baptist Church and Academy.  (R. Vol. VII, p. 199; Supp.R.Vol. 2, Social Investigation Report) Jon's mother kept in regular contact with her parents and her son. (R.Vol. VII, p. 349)  Keith and Lila Cearlock, along with Brother Bryant, the principal of the Park Meadows Baptist Academy, decided to take Jon off his medication. *Id.* At the private school, his grades went up and he was on the Dean's List.  Glenda felt that he was happy, but she knew that Jon was aware of some of the problems that his grandparents were having in their home.  Through Glenda's contact with her parents, she knew that the emotions in the house were always up and down.  Her parents would call her in Virginia and fight with her over the phone.  Their fighting disturbed her, and Glenda felt that it also kept Jon "riled up." (R.Vol. VII, p. 358) She believed that the varying emotions in the Cearlock home negatively affected Jon's attention deficit disorder.  *Id.*

Occasionally, Jon would get into trouble at school because he was "too rambunctious." As punishment, he would receive detentions or he was "paddled" by the principal. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 3) Keith Cearlock told Thomas Bryant he would beat Jon with a belt or a paddle as a form of discipline.  Brother Bryant acknowledged that he had since learned that a razor strap was used but he didn't recall that Mr. Cearlock had told him that. (R.Vol. VII, p. 216) Jon's grandfather also told Thomas Bryant that he had Jon bend over and grab his ankles when he was spanked. (R.Vol. VII, p. 217) Thomas Bryant acknowledged that Jon would have been beaten with a paddle at school as a form of discipline.  A student would be required to bend over and grab his or her ankles while Mr. Bryant would paddle them with a paddle made of quarter inch plywood, six or seven inches wide and one and a half to two feet long.  A student would be beaten on the buttocks three to five times. (R.Vol. VII, p. 218)

Jon moved back to Virginia for his fifth and sixth grade school years.  He was homesick and Glenda had recently remarried.  Her new husband was Linwood Ashworth.  Glenda felt that it was important for Jon to have a male role model in the home if Jon was going to live with her. Jon was enrolled in a public school for fifth and sixth grade.  He did average work at school. (R.Vol. VII, p. 351)  However, Linwood Ashworth was laid off from his job and he started

drinking. The home environment began to deteriorate and so did Jon's performance at school. Linwood Ashworth became physically abusive toward Jon and his siblings. He whipped Jon's sister, and beat Jon with a belt. (R. Vol. VII, p. 353)  On one occasion when she came home from work, Linwood assaulted Glenda. (R.Vol. VII, p. 354)

Near the end of Jon's sixth grade year, he was suspended from the school bus because Jon and other boys were throwing a book around. One of the boys threw the book and it hit Jon in the face. There was a minor fight that did not last long because the driver had stopped the bus. (R. Vol. VII, p. 355)

Jon returned to Lincoln to live with his grandparents just prior to the start of his seventh grade year. Relations were still poor between Keith and Lila Cearlock. Around the time Jon moved back, Lila began to sleep in a separate bedroom and kept a lock on her bedroom door. She wanted to keep Keith out of her bedroom because she was afraid that Keith was snooping around her room and would find her money.  (R.Vol. VII, p. 357) Keith and Lila Cearlock continued to fight about domestic matters. Lila told Glenda about a time when Keith hit her in the head with a shoe. (R.Vol. VII, p. 359) Keith and Lila Cearlock argued over punishing Jon. Lila would tell Glenda about how Keith wouldn't punish Jon as much as Lila thought he should be punished. *Id.* Glenda learned that her mother was constantly nagging Jon about trivial things such as getting a drink out of the refrigerator or coming in from outside.  Mother and daughter disagreed about other limitations on Jon's behavior. He had to wear a tee shirt when he went swimming. Lila got mad because Glenda allowed her daughters to swim without tee shirts over their swimsuits. As a means of discipline, Jon's grandfather made him fetch a razor strap and made Jon bend over and grab his ankles. This occurred at a frequency of a couple of times every three weeks. (Supp.R. Vol. II, Resp. Ex.No.2, p. 5) Jon was very unhappy about moving back to his grandparent's home. He preferred to stay with his mother and sisters "where I belonged with my true family." (Supp.R.Vol.II, Resp. Ex. No. 2, p. 4)

The atmosphere at the Cearlock home was less than pleasant. Jon's grandparents were constantly negative and complaining, running him down and comparing him to his mother whom they criticized as well. They did not like his father, Roe Morgan, because he was not "Christian

-6-

perfect." They often said Jon's mother married Roe to spite them. His grandmother and grandfather were always negative but put on a facade for the church. Jon's grandmother and grandfather did not get along, they fought and argued all of the time. His grandfather often told Jon that he was sorry he had married his grandmother and only married her for sex. The only friends Jon could have over at his house were Christian friends from the Baptist church. There was an occasion when his grandfather allowed a boy from the public school to come over, but Jon's grandmother was not happy about that. (Supp. R.Vol. II, Ex. No. 2, p. 4)

Roe Morgan, Jon's father, made several attempts to call Jon over the years but Jon's grandmother, who did not like Roe, would not let the calls go through. (Supp. R. Vol. II, Resp. Ex.. No. 2, p. 3) In addition to the beatings he received from his grandfather and Brother Bryant, his grandmother often hit him with her fists, handles of scissors or would backhand him or hit him with whatever she may have in her hand. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 6; R.Vol. VI, p.220)

For two years, Keith Cearlock had talked about moving out on Lila. He never discussed divorce. When Keith Cearlock talked to Brother Bryant about these problems, Jon was never mentioned as a reason for the discord between he and Lila Cearlock. *Id.* Lila Cearlock was always threatening to kick Keith out of the house and Keith was always threatening to move out. (R.Vol. VII, p. 359)

When Jon returned to Lincoln, he continued to attend school at Park Meadows Baptist Academy. In the course of the six years that Jon attended school at Park Meadows, Brother Bryant never saw Jon getting into any fist fights. He did recall normal type things about boys pushing somebody, but he never recalled that as a problem with Jon. When Jon was disciplined, he would acknowledge his wrongdoing and accept his punishment. (R.Vol. VII, p. 201, 202) There were a few occasions when he indicated he wasn't really happy with a plan of discipline, but always accepted the discipline with no outward rebellion. *Id.* Brother Bryant found Jon to be an angry child at times. Jon had told him in the past that he was angry about his mom and his dad because he wasn't with them. Brother Bryant identified Jon's absences from this home as the primary reason for Jon's anger. He felt like he had been rejected. (R.Vol. VII, p. 204)

-7-

Brother Bryant also made observations about Jon's ability to control his anger. On the basketball floor, he recalled a specific instance where Jon got roughed up and was knocked to the floor. Jon jumped up making Brother Bryant believe that he was going to deck the player that had put him to the ground. Jon didn't do that. He stood there, clenched his fist, slowed down and returned to playing. (R.Vol. VII, p. 204) According to Brother Bryant, Jon's response to that situation was typical of how Jon handled situations that made him angry.

As a seventh grader, Jon was very active in the church. He attended a church conference where he dedicated his life to being a foreign missionary. (R.Vol. VII, p. 207) He regularly attended church services. (R. Vol. VII, p. 212) There was a service on Sunday morning, Sunday night and Wednesday. Brother Bryant believed that Jon was attempting to live his life according with the morally pure standards of the church. He did believe that changed towards the end of Jon's tenure at the Park Meadow School. (R.Vol. VII, p. 213)

Jon Morgan demonstrated his dedication to religion to Brother Bryant. After deciding to become a foreign missionary, he spoke at a church service the Sunday evening following the conference. He stood before the church congregation and stated his dedication to the entire church membership. (R. Vol. VII, p. 215) This occurred in February or March of 1993. One day, in the 1994-1995 school year, Jon knocked on the door of Brother Bryant's office and asked to come in. He sat down with tears in his eyes and a look of wonder on his face. He told Brother Bryant that he had been reading his bible and stated "I just understand for the very first time that Jesus did just die for me. I know it." Brother Bryant believed that Jon had finally grasped that thought. (R. Vol. VII, p. 215, 216) Jon did well at Park Meadows school. (R. Vol. VII, p. 211, 212) Thomas Bryant described him as an intelligent young man. He was on the honor roll nearly every quarter. The grade report sent to Lincoln Community High School showed a grade average of ninety percent in each subject. (Supp.R. Vol. II, Resp. Ex. No.1)

Jon was not involved in teenage drinking or drug use. Brother Bryant asked him about that and Jon denied any alcohol or drug use. He believed that Jon was telling the truth and had no reason to believe otherwise. (R. Vol. VII, , p. 213) The church had certain beliefs that Jon was required to follow. Church members could not watch R rated movies or listen to rock music.

(R.Vol. VII, p. 214) Being personal friends with the Cearlocks, Brother Bryant believed that the Cearlocks would not allow the wrong kind of video or music in their home. *Id.* The church also prohibited mixed swimming so that Jon could not go to a pubic swimming pool. He could not be within 18 inches of a girl, he could not wear shorts or a tank top. Students had to attend chapel services every morning, memorize verses from the bible and recite them for homework. (Supp.R.Vol.II, Resp. Ex. No. 2, p. 4)

During the 1994-1995 school year, Park Meadows School played in a basketball tournament at DeWight, Illinois. Someone had stolen some money and school administrators were trying to find the culprit. Each of the players allowed school personnel to look through their duffel bags for the money. When it was Jon's turn, he told Brother Bryant that he would find something that he wouldn't want to see. Brother Bryant thought it was the money. Before looking in the duffel bag, Jon told him that he would find a *Playboy* magazine hidden in his bag.

Jon told Brother Bryant that his grandparents had found other *Playboy* magazines and they had burned them. However, they did not find one that he had hidden in the bathroom. He carried it in his duffel bag for several weeks and was trying to work up the nerve to go to Brother Bryant for help. (R.Vol. VII, p. 197) Normally, possessing a *Playboy* magazine was grounds for expulsion from Park Meadows School . Since he believed that Jon was honest about trying to come to him with the magazine, and he appeared repentant, Brother Bryant decided that there would be no expulsion. Brother Bryant and Jon burned the magazine. It seemed as though a burden had been lifted from Jon after the magazine was burned. (R.Vol. VI, p. 198)

In February of 1995, Jon kissed a girl on a Saturday night, away from school grounds. The girl was not a student of the school. He kissed her on her front porch. The girl's parents were home. (R. Vol. VII, p. 365) One of Jon's classmates tattled to Brother Bryant and Jon faced suspension from school. (R. Vol. VII, p. 324) Again, according to school policy, this was an expulsion offense but Brother Bryant wanted to help Jon and used his discretion to reduce the punishment from expulsion to suspension. Jon was to serve the suspension "in house." There were conditions to the suspension. In a small room off of Brother Bryant's office, Jon was given 45 to 50 religious videos to listen to and take notes on. In addition, he was required to read a

book titled *Lords of the Earth* and write a book report. Jon would be isolated from the student body while serving the suspension. (R.Vol. VII, p. 206-207) When he came to school, he was to walk straight to that room. He would be given separate bathroom breaks and lunch periods. He would have been in this small room, by himself, for the entire school day. (R. Vol. VII, p. 208) The suspension was for an indeterminate amount of time. (R. Vol. VII, p. 209) Brother Bryant estimated that, if Jon worked diligently, the suspension would have lasted two weeks. *Id.* Jon had agreed to all of the terms of the suspension except for reading the book and writing a book report and he would not agree to go without contact with other students for that length of time. (R.Vol. II, p. 180) When Jon refused to abide by these conditions, he was expelled on February 7, 1995. (R.Vol. VII, p. 176)

After the expulsion, a group of students from the school came to Brother Bryant and asked him to reconsider. Five students spoke to him randomly asking if Brother Bryant would reconsider Jon's expulsion. They requested to speak with Jon and Brother Bryant granted permission for them to do so. (R.Vol. VII, p. 177) Brother Bryant stated that one of the students told him that when the students talked to Jon, he said "I have been hurt all of my life. I am not going to be to hurt anymore. From now on, I will do the hurting." (R.Vol. VII, p. 178) Jon came to school two days later after he reconsidered the situation. He and Brother Bryant went over the rules of the suspension once again and he refused a final time. Brother Bryant indicated that the expulsion would be permanent and asked Jon not to turn his back on God. According to Brother Bryant, Jon responded, "I intend to commit every sin I want to commit. I am going to do anything and everything I want to do, and when I hit rock bottom then I will call on God." (R.Vol. VII, p. 181)

When Lila Cearlock learned that Jon was expelled from the Baptist school, she called Jon's mother. Jon's grandmother talked as if Jon had raped a girl. (R.Vol. VII, p. 365) Finally, Glenda came to the understanding that Jon had kissed a girl on her front porch. During the conversation, both Lila and Keith Cearlock were yelling at Jon. Keith was telling Jon that he was going to be stupid and that "I know you are stupid just like your mom, just like your dad. Nobody is going to like you. You're going to mess up." (R.Vol. VIII, p. 391) This was a

-10-

common refrain throughout the time Jon was in the house. It was also common for this to happen when Glenda was growing up in the Cearlock home. Her mother would nag and carry on to the point where her father would lose his temper and strike out. (R.Vol. VIII, p. 391, Supp.R.Vol. II, Social Investigation Report, p. 3) When Jon spoke to his mother about the kissing incident, his first words were, "I'm normal, Mom. I'm normal and they're not going to tell me I'm not." (R.Vol. VII, p. 364) *Id.*

After the expulsion, Glenda and her parents discussed where Jon should go to school. Lila Cearlock and Brother Bryant believed that the public school was evil and that he shouldn't go there. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 4) Brother Bryant attempted to arrange for Jon to go to a school in Oklahoma that was supported by the church. He described it as a boy's home for troubled young men. (R. Vol. VII, p. 209) There was a working ranch, other outdoor type activities and a school. Brother Bryant believed that this was the kind of environment that Jon could thrive in because Jon liked physical work. Jon wanted to go, but Mr. Cearlock didn't agree believing he could handle their problems. Lila Cearlock was also in favor of Jon going. The following week, Mr. Cearlock favored Jon's attendance at the ranch, but Jon disagreed. (R. Vol. VII, p. 210)

Glenda spoke to her son about his options. He told her that he was tired of living in a home that was not Christian and having Christian stuffed down his throat. He accepted that he would have to go to church, but did not want to go to the school. He wanted to try a public school. (R. Vol. VII, p. 367)

Following the expulsion, Lila and Keith Cearlock were fighting constantly. They would call Glenda and fight on the phone, not about Jon, but about each other. Glenda could not stand these battles on the phone which left Jon crying. She asked her father to bring Jon home. By this time, Jon was home schooling with no supervision at the recommendation of Brother Bryant and Brother Davis. (R.Vol. VII, p. 367, 368).

Within a day, Jon was packed and he and his grandfather traveled to Virginia. Prior to their arrival, Glenda realized that she couldn't afford to have Jon in her home. She lived in a small house and did not have room for Jon. Financially, she had reached the point where her

-11-

girls could drink real milk and she could buy her daughters new clothes rather than shop at yard sales.  She realized if she took Jon in, she would have to go back to the powder milk days.  Moreover, she did not believe she could share her time with Jon because her daughters suffer from learning disabilities requiring a lot of time to do homework.  (R.Vol. VII, p. 368, 369)  After Jon arrived in Virginia, his mother told him that he could not stay.  Jon cried and was very upset.  (R.Vol. VII, p. 370)

While her father was in Virginia, Glenda fought with him about the family situation.  He admitted that he had whipped and hurt Glenda in the past.  He also admitted that he was doing the same to Jon.  Keith Cearlock told his daughter that her mother's nagging was "setting him off."  (R.Vol. VII, p. 371)

After they returned from Virginia, his grandfather resorted to more physical violence when he disciplined Jon.  Around April 17, 1998, Jon's grandfather hit him in the head and the back with closed fists after Jon got mad and kicked a box of Legos.  (Supp.R.Vol. II, Resp. Ex. No. 2, p. 5)  His grandfather told him that if Jon were to fight back or attempt to overpower him, he would come upon him when he was sleeping or not aware and kill him.  Jon harbored no doubt about his grandfather's sincerity.  (Supp.R.Vol.II, Resp. Ex. No. 2, p. 5) Keith Cearlock's intentions were confirmed by his statement to Pastor Davis that he advised Jon he would get him in his sleep if Jon ever struck him.  (R. Vol. VI, p. 146)

When Jon was younger, he reacted to beatings by his father, stepfather, Brother Bryant or grandfather by thinking, "well, I'll never do that again."  In those days, the pain was the worst part of the beatings.  (Supp.R. Vol. II, Resp. Ex. No. 2, p. 6)  At 14, the beatings seemed too much for little things that were done more from stupidity than anything else.  Grabbing his ankles and being beaten on his buttocks made him to feel angry and think, "How can I get away from all of this?" and "I'll never do this to my kids." *Id.*

On April 19, 1995, Brother Bryant claimed to hear portions of a conversation Lila Cearlock had with his wife.  Lila Cearlock was telling Mrs. Bryant that she and Jon had a little problem over the control to the VCR and that Jon had pushed her  hand, slammed down the remote and pushed her against the wall.  However, she did not suffer any injuries nor was she

sore from the incident. (R. Vol. VII, p. 173) In the many phone calls from Lila Cearlock to Glenda Ashworth during this time frame, Lila never indicated that she was afraid to be in the same house with Jon. (R.Vol. VII, p. 359)

On April 22, 1995, Keith Cearlock told Thomas Bryant that he had made arrangements to move out of the house. (R.Vol. VII, p. 220) Both Jon and his grandmother were happy with the decision that the parties were separating.

On April 27, 1995, Jon came home from school and fell asleep on his bed. At approximately 6:30 p.m., his grandfather woke him up and demanded an explanation about a notice from school indicating that Jon had received a detention for tardiness. Keith Cearlock was screaming at Jon how the detention would affect any future career and that no one would want to hire him. The screaming lasted for 10 to 15 minutes. Jon yelled that his grandparents were making too much of it. Since he was not allowed to yell, his grandfather ordered him to fetch the razor strap making Jon bend over and grab his ankles. His grandfather beat him with the strap five licks as hard as he could across Jon's buttocks. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 5) Following the beating with the razor strap, Jon went to the bathroom. While in the bathroom, he wondered why his grandparents treated him like this. He could not find an answer and went to get a gun to kill himself. (Supp.R. Vol. II, Resp. Ex. No. 2, p. 6) He knew his grandfather kept guns on a closet shelf because they had been target shooting on prior occasions. He took the gun, which was in a case, and a box of ammunition back to the bathroom. Jon loaded eight bullets into the gun. (R.Vol. VI, p. 43) As he sat on the counter top, he shot at a bottle of Tylex which was on the bathtub approximately four feet away. (R.Vol.VI, p. 43, 44) After doing so, Jon believed his grandfather would kill him since he had shot the Tylex bottle. (Supp. R. Vol., II, Resp. Ex. No. 2, p. 6) Moments after firing the gun, Jon came out of the bathroom as his grandfather was coming around the corner. Jon's grandmother was standing in the hallway. His grandmother began to scream. (R.Vol. VI, p. 45)(Supp.R. Vol. II, p. 5, 6) Jon panicked and shot his grandfather. His grandmother screamed and he knew he had to shoot her to get everybody's attention. (Supp.R. Vol. II, Resp. Ex. No. 2, p. 6) Jon followed his

-13-

grandmother who had left the house through the front door. She had fallen in the front yard. He attempted to shoot her again, but the gun jammed. *(Id.,* p.5, 6)

Jon went inside and broke open the door to his grandmother's room. He believed that she kept a .38 pistol in her room. He looked for it but could not find it. (R.Vol. VI, p. 48)

Jon felt an urge to change his clothes and went into his room to do so. (R. Vol. VI, p. 50) He left the house taking the gun and box of bullets with him. He planned to go to a friend's house. While on the way there, Jon attempted to unjam the gun. The gun accidentally discharged two times nearly striking Jon in the head. (R.Vol. VI, p. 52) By direct route, Steve Powell's house was four or five blocks away. The route Jon took was approximately eight to ten blocks. (R.Vol. VI, p. 51) Jon spoke to Steve Powell's guardian and learned that Steve was not home. Jon decided to return to his grandparent's house and surrender to the police. (R.Vol. VI, p. 55)

Jon Morgan surrendered himself to the police 27 minutes after a 911 dispatch to the Lincoln Police Department. (R.Vol. VI, p. 123) Deputy Robert Spickard was in the yard at 1206 7th Street when Jon Morgan approached him holding the pistol and a box of bullets. (R. Vol. VII, p. 329) In a nonthreatening matter, Jon handed the items to Dep. Spickard. (R. Vol. VII, p. 329) While doing so, Jon told Deputy Spickard "I did it. I killed them." (R.Vol. VII, p. 330) Deputy Spickard walked Jon over to Detective Harberts who was leading the investigation. Jon did not resist. After Deputy Spickard explained what had happened, Deputy Harberts asked Jon why he did it. Jon said, "Because they pissed me off. I couldn't take it anymore so I shot them." (R.Vol. VI, p. 28)

Jon was handcuffed and placed under arrest. Jon Morgan submitted to two show ups for witnesses who had been across the street. Jon was cooperative and respectful throughout the course of the investigation that evening and into the early morning of the next day. Throughout the evening he referred to Detective Harberts as "sir". (R.Vol. VI, p. 92, 123)

After Jon Morgan was taken to the jail, Detective Harberts began an interrogation. (R.Vol. VI, p. 38, 39) During the first interrogation, Jon related the events that led to the shooting of his grandparents. Detective Harberts claimed that he asked if Jon had thought at any

-14-

previous time about killing his grandparents. Jon answered that he had thought about it a few times further indicating that he had thought about using a gun. (R.Vol. VI, p. 57) During a second interview, he stated that he had these thoughts three or four times in the past four or five months. (R.Vol. VI, p. 83) Detective Harberts also asked Jon if had thought about killing other people and Jon said that he had thought about killing others a few times, again, with a gun. According to Detective Harberts, Jon indicated that there were times when people made him mad he thought about killing them. Harberts followed this by asking Jon, "If he made him mad while they were talking, would Jon want to kill him?" Jon said no and it would take several, several times before Jon would have those thoughts. (R. Vol. VI, p. 57)

Detective Harberts asked more questions about Jon's background concluding the first interrogation at 9:37 p.m. (R.Vol. 6, p. 60) Jon Morgan then signed a consent to search the home. He also agreed to do a video re-enactment of the events of the evening at 1206 7th Street. (R.Vol. VI, p. 61) At 11:07 p.m., Detective Harberts conducted a second interrogation this time using a tape recorder. (R. Vol. VI, p. 64) The format of this interview was Detective Harberts' suggestive and leading questions followed by Jon's brief answers. (R.Vol. VI, p. 71-92) As an example, Detective Harberts asked:

> "Q:   Okay, I see. Tonight's deal with grandma and grandpa was a deal where you lost your temper after you had an argument with them about the detention. You didn't...Did you start the evening planning to kill them?
>
> A:   No, sir.
>
> Q:   It wasn't - . That wasn't the case. It was. It ended your mind - . When did it enter you mind. You tell me. Don't let me tell you. You tell me." (R.Vol. VI, p. 92)

The second interview ended at 11:30 p.m. At 12:40 a.m., Jon traveled to 1206 7th Street to participate in the videotaped interview. Following this, Jon Morgan and other police officers walked the route from Jon's house to Steve Powell's house. On the way back to the police station, Jon was taken to the hospital where he consented to a blood test to check for illegal

-15-

drugs. (R.Vol. VI, p. 108)   When Jon to the Logan County jail, he consented to photographs when he was stripped to his underwear. (R. Vol. VI, p. 109)

Following Jon's detention, his talked to him about his future.  Prior to the shootings, Jon had planned to go to college to become an electrical engineer.  Every time Glenda Ashworth talked to her son after he was in detention, they talked about his future because she would not let him believe that he has no future.  Jon continued to express an interest to go to college to be an engineer. (R. Vol. VII, p. 394, 395)

Jon Morgan was evaluated by Dr. Robert Chapman.  Jon had been referred for Psychiatric Evaluation by Tim Huyett, the Logan County State's Attorney.  (Supp.R. Vol. II, Resp. Ex. No.2) Dr. Chapman obtained background information and a psychiatric history.  Dr. Chapman made a diagnosis of attention deficit disorder.  He further stated an opinion concerning Jon's conduct on April 27, 1995.  Dr. Chapman stated that:

> "At the time of the offense charged in the late evening of April 27, 1995, due to the product of the symptoms of attention deficit disorder that included intolerance to frustration, impulsivity and the circumstances in which he perceived himself as being maltreated, abused, physically and psychologically, and harboring the belief that he was in mortal danger from the action of his grandfather, it is unlikely that he acted in a premeditated manner at the time of the alleged shootings, but was acting in a state of sudden and intense passion provoked by strong provocation at the time of the alleged offense."(Supp.R. Vol. II, Resp. Ex. No. 2, p. 7)

The Logan County juvenile probation officer, Kim Turner, testified at the transfer hearing on behalf of the State.  She had been a probation officer in Logan County for seven years.  She had spent six years as the juvenile probation officer. (R. Vol. VII, p. 246)  She had been ordered to prepare a social investigation report by Judge Coogan on May 4, 1995. (R.Vol. VII, p.251)

Ms. Turner indicated that she had attended an unspecified number of seminars or workshops for periodic training as a probation officer.  She did not identify the topics or subjects of her periodic training.  She identified the goal of a probation officer with respect to juvenile probationers rehabilitation. (R.Vol. VII, p. 248-250)  This case was the first first-degree murder case that she had had to work with as a juvenile probation officer or as an adult probation officer.

-16-

Also, this was the first time she had ever had to make some evaluation of the potential for rehabilitation for a person suspected of first-degree murder. (R.Vol. VII, p. 301, 302) To prepare the social investigation report, Ms. Turner reviewed police reports, spoke with school personnel, watched the videotape of Jon's statements, and interviewed Jon and his mother and father. She did not interview any other family members. Finally, she reviewed reports of Jon's hospitalization at the Psychiatric Institute of Richmond and Dr. Robert Chapman's report. (R.Vol. VII, p. 252)

She selectively testified to passages from documents prepared by physicians or psychologists concerning Jon's hospitalizations at the Psychiatric Institute of Richmond that were helpful to the State's position. (R.Vol. VII, p. 256-262) During her cross examination, she acknowledged that the discharge summaries demonstrated that Jon was of average intelligence, his concentration and judgment were impaired and that he came across as quite impulsive. Furthermore, she testified that as Jon and his family progressed in therapy, his condition improved. His condition also improved when medication reached therapeutic levels. Finally, she acknowledged that records demonstrated that Jon Morgan's family attended family therapy sessions on a regular basis and the family was supportive of the treatment plan. She confirmed in her testimony that the Psychiatric Institute of Richmond had made a diagnosis of attention deficit disorder and that Dr. Robert Chapman had made that diagnosis in the weeks preceding the transfer hearing. (R.Vol. VII, p. 280-283) Despite the past and recent diagnosis and the observations of impulsive behavior and lack of judgment, Kim Turner did not consider that Jon's attention deficit disorder could have any affect on the acts he was alleged to have committed in the case. (R.Vol. VII, p. 284-285)

Kim Turner testified that Jon did not have any relationship with his father after his parents were divorced in 1987. Jon told her that he spoke with his father occasionally on the phone, but his grandmother confiscated his father's address and phone number so he could not attempt to contact him. (R.Vol. VII, p. 262, 263) Jon had regular phone contact with his mother. (R.Vol. VII, p. 287) They would see each other during the summers or on holidays but she did not know a specific number of times. (R.Vol. VII, p. 264) She knew that in February or

-17-

March of 1995, arrangements had been made for Jon to move back to his mother's house. However, when Jon arrived there, Glenda had changed her mind deciding that she could not handle the additional burden of her oldest child in the home.    (R. Vol. VII, p. 288) After relating this testimony, she concluded that based on her investigation, she could not "uncover a support system" for Jon Morgan. (R.Vol. VII, p. 267) However, she never asked Jon's mother what her current situation was. (R.Vol. VII, p. 290)

She made no effort to determine what support system might be in place upon his release from the Juvenile Department of Corrections at age 21. (R.Vol. VII, p. 286, 315) Ms. Turner called one residential placement facility to determine if Jon would be appropriate for that facility. However, the Court and counsel concluded that if Jon were to be adjudicated delinquent as a juvenile, the only option at sentencing would be the Juvenile Department of Corrections. (R.Vol. VII, p. 268, 294, 295)

Kim Turner testified that there was no evidence of a treatment plan for Jon Morgan. This was so even though no one such as Dr. Chapman was asked to present a treatment plan. (R.Vol. VII, p. 270) Based upon her belief that there was no "support system," no appropriate placement facility, and no suggestion of a treatment plan, she rendered her opinion that there was no reasonable chance for the rehabilitation of Jon Morgan. She gave this opinion even though Jon Morgan had never been in the juvenile court system before this incident. She also gave this opinion despite the indications in her social investigation report that Jon had been attending classes at the Mary Davis Detention Center, and had been getting good grades and had not had any discipline problems while in detention. (Supp. R Vol. 2, Social Investigation Report, p.3) Also, she rendered this opinion without any knowledge of what Jon's rehabilitation needs were. (R.Vol. VII, p. 297)

Ms. Turner then rendered an opinion that regardless of whether there was adjudication as a juvenile or a conviction as an adult, the Department of Corrections would be the appropriate place for Jon. She did not specify whether she meant the juvenile division of the Department of Corrections or the adult division of the Department of Corrections. She based her opinion on her belief that both the juvenile and adult divisions of the Department of Corrections have

-18-

counselors and psychiatrists to address problems. (R.Vol. VII, p. 273, 274) She did not know whether the facilities or services were better in the adult division or the juvenile division of the Department of Corrections. (R.Vol. VII, p. 305) She further based her opinion on her belief that there was no support system he could be released to and probation would deprecate the seriousness of the offense.

### The Suppression Hearing

Jon Morgan is the son of Glenda and Roe Morgan. Jon was sent to live with his grandparents in Lincoln, Illinois, after his parents' marriage deteriorated and his mother could not care for Jon who had been treated and hospitalized as a five year old for attention deficit disorder. (R.Vol. XIII, p. 538, 544) He lived with this grandparents while he as in the first through fourth grade. Jon returned to live with his mother in the fifth and sixth grade. Jon returned to Lincoln to live with his grandparents when he was in the seventh grade. He was living with his grandparents at the time of his arrest. (R.Vol. XIII, p. 622, 623) Jon's grandparents, Keith and Lila Cearlock attended Park Meadows Baptist Church in Lincoln, Illinois. The Cearlocks were very active in the church. Jon was also active in the church school. He left the church school in ninth grade and attended Lincoln Community High School from March 17, 1995 to April 27, 1995. (R.Vol. XIII, p. 623, 624; R. Vol. XI, p. 253, 305)

Jon Morgan's earliest memories of authority figures were his grandparents and the Christian church and school. (R. Vol. XII, p. 447-449) For Jon, the church and school were everything as far as authority was concerned because they told him what he was supposed to do. The same was true of his grandparents. He was taught to respect teachers and preachers, obey them and do what they wanted him to do. (R. Vol. XII, p. 449) If church members or students did not do as they had been told, they were looked down on and treated as outcasts. Outcasts were not allowed to participate in the group because those who were obedient and followed the rules were supposedly better persons than those who did. (R.Vol. XII, p. 449-450) In addition to being made an outcast if students didn't follow school authority, they could be punished. (R.Vol. XII, p. 452) Jon made an effort to do what he was asked in school because that is what authorities wanted. (R.Vol. XII, p. 451) Jon named Brother Bryant as the person in authority

-19-

within the school. Brother Bryant exercised his authority by giving rules in the school and church and having control over students and the church membership. (R. Vol. XII, p. 451) If he wanted something done, you did it or you were punished. Punishment could mean a detention, a lecture from Brother Bryant or a spanking with a paddle. Brother Bryant would have students bend over and touch their ankles when he paddled them. (R.Vol. XII, p. 454) From his experiences at the church and the school, Jon learned never to question and always to obey to obey authority figures. (R. Vol. XII, p. 452)

Kim Ball was a classroom supervisor in the seventh and eighth grade at the church school when Jon Morgan was a student there. She described him as a good student who behaved in class. (R.Vol. XIII, p. 687-690) She acknowledged that the children at the academy were very aware of the negative consequences that flowed from not following all of the rules. More often than not, Jon was compliant with authority figures. She also observed Jon to submit to his grandparents' authority. She taught Jon Morgan about the duties of a police officer in a seventh grade social studies class. (Supp.R. Vol. III, p. 40, 41; Supp. R. Vol.IV, People's Ex. No. 16; R. Vol. XIII, p. 702, 703) Thomas Bryant, the associate pastor and school principal, observed that Jon responded to strong male authority. (R.Vol. XIII, p. 649) He believed Jon would have learned this trait at home. (R.Vol.XIII, p. 650) Thomas Bryant described Jon's grandfather, Mr. Cearlock, as a strong male authority figure. He had seen Jon submit to his grandfather's authority, control and discipline. (R. Vol. XIII, p. 651)

Thomas Bryant described Jon Morgan as a student who rarely got upset and had a calm, matter-of-fact approach to things. (R. Vol. XIII, p. 631) Mr. Bryant could recall one time when Jon did not accept a disciplinary measure he sought to impose. Jon had been suspended because he kissed a girl. This kiss did not happen on school property or during the school day. A student tattled on him and Brother Bryant fashioned a punishment that would have required Jon to show up at school at 8:00 a.m. and go directly to a room outside of Mr. Bryant's office. He could not have any contact with any student while he was there. While in the room, he had to watch 45 to 50 preaching videos and make a report on each one. He also had to read a book and prepare a book report. Jon refused to prepare the book report and he wanted to have contact with the

-20-

students as he was walking to and from the room.  Since Jon refused all of the conditions imposed by Mr. Bryant, he was expelled.

Another assistant pastor at Park Meadows Academy, Rick Ball,  offered his observations about Jon's response to authority figures.  On the second Saturday of April, 1995, Jon was attending a grandparent/teen conference.  (Supp. R. Vol. II, p. 6) Jon was outside of the auditorium and Mr. Ball approached him.  Jon stated he was waiting on Steve Powell.  Mr. Ball asked Jon to sit in the auditorium and he would have Steve come in and sit with Jon.  (Supp.R. Vol.III, p. 7) According to Pastor Ball, Jon got upset and stood up to his face saying "I don't go to this school anymore or this church anymore - you can't tell me what to do.  I don't have to go in there if I don't want to." (Supp.R. Vol. III, p. 7) Pastor Ball told Jon that he either going to have to go back into the auditorium or he would have to leave.  Jon backed down and went  into the auditorium. (Supp.R. Vol. III, p. 32)

Jon described his grandparents as authority figures also.  He believed there were strong parallels between his parents and the church.  (R.Vol. XII, p. 453) According to Jon, his grandparents did "...whatever the church wanted them to do and according to their standards, I was expected to do what they wanted."  (R.Vol. XII, p. 453) Jon learned that he was not supposed to question his grandparents' authority.  If  he did, he would be punished.  His grandmother would slap Jon with either her hand, or with objects  in her hand including  a pair of scissors. (R.Vol. XIII, p. 541)  His grandfather would whip him with a razor strap.  Jon had to bend over and touch his ankles  like Brother Bryant had him do when he was paddled at school with the paddle.  Jon would also be grounded.   (R.Vol. XII, p. 454)

There were times when his grandparents would yell at him for questioning authority. Their yelling took the form of "put downs" like "people aren't going to like me and that I'm going to grow up and be like my parents.:" In Jon's grandparents' eyes, his parents, Glenda and Roe Morgan, were "scum." (R. Vol. XII, p. 454)

On April 27, 1995, Jon received an internal suspension and the school had sent a note to his grandparents home.  His grandparents were very mad and were yelling about the detention. (R.Vol. XI, p. 291, 292) Jon went into the bathroom.  He then went to his grandfather's bedroom

and took a gun case and box of bullets off of the closet shelf . (R.Vol. XI, p. 292) He knew the gun was there because he and his grandfather had been target shooting with the guns. (R.Vol. XI, p. 293) He took the gun case and bullets into the bathroom where he loaded the gun with eight bullets. Jon noticed a bottle of Tylex on the bathtub. He fired the gun hitting the Tylex bottle. (R.Vol. XI, p. 293) Jon left the bathroom. His grandmother was standing in the living room looking down the hallway towards him. When she saw him, she screamed and backed up. Jon panicked and shot his grandfather as he came around the corner from the kitchen area. (R.Vol. XI, p. 295) He shot his grandmother as she was leaving the house. She continued out the front door. (R. Vol. XI, p. 295; Supp.R. Vol. IV, People's Ex. No.8, p.3) Jon's grandmother fell down by a tree outside near the sidewalk. He followed her outside and tried to unjam the gun. He did not know what he would do if he could have unjammed the gun. He gave other statements indicating that he wanted to shoot her again.

Jon returned to the house and broke into his grandmother's locked bedroom looking for a .38 handgun. (Supp.R.Vol. IV, People's Ex. No. 8, p. 4) He could not find the gun. Jon then changed his clothes and put on some shoes. He grabbed the gun and ammunition and ran out of the back door. Jon wanted to go to Steve Powell's house because he wanted some help and needed someone to talk to. Jon was scared and confused. He felt helpless and worried and did not know what to do. (R.Vol. XII, p. 455) When Jon arrived at Steve Powell's house, he learned his friend was not at home. Jon began to walk back to his house because he had no other place to go. He didn't know what to do. Jon felt he needed some help and thought the police would be at his house. (R.Vol. XII, p. 456) Jon believed the police would help him because that's exactly what they were supposed to do. As Jon approached his house, he saw police officers there. At that moment, he was a mixture of emotions. He was confused, scared, upset, angry and sad. He felt hopeless. (R.Vol. XII, p. 457)

Lincoln police officer Tim Kerns arrived at 1206 7th Street after receiving a dispatch that there had been a possible shooting. (R.Vol. X, p. 96-98)  Other police officers began to arrive, including Detective Michael Harberts. Detective Harberts arrived at 1206 7th Street at 8:38 p.m. (R. Vol. XI, p. 269) Initially, officers felt that a murder/suicide had resulted in two persons being

-22-

shot. (R. Vol. XI, p. 271) One body had been found by the police inside the home and the other outside the home.  Detective Harberts searched the area of the home where a body had been found and did not see a gun.  No other officer had seen a weapon lying near the body before he had been removed by emergency medical personnel.  Detective Harberts concluded there had to be a third person responsible for the shooting.  He told other officers to go outside and canvass the crowd and neighborhood for witnesses. (R.Vol. XI, p. 272)

Other officers were outside.  Police tape had been stretched around the yard.  (R. Vol. X, p. 102)  There were a number of clearly marked squad cars at the house.  Some of them had emergency lights flashing.  There were also ambulances at the home.  (R.Vol. X, p. 13)  Squad cars had head lights and spotlights on.  (R.Vol. X, p. 135)  Logan County Sheriff's deputy, Robert Spickard, arrived at 1206 7th Street to assist other officers.  (R.Vol.X, p. 168)  He was in the backyard to make sure no pedestrians came onto the yard.  (R.Vol. X, p. 169)  He knew that there had been some kind of shooting.  (R.Vol.X, p. 175)  As he was standing in the yard, he saw a young person walk underneath of the tape.  He came up to Deputy Spickard handing him a gun and ammunition.  (R.Vol. , p. 176)  This young person was Jon Morgan.  Jon stated, "I did it. I killed them."  (R.Vol. X, p. 177)  Other officers observed this.  It did not feel good to Jon to tell Deputy Spickard that he had shot his grandparents.  (R. Vol. XII, p. 508)

After Jon's statements, Deputy Spickard knew he had a suspect in the shooting.  (R.Vol. X, p. 177)  Deputy Spickard took Jon by the elbow directing him to "come with him."  (R.Vol. XII, p. 458)  Deputy Spickard's grip was firm.  Jon Morgan did not feel like he could walk away from the deputy.  (R.Vol. XII, p. 458)  It did not cross Jon's mind to pull away because he was there to get help and he figured the police would provide it.  (R.Vol. XII, p. 459)  If Jon Morgan had tried to walk away, Deputy Spickard would have stopped him.  (R.Vol. X, p. 177)  As Deputy Spickard walked toward the house with Jon Morgan in hand, Officer Kerns saw them. Deputy Spickard told Officer Kerns what had happened.  Officer Kerns hollered for Detective Harberts who was on the front porch outside of the house.  (R.Vol. X, p. 136)  Detective Harberts came over to the group.  By this time, there were three police officers within arm's reach of Jon Morgan.  Two of them were in uniform with service weapons.  There were at least a half a dozen

-23-

police officers in the yard. There were four or five police cars with their emergency lights on and reflecting off the side of the house. (R.Vol. X, p. 137) Officer Kerns would have stopped Jon Morgan if he had attempted to walk away. (R.Vol. X, p. 165)

Detective Harberts walked up to the group of officers and Jon Morgan. Deputy Spickard related to him what had happened, specifically telling Detective Harberts that Jon had turned over the gun and ammunition and admitted involvement in the shooting. (R.Vol. XII, p. 364) In Detective Harberts' mind, Jon Morgan was not free to leave. (R.Vol. XII, p. 365) Deputy Spickard was conveying Jon Morgan into Detective Harberts' custody. (R.Vol. XII, p. 365, 366; R. Vol.X., p. 179)

Detective Harberts' investigation now focused on Jon Morgan. (R.Vol. XII, p. 366) The detective asked Jon a question that focused specifically on his potential involvement in the shooting that was being investigated. He asked, "Why did you shoot these two people?" (R.Vol. XII, p. 367) Detective Harberts did not *Mirandize* Jon prior to asking him that question. (R.Vol. XII, p. 367) Jon answered, "They pissed me off. I couldn't take anymore, so I shot them." Jon answered Detective Harberts' question because he felt he did not have a choice. Detective Harberts was the authority and he wanted to know. Moreover, Detective Harberts had control over him at that point. Jon did not comprehend the significance of answering Detective Harberts' question. Jon didn't think he could simply walk away and not answer the question. Also, he wanted help and he believed the police would provide it. (R.Vol. XII, p. 460) (R.Vol. XI, p. 275).

Detective Harberts instructed Officer Kerns to place Jon under arrest. Jon was handcuffed and did not resist. There was nothing about Jon's actions that caused the deputy to be threatened in any way. Jon made no effort to escape before or after being handcuffed. Jon was then placed inside a squad car.

Detective Harberts had been a Lincoln police officer for 18 years and 3 months. He was familiar with the Lincoln police department policy and procedures concerning juvenile offenders. Department policy stated that handcuffs should not be placed on any juvenile except, when in

-24-

the officer's opinion, they are need to prevent violence or escape.  (R. Vol. XII, p. 369; Supp.R.Vol. IV, Def. Ex. No.3)

Jon did not expect to be handcuffed.  At this point in time, he had no feelings.  He felt like a robot.  The police had him under their authority and control and Jon was going along with what they said and what they wanted to do.  He didn't think about the consequences of that. (R.Vol. XII, p. 461) Jon had never been arrested or handcuffed before.  Jon had only two contacts with police before that evening.  Two years earlier, Jon was on some property with a friend and a police officer had told them to get off of the property.  On one occasion, police officers came to Park Meadows School and talked about their jobs.  The officers told the class that their job was to "help us out."  In Jon's seventh grade social studies class, he studied various vocations.  In a book used by the class, the chapter on policemen stated:

> "A policeman is your friend...The main responsibility of policemen is the protection of law abiding people.  Laws are needed to punish evildoers who have no self control.  Policemen enforce those laws...  A policeman must have a servant's heart.  He is a minister of God (Romans XIII).  He is public servant to help and protect others.  In the community, they are looked upon as leaders and are respected.  Policemen with Christian character are needed today to maintain well ordered, peaceful communities...."  (Supp. R. Vol. IV, People's Ex. No 16, p. 23)

After Jon was placed in the squad car, he sat there waiting for the police to tell him what to do.  An officer came to the car and directed Jon to the front of the house.  He believed he had to go with the officer and was supposed to do so what they wanted without asking any questions. (R.Vol. XII, p. 463)  Detective Harberts wanted a witness to view Jon Morgan to identify him. While Jon remained in handcuffs and in the company of officers, Jon submitted to this identification procedure.  All of the police vehicles described earlier were still at the house. (R.Vol. XII, p. 372) Jon did not understand why he was standing in front of the witness.  After the witness looked him over, Jon was placed back in the squad car.  Shortly thereafter, he was taken out of the car and returned to the front of the house for another witness to look at him from across the street.  Jon was told to stand in the spot where his grandmother fell.  As he was standing there, he looked down and saw blood and some other papers.  He did not want to think

-25-

about what he saw because it as painful. A crowd of people from the neighborhood had gathered around the police tape making Jon nervous. As he was standing near the spot where his grandmother fell, Detective Harberts told an officer to remove Jon's handcuffs. He was asked to extend his arms and turn his back to the street as if he was standing over the spot where his grandmother had fallen. The officer put the handcuffs back on Jon and drove him to the jail. (R.Vol. XII, p. 466) Jon was confused by the collection of lights, cars and people as he was being driven off.

Officer Kerns drove Jon Morgan to the Logan County Jail. (R.Vol. X, p. 142) He began to collect booking information from Jon and learned that he was 14 years old. Officer Kerns did not make any effort to contact Jon's mother or father. He did not ask any questions. He did not ask Jon where his mother or father could be located. Officer Kerns did not call Darrell Sisk, the Lincoln police department juvenile police officer. (R.Vol. X, p. 143) Jon was placed in a holding cell which he described as fifteen feet long, six feet wide with a concrete slab along the back wall and an exposed steel toilet. He had never been in a cell before and remained handcuffed while he was in there. (R.Vol. XII, p. 468) As Jon heard the door locking shut, he thought his life was over and did not know what to do. (R.Vol. VII, p. 468) He could hear other prisoners and police officers talking. Another prisoner asked Jon what he was doing and how long he was going to be in the cell. (R.Vol. XII, p. 469)

Before Detective Harberts left 1206 7th Street, he spoke with Logan County State's Attorney Timothy Huyett. Detective Harberts briefed the State's Attorney on the events of the evening. According to Detective Harberts, he told Mr. Huyett that Jon Morgan was approximately 18 or 19 years old. Mr. Huyett requested Detective Harberts to go to the jail and get a statement from Jon. (R.Vol. XII, p. 376) When Detective Harberts arrived at the jail, Officer Kerns told him that Jon was 14 years old. (R. Vol. X, p. 144) When Detective Harberts learned this, he did not make any effort to contact Jon's mother, father or a juvenile police officer. (R. Vol. X, p. 144)

Detective Harberts went to Jon's holding cell. This cell was routinely used to house adult jail prisoners pending some other action in their case. (R. Vol. XII, p. 376, 377) The door was

-26-

shut and locked when Detective Harberts arrived.  He did not believe that Jon was handcuffed in the cell, however, his testimony from the transfer hearing would suggest otherwise.  (R. Vol. XII, p. 378)  Detective Harberts did not tell Jon the purpose of his detention.  He did not tell Jon that he could be detained for a maximum of six hours.  He did not tell Jon how long Detective Harberts expected his detention to last.  Detective Harberts made no effort at that point to contact Jon's mother, father, any other relative, or the juvenile police officer.  (R. Vol. XII, p. 379, 380).

At 9:05 p.m., Detective Harberts began to question Jon.  (R. Vol. XII, p. 383) He learned once again that Jon was 14 years old.  He called Logan County State's Attorney Timothy Huyett to get advice about questioning Jon given his age.  The State's Attorney advised Detective Harberts to make sure Jon was informed of his *Miranda* warnings and to inquire whether the man and woman who had been shot were his guardians.

Detective Harberts asked Jon if the persons who had been shot were his legal guardians or his grandparents.  According to Harberts, Jon answered that they were his legal guardians and his grandparents.  Jon recalled that he answered that he thought his grandparents were his legal guardians.  (R. Vol. XII, p. 384, 515)  The next morning, April 28th, at 3:20 a.m., Detective Harberts spoke with Jon's mother and learned that Mr. and Mrs. Cearlock were not his legal guardians.  (R. Vol. XII, p. 385) THIS IS NOT IN THE DRAFT I AM WORKING FROM????

Detective Harberts took the handcuffs off and told Jon to follow him to another part of the jail.  (R. Vol. XII, p. 469) Jon went with him because the detective seemed like a nice guy and going with him was a better alternative than being locked up in a cell.  (R. Vol. XII, p. 469, 470) They went to an office.  Officer Kerns was in the room.   (R. Vol. XI, p. 287)  Detective Harberts believes he may have asked Jon whether he needed something to eat, drink or use the restroom.  Jon indicated that he did not need to use the restroom nor did he need any food or drink.  (R.Vol. XI, p. 288) When the interrogation began, he did not tell Jon that he could be tried as an adult.  Nor did he ask Jon about the whereabouts of his mother or father to contact them.  The police department's juvenile officer was not called.  (R. Vol. XII, p. 387) Detective Harberts knew that the policy of the Lincoln police department was that parents are to be contacted when a juvenile is taken into custody.  (R. Vol. XII, p. 388; Supp.R.Vol. IV, Def. Ex. No.3)  Detective

Harberts was not a trained juvenile officer. (R. Vol. XII, p. 388) Also, he knew that departmental policy dictates that a minor is not to be questioned unless either a parent or guardian is present. (R.Vol. XII, p. 400; Supp. R. Vol. IV, Def. Ex. No. 3)

The detective read Jon Morgan *Miranda* warnings. He did not have Jon sign a written waiver. (R. Vol. XII, p. 388)  The card he used to read *Miranda* warnings was 15 years old. (R. Vol. XII, p. 389) The detective read Jon the warnings just like he would read them to any adult defendant. (R. Vol. XII, p. 390) He didn't go over any individual *Miranda* warnings in any more detail than was stated on the card. (R. Vol. XII, p. 390) Jon was never asked if he waived or gave up his right to remain silent, his right to consult with a lawyer or his right to have appointed counsel.   Jon was asked if he understood each of those rights and finally he was asked, "Knowing these rights, do you want to talk to me without having a lawyer present?" (R. Vol. XII, p.390) When the officer read *Miranda* rights and began asking questions, Jon felt he was supposed to answer them because Detective Harberts was the boss and Jon felt he had to tell him what he wanted to know. Jon did not consider the consequences of answering the questions. (R. Vol. XII, p. 471)

If Jon would have had the chance, he would have talked with his mom or his dad.  This was true even though he felt rejected by her.  Jon did not think it would have been any more stressful to have his mother at the interview even though he was worried about how she was going to feel since he had shot her parents. (R.Vol.XII, p. 514, 515)  If he had been allowed a chance to speak with his mother, he would have listened to any advice she offered. (R. Vol. XII, p. 520) Jon believed that when he was being questioned, he couldn't talk to anyone other than Detective Harberts.  He felt that if Detective Harberts had wanted him to talk to somebody else, he would have given Jon this option. (R. Vol. XII, p. 473) Officer Kerns observed that Jon was oddly unemotional when he answered questions. (R. Vol. X, p. 121) During the first interrogation, Jon never asked that the questioning be stopped.  Detective Harberts never offered to stop.  Jon did not ask for anyone to be there, nor did Detective Harberts offer to have anybody there.  Officer Kerns noticed that Jon made extreme efforts to comply with every request he

-28-

made. (R. Vol. X, p. 151)  Officer Kerns did not see Jon resist or argue with any officer the entire evening.  (R. Vol. X, p. 152)

At the end of the first interrogation, Detective Harberts asked Jon about his mother for the first time.  (R. Vol. XII, p. 396)  Jon told the detective his mother's name and gave him her phone number off the top of his head.  (R. Vol. XII, p. 397)  Even though Detective Harberts had a phone number for Jon's mother, he did not attempt to call her.  (R. Vol. XII, p. 397)

Throughout the questioning, Jon was not thinking of criminal charges.  He had never been in court before.  When Detective Harberts finished asking him questions, Jon was taken back to the holding cell.  (R. Vol. XII, p. 473)

Following the first interrogation, Officer Kerns met with Assistant State's Attorney Kurt Schoenbein at the county building at 9:45 p.m.  He gave the Assistant State's Attorney information about the case telling him that Jon was 14 years old.  (R. Vol. X, p. 156)  Officer Kerns did not recall the Assistant State's Attorney indicating that Jon's parents needed to be contacted or that Sgt. Sisk, the juvenile police officer, should be at the jail.  (R. Vol. X, p. 156)

Shortly after the first interrogation ended, Detective Harberts took a call from the hospital.  Based on that conversation, he had some questions about the number of bullet wounds Lila Cearlock suffered.  He returned to the holding cell and confronted Jon.  Jon told him that he had shot his grandmother only one time.  (R. Vol. XI, p. 313-321)  At 10:30 p.m., Detective Harberts spoke with Assistant State's Attorney Schoenbein.  Mr. Schoenbein wondered if Jon would be willing to go back to 1206 7th Street and walk through the house while being videotaped.  Detective Harberts does not recall discussing Jon's age or any concerns arising from Jon's age with Mr. Schoenbein.  (R. Vol. XII, p. 399)

At approximately 10:30 p.m., Officer Bob Rawlins called Darrell Sisk.  Sgt. Sisk was in bed.  Officer Rawlins asked him if he knew Jon Morgan who was being held as a suspect.  Sgt. Sisk was not even told why Jon was being held.  Sgt. Sisk did not go to the station because he didn't "know the kid."  (R.Vol. XI, p.238)  Sgt. Sisk believed that since he as not a homicide investigator, he would not have been able to play any meaningful role during the interview of

Jon Morgan. (R.Vol. XI, p. 239) He stated his only purpose at the interview would have been to observe. (R. Vol. XI, p. 240)

Sgt. Sisk claimed that there was a policy at the Lincoln Police Department that if he was unavailable, then the shift commander assumes his role as the juvenile police officer for the City of Lincoln. (R. Vol. XI, p.238, 239, 242)

At 10:45 p.m., Detective Harberts placed a phone call to Jon's mother, Glenda Ashworth. He placed the call an hour and a half after he learned that Jon was 14 years old. (R. Vol. XI, p. 322) It took Detective Harberts over an hour to make the call after Jon gave him his mother's phone number. (R. Vol. XI, p. 322) He left a message on an answering machine stating his name and that "I had Jon and that there was an emergency" and that he needed to speak with Glenda Ashworth immediately. (R. Vol. XI, p. 322)

Detective Harberts claimed an attempt to tape the first interrogation. After he called Jon's mother, he listened to the tape and discovered that it was blank. (R. Vol. XI, p.322) He returned to Jon's cell at 11:07 p.m. pulling Jon out to be interrogated a second time in an attempt to tape the interview. (R. Vol. XII, p. 402)  The second interrogation started before Detective Harberts had contacted Jon's mother or father. The juvenile police officer was not present. Jon was read his *Miranda* warnings. (R. Vol.XII, p. 476; Supp. R. Vol. IV, People's Ex. No. 8)  Jon agreed to speak with to Detective Harberts again out of respect for him. Jon was never asked if he gave up any of the enumerated *Miranda* rights. (R. Vol. XII, p. 476)  The right to remain silent didn't mean anything to Jon because he thought *Miranda* warnings were just police show entertainment.  Around the Cearlock home, the family normally watched Christian preaching videos, but occasionally his grandfather would watch more standard fare. (R. Vol. XII, p. 477, 478) When he was at other homes, or with his mother, he would get the chance to watch an occasional police show. (R. Vol. XII, p. 478)  Jon had never spoken with a lawyer or been in a lawyer's office. He did not know what a lawyer might be able to do for him at that moment. He didn't ask Detective Harberts what a lawyer could do for him. He felt that if that knowledge was important, Detective Harberts would have told him. (R. Vol. XII, p. 479) He did not believe he had any choice when it came to answering the detective's questions because he believed he

-30-

was supposed to do what they wanted and answer questions when he was asked. After the second interrogation, he was taken back to the holding cell. (R. Vol. XII, p. 479)

At 12:40 a.m., Detective Harberts went to Jon's cell and asked if he would be willing to return to 1206 7th Street for a videotaped "re-enactment" of what occurred. Jon agreed to do so. (R.Vol. XI, p. 335) Prior to leaving, Detective Harberts made no attempt to contact Jon's mother again, nor was there any effort to contact the juvenile police officer to be present for this re-enactment. (R.Vol. XII, p. 404)

At 3:20 a.m., Glenda Ashworth responded to the message Detective Harberts left at her home. (R.Vol. XII, p. 427) She gave a wealth of information to him explaining how Jon came to live in Lincoln with his grandparents and his history of attention deficit disorder. She asked where her son was and whether he had a lawyer. (R.Vol. XII, p. 428) The following morning, Glenda Ashworth called Logan County State's Attorney Timothy Huyett at 10:00 a.m. She asked about getting her son a lawyer. (R. Vol. XII, p. 431)(Defendant's Officer of Proof)

Dr. Robert Chapman testified at the Motion to Suppress. He is board certified in forensic psychiatry. (R. Vol. XIII, p. 534) In this case, he was originally contacted by the Logan County State's Attorney for the purpose of examining Jon Morgan for fitness to stand trial. Following that, Jon's attorney, the Logan County Public Defender, Thomas Funk, called Dr. Chapman to do a further examination of Jon Morgan. (R.Vol. XIII, p. 536) Mr. Funk was interested in Dr. Chapman's opinion about Jon's ability to knowingly and intelligently waive *Miranda* rights and give statements. (R.Vol. XIII, p. 538) Dr. Chapman interviewed and evaluated Jon on a number of occasions. He obtained a history from Jon including his family background, life with his grandparents, and his psychiatric history. Dr. Chapman also reviewed policed reports, witness statements and the audio and video tapes of Jon's statements to the police. (R.Vol. XIII, p. 537-547) Dr. Chapman diagnosed Jon as suffering attention deficit disorder. He rendered his opinion that Jon's attention deficit disorder affected his ability to make a knowing and voluntary waiver of *Miranda* rights testifying that attention deficit disorder typically leads to misunderstandings at times, even confusion. (R.Vol. XIII, p. 549) He also testified that it is typical for a person

-31-

suffering from attention deficit disorder to appear calm in situations of heightened stimulation. (R.Vol. XIII, p. 549)

Dr. Chapman identified despair as a term he is familiar with in both clinical and forensic psychiatry. Despair is a mental state and emotion that implies that a person has a profound feeling of helplessness and hopelessness. Based on his review of the audiotape and videotape that were made on April 27th and April 28th, 1995, Dr. Chapman was struck by what appeared to be a sense of despair and hopelessness and fruitlessness of Jon's life in the situation he was in. (R.Vol. XIII, p.551) To Dr. Chapman, Jon appeared to be absolutely devoid of any interest in his own welfare and appeared to be very compliant with whatever the adult and authority figures asked of him. Jon appeared to be trying to please the authority figures as though he was in a helpless situation and had no choice other than to do that. (R.Vol.XIII, p. 551)

Dr. Chapman also rendered his opinion that Jon displayed a flat affect. Affect is a term psychiatrists use connote the outward manifestation of emotion. If a person's emotions are flat or blunted, there is the implication that a person's thought processes are preoccupied and constricted. (R.Vol. XIII, p. 553, 554)

After watching the videotapes, Dr. Chapman observed Jon Morgan exhibiting what he described as learned behaviors. Learned behavior is a term that describes behavior that a person learns as they progress in their chronological development. This is especially true of behavior during our younger years when a person learns how best to react to certain things and how best not to react. (R.Vol. XIII, p. 554) Dr. Chapman testified that, based Jon's history and the influences he had experienced, it was his impression that Jon's behavior with authority figures the night of his arrest was consistent with the type of learned behavior he had acquired in his 14 years concerning how to deal with and how to please and get the best outcome with authority figures. (R.Vol. XIII, p. 555).

Finally, Dr. Chapman gave his opinion that Jon was substantially impaired in his capacity to appreciate the gravity of the situation of waiving his *Miranda* rights. This opinion was based on his age, his background, his attention deficit disorder, and the situation that he found himself in.

-32-

*Trial Evidence*

The State charged Jon Morgan with eight counts of first degree murder in relation to the deaths of his grandparents. Counts I and II charged Jon pursuant to *720 ILCS 4/9-1(a)(1)* with causing the deaths of his grandmother and grandfather respectively with the intent to kill them. Counts III and IV charged Jon pursuant to *720 ILCS 4/901(a)(2)* with causing the death of his grandmother and grandfather respectively by shooting them knowing such act created a strong probability of death or great bodily harm. Counts V and VI charged Jon pursuant to *720 ILCS 5/9-1(a)(3)* with causing the death of his grandmother and grandfather respectively while committing the forcible felony of aggravated battery in that while committing a battery, Jon intentionally or knowing caused great bodily harm and that during the commission of the aggravated battery, Jon's grandparents died. Finally, Counts VII and VIII charged Jon pursuant to *720 ILCS 5/9-1(a)(3)* with causing the deaths of his grandmother and grandfather respectively while committing the forcible felony of aggravated discharge of a firearm in that he knowingly discharged a firearm in the direction of his grandmother and grandfather.

Defense counsel disclosed its intent to use a psychological defense and expert testimony to demonstrate that Jon Morgan's actions were based upon self-defense or the result of sudden and intense passion resulting from serious provocation. (C.248) The state filed a Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts arguing that the instruction was only proper for first degree murder charges. (C.315)

The trial court denied the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts, stating:

> A more vexing problem is raised by the State's Motion to Bar Second Degree Murder Instructions. The court has heard the arguments, considered the motion and authorities cited. First of all, the IPI Instructions are adopted pursuant to Committee recognized by the Supreme Court but to the best of the court's understanding, those instructions have never been formally adopted by the Supreme Court. Further, the law particularly relevant to this court, in the absence of a Supreme Court pronouncement on the subject is that of the Fourth District. Court has read <u>Williams</u> (and understands its timing) and believes that its rationale applies, or may apply here. Court understands that the state has the discretion of whether to charge, what to charge, whether to dismiss or nolle and

-33-

that the state may charge under alternate theories. But the court is charged with giving the jury instructions according to the facts that develop at trial according to the law that applies under the circumstances. Court indicated that the motion may be premature. Court cannot, as a matter of law, grant the motion. Court believes, if anything , the law is unsettled. Further, of concern to the court as well, is that under the state's theory as pointed out by the defense, inconsistent verdicts are a real possibility. Therefore, the state's motion is denied.

(C.23-25)

During the hearing on final pre-trial motions, the court reconfirmed its denial of the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts. In response to defense counsel's Motion for Clarification as to what "state of mind" evidence was permissible, the court ruled that Jon's psychological expert would be allowed to testify as to "the manner in which the defendant's experiences affected his perception of danger, its imminence, and the actions the defendant perceived as necessary to defend himself on the day of the crime." (C.346; C.31)

After all of the evidence and prior to closing arguments, the trial court held a jury instruction conference. (C.36)    During the instruction conference, the trial court reversed its ruling denying the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts and refused to give a second degree instruction for counts V through VIII. (R. Vol.XXIX, p.25-42) The trial court erred in refusing to instruct the jury as requested by defense counsel.

In the trial of this case, Jon Morgan did not deny that the shootings took place. He testified that he acted in self-defense on the night of April 27th, 1995, and on his belief, based on fear, that he needed to protect himself from great bodily harm. He testified that, on the night of the shootings, he had been strapped by his grandfather. Jon testified that he believed it was necessary to defend himself that night as the result of years of beatings and emotional abuse and an escalating pattern of violence in the weeks before the shootings occurred, which included beatings by his grandfather with his fists and threats by his grandfather that if he ever fought back, grandpa would get him in his sleep. He also testified that the beatings he endured were the results of prodding, urging, and provocation by his grandmother. His grandmother would push

-34-

his grandfather to discipline him or "take care of him." His grandfather would respond by striking out at Jon. The fear of harm Jon perceived was just as much the result of his grandmother's urgings as his grandfather's actions. In his mind, the threat was one. For him, his grandmother and grandfather was one threat and one person. (R. Vol. XXIII, p. 726-743, 751-770, 781-798)

The defendant called a witness to corroborate the beatings that he suffered at the hands of his grandmother and grandfather. Jenny Golden, a former babysitter, was called to testify to welts she had seen on Jon Morgan's back and buttocks. This occurred in 1998. (R.Vol. XXIV, p. 10-15. The defendant also called Barbara Blaum, an expert witness, who testified that leather fibers on a razor strap found in the Cearlock home were optically similar to leather fibers found on the jeans Jon was wearing at the time of the shooting. (R. Vol. XXIV, p. 36-55) The defendant also called Dr. Stuart Hart, a psychologist who gave expert testimony about how Jon's experiences affected his perception of danger that evening. Dr. Hart explained how a person who has been physically and emotionally abused perceives danger differently than a child who hasn't . He also testified that it would be reasonable for Jon to perceive his grandmother and grandfather as one threat based on past experiences. (R. Vol. XXV, p. 158-209) The defendant attempted to call his mother, Glenda Ashworth, to corroborate his testimony regarding his grandparents conduct. The State objected and the trial court ruled that her testimony would be too remote. The Judge made his ruling based on an offer of proof which indicated that when Glenda grew up in her parents' home, she was subjected to beatings with the same belt and razor strap that Jon was beaten with. In addition, the circumstances of the beatings she suffered were exactly the same as what was endured by Jon Morgan. Her mother would push and provoke her father to the point where he would beat Glenda. (R. Vol. III, C717) Dr. Stuart Hart also testified in an offer of proof that the information Glenda Ashworth had to offer would have helped him explain his opinions. (R. Vol. XXVI, p. 451-455).

-35-

# ARGUMENT

I. **THE TRIAL COURT ABUSED ITS DISCRETION WHEN GRANTING THE STATE'S MOTION FOR TRANSFER TO THE CIRCUIT COURT AFTER FINDING THAT THE FACTS PRESENTED A TRAGIC SITUATION WHERE JON MORGAN HAD BEEN SHORT-CHANGED IN HIS LIFE, MOREOVER, THE COURT FAILED TO ADEQUATELY CONSIDER ALL STATUTORY FACTORS AND IGNORED EVIDENCE THAT REFLECTED FAVORABLY UPON JON MORGAN.**

The purpose of a transfer proceeding is to balance the best interests of the juvenile, particularly as the interest relates to his or her potential for rehabilitation, against society's interests in being protected from criminal victimization by minors. *People v. Clark*, 119 Ill.2d 1, 518 N.E 2d 138 (1987). Section 5-4(3)(b) of the Juvenile Court Act of 1987 lists several factors that a juvenile court judge must consider in deciding whether a minor should be prosecuted as an adult. A judge weighing these relevant factors must determine whether to strike the balance for society by transferring the alleged juvenile offender, or strike the balance for the juvenile and retain jurisdiction. *Clark, supra*, 518 N.E. 2d at 143. No one criteria is determinative, nor must equal weight be given to every criterion. However, the court must create a clear record to allow meaningful review of the trial court's exercise of discretion. *People v. Taylor*, 76 Ill.2d 289, 303, 304, 391 N.E.2d 366, 367 (1979). On review, the appellate court's role is to determine whether, in light of the statutory criteria, the trial judge abused his discretion.

In Jon Morgan's case, the juvenile court judge failed to adequately consider all necessary statutory factors. Moreover, the juvenile court judge ignored evidence that reflected favorably upon the defendant. When Judge Coogan considered whether the alleged offense was committed in an aggressive and premeditated manner, he referred to only one fact which was not supported by the record. When the judge considered Jon Morgan's age and his previous history, he failed to consider a wealth of redeeming facts that warranted keeping Jon in the juvenile court system. When Judge Coogan considered whether there were facilities available for Jon Morgan's treatment and rehabilitation, he did not determine the likely effectiveness of these facilities in light of Jon Morgan's history and present circumstances. This analysis is required by the Illinois

Supreme Court in *People v. Clark, supra.* The court simply did not fully address Jon Morgan's potential for rehabilitation.

Judge Coogan did make a number of specific findings that weighed in favor of keeping Jon Morgan in the juvenile court system. The court observed that this case was a "major tragedy" because his parents were unwilling and unable to raise him. Because of his unstable family life, Judge Coogan concluded Jon did not have the parental support needed to "survive" and that "Jon may very well have been short-changed in his life." The transfer of Jon Morgan, who was shortchanged in life due to the failing of his parents and other caretakers, to be prosecuted as an adult where he faced life in prison if convicted, constitutes an abuse of discretion. This is especially true where the record overwhelmingly demonstrated Jon's potential for rehabilitation.

> **A.  The Juvenile Court Judge Relied on Only One Fact to Determine That the Alleged Offense Was Committed in an Aggressive and Premeditated Manner. The Fact Relied Upon by the Judge Did Not Exist in the Record and the Evidence Did Not Establish That Jon Morgan Acted out of Impulse, Fear and Panic.**

In determining whether to transfer a juvenile's case for adult prosecution, a juvenile court judge must consider whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner. *705 ILCS 405/5-4(3)(b)(2).* When Judge Coogan addressed this factor, he commented that:

> "There has been much talk here about aggressiveness and premeditated manner. Was this a premeditated act or was it not? The court is definitely going to find it was aggressive. The court is, I believe, is convinced by a preponderance of probable cause, that it was a premeditated act also. He [Jon Morgan] talked about killing his grandparents in the past and the grandparents did end up dead at his hands, and the court is going to find that it was in a premeditated manner."
> (R.Vol. VIII, p. 447)

The record does not evidence that Jon Morgan talked about killing his grandparents in the past. At the hearing, the State called Thomas Bryant as a witness. Thomas Bryant is the associate pastor and school principal at Park Meadows Baptist Church and Academy. He

-37-

testified that the day after the shootings, he spoke to a student at the school named Eric Gill. (R.Vol. VII, p. 182) He claimed that Eric Gill's mother, Cindy Gill, brought her son to the office so that Eric could tell him some important information. Mr. Bryant testified that Eric Gill told him that when he was in the men's room at a church service within a few weeks of the shootings, Jon burst into the restroom stating that he was going to kill his grandmother. Mr. Bryant did not know whether Eric had heard Jon say anything about his grandfather. (R.Vol. VII, p. 185, 186) Mr. Bryant did not make any effort to obtain any more details from Eric Gill.

Eric Gill was also called as a witness by the State. Eric recalled that approximately two months before Jon left Park Meadows in February of 1995, Jon walked into the locker room prior to basketball practice one day and made the statement "someday I wish I would kill them." There were six or seven other boys in the locker room at the time. (R.Vol. VII, p. 321, 322) Jon did not tell Eric or anyone else who he was referring to. Nor did Eric or anyone else ask. Over an objection that an answer would be speculative, the prosecutor was allowed to ask if Eric knew who Jon was referring to. Eric stated that he did not know who Jon was referring to. (R.Vol. VII, p. 321, 322) Finally, Eric Gill testified that when he told Pastor Bryant about this incident, he did not say that Jon said "I wish I could kill my grandparents." (R.Vol. VII, p. 324) Judge Coogan erred in making the factual finding that Jon Morgan talked about killing his grandparents in the past. Discretion exercised on an erroneous interpretation of fact is subject to keener scrutiny by a reviewing court. *In Re J.O.*, 269 Ill.App.3d 287, 645 N.E. 2d 1035, 1038 (1st Dist., 1995) Judge Coogan made this critical finding based on alleged statements by Jon Morgan that were, in fact, never made.

The evidence developed at the hearing does not establish that the alleged offense occurred in an aggressive or premeditated manner. Jon Morgan was not lying in wait for his grandparents when they came home from work on the evening of April 27, 1995. He stayed at a friend's house after school until approximately 5:30 when he came home and fell asleep on his bed. At approximately 6:30, his grandfather woke him up and berated him about a school detention. Because he shouted back, Jon's grandfather made him fetch a razor strap and required Jon to bend over and grab his ankles before he suffered a beating. Jon went into the bathroom

-38-

following the beating. While he was in the bathroom, he wondered why his grandparents had treated him in this way and contemplated suicide.

He did not have a gun hidden in the bathroom. He had to leave the bathroom not knowing where is grandparents were. The videotape demonstrates that this is a small house and the sound of the bathroom door opening might easily have been heard by the grandparents. Just as easily, they could have seen him walking from his grandfather's bedroom to the bathroom with a gun case and shells in hand. These possibilities demonstrate the lack of any planning or forethought. Moreover, Jon knew that there were more powerful and larger caliber guns in his grandfather's room. A person who had planned a shooting would have chosen the most powerful gun available. Once he was back in the bathroom, Jon loaded the gun. He considered killing himself. He sat on the counter top with the loaded gun. He then shot at a bottle of Tylex that was on the side of the tub.

The utterly irrational act of shooting at the Tylex bottle demonstrates that Jon was not executing some prearranged or premeditated plan to kill his grandparents. Firing a gun in this small house alerted everyone in the house that something very unusual had happened. His grandparents could have just as easily left the house.

After firing the gun, he believed his grandfather would kill him. His grandfather had often told him that if were to fight back or if he ever tried to overpower him , his grandfather would kill him. Jon believed that his grandfather would perceive Jon's firing of the gun in the house as attempting to fight back. Jon's statements to Dr. Chapman demonstrate that this was no premeditated plan. He told Dr. Chapman, "If he did not shoot his grandfather right away, his grandfather would kill him since he shot the Tylex bottle, so he panicked and shot his grandfather immediately. His grandmother screamed and he knew he had to shoot her to get everybody's attention." (Supp.R. Vol. II, Resp. Ex. No. 2, p.5,6) The notion that he had to shoot his grandmother to get "everybody's attention" confirms the impulsive, panicked nature of his act. A shooter who acts with premeditation to kill does not want anybody's attention.

Dr. Chapman's opinion on aggressiveness and premeditation is unrebutted. He states that it was unlikely that Jon acted with premeditation, but was acting as a result of a sudden and

-39-

intense passion resulting from strong provocation at the time of the offense. Dr. Chapman concluded that Jon's conduct was the product of the symptoms of attention deficit disorder including intolerance to frustration and impulsivity, his perception of being physically and psychologically maltreated, and his belief that he was in mortal danger from the actions of his grandfather.

Next, Jon Morgan's frantic changing of his clothes simply because he felt like it and his meandering through alleys to his friend's house, indicate a total lack of planing about how he was going to escape the consequences of his act. As he walked to Steve Powell's house, he attempted to unjam the gun. He made no attempt to conceal this effort. The gun discharged twice with one round narrowly missing Jon's head. This behavior shows a confused and panicked boy who was totally unprepared to face the consequences of this sudden, uncontemplated act. Jon Morgan did not have a prearranged get-away plan. He did not attempt to discard the gun in an alley on his trek to Steve Powell's home or on his way back to his own home. Finally, only minutes after the shooting, Jon turned himself into the police, giving the gun and shells to Deputy Spickard.

Jon's actions bespeak panic, fear and impulse rather than aggression and premeditation. They are not the actions of a person who has planned a course of conduct.

Cases where courts have found that an act was committed in a premeditated fashion demonstrate consideration, planning or plotting of that act. In *In Re D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873, the First District Appellate Court affirmed the trial court's finding that the minor should face charges of first degree murder, home invasion and residential burglary in the juvenile court system. At the transfer hearing, the State presented evidence that three minors learned that Ms. Larkin, an elderly woman in her 80's, kept large sums of money in her home or carried the money on her person. The three of them planned to burglarize her apartment. They discussed the burglary five times before carrying it out. On one occasion, approximately one week before the burglary, they gathered on a porch across the street from the intended victim's home. One of the minor's timed the victim with a stop watch and determined that she stayed on her porch for at least 17 minutes at a time. *In Re D.B., supra*, 559 N.E.2d 873 at 874.

-40-

When they put their plan in action, the minors checked to make sure that Ms. Larkin was on her porch. They entered her apartment through a bedroom window with a crow bar. Each burglar had an assigned task. One acted as a look out while the others, including D.B., searched the apartment. When Ms. Larkin entered the apartment, one of the minors, not D.B., beat her on the head with a crow bar. D.B. and another minor then resumed searching for money. When Ms. Larkin tried to get up, she was beaten again. *Id.* Her body was found with a blood soaked sheet covering her head and with her hands and feet bound. Her telephones had been ripped from the wall. The court found that the minors' conduct was premeditated and aggressive in light of the fact that the defendants planned to incapacitate the victim if she happened to return during the burglary.

In *People v. Beck*, 190 Ill.App.3d 748, 546 N.E.2d 1127(5th Dist., 1989), a 14 year old defendant was tried as an adult on six counts of attempted murder, six aggravated batterys and home invasion. The evidence in the case was that Beck, his brother and a friend had entered into a private residence with the intent to steal guns from the residence. Once inside the house, the defendant and his brother encountered one of the occupants. The defendant's brother brandished a steak knife and slit the occupant's throat. Her screams alerted others in the house who confronted the defendant and the other intruders. *Beck, supra*, 546 N.E.2d 1127 at 1132, 33. The defendant and his accomplices discussed shooting the occupants of the home so that there would be no witnesses to their crime. They demanded the guns and one of the occupants directed them to a number of handguns and a rifle. Despite being begged not to do so, the defendant and his brother ordered five children, ages 4 to 14, to lie across a bed. The defendant and his brother then fired the guns repeatedly into the children with the defendant firing the majority of the shots. *Id.* The court found that the actions of the defendant were aggressive and premeditated, observing that "the defendant and his brother certainly did not accidently or unintentionally shoot the children, nor shoot them in a blind rage, as a finding of a *lack* of premeditation would suggest." *Id. (emphasis in original)*

The blind rage the court suggested would demonstrate a lack of premeditation parallels the impulsive, panicked, confused and irrational behavior of Jon Morgan. In both *Beck* and *D.B.*,

-41-

the defendants planned a crime, armed themselves to enhance their chances of success and made specific plans to cover up their criminal conduct. On the other hand, Jon Morgan obtained a gun while he was contemplating suicide under circumstances where he may have been easily detected, fired the gun out of anger and frustration at a Tylex bottle, and became panicked and fearful of the consequences of doing so. After the shootings, he wandered in alleys near his home, nearly shooting himself in the head as he tried to unjam the gun. Within minutes, he returned to his home and surrendered himself to the police. Rather than discard the gun in an alley, he handed it to the first police officer he saw. This is not premeditation.

Another situation where premeditation is considered by courts of this state is in sentencing as an aggravating factor which may justify the imposition of the death penalty or an extended term sentence. In *People v. Hickman*, 143 Ill.App.3d 195, 492 N.E. 2d 1041, (5th Dist, 1986), the defendant was sentenced to an extended term partially based upon evidence that he had acted with premeditation and cold blooded deliberation. The evidence demonstrated that the defendant called the victim, his former wife, and asked her out to dinner. *Hickman, supra*, 492 N.E.2d at 1043. After dinner, he drove the victim to his apartment where they later disrobed and went to an upstairs bedroom. *Id.* While in the bedroom, the defendant strangled his ex-wife until she as dead. *Id.* On the day that he killed his ex-wife, the defendant repeatedly told his co-workers that he was going to "turn Olney on its ears" and that they would "have something to talk about the next day." Furthermore, one week prior to the murder, the defendant had formulated "Plan A" and "Plan B." Under Plan A, the defendant would go to work in Africa. Under Plan B, he would kill himself and the victim. *Id.* at 1044. At sentencing, the trial court found an extended term appropriate concluding that the defendant's action indicated he planned the murder and committed it with cold blooded deliberation. Jon Morgan's action stand in stark contrast to the cunning and calculated conduct of the defendant in *Hickman*.

In *People v. Howard*, 42 Ill.App.3d 381, 355 N.E.2d 543 (1st Dist., 1976), the defendant argued that the evidence at trial did not support his conviction and that his sentence should be modified. The appellate court rejected both of these contentions. At trial, a Chicago police officer testified that the defendant told him that 10 days prior to the shooting, he had been

-42-

"ripped off" by the victim of $460.00. The day after, the defendant purchased a gun and went out looking for the victim in order to get even. The defendant admitted that he went to the pool hall and fired several shots at the victim and when the defendant hid under a pool table, the defendant bent down and shot the victim as he intended. *Howard, supra*, 355 N.E.2d at 544. Three other eye witnesses testified that the defendant, without provocation, fired six shots at the victim. The appellate court upheld the defendant's sentence holding the trial court found that the defendant acted in a deliberate and vicious manner. The court further said that the defendant's actions were "not on impulse or the result or passion, but were planned." *Id.* at 546. Again, a stark contrast is painted by the court between planned action and one that is committed on impulse, panic, in the heat of passion or motivated by fear. Here, the juvenile court judge abused his discretion when the sole fact he relied on to make a finding of aggressive and premeditated conduct was not in the record and when he ignored the law and facts which demonstrate that Jon Morgan's conduct was not aggressive or premeditated.

> **B.    The Trial Judge Abused His Discretion When He Considered the Statutory Factor Concerning Jon Morgan's Age as He Did Not Consider Jon's Age in Light of His Experiences Which Demonstrate That He Is a Troubled Adolescent Rather than a Hardened Adult.**

The only comment that Judge Coogan made when considering the age factor is that if Jon Morgan were four months older at the time of the alleged offense, there would be an automatic transfer. (R.Vol. VII, p. 447) This analysis is wholly inadequate given case law which establishes that both chronological age and experience of the minor must be evaluated when addressing this statutory factor. In *In the Interest of L.J.*, 274 Ill. App.3d 977, 654 N.E.2d 671 (1st Dist., 1995), the appellate court reversed the trial court's ruling denying the State's motion to transfer for prosecution as an adult. The only comment the juvenile court made about L.J.'s age was that he was 14 years 6 months at the time of the homicide and 15 years 1 month and a day at the time of the hearing. In reversing the denial of the transfer, the appellate court noted that the record showed that L.J.'s life experiences are that of someone way beyond his age. *In The Interest of L.J., supra*, 654 N.E.2d at 673. L.J. was aged beyond his years due to his contact

-43-

with the police for criminality on numerous occasions and his admitted membership in a notorious street gang. L.J. had been a Black Disciple street gang member since he was 11 years old. Furthermore, L.J. was not attending school. *Id.* at 673. These factors led the court to conclude that "L.J. is plainly not a stranger to the criminal justice system or adult experiences. While it is true that L.J. is a minor in terms of his chronological age, in reality he has plainly ceased being a minor." *Id.* at 673.

In *People v. M.D.*, 101 Ill.2d 73, 461 N.E,.2d 367 (1984), the Supreme Court reversed the trial court's denial of the State's motion to permit prosecution of a minor as an adult on two counts of murder. This case was decided before there was an automatic transfer provision for minors who are 15 years old and charged with first degree murder. The court observed that even though M.D. was 15 years old at the time of the shootings, his experience was that of someone well beyond 15 years. He had come into contact with the police on numerous occasions, including a term of probation for burglary. M.D. had admitted drinking alcohol until he was intoxicated, using marijuana and enjoying sex with two different girlfriends. These facts led the Supreme Court to believe that although the respondent was fairly young in years, he was not a stranger to adult experiences. *M.D., supra*, 461 N.E.2d at 373. In *People v. Beck, supra*, the court affirmed the transfer of a 14 year old labeled "street wise" by a juvenile police officer. *Beck, supra*, 546 N.E.2d at 433.

Jon Morgan lived a life far different from M.D. or L.J. Jon Morgan had absolutely no previous experience with the criminal justice system.. He was not a member of a notorious street gang. He has always done well in school. The evidence produced at the hearing showed that Jon Morgan led a very sheltered existence. His grandparents were raising him in a very strict religious home. He attended a Christian school where he was prohibited from listening to rock and roll music or attending R rated movies. At the school, boys and girls were not allowed to be within 18 inches of each other. He was expelled from the school for refusing to be disciplined for kissing a girl who was not a student at the school while he was off school grounds. The Cearlock's life and, therefore, Jon's life, revolved around the activities at the Park Meadows Baptist Church which put a very high priority on personal moral purity and demanded that its

-44-

members avoid worldly influence to promote this purity. Jon Morgan could not swim in a pubic pool. His sisters had to wear tee shirts over their bathing suits when they went swimming. Jon's grandmother would not tolerate Jon's socializing with anyone other than Christian children from the Park Meadows Baptist Church. In contrast to M.D. and L.J., Jon Morgan was a stranger to adult experiences. If anything, Jon had been deprived of many of the experiences of young persons his age.

In *People v. D.B.,* 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990), the appellate court ruled that the trial court did not abuse its discretion in finding that the minor should remain in the juvenile system. D.B. was 14 years old at the time he committed the offenses of first degree murder, home invasion and residential burglary. The appellate court found that D.B. did not exhibit the experience of someone well beyond his years. Even though D.B. had one station adjustment for the possession of marijuana, the appellate court was not willing to consider this as proof of his involvement with illegal drugs. *Id.* There was also testimony that D.B. possessed the emotions of a young man at a tender age. *Id.* Here, Dr. Chapman observed that Jon Morgan appeared remorseful, and cried and sobbed about his grandparents death. (Supp.R.Vol. 2, Resp. Ex. No.2, p. 6)

In *In the Interest of Burns*, 67 Ill.App.3d 361, 385 N.E.2d 22, the appellate court affirmed the denial of the State's transfer motion to prosecute a minor as an adult. At 15 years old, Myra Burns was involved in a stabbing that lead to the death of the victim. A friend of Myra's was the active, knife-wielding killer. However, Myra Burns initiated the incident by expressing a desire to rob someone. She made her suggestion sufficiently before the incident occurred to warrant the conclusion that the armed robbery was premeditated. She became upset when her companion turned to violence and she attempted to stop the unplanned killing. *In the Interest of Burns, supra*, 385 N.E.2d at 24. The appellate court addressed Myra Burns' age stating that she was at "...an age where the path a persons life may take remains very much an uncertainty. It is at an age where it is too early to give up easily or in frustration or exasperation the hope that a young person will ever become a productive member of our society. This generalization is

-45-

particularly apt in the light of the personal history of Myra Burns as portrayed by the evidence at the juvenile court hearing." *Id.* at 24, 25.

Myra Burns' history has remarkable parallels to Jon Morgan's history. Her mother's emotional problems and instabilities deprived her of a stable home environment. Myra Burns' father made no contribution to her welfare. Ms. Burns was exposed to a number of relationships her mother had with different men. When these relationships terminated, she felt rejected. From time to time, Myra's grandmother would attempt to care for her and was given custody of Myra at one time. The grandmother felt that the mother was not a proper parent. When Myra was eight years old, her mother became deeply religious. The growing intensity of her mother's religious convictions began expressing itself in ways Myra Burns felt oppressive. As an example, she was not allowed to associate with anyone who was not, in her mother's view, "saved." *Id.* at 25. Myra developed behavior problems and became involved in auto theft. She was placed in numerous foster homes and children homes when her mother disappeared in early 1977. The court held that her history tends to favor treatment as a seriously troubled adolescent rather than incarceration as a hardened adult. *Id.* at 26.

M.D.'s and L.J.'s life experiences indicate that they have ceased being youths. Gangs, drugs and alcohol made them street wise, hardened adults. Like Myra Burns, Jon Morgan is a seriously troubled adolescent. The trial court abused its discretion when not considering his life experiences as part of the statutory factor of age.

C.   **After Judge Coogan Found That Jon Morgan Had Lived a Sad, Unusual and Tragic Life, Shuffled Back and Forth Between His Mother and Grandparents Only to Have Them Neglect His Needs to Survive, the Court's Finding That He Should Be Prosecuted as an Adult, Constitutes an Abuse of Discretion.**

The fourth criterion, the minor's history, usually includes review of information concerning such factors as social adjustment, mental and physical health, school adjustment, adjustment in the family, familial support for any possible treatment or rehabilitation, and any previous involvement in the juvenile system. *People v. Clark*, 119 Ill.2d 1, 518 N.E.2d 138, 145

-46-

E-FILED
Wednesday, 13 August, 2008  03:05:01 PM
Clerk, U.S. District Court, ILCD

(1987).  When Judge Coogan evaluated this factor, he focused on the neglect, deprivation, emotional impoverishment and chaos in Jon Morgan's life.  Judge Coogan found that Jon Morgan:

> "...has had a very unusual life and it looks like a sad life, and he was shuffled back and forth between his mother and grandparents, not having contact with his natural father on any meaningful basis.  He has had psychiatric problems with attention deficit disorder.  That, unfortunately, was not followed through by the parents to make sure that his medication was continued and continued to get treatment.  That was at the age of 5 and 6 and he is now 14.  That is something that others failed Jon by not following through on." (R. Vol. VIII, p. 448)

The judge's comments when addressing the statutory factor of Jon's previous history are connected to observation, he made before addressing any of the specific factors.  He stated:

> "I don't think that anyone who listened to this case can say that this is not a major tragedy.  We have a young man, 14 years old.  His parents were unwilling and unable to take care of him.  The grandparents were assuming the role of parents.  It is fairly common in today's society, but children need their parents as well as their grandparents to survive, and they are not interchangeable units.  They provide different services for offspring and grandchildren, and Jon may very well have been short-changed in his life."

Judge Coogan is right.  Jon Morgan was short-changed in his life.  In his discharge summary at the end of the first of two brief hospitalizations for major depression and attention deficit disorder when Jon Morgan was 5 years old, Dr. Dennis Beshera observed that Glenda and Roe Morgan had not planned on having children so early in their marriage.  Because of financial difficulties, Mr. Morgan enlisted in the Army when Jonnie was 15 months old.  He was gone for extended periods of time.  The environment did not offer consistency nor stability due to the moves, parental absences and the births of two siblings.  In part, Jonnie's tough, aggressive behavior may have been promoted by the father's ideas as to what a little boy should be.   In his second discharge summary dated April 20, 1987, Dr. Beshera identified Jon Morgan's assets.  He valued being a family member and he identified his father as a positive role model.  Within months of that evaluation, Glenda and Roe Morgan divorced and his father, thereafter, played no meaningful role in his life.  Later, Jon's mother sent him to live with her parents.  The one

thing he valued he lost. Through no action of his own, Jon Morgan lost his sense of family.

Glenda Morgan sent Jon to live with his grandparents even though she knew that they had physically and mentally abused her when she was being raised in their home. Moreover, she knew that their marital relationship was scarred by constant fighting. This had occurred in the home when she was a child and continued to occur during the regular phone contact she had with her parents. She sent Jon to live with them because her parents demanded it and because they had emotional control over her.

During Jon's second hospitalization, he began to make some progress and began to verbalize his feelings of sadness as his therapy progressed and the medications were adjusted to appropriate levels. Upon his discharge, additional medication was prescribed to reinforce the effects of earlier prescribed medication. He was discharged to the care of his parents since he was no longer considered a danger to himself or others. Jon's family was also to continue participating in therapy upon his discharge.

When he came to live with this grandparents, the Cearlocks, Jon was taken off of his medication. His grandparents, along with Brother Bryant, believed that God would take care of Jon. Jon lived with his grandparents in a strict religious setting through the fourth grade. He regularly attended church services. The rule of law at school and home was enforced with beatings.

Jon was returned home to live with his mother for his fifth and sixth grade school years. After Glenda's new husband lost his job, he started drinking and became abusive toward Jon and other family members.

Jon returned to Lincoln to live with his grandparents while he was in the seventh grade. His life with his grandparents became increasingly intolerable. He had to endure his grandparents constant fighting. Through 1994, school rules continued to be enforced with paddlings where the student had to suffer the demeaning act of bending over and grabbing his ankles. The same was true at home, but the paddle was exchanged for a razor strap. Jon suffered the additional emotional trauma of having to fetch the strap for his grandfather. Jon's grandfather repeatedly reminded him that if he ever tried to fight back or if he tried to overpower

-48-

him, he would kill John in his sleep. Both his grandmother and his grandfather told him that he would grow up to be worthless, like his parents. Brother Bryant sought to punish Jon for violating school rules that had questionable value in today's society. Jon Morgan dared to violate the rule that he could not come within 18 inches of a girl. He kissed a girl. This act occurred at the girl's home, on her porch, with her parents at home. Jon was expelled from school and the fall out from his expulsion resulted in his mother asking his grandfather to bring Jon back to Virginia to live with her. Jon's dreams of once again becoming a family member were shattered when he was told upon his arrival in Virginia that there was no room for him and he was not wanted in his mother's home. The emotional devastation wrought by his mother's actions cannot be overstated. Within weeks, the shootings occurred.

As a youth and as an adolescent, Jon Morgan had no control over the way he was treated by his parents, stepfather, grandparents and school administrators. The activities that Jon could control demonstrate he could function quite well in society. He was a good student, receiving average to above-average grades. He was able to avoid drugs and alcohol. He had absolutely no contact with the police or juvenile court except for one instance where a police officer asked him to step off of some private property, an innocent incident that Jon volunteered to Detective Harberts.

According to Thomas Bryant, Jon responded well to discipline. He had absolutely no history of fighting at Park Meadows school. Mr. Bryant specifically observed that from time to time, such as at an athletic event, if Jon suffered a hard foul, he would get up with a flash of anger and then would immediately calm down.

Jon Morgan has no history of violence towards other people. There were only two instances of physical confrontation. The first was in 6th grade when he came to the aid of a student who was being picked on and got hit in the face with a book, resulting in a minor scuffle. The second was in the late winter of 1995 when he and his grandmother tussled over a TV remote control. The incident was apparently so minor that Lila Cearlock did not mention it to Jon's mother in their frequent and heated phone conversations. Two incidents can hardly be

-49-

considered a history of violence. There was not a single instance of the use of any type of weapon.

Again, the parallels between Jon's prior history and the prior history of the minor in *In Re the Interest of Burns, supra*, are remarkable in their similarity. In *Burns*, the evidence compelled the court's conclusion that the minor's history was indisputably one of neglect, deprivation, emotional impoverishment and chaos. The same is true in the present case. In *In the Interest of Burns*, the court concluded that the minor's history favored treatment as a seriously troubled adolescent rather than incarceration as a hardened adult. Judge Coogan abused his discretion when he did not make a similar finding in this present case.

In *In the Interest of R.L.L.*, the Fourth District Appellate court affirmed the trial court's denial of the State's motion to allow a juvenile who was charged with murder to be prosecuted as an adult. When the court considered the previous history of R.L.L., many of the facts recited were similar to Jon Morgan's history. R.L.L.'s parents divorced when he was very young. His mother was considered to be an unstable person. His stepfather constantly belittled R.L.L., warning him that he would grow up to be "worthless like your dad." R.L.L. was repeatedly moved back and forth between his natural parents. *In the Interest of R.L.L.*, 106 Ill.App.3d 209, 435 N.E. 2d 904 (4th Dist., 1982)

R.L.L., unlike Jon Morgan, dropped out of school in the eighth grade and had several scrapes with the law in his early teenage years. *In the Interest of R.L.L., supra*, 435 N.E.2d at 906. R.L.L. was adjudicated a neglected minor in March of 1981. He was placed in a foster home. *Id.*

R.L.L. was arrested on May 1, 1989, and charged with the murder of his foster mother. He told authorities that he and his foster mother were constantly arguing and that she would not listen to him. He told authorities, "It finally built up and I just went crazy." He took a friend's knife and stabbed his foster mother twice while she was sleeping. He took her purse, ran out and drove off in her car. *Id.* at 905 and 906. This court held that the record showed that R.L.L. was a severely disturbed young man and his early life was hard and cruel. He lacked a feeling of acceptance and self-worth. Psychiatric reports introduced at the hearing indicated the necessity

-50-

of long term psychiatric treatment if R.L.L. was to have any chance at all of being rehabilitated. Jon Morgan's background is very similar, yet Judge Coogan had before him no evidence of the appropriate mental health treatment for Jon Morgan.

In *People v. D.B., supra,* the First District Appellate court affirmed the trial court's denial of the State's motion to permit the prosecution of the minor as an adult. One of the factors that persuaded the appellate court to affirm the denial of the motion to transfer was the evidence from D.B.'s teacher that D.B. was "neither violent nor ever a problem to other students" but was hanging around a group of bad friends. *People v. D.B., supra,* 559 N.E.2d at 875. Jon Morgan's principal testified that he did not remember a single fight involving Jon Morgan when he was a student at Park Meadows. There was never a problem with other students. Nor was there ever any indication that Jon Morgan was hanging around a group of bad friends that led him to trouble. Jon Morgan could pick his friends and, apparently, chose well. The tragedy noted by Judge Coogan was that he could not pick his caretakers. Jon Morgan did not choose to be shuttled between his mother's home and his grandparent's home. He did not choose to be physically abused or emotionally abused by the adults charged with his care. He did not choose to ignore treatment recommendations or treatment for his attention deficit disorder. Judge Coogan noted all of these things. Judge Coogan recognized that Jon Morgan was a troubled adolescent not by his own choosing, but because the adults charged with his care failed him. Granting the State's Motion for Transfer runs contrary to his own findings, therefore, it was an abuse of discretion.

In most cases where the appellate court has either reversed the denial of the State's motion to transfer or affirmed the trial court's order granting a motion to transfer, the history of the minor stands in stark contrast to Jon Morgan's history. In *People v. Michael Cooks*, the First District Appellate Court affirmed the trial court's granting of the state's motion to transfer. The minor was charged with committing two homicides. 271 Ill.App.3d 25, 648 N.E.2d 190 (1995). He made statements that he was a member of the Gangster Disciples street gang and that he sold narcotics for this gang in front of 5727 South Justine Street. He told law enforcement officials that he was working the night shift as a seller of drugs when he shot two people across

-51-

the street from his usual place of business. *Cooks, supra*, 648 N.E.2d at 192. Even though the defendant was only 14 years old, he had five previous station adjustments and two prior referrals to juvenile court. When he was in an early offenders program, the defendant did not attend counseling programs to which he had been referred. Nor did he attend the school he had been referred to. At the time of the hearing, the defendant had not attended school for one year. *Id.* In *In the Interest of L.J.*, the First District Appellate Court reversed the trial court's denial of the state's motion to transfer a 14 year old juvenile to the general adult criminal division to be prosecuted for first degree murder. 274 Ill.App.3d 977, 654 N.E.2d 671 (1st Dist. 1995) L.J. was also a member of the Black Disciples street gang. He had been a member since he was 11 years old. Along with another gang member, L.J. killed a 13 year old boy because that youth would not join the gang. L.J. had come into contact with the police for criminality on numerous occasions. Due to his previous involvement in the juvenile court system, he was sent to a school that specializes in treating children with behavioral disorders. He attended only one day. While in juvenile detention, he was caught scratching his street gang signals into a table. *Id.* at 673.

The previous history of Michael Cooks and L.J. sets the standard for 14 year olds who should be tried as adults. Their prior history demonstrates that they have ceased being children. Jon Morgan's prior history sets the standard for 14 year old troubled adolescents who deserve the benefits of the juvenile justice system.

> **D.    Judge Coogan Did Not Consider Jon Morgan's Potential for Rehabilitation Nor Did the Court Make Any Determination of the Likely Effectiveness of Any Facility Available for Treatment or Rehabilitation in Light of Jon Morgan's History and Present Circumstances**.

When ruling on a motion to transfer, the fifth factor the court is to consider is whether there are facilities particularly available to the juvenile court for the treatment and rehabilitation of the minor. Consideration of this factor embraces a number of points. First, the statute requires the juvenile judge receive and evaluate information about the type of facilities available for treatment and rehabilitation of the minor. *People v. Clark*, 119 Ill.2d 1, 518 N.E.2d 138, 145. Next, the statute requires that the judge determine the likely effectiveness of these facilities in

-52-

light of the history and present circumstances of the minor. *Id.* Finally, the court must consider whether the minor has ever been exposed to any juvenile programs. If he has not, it would be premature to predict that he would not be amenable to treatment and rehabilitation in the juvenile system. *People v. D.B., supra* at 879.

Judge Coogan did not do any of these things. The sum total of his analysis was to summarize the testimony of the juvenile probation officer and to recall from his own knowledge that he did not believe that there were any unique facilities particularly available to Jon that were not available to an adult. (R. Vol. VIII, p. 448) Judge Coogan noted that if Jon Morgan were transferred and convicted in adult court, he would go to the juvenile division to begin with. *Id.* At the transfer hearing, the State offered very little evidence of the availability of treatment for Jon's attention deficit disorder in either a juvenile or adult facility. The Logan County juvenile probation officer testified that she had made contact with both divisions of the Department of Corrections and talked with them about Jon Morgan's situation. She learned that he would go to the reception center in St. Charles if his case proceeded in juvenile court. Without any foundation for the basis of her knowledge, she testified that he would receive treatment for any psychological or psychiatric disorder and receive any kind of counseling the offender may require. (R.Vol. VII, p. 271) When asked if the juvenile division of the Department of Corrections had the ability to treat Jon's attention deficit disorder, she responded, "Yes, and much more than that I'm sure." *Id.* There was no foundation for this answer. Ms. Turner testified that she spoke to some unspecified person and learned that the adult division has "all of the services." Without foundation, she testified that they have counselors and psychiatrists and specific facilities if someone has a severe psychiatric or psychological problem.

This testimony and the judge's analysis falls far short of the requirement that a juvenile judge receive and evaluate information about the type of facilities available for the treatment or rehabilitation of the minor. There was no specific testimony about how attention deficit disorder or emotional problems stemming from Jon's family situation is addressed in the juvenile facility as opposed to the adult facility. It may well be that there are different theories of treatment in the adult as opposed to the juvenile division of the Department of Corrections. Courts have

-53-

observed fundamental distinctions between being prosecuted and sentenced as a juvenile as opposed to an adult.  The divide between juvenile court with its promise of non-punitive rehabilitation and the harsher world of the District Court is one not lightly to be crossed.  *In the Interest of Burns,* 67 Ill.App.3d 361, 385 N.E.2d 22, 29 (citing *Haziel v. United States*, 404 F.2d 1275, 1278 (D.C. Cir., 1968).  In *In the Interest of R.L.L. supra,* one issue the Fourth District Appellate court had to address was the trial court's comment that the main purpose of adult facilities was to punish offenders and not rehabilitate them. *R.L.L., supra* at 907.

Judge Coogan made no effort to determine the likely effectiveness of these facilities in light of the history and present circumstances of Jon Morgan.  As discussed earlier, his history and circumstances compel treatment and rehabilitation in the juvenile justice setting.

In *People v. D.B., supra*, the appellate court reviewed the Illinois Supreme Court's analysis of the fifth statutory factor in *People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367, 374.  In M.D., the Supreme Court addressed to what extent M.D. benefitted from juvenile programs in the past.  Finding no evidence of any benefits although the respondent had been through several such programs, lead the supreme court to conclude that M.D. should be prosecuted as an adult.  In *D.B.,* the court observed that the respondent had never been exposed to any juvenile programs.  Thus, it would be premature to predict that D.B. would not be amenable to treatment and rehabilitation in the juvenile system.  *D.B., supra* at 879.  Jon Morgan had not been exposed to any juvenile programs because he had no prior history of criminality which would have resulted in exposure to the juvenile justice system.  It was premature for Judge Coogan to predict that he would not be amenable to treatment and rehabilitation in the juvenile justice system.

Implicit in Judge Coogan's ruling is that Jon Morgan is not amenable to treatment and rehabilitation in the juvenile justice system and deserves to spend life in prison without parole.  Jon Morgan's history and present circumstances demonstrate the overwhelming likelihood of successful treatment and rehabilitation within the juvenile system.

By the time of the court's ruling, Jon had already demonstrated good grades and good conduct while detained at the Mary Davis Home since April 28, 1995.  Thus, Jon Morgan's track record while in juvenile detention, albeit a short a one, demonstrated a capacity for

-54-

rehabilitation. When he was hospitalized for two brief periods of time as a youth for depression and attention deficit disorder, Jon Morgan responded to therapy and medication. Each hospitalization resulted in an improvement in his maladaptive behaviors he displayed in kindergarten. He was discharged with the finding that the was no longer a danger to himself or others. Neither his parents nor his grandparents followed up with the appropriate counseling. His grandparents made the decision to discontinue his medication. Despite the failure to properly treat Jon's attention deficit disorder, he did well in school both academically and socially. He had no history of maladaptive behaviors or fighting while at Park Meadows School, the public school in Virginia, or Lincoln Community High School. Brother Bryant testified that Jon Morgan responded well to discipline. While at a church service, Jon had the courage to stand before the entire congregation and explain his decision to become a foreign missionary. On another occasion, he was able to share his very private feelings about God and religion with Brother Bryant. On yet another occasion while in school at Park Meadows School, he confessed possession of a *Playboy* magazine to Brother Bryant under circumstances where Brother Bryant never would have known about the magazine except for Jon's acknowledgment. Thomas Bryant was never willing to give up on Jon. (R.Vol. VII, p.230)

In *People v. D.B., supra,* the Court took into consideration that the respondent confessed his crime to his mother the night it occurred and to the police the very next day. The court found that these acts reflected D.B.'s remorse and a willingness to take responsibility for his wrongful behavior. Jon Morgan surrendered himself to police only minutes after shooting his grandparents. His cooperation with the police demonstrates his remorse and his willingness to take responsibility for his behavior. At the direction of law enforcement officers, he appeared in two show ups, he submitted to two lengthy periods of questioning. Jon agreed to do a video reenactment of the events of the evening. He agreed to accompany the police on the route he took from his house to Steve Powell's house and back in an effort to search for evidence. He consented to a blood test. Finally, he stripped down to his underwear and allowed law enforcement officers to take pictures. All through this time, he showed respect for the police officers.

-55-

Judge Coogan abused his discretion when he failed to consider Jon Morgan's capacity to be rehabilitated, and his history and circumstances when considering whether Jon could be treated and rehabilitated within the juvenile justice system.

**E.   The Juvenile Court Judge's Failure to Make Any Meaningful Analysis of Jon's Interests Compared to Society's Interests in Incarcerating Him for a Period of Time Beyond His Minority Was an Abuse of Discretion Especially in Light of the Court's Findings That Jon's Caretakers Had Not Provided Him with the Means to Survive and That He Was Short-changed in His Life.**

The sixth statutory factor the juvenile court judge was called on to consider is whether the best interests of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. This sixth statutory factor encompasses a weighing of all of the other factors by the court. The juvenile judge must weigh these relevant factors and determine whether to strike the balance for society by transferring the alleged juvenile offender or strike the balance for the juvenile by retaining jurisdiction. *People v. Clark,* 119 Ill.2d 1, 518 N.E. 2d 138 (1987).

The clearest findings Judge Coogan made revealed his belief that Jon Morgan was raised under tragic circumstances. He commented that a child needs both parents and grandparents to survive but Jon's parents were unwilling and unable to take care of him. He concluded that Jon may very have been short-changed in his life. Judge Coogan's findings compel the conclusion that the judge should have struck the balance for Jon Morgan and retained jurisdiction in juvenile court. Jon Morgan is entitled a chance to remedy the fact that he has been short changed in his life. His caretakers did not provide what was needed to survive. Jon Morgan's history demonstrates that he can overcome his troubled life and be a productive member of society. In our society, every child is entitled to better than what Jon Morgan had. Every person entrusted with his care failed him in some measure. While there is no question that his mother, father, grandmother, grandfather and school administrator provided some positive input, the negative factors established in the evidence at the transfer hearing and commented on by Judge Coogan command the conclusion that Jon Morgan be given the opportunity for rehabilitation and

-56-

treatment as opposed to a life in prison without parole. Both society and Jon Morgan would benefit by the juvenile court retaining jurisdiction in this case.

A wealth of facts demonstrate that after Jon Morgan's problems in kindergarten were addressed, he had no history of fighting or assaultive behavior. Through the ninth grade, he was involved in only one school bus skirmish while attending three different schools and living in two different homes. Until the alleged offense, he had no history of violence using any type of weapon, especially a gun. As a youth, Jon lived in two cities without any contact with the juvenile justice system. He was able to comport his behavior to what society expects. Jon's problems were related strictly to the family setting rather than society in general. Jon Morgan should have been allowed the opportunity to rehabilitate his life and family issues through the juvenile justice system.

**F.    The Findings of the Juvenile Court Evidenced a Flawed Misunderstanding of the Non-statutory Factor Set Forth in *People V. Clark*. Therefore, Granting the State's Motion to Transfer Was an Abuse of Discretion.**

In *People v. Clark, supra,* a 14 year old defendant was charged with the murder of two people. That fact statutorily mandated the imposition of a sentence of imprisonment for the defendant's natural life if he were convicted under the criminal laws. Yet, neither the juvenile court, the prosecutor, nor the defendant's own attorney, apparently realized the consequence of allowing the State's motion to prosecute the defendant under the criminal laws. The Illinois Supreme Court remanded the case for hearing on the issue of the transfer, reasoning that "where, as here, the choice between two extremes, incarceration to the age of 21 under the act, or incarceration for life without possibility of parole under the criminal code, adequate balancing calls for consideration of which penalty would best serve both of the interests at stake." *People v. Clark, supra,* 518 N.E.2d at 144.

In this case, Jon Morgan's attorney, in a Memorandum of Law, attempted to make the court aware of the potential life sentence without parole. (Supp.R. Vol. 1, C3-C77)

Judge Coogan concluded his findings by stating:

-57-

> "The court is going to rule that after considering all of the statutory factors as well as being well aware that if the minor stood convicted of a couple of first degree murders, *that his sentence of mandatory imprisonment would be imposed.* The court is in the opinion, it is in the best interests of the public that the minor be transferred to the adult division to be treated as an adult on this particular, these particular offenses. Thank you." (R.Vol. VIII, p. 450)(emphasis added)

The judge's statement evidences a misunderstanding of the sentence that could be imposed if Jon Morgan was tried and convicted as an adult. Under Illinois law, if Jon Morgan were convicted of one first degree murder in criminal court, mandatory imprisonment would be imposed. *730 ILCS 5/5-8-1(a).  People v. Clark* mandates that the court be aware and evaluate a mandatory life sentence without the possibility of parole upon conviction for two first degree murders. Moreover, the court did not engage in any balancing which considered Jon Morgan's as well as society's interests that he have a chance at rehabilitation.

### G.    The Facts Recited by the Judge Prior to Beginning His Statutory Analysis Do Not Support the Motion to Try Jon Morgan as an Adult.

Prior to his analysis of the statutory and nonstatutory factors that apply in this case, Judge Coogan recited a number of facts that stood out in his mind. None of these facts support transfer. First, Judge Coogan referred to Jon Morgan's statement "they pissed me off. I couldn't take it anymore." No law enforcement officer asked Jon what he "couldn't take it any more." The facts at the transfer hearing make his statement eminently understandable. Judge Coogan recognized this when he found that Jon Morgan lived a sad and unusual life in which his caretakers did not provide him the tools he needed to survive.

Second, Judge Coogan made reference to Jon's statement that he thought of shooting the grandparents or other people. (R.Vol.7, p. 445) Dr. Chapman addressed this issue. He noted that Jon admitted to "...intrusive thoughts that bother him and make him anxious. He stated that he could not get rid of them no matter how hard he tries. The thoughts sometimes are about shooting people mostly at the church for the way they treated him. He did not want these thoughts but he could not keep them out..." (Supp. R. Vol. 2, Resp. Ex. No. 2, p.6) Jon did not want to have these thoughts. They were no specific threats.

-58-

Next, Judge Coogan noted a colloquy between the veteran police detective, Michael Harberts, and Jon Morgan, a complete newcomer to interrogation by police. In this colloquy, Detective Harberts asked if he made Jon mad, would Jon want to kill him. Jon responded that it would have to happen several times and then he might think about it. Jon Morgan's history is that he was not a violent person when he was mad. Thomas Bryant testified to Jon's ability to remain calm after being shoved to the floor by an opposing play in a basketball game. Mr. Bryant acknowledged that Jon controlled his temper or anger in other situations also.

Judge Coogan referred to a statement Jon made to a student after Jon had been expelled for kissing a girl. According to Thomas Bryant, this girl, Rachel Kirby, told him that Jon said "I have been hurt all of my life and I will do the hurting." (R.Vol. VIII, p. 446). To understand this vague statement as a threat to kill his grandparents requires a great deal of speculation. Is Jon going to hurt himself? No other person is actually threatened. When he talked to his mother about the expulsion, he told her "All I want to be is normal."

Finally, Judge Coogan referred to Jon's statements to Brother Bryant when he was expelled "I will do every sin, whatever I want. When I hit rock bottom then I will turn to God." *Id.* This statement, as well as the others, must be evaluated in light of Jon's history. For Jon Morgan, sinning was stealing a kiss on a girl's front porch after a basket ball game. Sinning for Jon Morgan was standing within arm's length of a girl, watching an R-rated movie or playing with neighborhood kids without incurring his grandmother's wrath because they were not Christian. To consider these statements individually or collectively, along with all of the other evidence of Jon Morgan's history and circumstances, does not support the State's motion to transfer.

Judge Coogan erred when he transferred Jon Morgan's case for prosecution as an adult.

**II.    THE TRIAL COURT ERRED WHEN RULING THAT JON MORGAN'S STATEMENTS TO DETECTIVE HARBERTS WERE NOT MADE DURING CUSTODIAL INTERROGATION REQUIRING *MIRANDA* WARNINGS.**

"Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any

significant way." *Miranda v. Arizona*, 386 U.S. 436 (1966). *Miranda* established the procedural safeguards necessary to ensure that the right against self-incrimination is not compromised. While it is clear that *Miranda* warnings are not required under all circumstances, they are required when a person is subjected to custodial interrogation. In this case, Detective Harberts subjected Jon Morgan to custodial interrogation when the detective asked him, "Why did you do it?" while Jon Morgan was in police custody. Determining whether a person is in custody requires an objective evaluation of the totality of the circumstances surrounding the interrogation. *People v. Clark*, 84 Ill.App.3d 637, 405 N.E. 2d 1192 (1st. Dist., 1980). If a person voluntarily answers questions when not in custody and at a time when there are no restrictions on his freedom, there is no custodial interrogation and Miranda warnings are not required. *Id.* at 1194. "The test is whether, under the circumstances, a person would reasonably believe that he is not free to leave the scene of the questioning, so that he is deprived of his freedom of action in a significant way during the questioning." *Id.*

In evaluating the totality of the circumstances, the court must consider a number of factors, including the location, length, mood and mode of interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint; the intentions of the officers and the focus of their interrogation. *People v. Brown*, 136 Ill.2d 116, 554 N.E.2d 216 (1990). In addition to these factors, courts have also considered the "age, intelligence and mental make-up of the accused." *People v. Savory*, 105 Ill.App.3d 737, 435 N.E. 2d 226 (2nd Dist. 1982); *Haley v. Ohio*, 332 U.S. 596 (1948); *Gallegos v. Colorado*, 370 U.S. 49 (1962)("[A] 14 year old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police...[The boy] is a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interest or how to get the benefits of his constitutional rights.")

In *Miranda*, the Court was concerned with interrogations that take place in a police-dominated environment containing "inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so

-60-

freely." *Miranda*, *supra*, 384 U.S. at 467. In *People v. Clark*, police officers investigating a shooting found the deceased slumped in an automobile, and saw two women standing nearby. One of the women, the defendant, was identified as the decedent's wife. The police asked her to sit in the police car and permitted her friend to accompany her. *Clark*, *supra*, 405 N.E.2d at 1194. While the defendant and her friend were seated in the police car, an officer asked, "[W]hat happened." The defendant responded, "I shot my husband." *Id*. At this point, the officer asked the friend to leave the police car. Without giving *Miranda* warnings, the officer asked the defendant, "What do you mean you shot your husband? What happened?" In response, the defendant made certain statements. *Id*.

The court held that the statements given in response to the second question should have been suppressed as they were the result of custodial interrogation. *Id*. at 1194, 1195. The court noted that the officer was aware that the defendant had shot her husband and that the investigation was focused on her conduct at the time of the second questions. *Id*. Thus, the second question was more than a "general on the scene inquiry" and took place when a person would not reasonably believe they were free to leave. *Id*. The court found it significant that once the defendant admitted that she shot her husband, the officer asked the defendant's friend to leave the car. *Id*.

The parallels of this case to *Clark* compel the conclusion that Jon Morgan should have been given Miranda warnings prior to Detective Harberts' questioning him. After Jon handed Deputy Spickard the gun and ammunition stating, "I did it. I shot them," Deputy Spickard had a suspect in the shooting. He took Jon by the arm directing him towards other uniformed officers. Deputy Spickard made it clear that he would have stopped Jon if he had attempted to walk away. Deputy Spickard related the events that had just occurred to Officer Kerns who hollered for Detective Harberts. When Detective Harberts came over, there were at least three uniformed officers present. Both Harberts and Kerns acknowledged that Jon would not have been free to walk away. Deputy Spickard told Detective Harberts what had happened. He also indicated he was conveying custody of Jon Morgan to Detective Harberts. Once Deputy Spickard had told Detective Harberts what Jon had said, the investigation obviously focused on

his conduct in the shooting. No reasonable person would believe that they were free to leave the scene of a shooting investigation after they had just admitted involvement in the shooting. It is significant that after Jon admitted his involvement, Deputy Spickard held Jon by the arm and led him to a group of police officers. Jon Morgan was in custody at the time Detective Harberts questioned him.

Given Detective Harberts' knowledge that Jon had admitted involvement in the shooting, his question went beyond the boundaries of general, on the scene questioning. Interrogation includes express questioning and "any words or actions on the part of the police...that [they] should know are reasonably likely to elicit an incriminating response." *People v. Savory*, 105 Ill.App.3d 1023, 435 N.E.2d 226, (2nd Dist., 1982)(citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). Detective Harberts specific question, "Why did you do it?" directly called for an answer of a testimonial nature as to Jon's motive for shooting his grandparents. The question was designed to elicit an incriminating response. All statements obtained as a result of the question were obtained in violation of *Miranda v. Arizona* and must be suppressed.

When reviewing a trial court's ruling on a motion to suppress, the court of review should not disturb the court's finding unless it is manifestly erroneous. *People v. Brown*, 136 Ill. 2d 116, 554 N.E. 216 (1990). Judge Dehner ruled that, "The single question that was asked by Detective Harberts at the scene after the minor was presented to him by Deputy Spickard does appear to have been an appropriate on-scene general investigative question..." (R.Vol. I, C13) Judge Dehner's ruing is manifestly erroneous.

**III.   DUE TO THE COERCIVE NATURE OF JON'S ENCOUNTER WITH THE POLICE, THE FAILURE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON'S PARENTS, THE CIRCUMSTANCES OF THE INTERROGATIONS AND JON'S LACK OF EXPERIENCE WITH THE POLICE, THE STATEMENTS MADE IN POLICE CUSTODY WERE NOT VOLUNTARY.**

Courts throughout Illinois have spoken volumes about the care that must be taken when judging the voluntariness of a juvenile's confession. Courts must be particularly careful in cases involving juveniles because, "the coerciveness of the situation is thereby enhanced." *People v. Cole*, 168 Ill.App.3d 172, 522 N.E.2d 635, 639 (1988). In *People v. McGhee*, the court stated

-62-

that, "an incriminating statement by a juvenile is a sensitive concern, and the greatest care must be taken to assure the admission was voluntary." 154 Ill.App.3d 232, 507 N.E.2d 33, 37 (1987). The *McGhee* court quoted a passage from *Haley v. Ohio*, 332 U.S. 596 (1948) wherein Justice Douglas noted the special care the court must taken in scrutinizing the record when a juvenile is involved. Justice Douglas wrote:

> "No friend stood at the side of this 15 year old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn...The age of the petitioner, the hours he was grilled, the duration of the quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combined to convince us that this was a confession wrung from a child by means which a law should not sanction." *People v. McGhee, supra*, 507 N.E. 2d at 37 (citing *Haley, supra,* 332 U.S. at 600-601).

In the case of juveniles unaided by counsel, trial courts must take great care "to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights, adolescent fantasy, fright or despair." *In Re Gault*, 387 U.S. 1, 55 (1967). The youth of the defendant and the length of his detention must be considered due to the "unequal footing" of a juvenile and an adult. *Gallegos v. Colorado*, 370 U.S. 49, 54, (1962). In Jon Morgan's case, a multitude of factors compel the conclusion that Judge Dehner's ruling about his statements where voluntary is against the manifest weight of the evidence.

Jon Morgan returned from Steve Powell's house looking for police officers that he believed would help him. He felt confused and hopeless. After Dr. Chapman reviewed the video and listened to the audiotape made by the police on April 27, 1995, he concluded that Jon showed signs of despair. In clinical and forensic psychiatry, despair is a mental state and emotion that implies that the person has a profound feeling of helplessness and hopelessness. Dr. Chapman was struck by what appeared to be a sense of despair and hopelessness and fruitlessness of Jon's life in the situation he had found himself in.

After handing the gun and ammunition to Deputy Spickard and admitting involvement in the shooting, Jon was confronted by a group of police officers including Detective Harberts. Detective Harberts demanded to know why Jon shot his grandparents. In Jon's mind, he had no

-63-

choice but to answer the question because these officers were authority figures. Jon perceived that the officer wanted an answer to his question. Throughout his life, Jon Morgan had learned the hard way that there were negative consequences when he did not follow authority.

After Jon answered Detective Harberts' question, he was handcuffed and placed in a police car. Jon's statements to Deputy Spickard were very painful for him to make. He sat in the police car, confused and helpless, waiting for the officers to tell him what to do. Police officers directed Jon out of the car and into the yard where he was subjected to grossly suggestive identification procedures. He was the only person in the yard without a uniform other than Detective Harberts. There were four to five clearly marked squad cars with emergency lights flashing and reflecting off the house. Those cars also had headlights and spotlights shining. Persons from the neighborhood had gathered along the police tape line. Jon was handcuffed when the first witness was asked to identify him. During the second show up, Jon was directed by Detective Harberts to stand over a pool of blood on the ground where his grandmother had fallen. It was very painful for him to look at the blood stain. The handcuffs were removed and Jon was asked to extend his arms while the witness attempted to identify him from across the street. He was handcuffed again and placed in a squad car and taken to the jail. As the squad car drove away, Jon felt confused by the police lights, onlookers and the situation. He felt that his life was over. He was taken to the jail and confined in a cell ordinarily used for the confinement of adult prisoners. Jon was taken into custody by Detective Harberts shortly after 8:30 p.m. He was in a cell by 9:00 p.m. The coercive circumstances of this 20 minute time span is a significant element in the involuntariness of Jon's statement.

In *In Re J.J.C*, 294 Ill.App.3d 227, 689 N.E. 2d 1172 (1998), the coercive circumstances of the minor's arrest were a factor the court considered in determining that his later statements were involuntary. In that case, a police officer went to J.J.C.'s residence where he encountered his father and indicated that his son was needed at the police station by investigators. Office Weaver radioed the station and informed the parents that he would have to take J.J.C. into custody. The officer took the minor's belt and put him in handcuffs and called for a patrol unit to take J.J.C. to the police station. The court found that the coercive nature of the minor's

-64-

police began at his home after he was taken into custody and his belt was removed. The coercive encounter continued when J.J.C. was placed in handcuffs and transported to the police station in a squad car. In less than ten minutes time, J.J.C. was brought to the station, read *Miranda* warnings, a constitutional waiver and two additional juvenile warnings. The coercive encounter in the present case is far more oppressive and intimidating than what the court found significant in *In Re J.J.C, supra,* 689 N.E. 2d at 1179.

The Lincoln police department and the Illinois legislature have created rules to reduce the coercive atmosphere inherent in police juvenile encounters. By 9:30 p.m., April 27, 1995, the police had managed flagrant violations of the Juvenile Court Act and Lincoln Police Department policy. The policy of the Lincoln Police Department states that handcuffs should not be placed on a juvenile except when they are needed to prevent violence or escape (Supp.R.Vol. IV, Def. Ex. No.3). The clear intent of this rule is to reduce the apprehension of a juvenile when taken into custody by the police. For a 14 year old boy that had never been arrested handcuffs are coercive and oppressive.

Both the Juvenile Court Act and the policy of the Lincoln police department state that, "No minor under 16 years old may be confined in a jail or place ordinarily used for the confinement of prisoners in a police station." *705 ILCS 405/5-7(2)(c)(vi),* (Supp.R. Vol. IV, Def. Ex. No.3). When a minor of appropriate age is detained in a jail cell, the Juvenile Court Act requires that he be told the purpose of his detention, the time it is expected to last and that the detention cannot exceed six hours. 705 ICLS 405/5-7(2)(c)(iii) No one told this to Jon. His detention was inherently coercive. Jon Morgan remained handcuffed after being placed in the cell which served to aggravate the coerciveness of his detention.

Shortly after 9:00 p.m., Detective Harberts learned that Jon Morgan was 14 years old. He called Logan County State's Attorney for advice. Mr. Huyett told the detective to make sure he read Jon *Miranda* warnings and to find out if the persons who had been shot were his guardians. Conspicuously absent from the advice that the State's Attorney offered was a suggestion to call the City of Lincoln juvenile police officer or Jon's parents. The Juvenile Court Act requires that a police officer taking a minor into custody make an immediate and reasonable

-65-

attempt to notify the minor's parents **or** other person legally responsible for the minor's care **or** the person with whom the minor resides. *705 ILCS 405/5-6(1)* This same section requires that the minor be taken to the juvenile police officer for the jurisdiction. *Id.* Detective Harberts did neither.

In *People v. Knox*, 186 Ill.App.3d 808, 542 N.E.2d 910 (1989), the court reversed the denial of the defendant's motion to suppress finding that the police had "contributed significantly to eliminating any opportunity the defendant had from speaking to his mother at the police station." In evaluating the evidence, the court stated:

> We do not believe such conduct by the police is consistent with the great care required when a juvenile's incriminating statement is received. At worst, the police purposely precluded the defendant's mother from contact with the defendant by neglecting to see if the defendant's mother had arrived until after such time as the defendant had completed his confession. At best, the police simply subjected the defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of the defendant's statement. *Knox, supra*, 542 N.E. 2d at 914.

In *People v. R.B.*, 232 Ill.App.3d 583, 597 N.E.2d 879 (1992), the court stated the failure to telephone a juvenile's parents, or the absence of a parent during questioning, is a factor in determining voluntariness, but is not determinative of whether the defendant's confession should be suppressed. However, where the state failed to take appropriate steps to ensure that a juvenile defendant had the opportunity to confer with an interested adult, either a parent or youth officer, this court has held that the police conduct rendered his confession inadmissible. *People v. R.B., supra*, 597 N.E.2d 879.

In *People v. Montanez*, 273 Ill.App.3d 844, 652 N.E.2d 1271 (1995), the court stated that the purpose of the "notice" requirement is to permit, where possible, a parent to confer and counsel with the juvenile before interrogation and confession. In *Montanez*, the interrogation of the juvenile began before a juvenile police officer was present. Later, the juvenile police officer was present for additional statements made by the minor. *Montanez, supra*, 652 N.E.2d at 1272. In *Montanez*, the Court observed that:

-66-

'Notice' here must be understood to have some purpose, namely, to allow where possible, the concerned adult to confer and counsel with the juvenile *before* interrogation and confession. Yes, an attempt was made to contact a youth officer before the statement was taken; but, the interrogation went forward anyway, within minutes...these circumstances demonstrate that the intended fulfillment of notice here was simply a tragic charade. *Id.* at 1275 (emphasis in original)

Here, Detective Harberts interrogated Jon Morgan from shortly after 9:00 p.m. until 9:37 p.m. Officer Kerns was in the interrogation room. Detective Harberts was taping the interrogation. It would not have been difficult for Detective Harberts to ask Officer Kerns to contact Jon's parents or Darrell Sisk, the juvenile police officer. When Detective Harberts asked, Jon provided his mother's name and phone number. Detective Harberts waited an hour and half before he even *attempted* to call her. When he did, he simply stated his name and that Jon was with him and that there was an emergency. He failed to mention that her son was in the custody of police, suspected in a double homicide. When she returned his call, she demonstrated great interest in her son's welfare. She made Detective Harberts aware of Jon's attention deficit disorder and wanted Jon to have an attorney.

Sgt. Sisk was called by another Lincoln police officer at 10:30 p.m. He was home in bed. He was not told that a minor was in custody, suspected of a double homicide. He was only asked if he knew Jon Morgan. Since he didn't know "this kid," he rolled over and went back to sleep. Darrell Sisk's testimony evidences a grave misunderstanding about his role as a juvenile police officer. His is supposed to be interested in the minor's welfare. *In Re Lashun H.*, 284 Ill.App.3d 545, 672 N.E. 2d 331, 334 (1996) Sgt. Sisk couldn't understand why he should have gone to the jail, indicating that all he would have done was observed. In *Montanez*, the court harshly criticized police efforts to notify parents and a juvenile police officer, stating that the police officer's failure, after the defendant was arrested, to notify her mother and a juvenile police officer, makes a mockery of the concept of reasonable notice. *People v. Montanez, supra,* 652 N.E.2d at 1275. Those words ring loudly in the present case. The City of Lincoln policy on juveniles also requires that a juvenile court officer be called when a minor is taken into custody.

-67-

Furthermore, the policy states, "Do not question him/her unless either a parent or guardian is present." (Supp.R. Vol. IV, Def. Ex. No. 3)

Judge Dehner found that there was a technical violation of state statute. The finding of a single violation demonstrates that his ruing is manifestly erroneous. There were multiple violations and they were flagrant rather than technical. The police conduct in this case makes a mockery of the juvenile court act and department policy designed to reduce the coercive circumstances inherent in juvenile police contact.

After Jon's first interrogation, both Detective Harberts and Officer Kerns either met with or spoke to the State's Attorney for Logan County or an Assistant State's Attorney for Logan County. No one discussed whether Jon's parents or Sgt. Sisk had been contacted. The Juvenile Court Act was the farthest thing from their minds. The purpose of their meetings was to determine how to gain more incriminating evidence against Jon Morgan. Assistant State's Attorney Kurt Schoenbein suggested that a video re-enactment of the scene be done. Jon was asked to do so and he agreed. This.evidence supports the proposition that the police and the State's Attorney's office combined to subject the respondent to the same routine interrogation of an adult suspect without any special regard for his youth. This type of interrogation rendered the defendant's statement involuntary in *People v. Knox,* 542 N.E. 2d at 914.

Each time the police wanted to interrogate Jon, they would go to his jail cell. The interrogation efforts last until the wee hours of the morning. The fact that an interrogation occurred in the middle of the night may be properly considered in evaluating the voluntary nature of a confession. *In Re Lashun H*, 284 Ill.App.3d 545, 672 N.E. 2d 331, 337 (1996).

Judge Dehner made the observation that, "[J]on did seem to want to tell what happened." (R. Vol. I, C.14) This evidences a misunderstanding of the test for voluntariness. The benchmark for voluntariness is whether the defendant's will was overborne at the time, not whether he would have confessed in the absence of interrogation. *People v. Brown*, 169 Ill.2d 132, 144, 661 N.E. 2d 287 (1996). Furthermore, Judge Dehner focused on the lack of overt coercion or threats. He found that, from the video and audio tape, it appeared that there were no threats, promises or abuse of the minor and he was never denied access to food, or the use of the

-68-

restroom. He observed the officer's to be calm, non-intimidating and non-threatening. (R. Vol. I, C.13) The absence of overt coercion or threats does not mean that the statement was not voluntary under the circumstances. *In Re L.L.*, 295 Ill.App.3d 594, 693 N.E.2d 908 (1998)

Jon Morgan had no prior experience with the police. He had gone to them for help. It was painful for him to admit to Deputy Spickard that he had shot his grandparents. In his seventh grade social studies class, Jon learned that "A policeman is your friend. A policeman must have a servant's heart. He is a minister of God (Romans XIII)...In the community they are looked upon as leaders and are respected." (Supp. R.IV, People's Ex. 16, p. 23) What Jon didn't know was that on April 27, 1995, Detective Harberts was not acting as his friend. The detective was a servant of prosecutors who encouraged Detective Harberts to gain incriminating evidence from Jon Morgan without any regard for the Juvenile Court Act or the policy of the Lincoln Police Department. Judge Dehner's finding that Jon Morgan's statements are voluntary is against the manifest weight of the evidence.

## IV. JON MORGAN DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS MIRANDA RIGHTS.

The incriminating statements elicited from Jon Morgan by the officers of the Lincoln Police Department are not admissible because Jon did not knowingly and intelligently waive his Miranda rights. Whether Jon knowingly and intelligently waived his Miranda rights is a distinctly different question than the voluntariness of Jon's statements.

> "[W]here a defendant confesses after being given *Miranda* warnings..., both intelligent knowledge and voluntariness remain requirements for assuring that a defendant's *Miranda* waiver reflects *Miranda's* 'carefully drawn approach': its 'subtle balance' between the need for police questioning and the coercive pressures inherent in such questioning." *People v. Bernasco*, 138 Ill.2d 349, 562 N.E. 2d 958, 961 (1990) (quoting *Moran v. Burbine*, 475 U.S. 512, 426-427 (1986)).

This law was relied on in *People v. Higgins*, where the Court held:

> "For a defendant to make an intelligent and knowing waiver, there must be an intentional abandonment of the privilege, a defendant must know what he is doing, and he must understand both the nature of the right and consequence of

the decision to abandon it." *People v. Higgins,* 239 Ill. App. 3d 260, 607 N.E. 2d 337, 343 (5th Dist., 1993)(citing *People v. Bernasco*, 562 N.E.2d 962-963).

The question of whether Jon knowingly and intelligently waived his *Miranda* rights is "essentially a question of fact for the trial court." *Id.* at 344. In making this determination, this Court must look to the totality of the circumstances. "Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience and conduct." *Bernasco*, 562 N.E.2d at 966 (citing *People v. Turner*, 56 Ill. 2d 201, 306 N.E. 2d 27, 30 (1973)). Also relevant to the decision is the defendant's prior experience with the police. *Higgins*, 607 N.E.2d at 337. A lack of prior experience with the police militates in favor of finding that a knowing and intelligent waiver was not made. *Id.*

The mere fact that a defendant was read his *Miranda* rights and purported to waive those rights does not result in an automatic finding that the defendant waived those rights knowingly and intelligently. For example, the defendants in *Bernasco, Higgins,* and *Turner* all had *Miranda* warnings read to them and all appeared to have waived their rights. In each case, however, the courts found that the defendants were not fully aware of their rights and, therefore, had not *knowingly and intelligently* waived those rights. As the Supreme Court of Illinois has stated, "[a]lthough there is no doubt that the defendant was advised of his rights as mandated by *Miranda v. Arizona,* (cite omitted), the questions presented by this record is whether he knowingly waived those rights." *Turner*, 306 N.E. 2d at 30.

The analysis of the Court in *People v. Travis,* 122 Ill.App.3d 671, 462 N.E.2d 654, 659 (1st Dist., 1984), is particularly instructive on this issue. In addressing whether the defendant had knowingly and voluntarily waived his rights, the court asked:

> [a]lthough the trial court found that defendant was given Miranda warnings, there is scant evidence in the record to support the conclusion that defendant knowingly waived his rights under the Fifth Amendment. Defendant was only 15 years old at the time of his interrogation. There is no testimony regarding his intellectual capacity. He was questioned twice by the police at the police stations for substantial periods of time. After he was given Miranda warnings, he was merely

-70-

asked whether he understood them. He did not sign a waiver of rights form at either of the two interrogations, nor did he sign any written statements.

****** 

Under the circumstances, the failure of the police officers to make any reasonable attempt to locate defendant's parents becomes a consequential fact. The police were attempting to coerce defendant into making incriminating statements, and their admitted failure to even attempt to notify an adult interested in defendant who could have ensured that defendant understood the extreme importance of the constitutional rights which he allegedly waived without hesitation underscores our conclusion that the State failed to prove that defendant's statements were voluntary under the totality of the circumstances. *People v. Travis, supra*, at 659.

Detective Harberts read *Miranda* warnings to Jon Morgan shortly after 9:00 p.m. on April 27, 1995. Before that reading, he and other police officers had managed to ignore and violate key provisions of the Lincoln police department policy on juvenile offenders as well as the Juvenile Court Act. As noted above, he was handcuffed in violation of department policy. Detective Harberts testified that Jon Morgan acted in a non-violent, passive way, never making any effort to escape. Nevertheless the was handcuffed. Tim Kerns, the officer who placed Jon in handcuffs, testified that Jon was compliant with every request. The obvious intent of the handcuffs is to reduce the coercive and intimidating circumstances inherent in police juvenile contact.

After being transported to the Logan County jail, Jon Morgan, who was 14 years old, was confined in a jail cell which was ordinarily used for the confinement of adults. The circumstances of his confinement allowed the adults in custody to come into contact with him. His detention under those conditions marks a violation of the Illinois Juvenile Court Act, *705 ILCS 405/5-7(2)(C)(ii)(vi)* and also violates 3-5.A. of the Lincoln police department policy. The language of the police department's policy, parallels state law. (Supp. R. Vol. IV, Def. Ex. No. 3) These provisions serve, like those related to handcuffs, to reduce the inherently coercive circumstances of a juvenile being taken into police custody. These coercive circumstances are especially evident for a minor such as Jon Morgan who had never been arrested, let alone inside of a locked jail cell.

-71-

One he was jailed, he was not told that his detention could not last for more than six hours. Nor was he told the purpose of his detention or how long he was expected to be detained. Failure of Officer Kerns or Detective Harberts to do so, violates yet another section of the Juvenile Court Act. *705 ILCS 405/5-7(2)(C)(iii)*

After he was taken into custody, neither Officer Kerns nor Detective Harberts made an immediate and reasonable attempt to notify Jon's parents. Nor did either officer contact Sgt. Sisk, the juvenile police officer for the City of Lincoln police department. The failure to do so establishes a violation of §405/5-6 of the Juvenile Court Act.

When Detective Harberts directed Jon out of the cell into an office, Jon was more than happy to comply. In Jon's mind, the company of Detective Harberts was far better than the locked jail cell. Detective Harberts read Miranda warnings to Jon Morgan no differently than if Jon were an adult. He made no effort to explain the warnings or the consequences of waiving any of the stated rights. Jon was not asked to sign a written waiver or initial each right as it was read to him indicating an understanding of that right.

In *People v. Travis, supra*, 462 N.E.2d 654, 659 (1st Dist. 1984), one of the reasons the Court held that there was no voluntary waiver of *Miranda* was that the minor was merely asked whether he understood the *Miranda* warnings. Here, Jon was asked if he understood each warning, but he was never asked if he waived or gave up his right to remain silent, his right to consult with counsel, or his right to appointed counsel. At the end of the warnings, he was asked, "Knowing these rights, do you want to talk to me without having a lawyer present?" (Supp.R.Vol.IV, People's Ex. 8) This question is completely inadequate to demonstrate a knowing and intelligent waiver of *Miranda* warnings.

Judge Dehner made findings that Jon Morgan appeared to be of average intelligence. However, it was apparent that Judge Dehner did not consider Jon's educational experience concerning police officers. In his seventh grade social studies class, Jon learned that, "A policeman is your friend...a policeman must have a servant's heart. He is a minister of God (Romans XIII), in the community they are looked upon as leaders and are respected." (Supp.R. Vol. IV, People's Ex. 16, p. 23) Given all of the information in the record about Jon's

-72-

background and the negative consequences he faced when he did not do what he perceived was being asked of him, the State cannot demonstrate that Jon understood the consequences of his decision to abandon his *Miranda* rights. Thus, they cannot show a *knowing and intelligent* waiver of those rights.

## V. THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY OF GLENDA ASHWORTH AND DR. STUART HART REGARDING THE PRIOR VIOLENT CONDUCT OF THE CEARLOCKS.

Prior to the commencement of evidence, the State moved to exclude certain testimony of Glenda Ashworth. Glenda, the Defendant's mother, was to testify to the physical and emotional abuse suffered by her at the hands of her parents, Mr. and Mrs. Cearlock. An offer of proof was made of this testimony. The trial judge granted the State's motion, and the Defendant was barred from introducing this crucial evidence at trial. While no written opinion was made for this ruling, the transcripts indicate that the only basis for the exclusion was the remoteness in time of the beatings that Glenda had received. This order was erroneous and must be reversed.

The law applicable to this question is really quite simple. The answer to the question is found in the general principles of relevancy. These principles state that evidence that tends to make a fact of consequence to the determination of the action more probable than it would be without the evidence must generally be admitted. The evidence to be found in Glenda's testimony clearly fits that description.

Jon asserted, and attempted to prove, that he could not be guilty of first-degree murder as he acted in self-defense. The key element in that defense is that the Defendant believed that his life and safety were in imminent danger. *People v. Keefe,* 209 Ill.App.3d 744, 567 N.E.2d 1052, 153 Ill.Dec. 825 (1st Dist. 1991). Jon Morgan, therefore, had to introduce evidence that he believed that his safety was in imminent danger at the hands of his grandparents. Jon's fear is clearly of "consequence to the determination" of this prosecution. Therefore, any evidence which tended to make that fear more probable in the jury's mind is relevant.

The evidence of the violent tendencies of the victims and the prior treatment of the Defendant at the hands of the victims are the most probative facts tending to prove the requisite

-73-

fear. *People v. Lynch*, 104 Ill.2d 194, 470 N.E.2d 1018, 83 Ill.Dec. 598 (1984).  As such, this type of evidence is nearly always admissible.

> It is generally a defendant's right to present evidence of a victim's character for violence when the defendant alleges that he acted in self-defense against the victim.  '[T]he reason for the rule is that such evidence tends to show circumstances confronting the defendant, the extent of his apparent danger, and the motive influencing him.' *People v. Robinson* (1987), 163 Ill.App.3d 754, 773, 114 Ill.Dec. 898, 516 N.E.2d 1292.  *People v. Keefe, supra*, at 1058.

The Supreme Court has determined that such evidence is admissible for two distinct reasons.

> First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior.  The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies.  *People v. Lynch,* 104 Ill.App.2d 194, 470 N.E.2d 1018 at 1020, 83 Ill.Dec. 598 (1984).

This reasoning is particularly powerful when, as here, the Defendant not only *knew* of the Cearlock's violent tendencies, but had actually, repeatedly and physically, *suffered* from those tendencies.

The second reason for admitting this type of evidence is equally applicable to the case at bar.

> [E]vidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened.  *Lynch, supra*.

Jon Morgan's testimony regarding the events immediately leading up to the shootings, had they been believed by the jury, were sufficient to support a self-defense finding.  Obviously, any and all corroboration of those events was crucial to his case.

As the Supreme Court found in *People v. Lynch, supra* at 1020, the goal at trial is to help the jury see for itself exactly what Jon saw at the time he pulled the trigger.  To make that leap

of perception, the jury needed to hear from Jon how he saw the events of that day *Keefe, supra,* at 1056-1057. And the jury had to believe him.

Glenda Ashworth's testimony would have gone a long way towards having the jury believe Jon's perception. Her testimony would have corroborated not only the truth of Jon's stories of past beatings, but also, more importantly, would have corroborated Jon's feelings of fear and panic. Without Glenda's testimony, Jon's claims clearly struck the jury as self-serving and unreliable. With Glenda's testimony, the jury could not so easily discount Jon's defense. The rules of relevance require nothing more.

The trial court's refusal to admit Glenda's testimony apparently was based solely on it's belief that too much time had passed between Glenda's beatings and the beatings suffered by Jon. This is an error of law and an abuse of discretion.

Remoteness in time is, of course, simply an arm of relevance. The operative question is, "are the offered events so removed by time so as to destroy their relevance to the events at issue?" *People v. Ward*, 101 Ill.2d 443, 463 N.E.2d 696, 79 Ill.Dec. 142 (1984). In stating this question, it becomes obvious that, except in the extremes, the issue is really one of weight rather than admissibility.

> As a general rule, other offenses which are close in time to the charged offense will have more probative value than those which are remote. Nevertheless, the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged. *People v. Illgen*, 145 Ill.2d 353, 583 N.E.2d 515 at 522 (1991).

To exclude the evidence altogether, the court must find that it has *no* relevance. Such a finding is not possible in the case at bar.

While it is conceded that Glenda's beatings occurred at least nineteen (19) years prior to the shooting, the astonishing similarities between Glenda's treatment and Jon's treatment so bolsters their relevance as to overwhelm any remoteness weaknesses. *People v. Bartall*, 98 Ill.2d 294, 456 N.E.2d 59, 74 Ill.Dec. 557 (1983).

-75-

Glenda testified, in her offer of proof, to specific details of her beatings. She testified that nearly every beating started with the exhortations of her mother and that her father's rage was always incited by her mother. She testified that her father had a particular leather strap that he used to administer the beatings. She further related that her father had a peculiar method of administering a closed-fist punch. This involved the extension of the knuckle of the middle finger which turned the fist into a pointed wedge. The similarities between her experiences and Jon's were eerie.

Jon's beatings also started with the insistence of Mrs. Cearlock, the trusty razor strap was still liberally employed and the extended knuckle punch was still a favorite of Mr. Cearlock. "It is this similarity which increases the relevance of the evidence," *Bartall, supra,* and outweighs any problem with the passage of time.

The remoteness challenge to relevancy is also destroyed by the use that this evidence was to be put. Jon was not trying to prove that, on the day of the shootings, his grandparents had acted in exact conformity with their actions toward Glenda. Rather, he was trying to prove that he had in the past been similarly mistreated and that his testimony of fear should be believed. He was not trying to convince a jury that his grandparents were criminals, but rather to convince the jury that he had not made up the stories of his repeated abuse at his grandparents hands. In that context, the remoteness of his mother's experience had little or no bearing on the relevance of that experience.

Finally, the State implicitly conceded the great relevance of Glenda's testimony. In it's closing statement, the prosecutor made much of Jon's inability to corroborate his beatings and the legitimacy of his fear. The prosecution urged the jury to ignore Jon's claim of self-defense as unbelievable and unsubstantiated. In "repeatedly emphasizing the improperly excluded evidence" the State recognized the importance of any testimony that supported Jon's claims of repeated beatings. *People v. Keefe*, 209 Ill.App.3d 744, 567 N.E.2d 1052, 153 Ill.Dec.825 (1st Dist. 1991). Such argument also highlights the harmfulness of the court's error on this issue. If Glenda had been allowed to testify, that crucial portion of the State's closing simply could not have been made.

-76-

The fallacy of the remoteness objection was highlighted in the improperly excluded testimony of Dr. Stuart Hart. Dr. Hart was a psychologist testifying on Jon's behalf. In the course of his examination of Jon, Dr. Hart spoke with Glenda Ashworth. The State objected to any testimony regarding that conversation and regarding the purpose of that conversation. The objection was sustained.

In an offer of proof (R. Vol. XXVI, pp. 451-460), Dr. Hart explained that he felt that, as a professional, it was necessary that he interview Glenda to support his opinion about Jon (R.Vol. XXVI, pp. 451-452). Dr. Hart testified that parental physical abuse is often "cross generational" (R.Vol. XXVI, p. 454). By this phrase, Dr. Hart explained that abuse by parents of their child will lead to abuse by the child of her own children. This recognized phenomenon also meant that "patterns" of abuse were not easily overcome and that, if the abuser is again put into a caretaker role, he is likely to repeat his abuse (R..Vol XXVI, p. 455). Dr. Hart clearly felt that Glenda's experiences would have been "reasonably relied upon by experts in the particular field in forming opinions" (Rule 703 of Federal Rules of Evidence).

Through his conversation with Glenda, Dr. Hart was able to corroborate many of the experiences testified to by Jon. The abuse suffered by Glenda confirmed in Dr. Hart's mind that Jon had indeed suffered the same type of abuse. In Dr. Hart's words, Glenda's information confirmed a "repetitive and persistent pattern" of severe mental, emotional and physical abuse (R.Vol. XXVI, pp. 453-454). Glenda's information also gave Dr. Hart a better understanding of Jon's psyche. Glenda's experiences gave important insight into Jon's early developmental experiences and Jon's home life as a very young child. This information was crucial to Dr. Hart's testimony regarding Jon's perception of the threat on the day of the shootings. Obviously, with the stated goal of helping the jury see what Jon saw, Dr. Hart's testimony was relevant.

Given the use that Dr. Hart intended to put this testimony, the alleged remoteness was meaningless. In fact, Dr. Hart opined that the length of time between Glenda's beatings and Jon's beatings actually enhanced the probative value of the testimony.

> Q    ....Does the passage of time effect the value of Glenda's
>        statements to you as cooberation (*sic*) of Jon's statements?

-77-

A       Well, certainly a person would have to take into consideration that these things happened at different times and that changes may occur within people and within families. But I did not have any information to indicate that there were changes, substantial changes that had occurred here; that the patterns were remarkably similar.

Q       And what significance did that have?

A       Well, the significance was added credibility to Jon's description of his own life experiences.

Q       And did the passage of time in any way detract from that?

A       In a sense, it would indicate that this was a long-standing pattern and was less likely to be modified.

R Vol. XXVI, p. 455, lines 4-18.

The information obtained from Glenda was important to Dr. Hart in two ways. One, it corroborated and supported Jon's version of the crucial and operative facts of his own abuse. Second, it provided important diagnostic insights into Jon's psychological make up. Both the corroborative component and the diagnostic component were equally important to the jury's understanding of Jon's defense and were clearly relevant. The trial court's refusal to permit this testimony was error and must be reversed.

## VI.    THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO BAR SECOND DEGREE MURDER INSTRUCTIONS AS TO THE FELONY MURDER COUNTS.

The State charged Jon Morgan with eight counts of first degree murder in relation to the deaths of his grandparents. Counts I and II charge Jon pursuant to *720 ILCS 4/9-1(a)(1)* with causing the deaths of his grandmother and grandfather respectively with the intent to kill them. Counts III and IV charge Jon pursuant to *720 ILCS 4/901(a)(2)* with causing the death of his grandmother and grandfather respectively by shooting them knowing such act created a strong probability of death or great bodily harm. Counts V and VI charge Jon pursuant to *720 ILCS 5/9-1(a)(3)* with causing the death of his grandmother and grandfather respectively while

-78-

committing the forcible felony of aggravated battery in that while committing a battery, Jon intentionally or knowing caused great bodily harm and that during the commission of the aggravated battery, Jon's grandparents died. Finally, Counts VII and VIII charge Jon pursuant to *720 ILCS 5/9-1(a)(3)* with causing the deaths of his grandmother and grandfather respectively while committing the forcible felony of aggravated discharge of a firearm in that he knowingly discharged a firearm in the direction of his grandmother and grandfather.

Defense counsel disclosed its intent to use a psychological defense and expert testimony to demonstrate that Jon Morgan's actions were based upon self-defense or the result of sudden and intense passion resulting from serious provocation. (C.248) The state filed a Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts arguing that the instruction was only proper for first degree murder charges. (C.315)

The trial court denied the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts, stating:

> A more vexing problem is raised by the State's Motion to Bar Second Degree Murder Instructions. The court has heard the arguments, considered the motion and authorities cited. First of all, the IPI Instructions are adopted pursuant to Committee recognized by the Supreme Court but to the best of the court's understanding, those instructions have never been formally adopted by the Supreme Court. Further, the law particularly relevant to this court, in the absence of a Supreme Court pronouncement on the subject is that of the Fourth District. Court has read <u>Williams</u> (and understands its timing) and believes that its rationale applies, or may apply here. Court understands that the state has the discretion of whether to charge, whether to charge, what to charge, whether to dismiss or nolle and that the state may charge under alternate theories. But the court is charged with giving the jury instructions according to the facts that develop at trial according to the law that applies under the circumstances. Court indicated that the motion may be premature. Court cannot, as a matter of law, grant the motion. Court believes, if anything , the law is unsettled. Further, of concern to the court as well, is that under the state's theory as pointed out by the defense, inconsistent verdicts are a real possibility. Therefore, the state's motion is denied.

(C.23-25)

During hearing on final pre-trial motion, the court reconfirmed its denial of the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts. In response to

-79-

defense counsel's Motion for Clarification as to what "state of mind" evidence was permissible, the court ruled that Jon's psychological expert would be allowed to testify as to "the manner in which the defendant's experiences affected his perception of danger, its imminence, and the actions the defendant perceived as necessary to defend himself on the day of the crime." (C.346; C.31)

After all of the evidence and prior to closing arguments, the trial court held a jury instruction conference. (C.36)   During the instruction conference, the trial court reversed its ruling denying the state's Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts and refused to give a second degree instruction for counts V through VIII. (Vol.XXIX, R.25-42) The trial court erred in refusing to instruct the jury as requested by defense counsel.

**A.    The Second Degree Murder Instruction On The Felony Murder Counts Was Required Because The Evidence Showed That Jon Morgan Formed The Intent To Kill After He Determined That Deadly Force Was Necessary To Protect Himself**

Contrary to the State's argument, Jon is entitled to a second-degree murder instruction on the felony-murder counts. *People v. Kidd*, 295 Ill.App.3d 160, 692 N.E.2d 455 (4th Dist. 1998); *People v. Williams*, 164 Ill.App.3d 99, 517 N.E. 2d 745, 751-52 (4th Dist., 1987).

In *People v. Williams*, 164 Ill.App.3d 99, 517 N.E.2d 745 (4th Dist. 1987), the Fourth District addressed the question of whether a defendant charged with felony-murder could receive a voluntary manslaughter instruction, now a second degree murder instruction.  In that case, the defendant was charged with several counts of murder.  One of the murder charges was based upon a felony-murder theory with the predicate felony being aggravated battery. *Id.* At 750. The trial judge gave voluntary manslaughter instructions on all of the murder counts except the felony-murder count, finding that voluntary manslaughter was not a defense to felony-murder. *Id.*

The appellate court reversed the defendant's conviction on felony murder.  Although the appellate court acknowledged "that in most instances, the reduction in culpability due to passion

-80-

should not be available as a partial defense to a felony murder charge," it held that under the facts of that case a manslaughter instruction on the felony murder counts was required. *Id.*, 517 N.E.2d 751. Initially the appellate court noted that an unreasonable belief in self-defense and provocation are not defenses available to reduce the seriousness of an aggravated battery charge. Perfect self-defense is a complete defense to aggravated battery, but unreasonable self-defense is not. Furthermore, acting under provocation is never a defense to aggravated battery. The appellate court wrote:

> Therefore, a defendant facing two people in mutual combat can be seriously provoked, and if he kills both, he is guilty of two counts of voluntary manslaughter. It would be absurd to state that under the identical facts, if one of the victims dies and one lives, he is now guilty of murder because as to the one that lives, he is guilty of aggravated battery, and hence, under the felony murder doctrine, the affirmative defense of provocation is inapplicable. We agree with defendant that such a result is contrary to common sense. *Id.*, 517 N.E. 2d at 751.

The court then held that under the defendant's version of the killing, the jury could have found that the defendant did not form any felonious intent until <u>after</u> he had been provoked by the victim. Since, under the defendant's version of the killing, the defendant did not form the felonious intent until after he was provoked, the court held the defendant was entitled to a voluntary manslaughter instruction.

In reversing the defendant's conviction on the felony-murder count, the appellate court wrote:

> We hold that where evidence has been presented that the provocation occurs prior to the time that a defendant forms the felonious intent or commits a forcible felony, the partial affirmative defense of voluntary manslaughter based upon provocation should be available, and the jury should be instructed accordingly.

*Id.*, 517 N.E.2d at 752.*See also People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903, 911 (1975) (it is reversible error to refuse a voluntary manslaughter instruction on a charge of felony murder, where the predicate felony is aggravated battery).

More recently, the Fourth District Appellate Court revisited its holding in *Williams* and addressed the issue of whether a prosecutor may avoid the provocation defense in an intentional

or knowing murder case by charging felony murder based upon an aggravated battery of the person killed. *Kidd*, 692 N.E.2d 459. In that case, a fist fight between the defendant and the victim resulted in the victim's death. The defendant was charged in a two count indictment with one count of first degree murder (felony murder) based upon the forcible felony of aggravated battery and one count of aggravated battery. The defendant was convicted of both counts and sentenced to 25 years in the Department of Corrections. The defendant appealed arguing that the trial court erred in refusing to instruct the jury on second degree murder. *Id.*, 692 N.E.2d 459.

The appellate court stated: "It is not the law that a prosecutor may avoid the provocation defense in an intentional or knowing murder case by charging felony murder based upon an aggravated battery upon the person killed. The procedure to be followed in that situation was addressed in *Williams*, where the court concluded there should be an instruction on the defense, even though provocation is not a defense to aggravated battery and is not usually a defense to felony murder" *Id.*, 692 N.E.2d 459.

In *Kidd*, the state argued that, in 1987, when the legislature adopted the second degree murder statute, it specifically provided that the defense of provocation applied only to intentional or knowing murder and could never apply to felony murder. *Id.*, 692 N.E.2d at 459. The appellate court recognized the infirmity in the state's position and noted that it would effectively eliminate the second degree murder statute in intentional or knowing murder cases at the discretion of the prosecutor. *Id.*

The appellate court rejected the state's position. In describing its rationale, the appellate court wrote:

> Did the legislature really intend an illusory second degree murder statute, one that exists at the choice of the prosecutor and will be applied only in cases in which it could be of no benefit to the defendant? We should avoid a construction of a statute that renders any part of it meaningless. The courts presume the General Assembly, in passing legislation, did not intend absurdity, inconvenience or injustice, and a statute will be interpreted so as to avoid a construction that would raise doubts as to its validity. A court should avoid an interpretation under which a statute is "explained away, or rendered insignificant, meaningless, inoperative, or nugatory." In order to give some meaning to the second degree murder statute,

-82-

there must be some limit on a prosecutor's ability to charge felony murder in cases such as this.

*Kidd.*, 692 N.E.2d at 459-60.

The holding in *Williams* and the reasoning in *Kidd* apply with equal force in this case. The state has charged Jon with four counts of felony murder. The predicate felony for two counts is aggravated battery, and the predicate felony for the other two counts is aggravated discharge of a firearm. It is impossible for a defendant to kill an individual by shooting him and not commit the felonies of aggravated battery or aggravated discharge of a firearm.

At trial, Jon produced evidence that he killed his grandparents because he believed the killings were necessary to save his own life. If the jury believed that Jon reasonably believed his use of deadly force was necessary to protect his own life, they could have acquitted him of first degree murder. *People v. O'Neal*, 104 Ill.2d 481, 472 N.E.2d 441, 443 (1984). If the jury believed Jon believed it was necessary to kill his grandparents in order to protect himself, but that belief was unreasonable, it could convict him of second degree murder.

In *People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983), the Illinois Supreme Court discussed the "intent" possessed by an individual who commits the offense of voluntary manslaughter, now second-degree murder.

Yet no one who commits voluntary manslaughter intends in advance to take a life or employ deadly force; the only "intent" of this sort that enters into the crime is the decision, arrived at without deliberation and in most cases instantaneously, to use force capable of killing. Before that decision is arrived at, the person who is guilty of voluntary manslaughter typically has no criminal intent whatsoever. *Id.*, 455 N.E.2d at 51. If the jury found that Jon acted upon an unreasonable belief of self-defense, therefore, they would have necessarily found that he did not form any criminal intent until he determined that he had to kill his grandparents to defend himself. It was at that particular point in time, when Jon formed the belief that killing his grandparents was necessary to save his own life, that Jon also necessarily formed the intent to commit aggravated battery and aggravated discharge of a firearm. "Logically, any time a defendant commits second degree murder based on an unreasonable belief of self-defense, the

-83-

defendant will also possess the intent or knowledge necessary for a conviction on aggravated battery causing great bodily harm." *People v. Drakeford*, 138 Ill.2d 206, 564 N.E.2d 792, 796 (1990). The same is true for aggravated discharge of a firearm if the second degree murder is committed by shooting the victim. Thus, Jon's intent to commit the felonies of aggravated battery and aggravated discharge of a firearm was not formed until <u>after</u> Jon formed his belief that deadly force was necessary to protect his life. Consequently, under *Williams*,. Jon is entitled to a second-degree instruction on all of the felony murder counts.

**B.    A Second Degree Murder Instruction On The Felony Counts Was Required To Avoid Inconsistent Verdicts And Prevent The State From Nullifying The Second Degree Murder Statute.**

Without a second degree instruction for the felony murder, the following scenario could occur. The jury could find Jon guilty of second degree murder on County I through IV based upon an unreasonable belief in the need for self-defense. This will necessarily meant that the jury found that Jon committed and aggravated battery. *Drakeford*, 564 N.E.2d at 796. Furthermore, a finding of second degree murder on counts I through IV will necessarily result in the jury finding that Jon committed aggravated discharge of a firearm because they will have concluded that he fired a firearm in the direction of his grandparents. If so, the jury will have no alternative but to convict Jon of first degree murder on the felony murder counts because of the way they were instructed. The foregoing reasoning would result in inconsistent verdicts. *People v. Porter*, 168 Ill.2d 201, 659 N.E.2d 915 (1995).

In *Porter*, the defendant was charged with four counts of first degree murder, all arising out of the death of his mother. At trial, the jury found the defendant guilty but mentally ill of two counts of second degree murder and guilty but mentally ill of two counts of first degree murder. *Id.*, 659 N.E.2d at 916. On of the first degree convictions was based upon felony-murder. *Id.*,659 N.E.2d at 920. The second degree convictions were based on the jury's finding that at the time of the killing the defendant was acting under a sudden and intense passion. *Id.*, 659 N.E.2d at 921. The defendant was sentenced to death based upon the first degree murder convictions, and he appealed directly to the Illinois Supreme Court.

-84-

The Illinois Supreme Court held that the jury's verdicts were inconsistent and reversed. The court explained that the offense of second degree murder is simply first degree murder plus mitigation. *Porter*, 659 N.E.2d at 921. The court reasoned that when a defendant is charged with first degree murder and presents the defense of provocation the jury must decide:

> (1) whether the State proved all of the elements of first degree murder and, if so (2) whether the mitigating factor of serious provocation was present at the time of the murder. If the jury finds that serious provocation was present, then the defendant is guilty of second degree murder. However, if the jury determines that serious provocation was not present, the defendant is guilty of first degree murder. Consequently, a jury must find either "provoked" second degree murder of "unprovoked" first degree murder. A single murder cannot be both provoked and unprovoked at the same time. The jury's verdicts were therefore both legally and logically inconsistent.

*Id.*., 659 N.E.2d at 291. Although *Porter* addresses the provocation prong of the second degree murder statute, its holding is equally applicable when the second degree finding is an unreasonable belief of self defense.

In this case, the jury was presented with the mitigating factor of unreasonable belief in self defense. The jury had to decide: (1) whether the state proved all of the elements of first degree murder and, if so, (2) whether the mitigating factor of unreasonable belief in self-defense was present at the time of the murder. If the jury found that the unreasonable belief in self-defense was present, Jon is guilty of second degree murder. If the jury found the unreasonable belief was not present, Jon is guilty of first degree murder. A single murder cannot be both pursuant to and not pursuant to an unreasonable belief in self defense at the same time. Without a second degree instruction on the felony murder counts, if Jon were found guilty of second degree murder on Counts I through IV, the jury would necessarily find Jon guilty of first degree murder on Counts V through VIII.

Under the foregoing scenario, Jon would be sentenced on first degree murder with the result being the state will have eliminated second degree murder as a possible defense in this case. The Illinois Supreme Court has previously held that it is improper for the state to attempt to eliminate second degree murder as an available defense.

-85-

. In *People v. Drakeford*, 139 Ill.2d 206, 564 N.E.2d 792 (1990), the defendant was found guilty of second degree murder and armed violence. Under the armed violence statute, a defendant is guilty of a class X felony if while armed with a dangerous weapon he commits a felony defined by Illinois law. *Id*, 564 N.E.2d at 794. The defendant stabbed the victim to death. The armed violence conviction was predicated on the defendant committing the felony of aggravated battery while armed with a knife. *Id.*, 564 N.E.2d at 793. Relying on its decision in *People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983), the Illinois Supreme Court held that a defendant cannot be sentenced for armed violence predicated on the felony of aggravated battery when the defendant is simultaneously convicted of second degree murder for the same act which supports the aggravated battery. The court wrote:

> Lastly, if we were to hold that a defendant could be sentenced for armed violence predicated on aggravated battery where there was a simultaneous conviction for second degree murder arising out of the same act, we would render ineffective the second degree murder statute. To commit aggravated battery causing great bodily harm, a specific intent crime, the defendant must act "intentionally" or "knowingly" . . . Logically, any time a defendant commits second degree murder based on an unreasonable belief of self-defense, the defendant will also possess the intent or knowledge necessary for a conviction on aggravated battery causing great bodily harm. Thus, in the future, prosecutors will seek sentencing on the Class X armed violence predicated on aggravated battery conviction rather than on the Class 1 second degree conviction murder conviction. This result would effectively nullify the second degree murder statute.

*Drakeford*, 564 N.E.2d at 796-97.

In the instant case, the state as in *Drakeford* nullified the second degree murder statute. By charging Jon with felony murder based upon aggravated battery and aggravated discharge of a firearm--two felonies that are always present when a defendant shoots someone-- and then arguing that he is not entitled to a second degree murder instruction on the felony murder counts, the state effectively eliminated the application of his defenses. The Illinois Supreme Court has held this conduct to be unacceptable.

C.    **A Second Degree Murder Instruction Was Required On The Felony Counts Pursuant To The Plain Language Of The Second Degree Murder Statute.**

Under the plain language of the second degree murder statute, Jon is entitled to a second degree instruction in this case. The second degree murder statute states, in relevant part: "A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraph (1) or (2) of subsection (a) of section 9-1 of this Code and either of the following mitigating factors are present." 720 ILCS 5/9-2. Subsections (a)(1) and (a)(2) of section 9-1 state:

(a) A person who kills an individual without lawful justification commits first degree murder if, in  performing the acts which caused the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

In this case, if the jury did not find perfect self defense, then Jon committed first degree murder by intentionally killing his grandparents, knowing his conduct caused a strong probability of death or great bodily harm.  This is true of every count in the Indictment, including the felony murder counts.  The same conduct which supports counts I through IV supports Counts V through VIII--there is no difference.  In counts V through VIII, the state has broken Jon's actions in a piecemeal fashion, however, the conduct is the same as the conduct charged in the first four counts.  Simply put, calling the conduct felony murder does not change the conduct itself.  Accordingly, in each count of the Indictment, Jon is charged with committing the offense of first degree murder as defined in paragraphs (1) and (2) of subsection (a) of section 9-1 of the Criminal Code.  Under the plain language of Section 9-2(a), Jon is eligible to receive a second degree instruction on each count of the Indictment.

-87-

Since first degree murder is a more serious offense than second degree murder, Jon will be sentenced on first degree murder with the result

## VII.   THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS UPON APPLICATION OF THE MERGER DOCTRINE TO THE PREDICATE FELONIES OF AGGRAVATED BATTERY AND AGGRAVATED DISCHARGE OF A FIREARM

Prior to trial, defense counsel filed a motion to dismiss the felony murder counts on the grounds that the predicate felony charges--aggravated battery and aggravated discharge of a firearm--merged with the homicides and could not be used to support a felony murder charge. (C.318)  Defense counsel argued that the state improperly charged felony murder in order to deprive Jon of a second degree murder defense. (C.325) That motion was denied. (C.30)  The trial court's ruling was erroneous.

At trial, the state made clear its theory that Jon intentionally killed his grandmother and grandfather. In any case where the defendant is charged with intentionally killing a victim, or engaging in acts which the defendant knows will create a strong probability of death or great bodily harm, the defendant, by implication, is charged with aggravated battery.  Aggravated battery is defined as committing a battery (intentionally or knowingly without legal justification and by any means, causing bodily harm to an individual) and intentionally or knowingly causing great bodily harm, or permanent disability or disfigurement.  It is impossible to intentionally kill someone or engage in conduct knowing the conduct creates a strong probability of death or great bodily harm and that conduct actually kills a victim, and not commit the offense of aggravated battery.   If a defendant intentionally kills a victim or kills a victim while engaging in acts he knows creates the strong probability of death or great bodily harm then the defendant has intentionally or knowingly caused great bodily harm while committing a battery.  Thus, in any first degree murder case, charging the defendant with intentionally killing the victim or engaging in conduct knowing the conduct creates a strong probability of death or great bodily harm, it is possible to charge the defendant with aggravated battery.

By the same token, if a defendant is charged with intentionally killing a victim by shooting the victim with a firearm, then by definition, the defendant is charged with aggravated

-88-

discharge of a firearm.    Aggravated discharge of a firearm is defined as knowingly or intentionally discharging a firearm in the direction of another person.  *720 ILCS 5/24-1.2(a)(2)* It is impossible to kill someone by shooting them and not have discharged a firearm in the victim's direction.  Thus, any defendant who is charged with first degree murder by shooting the victim can be charged with aggravated discharge of a firearm.

These simple observations take on significance in the context of how the state charged Jon in this case.  Under the felony-murder provision of the first degree murder statute, 720 ILCS 5/9-1(a)(3), a person is guilty of first degree murder if they cause the death of a victim and the defendant is attempting or committing a forcible felony other than second degree murder.  Forcible felonies are defined in 720 ILCS 5/2-8.  Section 2-8 lists several specific forcible felonies, one of which is aggravated battery.  In addition to the enumerated forcible felonies, Section 2-8 defines a forcible felony as "any other felony which involves the use or threat of physical force or violence against any individual."  Under the felon-murder rule, the defendant can be convicted of first degree murder without the State having to prove any intent to kill.  *People v. O'Neal*, 104 Ill.2d 399, 472 N.E.2d 441, 445 (1984); *People v. Pugh*, 261 Ill.App.3d 75, 634 N.E.2d 34, 36 (5th Dist., 1994).  Rather, the State need only prove that the defendant was attempting to commit or was committing a forcible felony and while the defendant was attempting to commit or committing the forcible felony, someone was killed.

"The purpose of the felony murder statute is to deter individuals from committing forcible felonies by holding them responsible for murder if death results from their criminal actions." *Pugh*, 634 N.E.2d at 35 (citing *People v. Graham*, 132 Ill.App.3d 673, 477 N.E. 2d 1342, 1347 (1st Dist., 1985)).  The rationale behind the rule is that if a potential felon knows that if he commits a forcible felony and that during the course of that felony someone is killed, he will be found guilty of first degree murder, the potential felon will chose not to commit the felony because the stakes are too high.  This rationale breaks down when the felony used as the predicate for the felony-murder charge is inherently part and parcel of the killing act as is the case here.

-89-

If the State's theory of the case is believed, then Jon intentionally killed his grandmother and grandfather. If Jon's theory of the case is believed, Jon intentionally killed his grandparents in self-defense or while he was acting under a sudden and intense passion. Either way, Jon intended to kill his grandparents. As discussed above, for Jon to kill his grandparents by shooting them, he necessarily had to commit the forcible felonies of aggravated battery and aggravated discharge of a firearm. In this case, therefore, there is no possibility that the felony-murder rule would act to deter Jon from committing the forcible felonies. Jon had to commit the forcible felonies to effectuate his intent to kill his grandparents in order to defend himself. Applying the felony-murder rule in this case, is inconsistent the rule's purpose, and the state's reliance on the rule is improper.

Absent the giving of a second degree instruction, charging felony-murder in this fashion will allow the State to achieve a conviction of first degree murder withing having to prove intent to kill. Furthermore, if the State is allowed to charge felony-murder based on aggravated battery and aggravated discharge of a firearm when those felonies are not independent of the homicide, the State will be able to charge felony- murder in *every* homicide case and, therefore, never have to prove intent to kill to achieve a conviction of first degree murder. This would be an unwarranted expansion of the felony-murder rule.

By charging felony-murder in this manner, the State is able to argue that Jon is not entitled to a second-degree murder instruction on the felony-murder counts. It is quite obvious that the State deliberately charged Jon in this manner to deprive him of the defense of second degree murder, a defense specifically provided by the Illinois legislature, by improperly invoking the felony-murder rule.

Although Jon is entitled to a second degree murder instruction on the felony-murder counts in this case, the most straight forward and logical way to eliminate this problem, created by the State's improper use of the felony-murder rule, is to dismissing the counts of the Indictment charging felony-murder, finding that the felonies of aggravated battery and aggravated discharge of a firearm merge into homicide. *People v. Ireland,* 450 P.2d 580 (1969); *People v. Wagner*, 245 N.Y. 143, 156 N.E. 644 (1927); *People v. Huter,* 184 N.Y. 237, 77 N.E.

6 (1906); *The Doctrine of Merger in Felony-Murder and Misdemeanor Murder*, 35 S. Jon's L.Rev. 109 (1960); Van Patton, *Merger and the California Felony-Murder Rule*, 20 UCLA L.Rev. 250 (1972).   By finding that the aggravated battery and aggravated discharge of a firearm felonies merge into the homicide, the merger doctrine prevents prosecutors from charging crimes in a piecemeal manner.   Furthermore, the merger doctrine recognizes that the rationale supporting the felony-murder rule simply does not support the charge of felony-murder when the predicate felony is part and parcel of the act of kills.   Finally, the merger doctrine prevents the Stater from charging felony-murder in *every* first degree murder case.   Without the merger doctrine, the State need never charge any defendant with intentionally killing a victim or killing a victim while engaging in conduct the defendant knew created the strong probability of death. Rather, the State would only have to charge felony murder based on aggravated battery and not have to prove any intent to kill.   Finally, if his Court does not apply the merger doctrine, the State will be given the opportunity to expand the felony-murder rule to an unwarranted degree in a blatant attempt to deny Jon Morgan of the defense of second degree murder.

# Conclusion

For the foregoing reasons, the appellant, JON R. MORGAN, requests that his conviction be reversed and remanded for proceedings in the juvenile court of Logan County or, in the alternative, that he be granted a new trial.

Respectfully submitted,

JON MORGAN  - Defendant-Appellant.

By:    _D. Peter Wise_
His Attorney

D. PETER WISE (6187876)
**GATES, WISE & SCHLOSSER, P.C.**
Attorneys at Law
1225 South Sixth Street
Springfield, IL. 62703
217/522-9010

# APPENDIX

Cumulative Index to Record on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

Petition for Transfer from Juvenile Court to Criminal Court  . . . . . . . . . . . . . . . . . . . . .  A-37

Judge Coogan's Ruling on Petition for Transfer from
Juvenile Court to Criminal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-40

Amended Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-48

Judge Dehner's Ruling on Amended Motion to Suppress  . . . . . . . . . . . . . . . . . . . . . . . .  A-53

Judgment and Sentence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-57

Notice of Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-59

## CUMULATIVE INDEX TO RECORD ON APPEAL

### VOLUME I

| Date | Document | Page |
|------|----------|------|
| 4/2/97 | Certification of Record | C1 |
| 6/3/95-4/2/97 | Record and Docket Sheets | C2 |
| 6/3/95 | Information | C40 |
| 6/3/95 | Information | C41 |
| 6/8/95 | Bills of Indictment - Counts I-VIII | C42 |
| 6/8/96 | Motion for Disclosure to Accused | C50 |
| 6/27/95 | Order for Transportation | C52 |
| 6/27/95 | Clerk's Certificate of Mailing | C53 |
| 6/29/95 | Motion for Change of Venue (Place of Trial) | C54 |
| 6/30/95 | Motion to Suppress Statements | C90 |
| 7/6/95 | Motion for Disclosure to Prosecution | C95 |
| 7/6/95 | Answer to Defendant's Discovery Motion | C97 |
| 7/10/95 | Supplemental Answer to Defendant's Discovery Motion | C100 |
| 7/14/95 | Notice of Hearing on Motion to Suppress | C101 |
| 7/17/95 | Notice of Hearing on Motion for Change of Venue | C102 |
| 7/18/95 | Order for Transportation | C103 |
| 7/18/95 | Order for Transportation | C104 |
| 7/21/95 | Motion to Amend Motion for Change of Venue | C105 |
| 7/21/95 | Notice of Hearing on Motion to Amend Motion for Change of Venue | C108 |
| 7/31/95 | Affidavit of Sharon Gissler | C109 |
| 8/18/95 | Entry of Appearance by Michael Metnick & D. Peter Wise | C115 |
| 8/18/95 | Motion to Continue Hearing on Motion to Suppress | C117 |
| 8/18/95 | Motion for Substitution of Attorneys & Order | C120 |

**VOLUME I - Continued**

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 8/29/95 | Motion for Additional Discovery | C122 |
| 9/18/95 | Motion to Continue Trial | C126 |
| 9/18/95 | Motion to Reconsider Ruling Regarding Transfer | C131 |
| 9/18/95 | Motion to Suppress | C135 |
| 9/26/95 | Notice of Hearing on Motion to Continue | C141 |
| 10/24/95 | Supplemental Answer to Defendant's Discovery Motion | C142 |
| 11/21/95 | Notice of Hearing (Case Review) | C143 |
| 11/21/95 | Order | C144 |
| 12/21/95 | Motion to Strike Motion to Reconsider | C145 |
| 12/29/95 | Motion to Reopen Evidence and Reconsider Ruling Regarding Transfer | C147 |
| 1/3/96 | Proof of Service on Defendant's First Response to Request for Discovery and Defendant's Supplement to First Response to Request for Discovery | C151 |
| 1/3/96 | Letter from Defense Counsel to Clerk of Logan County | C153 |
| 1/3/96 | Fax Cover Sheet from Defense Counsel to Clerk of Logan County | C154 |
| 1/4/96 | Original Proof of Service Defendant's First Response to Request for Discovery and Defendant's Supplement to First Response to Request for Discovery | C155 |
| 1/10/96 | Notice of Hearing on Motion to Suppress & Motion to Reopen Evidence and Reconsider Ruling Regarding Transfer | C156 |
| 1/11/96 | Subpoena to Rodney E. Wamsley, Morton Crime Lab | C158 |
| 1/12/96 | Amended Motion to Suppress | C159 |
| 1/12/96 | Subpoena to Thomas E. Bryant | C165 |
| 1/12/96 | Subpoena to Sgt. Darrell Sisk | C167 |
| 1/12/96 | Subpoena to Dr. Joan Barenfanger, M.D. | C168 |

**VOLUME I - Continued**

| Date | Document | Page |
|------|----------|------|
| 1/12/96 | Subpoena to Dr. Victor Lary | C169 |
| 1/12/96 | Memorandum of Law on the Admissibility of Juvenile Confessions | C170 |
| 1/16/96 | Motion to Continue Trial | C177 |
| 1/16/96 | Motion for Transportation | C180 |
| 1/16/96 | Memorandum of Law and Argument on the Inapplicability of Miranda to the On the Scene Question of the Defendant as to Why He Shot his Grandparents | C182 |
| 1/16/96 | Motion in Limine to Prohibit Expert Testimony on the Defendant's State of Mind | C184 |
| 1/16/96 | Defendant, Jon Morgan's, Memorandum of Law in Support of Motion to Suppress | C186 |
| 1/17/98 | Order Transferring Case to Adams County | C207 |
| 1/17/96 | Clerk's Certificate of Mailing | C208 |
| 1/25/96 | Subpoena to Sgt. Darrell Sisk | C209 |
| 1/  /96 | Subpoena to Teresa Smith | C211 |
| 1/  /96 | Subpoena to Jason T. Wade | C213 |
| 1/12/96 | Subpoena to Rob Grant, M.D. | C215 |
| 1/24/96 | Subpoena to Penny R. Bailey | C217 |
| 1/24/96 | Subpoena to William Belhomme | C219 |
| 1/24/96 | Subpoena to Jeremiah R. Newhouse | C221 |
| 1/24/96 | Subpoena to Eric M. Gill | C223 |
| 1/24/96 | Subpoena to Steve Powell | C225 |
| 1/24/96 | Subpoena to Dean Langdon | C229 |
| 2/5/96 | Motion for Transportation | C232 |

## VOLUME I - Continued

| **Date** | **Document** | **Page** |
|---|---|---|
| 2/5/96 | Order for Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C234 |
| 2/6/96 | Motion for Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C235 |
| 2/6/96 | Subpoena to Thomas E. Bryant . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C238 |
| 2/7/96 | Subpoena to Steve Powell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C240 |
| 2/7/96 | Subpoena to Sgt. Darrell Sisk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C241 |
| 2/21/96 | Subpoena to Sgt. Darrell Sisk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C242 |
| 2/21/96 | Subpoena to Kim Ball . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C243 |
| 2/22/96 | People's Response to Defendant's Memorandum of Law in Support of Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C245 |
| 3/5/96 | Clerk's Certificate of Mailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C247 |
| 3/29/96 | Motion in Limine to Prohibit Evidence of any Psychological Diagnosis, Trait or Condition of the Defendant . . . . . . . . . . . . . . . . . . . . | C248 |
| 3/29/96 | Notice of Hearing on Motion in Limine to Prohibit Expert Testimony on the Defendant's State or Mind and the People's Motion in Limine to Prohibit Evidence of any Psychological Diagnosis, Trait or Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C250 |

## VOLUME II

| **Date** | **Document** | **Page** |
|---|---|---|
| 4/17/96 | Subpoena to Rodney E. Wamsley . . . . . . . . . . . . . . . . . . . . . . . . . . . | C251 |
| 4/17/96 | Subpoena to Patricia Orr . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C252 |
| 4/17/96 | Subpoena to Bob Klockenga . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C253 |
| 4/17/96 | Subpoena to Dr. Victor Lary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C254 |
| 4/17/96 | Subpoena to Dr. Joan Barenfanger . . . . . . . . . . . . . . . . . . . . . . . . . . | C255 |
| 4/17/96 | Subpoena to S.M. Davis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C256 |
| 4/17/96 | Subpoena to Thomas Bryant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C257 |

## VOLUME II - Continued

| Date | Document | Page |
|------|----------|------|
| 4/17/96 | Subpoena to Richard Ball | C258 |
| 4/17/96 | Subpoena to Penny R. Bailey | C259 |
| 4/17/96 | Subpoena to Angela Babbs | C261 |
| 4/17/96 | Subpoena to Jeremiah R. Newhouse | C263 |
| 4/17/96 | Subpoena to Mathew Johnson | C265 |
| 4/17/96 | Subpoena to Jason T. Wade | C267 |
| 4/17/96 | Subpoena to Teresa S. Smith | C269 |
| 4/17/96 | Subpoena to Eric M. Gill | C271 |
| 4/17/96 | Subpoena to Joseph Tonellato | C273 |
| 4/25/96 | Index of Discovery to Defendant | C277 |
| 4/29/96 | Subpoena to Rachel Kirby | C279 |
| 4/29/96 | Subpoena to Mike O'Hara | C283 |
| 4/29/96 | Subpoena to Steve Taute | C284 |
| 5/6/96 | Subpoena to William Belhomme | C286 |
| 5/9/96 | Certificate of Compliance on Defendant's Second Supplemental Response to Request for Discovery | C287 |
| 5/13/96 | Motion to Exclude Evidence | C288 |
| 5/13/96 | Notice of Hearing | C290 |
| 5/15/96 | Affidavit of D. Peter Wise | C291 |
| 5/15/96 | Affidavit of Cecilia Tumulty | C296 |
| 5/15/96 | Response to Motion to Exclude Evidence | C299 |
| 5/15/96 | Affidavit of Claire Allen | C304 |
| 5/15/96 | Defendant, Jon R. Morgan's, Memorandum of Law in Opposition to the State's Motion in Limine | C307 |
| 5/16/96 | Motion to Bar Second Degree Murder Instructions as to the Felony Murder Counts | C315 |

**VOLUME II - Continued**

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 5/15/96 | Certificate of Compliance on Defendant's Third Supplemental Response to Request for Discovery | C316 |
| 5/20/96 | Clerk's Certificate of Mailing | C317 |
| 5/20/96 | Defendant, Jon R. Morgan's, Motion to Dismiss | C318 |
| 5/20/96 | Defendant, Jon R. Morgan's, Memorandum of Law in Support of Motion to Dismiss | C321 |
| 5/20/96 | Notice of Hearing on Motion to Dismiss | C328 |
| 5/20/96 | Defendant, Jon R. Morgan's, Supplemental Memorandum of Law in Opposition to the State's Motion in Limine | C330 |
| 5/22/96 | Defendant, Jon R. Morgan's, Motion to Reconsider | C339 |
| 5/22/96 | Defendant, Jon R. Morgan's, Motion for Clarification | C346 |
| 5/22/96 | Defendant, Jon R. Morgan's, Memorandum of Law in Opposition to the State's Motion to Bar Second Degree Murder Instructions as to The Felony Murder Counts | C349 |
| 5/22/96 | Defendant, Jon R. Morgan's, Motion for Return of Transcripts and to Bar the Use of Transcripts at Trial | C360 |
| 5/22/96 | Defendant, Jon R. Morgan's, Motion in Limine to Prohibit Expert Testimony on Cause of Death | C362 |
| 5/22/96 | Notice of Hearing on Defendant, Jon R. Morgan's, Motion in Limine to Prohibit Expert Testimony on Cause of Death | C365 |
| 5/22/96 | Motion to Strike Defendant's Motion to Dismiss | C367 |
| 5/22/96 | Order of Temporary Detention | C368 |
| 5/22/96 | Subpoena to Stephanie Rhoades | C369 |
| 5/22/96 | Subpoena to Roe Morgan | C370 |
| 5/22/96 | Subpoena to Billy Jo Morgan | C371 |
| 5/22/96 | Subpoena to Tracy Morgan | C372 |

**VOLUME II - Continued**

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 5/22/96 | Subpoena to Candi Morgan | C373 |
| 5/22/96 | Subpoena to Glenda Ashworth | C374 |
| 5/22/96 | Motion With Respect to Jury Selection | C375 |
| 5/24/96 | Subpoena to Jennie Golden | C378 |
| 5/24/96 | Clerk's Certificate of Mailing | C380 |
| 5/28/96 | Defendant, Jon R. Morgan's, Motion for Additional Peremptory Challenges | C381 |
| 5/28/96 | Defendant, Jon R. Morgan's, Motion to Disqualify Prosecutors | C383 |
| 5/28/96 | Defendant, Jon R. Morgan's, Motion to Allow His Mother to Remain in Courtroom During the Entire Course of Trial | C385 |
| 5/28/96 | Defendant, Jon R. Morgan's, Motion to Continue | C387 |
| 5/28/96 | Defendant, Jon R. Morgan's, Witness List | C394 |
| 5/28/96 | Defendant, Jon R. Morgan's, Exhibit List | C396 |
| 5/28/96 | Motion In Limine I | C398 |
| 5/28/96 | Motion in Limine II | C401 |
| 5/30/96 | Motion in Limine III | C404 |
| 5/30/96 | Conduct of a Jury Trial, Circuit Court of Logan County, Circuit Judge Gerald G. Dehner | C407 |
| 5/30/96 | Motion for Jon Morgan to Be Present in Court Without Shackles | C413 |
| 5/30/96 | Letter from Defense Counsel to Judge Dehner | C418 |
| 5/31/96 | Letter from Defense Counsel to Judge Dehner | C422 |
| 6/4/96 | Certificate of Substantial Impairment | C449 |
| 6/4/96 | Notice of Appeal by State | C450 |
| 6/4/96 | Motion for No Bond Pending Appeal by The People | C451 |
| 6/4/96 | Motion | C452 |
| 6/5/96 | Clerk's Certificate of Mailing | C453 |

## VOLUME II - Continued

| Date | Document | Page |
|------|----------|------|
| 6/6/96 | Subpoena to Steve Powell | C455 |
| 9/6/96 | Subpoena to Doug Grieser | C458 |
| 9/6/96 | Subpoena to Officer Kerns | C459 |
| 9/6/96 | Subpoena to Officer Montcalm | C460 |
| 9/24/96 | Letter from Defense Counsel to Judge Dehner | C461 |
| 9/25/96 | Clerk's Certificate of Mailing | C462 |
| 9/27/96 | Subpoena "Duces Tecum" to Michael B. Metnick | C463 |
| 10/1/96 | Clerk's Certificate of Mailing | C464 |
| 6/10/96 | Letter to Counsel from Darryl Pratscher, Clerk of the Appellate Court for the Fourth District | C465 |
| 6/10/96 | Subpoena Dues Tecum to Mr. Les Sachs | C466 |
| 6/19/96 | Docket Entry by the Appellate Court dismissing State's appeal | C469 |
| 6/21/96 | Letter from Defense Counsel to Judge Dehner | C470 |
| 7/17/96 | Letter from Darryl Pratscher, Clerk of the Appellate Court for the Fourth District, Issuing Mandate | C472 |
| 6/5/96 - 7/22/96 | Record/Docket Sheets | C474 |
| 7/22/96 | Clerks' Certificate of Mailing | C475 |
| 7/25/96 | Letter from Judge Dehner to Ms. Jane Engblom | C476 |
| 8/7/96 | Motion to Reconsider Order Excluding Expert Testimony as to Cause of Death | C477 |

## VOLUME III

| Date | Document | Page |
|------|----------|------|
| 8/7/96 | Motion to Reconsider Order Excluding Expert Testimony as to Cause of Death (Continued from Volume II) | C501 |

**VOLUME III - Continued**

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 8/7/96 | Motion for Change of Place of Trial | C521 |
| 8/7/96 | Supplemental Authority in Support of Motion for Jon Morgan to Be Present in Court without Shackles | C565 |
| 8/7/96 | Motion to Reconsider Suppression Order | C578 |
| 8/8/96 | Subpoena to Jason T. Wade | C583 |
| 8/8/96 | Subpoena to Rodney E. Wamsley | C584 |
| 8/8/96 | Subpoena to Thomas Bryant | C585 |
| 8/8/96 | Subpoena to Richard Ball | C586 |
| 8/8/96 | Subpoena to Patricia Orr | C587 |
| 8/8/96 | Subpoena to Angela Babbs | C588 |
| 8/8/96 | Subpoena to Dr. Victor Lary | C589 |
| 8/8/96 | Subpoena to Dr. Joan Barenfanger | C590 |
| 8/8/96 | Subpoena to Penny R. Bailey | C591 |
| 8/8/96 | Subpoena to Steve Powell | C592 |
| 8/8/96 | Subpoena to William Belhomme | C593 |
| 8/8/96 | Subpoena to Eric M. Gill | C594 |
| 8/8/96 | Subpoena to Teresa (Smith) Oltmans | C595 |
| 8/8/96 | Subpoena to Jeremiah R. Newhouse | C596 |
| 8/8/96 | Subpoena to Steve Taute | C597 |
| 8/8/96 | Subpoena to Mike O'Hara | C598 |
| 8/8/96 | Subpoena to Mathew Johnson | C599 |
| 8/8/96 | Subpoena to Joseph Tonellato | C600 |
| 8/8/96 | Subpoena to Rachel Kirby | C601 |
| 8/8/96 | Subpoena to Bob Klockenga | C602 |
| 8/8/96 | Subpoena to S.M. Davis | C603 |
| 8/8/96 | Subpoena to Eric M. Gill | C604 |

**VOLUME III - Continued**

| Date | Document | Page |
|------|----------|------|
| 8/9/96 | Motion in Limine | C605 |
| 8/13/96 | Conduct of a Jury Trial, Circuit Court of Logan County, Circuit Judge Gerald G. Dehner | C606 |
| 8/13/96 | Order (on People's Motion in Limine) | C616 |
| 8/13/96 | Docket Sheets dated 8/13/96, 8/14/96 signed by Judge Dehner | C617 |
| 8/14/96 | Clerk's Certificate of Mailing | C619 |
| 8/12/96 | Defendant's Fourth Supplemental Response to Request for Discovery | C620 |
| 8/16/98 | Motion to Continue | C626 |
| 8/16/96 | Notice of Motion | C628 |
| 8/20/96 | Supplemental Argument in Support of Motion to Continue | C629 |
| 8/19/96 | Order (Re: Transportation of Defendant) | C631 |
| 8/23/96 | Subpoena to Billy Jo Morgan | C632 |
| 8/23/96 | Subpoena to Kelsey Morgan | C633 |
| 8/23/96 | Subpoena to Roe Morgan | C634 |
| 8/23/96 | Subpoena to Tracy Morgan | C635 |
| 8/23/96 | Subpoena to Candi Morgan | C635 |
| 8/23/96 | Subpoena to Glenda Ashworth | C637 |
| 8/26/96 | Motion to Compel Defendant to Submit to Mental Exam | C638 |
| 8/26/96 | People's Witness List | C639 |
| 8/26/96 | Defendant's Witness List | C640 |
| 8/26/96 | Criminal Pretrial Check-off List | C642 |
| 8/26/96 | Amended Proposed Juror Questions | C644 |
| 8/27/96 | Order (Re: Transportation of Defendant) | C672 |
| 8/27/96 | Verification/Swearing In of Court Bailiff | C673 |
| 8/27/96 | Motion to Compel Discovery | C674 |

## VOLUME III - Continued

| Date | Document | Page |
|------|----------|------|
| 8/27/96 | Motion to Bar Testimony of Illinois State Police Forensic Scientist Glen D. Schubert | C675 |
| 8/28/96 | Subpoena to Steve Powell | C680 |
| 8/29/96 | People's Revised Witness List | C681 |
| 8/30/96 | Defendant's Motion in Limine IV | C682 |
| 9/3/96 | Subpoena to Keeper of Records, Lincoln City Police Department | C684 |
| 9/4/96 | Proposed Distribution of State's Witnesses | C686 |
| 9/4/96 | Subpoena to Glenn Shubert | C688 |
| 9/4/96 | Motion in Limine V | C689 |
| 9/4/96 | Offer of Proof of Glenda Ashworth | C717 |
| 9/4/96 | Motion to Compel Production of Dr. Borenstein's Notes and Reports | C722 |
| 9/5/96 | People's Response to Defendant's Motion in Limine II Regarding the Admissibility of Statements By the Deceased Victim, Lila Cearlock, in the presence of Thomas Bryant | C724 |
| 9/5/96 | Names and Addresses of Members and Alternates of Jury | C726 |
| 9/5/96 | Petit Jury List | C730 |
| 9/5/96 | Note from Attorney Metnick to Judge Dehner | C735 |
| 9/5/96 | Verification/Swearing In of Court Bailiff | C737 |
| 9/5/96 | Interview of Jon R. Morgan by Sgt. Harbarts | C738 |
| 9/6/96 | Stipulation | C750 |

## VOLUME IV

| Date | Document | Page |
|------|----------|------|
| 9/9/96 | Motion to Reconsider | C751 |
| 9/9/96 | Motion in Limine to Prohibit Testimony of Jennie M. Golden | C753 |
| 9/9/96 | Judge's Statement to Jury re:Audio/Videotape | C755 |

**VOLUME IV - Continued**

| <u>Date</u> | <u>Document</u> | <u>Page</u> |
|---|---|---|
| 9/10/96 | Handwritten Stipulation Re: Razor Strap/Blue Jeans . . . . . . . . . . . . . . . | C756 |
| 9/13/96 | Motion in Limine Regarding Testimony of Dr. Stuart Hart . . . . . . . . . . | C757 |
| 9/13/96 | Note to Judge from Juror #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C759 |
| 9/13/96 | Subpoena to Eric Gill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C760 |
| 9/15/96 | Motion to Strike Testimony Elicited on Cross Examination of | |
| | Dr. Hart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C762 |
| 9/15/96 | Notice of Surrebuttal Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C764 |
| 9/13/96 | Subpoena to Edson Peacock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C765 |
| 9/13/96 | Subpoena to Daniel Ball . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C767 |
| 9/13/96 | Subpoena to Andrew Ball . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C769 |
| 9/13/96 | Subpoena to Roger Gill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C771 |
| 9/18/96 | Motion in Limine To Prohibit Testimony of Dr. Robert Chapman | |
| | in Surrebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C773 |
| 9/18/96 | Witness List of Date & Time of Actual Testimony . . . . . . . . . . . . . . . | C775 |
| 9/20/96 | Verification/Swearing In of Bailiff . . . . . . . . . . . . . . . . . . . . . . . . . . | C777 |
| 9/20/96 | Trial Practice Check-Off Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C778 |
| 9/20/96 | State's Witness List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C779 |
| 9/20/96 | Instruction Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C782 |
| 9/20/96 | Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C784 |
| 9/20/96 | Judgment of Guilty & Order Setting Sentencing Hearing | |
| | and for Presentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C981 |
| 9/20/96 | Order for Sequestration of Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . | C982 |
| 9/20/96 | Jury Selection and Trial Timetable . . . . . . . . . . . . . . . . . . . . . . . . . | C985 |
| 9/20/96 | People/Defense List of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . | C986 |
| 9/20/96 | List of Exhibits Approved for Jury Review . . . . . . . . . . . . . . . . . . . . | C987 |
| 9/20/96 | Jury Selection Panels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C993 |

9/23/96     Order (Re: Transportation of Defendant) ......................... C999

10/21/96    Clerk's Certificate of Mailing .................................. C1000


**VOLUME V**

**Date**        **Document**                                                    **Page**

10/25/96    Defendant's Motion for New Trial and Post Trial Motions .......... C1001

11/5/96     Letter to Defense Counsel Wise from Logan County

            Clerk Re: Exhibit #16 .......................................... C1014

11/5/96     Letter to Prosecutor Huyett from Logan County

            Clerk Re: Exhibit No. 98 ....................................... C1015

11/25/96    Presentence Investigation Report ............................... C1016

11/25/96    Social Investigation Report .................................... C1020

            Report of Dr. Robert E. Chapman ............................... C1028

            Report of Dr. Philipp Bornstein ............................... C1035

            Report of Dr. Stuart Hart ..................................... C1042

11/18/96    People's Sentencing Memorandum ................................ C1045

11/20/96    Defendant's Sentencing Memorandum ............................. C1052

11/20/96    Defendant's Memorandum on Sentencing Factors .................. C1120

11/25/96    People's Supplemental Information & Authority ................. C1209

11/25/96    Defendant's Supplement to Post-Trial Motion ................... C1254

11/26/96    Victim Impact Statement ....................................... C1263

11/26/96    Judgment and Sentence of Imprisonment ......................... C1265

11/26/96    Transmittal of Information from Logan County Circuit Clerk

            to Warden, St. Charles Illinois Youth Center .................. C1267

11/27/96    Appointment of Counsel on Appeal .............................. C1268

12/9/96     Administrative Transfer Order ................................. C1269

12/16/96    Notice of Appeal .............................................. C1270

12/16/96    Clerk's Certificate of Mailing ................................ C1271

**VOLUME V - Continued**

| Date | Document | Page |
|------|----------|------|
| 12/18/96 | State's Attorney's Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1272 |
| 12/20/96 | Notice to Appellate Counsel regarding docketing statement . . . . . . . . . | C1273 |
| 1/13/97 | Letter from Appellate Counsel to Clerk Re: Record on appeal . . . . . . . | C1274 |
| 1/16/97 | Notice to Appellate Counsel from Appellate Court with | |
| | Docketing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1275 |
| 2/5/97 | Court Reporter's Request for Extension for Transcript . . . . . . . . . . . . . | C1278 |
| 2/5/97 | Report of Proceedings Filed by CSR Annette Wilkey . . . . . . . . . . . . . . | C1279 |
| 2/11/97 | Order granting Linda Peasley's extension of time to file report | |
| | of proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1280 |
| 2/11/97 | Amended Docketing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1281 |
| 3/12/97 | Court Reporter's Request for Extension for Transcript . . . . . . . . . . . . . | C1282 |
| 3/17/97 | Order granting Linda Peasley's extension of time to file report | |
| | of proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1283 |
| 3/17/97 | Amended Docketing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C1284 |

**VOLUME VI**

Report of Proceedings on Transfer Hearing before the Honorable David L. Coogan held June 1, 1995

Witness:
MICHAEL HARBERTS
Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 19
Cross Examination by Mr. Funk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 121
Cross Examination by Ms. VanTine  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.149
Cross Examination by Mr. Behle  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 152
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.155
Recross Examination by Mr. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.162
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.163
Recross Examination by Mr. Behle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.164
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.164

## Volume VII

Report of Proceedings on Transfer Hearing before the Honorable David L. Coogan, held June 2, 1995.

Witness:
THOMAS EDWARD BRYANT

Direct Examination by Mr. Huyett ..................................... p.170
Cross Examination by Mr. Funk ...................................... p.188
Cross Examination by Mr. Behle ..................................... p.222
Cross Examination by Ms. VanTine .................................. p.228
Redirect Examination by Mr. Huyett ................................. p.230
Recross Examination by Mr. Funk ................................... p.236
Redirect Examination by Mr. Huyett ................................ p.240

KIM TURNER

Direct Examination by Mr. Huyett .................................... p.246
Cross Examination by Mr. Funk ...................................... p.276
Cross Examination by Mr. Behle ..................................... p.306
Cross Examination by Ms. VanTine .................................. p.307
Redirect Examination by Mr. Huyett ................................. p.310
Recross Examination by Mr. Funk ................................... p.314
Recross Examination by Ms. Van Tine .............................. p.316

ERIC GILL

Direct Examination by Mr. Huyett .................................... p.318
Cross Examination by Mr. Funk ...................................... p.323

ROBERT L.. SPICKARD

Direct Examination by Mr. Funk ..................................... p.326

DARREL L. SISK

Direct Examination by Mr. Funk ..................................... p.326

## VOLUME VII - CONTINUED

GLENDA ASHWORTH

Direct Examination by Mr. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.338
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.383
Cross Examination by Mr. Behle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.390
Cross Examination by Ms. Van Tine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.393
Redirect Examination by Mr. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.395

## VOLUME VIII

Report of Proceedings on Transfer Hearing held before the Honorable David L. Coogan on June 3, 1995.

Witness:

GLENDA ASHWORTH

Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p..383
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.383
Cross Examination by Mr. Behle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.390
Cross Examination by Ms. Van Tine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.393

## VOLUME IX

Report of Proceedings on the Hearing before the Honorable Gerald Dehner on June 12, 1995.  Return on the Bill of Indictment from the Grand Jury.

## VOLUME X

Report of Proceedings held before the Honorable Gerald Dehner:

Arraignment held 6/5/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.11-17
Hearing held 6/29/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.18-21
Hearing held 7/25/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.22-26
Hearing held 7/26/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.27-29
Hearing on Motions 7/31/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.30-37
Hearing held 8/21/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.38-40
Hearing held 8/29/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.41-48
Hearing on Motion to Continue held 9/27/95 . . . . . . . . . . . . . . . . . . . . . . . . . p.49-56
Hearing held on 11/28/95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.57-64

Hearing held 01/2/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.65-75
Hearing on Motions 1/16/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.76-184

**Report of Proceedings on the Motion to Suppress before the Honorable Gerald Dehner on January 16, 1996:**

Witness:

TIM KERNS

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.96-129
Cross Examination by Mr. Wise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.129-157
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.158-164
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.164-166

ROBERT SPICKARD

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.167-175
Cross Examination by Mr. Wise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.175-179
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.179-182
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.182-184

## VOLUME XI

Report of Proceedings on Motion to Suppress Hearing before the Honorable Gerald Dehner on January 16, 1996.

Witness:

DOUG GRIESER

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.186-196
Cross Examination by Mr. Wise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.196-213
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.213-215
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.215

BILL SHELBY

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.216-227
Cross Examination by Mr. Wise  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.227-232
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.232-233
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.233-234

**VOLUME XI - CONTINUED**

DARRELL SISK

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.237-240
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.240-248
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.248

JERRY BAUERSACHS

Direct Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.252-257
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.257-264
Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . . p.265-267

MICHAEL HARBERTS

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.268-340

**VOLUME XII**

Report of Proceedings on the Motion to Suppress Hearing before the Honorable Gerald Dehner on January 30, 1996:

Witness:

MICHAEL HARBERTS

Further Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . p.345-356
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.356-406
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.407-418
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.418-419

GLENDA ASHWORTH

Direct Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.423-434
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.434-442
Redirect Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.442-445
Recross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.445
Further Redirect Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . p.445
Futher Recross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . p.446

**VOLUME XII - CONTINUED**

JON R. MORGAN

Direct Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.447-485
Cross Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.485-518
Redirect Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.519-525
Recross Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . p.525-527

**VOLUME XIII**

Report of Proceedings on the Motion to Suppress Hearing before the Honorable
Gerald Dehner on January 31, 1996:

Witness:

ROBERT E. CHAPMAN, M.D.

Direct Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.530-556
Cross Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.557-598
Redirect Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.598-610
Recross Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . p.610-616
Further Redirect Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . p.616-617

THOMAS EDWARD BRYANT

Direct Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.620-640
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.640-663
Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . p.663-672
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.673-674
Further Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . p.674-675

NANCY WILKINSON

Direct Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.676-680
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.680-685
Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . p.686

## VOLUME XIII - CONTINUED

KIMBERLY BALL

Direct Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.687-696
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.696-704
Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.705-706
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.706

## VOLUME XIV

Report of Proceedings held before Judge Gerald Dehner on August 26, 1996.

Jury Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.1-143

## VOLUME XV

Report of Proceedings held before Judge Gerald Dehner on August 27, 1996.

Jury Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.144-355

## VOLUME XVI

Report of Proceedings held before Judge Gerald Dehner on August 29, 1996.

Jury Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.356-553

## VOLUME XVII

Report of Proceedings held before Judge Gerald Dehner on August 30, 1996.

Jury Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.554-747

## VOLUME XVIII

Report of Proceedings held before Judge Gerald Dehner on September 3, 1996.

Jury Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.748

## VOLUME XIX

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 4, 1996.

## VOLUME XX

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 4, 1996.

Witness:

Opening Statement by Mr. Workman .................................. p.260
Opening Statement by Mr. Wise ..................................... p.279

DOUGLAS KEITH CEARLOCK

Direct Examination by Mr. Huyett .................................. p.303

JASON WADE

Direct Examination by Mr. Huyett .................................. p.307
Cross Examination by Mr. Metnick .................................. p.313

## VOLUME XXI

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 6, 1996.

Witness:

JEREMIAH ROBERT NEWHOUSE

Direct Examination by Mr. Huyett .................................. p.336
Cross Examination by Mr. Metnick .................................. p.340

TIM KEARNS

Direct Examination by Mr. Workman ................................. p.346
Cross Examination by Mr. Metnick .................................. p.381
Redirect Examination by Mr. Workman .............................. p. 398
Recross Examination by Mr. Metnick ............................... p.399

CHARLES GUNNING

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.402
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.410

JOAN BARENFANGER

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.433

VICTOR LARY

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.443
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.453

RODNEY E. WAMSLEY

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 455
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.480
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 485

## VOLUME XXII

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 9, 1996.

Witness:

ROBERT L. SPICKARD

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 495
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 502
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 506

MICHAEL HARBERTS

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 507
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 558
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 637
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 667
Further Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . p. 673

## VOLUME XXIII

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 10, 1996.

Witness:

JON R. MORGAN

Direct Examination by Mr. Metnick .................................. p.  704
Cross Examination by Mr. Huyett ................................... p.  811
Redirect Examination by Mr. Metnick .............................. p.  908
Recross Examination by Mr. Huyett ............................... p. 924

## VOLUME XXIV

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 11, 1996.

Witness:

JENNIE GOLDEN

Direct Examination by Mr. Metnick ............................... p. 10 - 15
Cross Examination by Mr. Workman ............................... p. 15 - 20
Redirect Examination by Mr. Metnick ............................. p. 20 - 24

THOMAS FUNK

Direct Examination by Mr. Metnick ............................. p. 24 - 30
Cross Examination by Mr. Huyett ................................ p. 30 - 32

OFFICER RICH MONTCALM

Direct Examination by Mr. Metnick ............................. p. 32 - 35

BARBARA BLAUM

Direct Examination by Mr. Metnick ............................. p. 36 - 55
Cross Examination by Mr. Huyett ................................ p. 56 - 59
Redirect Examination by Mr. Metnick ............................ p. 59 - 61

## VOLUME XXIV - CONTINUED

ROE MORGAN

Direct Examination by Mr. Wise ................................... p. 75 - 79
Cross Examination by Mr. Workman ................................. p. 80

## E X H I B I T S

Exhibit No.                                                    Admitted

Defendant's Exhibit No. 24 ........................................ p. 82

## VOLUME XXV

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 13, 1996.

Witness:

DR. STUART N. HART

Direct Examination by Mr. Metnick ............................. p. 136-142
Cross Examination by Mr. Huyett ............................... p. 142-158
Redirect Examination by Mr. Metnick ........................... p. 158-209
Recross Examination by Mr. Huyett ............................. p. 212-325

## VOLUME XXVI

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 16, 1996.

Witness:

DR. STUART HART

Redirect Examination by Mr. Metnick ........................... p. 329-395
Recross Examination by Mr. Huyett ............................. p. 395-431
Further Redirect Examination by Mr. Metnick ................... p. 431-439
Further Recross Examination by Mr. Huyett ..................... p. 439-445
Further Redirect Examination by Mr. Metnick ................... p. 445-448
Further Recross Examination by Mr. Huyett ..................... p. 448-449
Further Redirect Examination by Mr. Metnick ................... p. 449-451

Direct Examination by Mr. Metnick (Offer of Proof) ................ p. 451-455
Cross Examination by Mr. Huyett (Offer of Proof) ................. p. 455-460

STEVE POWELL

Direct Examination by Mr. Wise .................................. p. 467-471
Cross Examination by Mr. Huyett ................................ p. 471-473

ANDY RHODES

Direct Examination by Mr. Wise ................................. p. 473-475
Cross Examination by Mr. Huyett ............................... p. 475-484

S.M. DAVIS

Direct Examination by Mr. Workman ........................... p. 484-489
Cross Examination by Mr. Wise ................................ p. 489- 492

JAMES E. VIPOND

Direct Examination by Mr. Huyett .............................. p. 492-497
Cross Examination by Mr. Wise ................................ p. 497-502
Redirect Examination by Mr. Huyett ............................. p. 503

ERIC GILL

Direct Examination by Mr. Huyett .............................. p. 503-509
Cross Examination by Mr. Wise ................................ p. 509-513
Redirect Examination by Mr. Huyett ............................ p. 513-514

ANDREW BALL

Direct Examination by Mr. Huyett .............................. p. 515-520
Cross Examination by Mr. Wise ................................ p. 521-526
Redirect Examination by Mr. Huyett ........................... p. 526-528
Recross Examination by Mr. Wise .............................. p. 529-530

## VOLUME XXVII

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 17, 1996.

Witness:

ROGER GILL

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 575-582

JAMES CREAGER

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 582-585
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 585-586
Redirect Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 586

DR. PHILIPP E. BORNSTEIN

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 587-623
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 623-772
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 772-808
Recross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 809-820

## VOLUME XXVIII

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 18, 1996.

Witness:

STEVE POWELL

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 841-847
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 848-853
Redirect Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 853-858
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 858-860

THOMAS E. BRYANT

Direct Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 860-876
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 876-897

## VOLUME XVIII - CONTINUED

Redirect Examination by Mr. Workman . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 897-903
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 903-904

GLEN SCHUBERT

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 905-920
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 920-945
Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 945-951
Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 951-953
Further Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . p. 953-954
Further Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . p. 954-955
GLEN SCHUBERT (Continued)

Further Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . p. 955
Further Recross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . p. 955-956
Further Redirect Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . p. 956-957

DR. ROBERT E. CHAPMAN

Direct Examination by Mr. Huyett on Rebuttal . . . . . . . . . . . . . . . . . . . . . . p. 958-960
Cross Examination by Mr. Metnick on Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . p. 960
Direct Examination by Mr. Metnick (Offer of Proof) . . . . . . . . . . . . . . . . . p. 963-969
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 969-971
Direct Examination by Mr. Metnick on surrebuttal . . . . . . . . . . . . . . . . . p. 1005-1052
Cross Examination by Mr. Huyett on surrebuttal . . . . . . . . . . . . . . . . . . p. 1052-1065
Redirect Examination by Mr. Metnick on surrebuttal . . . . . . . . . . . . . . . p. 1065-1067

## E X H I B I T S

Exhibit No.                                                        Admitted

Defendant's Exhibit Nos. 68 and 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 957

## VOLUME XXIX

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 19, 1996.

Witness

None

## VOLUME XXX

Report of Proceedings of the trial held before Judge Gerald Dehner and Jury on September 20, 1996.

Witness:

None

### E X H I B I T S

| Exhibit No. | Marked | Admitted | Denied |
|-------------|--------|----------|--------|
| Court's #1 | 144 | | |
| Court's #2 | 155 | | |

## VOLUME XXXI

### APPEAL RECORD

VERDICTS AT JURY TRIAL

## VOLUME XXXII

### APPEAL RECORD

Hearing on Post Trial Motions and Sentencing Hearing Held on November 25, 1996

Arguments on Motions

Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 5-17

Appendix Page -28-

## VOLUME XXXII - CONTINUED

Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 17-19

Court's Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 19-20

Witness:

MICHAEL HARBERTS

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 22-31
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 31-38

Witness:

DOUGLAS CEARLOCK

Direct Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 48-60
Cross Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 60-61

MICHELLE HOBBS

Direct Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 62-67
Cross Examination by Mr. Huyett          . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 67-70

LOUISE JONES

Direct Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 71-78
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 78-79

ARTHUR JONES

Direct Examination by Mr. Metnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 80-83
Cross Examination by Mr. Huyett      . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 83-84

JOAN LEVI

Direct Examination by Mr. Wisé . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 84-89
Cross Examination by Mr. Huyett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 90-91

## VOLUME XXXII - CONTINUED

### BRENDA DECKER

Direct Examination by Mr. Metnick ................................. p. 92-106
Cross Examination by Mr. Huyett ................................. p. 106-110

### CHERYL CONSTABLE

Direct Examination by Mr. Metnick ............................... p. 111-118

### ROE MORGAN

Direct Examination by Mr. Metnick ............................... p. 122-124
Cross Examination by Mr. Huyett ................................. p. 124-128

### GLENDA ASHWORTH

Direct Examination by Mr. Wise ................................. p. 128-133
Cross Examination by Mr. Huyett ................................. p. 133-146

THE DEFENDANT IN ALLOCUTION ............................ p. 147-148

Arguments:

Mr. Huyett ................................................. p. 153-170
Mr. Wise ................................................. p. 172-191
Mr. Metnick ............................................... p. 191-202
Mr. Huyett ................................................. p. 202-211

Sentencing by the Court ................................... p. 211-214

## SUPPLEMENT TO RECORD ON APPEAL

### SUPPLEMENT VOLUME I

| Date | Document | Page |
|------|----------|------|
| 8/29/97 | Certification of Supplement to the Record ........................ | C1 |
| 4/28/95 - | | |
| 3/22/96 | Record/Docket Sheets Re: Logan County Case No. 95-J-39 ............ | C2 |

4/28/95    Petition for Adjudication of Wardship ........................... C10

4/28/95    Motion for Appointment of Psychiatrist .......................... C13

4/28/95    Order for Examination ......................................... C15

4/28/95    Clerk's Certificate of Mailing .................................. C16

4/28/95    Order for Transport .......................................... C17

4/28/95    Clerk's Certificate of Mailing .................................. C18

4/27/95    Affidavit of Officer Tim Kerns for Search Warrant ................ C19

4/28/95    Summons to Jon R. Morgan .................................... C21

4/28/95    Summons to Roe Morgan ...................................... C23

4/28/95    Summons to Glenda Ashworth ................................. C25

4/28/95    Summons to Glenda Ashworth ................................. C27

4/28/95    Petition for Adjudication of Wardship .......................... C28

5/2/95     Amended Petition for Adjudication of Wardship ................... C31

5/2/95     Subpoena Duces Tecum to Memorial Medical Center ............... C34

5/2/95     Motion for Social Investigation Report .......................... C35

5/2/95     Motion for Special Detention Condition ......................... C37

5/2/95     Notice of Hearing on Motion for Social Investigation Report ........ C38

5/3/95     Complaint for Search Warrant .................................. C39

           Search Warrant dated April 27, 1995 ........................... C40

           Affidavit of Officer T. Kerns for Search Warrant .................. C41

5/3/95     Petition for Transfer from Juvenile Court to Criminal Court .......... C43

5/3/95     Motion to Continue Petition for Transfer ......................... C46

5/3/95     Subpoena Duces Tecum to Lincoln Community High ............... C49

5/11/95    Subpoena Duces Tecum to Timothy Huyett ....................... C50

5/12/95    Summons to Jon R. Morgan .................................... C51

5/12/95    Summons to Glenda Ashworth ................................. C53

5/16/95    People's Proof of Service ...................................... C55

5/22/95    Motion for Additional Psychiatric Examination ................... C56

## SUPPLEMENT VOLUME I-Continued

| Date | Document | Page |
|------|----------|------|
| 5/23/95 | Subpoena Duces Tecum to Lincoln Community High | C59 |
| 5/23/95 | Notice of Hearing on Motion for Additional Psychiatric Exam | C61 |
| 5/24/95 | Order for Transportation | C62 |
| 5/24/95 | Clerk's Certificate of Mailing | C63 |
| 5/31/95 | Motion for Medical Treatment and Care | C64 |
| 5/31/95 | Notice of Hearing for Motion for Medical Treatment and Care | C67 |
| 5/31/95 | Subpoena to Pastor Thomas Bryant | C68 |
| 5/31/95 | Subpoena to Steve Powell | C69 |
| 5/31/95 | Subpoena to Sgt. Darrell Sisk | C70 |
| 5/31/95 | Subpoena to Deputy Robert Spickard | C71 |
| 5/31/95 | Entry of Appearance by Barbara R. Van Tine on behalf of Roe Morgan | C72 |
| 6/1/95 | Subpoena to Pastor S.M. Davis | C73 |
| 6/2/95 | Subpoena to Eric Gill | C76 |
| 6/3/95 | Respondent Minor's Trial Brief Regarding Transfer Hearing | C77 |
| 6/5/95 | Mary Davis Detention Home Medical History & Physical of Jon R. Morgan | C95 |
| 6/9/95 | Affidavit of Services Rendered by Guardian Ad Litem and Motion for Same by Donald Behle | C96 |
| 6/30/95 | Affidavit and Motion for Partial Payment of Attorney Fees by Thomas W. Funk | C98 |
| 6/30/95 | Order for Partial Payment of Attorney Fees | C99 |
| 8 /22/95 | Affidavit and Motion for Partial payment of Attorney Fees by Thomas W. Funk | C100 |
| 9/23/95 | Order for Partial Payment of Attorney Fees | C101 |
| 9/19/95 | Affidavit and Motion for Partial payment of Attorney Fees by Thomas W. Funk | C102 |

## SUPPLEMENT VOLUME I-Continued

| **Date** | **Document** | **Page** |
|---|---|---|
| 9/20/95 | Order for Partial Payment of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . | C103 |
| 10/1/95 | Motion to Reconsider Ruling Regarding Transfer . . . . . . . . . . . . . . . . . . | C104 |
| 10/25/95 | Affidavit and Motion for Partial Payment of Attorney Fees | |
| | by Thomas W. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C108 |
| 11/1/95 | Order for Partial Payment of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . | C109 |
| 12/21/95 | Motion to Strike Motion to Reconsider . . . . . . . . . . . . . . . . . . . . . . . . . | C110 |
| 12/4/95 | Affidavit and Motion for Partial Payment of Attorney Fees | |
| | by Thomas W. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C112 |
| 12/24/95 | Order for Partial Payment of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . | C113 |
| 3/19/96 | Affidavit and Motion for Partial Payment of Attorney Fees | |
| | by Thomas W. Funk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C114 |
| 9/23/95 | Order for Partial Payment of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . | C115 |

## SUPPLEMENT VOLUME  II - EXHIBITS

| **Exhibit #** | **Document** |
|---|---|
| People's #2 | Interview of Jon R. Morgan dated April 27, 1995 |
| People's #4 | Autopsy Report of Lila Cearlock |
| People #5 | Autopsy Report of Marion Keith Cearlock |
| People's #11 | Photo |
| People's #10 | Photo |
| People's #12 | Photo |
| People's #13 | Photo |
| People's #15 | Grant of Guardianship and Custody |
| Respondent's #1 | Letter from Pastor Bryant to Lincoln Community High School |
| Respondent's #2 | Report of Dr. Robert E. Chapman dated May 26, 1995 |

## SUPPLEMENT VOLUME II - EXHIBITS-CONTINUED

| **Exhibit #** | **Document** |
| --- | --- |
| Respondent's #3 | Logan County Sheriff's Department Incident Report dated April 27, 1995 |
| Respondent's #4 | Custody/Visitation Order dated 6/23/89 |
| Respondent's #5 | Interview of Matthew Johnson dated 5/29/95 |
| Respondent's #6 | Interview of Steve Powell dated 5/20/95 |
| (Unmarked) | Discharge Summary from Psychiatric Institute of Richmond, Inc. dated 3/29/87 |
| (Unmarked) | Letter from Ronald B. David, M.D. Children's Neurological Services, To Wesley B. Carter, M.D., dated 4/11/86 |
| (Unmarked) | Instructional Summary from Psychiatric Institute of Richmond, Inc., Dated 5/1/86 |
| (Unmarked) | Psychological Evaluation by Joseph J. Crowley, Ph.D., P.C. |
| (Unmarked) | Psychological Evaluation by Gail C. McGinnes, M.A., dated 12/4/85 |
| (Unmarked) | Social Investigation Report by Logan County Probation Office |

## SUPPLEMENT VOLUME III

Report of Proceedings of Motion to Suppress before the Honorable Gerald Dehner held on February 22, 1996.

Witness:

RICHARD BALL

Direct Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 4-9
Cross Examination by Mr. Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 9-14
Redirect Examination by Mr. Schoenbein . . . . . . . . . . . . . . . . . . . . . . . . . p.14-16

## SUPPLEMENT VOLUME III-CONTINUED

### DARRELL SISK

Direct Examination by Mr. Wise .................................... p. 17-19
Cross Examination by Mr. Schoenbein ............................... p. 19-20
Redirect Examination by Mr. Wise .................................. p. 20-23
Further Cross Examination by Mr. Schoenbein ....................... p. 22-23
Further Redirect Examination by Mr. Wise .......................... p.23

### GLENDA ASHWORTH

Direct Examination by Mr. Wise .................................... p.24-28
Cross Examination by Mr. Huyett .................................. p.28-30

### MICHAEL HARBERTS

Direct Examination by Mr. Wise .................................... p.30-33
Cross Examination by Mr. Schoenbein ............................... p.33-34
Redirect Examination by Mr. Wise .................................. p. 35
Recross Examination by Mr. Schoenbein ............................. p.35-36
Further Redirect Examination by Mr. Wise .......................... p. 36

### KIMBERLY BALL

Direct Examination by Mr. Wise .................................... p.37-38
Cross Examination by Mr. Schoenbein ............................... p. 38-41

Closing Argument by Mr. Schoenbein ................................ p.45-73
Closing Argument by Mr. Wise ...................................... p.73-121
Reply by Mr. Huyett .............................................. p.121-140

## SUPPLEMENT VOLUME IV- EXHIBITS

| **Date** | **Document** |
|---|---|
| 1/30/96 | People's Exhibit No. 1 (Lincoln Community High School documents) |
| (Undated) | People's Exhibit No. 8 (Interview of Jon Morgan dated April 27, 1995, at 11:07 a.m. by Detective Harberts) |
| (Undated) | People's Exhibit No. 10 (Interview of Jon Morgan at 1206 7th Street, |

## SUPPLEMENT VOLUME IV- EXHIBITS-CONTINUED

| **Date** | **Document** |
|---|---|
| (Undated) | People's Exhibit No. 10 (Interview of Jon Morgan at 1206 7th Street, Lincoln, Illinois by Detective Harberts) |
| (Undated) | People's Exhibit No. 15 - Grant of Guardianship and Custody |
| (Undated) | People's Exhibit No. 16 - Park Meadows Baptist School Social Studies Book |
| 1/31/96 | Defendant's Exhibit No. 3 (Juvenile Offenders/Diversion Program) |
| (Undated) | People's Exhibit (Offer of Proof #1 - Lila Cearlock Autopsy) |
| (Undated) | People's Exhibit (Offer of Proof #2 - M. Keith Cearlock Autopsy) |
| 5/16/96 | People's Exhibit #1 - Motion to Exclude Evidence |
| 5/16/96 | People's Exhibit No. 2 - Fax Cover Sheet and Dr. Stuart Hart letter of 5/13/96 |
| 5/16/96 | People's Exhibit No. 3 - Curriculum Vitae of Richard E. Bisbing |
| (Undated) | People's Exhibit A - Dr. Stuart Hart letter of 5/13/96 |
| (Undated) | People's Exhibit B. - Letter from D. Peter Wise to Tim Huyett dated 8/15/96 |

IN THE CIRCUIT COURT
FOR THE ELEVENTH JUDICIAL CIRCUIT OF ILLINOIS
LINCOLN, LOGAN COUNTY, ILLINOIS

IN THE INTEREST OF:                    )
                                       )
   JON R. MORGAN                       )    Case No. 95 J 39
                                       )



### PETITION FOR TRANSFER FROM JUVENILE COURT
### TO CRIMINAL COURT

NOW COME the People of the State of Illinois by Timothy J. Huye

State's Attorney in and for the County of Logan, State of Illinois,

moving this Honorable Court to Transfer the above-captioned juvenile

matter from Juvenile Court to Criminal Court pursuant to 705 ILCS

405/5-4(3)(b) for further proceedings, and in support thereof states

follows:


1.   The minor, Jon R. Morgan, is alleged to be a delinquent min

reason of the first degree murder of Lila Cearlock and the first deg

murder of Keith Cearlock in a delinquency petition originally filed

this court on April 28, 1995 as amended on May 2, 1995.


2.   Sufficient evidence for said crimes exists such that the St

believes it can obtain an indictment for the aforementioned first de

murders.


3.   The first degree murders referred to were committed in an

aggressive and premeditated manner.



A-37

4.  The minor was born on August 20, 1980, and, therefore, was 14 years, 8 months of age when the alleged offenses were committed.

5.  The minor has no previous juvenile justice history known to the State.

6.  There are no facilities particularly available to the juvenile court for the treatment and rehabilitation of the minor.

7.  The best interest of the minor and the security of the public require that the minor continue in custody or under supervision for a period extending beyond his minority.  If convicted as charged in adult criminal court, the minor would face a mandatory natural life sentence in the Illinois Department of Corrections.

8.  The minor possessed a deadly weapon, a pistol, when committing the offenses of first degree murder.

WHEREFORE, the Petitioner respectfully prays this Court transfer this matter from Juvenile Court to Criminal Court for further proceedings and in accordance with criminal laws of the State of Illinois.

_____
Timothy J. Huyett, State's Attorney

A-38

44

Timothy J. Huyett
Logan County State's Attorney
Room 31, Courthouse
Lincoln, IL 62656
(217) 732-2184

## VERIFICATION

I, Timothy J. Huyett, being first duly sworn on oath state that information set forth in the within Petition are true to the best of knowledge and belief.

*T H Huyett*

Subscribed and sworn to before me this 3 day of May, 1995.

*Dianne K Ruff*
Notary Public

> "OFFICIAL SEAL"
> Dianne K. Ruff
> Notary Public State of Illinois
> My Commission Expires 4/13/96

## PROOF OF SERVICE

The undersigned certifies that a true and accurate copy of the foregoing Petition for Transfer From Juvenile Court to Criminal Court was hand delivered to the attorney of record this 3rd day of May, 1995.

*T H Huyett*

A-39

1              IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

2                            LOGAN COUNTY, ILLINOIS

3

4      IN THE INTEREST OF              )
                                       )
5      JON R. MORGAN,                  )
                                       )   No. 95-J-39
6          a Minor.                    )

7                          *4-96-0996*

8                              APPEAL

9                            VOLUME III

10            REPORT OF PROCEEDINGS had on the TRANSFER HEARING,

11     before the Honorable DAVID L. COOGAN, on the 3rd day

12     of JUNE, 1995.

13         APPEARANCES:                *VOL. VIII*

14            MR. TIMOTHY HUYETT,
                 Assistant State's Attorney of Logan County,
15               for the People of the State of Illinois;

16            MR. THOMAS FUNK,
                 Attorney at Law,
17               for the Minor;

18            MS. BARBARA VAN TINE,
                 Attorney at Law,
19               for the father;

20            MR. DONALD BEHLE,
                 Attorney at Law,
21               for the mother.

22

23     Valerie A. Lee, CSR
       Logan County
24     Lincoln, Illinois 62656

FILED

AP─ -2 1997

Clerk of the
Appellate Court, 4th Dist.

JAN 16 1997

A-40

1    the gun was, and he did it.   That is exactly in a cold

·2    blooded calculated premeditated manner consequent to the

3    preconceived plan.   One, he thought about a scheme and he

4    finished it.   You don't take a human life by unlawful

5    means.   That is it.

6                    Judge, I can say a lot of other things.   I

7    will leave those for the court.   Thank you, your Honor.

8                THE COURT:   This has certainly been an

9    interesting case.   The 28 years I have been an attorney I

10   have not been involved in an alleged double homicide.   As

11   public defender back numerous years ago I did represent a

12   murder client that went to a jury trial, but these were not

·13  everyday affairs obviously.   Ten and a half years I have

14   been on the bench I have never had a transfer hearing where

15   it has been requested that a juvenile be transferred to the

16   Adult Division to be tried as an adult.

17                   I have taken fairly extensive notes of the

18   testimony in this particular case.   Some things stand out

19   in my mind more than others.   I don't think anyone who

20   listened to this case can say that this is not a major

21   tragedy.   We have a young man 14 years old.   His parents

22   were unable and unwilling to take care of him.   The

23   grandparents were assuming the role of parents.   It is

24   fairly common in today's society, but the children need

1    their parents as well as their grandparents to survive, and

2    they are not interchangeable units.   They provide different

3    services for offspring and grandchildren, and Jon may very

4    well have been short changed in his life.

5              Some of the things that stand out in my mind

6    in this particular case is the testimony when Detective

7    Harberts was testifying as to when Jon Morgan was talking to

8    him at the police station as to what occurred, and what my

9    quote was, "they pissed me off.   I couldn't take it any

10   more."   And that is the reason Jon gave for shooting the

11   grandparents, and I also had written out that Jon said,

12    "thought of shooting the grandparents or other people."

13   And I believe the detective asked him after that well, if

14   people made you mad, would you want to kill them.   Well, he

15   said if you did it several times, I may want to kill you.

16   So, it is that one statement that kind of sticks out in my

17   mind.

18              Other parts of the notes that I took when

19   Superintendent Bryant or Pastor Bryant, the superintendent

20   of the school, testified that he had expelled Jon or

21   suspended him from school and the other children came and

22   asked him to relent and let Jon come back.   So, evidently

23   Pastor Bryant did relent and said Jon, you can come back,

24   and Jon changed his mind.   "I have been hurt all my life and

1    I will do the hurting," and that is a quote.  That is a

2    quote that Bryant stated that Jon had said.

3                Further he told Pastor Bryant, when Jon left

4    the school, that "I will do every sin, whatever I want.

5    When I hit rock bottom, then I will turn to God."  Well, all

6    of us have to turn to God at various times in our lives

7    hopefully not when we hit rock bottom.  This is a case where

8    this young man has hit rock bottom.

9                The enormity of this crime, the alleged

10   crime, cannot be underestimated.  We have two people who

11   are now dead.  We have a young man who is 14 years, 8

12   months and a few days accused of this crime.  The purpose

13   of the juvenile transfer hearing is to determine the proper

14   forum in which a trial of a juvenile should be held.  It is

15   not a determination of guilt or innocence.  This is not, in

16   fact, a trial.  The standard of proof that is proved in the

17   transfer hearing is simply probable cause.  It is not

18   beyond a reasonable doubt.  The court must be convinced

19   probable cause exists to transfer the minor.

20               There are seven different factors that are

21   set forth in the statute, and as People versus Clark and

22   these other cases expound upon, there is also an eighth

23   factor.  The possible sentence if the minor stood convicted

24   in the General Division Court should also be a factor, even

1    though, it is not set forth specifically in the statute.

2    The courts are pretty uniformly set it is not necessary tha

3    all the factors be resolved against a juvenile in order to

4    allow a transfer.  Equal weight need not be given to all th

5    factors and no single factor is depositive.

6              Going down through the factors in this

7    particular case the court has considered whether or not the

8    grand jury would be expected to return an indictment.  That

9    is pretty much a given.  I believe they would.

10             Second factor is whether or not there is

11   evidence that the alleged offense was committed in an

12   aggressive and premeditated manner.  There has been much

13   talk here about aggressiveness and premeditated manner.  Was

14   this a premeditated act or was it not?  The court is

15   definitely going to find it was aggressive.  The court is,

16   I believe, is convinced by a preponderance of probable cause

17   that it was a premeditated act also.  He talked about

18   killing his grandparents in the past and the grandparents

19   did end up dead at his hands, and the court is going to find

20   that it was in a premeditated manner.

21             The third factor is the age of the minor.

22   If the minor were four months older at the time of this

23   alleged offense, we wouldn't be having a transfer hearing.

24   It would be an automatic.  The case would be in the adult

447

A-44

1    division, but the minor is 14 years, 8 months.

2              Next factor to be considered is the previous

3    history of the minor.   We have considered the minor's

4    background.   He has had a very unusual life and it looks

5    like a sad life, and he was shuffled back and forth between

6    his mother and grandparents, not having contact with his

7    natural father on any meaningful basis.   He has had

8    psychiatric problems with Attention Deficit Disorder.   That

9    unfortunately was not followed through by the parents to

10   make sure that his medication was continued and continued to

11   get treatment.   That was at the age of five and six, and he

12   is now 14.   That is something that others failed Jon by not

13   following through on.

14              The next factor is whether or not there is

15   facilities particularly available to the juvenile court for

16   the treatment and rehabilitation of the minor.   As Mrs.

17   Turner has testified here today, and the court is well

18   aware, I don't believe there are any unique facilities

19   particularly available to the juvenile that are not

20   available to an adult.   In fact, if the minor were

21   transferred over and did stand convicted in an adult court,

22   he would go into the Juvenile Division to begin with

23   anyway.

24              The last or the sixth item is whether or not

1   it is in the interest of the minor and the security of

2   public to require the minor to continue in custody pas

3   majority time.   That is an interesting type situation

4   here.  We have had a lot of argument whether or not th:

5   young man could be rehabilitated in the six years, fou:

6   months in the time he would have to be released if he s

7   convicted.  In a juvenile conviction at age 21 he woulc

8   released.  If he was not rehabilitated, he would be rel

9   anyway.  He would be out.  There would be no continued

10   supervision beyond age 21 if the minor went through the

11   juvenile court.

12                The last statutory element is whether or

13   the minor had a deadly weapon committing the offense.

14   Well, that is given.  He did.   The purpose of any tran

15   proceeding again is to balance the best interest of the

16   alleged juvenile offender against society's legitimate

17   interest in being protected from criminal victimization

18   perpetrated by the minor.   That is what we are here fo:

19   today.  That is a balancing test.  I mean to balance the

20   interest of society against the interest of Jon Morgan t

21   determine whether or not it is in the best interest of

22   society here to be protected from Jon Morgan past his 21

23   birthday or it is in Jon Morgan's best interest to stay

24   the juvenile division and the court have no further cont

A-46

1    with him after age 21.    This certainly has not been an easy

2    decision.    These are not decisions that the court desires

3    to make and seek out.    This is part of my job and I do it

4    and try to take all these factors into consideration.

5              The court is going to rule that after

6    considering the statutory factors as well as being well

7    aware that if the minor stood convicted of a couple first

8    degree murders, that his sentence of mandatory imprisonment

9    would be imposed.    The court is in the opinion it is in the

10   best interest of the public that the minor be transferred to

11   the adult division to be treated as an adult on this

12   particular, these particular offenses.    Thank you.

13            MR. HUYETT:    Your Honor, with that in mind I

14   think the last thing we need to do as I read the statute,

15   these matters will be discharged as a practical matter.    I

16   anticipated perhaps, at least I didn't want to be cut short,

17   I prepared two charges of First Degree Murder, and I tender

18   them to the clerk and ask to create a file and ask that the

19   court bind him over on a finding of probable cause pursuant

20   to the felony court file and direct that he be transferred

21   to Judge Dehner's courtroom.    I believe 9:00 o'clock Monday

22   his secretary indicated to me would be available for a first

23   appearance status on that.    That would be the People's

24   recommendation that it be without bond at this time given

IN THE CIRCUIT COURT
FOR THE ELEVENTH JUDICIAL CIRCUIT OF ILLINOIS
LOGAN COUNTY, ILLINOIS

FILI

PEOPLE OF THE STATE OF ILLINOIS,        )
                                        )
        Plaintiff,                      )
                                        )
- vs -                                  )        NO.  95-CF-101
                                        )
JON MORGAN,                             )
                                        )
        Defendant.                      )

JAN 12

*Carle L*
Clerk of the C
Logan Count

## AMENDED MOTION TO SUPPRESS

NOW COMES the defendant, JON R. MORGAN, by his attorneys METNICK, WISE, CHERRY & FRAZIER, and moves to suppress statement made to the police and the fruits thereof and as grounds for sai motion states as follows:

1.    On April 27, 1995, near 1206 7th Street, Lincoln Illinois, Jon Morgan approached Deputy Robert Spickard of th Logan County Sheriff's department who was investigating a shootin at the above referenced address.

2.    After approaching Deputy Spickard, Jon Morgan hande the deputy a firearm and shells stating that he was involved i the shooting.

3.    Deputy Spickard took Jon Morgan into his custody an then walked over to Officer Michael Harberts of the Lincol Police Department, who was at the above referenced addres investigating the shooting that had occurred.

4.    Deputy Spickard made Officer Harberts aware of th statements Jon Morgan had made to him concerning his [Morgan's involvement in the shooting.

-1-

A-48

5.    While Jon Morgan was in the custody of these officers, Officer Harberts asked Jon Morgan questions concerning the shootings which were designed to elicit incriminating responses and were reasonably likely to elicit incriminating responses.

6.    Jon Morgan's response to Officer Harberts questions was incriminating.

7.    Prior to asking Jon Morgan questions concerning the offense, neither Deputy Spickard nor Officer Harberts advised him of his rights pursuant to <u>Miranda v. Arizona</u>

8.    Prior to asking Jon Morgan questions concerning the offense, neither Deputy Spickard nor Officer Harberts made any attempt to notify Jon Morgan's parents or any other person legally responsible for his care to tell them that Jon Morgan had been taken into custody and where he was being held; nor did these officers take Jon Morgan without unnecessary delay to the nearest juvenile police officer designated for such purposes in the county of venue nor did they surrender Jon Morgan to a juvenile police officer in the city of Lincoln where the offense was alleged to have been committed.

9.    Jon Morgan did not have the opportunity to consult with his parents or an attorney or any other person prior to these officers questioning him concerning the shooting that they were investigating.

10.    The statements Jon Morgan made to Officer Harberts in response to his questions were not voluntary.

11.    After his contact with Deputy Spickard and Officer

-2-



A-49

Harberts at 1206 Seventh Street, Lincoln, Illinois, Jon Morgan was transported to the Logan County Safety Complex where he was again questioned by Officer Michael Harberts of the Lincoln Police Department.

12.   Prior to questioning at the Logan County Safety Complex, neither Officer Harberts nor any other law enforcement officer made any reasonable attempt to notify Jon Morgan's parents or any other legally responsible for his care to tell them that Jon Morgan had been taken into custody and where he was being held; nor did any law enforcement officer take Jon Morgan without unnecessary delay to the nearest juvenile police officer designated for such purposes in the county of venue nor did they surrender Jon Morgan to a juvenile police officer in the city of Lincoln where the shootings that were being investigated were alleged to have been committed.

13.   Prior to questioning at the Logan County jail, Jon Morgan was not read his rights pursuant to <u>Miranda v. Arizona</u>.

14.   When Jon Morgan was read his rights pursuant to <u>Miranda v. Arizona</u>, he did not voluntarily, knowingly and intelligently waive his <u>Miranda</u> rights.

15.   At the time Jon Morgan was questioned by Officer Harberts at the Logan County Safety Complex, he had been arrested and was held in a jail cell prior to the questioning. He was questioned in the presence of at least one armed uniformed police officer and had not had the opportunity to consult with his parents, an attorney or a juvenile officer.

-3-

A-50

16.    The   nature   of the  questioning  was   inherently cooercive.

17.    The ongoing interrogations  of Jon Morgan were part of a  pattern  of  police  attempts  to  question  him  without  prior parental  counseling or without prior  counseling  by  a  juvenile police officer.

18.    Law  enforcement officers subjected Jon Morgan to the type of questioning  that  would  be conducted on the suspect of a crime without special regard for his youth.

19.    The  statements  Jon  Morgan  made  in  response  to questions by law enforcement officers  at  the Logan County Safety Complex were not voluntary. Any statements  along with any fruits of these statements should be suppressed.

20.    On April 28, 1995, at approximately 1:10 a.m., at 1206 Seventh  Street,  Lincoln,  Illinois,  Jon Morgan  was  questioned, again,  by  law enforcement officers  including John  Bunner  and Michael Harberts  while in the process of "reenacting" the alleged shooting while this  reenactment  was  being  recorded  by a video camera which had both video and audio capabilities.

21.    Prior to this questioning, no law enforcement  officer had  made  a reasonable attempt to notify Jon Morgan's parents  or any other person  legally  responsible  for  his care to tell them that Jon Morgan had been taken into custody and where he was being held, nor had any law enforcement officer taken Jon Morgan without unnecessary  delay  to  the  nearest  juvenile  police  officer designated for such purposes  in  the county of venue nor did they

-4-

A-51

surrender Jon Morgan to a juvenile police officer in the city of Lincoln, Illinois, where the alleged offense occurred.

22.   Law enforcement officials subjected Jon Morgan to the type of questioning that a suspect of a crime would undergo without special regard for his youth.

23.   This so-called "reenactment" was an ongoing interrogation which was part of a pattern of police attempts to question Jon Morgan without prior parental counseling or without the benefit of counseling by a juvenile police officer.

24.   Any statements that Jon Morgan made during this reenactment were not voluntary.

25.   These statements, along with any fruits of these statements, should be suppressed.

WHEREFORE, the defendant, JON MORGAN, prays that this Honorable Court enter an order suppressing all statements made to law enforcement officials and, additionally, the defendant prays for an order suppressing all fruits obtained from the illegal questioning of Jon Morgan.

Respectfully submitted,

JON R. MORGAN, Defendant

By: _D. Peter Wise_
One of His Attorneys

D. PETER WISE (6187876)
METNICK, WISE, CHERRY & FRAZIER
Attorneys at Law
Suite 410 Myers Building
One West Old State Capitol Plaza
P.O. Box 12140
Springfield, IL  62791

-5-

A-52



ADDITIONAL RECORD SHEET

Case No. ___95 CF 101___

Nature of Case ___People -v- Morgan___


3-4-96  GGD          With regards to the Motion to Suppress which was heard over several

days, the Court has considered the testimony, any exhibits, arguments

and the authorities submitted by counsel.  The State has the burden of

proving the voluntariness of any confession by a preponderance of the

evidence or, in other words, that it is more likely truth than not that the

confession was voluntarily made.  The Court is to look at the totality of

the circumstances and no single factor, even a technical violation of State

statute, is controlling.  In this particular matter the Court has looked at all

the evidence and has considered the Defendant and had the opportunity to

observe him in open court giving testimony and also on video tape and has

listened to what is a purported audio confession.  The Court considers the

Defendant's apparent mental ability, familiarity with the English language,

his age, education, experience, emotional complexion, any prior contacts

with authorities which, in this case, there were none, Court also considers

the disfunction with which the Defendant is afflicted and the doctor's

testimony.  The Court is not required to accept the doctor's testimony

and, in this case it would appear from all the other evidence, that the Court

cannot conclude similarly as the doctor.  The evidence shows that the

Defendant is of average intelligence, appeared emotionally stable,



A 53

ADDITIONAL RECORD SHEET

Case No. ___95 CF 101_____

Nature of Case ___People -v- Morgan___


3-4-96   Continued     articulate and familiar with the English language.  The Court is also to

consider the manner, form, duration and substance of any interrogation

and the style of the police officer doing the questioning.  In this particular

case it seems apparent to the Court that the Defendant was well aware of

his rights, that he understood them and that he made a knowing and

intelligent waiver of Miranda.  There is essentially very little that would

indicate otherwise.  From the Court's own observation of the Defendant

while testifying, it appeared that the Defendant was of average or above

intelligence, understood the questions asked and responded appropriately

and intelligently.  From the testimony, video tape, and audio, it would

appear that there were no threats, no promises, no abuse of the minor

during such interrogation and that he was never denied access to food,

drink, the bathroom and, in fact, in one instance where the Defendant

was reluctant to make further statement, he clearly articulated that

to the officer and that particular line of questioning was no longer

pursued.  The officer's manner and demeanor during questioning and

on the videos appeared to be very calm, non-intimidating, non-threatening

and respectful of the Defendant's age and comported himself accordingly.

With regards to the violation of the Juvenile Court Act, the Courts

C 13

A54

ADDITIONAL RECORD SHEET

Case No. ___95 CF 101___

Nature of Case ___People -v- Morgan___


3-4-96  Continued        certainly do not condone such violation but higher Courts, on review,

have made it clear that such a violation does not cause a per se

suppression and is one factor of many that the Court is to consider

in ruling on the Motion to Suppress.  Although it does appear that

the Juvenile was not told that he could be prosecuted as an adult,

it does not appear that the state of the law in Illinois requires such an

admonition.  In sum and substance, it did appear to the Court from all

the evidence, under any standard, that there was an awareness by the

Defendant of his understanding of the rights that he had and the

consequences of giving those up.  Further, from the standards set

forth by reviewing Courts, it would also appear to this Court that the

Defendant's confession was voluntarily made.  From the very outset,

when the minor first approached Officer Spickard and made a gratuitous

and spontaneous declaration of an incriminating nature, it did appear to

the Court that the Defendant knew what he was doing and that he indeed

did seem to want to tell what happened.  Further, the single question that

was asked by Officer Harberts at the scene after the minor was presented

to him by Officer Spickard does appear to have been an appropriate on-

scene general investigative question and will not be suppressed.  Also,



A55

# ADDITIONAL RECORD SHEET

Case No. ___95 CF 101___

Nature of Case ___People -v- Morgan___


3-4-96  Continued     from all the evidence, it would appear to this Court that any suggestion

that Miranda was not given before the first interview and the video was

inoperative and consequently the reason for it not being available would

be specious.  It does not appear to the Court that the Defendant's will

had been overborne by any coercion, threats, intimidation by the officers

even though the environment may certainly appear that way.  Also, there

is nothing to suggest to the Court that the Defendant's confession was

a product of confusion, fright, fantasy or despair.  The doctor's testimony

is one the Court certainly considers but, as mentioned earlier, is not given

the weight that the Defendant would perhaps wish.  To briefly reiterate,

Court does find that the waiver of Miranda by the Defendant was

knowingly and intelligently made and, by any standard, the Defendant

did voluntarily confess to the officer.  The Motion to Suppress is denied

in its entirety.  Clerk to mail or deliver copy of this entry-order to

respective counsel of record and file proof of service herein.  So Ordered.


GERALD G. DEHNER
CIRCUIT JUDGE

3-5-96  cl     **CLERK'S CERTIFICATE OF MAILING FILED**

See Folder #2  A56



IN THE CIRCUIT COURT
FOR THE ELEVENTH JUDICIAL CIRCUIT OF ILLINOIS
LINCOLN, LOGAN COUNTY, ILLINOIS

**FILED**

NOV 2 6 1991

*Carla Bender*
Clark of the Circuit Court
Logan County, Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff | ) | |
| VS. | ) | No. 95 CF 101 |
| | ) | |
| JON R. MORGAN, Defendant | ) | |

### JUDGMENT AND SENTENCE OF IMPRISONMENT

On November 26, 1996, the Court having entered judgment upon the jury's verdict of

guilty to First Degree of Murder as to Lila Cearlock, and Second Degree of Murder as to Keith

Cearlock , and on said date the Court having entered judgment on said verdict:

This cause now comes on for hearing on sentencing.  The Court has considered:

1. _____ (X) the facts as produced during the jury trial;

2. _____ (X) the presentence report;

3. _____ (X) the evidence and information offered by the parties in aggravation and mitigation;

4. _____ (X) the arguments as to sentencing alternatives;

5. _____ (X) the statement of the defendant in his own behalf;

6. _____ (X) a finding is made for the record as to the defendant's history of delinquency and/or criminality including any previous sentence;

And the Court is of the opinion that:

7. _____ (X) imprisonment of the defendant is necessary for the protection of the public;

8. _____ (X) the defendant is in need of correctional treatment that can most effectively be provided by a sentence of imprisonment;

9. _____ (X) probation or conditional discharge would deprecate the seriousness of the defendant's conduct and would be inconsistent with the ends of justice;

IT IS, THEREFORE, ORDERED:



A-57

The defendant Jon R. Morgan is sentenced to a term of 58 years in the Illinois Department of Corrections for the offense of First Degree Murder as to Lila Cearlock and 17 years in the Illinois Department of Corrections, to be served consecutively, for the Second Degree Murder of Keith Cearlock;

a. _____ (X) the defendant shall pay court costs in the sum of $_____;

b. _____ (X) The defendant is committed to the custody of the Department of Corrections. The Sheriff shall convey the defendant to the nearest receiving station designated by the Department.

c. _____ (X) The defendant will receive credit for 579 days previously served.

A certified copy of this judgment and sentence may serve as a warrant of commitment (mittimus).

ENTER: _____11-26_____, 1996

_____
JUDGE

I, Carla Bender, Clerk of the Circuit Court of Logan County, Illinois, certify that this instrument, consisting of two pages, is a true and complete copy of the original on file in my office in the case of the "People of the State of Illinois, Plaintiff, vs. __Jon R. Morgan__, Defendant, No. _95CF1C1_ "

_____, 1996

_____
Circuit Clerk



A58

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## LOGAN COUNTY

THE PEOPLE OF THE STATE OF ILLINOIS

VS                                         CASE NO. 95 CF 101

JON R. MORGAN

### NOTICE OF APPEAL

An Appeal is taken from the Order or Judgment described below.

1. Court to which appeal is taken: Appellate Court
2. Name of Appellant and address to which notices shall be sent.
   Name: Mr. Jon R. Morgan
         F31784
         Illinois Youth Center Joliet
         2848 E. McDonough St.
         Joliet, IL 60436
3. Name and address of Appellant's attorney on Appeal.
   Name:  Mr. Daniel D. Yuhas
          Appellate Defender
          400 S. 9th St.  Suite 102
          Springfield, IL 62701
If indigent does defendant want an attorney appointed?  Yes

**FILED**

**DEC 16 1996**

*Carla Bender*
Clerk of the Circuit Court
Logan County, Illinois

4. Date of Judgement or Order: 11/26/96

5. Offense of which convicted: One count first degree murder; one count second degree murder

6. Sentence: 58 years on first degree murder; 17 years on second degree murder.
             Sentences to run consecutively.  Credit for 579 days served.

_____
CLERK OF CIRCUIT COURT

### CERTIFICATE OF SERVICE

The undersigned Clerk certifies that copies of this Notice of Appeal were sent to the Petitioner, and to the Respondent and his attorney on appeal.
Dated at Lincoln, IL, this __16th__ day of __December_____, 1996.

_____
Clerk of Circuit Court
Logan County, Illinois



A59



E-FILED
Wednesday, 13 August, 2008   03:06:47 PM
Clerk, U.S. District Court, ILCD

NO.  4-96-0996

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

FILED

JAN - 5

CLERK OF THE
APPELLATE COURT, 4th DIST.

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | the Eleventh Judicial Circuit |
| Plaintiff-Appellee, | ) | Logan County, Illinois |
| | ) | |
| vs. | ) | No.  95-CF-101 |
| | ) | |
| JON R. MORGAN, | ) | Honorable |
| | ) | Gerald G. Dehner |
| Defendant-Appellee. | ) | Judge Presiding. |

<u>BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE</u>

*ORIGINAL*

William G. Workman
State's Attorney
Logan County Courthouse
601 Broadway
Lincoln, Illinois  62656

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
David E. Mannchen
Staff Attorney
State's Attorneys Appellate
          Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

**COUNSEL FOR PLAINTIFF-APPELLEE**

<u>ORAL ARGUMENT REQUESTED</u>

EXHIBIT D

<u>POINTS AND AUTHORITIES</u>                    <u>PAGE</u>

I

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN
GRANTING THE PETITION TO TRANSFER THIS CASE FROM
THE JUVENILE COURTS TO THE ADULT CRIMINAL JUSTICE
SYSTEM..........................................2

<u>People</u> v. <u>Bien</u>, 277 Ill.App.3d 744, 214 Ill.Dec.
    657, 661 N.E.2d 511 (4th Dist. 1996).............3

<u>People</u> v. <u>Terneus</u>, 239 Ill.App.3d 669, 190 Ill.Dec.
    499, 607 N.E.2d 568 (4th Dist. 1992).............3

<u>People</u> v. <u>Fuller</u>, 292 Ill.App.3d 651, 226 Ill.Dec.
    657, 686 N.E.2d 6 (1st Dist. 1996)...............4

<u>People</u> v. <u>Taylor</u>, 76 Ill.2d 289, 29 Ill.Dec. 103,
    391 N.E.2d 366 (1979)............................4, 6

<u>People</u> v. <u>Cooks</u>, 271 Ill.App.3d 25, 207 Ill.Dec.
    190, 648 N.E.2d 199 (1st Dist. 1995).............4, 6,
                                                    12, 13

<u>In the Interest of L.J.</u>, 274 Ill.App.3d 977, 211
    Ill.Dec. 209, 654 N.E.2d 671 (1st Dist. 1995).....4

<u>People</u> v. <u>Illgen</u>, 145 Ill.2d 353, 164 Ill.Dec.
    599, 583 N.E.2d 515 (1991)......................4, 5

<u>People</u> v. <u>Clark</u>, 119 Ill.2d 1, 115 Ill.Dec. 613,
    518 N.E.2d 138 (1987)...........................9, 10

<u>In the Interest of R.L.L.</u>, 106 Ill.App.3d 209, 62

    Ill.Dec. 106, 435 N.E.2d 904 (4th Dist. 1982).....9, 10, 11

<u>In re Burns</u>, 67 Ill.App.3d 361, 24 Ill.Dec. 255,

    385 N.E.2d 22 (1st Dist. 1978)...................9, 11

<u>People</u> v. <u>Ollins</u>, 231 Ill.2d 243, 179 Ill.Dec. 360,

    606 N.E.2d 192 (1992)............................12

705 ILCS 405/5-4(b)(6)(a) (West 1996).................7

705 ILCS 405/5-33(1.5) (West 1996).................12

II

THE TRIAL COURT DID NOT ERR IN DENYING THE DEFENDANT'S

MOTION TO SUPPRESS HIS INITIAL STATEMENT TO THE

POLICE..........................................14

<u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 826, 86 S.Ct. 1602,

    16 L.Ed.2d 694 (1966)..........................14, 15

<u>Berkermer</u> v. <u>McCarty</u>, 468 U.S. 420, 104 S.Ct. 3138,

    82 L.Ed.2d 317 (1984)..........................14

<u>People</u> v. <u>Parks</u>, 48 Ill.2d 232, 269 N.E.2d 484

    (1971).........................................14,15

<u>People</u> v <u>Laspisa</u>, 243 Ill.App.3d 777, 184 Ill.Dec.

    118, 612 N.E.2d 994 (2nd Dist. 1993).............14

<u>People</u> v. <u>Acebo</u>, 182 Ill.App.3d 403, 130 Ill.Dec.

    784, 537 N.E.2d 403 (3rd Dist. 1989).............15

<u>People</u> v. <u>Tripkovich</u>, 6 Ill.App.3d 37, 284 N.E.2d

    323 (1st Dist. 1972)............................15

People v. Clark, 84 Ill.App.3d 637, 40 Ill.Dec.

    100, 405 N.E.2d 1192 (1st Dist. 1980)............15, 16

Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209

    (1962)........................................16

People v. Brown, 136 Ill.2d 116, 143 Ill.Dec. 281,

    554 N.E.2d 216 (1990)...........................16, 17

People v. Savory, 105 Ill.App.3d 737, 62 Ill.Dec.

    737, 435 N.E.2d 226 (2nd Dist. 1982).............16, 17

III

THE TRIAL COURT DID NOT ERR IN HOLDING THAT THE
DEFENDANT'S STATEMENTS TO THE POLICE AT THE POLICE
STATION WERE VOLUNTARY................................19

People v. Lash, 252 Ill.App.2d 239, 191 Ill.Dec.

    751, 624 N.E.2d 1129 (1st Dist. 1993)............20

People v. M.S., 247 Ill.App.3d 1074, 188 Ill.Dec.

    53, 618 N.E.2d 623 (1st Dist. 1993)..............20

Miranda v. Arizona, 384 U.S. 826, 86 S.Ct. 1602,

    16 L.Ed.2d 694 (1966)...........................24

People v. Daniel, 238 Ill.App.3d 19, 179 Ill.Dec.

    262, 606 N.E.2d 94 (1st Dist. 1992)..............24

People v. Servier, 230 Ill.App.3d 1071, 174 Ill.Dec.

    336, 598 N.E.2d 968 (1st Dist. 1992).............24

People v. Knox, 186 Ill.App.3d 808, 134 Ill.Dec.

    564, 542 N.E.2d 910 (1st Dist. 1989).............24, 25

People v. Pico, 287 Ill.App.3d 607, 222 Ill.Dec. 908, 678 N.E.2d 780 (1st Dist. 1997)..............24

People v. McGhee, 154 Ill.App.3d 232, 107 Ill.Dec. 369, 507 N.E.2d 33 (1st Dist. 1987)..............25, 26

In re J.J.C., 294 Ill.App.3d 227, 228 Ill.Dec. 751, 689 N.E.2d 1172 (2nd Dist. 1998)..................25

In re Lashun H., 284 Ill.App.3d 545, 219 Ill.Dec. 823, 672 N.E.2d 331 (1st Dist. 1995)..............25

People v. Montanez, 273 Ill.App.3d 844, 210 Ill.Dec. 295, 652 N.E.2d 1271 (1st Dist. 1995)............25, 26

In re L.L., 295 Ill.App.3d 594, 230 Ill.Dec. 430, 693 N.E.2d 908 (2nd Dist. 1998)..................25, 26

Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209 (1962).......................................27

Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302 (1948).......27

705 ILCS 405/5-5 (West 1996)..........................24

705 ILCS 405/5-6 (West 1996)..........................24

705 ILCS 405/5-7 (West 1996)..........................24

IV

THE TRIAL COURT'S FINDING THAT THE DEFENDANT HAD
MADE A KNOWING AND INTELLIGENT WAIVER OF HIS
CONSTITUTIONAL RIGHTS WAS NOT CONTRARY TO THE MANIFEST
WEIGHT OF THE EVIDENCE.................................29

People v. Bernasco, 138 Ill.2d 349, 150 Ill.Dec.
    155, 562 N.E.2d 958 (1990)........................29, 30

People v. Henderson, 175 Ill.App.3d 483, 124 Ill.Dec.
    934, 529 N.E.2d 1051 (1st Dist. 1988)............29

People v. Rabus, 238 Ill.App.3d 765, 179 Ill.Dec.
    768, 606 N.E.2d 600 (1st Dist. 1992).............29, 32

People v. Phillips, 226 Ill.App.3d 878, 168 Ill.Dec.
    707, 589 N.E.2d 1107 (2nd Dist. 1992)............31

People v. Burke, 164 Ill.App.3d 889, 115 Ill.Dec.
    847, 518 N.E.2d 372 (1st Dist. 1987).............31

People v. Turner, 56 Ill.2d 201, 306 N.E.2d 27
    (1973).........................................34,35

People v. Higgins, 239 Ill.App.3d 260, 180 Ill.Dec.
    443, 607 N.E.2d 337 (1st Dist. 1993)............34, 35

People v. Travis, 122 Ill.App.3d 671, 78 Ill.Dec.
    535, 462 N.E.2d 654 (1st Dist. 1984).............34, 35,
                                                        36

V

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN

EXCLUDING EVIDENCE OF PRIOR VIOLENT CONDUCT BY THE

VICTIMS.........................................37

People v. Lynch, 104 Ill.2d 194, 83 Ill.Dec. 598,
    470 N.E.2d 1018 (1984)..........................37, 38

People v. Ciaverelli, 262 Ill.App.3d 966, 200
    Ill.Dec. 271, 635 N.E.2d 610 (1st Dist. 1994).....38, 45

People v. Illgen, 145 Ill.2d 353, 164 Ill.Dec. 599,

   583 N.E.2d 515 (1991)..............................38

People v. Sloan, 111 Ill.2d 517, 96 Ill.Dec. 55,

   490 N.E.2d 1260 (1986)............................44

People v. Ellis, 187 Ill.App.3d 295, 134 Ill.Dec.

   913, 543 N.E.2d 196 (1st Dist. 1989).............44

People v. Friday, 232 Ill.App.3d 1047, 174 Ill.Dec.

   105, 598 N.E.2d 312 (4th Dist. 1992)..............45

People v. Moore, 189 Ill.App.3d 957, 137 Ill.Dec.

   478, 546 N.E.2d 232 (4th Dist. 1989).............45

VI

THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY
ON SECOND DEGREE MURDER AS TO THE CHARGES OF FELONY
MURDER.................................................46

People v. Jeffries, 164 Ill.2d 104, 207 Ill.Dec. 21,

   646 N.E.2d 587 (1995).............................47

People v. Shumpert, 126 Ill.2d 344, 128 Ill.Dec. 18,

   533 N.E.2d 1106 (1989)............................47

People v. Allen, 153 Ill.2d 145, 180 Ill.Dec. 72,

   606 N.E.2d 1149 (1992)........................47, 48

People v. Williams, 164 Ill.App.3d 99, 115 Ill.Dec.

   334, 517 N.E.2d 745 (4th Dist. 1987)..............48

People v. Kidd, 295 Ill.App.3d 160, 229 Ill.Dec.

   682, 692 N.E.2d 455 (4th Dist. 1998).........48, 49

People v. Thurman, 223 Ill.2d 196, 165 Ill.Dec.
      635, 584 N.E.2d 1069 (3rd Dist. 1991)............48, 49

People v. Taylor, 166 Ill.2d 414, 211 Ill.Dec. 518,
      655 N.E.2d 901 (1995)............................49

People v. Walker, 253 Ill.App.3d 93, 192 Ill.Dec. 1,
      624 N.E.2d 1353 (1st Dist. 1993).................49, 50

People v. Moore, 95 Ill.2d 404, 69 Ill.Dec. 640,
      447 N.E.2d 1327 (1983)..........................51

People v. Anderson, 266 Ill.App.3d 947, 204 Ill.Dec.
      367, 641 N.E.2d 591 (1st Dist. 1994).............51

720 ILCS 5/9-2 (West 1996)............................46, 47

720 ILCS 5/9-1(a)(3) (West 1996)......................47

720 ILCS 5/9-2(c) (West 1996).........................47

Ill.Rev.Stat., ch. 38, sec. 9-2(a) (1985).............48

VII

THE TRIAL COURT PROPERLY DENIED THE DEFENDANT'S
MOTION TO DISMISS THE CHARGES OF FELONY MURDER........52

People v. Viser, 62 Ill.2d 568, 343 N.E.2d 903
      (1975)..........................................52,53

People v. Thurman, 223 Ill.2d 196, 165 Ill.Dec.
      635, 584 N.E.2d 1069 (3rd Dist. 1991)............53

People v. Szerlitech, 86 Ill.App.3d 1121, 42 Ill.Dec.
      389, 408 N.E.2d 1098 (4th Dist. 1980)............53

720 ILCS 5/2-8 (West 1996)............................53

## NATURE OF THE CASE

Following a transfer from the juvenile courts, defendant, age 14, was tried by a jury and convicted of second degree murder for the death of Keith Cearlock and of first degree murder for the death of Lila Cearlock. He was sentenced to 75 years' imprisonment. On appeal, the defendant contends that: (1) the court abused its discretion in approving the transfer of this case to the adult court; (2) his statements to the police were improperly admitted; (3) testimony regarding prior violent conduct by the victims was improperly excluded; (4) the court erred in barring second degree murder instructions as to felony murder; and (5) his motion to dismiss the felony murder charges was improperly denied.

1

## ARGUMENT

I

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE PETITION TO TRANSFER THIS CASE FROM THE JUVENILE COURTS TO THE ADULT CRIMINAL JUSTICE SYSTEM.

The defendant contends that the trial court erred in granting the petition to transfer this case from the juvenile courts to the adult courts. Defendant contends that the trial court erred in finding that the offenses charged were aggressive and premeditated, failed to place adequate weight on the defendant's troubled background and home life, failed to consider his rehabilitative potential, did not make findings as to the likely effectiveness of any treatment facility, and had a "flawed misunderstanding" of the non-statutory factor of the length of sentence faced if the transfer was granted. The State maintains that the trial court did not abuse its discretion in granting the transfer petition and that this court should decline defendant's invitation to reweigh the various factors involved.

Initially, the State notes that much of defendant's argument is premised on comparing defendant to the individuals involved in several published opinions. The defendant's argument is basically two fold. First, the defendant refers

2

to cases which involve conduct allegedly more egregious than that of the defendant's with an assertion that his "lesser" offense does not justify transfer.  Secondly, the defendant argues that his background is comparable to some individuals who were not transferred to the adult courts and that therefore he should similarly not have been transferred.

This court should reject any approach that simply compares the facts in published opinions and make a determination based on the defendant's alleged similarity to the juveniles or defendants involved in those cases.  This determination is similar to the comparative sentence analysis which this court has rejected in People v. Bien, 277 Ill.App.3d 744, 214 Ill.Dec. 657, 661 N.E.2d 511, 518-519 (4th Dist. 1996), and People v. Terneus, 239 Ill.App.3d 669, 180 Ill.Dec. 499, 607 N.E.2d 568, 572-573 (4th Dist. 1992).  In Bien and Terneus, this court rejected the argument that sentence reduction was required because the sentences of allegedly similarly situated defendants in other cases had been reduced on appeal because such comparison was flawed since it did not take into account non-published opinions or cases in which the sentences were not challenged on appeal and since it failed to consider the purpose of individually tailored sentences unique to each case.  Similar concerns should lead this court to reject defendant's contention that the transfer was improper because other allegedly similar juveniles were not transferred to the adult courts.

3

On the merits, the trial court did not abuse its discretion in granting the transfer petition. The purpose of a transfer hearing is to balance the best interests of the minor, particularly in regards to rehabilitation, with the right of society in being protected against criminal victimization by minors. People v. Fuller, 292 Ill.App.3d 651, 226 Ill.Dec. 657, 686 N.E.2d 6, 11 (1st Dist. 1996). In making this determination, the trial court must weigh the various factors but need not give equal weight to all of the various factors. No one factor is determinative and the court is not required to resolve all of the factors against the minor to justify the transfer. People v. Taylor, 76 Ill.2d 289, 29 Ill.Dec. 103, 391 N.E.2d 366, 373 (1979); People v. Cooks, 271 Ill.App.3d 25, 207 Ill.Dec. 190, 648 N.E.2d 190, 199 (1st Dist. 1995); Fuller, 686 N.E.2d at 11. The determination is left to the sound discretion of the trial court and the role of the reviewing court is solely to determine if the trial court abused its discretion in making its determination. The reviewing court may not reweigh the factors and may not substitute its judgment for that of the trial court. In the Interest of L.J., 274 Ill.App.3d 977, 211 Ill.Dec. 209, 654 N.E.2d 671, 672 (1st Dist. 1995); Fuller, 686 N.E.2d at 11-12. An abuse of discretion may be found only if the court's decision is arbitrary, fanciful, or no reasonable person would take the view adopted by the court. People v. Illgen, 145 Ill.2d 353, 164 Ill.Dec. 599, 583 N.E.2d

4

515 (1991).  There was no such abuse of discretion here.

The trial court properly found that this offense was committed in an aggressive and premeditated manner.  In his statement to the police, the defendant admitted that he had though about killing his grandparents three or four times in the last four to five months.  (R. Vol. VI, 56-57,83-84) The defendant further stated that he started thinking about killing his grandparents when his grandfather berated him about how no one would ever hire him because he was late for school.  Defendant went to get the gun 15 minutes later.  (R. Vol. VI, 92)  He got the .22 on the spur of the moment because it was the only gun available.  (R. Vol. VI, 84)  He took it into the bathroom and loaded it with eight bullets.  (R. Vol. VI, 43)

Other evidence showed that defendant shot his grandfather in the head without any warning and then shot his grandmother in the back as she fled.  (R. Vol. VI, 45-47)  He tried to shoot his grandmother as she lay dying on the ground but his gun misfired.  (R. Vol. VI, 47)  He went into the house and broke into his grandmother's room to try to find another pistol to shoot his grandmother some more but was unable to find the gun.  (R. Vol. VI, 48-49) Defendant expressed no regret or remorse for killing his own grandparents.

This evidence indicated that the defendant had in fact contemplated the homicide for a short period of time before he secretly procured a weapon and loaded it with eight bullets.

5

This evidence also showed that the defendant shot his grandparents deliberately and in cold blood. This was sufficient to allow the court to reasonably conclude that the offense was aggressive and premeditated, particularly in view of the evidence that defendant tried to shoot his mortally wounded grandmother as she lay helpless on the ground.

Defendant suggests that the offense was not premeditated based on the weapon chosen by the defendant, the senselessness of his action in shooting the bottle of tile cleaner, the possibility that he could have been seen by his grandparents getting the gun and loading it in the bathroom, and the evidence that he had contemplated committing suicide prior to the homicides. However, the choice of weapon does not indicate that the offense was not planned since the defendant used a weapon with which he was familiar and which he stated was the only one available to him at the time of the shooting. Nor does the alleged senselessness of the defendant's actions undercut the fact that the defendant had contemplated the shooting prior to getting the gun and loading it for the purpose of killing his grandparents because he was "sick of" their treatment of him.

Moreover, the standard of proof at the transfer hearing is only probable cause. Taylor, 391 N.E.2d at 372; Cooks, 648 N.E.2d at 199. The evidence outlined above was sufficient to establish reason to believe that the offense was premeditated. The circumstances pointed to by the defendant only go to the

6

weight of the inference that the offense was premeditated and would not justify this court in substituting its judgment for that of the trial court.

The defendant's age also supported the transfer determination. The legislature has determined that any minor who is at least 15 years old who commits murder shall be tried as an adult. 705 ILCS 405/5-4(b)(6)(a) (West 1996). The fact that the defendant was so close to this age would certainly support the conclusion that he should be treated as an adult, particularly since there was no indication that the defendant was immature for his age.

Defendant's contention that the court did not consider his history in terms of his age is without merit. The trial court expressly referred to the defendant's history and background as one of the factors that he was considering. (R. Vol. VII, 448) The mere fact that he did not refer to this background specifically in terms of defendant's age does not indicate that it was not being considered in terms of measuring the defendant's apparent maturity or the fact that he had reached such an age that it was appropriate to treat him as an adult for purposes of this offense.

The fact that defendant does not have any prior experience with the criminal justice system or with the juvenile system does not mean that his age could not be viewed as a factor favoring transfer. Exposure to or involvement in criminal activity is not the sole gauge for maturity. Nor is

7

it the only measure of whether an individual should be viewed as older than his chronological age.

Similarly, defendant's "sheltered" life in a strictly religious home does not mean that he is immature or that he should be retained in the juvenile system. The commission of this offense was in stark contrast to the highly moral background against which defendant was raised and demonstrated the degree to which this was a deliberate flouting of the principles and standards that were being set for him. This was also reflected in his statement, "I intend to commit every sin that I want to commit. I'm going to do anything and everything I want to do, and when I hit rock bottom, then I will call on God." (R. Vol. VII, 180-181) In addition, the strict manner in which the defendant was being raised could be viewed as providing a motive for the slayings, particularly in view of defendant's statement, "I have been hurt all my life. I'm not going to be hurt anymore. From now on I will do the hurting." (R. Vol. VII, 178) The court's appraisal of the defendant's age was not an abuse of discretion under these circumstances.

Similarly, defendant's poor childhood would not mandate keeping this case in the juvenile court system. The defendant's unfortunate background admittedly could be viewed as a mitigating factor to a certain degree. However, the court was justified in concluding that this background was no excuse for his deliberate murder of his own grandparents in

retaliation for their treatment of him.

In addition, the lack of a family support system shown by defendant's background would tend to undercut the possibility that the family could be used to assist in any rehabilitative process. Moreover, the defendant's history indicated that he was aggressive, had assaulted his siblings and peers at school, was openly defiant of parental authority, and disruptive in school. (Supp.R. Vol. II) The defendant was expelled from school after being given "opportunity after opportunity, chance after chance." (R. Vol. VII, 176) These circumstances supported the court's determination to transfer the case to the adult courts since they reflected poorly on the defendant's rehabilitative ability.

The defendant's suggestion that the court did not sufficiently consider the likely effectiveness of any facility available for treatment or rehabilitation is without merit. This case is clearly distinguishable from People v. Clark, 119 Ill.2d 1, 115 Ill.Dec. 613, 518 N.E.2d 138 (1987), In the Interest of R.L.L., 106 Ill.App.3d 209, 62 Ill.Dec. 106, 435 N.E.2d 904 (4th Dist. 1982), and In re Burns, 67 Ill.App.3d 361, 24 Ill.Dec. 255, 385 N.E.2d 22 (1st Dist. 1978), relied upon by the defendant. In Clark, the probation officer had recommended the transfer based solely upon the nature of the offense without ever interviewing the defendant. The probation officer also provided no basis for his conclusion that there were no facilities available for the defendant in

9

the juvenile system. The defendant had objected to the lack of foundation or limited basis for the probation officer's opinion. It was under these circumstances that the court in Clark determined that insufficient consideration had been given to the defendant's background and rehabilitative potential. In contrast, the court here was provided with very detailed information about defendant's history and background. In addition, the probation officer here, Kim Turner, provided an extensive basis for her conclusion that the transfer was warranted. No objection was made to the sufficiency of her qualifications, the extensiveness of her inquiry into the defendant's background, or the extensiveness of her inquiries into the alternatives available in this case. Clark thus does not support the claim that the trial court did not adequately consider the defendant's background or rehabilitative potential.

In Interest of R.L.L., evidence had been presented that the minor had severe psychological problems that required long-term psychiatric care in a secure facility. No testimony had been presented concerning the psychiatric facilities available in the adult system. Expert testimony had also been presented that the minor would be beyond rehabilitation if put into the adult system. The transfer was denied by the court which found that the minor would not receive the needed mental health treatment if put into an adult facility. In contrast, there is no evidence here that the defendant required

10

extensive psychiatric treatment that was not shown to be available in the adult system.  In addition, testimony had been presented here, without objection, that the facilities available for the defendant were similar in both systems.  No evidence was presented that treatment as an adult would impair the defendant's rehabilitative potential.  R.L.L. thus does not support the defendant's contention that being retained in the juvenile system would be in his best interests or that inadequate attention had been paid to the rehabilitative facilities uniquely available in the juvenile system.

In Burns, the court was faced with a juvenile who did not personally kill the victim but had tried to dissuade her companion from stabbing the victim.  The juvenile had a history of neglect, emotional impoverishment, chaos, and repeated minor criminal offenses but had never been implicated in violence. Evidence was presented that the juvenile needed serious mental treatment that could be provided by the juvenile system and by a mental health institution.  It was under these circumstances that the request for a transfer was denied.  In contrast, the defendant here had committed the murders in a premeditated fashion and was not shown to need mental health treatment that could be provided in facilities other than the adult criminal justice system.  Burns is thus distinguishable and does not support the claim that the trial court abused its discretion in authorizing the transfer.

It should be noted that the court here did not err in

11

accepting the recommendation of Kim Turner regarding the unavailability of any special facilities that would be unique to the juvenile system.    In this case, the only juvenile facilities that would be available to the defendant would be the Department of Corrections, Juvenile Division.    705 ILCS 405/5-33(1.5) (West 1996).    These same facilities would be used if the defendant was treated and sentenced as an adult until at least age 17 and possibly until age 21.    (R. Vol. VII, 272) Since the defendant would be subject to the identical facilities for an extensive period of time regardless of whether he was treated as a juvenile delinquent or tried as an adult, the court was correct in accepting Turner's unchallenged opinion that there were no juvenile facilities particularly available to the defendant that would not be available to him if tried as an adult.

Finally, the trial court gave proper consideration to the penalty facing the defendant if tried as an adult.    The trial court is presumed to know the law regarding the potential sentences facing the defendant.    People v. Ollins, 231 Ill.2d 243, 179 Ill.Dec. 360, 606 N.E.2d 192, 198 (1992); Cooks, 648 N.E.2d at 198.    That presumption applies here where the prosecutor (R. Vol. VIII, 410), defendant's attorney (R. Vol. VIII, 416-417), and the attorneys for the defendant's parents (R. Vol. VIII, 436, 441-442) each referred to the fact that defendant was facing a mandatory life sentence if treated as an adult.    The court's reference to the sentence faced if the

12

transfer was granted (R. Vol. VIII, 446) and the mandatory nature of the sentence (R. Vol. VII, 450) are therefore sufficient to demonstrate that he did in fact consider the mandatory life sentence as a factor in making his determination.    See, Cooks, 648 N.E.2d at 198 (single reference by counsel to mandatory life term sufficient to show court's consideration of this factor even though court made no specific reference thereto).

This is thus a case in which the trial court gave very careful consideration to all the various information and factors presented.    The defendant's argument on appeal represents an effort to have this court reweigh the different factors and to substitute its judgment for that of the trial court.    This court should decline the defendant's invitation to act as the trier of fact or to make its own determination as to whether the transfer was warranted.

The defendant's conviction should therefore be affirmed.

ARGUMENT

II

THE TRIAL COURT DID NOT ERR IN DENYING THE DEFENDANT'S MOTION
TO SUPPRESS HIS INITIAL STATEMENT TO THE POLICE.


The defendant contends that the trial court erred in
denying his motion to suppress his statement at the scene of
the offense to Detective Michael Harberts that he had shot his
grandparents because "they pissed him off." The defendant
contends that this statement was the product of custodial
interrogation without the benefit of the Miranda v. Arizona,
384 U.S. 826, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings
and should therefore have been suppressed.

The State maintains that the trial court's decision was
not contrary to the manifest weight of the evidence. The State
further maintains that any error was harmless beyond a
reasonable doubt.

It is well established that the requirement that an
individual be warned of his rights prior to questioning does
not extend to general crime-scene questioning. Berkermer v.
McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984);
People v. Parks, 48 Ill.2d 232, 269 N.E.2d 484, 487 (1971);
People v. Laspisa, 243 Ill.App.3d 777, 184 Ill.Dec. 118, 612
N.E.2d 994, 998 (2nd Dist. 1993). This exception to the

14

<u>Miranda</u> requirements was properly found to apply in the instant case.

The evidence here showed that Detective Harberts was told that the defendant had admitted shooting the two victims and then asked the defendant only the single question, "Why?" At the time this question was asked, the defendant was not restrained in any way, was not handcuffed, and had not been subjected to any search. No threats or promises had been made to the defendant and no coercion had been used against the defendant. In addition, no guns had been pointed at the defendant. (R. Vol. X, 103-104, 106, 171-172, 181; Vol. XI, 221, 273-274, 313, 363) The defendant had approached the police and, by his own admission, wished to surrender to the police and to tell them what had happened. (R. Vol. XII, 487) Under these circumstances, the single question "why" was a proper on-the-scene inquiry to assess the situation faced by the police. No warnings were required before this question. See, <u>Parks</u>, 269 N.E.2d at 487; <u>People v. Acebo</u>, 182 Ill.App.3d 403, 130 Ill.Dec. 784, 537 N.E.2d 1113, 1114 (3rd Dist. 1989); <u>People v. Tripkovich</u>, 6 Ill.App.3d 37, 284 N.E.2d 323, 329 (1st Dist. 1972) (burglary suspect caught in the act and standing over dead victim could be asked "what happened" without warnings even though detained for investigation).

A contrary conclusion is not required by <u>People v. Clark</u>, 84 Ill.App.3d 637, 40 Ill. Dec. 100, 405 N.E.2d 1192 (1st Dist. 1980). In <u>Clark</u>, the court stated the general rule that

15

warnings are not required merely because the questioning takes place in a police car or at the station or that the person being questioned was the suspect.  405 N.E.2d 1194.  It was further held that warnings were not required for general on-the-scene questioning regarding the facts surrounding the crime or other general questioning of persons in the fact-finding process.  405 N.E.2d at 1194.  Applying these principles, the court held that the initial questioning of the defendant as to what happened was proper but that the subsequent questioning after the defendant was separated from her friend was improper.  405 N.E.2d at 1194.  The single question here was similar to the initial questioning in Clark and clearly falls within the exception for on-the-scene questioning as to the facts surrounding the offense.

Nor is reversal required by Gallegos v. Colorado, 370 U.S. 49, 82 S. Ct. 1209 (1962), People v. Brown, 136 Ill.2d 116, 143 Ill.Dec. 281, 554 N.E.2d 216 (1990), or People v. Savory, 105 Ill.App.3d 737, 62 Ill.Dec. 737, 435 N.E.2d 226 (2nd Dist. 1982).  In Gallegous, the 14-year-old defendant was detained in jail for one day before he gave one statement.  He later gave a more complete and formal written statement after being detained for five days without being presented to the court.  The defendant was kept isolated during this period and his mother was refused permission to see the defendant.  The defendant's statements were found to violate due process based on his age, the length of detention, the isolation from his

16

parents, and the lack of any warnings.    This is clearly distinguishable from the single question asked at the scene of the crime in the instant case.

In Brown, the defendant had been arrested by the police and turned over to the Bureau of Alcohol, Tobacco, and Firearms for questioning.  He was given the Miranda warnings and questioned twice at the police station.  At the end of the first session, the defendant was released to inform his employer that he was not returning to work with the understanding that the defendant was required to return to the station.   The defendant made a request for an attorney and indicated that he did not wish to give a statement but the questioning continued.  The court concluded that the defendant was in custody during the second interview and that his confession was properly suppressed based on the violation of defendant's request for counsel.  None of these circumstances are present here.

Finally, in Savory, the 14-year-old defendant was questioned twice, once in the principal's office at his school and a second time at the police station.  The defendant was found not to have been in custody when questioned at the principal's office or when he was allowed to retrieve a knife used in the offense but to be in custody when questioned at the police station in an accusatory manner.  This holding has no bearing on the single question asked at the scene of the crime in the instant case.

17

Assuming arguendo that the defendant's statement, "I shot them because they pissed me off," was improperly admitted, reversal is not required. The defendant's guilt of first degree murder was overwhelmingly established by the defendant's detailed confessions to the police at the police station, the defendant's testimony at trial, the nature and location of the victims' wounds, and the fact that defendant shot his grandmother in the back as she fled. The jury's verdict could not have been different had the defendant's initial statement been excluded. Any error is thus harmless beyond a reasonable doubt and does not require reversal.

This court should therefore affirm the defendant's conviction.

ARGUMENT

III

THE TRIAL COURT DID NOT ERR IN HOLDING THAT THE DEFENDANT'S STATEMENTS TO THE POLICE AT THE POLICE STATION WERE VOLUNTARY.

The defendant contends that his statements to the police at the police station should have been suppressed as involuntary. The defendant contends that his statements were rendered involuntary by the coercive nature of his arrest and by the failure to comply with the statutory requirements regarding treatment and questioning of minors. The State maintains that the trial court's decision was not contrary to the manifest weight of the evidence.

It is well established that the test for the voluntariness of the statement of a juvenile to the police is whether the statement was voluntary and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he made the statement. In making this determination the court is to look to the totality of the circumstances, including, the existence of any threats, promises, or coercion; the length, location, and intensity of the interrogation; the age, experience, intelligence, experience, and physical condition of the defendant; and whether the juvenile defendant's parents have been contacted

19

or are present.   <u>People v. Lash</u>, 252 Ill.App.3d 239, 191 Ill.Dec. 751, 624 N.E.2d 1129, 1132-1133 (1st Dist. 1993); <u>People v. M.S.</u>, 247 Ill.App.3d 1074, 188 Ill.Dec. 53, 618 N.E.2d 623, 629-630 (1st Dist. 1993).   The trial court's determination is entitled to great deference and may not be disturbed unless contrary to the manifest weight of the evidence.   <u>Lash</u>, 675 N.E.2d at 163; <u>M.S.</u>, 618 N.E.2d at 630. Defendant's statements were admissible under this standard.

The record here clearly indicates that the defendant was given a warning as to his constitutional rights before each statement to the police, indicated his understanding of those rights, and agreed to talk without asking for any clarification or explanation of his rights.   (R. Vol. X, 116-117, 150; Vol. XI, 194, 212, 230-231, 288-290)   No threats, promises, or coercion was used by the officers who were talking in a conversational tone of voice.   (R. Vol. X, 116, 119, 125-126, 129; Vol. XI, 194-195, 221, 224, 291, 306, 315. 332)   Even the defendant admitted that he was not bullied, beaten, threatened, promised anything, yelled at, or called any names.   (R. Vol. XII, 505-506) The defendant was offered food, drink, and the use of bathroom facilities and no requests for any of these items were made or denied.   (R. Vol. XI, 224-225, 288; Vol. XII, 515-516)   The defendant was not kept in handcuffs after he was brought to the station and was not handcuffed during the interviews or during the video-taped re-enactment of the crime at the scene of the offense.   (R.

Vol. X, 115, 122-125, 127-128, 144; Vol. XI, 192, 285, 335-336, 350) The defendant never asked to speak with his parents or an attorney during the interviews or re-enactment, made no request to stop the questioning, and made no complaints regarding his treatment. (R. Vol. X, 119, 122-123; Vol. XI, 195-196, 214, 226-227, 315, 333, 403; Vol. XII, 355, 392)

Based on this record, the trial court properly found defendant's statements to be voluntary. The defendant had been questioned only briefly in a non-threatening and non-coercive manner. The defendant was not mistreated in any way, was fully admonished as to his right to counsel and to remain silent, was not threatened, was not made any promises, and was not deprived of food, drink, sleep, or prevented from using the bathroom. A statement given in these circumstances was clearly voluntary and was not the result of police action which overcame the defendant's will. This is particularly true in light of the defendant's admission that he knew he had committed a crime and wanted to confess. (R. Vol. XII, 487, 490)

The fact that the defendant wanted to talk to the police to get help supports the conclusion that his statement was voluntary. The defendant knew and understood that the police investigate crimes and catch criminals. (R. Vol. XII, 486, 489) The defendant also understood that he had committed a crime or done something wrong in shooting his grandparents and stated that he wanted to confess. (R. Vol. XII, 487, 490,

21

492)  The desire to get help thus highlights the extent to which the defendant's statements were given freely.

The trial court properly rejected the suggestion that defendant was so compliant with authority figures that he would have been unable to refuse to give a statement.  The defendant testified that he did not feel compelled to answer Detective Harberts' questions merely because he was an authority figure (R. Vol. XII, 495) and admitted that he felt free to decline to answer certain questions and to insist that he had only shot his grandfather once (R. Vol. XII, 496-498). The defendant further admitted that he had no trouble standing up to Pastor Thomas Bryant as an authority figure.  (R. Vol. XII, 493-494)  In addition, Dr. Robert Chapman testified that defendant's level of compliance did not mean that he would comply with everything that was asked of him and that the defendant had talked to the police because he wanted to talk with the police.  (R. Vol. XIII, 606, 612) This evidence supports the conclusion that the defendant's personality and background were not such that he would have been unable to refrain from talking to the police and that his decision to seek out the police with the intention of confessing was in fact a voluntary one.

The defendant's conduct on the video tape does not indicate that his will was overborne or that he was acting out of despair.  Four individuals who were familiar with the defendant each testified that his conduct on the tape was no

22

different than his usual conduct or manner.    (R. Vol. XIII, 625-626, 679, 691; Supp.R. III, 9)  The trial court could reasonable rely on this testimony instead of the opinion of Dr. Chapman that the defendant exhibited despair in the video tape.  (R. Vol. XIII, 550-551)  This is particularly true in light of the doctor's testimony that the defendant wanted to talk to the police (R. Vol. XIII, 612-613), that it would be hard to distinguish an individual suffering from despair and an individual who was confessing to ease his conscience (R. Vol. XIII, 578-579), and that wanting to help the police was not incompatible with the ability to knowingly and intelligently waive one's rights (R. Vol. XIII, 613).  In light of this evidence, the court could reasonably reject the contention that the confessions were a product of despair.

The manner of the defendant's arrest could not render his statements involuntary.    Contrary to the defendant's assertion, there was no violation of the Lincoln Police Department guidelines for making an arrest of a juvenile based on the use of handcuffs.  The arresting officers were not aware of the defendant's age at the time of the arrest and stated that they believed that the defendant was 17 to 19 years old.  (R. Vol. X, 109-111; Vol. XI, 277)  In addition, Detective Harberts stated that he believed that the defendant presented a risk or threat based on the fact that he admitted shooting two people.  (R. Vol. XII, 414)  The use of the handcuffs was thus consistent with the police department

23

policy and would not render the manner of the arrest so coercive as to overcome the defendant's will and render his statements at the police station following the <u>Miranda v. Arizona</u>, 384 U.S. 826, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings involuntary.  This is particularly true since no force was used in making the arrest, the defendant was not searched prior to the arrest, and there was nothing here beyond the mere fact of arrest that could compel the defendant to give a statement.

Similarly, the fact that defendant's mother was not contacted prior to the first statement does not render his statements involuntary.  First, it is questionable whether the requirements of the Juvenile Court Act regarding the detention and questioning of minors apply to the instant case.  By their very terms, 705 ILCS 405/5-5, 405/5-6, and 405/5-7 (West 1996) apply where the minor has been taken into temporary custody under the Juvenile Court Act.  The defendant was not detained pursuant to the Act but was formally arrested for murder.  The Act does not apply in such a situation.  See, <u>People v. Daniel</u>, 238 Ill.App.3d 19, 179 Ill.Dec. 262, 606 N.E.2d 94, 104 (1st Dist. 1992); <u>People v. Servier</u>. 230 Ill.App.3d 1071, 174 Ill.Dec. 336, 598 N.E.2d 968, 978 (1st Dist. 1992); <u>People v. Knox</u>, 186 Ill.App.3d 808, 134 Ill. Dec. 564, 542 N.E.2d 910, 915 (1st Dist. 1989); but see, <u>People v. Pico</u>, 287 Ill.App.3d 607, 222 Ill.Dec. 908, 678 N.E.2d 780 (1st Dist. 1997).

24

Moreover, the police acted in substantial compliance with the statute in questioning the defendant. The failure to try to contact defendant's parent or guardian prior to the first interview was understandable under the circumstances of this case. The police were faced with an individual who had shot his legal guardian and custodian. It was thus not unreasonable to proceed with the interview. Moreover, once the defendant had provided the name and telephone number of his mother, the police complied with the requirement of a reasonable attempt to notify the minor's mother in Virginia prior to the start of the second interview and the walk-through procedure. There was thus no egregious violation of the statute that would require suppression of the defendant's statements.

This case is clearly distinguishable from <u>People v. McGhee</u>, 154 Ill.App.3d 232, 107 Ill.Dec. 369, 507 N.E.2d 33 (1st Dist. 1987); <u>In re J.J.C.</u>, 294 Ill.App.3d 227, 228 Ill.Dec. 751, 689 N.E.2d 1172 (2nd Dist. 1998); <u>People v. Knox</u>, <u>supra</u>; <u>In re Lashun H.</u>, 284 Ill.App.3d 545, 219 Ill.Dec. 823, 672 N.E.2d 331 (1st Dist. 1995); <u>People v. Montanez</u>, 273 Ill.App.3d 844, 210 Ill.Dec. 295, 652 N.E.2d 1271 (1st Dist. 1995); and <u>In re L.L.</u>, 295 Ill.App.3d 594, 230 Ill.Dec. 430, 693 N.E.2d 908 (2nd Dist. 1998), relied upon by the defendant. In each of these cases, the defendants' parents were in fact at the police station at the time of the questioning but were prevented from seeing the juvenile even after repeated

25

requests to do so.  Indeed, in <u>Montanez</u>, the police had told the defendant's mother not to come to the police station and then denied repeated requests to see the juvenile when she came to the station anyway.  652 N.E.2d at 1272.  In addition, in <u>McGhee</u>, the defendant had been arrested without probable cause prior to the interview.  <u>L.L.</u> is also distinguishable by the fact that the 13-year-old defendant in that case was of limited mental ability, was questioned for three hours when sleep deprived, and asked about his parents during the interview.  His parents were available at the station at the time of this inquiry.  The instant case does not involve this blatant disregard for the notification requirement or any deliberate obstruction of the defendant's right to see a parent who is present and expressing an interest in the minor's welfare.  The trial court's decision thus need not be disturbed based on these cases.

Similarly, there was at most a technical violation of the requirement that the defendant be taken before a youth officer.  The Lincoln Police Department has only one designated youth officer.  (R. Vol. XI, 240) Accordingly, the department has adopted the policy that if this officer is not on duty, the shift commander would assume the role of the youth officer.  (R. Vol. XI, 238-239, 242)  The shift commander on the night in question was Detective Harberts. (R. Vol. XI, 231) His presence conducting the interview was

thus consistent with the statutory policies as they were implemented by this small police department.  There was thus no statutory violation which would require suppression, particularly in view of the total absence of any coercive atmosphere at the police station beyond that inherent at the station.

This case is also distinguishable from <u>Gallegos v. Colorado</u>, 370 U.S. 49, 82 S. Ct. 1209 (1962), and <u>Haley v. Ohio</u>, 332 U.S. 596, 68 S.Ct. 302 (1948).  In <u>Gallegos</u>, the 14-year-old defendant was detained in jail for one day before he gave one statement.  He later gave a more complete and formal written statement after being detained for five days without being presented to the court.  The defendant was kept isolated during this period and his mother was refused permission to see the defendant.  The defendant's statements were found to violate due process based on his age, the length of detention, the isolation from his parents, and the lack of any warnings.  This is clearly distinguishable from the case at bar in which the defendant was fully admonished of his rights, was detained only a short time before giving his confession, and in which his mother was not prevented from seeing him upon her request.

In <u>Haley</u>, the defendant was questioned by several officers in relays over a 5-hour period prior to his confession.  The defendant was never admonished of his rights and was held incommunicado for 3 days following his

27

confession, during which time the defendant's attorney was not allowed to visit the defendant. In addition, the defendant's mother was not allowed to see him until 5 days after his arrest. None of these circumstances are remotely present in the instant case.

The trial court's conclusion that the defendant's statements were voluntary was thus not contrary to the manifest weight of the evidence. There is no basis upon which this court should substitute its opinion for his evaluation of the evidence presented.

ARGUMENT

IV

THE TRIAL COURT'S FINDING THAT THE DEFENDANT HAD MADE A KNOWING AND INTELLIGENT WAIVER OF HIS CONSTITUTIONAL RIGHTS WAS NOT CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

The defendant contends that his statements to the police were not admissible because he did not knowingly and intelligently waive his constitutional rights since he had been interrogated in a coercive atmosphere and had not been adequately admonished as to his rights. The State maintains that the trial court properly found that the defendant had made a knowing and intelligent waiver of his rights.

In order for a defendant's statements to be admissible, it must be shown that he has made a knowing and intelligent waiver of his rights or that he has intentionally relinquished or abandoned a known right or privilege. People v. Bernasco, 138 Ill.2d 349, 150 Ill.Dec. 155, 562 N.E.2d 958, 962 (1990). This must be determined based on the totality of the circumstances surrounding the defendant's statements to the police. People v. Henderson, 175 Ill.App.3d 483, 124 Ill.Dec. 934, 529 N.E.2d 1051, 1053 (1st Dist. 1988); People v. Rabus, 238 Ill.App.3d 765, 179 Ill.Dec. 768, 606 N.E.2d 600, 602 (1st Dist. 1992). However, it is not necessary to establish that

29

the defendant knew and understood every possible consequence of a waiver of his rights, that the defendant was totally rational and properly motivated when he confessed, or that he had all the information that might be useful or affect the decision to confess. <u>Bernasco</u>, 562 N.E.2d at 962. The reviewing court is not to reweigh the evidence and may not disturb the trial court's determination unless it is contrary to the manifest weight of the evidence. <u>Bernasco</u>, 562 N.E.2d at 966. Defendant's statements were admissible under this standard.

The defendant gave his statements here following very brief questioning by the police in a non-threatening and non-coercive manner. The defendant was twice admonished of his rights and indicated that he understood those rights. No requests for any clarification or further explanation were made. (R. Vol. X, 116-118, 148, 150; Vol. XI, 194, 212, 226-227, 230-231, 288-291; Vol. XII, 476-478, 509, 511, 522) No threats or promises were made to the defendant. (R. Vol. X, 116, 119, 125-126, 129; Vol. XI, 194-195, 221, 224, 291, 306, 315, 332)

Other evidence established that the defendant was of average intelligence (R. Vol. XIII, 563-564) and communicated well (R. Vol. XIII, 690). The language of the warnings given to the defendant was not beyond his comprehension. (R. Vol. XIII, 572, 693-695) Indeed, the defendant admitted that he understood what Detective Michael Harberts was saying when he

30

read the warnings (R. Vol. XII, 511) but claimed that the warnings "didn't register" and that the warnings didn't mean anything because he thought they were just police show entertainment (R. Vol. XII, 477, 522).

Based on this record, the trial court properly found the defendant's waiver of his constitutional rights knowing and intelligent.  The questioning was not so coercive that the defendant would have been compelled to waive his rights against his volition.  (See, Argument III)  Nor was there any evidence of limited intelligence or of a mental defect which would prevent the defendant from knowing and understanding his rights or from knowingly waiving those rights.  The defendant exhibited no sign that he did not understand his rights and expressly stated that he understood the rights that had been read to him.   The waiver was clearly valid under these circumstances.  This is particularly true since the manner in which the defendant answered questions at the time of the statements and at the suppression hearing clearly indicated his capacity to make a knowing waiver of his rights. See, People v. Phillips, 226 Ill.App.3d 878, 168 Ill.Dec. 707, 589 N.E.2d 1107, 1113 (2nd Dist. 1992); People v. Burke, 164 Ill.App.3d 889, 115 Ill.Dec. 847, 518 N.E.2d 372, 376 (1st Dist. 1987).

The trial court was justified in rejecting the suggestion that the defendant's respect for authority figures was so great that he would waive his rights and give a statement

31

simply because this was what the police wanted him to do.
Kimberly Ball, the defendant's teacher, testified that the
defendant was compliant with authority figures "when he wanted
to be." (R. Vol. XIII, 702) Thomas Bryant, the associate
pastor and principal at the church school attended by the
defendant, stated that the defendant was not meek and mild in
dealing with adults and was able to refuse requests. (R. Vol.
XIII, 635-636)  Dr. Robert Chapman testified that the
defendant's level of compliance with authority figures did not
mean that he would comply with everything that was asked of
him (R. Vol. XIII, 606) and that the defendant spoke to the
police because he wanted to (R. Vol. XIII, 612). The
defendant had a history of non-compliance and defiance with
authority figures including the principal and teachers at his
school. (R. Vol. XII, 493-494; Vol. XIII, 585-588, 702, 704)
The defendant also felt free to refuse to answer questions
during the taped interview and to insist that he had only shot
his grandfather once even when questioned repeatedly about
multiple shots. (R. Vol. XII, 496-498; Vol. XIII, 592-593)
This would tend to indicate that the defendant would not
simply say whatever was asked or wanted of him. See, Rabus,
606 N.E.2d at 602. Moreover, the defendant admitted that he
was not bullied into answering questions (R. Vol. XII, 505)
and that he did not feel compelled to answer Detective
Harberts' questions because he was an authority figure (R.
Vol. XII, 495). The defendant further testified that he

32

wanted to confess.   (R. Vol. XII, 487, 490)   Any claim that the defendant's waiver of his rights was not knowing because of his compliance with authority figures was without merit in light of this evidence.

Nor would the court be required to suppress the defendant's statements based on his lack of ability to make a knowing waiver because of some mental condition.   The only evidence of any mental condition that might affect the defendant's ability to make a knowing waiver was the testimony of Dr. Chapman that the defendant suffered from attention deficit disorder (ADD) and that this could affect or impair the defendant's ability to make a knowing waiver.   (R. Vol. XIII, 549, 555)   However, Dr. Chapman admitted that he was not testifying that the defendant in fact could not appreciate the gravity of the waiver.   (R. Vol. XIII, 573) The doctor further admitted that he had not spoken to the defendant's most recent teachers and had not reviewed his complete school records. (R. Vol. XIII, 588)   Other evidence indicated that the defendant was not exhibiting any of the signs of ADD described by Dr. Chapman in his most recent classes.   (R. Vol. XIII, 669-670, 678, 689-690, 695)   Indeed, Rev. Bryant, who is familiar with ADD and who saw the defendant regularly at school, indicated that the defendant did not show signs of ADD.   (R. Vol. XIII, 639-640)   The trial court was justified in placing little weight on Dr. Chapman's opinion as to defendant's impaired ability to make a knowing waiver (R. Vol.

I, C 12, C15) under these circumstances.

The defendant's suggestion that the court failed to consider the defendant's educational experience regarding police officers in making his determination (Deft.Br. 72) is without merit. The evidence to which the defendant refers on appeal was before the trial court and was presumably considered by him in making his finding that the defendant knowingly and intelligently waived his rights. That this was in fact considered is shown by the trial court's statement that it had considered the defendant's education and experience. (R. Vol.I, C12) The court's determination thus cannot be disturbed on the basis that it failed to consider relevant information. Moreover, the mere fact that the defendant was taught that police officers were entitled to respect would not mandate the conclusion that he was incapable of refusing to give the police a statement or incapable of understanding the admonition that he was not required to speak to the police.

The trial court's determination also does not have to be reversed based on People v. Turner, 56 Ill.2d 201, 306 N.E.2d 27 (1973), People v. Higgins, 239 Ill.App.3d 260, 180 Ill.Dec. 443, 607 N.E.2d 337 (1st Dist. 1993), or People v. Travis, 122 Ill.App.3d 671, 78 Ill.Dec. 535, 462 N.E.2d 654 (1st Dist. 1984), cited by defendant. In Turner, the defendant was mentally retarded and had an IQ of between 65 and 77 (bottom 10% of the population). His confession was held to be subject

34

to suppression because he had made a request for counsel which was not honored.  306 N.E.2d at 30-31.  The defendant here was not mentally retarded and did not make any request for counsel.  Turner is thus inapplicable.

In Higgins, the defendant had an IQ of 67 and was in special education classes.  Expert testimony was presented that a rote reading of the warnings would be a problem for the defendant and that many of the words used in the warning would be beyond his understanding.  In addition, the defendant's conduct at the suppression hearing and inability to read the warning form indicated his lack of understanding.  No similar evidence was presented here where the defendant was of average intelligence and understood the words used in the warnings.

In Travis, the defendant's confession was found to be subject to suppression because he had been held and questioned by the police at the police station for several hours on two separate days without probable cause.  462 N.E.2d at 657-658.  The court then held that the record did not support the conclusion that the defendant had knowingly waived his rights, relying, in part, on the illegality of his detention.  462 N.E.2d at 658-659.  The court also noted that no evidence had been presented regarding the defendant's intellectual capacity and that the police had attempted to coerce the defendant into making an incriminating statement by failing to contact his parents either time they took him into custody without probable cause.  462 N.E.2d at 659.  In contrast, the

35

defendant here was properly arrested after he had admitted shooting two individuals. Moreover, the court was presented with substantial evidence concerning the defendant's mental capacity and his ability to understand the warnings given to him. Furthermore, there was no deliberate attempt to coerce the defendant into giving a statement. Instead, the police were found to have acted in a manner that was "very calm, non-intimidating, non-threatening and respectful of the defendant's age." (R. Vol. I, C13) <u>Travis</u> thus need not be followed here.

The trial court's finding that the defendant had made a knowing and intelligent waiver of his rights was thus not contrary to the manifest weight of the evidence and should not be disturbed by this court.

ARGUMENT

V

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING
EVIDENCE OF PRIOR VIOLENT CONDUCT BY THE VICTIMS.

The defendant sought to introduce evidence that his
mother, Glenda Ashworth, had been physically abused by her
parents, the victims in this case, when she was a child. The
defendant contended that this evidence was relevant to his
claim that he was acting in self-defense when he shot and
killed his grandparents who had physically abused him in a
manner similar to the abuse inflicted on Glenda some 19 years
earlier. The trial court properly ruled that this evidence
was inadmissible.

Evidence of the victim's violent character and acts may
be admissible where the defendant claims self-defense in one
of two ways. First, if the victim's violent character is
known to the defendant, the other acts of violence may be
admissible to show the effect of the defendant's knowledge of
the victim's history of violence on his perceptions and
reactions. Secondly, if the evidence as to the offense is
conflicting, the victims' violent nature may be admissible as
relevant to who was the aggressor, even if the defendant was
not aware of the victims' violent character. People v. Lynch,

37

104 Ill.2d 194, 83 Ill.Dec. 598, 470 N.E.2d 1018, 1020 (1984);
People v. Ciaverelli, 262 Ill.App.3d 966, 200 Ill.Dec. 271,
635 N.E.2d 610, 614-615 (1st Dist. 1994). The admissibility
of this evidence is left to the sound discretion of the trial
court.  Ciaverelli, 635 N.E.2d at 615.  On appeal, the
reviewing court may not simply substitute its judgment for
that of the trial court and may disturb the trial court's
decision only if it is arbitrary, fanciful, or unreasonable,
or if no reasonable man would take the view adopted by the
trial court.  People v. Illgen, 145 Ill.2d 353, 164 Ill.Dec.
599, 583 N.E.2d 515, 519, 522 (1991).  The trial court's
ruling should be affirmed under this standard.

Glenda's proposed testimony was clearly not admissible
under the theory that the alleged abuse of Glenda somehow
affected the defendant's perceptions. There was no claim made
that the defendant was aware of the alleged abuse inflicted
upon his mother many years before he had even been born. It
could thus not have had any impact on his perceptions on the
night in question.

The fact that the defendant was aware of the Cearlocks'
violent tendencies because he had allegedly suffered from
those tendencies would not open the door to the evidence of
the abuse of Glenda.  The question is whether the defendant
knew of the abuse of Glenda and whether that knowledge played
any part in his alleged perception of danger or fear at the
time he shot the Cearlocks.  There was no evidence that

defendant was either aware of Glenda's abuse or that this affected his actions on the night in question. Indeed, the defendant only claimed that he was afraid of his grandparents based on their past mistreatment of him. He made no reference to Glenda's alleged experience as a basis for his fears. The evidence of the alleged mistreatment of Glenda was therefore not admissible as reflecting on the defendant's state of mind.

Nor was the evidence of Glenda's alleged abuse admissible as relevant to the question of who was the aggressor. In this case, the only conflict as to what happened before and at the time of the shootings arose from the differences between the defendant's statements or testimony regarding how the offense occurred. In his first statement to the police, the defendant only said that he shot his grandparents because "they pissed him off and he couldn't take anymore." (R. Vol. XXI, 356; Vol. XXII, 514)

In his first statement to the police at the police station, the defendant stated that his grandparents were angry and yelling at him because of a detention notice for being tardy to class. (R. Vol. XXII, 525-526) After this had gone on for several minutes, the defendant went to the bathroom. He then got a pistol and bullets from his grandfather's room, returned to the bathroom, and loaded the pistol. (R. Vol. XXII, 526-528) The defendant shot a Tilex bottle in the bathroom and immediately left the bathroom. (R. Vol. XXII, 528-529) He saw his grandmother standing at the end of the

39

hallway. She screamed and backed up. At this time, the defendant's grandfather came around the corner and the defendant shot him in the head. (R. Vol. XXII, 529) He then chased his grandmother as she ran towards the front door and shot her in the back. He tried to shoot her several more times as she ran and after she fell on the ground but the gun jammed. (R. Vol. XXII, 529-530) The defendant stated that he had thought about killing his grandparents in the past. (R. Vol. XXII, 534-535) He went into his grandmother's bedroom to look for another gun to shoot her some more but couldn't find it. (R. Vol. XXII, 530-531)

In his second, taped statement to the police, the defendant again stated that his grandparents had made a "big deal" about his tardy slip and were very upset and complaining about the tardy slip. (R. Vol. XXXIV, 55) The defendant stated that he got mad because of how they were making such a big deal about this. (R. Vol. XXXIV, 55) The defendant got the gun, loaded it in the bathroom, and shot the Tilex bottle out of anger. (R. Vol. XXXIV, 55) In his taped statement, the defendant stated that he had thought about killing his grandparents for 10 or 15 minutes before he went to get the gun and that he used the .22 on the spur of the moment because it was the only gun available. (R. Vol. XXXIV, 60, 65) He saw his grandparents in the hallway when he came out of the bathroom. His grandmother screamed and jumped out of the way as his grandfather came around the corner. The defendant shot

40

him as he came around the corner, then shot his grandmother as she fled from the house. (R. Vol. XXXIV, 55-56). The defendant again stated that he tried to shoot his grandmother as she lay on the ground but that the gun jammed. (R. Vol. XXXIV, 56-57) He tried to find a gun in her room to shoot her with but couldn't find it. (R. Vol. XXXIV, 57)

During the video-taped re-enactment, the defendant said that he had loaded the gun in the bathroom and shot the Tilex bottle. (R. Vol. XXXIV, 66-67) This grabbed his grandparents attention. (R. Vol. XXXIV, 67) When he came out of the bathroom, his grandmother saw the gun, started screaming, and ran away. (R. Vol. XXXIV, 67) The defendant shot his grandfather in the head right when he saw him come around the corner. (R. Vol. XXXIV, 67) He shot his grandmother in the back as she was trying to get out the door and tried to shoot her again but his gun jammed. (R. Vol. XXXIV, 67-68) The defendant broke down the door to his grandmother's room to look for another gun but couldn't find it. (R. Vol. XXXIV, 68) During the video-taped interview, the defendant said that his grandparents had yelled at him that night but had not hit him. (R. Vol. XXXIV, 70) His grandfather had hit or punched him the week before. (R. Vol. XXXIV, 70)

At trial, the defendant embellished on these previous statements by claiming that he had been subjected to mistreatment and beatings at the hands of his grandparents on numerous instances in the past and that his grandfather had in

41

fact beat him with a razor strap on the night of the
shootings.    The defendant further claimed that he was
contemplating suicide at the time that he got the gun and
loaded it in the bathroom.  (R. Vol. XXIII, 790) He instead
shot the Tilex bottle for "some reason or other."  (R. Vol.
XXIII, 790-791)  He got scared about what his grandparents
were going to do because of this and stepped out of the
bathroom.  (R. Vol. XXIII, 791-792)  His grandmother started
screaming when she saw the gun.  (R. Vol. XXIII, 791) The
defendant shot his grandfather as he walked around the corner
because he was afraid his grandfather would lose control and
wouldn't stop.  (R. Vol. XXIII, 792-794, 800-801)  He also
shot his grandmother in the back as she was running out of the
house because he was afraid of her. (R. Vol. XXIII, 794-796,
802)  The defendant admitted trying to unjam the gun but
denied trying to fire additional shots at his grandmother.
(R. Vol. XXIII, 796-797) The defendant further admitted
looking for the other gun but stated that he did not know why
he was looking for it.  (R. Vol. XXIII, 798-799) The defendant
had not told the police about his grandparents' mistreatment
of him because he "didn't want to disrespect them."  (R. Vol.
XXIII, 803-804)

The jury was thus faced with essentially two different
versions of what had occurred.  In each of his pretrial
statements, the defendant had admitted that he had shot his
grandparents deliberately because he was angry at how they

treated him over the tardy notice.   The defendant further admitted trying to shoot his grandmother as she lay on the ground.   At trial, the defendant altered the course of events to claim that he was acting in self-defense when he shot his unarmed grandparents when they responded to the shot he had fired in the bathroom.   In both scenarios, the defendant shot his grandfather immediately as he walked around a corner from a distance of around 6 feet and shot his grandmother in the back as she fled.   In both scenarios, there was no indication that either Keith or Lila Cearlock was the aggressor at the time of the shooting or that they did anything other than respond to the shot that had been fired by the defendant. Indeed, Mrs. Cearlock clearly could not be deemed the aggressor as she was shot in the back as she fled from the defendant.

The trial court properly excluded the evidence of the alleged abuse of Glenda under these circumstances.   There was no conflict in the evidence as to who was the aggressor at the time of the shooting that would permit evidence of the victims' prior acts of violence to be admitted to show that they were the aggressors.   The mere fact that the Cearlocks had allegedly punished the defendant using a leather strap shortly before the shootings would not justify admission of Glenda's testimony.   They had clearly ceased to be the aggressors when the defendant left the room, loaded the gun, fired a shot at a bottle, and then shot the Cearlocks as they

43

reacted to his actions.  The defendant could not claim that they were the aggressors based on their reaction to his actions.  See, <u>People v. Sloan</u>, 111 Ill.2d 517, 96 Ill.Dec. 55, 490 N.E.2d 1260 (1986).

Moreover, assuming arguendo that there was some question as to who was the aggressor, the trial court properly excluded the evidence of the past abuse of Glenda.  As the court found, the events described by Glenda were extremely remote from this offense and the necessary nexus between those remote events and the instant offense was lacking due to the lack of reliability concerning Glenda's claims of abuse and due to the intervening time frame.  (R. Vol. XX, 248-249) See, <u>People v. Ellis</u>, 187 Ill.App.3d 295, 134 Ill.Dec. 913, 543 N.E.2d 196, 200 (1st Dist. 1989) (victim's convictions not admissible to support self-defense claim where offenses were over 10 years old).  The mere fact that the defense expert found the information from Glenda to be relevant and helpful to him in making his evaluation of the defendant would not require the admission of this evidence since the court was not required to accept Dr. Stuart Hart's opinion and was entitled to make his own determination as to whether the information would be helpful to the jury.

Moreover, admission of Glenda's testimony would have necessitated a considerable mini-trial to determine whether the abuse had in fact taken place as she claimed.  For example, the State would have been required to present friends

44

and relatives of Glenda who would be able to testify whether she ever showed any signs of having been beaten, whether she had ever reported the beatings, or even whether the alleged beatings had in fact never taken place. The court could exclude the evidence on this basis to avoid diverting the jury's attention from the events of the present case. See, People v. Friday, 232 Ill.App.3d 1047, 174 Ill.Dec. 105, 598 N.E.2d 312, 318 (4th Dist. 1992); People v. Moore, 189 Ill.App.3d 957, 137 Ill.Dec. 478, 546 N.E.2d 232, 236 (4th Dist. 1989); Ciaverelli, 635 N.E.2d at 615.

The trial court did not abuse its discretion in excluding the evidence in question. The trial court carefully weighed the probative value of the evidence against its remoteness and lack of reliability. The conclusion he reached was not arbitrary or unreasonable. There is no basis upon which this court should substitute its judgment for that of the trial court. Defendant's convictions should therefore be affirmed.

ARGUMENT

VI

THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON
SECOND DEGREE MURDER AS TO THE CHARGES OF FELONY MURDER.

The defendant contends that the trial court erred in
refusing to give an instruction on second degree murder in
connection with the charges of felony murder. The defendant
contends that such instructions were required based on the
evidence that the intent to kill was formed after the
defendant determined that it was necessary to use force to
protect himself. The defendant further contends that self-
defense instructions to felony murder are required based on
the language of the statutes and the need to avoid
inconsistent verdicts and to prevent the State from nullifying
the second degree murder statute.

The State maintains that the trial court properly refused
to instruct the jury on second degree murder regarding the
felony murder counts. The State further maintains that any
error was harmless.

The trial court properly refused to instruct the jury on
second degree murder with respect to the charge of felony
murder. 720 ILCS 5/9-2 (West 1996) provides:

46

(a) A person commits the offense of second degree murder when he commits the offense of first degree murder <u>as defined in paragraphs (1) or (2) of subsection (a) of Section 9-1</u> of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed . . . or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.
(Emphasis added)

Under the express language of the statute, second degree murder applies only if the defendant is charged with knowing or intentional murder and is not available if the defendant is charged with felony murder under 720 ILCS 5/9-1(a)(3) (West 1996). In addition, under 720 ILCS 5/9-2(c) (West 1996), the State is no longer required to prove the absence of any mitigating factor beyond a reasonable doubt and the burden is on the defendant to prove the mitigating factor by a preponderance of the evidence. See, <u>People v. Jeffries</u>, 164 Ill.2d 104, 207 Ill.Dec. 21, 646 N.E.2d 587, 591-592 (1995); <u>People v. Shumpert</u>, 126 Ill.2d 344, 128 Ill.Dec. 18, 533 N.E.2d 1106, 1109 (1989). Allowing an instruction on second degree murder for felony murder would be directly contrary to this express language of the statute and would entail unwarranted and improper judicial redrafting of a clear and unambiguous statute. See, <u>People v. Allen</u>, 153 Ill.2d 145,

180 Ill.Dec. 72, 606 N.E.2d 1149, 1155 (1992). The second degree murder instruction was therefore properly denied as to the charges of felony murder.

A contrary conclusion is not mandated by People v. Williams, 164 Ill.App.3d 99, 115 Ill.Dec. 334, 517 N.E.2d 745 (4th Dist. 1987), and People v. Kidd, 295 Ill.App.3d 160, 229 Ill.Dec. 682, 692 N.E.2d 455 (4th Dist. 1998), relied upon by the defendant. In both Williams and Kidd the question was whether a defendant charged with first degree murder (based on aggravated battery) was entitled to a second degree murder instruction based on provocation. In this case, there is no claim that the homicides were provoked by the victims. These decisions thus do not apply.

Moreover, Williams is clearly inapplicable. Williams was decided under the prior voluntary manslaughter statute, Ill.Rev.Stat., ch. 38, Sec. 9-2(a)(1985). Applying the Williams analysis to the instant case, as was done by this court in Kidd, simply ignores the significant changes made in the law and, as noted by Justice Steigmann in his concurrence in Kidd, 692 N.E.2d at 462-463, disregards the clearly stated intent of the legislature to preclude the possibility of second degree murder where the defendant is charged with felony murder.

Furthermore, the decisions in Williams and Kidd are contrary to the third district's decision in People v. Thurman, 223 Ill.App.3d 196, 165 Ill.Dec. 635, 584 N.E.2d 1069

48

(3rd Dist. 1991). In <u>Thurman</u>, the defendant contended that he could not properly be charged with felony murder based upon aggravated battery on the basis that:

> Because every murder involves an aggravated battery, . . . every murder could be charged as felony murder, and defendants would be precluded from proving mitigating factors to reduce first degree to second degree murder.
> 584 N.E.2d at 1074.

The appellate court expressly rejected this defense theory and held that felony murder could be based on aggravated battery. 584 N.E.2d at 1074. This court's concern that the second degree murder statute would effectively be eliminated if second degree murder did not apply if the defendant was charged with felony murder based on aggravated battery has thus been addressed and rejected by the third district. This court's opinion in <u>Kidd</u> is in conflict with the opinion in <u>Thurman</u> and should not be followed here.

The defendant's contention that precluding a second degree murder instruction for felony murder could lead to inconsistent verdicts is without merit. The jury here was instructed as to the verdicts that could be returned by them and were expressly told that they should only sign one form of verdict, either "not guilty of first degree murder," "guilty of first degree murder," or "guilty of second degree murder" as to each of the victims. (R. Vol. IV, C962) The jury is presumed to follow the court's instructions. <u>People v. Taylor</u>, 166 Ill.2d 414, 211 Ill.Dec. 518, 655 N.E.2d 901, 913

49

(1995); <u>People v. Walker</u>, 253 Ill.App.3d 93, 192 Ill.Dec. 1, 624  N.E.2d 1353, 1362 (1st Dist. 1993).   No inconsistent verdicts were therefore possible and no instruction on second degree murder based on felony murder was required to prevent inconsistent verdicts.

Assuming arguendo that a second degree murder instruction should have been given as to the felony murder, the defendant was not deprived of a fair trial.   The absence of the requested instruction could clearly not have prejudiced the defendant regarding the death of Keith Cearlock.   The jury found the defendant of second degree murder as to Keith Cearlock.   (R. Vol. IV, C979; Vol. XXXI, 3) The absence of a second degree felony murder instruction could thus not have deprived the defendant of a fair trial.

Similarly, the absence of a second degree felony murder instruction was clearly harmless regarding the charge of murder as to Lila Cearlock.   Taking the evidence in the light most favorable to the defendant, the evidence established that Lila had encouraged or told Keith to beat or spank the defendant in the past and that Lila was angry and yelling at the defendant on the night in question.   The evidence further established that Lila did not use or threaten any force against the defendant on the night of the offense and that she was shot in the back as she fled from the house.   Based upon this evidence, no reasonable juror could have found that the defendant acted in unreasonable belief of self-defense.   The

50

evidence clearly showed that the defendant shot and killed an elderly woman who presented no possible threat to him and who was attempting to flee from him at the time of the murder. This evidence overwhelmingly established that the defendant was guilty of first degree murder and that there was no mitigation to reduce the offense to second degree murder. Any error was therefore harmless. See People v. Moore, 95 Ill.2d 404, 69 Ill.Dec. 640, 447 N.E.2d 1327, 1330-1331 (1983); People v. Anderson, 266 Ill.App.3d 947, 204 Ill.Dec. 367, 641 N.E.2d 591, 596 (1st Dist. 1994).

Defendant's convictions should therefore be affirmed.

ARGUMENT

VII

THE TRIAL COURT PROPERLY DENIED THE DEFENDANT'S MOTION TO DISMISS THE CHARGES OF FELONY MURDER.

The defendant contends that the trial court erred in denying his motion to dismiss the felony murder charges. The defendant contends that the State should not be allowed to charge an individual with felony murder where, as here, the underlying felony is aggravated battery or aggravated discharge of a firearm because this would allow the State to charge felony murder in every homicide and because this would be inconsistent with the legislative intent to deter individuals from committing violent felonies which formed the basis for the felony murder rule. The defendant therefore contends that the felony murder charges were required to be merged in the intentional and knowing counts of murder. The State maintains that the trial court properly denied the defendant's motion to dismiss the felony charges.

The claim that the State may not charge an individual with felony murder when the underlying offense is aggravated battery has previously been addressed by the courts. In People v. Viser, 62 Ill.2d 568, 343 N.E.2d 903 (1975), the defendant contended that he could not be charged with felony

52

murder (aggravated assault) on the theory that since all felony murders involved aggravated battery or assault it would be improper to allow a charge of felony murder to be brought since this was not the type of offense the legislature intended to deter when it created the felony murder rule. The supreme court expressly rejected this merger theory holding that the express legislative language characterizing aggravated battery as one of the forcible felonies which will trigger felony murder charges authorized the charge of felony murder based on aggravated battery. 343 N.E.2d at 909.

In People v. Thurman, 223 Ill.2d 196, 165 Ill.Dec. 635, 584 N.E.2d 1069 (3rd Dist. 1991), the third district addressed the claim that since every murder involves an aggravated battery the aggravated battery should merge into the murder as a lessor included offense. Citing Viser, the court again specifically held that aggravated battery could be used as the predicated for felony murder. 584 N.E.2d at 1074. See also, People v. Szerlitech, 86 Ill.App.3d 1121, 42 Ill.Dec. 389, 408 N.E.2d 1098, 1101 (4th Dist. 1980) (felony murder doctrine applies even though operating felony of aggravated battery not independent of homicide).

Defendant's claim that a charge of felony murder may not be based on the underlying offenses of aggravated battery or aggravated discharge of a firearm is thus without merit. This is particularly true ion light of 720 ILCS 5/2-8 (West 1996) which specifically lists aggravated battery as a forcible

53

felony and which defines forcible felony to include any felony involving the use or threat of physical force or violence against any individual.   To hold that aggravated battery cannot be the predicate for felony murder is directly contrary to the legislative definition o forcible felony and cannot be adopted by this court.

This court should therefore affirm the defendant's convictions.

## CONCLUSION

Wherefore, the PEOPLE OF THE STATE OF ILLINOIS respectfully request this court to affirm the defendant's convictions and to tax costs accordingly.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS

William G. Workman
State's Attorney
Logan County Courthouse
601 Broadway
Lincoln, Illinois  62656

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
David E. Mannchen
Staff Attorney
State's Attorneys Appellate
        Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782-8076

COUNSEL FOR PLAINTIFF-APPELLEE



E-FILED
Wednesday, 13 August, 2008 03:07:30 PM
Clerk, U.S. District Court, ILCD

## CASE NO. 4-96-0996

### IN THE APPELLATE COURT
### FOR THE FOURTH DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | On Appeal from the Circuit Court |
| | ) | for the Eleventh Judicial Circuit |
| | ) | Logan County, Illinois |
| Plaintiff-Appellee | ) | |
| | ) | |
| v. | ) | Case No. 95-CF-101 |
| | ) | |
| JON R. MORGAN, | ) | The Honorable Gerald Dehner |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

# REPLY BRIEF OF APPELLANT,
# JON R. MORGAN

<u>Counsel for Appellant</u>:
D. Peter Wise
Gates, Wise & Schlosser, P.C.
Attorneys at Law
1225 South Sixth Street
Springfield, Illinois  62703
(217) 522.9010



FILED

MAR - 4 1999

Clerk of the
Appellate Court, 4th Dist.

## ORAL ARGUMENT REQUESTED

EXHIBIT E

# ARGUMENT

I.   **JON MORGAN PROPERLY USED SUPREME COURT AND APPELLATE COURT PRECEDENT AND HIS BRIEF EXPOSED THE TRIAL COURT'S ABUSE OF DISCRETION RATHER THAN SIMPLY INVITING THIS COURT TO REWEIGH THE FACTS.  MOREOVER, THE SELECTIVE AND INACCURATE REFERENCES TO THE RECORD BY THE APPELLEE SHOULD NOT PERSUADE THIS COURT TO AFFIRM THE TRIAL COURT'S ORDER TRANSFERRING JON MORGAN'S JUVENILE CASE TO THE CIRCUIT COURT FOR PROSECUTION.**

In its brief, the appellee attempts to apply this court's rule that a defendant cannot compare other sentences imposed in allegedly similar cases to determine whether the trial court in a particular case on appeal has abused its discretion by imposing an excessive sentence. *People v. Bien*, 227 Ill.App. 3d 744. 661 N.E.2d 511 (1996).  This rule has no application to this case.  Jon Morgan relied on established precedent from Illinois Supreme Court and the appellate courts to demonstrate that the trial court abused its discretion in this case.  Additionally, the appellee failed to address Judge Coogan's sole and erroneous reference to the record when determining that the offense was aggressive and premeditated.  The appellee also selectively and incorrectly refers to other portions of the record when arguing that the offense was aggressive and premeditated.  The appellee's analysis of other factors such as Jon Morgan's age, his background and history and potential for rehabilitation are flawed due to selective and incomplete references to the record.  Finally, the trial court's specific reference that Jon Morgan would serve  a mandatory prison sentence rather than a life sentence if convicted as an adult, despite all counsel's attempt to educate him to the potential of a life-sentence demonstrates that

Judge Coogan failed to give proper consideration to the penalty Jon Morgan faced if tried as an adult.

> **A.** **The Appellee Improperly Applied This Court's Rule That States that a Defendant Cannot Compare Other Sentences Imposed in Allegedly Similar Cases to Determine Whether The Trial Court In a Particular Case On Appeal has Abused Its Discretion By Rendering an Excessive Sentence.**

The appellee argues that "[t]his Court should reject any approach that simply compares the facts in published opinions and makes a determination based on the defendant's alleged similarity to the juveniles or defendants involved in those cases." (Brief of Appellee, p.3) For this proposition, the appellee cites *People v. Bien*, 277 Ill.App.3d 744, 661 N.E. 2d 511 (1996). In *Bien*, this court rejected the comparative sentence approach when a defendant argues on appeal that the trial court sentence was excessive. This court ruled that the comparative sentence approach is statistically invalid. *Bien, supra*, 661 N.E.2d at 518. In this case, Jon Morgan is not comparing his sentence to allegedly similar cases to argue that his sentence was excessive. He used the established and time-honored tradition in legal research and writing of relying on established case precedent to marshal arguments that Judge Coogan abused his discretion.

Jon Morgan relied on established precedent from the Supreme Court and appellate courts in preparing his brief. To use legal precedent, Jon Morgan looked to all of the issues presented by the facts and the record and either compared or contrasted them to the facts and legal principals established in the reported decisions he cited. The Supreme Court cases and appellate court cases Jon Morgan cited are the controlling authority for the interpretation of *705 ILCS 405/5-4(3)(b)(2)* which is the statute that governs Judge Coogan's decision to transfer this case

-2-

to the circuit court. These cases exist for the benefit of judges, attorneys and litigants to argue their respective positions to trial or appellate court judges.

Jon Morgan used a number of those cases to contrast his background to juveniles who were prosecuted as adults. For instance, he compared his background of continuous school attendance, no prior contact with criminal justice system, lack of drug use, no gang membership, no meaningful history of violent behavior and outstanding rehabilitative potential against the background and history of defendants L.J. and M.D. In *In the Interest of L.J.*, 274 Ill.App.3d 977, 654 N.E. 2d 671 (1st Dist., 1995), the court observed that the record showed that L.J.'s life experiences are that of someone way beyond his age. Although he was only 14 ½ years old when he committed a homicide, L.J. had numerous police contacts for criminality and had been a member of a notorious street gang since he was eleven. He was not attending school. These factors led the court to conclude that L.J. was not a stranger to the criminal justice system or adult experiences. His experience demonstrated that he had plainly ceased being a minor. *Id.* at 673. In *People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367 (1994), the Supreme Court sanctioned the prosecution of a minor as an adult on two counts of murder. M.D. had admitted drinking alcohol until he was intoxicated, using marijuana, and enjoying sex with two different girlfriends. The court concluded that his experience was that of someone well beyond his years. *Id.* at 373. Jon Morgan appropriately used these established precedents to contrast the backgrounds of those defendants against his own. Jon Morgan's background demonstrated that he had not ceased being a minor. Indeed, as Judge Coogan found, his background was such that he had not been provided a chance to live a normal life as a youth in our society.

Jon Morgan also used established precedent in which appellate courts ruled that a minor's case should remain in the juvenile justice system. In *People v. D.B.*, 202 Ill.App.3d 194, 555 N.E. 2d 873 (1st. Dist. 1990), the defendant committed the offenses of first degree murder, home invasion and residential burglary. In this case, the court found that minor's history and background did not demonstrate that he had experience of someone well beyond his years. The court also noted that D.B. possessed the emotions of a young man at a tender age. This precedent compared favorably with Jon Morgan's background. Another case cited by Jon Morgan where the juvenile's background was similar to his own is *In the Interest of Burns*, 67 Ill.App.3d 361, 385 N.E.2d 22 (1978). In that case, Myra Burns was 15 years old. Her mother's instabilities deprived her of a stable home environment. Myra Burns' father was not a part of her life. She felt rejected when mother ended a number of relationships with different men. Her grandmother cared for her from time to time and had custody of Myra at one time. Her grandmother felt that Myra's mother was not a proper parent. When her mother found religion, Myra was not allowed to associate with anyone who was not, in her mother's view, "saved." *Id.* at 25. When determining that she should be tried as a juvenile, the court held that her history tends to favor treatment as a troubled adolescent rather than incarceration as a hardened adult. *Id.* at 26. The court found that she was at an age where it was too early to give up easily or in frustration or exasperation the hope that she would ever become a productive member of our society. *Id.* at 24, 25. These facts and legal principles are directly analogous to Jon Morgan's case.

-4-

**B.    The Appellee Failed to Address the Trial Court's Reference to a Fact Not in the Record When Announcing That the Offense Was Committed in an Aggressive and Premeditated Manner. Moreover, the Record Established That Jon Morgan Acted Out of Impulse, Fear and Panic.**

When Judge Coogan ruled that the offense was committed in an aggressive and premeditated manner, he pinned his finding on his belief that Jon Morgan had talked about killing his grandparents in the past and that the grandparents ended up dead at his hands. (R.Vol. VIII, p. 447) The record does not demonstrate that Jon Morgan talked about killing his grandparents. Jon Morgan established this without question in his brief (Brief of Appellant, p. 37, 38). The appellee makes no effort to persuade this court that Judge Coogan's finding of fact was correct. They cannot do so.

The appellee attempts to persuade this court that the offense was aggressive and premeditated by selectively citing passages to the record. Other passages are taken out of context or are not complete.

The appellee points to testimony that Jon Morgan stated that he thought about killing his grandparents three or four times in the four or five months prior to the shooting. (Brief of Appellee, p. 5) First, in context, these thoughts hardly constitute premeditation. The record never establishes when the last of these "thoughts" was prior to the shooting. No detail was ever developed about these thoughts. Second, Dr. Chapman's examination demonstrated that Jon admitted to intrusive thoughts that bother him and make him anxious. These thoughts are sometimes about shooting people, mostly at church, for the way they treated him. Jon did not want these thoughts but he could not keep them out of his head. (Supp.R.Vol. II, Respondent's

-5-

Exhibit No.2, p.6)  The uncontradicted assessment of these types of thoughts from a mental

health professional establishes that Jon's fleeting thoughts do not establish a premeditated act

on April 27, 1995.

Contrary to the appellee's assertions, the record does not definitively state that Jon began

thinking about killing his grandparents when his grandfather was berating him about the

detention he had received.  Jon told Detective Harberts that he did not start the evening planning

to kill his grandparents. Detective Harberts  then attempted to ask him a leading question about

when he formed that thought.  Detective Harberts then stated, "Don't let me tell you.  You tell

me." (R.Vol. VI, p. 92) Jon's answer only indicates that when his grandfather was telling him

how people wouldn't hire him because he as late, it then entered Jon's mind that he was getting

sick of the manner in which his grandfather was berating him.  *Id.*

Jon yelled at his grandparents for making too much of the detention.  Because he yelled,

his grandfather ordered him to fetch a razor strap making Jon bend over and grab his ankles.  His

grandfather beat him with the strap, five licks, as hard as he could across Jon's buttocks.

(Supp.R.Vol. II, Respondent's Exhibit No. 2, p. 5) Following the beating with the razor strap,

Jon went to the bathroom.  While in the bathroom, he wondered why his grandparents treated

him like this.  He could not find an answer and went to find a gun to kill himself.  *Id.,* p. 6.  The

appellee concedes that Jon got the gun on the spur of the moment.  (Brief of Appellee, p. 5) Jon

took the gun and a box of shells into the bathroom where he loaded eight bullets into the gun.

As he sat on the counter top, he shot at a bottle of Tylex that sat on the bathtub approximately

four feet away.  (R.Vol. VI, p. 43, 44) After doing so, Jon believed that his grandfather would

-6-

kill him for his actions. (Supp.R.Vol. II, Respondent's Exhibit No. 2, p. 6) Moments after firing the gun, Jon came out of the bathroom as his grandfather was coming around the corner. Jon's grandmother was standing in the hallway. His grandmother began to scream. *Id.*, p. 5, 6. Jon panicked and shot his grandfather. His grandmother screamed and he knew he had to shoot her to get everyone's attention. *Id.* p. 6. These facts establish fear, panic and impulse. After the irrational act of shooting the Tylex bottle, his grandparents could have easily fled the house after dialing 911 rather than rush to the bathroom to see what had happened. Jon's fear of this grandfather killing him were real. In the weeks prior to the shooting, episodes of physical violence against Jon by his grandfather were on the rise. Moreover, his grandfather had threatened to kill him in his sleep if he ever resisted. Jon's grandfather shared this threat with the pastor of the church. Jon's statement that he needed to shoot his grandmother to get everybody's attention leads inescapably to the conclusion that his conduct was impulsive and irrational, not calculated and premeditated.

The appellee points to Detective Harberts' testimony that Jon made the statement to him that he tried to shoot his grandmother as she lay dying on the ground but he gun misfired. (Brief of Appellee, p. 5) When Jon's statements were recorded, he indicated that he did follow his grandmother out of the house where she fell down by a tree. He indicated that he did not know what he would do if he gun were not jammed. (R.Vol. VI, p. 76) In any event, following his grandmother out of the house into the light of early evening after firing a gun three times where anyone within hearing distance would be focusing on the Cearlock home can hardly be called the act of a cold, calculated killer.

-7-

Finally, the appellee suggests that Jon Morgan expressed no regret or remorse for killing his own grandparents. The record is sharply to the contrary. After changing his clothes because he had the "urge" to do so, Jon wandered in nearby alleys to his friend's house. He accidentally discharged the gun two times while trying to unload it. Once, he nearly shot himself in the head. These facts demonstrate that Jon did not have a getaway plan. Less than an half hour after the shootings, he turned himself in to law enforcement authorities. Throughout the evening, Jon submitted to witness identification procedures and repeated questioning. He agreed to do a "video re-enactment' of the scene and help law enforcement authorities search for evidence. During his meeting with Dr. Chapman, Jon broke down and cried when talking about his conduct. In *People v. D.B., supra*, the court took into consideration that the respondent confessed his crimes to his mother the night it occurred and to the police the next day. The court found that these acts reflected D.B.'s remorse and a willingness to take responsibility for his wrongful behavior. *D.B., supra*, 559 N.E. 2d at 878.

C.    **The Appellee's Assessment of Jon's Age, History, Background and Prospects for Rehabilitation Should Not Persuade this Court to Affirm the Trial Court's Order Transferring Jon Morgan's Case to the Circuit Court for Prosecution.**

The appellee claims that there is no indication that Jon Morgan was immature for his age. (Brief of Appellee, p. 7) The record demonstrates otherwise. Judge Coogan specifically found that Jon Morgan did not have the skills to survive and that he had been short changed in his life. This is the essence of immaturity. At a more traditional level, boys and girls were not allowed to be within 18 inches of each other at the Park Meadows Baptist School . Jon was expelled from the school for refusing to be disciplined for kissing a girl. The girl was not a student of

-8-

Park Meadows and the kiss did not occur on school grounds. Jon did not use alcohol or drugs. Jon's grandmother would not tolerate him socializing with anyone other than Christian children from the Park Meadows Baptist church. Jon Morgan was a stranger to adult experiences. He was deprived of many of the experiences of young persons his age.

Interestingly, the appellee notes that "the strict manner in which the defendant was being raised could be viewed as providing a motive for the slayings..." (Brief of Appellee, p. 8) Jon's background is directly related to the shootings. His grandparent's public, pious posing masked their fighting with each other and intolerance for one another in their home. His grandparents were constantly criticizing Jon's mother, his father and anyone who wasn't "Christian." His grandparents were physically and emotionally hostile towards Jon. They fought with Jon's mother during phone conversations. His grandfather threatened him with death if he dared to resist him. He learned intolerance and hostility at the Park Meadows School where discipline was dispensed with a paddle.

If a child lives with criticism, he learns to condemn. If a child lives with hostility, he learns to be angry. If a child lives in fear, he learns to lash out. As Judge Coogan pointed out, Jon was never afforded the opportunity to live with acceptance, praise, security or approval. These are a few of the basic emotional needs a child needs to survive.

Despite the failings of those who were responsible for his care, Jon Morgan has a great capacity for rehabilitation. He had demonstrated good grades and good conduct while at the Park Meadows School, the public school he attended in Virginia, and at Lincoln High School. While he was detained at the Mary Davis Home after the shootings, his grades and conduct were

-9-

reported to be good. Pastor Bryant testified that Jon responded well to discipline. Jon's mother showed the type of family support necessary for successful rehabilitation by visiting and speaking with Jon after he was in custody. She encouraged him to believe in his future. During these conversations, Jon continued to express his desire to go to college and become an engineer. He approached the police minutes after the shooting which demonstrates a willingness to take responsibility for his conduct.

**D.     Despite Counsel's Attempt to Educate the Trial Court, the Findings of Judge Coogan Evidence a Misunderstanding of the Non-statutory Factors Set Forth in *People V. Clark*.**

The appellee is correct that all counsel attempted make Judge Coogan aware of the potential that Jon Morgan could spend life in prison if he was convicted of two first degree murders. Also, it may well be that the trial court is presumed to know the law regarding the potential sentences facing Jon Morgan if he were tried as an adult. However, that presumption is rebutted when Judge Coogan announced that he was aware that if Jon Morgan stood convicted of a couple of first degree murders, a sentence of mandatory imprisonment would be imposed. Apparently, Judge Coogan did not hear or understand what counsel was telling him. The judge's statement evidences a misunderstanding of the sentence that could be imposed if Jon Morgan was tried and convicted as an adult. *People v. Clark* mandates that the court be aware of and evaluate a mandatory life sentence without the possibility of parole upon conviction for two first-degree murders. Judge Coogan affirmatively demonstrated that he was not aware of this despite counsel's efforts.

-10-

II.    **DETECTIVE HARBERTS' QUESTION DIRECTED TO JON MORGAN AFTER HAD DETERMINED THAT A THIRD PERSON HAD COMMITTED THE SHOOTING AND AFTER DETECTIVE HARBERTS HAD LEARNED THAT JON HAD ADMITTED SHOOTING THE TWO PEOPLE THE POLICE HAD FOUND DID NOT CONSTITUTE GENERAL ON THE SCENE QUESTIONING.**

A defendant who is subjected to custodial interrogation or otherwise deprived of his freedom in any significant way, is entitled to *Miranda* warnings. *In the Interest of H.D.B.*, 301 Ill.App.3d 324, 702 N.E. 2d 951 (4th Dist., 1998).  In *In the Interest of H.D.B.*, a search warrant was served on a trailer by a police tactical team.  H.D.B was one of the persons found in the trailer.  As part of a "normal routine" the tactical team handcuffed everyone inside.  *H.D.B., supra*, 703 N.E.2d at 953.  After entering the trailer, the police officer questioned H.D.B. after several rocks of crack cocaine had been found.  The police officer's conversation lasted about three minutes.  In response to the officer's questions, H.D.B., said that Robertson, another occupant of the trailer, was not involved and that he had sold crack cocaine from the residents "in an ongoing process over the past week of so." *Id.*  This court held that H.D.B. was in custody.  While Jon Morgan was not handcuffed, he was in custody or otherwise deprived of his freedom in any significant way.

By the time Jon Morgan was making his way back to 1206 7th Street, Detective Harberts had reached the conclusion there had to be a third person responsible for shooting the two people found at the scene.  He told other officers to go outside and canvass the crowd and neighborhood for witnesses.  Police tape had been stretched around the yard.  Deputy Spickard, who was in the backyard, saw a young person walk under the tape.  He approached Deputy Spickard handing him a gun and ammunition.  This was Jon.  He stated, "I did it.  I killed them." After Jon's

-11-

statements, Deputy Spickard knew he had a suspect in the shootings. Deputy Spickard took Jon by the elbow directing to "come with him." As Deputy Spickard walked toward the house with Jon Morgan in hand, Officer Kearns saw them. Deputy Spickard told Officer Kearns what had happened. Officer Kearns hollered for Detective Harberts who was on the front porch outside the house. Detective Harberts came over to the group. There were other police officers in the yard. All law enforcement officers within an arm's reach of Jon Morgan indicated that Jon Morgan was not free to leave and they would have stopped him had he attempted to walk away. Deputy Spickard testified that he was conveying Jon Morgan into Detective Harberts' custody.

Deputy Spickard told Detective Harberts that Jon had admitted involvement in the shooting and handed him a gun and ammunition. Detective Harberts' question, "Why did you shoot them?" focused specifically on Jon's conduct. His question was reasonably likely to elicit an incriminating response. The statement obtained as a result of the question should have been suppressed.

The appellee argues that if Jon's statement, "I shot them because they pissed me off," was improperly admitted, reversal is not required because Jon Morgan's guilt on the first degree murder conviction was overwhelmingly established. This is not the case. The phrase, "they pissed me off" became a prosecution mantra. The phrase was used to undermine Jon Morgan's self-defense case regarding both Keith and Lila Cearlock. Without this evidence, that defense would have been stronger.

For instance, in the State's closing argument, the prosecutor argued, "And now we get into the significant undermining of any suggestion that self-defense is even at play here.

-12-

Detective Harberts asked one simple question, 'Why did you shoot these people?...And what did

Jon Morgan say? Well, it was - what were the first words out of his mouth? Nobody put those

words in his mouth. The true expression of the emotion he felt at the time he gunned down Keith

and Lila Cearlock, "Why did you shoot those people?" "Because they pissed me off. I couldn't

take anymore, so I shot them." (R.Vol. XXX, p. 174) The prosecutor continued to repeat that

phrase, "they pissed me off." *Id.* (R.Vol. XXX, p.199)

## III. THE LINCOLN POLICE DEPARTMENT CANNOT IGNORE THE REQUIREMENTS OF THE JUVENILE COURT ACT. THE FAILURE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON MORGAN'S PARENTS AS WELL AS OTHER CIRCUMSTANCES OF HIS CUSTODY AND INTERROGATION RENDER HIS STATEMENTS INVOLUNTARY.

The appellee argues that "it is questionable whether the requirements of the Juvenile

Court Act regarding the detention and questioning of minors apply to the instant case." (Brief

of Appellee, p. 24) The appellee is wrong. The State of Illinois attempted this argument in

*People v. Pico*, 287 Ill.App. 3d 607, 678 N.E. 2d 780 (1st Dist. 1997). In that case, a 16 year old

minor was arrested for first degree murder. The minor argued that a violation of the provisions

of the Juvenile Court Act that requires a law enforcement officer to immediately make

reasonable attempts to notify the parent or other person legally responsible for the minor's care

and take the minor to the nearest juvenile police officer in the jurisdiction required a finding that

his statements were involuntary. On appeal, the State contended that this section did not apply

to the minor because he was in custody as a murder suspect and was, therefore, not a "delinquent

minor" who benefits from the protection of the Act. The appellate court disagreed. *Pico, supra,*

678 N.E. 2d at 783. The appellate court observed that the State correctly pointed out that the

Juvenile Court Act exempts certain minors from the definition of delinquent minors. Section 5-4(6)(a) states that "the definition of delinquent minor under Section 5-3 of the Act shall not apply to any minor who, at the time of the offense, was at least 15 years of age and who is charged with first degree murder. The court then concluded that the plain language of this section indicates that this exemption is triggered only when the minor has been charged. Until that point, the minor retains the protection of the Act. *Id.* In the present case, the exemption doesn't even apply since Jon Morgan was 14 years old at the time of the alleged offense. Detective Harberts' failure to immediately make a reasonable attempt to notify Jon Morgan's mother and his failure to contact Darrell Sisk, the Lincoln Police Department juvenile officer, combined with other factors render Jon's statements involuntary. Moreover, the State failed to raise the argument that the Juvenile Court Act did not apply to Jon's statements in the trial court. Therefore, the argument is waived.

Next, the appellee argues that since the Lincoln Police Department has only one designated youth officer, they have adopted a policy that if this officer is not on duty the shift commander assumes the role as youth officer. (Brief of Appellee, p. 26) A youth officer is supposed to be present during the interrogation of a minor to protect the minor's rights. *In Re Lashun H.*, 284 Ill.App. 3d 545, 672 N.E. 2d 331, 338, 339 (1st. Dist., 1996), *People v. Montanez*, 273 Ill.App.3d 844, 652 N.E. 2d 1271, 1274, 1275, 1276, 1277 (1st. Dist., 1995). Given the purpose of a juvenile police officer at a minor's interrogation, the appellee's argument is absurd. Detective Harberts left the scene of the shooting and went to the jail at the direction of Logan County State's Attorney Timothy Huyett for the purpose of obtaining incriminating

-14-

statements from Jon Morgan. When he learned that Jon was only 14 years old minutes after arriving at the jail, he called the State's Attorney for advice. Mr. Huyett told Detective Harberts to make sure he read Jon his *Miranda* warning and to find out if the persons who had been shot were his guardians. Mr. Huyett did not tell Detective Harberts to contact Darrell Sisk who is the Lincoln Police Department juvenile officer nor was Detective Harberts told to contact Jon's parents. Detective Harberts cannot play the dual role of juvenile police officer and lead investigator in a double homicide case and fulfill the obligation of a juvenile police officer to protect a minor's rights during the interrogation. This is especially true where Detective Harberts candidly acknowledged that he subjected Jon Morgan to the same type of questioning of an adult criminal suspect without any special regard for his youth and that he had no training as a youth officer. The absurdity of the State's argument is highlighted by the fact that Darrell Sisk was called by another Lincoln Police Officer although that call was not placed until 10:30 p.m. He was at home in bed. He was not told that a minor who had implicated himself in a double homicide was in custody. He was only asked if he knew the name "Jon Morgan." Since he didn't know "this kid" he rolled over and went back to sleep.

The appellee claims that the police acted in "substantial compliance with the statute in questioning Jon Morgan. (Brief of Appellee, p. 25) Without citing any authority, the appellee argues that it was understandable to proceed with the interrogation without a youth officer and without contacting Jon's parents because he had shot the persons he was living with. Obviously, the persons whom Jon Morgan was living with could not be called. The statute alternatively lists the minor's parent or other person legally responsible for his care or the person with whom the

-15-

minor resides as persons the police are to contact immediately. Shortly after 9:00 p.m., Detective Harberts asked for a phone number for Jon's mother. Jon gave it to him from memory. Detective Harberts did not place a call to Jon's mother until more than one hour after he had received the number. Even then, he did not explain the dire circumstances that Jon was in. He only indicated that there was an emergency and that he needed to speak to Glenda Ashworth immediately. Between the first and second interrogations, the Logan County Assistant State's Attorney, Kurt Schoenbein, became involved in the investigation and evidence gathering in the case. He, too, learned that Jon Morgan was 14 years old. He made no effort to make sure that the requirements of the Juvenile Court Act or the Lincoln Police Department policies regarding the detention and interrogation of juveniles were being complied with. He was more concerned with Jon's participation in a video re-enactment "at the scene."

When Glenda Ashworth responded to Detective Harberts' message, she asked where he son was and whether he had a lawyer. Her concerns demonstrate that the interrogation process may have gone quite differently if immediate and reasonable attempts had been made to contact her when Jon provided Detective Harberts with her phone number. Additionally, Jon indicated that the would have accepted her advice.

In *People v. Montanez, supra*, the court stated that the purpose of the "notice requirement is to permit, where possible, a parent to confer and counsel with the juvenile before interrogation and confession." In *Montanez*, the interrogation of the juvenile began before a juvenile police officer was present. *Montanez, supra*, 652 N.E.2d at 1272. In *Montanez*, the court observed that:

-16-

'Notice' here must be understood to have some purpose, namely, to allow where possible, the concerned adult to confer and counsel with the juvenile *before* interrogation and confession. Yes, an attempt was made to contact a youth officer before the statement was taken; but, the interrogation went forward anyway, within minutes...these circumstances demonstrate that the intended fulfillment of notice here was simply a tragic charade. *Id.* at 1275 (emphasis in original)

The conduct of State's Attorney Tim Huyett, Assistant State's Attorney Kurt Schoenbein, Detective Harberts and Sgt. Darrell Sisk give new meaning to the term charade as it was used in the *Montanez* opinion. One cannot fathom more egregious violation of the Juvenile Court Act and Lincoln Police Department policy concerning the detention and interrogation of a minor.

The appellee seems obsessed with reminding this court that Jon Morgan was not beaten, threatened or deprived of food or drink. The absence of overt coercion or threats does not mean that Jon's statements were voluntary under the circumstances. *In Re L.L.*, 295 Ill.App.3d 594, 693 N.E.2d 908 (1998).

The appellee's assessment that the police questioning of Jon Morgan was brief is not correct. The first interrogation by Detective Harberts began at 9:05 p.m. After that interrogation, Jon was returned to the holding cell regularly used for housing adult prisoners in violation of the Juvenile Court Act. The second interrogation began at 10:45 p.m. When that interrogation concluded, Jon was again returned to the holding cell in violation of the Juvenile Court Act. At 12:40 a.m., Detective Harberts went to the cell and asked if Jon would be willing to return to 1206 7th Street for a video tapped "re-enactment" of what occurred. Jon agreed to do so. Prior to leaving, Detective Harberts made no attempt to contact Jon's mother nor was any effort made to contact the juvenile police officer to be present for this re-enactment.

-17-

The appellee's assessment that the defendant wanted to confess also is not borne out in the record.  When Jon Morgan walked from his friend's house back to his house, he thought that the police would be there.  He needed some help and he thought the police would help him. (R.Vol. XII, p. 456) His belief that the police would help him is established through his 7th grade social studies class at Park Meadows Baptist Academy.  "A policeman is your friend.  A policemen must have a servant's heart.  He is a minister of God (Romans, XIII)...In the community, they are looked upon as leaders and are respected."  (Supp.R.Vol. IV, People's Exhibit No. 16, p. 23) It did not make Jon feel good when he told Deputy Spickard that he had shot his grandparents.  (R.Vol. XII, p. 508) When asked in a non-leading fashion whether he wanted to get it (the information about the shootings) out, Jon answered, "No."  (R.Vol. XII, p. 487)

There are a host of circumstances that establish the coercive nature of the detention and questioning of Jon Morgan.  More coercive circumstances are present in this case than any other reported decision in the State of Illinois.  The circumstances of Jon Morgan's initial encounter with the police were coercive.  Detective Harberts demanded to know why he had shot his grandparents.  He was handcuffed in violation of Lincoln Police Department policy.  He was ordered to participate in two coercive and suggestive procedures where witnesses identified him. During one of these times, he was standing over a pool of his grandmother's blood and forced to hold his arm and fingers out as if he were holding a gun.

Jon was taken to the Logan County jail where he sat, handcuffed in a cell.  Placing him in this holding cell which was normally used to house adult prisoners violates the Juvenile Court

-18-

Act. Jailing Jon Morgan in this fashion also violated written Lincoln Police Department policy. When a 14 year old is detained in a jail cell, the Juvenile Court Act requires that he be told the purposes of the detention, the time it is expected to last and that detention cannot exceed six hours. No one told this to Jon.

When Detective Harberts began to interrogate him at 9:00 p.m., the handcuffs were removed and he was taken to an office. However, Detective Harberts did not take immediate and reasonable attempt to notify Jon's parents. The Lincoln Police Department juvenile officer was not notified that a minor was in custody for two first-degree murders and that the detective wanted to proceed with an interrogation. All interrogation of Jon that evening proceeded without any regard for Jon's youth.

Finally, Jon Morgan had no prior contact with the police. The interrogations and re-enactment proceeded late into the night. Jon was never told that he could be tried as an adult. Throughout his youth, he learned that there were very harsh consequences both at home and at his church and school for failure to comply with authority figures. He was educated to believe that police officers have the heart of a servant and that they are ministers of God that are to be looked upon as leaders and respected. His tragic family situation left him helpless and hopeless. All of these factors lead to the conclusion that the statements Jon made to the law enforcement officials on the evening of April 27th, 1995, were involuntary.

## IV.    JON MORGAN DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS *MIRANDA* RIGHTS

The defendant's arguments concerning the voluntariness of his statements apply equally to a knowing and intelligent waiver of *Miranda* rights. Jon Morgan's stands on the argument in his brief and the arguments made in this Reply Brief regarding voluntariness.

## V.    THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY OF GLENDA ASHWORTH AND DR. STUART HART REGARDING THE PRIOR VIOLENT CONDUCT OF THE CEARLOCKS

The appellee argues that Judge Dehner should have never allowed evidence of self-defense. That is not the issue before this court. In essence, the appellee's argument is in the nature of a cross-appeal from Judge Dehner's ruling that Jon Morgan could present evidence concerning his state of mind at the time of the shooting of both his grandmother and grandfather. This issue was litigated extensively prior to the trial. Initially, any meaningful potential self-defense case was limited by Judge Dehner's ruling of 5/20/96 that no testimony concerning Battered Persons Syndrome would be allowed. (R.Vol. I, C18) On August 14, 1996, Judge Dehner reconsidered his ruling and indicated that Jon Morgan would be able to testify as to the history of his relationships with his mother, father, grandmother and grandfather. Furthermore, a defense expert, Dr. Stuart Hart, would be allowed to testify to "the manner in which the defendant's experiences affected his perception of danger, its imminence, and the actions the defendant perceived as necessary to defend himself on the day of the crime..." (R.Vol. I, C31) As the appellee points out, Jon Morgan's statement to the police on the night of the shootings contained precious little information about the beatings he suffered at the hands of his grandfather and grandmother. He testified extensively to these circumstances at trial. His

testimony led up to his reasonable belief on the night of the shootings that his grandfather would kill him and that he grandmother would incite his grandfather into causing great bodily harm or killing him. The prosecution's theory in this case was that these beatings never occurred. Moreover, they argued that Jon, not his grandfather or his grandmother, was the aggressor on the night of the shootings. With this in mind, Jon Morgan urges this Court to consider the argument stated in his brief. Once Judge Dehner allowed evidence of self-defense regarding Mr. and Mrs. Cearlock, the issue of who was the aggressor was paramount in the trial. Jon Morgan is entitled to present whatever relevant evidence that exists concerning who the aggressor was on April 27, 1995. He should also have been able to present this evidence to corroborate that the beatings occurred. The trial court erred in denying Jon the opportunity to present the evidence of his mother and Dr. Hart on these issues.

## VI. THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO BAR SECOND DEGREE MURDER INSTRUCTIONS AS TO THE FELONY MURDER COUNTS.

In his brief, Jon Morgan argued that the trial court erred in granting the State's Motion to Bar Second Degree Murder Instructions as to the felony murder counts. Mr. Morgan relied on *People v. Williams*, 164 Ill.App.3d 99, 115 Ill.Dec. 334, 517 N.E.2d 745 (4th Dist. 1987) and *People v. Kidd*, 295 Ill.App.3d 160, 2229 Ill.Dec. 682, 692 N.E.2d 455 (4th Dist. 1998) for the proposition that a second degree murder instruction is not precluded simply because the state has chosen to charge a defendant with felony murder.

The State attempts to distinguish the factual scenarios in *Williams* and *Kidd* by arguing that those cases involve the availability of a second degree instruction in response to a

-21-

provocation defense. However, the legal reasoning in both *Williams* and *Kidd* applies with equal force to Jon Morgan's argument that a second degree instruction is available based Jon's claim of self-defense.

The State implicitly admits that this court's holding in *Kidd* is controlling in this case. The State notes that "the decisions in *Williams* and *Kidd* are contrary to the third district's decision in *People v. Thurman*, 223 Ill.App.3d 196, 165 Ill.Dec. 635, 584 N.E.2d 1069 (3rd Dist. 1991) (Brief of Appellee, p. 48-49) Without expressly asking that this court reverse its holding in *Kidd,* the State asks this court to disregard its own precedent and follow the third district's holding in *Thurman.*

The charging decisions made by the State in this case highlight the majority's concern in *Kidd* that the second degree murder statute would effectively be eliminated if a second degree murder instruction was precluded in all cases charging felony murder. This court's concerns in *Kidd* were previously expressed by the Illinois Supreme Court in *People v. Drakeford,* 139 Ill.2d 206, 564 N.E.2d 792 (1990), which rejected the State's attempt to nullify the second degree murder statute by charging certain offenses in a certain manner.

This court should decline the State's invitation to disregard fourth district precedent in *Kidd* in favor of the third district's decision in *Thurman.* The trial court erred in granting the State's Motion to Bar Second Degree Murder Instructions as to the felony murder counts. Accordingly, Jon Morgan's convictions should be reversed and this cause remanded for a new trial.

**VII.    THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS UPON APPLICATION OF THE MERGER DOCTRINE TO THE PREDICATE FELONIES OF AGGRAVATED BATTERY AND AGGRAVATED DISCHARGE OF A FIREARM**

Jon Morgan incorporates his original argument in reply to Argument VII in the State's brief.

# CONCLUSION

For the foregoing reasons, the appellant, JON R. MORGAN, requests that his conviction be reversed and remanded for proceedings in the juvenile court of Logan County or, in the alternative, that he be granted a new trial.

Respectfully submitted,

JON MORGAN  - Defendant-Appellant.

By: _____

His Attorney

D. PETER WISE (6187876)
FREDERICK J. SCHLOSSER (6209954)
GATES, WISE & SCHLOSSER, P.C.
Attorneys at Law
1225 South Sixth Street
Springfield, IL. 62703
217/522-9010

Page 2 of 9    E-FILED
Wednesday, 13 August, 2008 03:08:08 PM
Clerk, U.S. District Court, ILCD

Westlaw.

1999 WL 33749212 (Ill.)                                                    Page 1

For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

Supreme Court of Illinois.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Petitioner,
v.
Jon R. MORGAN, Defendant-Respondent.
No. 88508.
November 3, 1999.

Appeal from the Appellate Court Fourth District No. 4-96-0996
Original Appeal from the Circuit Court, Eleventh Judicial Circuit Logan County,
Illinois No. 95-CF-101
Honorable Gerald G. Dehner Judge Presiding.

Petition for Leave to Appeal from the Appellate Court to the Supreme Court
William G. Workman, State's Attorney, Logan County Courthouse, Lincoln, Illinois
62656, of CounselJames E. Ryan, Attorney General, State of Illinois, 100 West Ran-
dolph, 12th Floor, Chicago, Illinois 60601, Norbert J. Goetten, Director, Robert
J. Biderman, Deputy Director, David E. Mannchen, Staff Attorney, State's Attorneys
Appellate, Prosecutor, 725 South Second Street, Springfield, Illinois 62704, (217)
782 - 8076, Counsel for Plaintiff-Petitioner

*1 PRAYER

Now comes the plaintiff, the People of the State of Illinois, and respectfully re-
quests leave to appeal a decision of the Fourth District Appellate Court reversing
the defendant's conviction for first degree murder.

STATUS

The decision of the Fourth District Appellate Court was issued on September 29,
1999. Notice of intent to seek leave to appeal to this court was filed on October
12, 1999. No petition for rehearing was filed.

*2 REASONS FOR GRANTING REVIEW.

In this case, the appellate court reversed the defendant's conviction for first
degree murder finding that the jury should have been instructed as to the offense
of second degree murder for the charge of felony murder and that the defendant
could not be found guilty of felony murder based on aggravated battery or dis-
charge of a firearm because these predicate offenses were inherent in the offense
of felony murder. This decision is directly contrary to the statutes and the pre-
vious decisions of this court.

The appellate court further held that a statement given by the defendant at the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT F

1999 WL 33749212 (Ill.)                                                                          Page 2

scene of the offense in response to a single question should have been suppressed because it was the product of custodial interrogation. This decision improperly substituted the judgment of the appellate court for that of the trial court and distorted the rule regarding on-the-scene questioning by the police.

Finally, the appellate court ruled that the defendant should have been allowed to present evidence that the victims had abused another individual some 19 years prior to this offense in order to "corroborate the defendant's version of the offense." This decision arbitrarily substituted the judgment for that of the trial court regarding the admissibility of evidence and would result in allowing a **\*3** substantial mini-trial which would only serve to confuse and distract the jury from the central issues in the case.

## **\*4** STATEMENT OF FACTS

The defendant, age 14, was tried as an adult for the murder of Lila and Keith Cearlock. The jury found defendant guilty of second degree murder as to Keith but guilty of first degree murder as to Lila. On appeal, the Fourth District Appellate Court affirmed the conviction for second degree murder for the slaying of Keith Cearlock but reversed the first degree murder conviction as to Lila. The State seeks review of this decision.

The evidence at trial established that the Cearlocks were shot and killed on April 27, 1995. The defendant gave the police several different statements in which he admitted shooting Lila in the back and Keith in the head. (R. Vol. XXI, 356;, Vol. XXII, 514, 525-530, 534-535; Vol. XXIV, 55-57, 60, 65-68, 70) The defendant stated that he had thought about killing the Cearlocks in the past (R. Vol. XXII, 534-535) and thought about killing them on that night for 10 or 15 minutes before he went to get the gun (R. Vol. XXIV, 60, 65). The defendant further admitted that he had tried to shoot Lila as she lay helpless on the ground but that his gun misfired. (R. Vol. XXII, 529-530; Vol. XXIV, 56-57, 667-68) In these statements, the defendant denied that the Cearlocks had hit him on the night of the shooting. (R. Vol. XXIV, 70)

The defendant testified at trial and again admitted killing the Cearlocks. However, the defendant claimed that **\*5** the Cearlocks had a history of abusing him in the past and that Keith had beaten the defendant with a leather strap shortly before the offense. He claimed to have shot the Cearlocks because he·believed it was necessary to defend himself from the Cearlocks. (R. Vol. XXIII, 726-743, 751-770, 781-798)

At the close of all the evidence, the court instructed the jury as to second degree murder regarding the counts charging intentional or knowing first degree murder. However, the court refused to instruct the jury on first degree murder regarding the felony murder charges. (R. Vol. XXIX, 25-42) The jury thereafter found defendant guilty of second degree murder as to Keith but guilty of second degree

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

murder as to Lila. (R. Vol. IV, C979; Vol. XXXI, 3) He was sentenced to consecut-
ive sentences of 58 years for first degree murder and 17 years for second degree
murder.

## *6 ARGUMENT

### I

THE APPELLATE COURT ERRED IN RULING THAT THE DEPENDANT COULD NOT BE FOUND GUILTY
OF FELONY MURDER BASED ON THE UNDERLYING OFFENSES OF-AGGRAVATED BATTERY AND DIS-
CHARGE OF A FIREARM.

The Fourth District Appellate Court held that the defendant could not be convicted
of felony murder based on aggravated battery or discharge of a firearm for the
death of Lila Cearlock. The appellate court recognized that these offenses are in-
cluded in the definition of forcible felony contained in 720 ILCS 5/2-8 (West
1996). However, the court ruled that, since the underlying felonies in this case
were not independent from the murder but were inherent in the offense of felony
murder, they could not form the basis for a conviction for felony murder. People
v. Morgan, 4th Dist. No. 4-96-0996, slip op. at 67-72 (September 29, 1999).

The State maintains that the appellate court's decision is clearly contrary to the
statutes and the prior decisions of this court. This court should therefore review
and reverse the appellate court's decision.

This court has previously addressed the question of whether an individual may be
charged and convicted of felony murder when the underlying offense is aggravated
battery in People v. Viser. 62 Ill. 2d 568, 343 N. E. 2d 903 (1975). In Viser, the
defendant contended that he could not be charged *7 with felony murder (aggravated
assault) on the theory that since all felony murders involved aggravated battery
or assault it would be improper to allow a charge of felony murder to be brought
since this was not the type of offense the legislature intended to deter when it
created the felony murder rule. This court expressly rejected this merger theory
holding that the explicit legislative language characterizing aggravated battery
as one of the forcible felonies which will trigger felony murder charges author-
ized the charge of felony murder based on aggravated battery. 343 N. E. 2d at 909.
This court further rejected any claim that the underlying felony must have an in-
dependent felonious purpose when it noted that the concern that every felony
murder would include an aggravated battery was not eliminated by the presence of
an intent to commit another felony. 343- N. E. 2d at 909. Finally, this court re-
jected the contention that the legislature only intended to deter certain kinds of
aggravated batteries resulting in death, stating:
[W]e are not concerned with whether the General Assembly, in establishing the of-
fense of felony murder, intended to deter the criminal from the commission of
rape, or robbery, or burglary, but not to deter him from the violent assault that
accompanies each of those offenses. That kind of fragmentation of legislative pur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pose cannot survive the forthright characterization of aggravated battery as one of the forcible felonies that will trigger a charge of felony murder. What was intended was to deter the commission of any of the enumerated forcible felonies, including aggravated battery, by holding the perpetrator responsible for murder if death results. 343 N. E. 2d at 909.

**\*8** This decision was subsequently followed by the court in People v. Thurman, 223 Ill. 2d 196, 165 Ill. Dec. 635, 584 N. E. 2d 1069 (3rd Dist. 1991). The defendant there contended that, since every murder involves an aggravated battery, the aggravated battery should merge into the murder as a lessor included offense. The third district rejected this contention and specifically held that aggravated battery could be used as the predicate for felony murder. 584 N. E. 2d at 1074. See also, People v. Szerlitech, 86 Ill. App. 3d 1121, 42 Ill. Dec. 389, 408 N. E. 2d 1098, 1101 (4th Dist. 1980) (felony murder doctrine applies even though operating felony of aggravated battery not independent of homicide).

The appellate court here acknowledged this court's opinion in Viser but determined that it did not govern the issue of whether there must be an independent felonious purpose for the underlying felony before a defendant could be found guilty of felony murder. Morgan. Slip op. at 70-71. This attempt to distinguish Viser completely overlooks this court's holding quoted above in which it rejected the attempt to distinguish between types of aggravated battery based on whether they were part of another offense or whether they were simply an aggravated battery. The appellate court's opinion further ignores this court's observation that the concern that the aggravated battery was inherent in the offense of murder existed even when another felony is present. **\*9**343 N. E. 2d at  909. The appellate court's decision is thus contrary to this court's decision in Viser and should be reversed.

A contrary decision is not required by the recent amendments to the homicide statutes. The legislature is presumed to act with knowledge of the prevailing case law. See, Fink v. Ryan, 174 Ill.2d 302, 220 Ill.Dec. 369, 673 N.E.2d 281 (1996); People v. Hickman, 163 Ill.2d 250, 206 Ill.Dec. 94, 644 N.E.2d 1147 (1994). By adopting the same felonies which triggered felony murder without change, the legislature should be presumed to have adopted the interpretation used by this court in Viser. If the legislature had intended to limit the application of felony murder to aggravated batteries which have an independent basis, the legislature could clearly have expressly provided such an exception. See, 730 ILCS 5/5-8-4(a) (West 1996) (consecutive sentences proper only where there is change in criminal objective).

This court should therefore review and reverse the decision of the Fourth District Appellate Court.

**\*10** ARGUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33749212 (Ill.)                                                Page 5

II

THE APPELLATE COURT ERRED IN HOLDING THAT THE DEFENDANT WAS ENTITLED TO AN IN-
STRUCTION ON SECOND DEGREE MURDER FOR THE OFFENSE OF FELONY MURDER.

The defendant was charged with felony murder for the death of Lila Cearlock and
requested an instruction on second degree murder (imperfect self-defense). The
trial court rejected this request. (R. Vol. XXIX, 25-42) The appellate court held
that the refusal of the second degree murder instruction was improper.

The State maintains that the trial court properly rejected the second degree
felony murder instructions. 720 ILCS 5/9-2 (West 1996) provides:
(a) A person commits the offense of second degree murder when he commits the of-
fense of first degree murder as defined in paragraphs (1) or (2) of subsection (a)
of Section 9-1 of this Code and.:
(2) At the time of the killing he believes the circumstances to be such that, if
they existed, would justify or exonerate the killing under the principles stated
in Article 7 of this Code, but his belief is unreasonable. (Emphasis added)

Under the express language of this statute, second degree murder applies only if
the defendant is charged with knowing or intentional murder and is not available
if the defendant is charged with felony murder under 720 ILCS 5/9-1(a)(3) (West
*11 1996). In addition, under 720 ILCS 5/9-2(c) (West 1996), the State is no
longer required to prove the absence of any mitigating factor beyond a reasonable
doubt and the burden is on the defendant to prove the mitigating factor by a pre-
ponderance of the evidence. See, People v. Jeffries, 164 ILL. 2d 104, 207 Ill.
Dec. 21, 646 N. E. 2d 587, 591-592 (1995); People v. Shumpert. 126 ILL. 2d 344,
128 Ill. Dec. 18, 533 N. E. 2d 1106, 1109 (1989). Allowing an instruction on
second degree murder for felony murder is directly contrary to this express lan-
guage of the statute and entails unwarranted and improper judicial redrafting of a
clear and unambiguous statute. People v. Alien, 153 ILL. 2d 145, 180 Ill. Dec. 72,
606 N. E. 2d 1149, 1155 (1992). The appellate court's decision is thus directly
contrary to the express language and should be reversed.

                              *12 ARGUMENT

                                 III

THE TRIAL COURT DID NOT ERR IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS HIS INI-
TIAL STATEMENT TO THE POLICE.

While investigating the shooting of the Cearlocks, the police were approached by
the defendant who admitted having killed the Cearlocks. One of the officers asked,
"Why?" The defendant replied, "they pissed him off." (R. Vol. X, 106-107, 138-140,
162, 170-172, 174-175, 177, 179-181; Vol. XI, 273-275; Vol. XXI, 356; Vol. XXII,
514) The defendant's motion to suppress this statement was denied. On appeal, the
fourth district held that this statement should have been suppressed because the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33749212 (Ill.)                                                    Page 6

defendant had not been given any warnings prior to being asked "why." The State
maintains that the appellate court improperly substituted its judgment for that of
the trial court as to the admissibility of this statement-

The evidence here showed that Detective Harberts was told that the defendant had
admitted shooting the two victims and then asked the defendant only the single
question, "Why?" At the time this question was asked, the defendant was not re-
strained in any way, was not handcuffed, and had not been subjected to any search.
No threats or promises had been made to the defendant and no coercion had been
used against the defendant. In addition, no guns had been pointed at the defend-
ant. (R. Vol. X, 103-104, 106, 171-172, 181; Vol. XI, *13 221, 273-274, 313, 363)
The defendant had approached the police and, by his own admission, wished to sur-
render to the police and to tell them what had happened. (R. Vol. XII, 487) Under
these circumstances, the single question "why" was a proper on-the-scene inquiry
to assess the situation faced by the police. No warnings were required before this
question. Berkermer v. McCartv. 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317
(1984); People v. Parks, 48 ILL. 2d 232, 269 N. E. 2d 484, 487 (1971); People v.
Acebo. 182 Ill. App. 3d, 134 Ill. Dec. 784, 537 N. E. 2d 403, 404 (3rd Dist.
1989);. people. _. v. _. _Tripkovich, 6 Ill. App. 3d 37, 284 N. E. 2d 323, 329
(1st Dist. 1972). The appellate court's decision to the contrary should be re-
viewed and reversed by this court.

**                            *14 ARGUMENT**

IV

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING EVIDENCE OF PRIOR VIOL-
ENT CONDUCT BY THE VICTIMS.

The defendant sought admission of the testimony of his mother, Glenda Ashworth,
that she had been physically and emotionally abused by Keith and Lila Cearlock
some 19 years previously when Glenda was a child. (R. Vol. Ill, C717) He further
sought to present testimony from Dr. Stuart Hart that this information would have
helped him explain his opinions regarding the defendant's state of mind. (R. Vol.
XXVI, 451-455) The trial court rejected this evidence finding that it was too re-
mote to be relevant. On appeal, usurping the trial court's role to determine the
admissibility of evidence, the fourth district ruled that the trial court had
erred in excluding this evidence. The fourth district ruled that the evidence
would have been relevant to corroborate the defendant's version of the offense and
would have bolstered his credibility. The State maintains that this decision rep-
resents an unwarranted intrusion into the trial court's role to determine the ad-
missibility of evidence and that the trial court had not abused its discretion in
excluding the evidence of the alleged abuse of Glenda when she was a child.

In People v. Lynch. 104 Ill.2d 194, 83 Ill.Dec. 598, 470 N.E.2d 1018, 1020 (1984),
this court established the scope of *15 the admissibility of evidence of a vic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tim's history for violence. Such history was held to be admissible only to show
the effect of the defendant's knowledge of the victim's history of violence on his
perceptions and reactions or, if the evidence as to the offense is conflicting, as
relevant to who was the aggressor, even if the defendant was not aware of the vic-
tim's violent character. In this case, the appellate court went beyond this de-
cision and held that the victim's alleged history of violence to another individu-
al many years prior to the offense should have been admitted to corroborate the
defendant's version of the offense and to bolster his credibility. This is an un-
warranted extension of the principles established in Lynch which would allow the
defendant to force the court to hold a mini-trial regarding the victim's previous
history in every case. No such rule should. be adopted.

Moreover, the reviewing court may not simply substitute its judgment for that of
the trial court regarding the admissibility of evidence and may disturb the trial
court's decision only if it is arbitrary, fanciful, or unreasonable, or if no
reasonable man would take the view adopted by the trial court. People v. Illgen,
145 ILL. 2d 353, 164 Ill. Dec. 599, 583 N. E. 2d 515, 519, 522 (1991). The appel-
late court ignored these principles in finding that the alleged abuse of Glenda
was admissible. Instead, the appellate court made its own erroneous determination
as to the *16 potential value of this evidence, despite its remoteness and con-
cluded that the evidence was admissible. See, People v. Ward. 101 ILL. 2d 443, 79
Ill. Dec. 142, 463 N. E. 2d 696, 702 (1984) (evidence of abuse of another child
four years earlier too remote to be admissible); People v. Ellis. 187 Ill. App. 3d
295, 134 Ill. Dec. 913, 543 N. E. 2d 196, 200 (1st Dist. 1989) (victim's convic-
tions not admissible to support self-defense claim where offenses were over 10
years' old). This decision failed to accord any weight to the trial court's role
as arbiter of the evidence to be admitted at trial. It also failed to consider the
dangers involved in holding a mini-trial to determine if in fact Glenda had been
abused when she was a child. See, People v. Friday, 232 Ill. App. 3d 1047, 174
Ill. Dec. 105, 598 N. E. 2d312, 318 (4th Dist. 1992); People v. Moore. 189 Ill.
App. 3d 957, 137 N. E. 2d 478, 546 N. E. 2d 232, 236 (4th Dist. 1989); People v.
Ciaverelli, 262 Ill. App. 3d 966, 200 Ill. Dec. 271, 635 N. E. 2d 610, 614-615
(1st Dist. 1994). The trial court's decision to exclude the evidence regarding the
alleged abuse of Glenda was not arbitrary or capricious but was well justified.
The appellate court's decision to second-guess the trial court's determination
should be reversed by this court.

This is particularly true in light of the circumstances in which the defendant
shot and killed Lila Cearlock. The jury was faced with essentially two different
versions of what had occurred. In each of his pretrial statements, the *17 defend-
ant had admitted that he had shot his grandparents deliberately because he was
angryat how they treated him over a tardy notice. The defendant further admitted
trying to shoot his grandmother as she lay on the ground. The defendant denied
having been beaten by the Cearlocks. (R. Vol. XXII, 525-531, 534-535; Vol. XXXIV,
55-57, 60, 65, 66-68, 70) At trial, the defendant altered the course of events to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim that he had previously been beaten by the Cearlocks and that he was acting in self-defense when he shot his unarmed grandparents when they responded to the shot he had fired in the bathroom. (R. Vol. XXIII, 790-797, 800-801, 803-804) In both scenarios, the defendant shot his grandfather immediately as he walked around a corner from a distance of around 6 feet and shot his grandmother in the back as she fled. In both scenarios, there was no indication that either Keith or Lila Cearlock was the aggressor at the time of the shooting or that they did anything other than respond to the shot that had been fired by the defendant. Indeed, Mrs. Cearlock clearly could not be deemed the aggressor as she was shot in the back as she fled from the defendant.

There was thus no conflict in the evidence as to who was the aggressor at the time of the shooting that would permit evidence of the victims' prior acts of violence to be admitted to show that they were the aggressors. The mere fact that the Cearlocks had allegedly punished the defendant using a leather strap shortly before the shootings would not justify admission **18** of Glenda's testimony. They had clearly ceased to be the aggressors when the defendant left the room, loaded the gun, fired a shot at a bottle, and then shot the Cearlocks as they reacted to his actions. The defendant could not claim that they were the aggressors. See, People v. Sloan, 111 Ill. 2d 517, 96 Ill. Dec. 55, 490 N. E. 2d 1260 (1986). The appellate court's opinion that Glenda's abuse 19 years earlier was admissible will only serve to put the victims on trial even though defendant clearly was the aggressor.

**19** CONCLUSION

WHEREFORE, the PEOPLE OF THE STATE OF ILLINOIS respectfully request this court to review and reverse the decision of the Fourth District Appellate Court which reversed the defendant's conviction for first degree murder.

Appendix not available.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Petitioner, v. Jon R. MORGAN, Defendant-Respondent.
1999 WL 33749212 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Delivery Summary Report for PARK,DALE 6066509**

| | |
|---|---|
| Date/Time of Request: | Wednesday, July 9, 2008 17:52 Central |
| Client Identifier: | AG |
| Database: | IL-BRIEF-ALL |
| Citation Text: | 2000 WL 34029407 |
| Lines: | 1565 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



1999 WL 33955190 (Ill.)                                                    Page 1


For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

                         Supreme Court of Illinois.
            PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Respondent,
                                     v.
                 Jon R. MORGAN, Defendant-Petitioner.
                              No. 88513.
                           November 3, 1999.

Petition for Leave to Appeal from the Appellate Court of Illinois, Fourth Judicial
District, Case No. 4-96-0996
There Heard on Appeal from the Circuit Court of the Eleventh Judicial Circuit, Lo-
gan County, Illinois Case No. 95-CF-101
The Honorable Gerald Dehner Judge Presiding.

                       Petition for Leave to Appeal
D. Peter Wise (6187876), Gates, Wise & Schlosser, P.C., Attorneys at Law, 1225
South Sixth Street, Springfield, IL. 62703, Phone: 217/522-9010, Counsel for De-
fendant-Petitioner.
     *1 TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May It Please The Court:

                                    I.

                         PRAYER FOR LEAVE TO APPEAL

Now comes the petitioner-appellant, JON R. MORGAN, and respectfully petitions this
Court pursuant to Illinois Supreme Court Rule 315 for leave to appeal from the
judgment of the Appellate Court for the Fourth Judicial District, which affirmed
in part and reversed in part the judgment of the Circuit Court of Logan County.

                                  *2 II.

                    PROCEEDINGS IN THE APPELLATE COURT

The opinion of the Fourth District Appellate Court was issued on September 29,
1999. An Affidavit of Intent to File a Petition for Leave to Appeal was filed on
October 18, 1999. A copy of the opinion is found in the Appendix of this Petition.

                                   III.

                       REASONS FOR GRANTING REVIEW

The Appellate Court did not follow this Court's holding in *People v. Clark*, 119


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                              EXHIBIT G

Ill.2d 1, 518 N.E.2d 138 (1987). In *Clark*, this Court remanded for further hearing on the issue of whether the transfer of the juvenile from juvenile court to circuit court was appropriate in light of the extreme penalty the juvenile would suffer if he as convicted. The juvenile in *Clark* was charged with two first-degree murders and faced a sentence of life imprisonment if convicted. The record in this case affirmatively demonstrates that the trial court did not understand that Jon Morgan faced life in prison if convicted.

The body of law that has interpreted the statutory factors regarding transfer of a juvenile's case to circuit court has developed largely in the First District Appellate Court. The Fourth District's opinion in this case conflicts with the law regarding juvenile transfer to circuit court that has developed in the First District.

This Court should also grant review of the Fourth District's ruling that Jon Morgan's post arrest statements were voluntary. The Fourth District's ruling on this issue is not consistent with a number of recent opinions of the First and Second District Appellate Courts. *See People v. Montanez*, 273 Ill.App.3d 844, 652 N.E.2d 1271 (1995); **3***In Re Lashun H.*, 284 Ill.App.3d 545, 672 N.E. 2d 331 (1996); *In Re L.L.*, 295 Ill.App.3d 594, 693 N.E.2d 908 (1998); *People v. Robinson*, 301 Ill.App.3d 634, 704 N.E.2d 968(1998); *In Re G.O.*, 304 Ill.App.3d 719, 710 N.E.2d 140 (1999).

**IV.**

*POINTS RELIED UPON FOR REVERSAL*

**A. THE TRIAL COURT DEMONSTRATED THAT IT DID NOT UNDERSTAND THE CRITICAL, NON-STATUTORY ELEMENT IN THE TRANSFER PROCEEDING THAT JON MORGAN WOULD BE SENTENCED TO MANDATORY LIFE IN PRISON IF CONVICTED OF TWO FIRST-DEGREE MURDERS, MOREOVER, THE BODY OF TRANSFER LAW DEVELOPED IN THE FIRST DISTRICT APPELLATE COURT CONFLICTS WITH THE APPELLATE COURT'S RUING IN THIS CASE AND DEMONSTRATES THAT THE TRIAL COURT ABUSED ITS DISCRETION IN TRANSFERRING JON MORGAN'S CASE TO CIRCUIT COURT FOR PROSECUTION AS AN ADULT.**

**B. DUE TO THE COERCIVE NATURE OF JON MORGAN'S ENCOUNTER WITH THE POLICE, THE FAILURE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON'S PARENTS, THE CIRCUMSTANCES OF HIS DETENTION AND INTERROGATION, JON'S LACK OF EXPERIENCE WITH THE POLICE, HIS EMOTIONAL CHARACTERISTICS AND EDUCATION ABOUT POLICE OFFICERS, THE STATEMENTS JON MORGAN MADE IN POLICE CUSTODY WERE NOT VOLUNTARY.**

**4 V.**

STATEMENT OF FACTS

*The Transfer Hearing*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33955190 (Ill.)                                              Page 3

Jon Morgan was born XX/XX/1980, the same year that his mother, Glenda (Cearlock)
Ashworth was married to Roe Morgan. (Supp.R.Vol. II, Resp. Ex. No.2, Social In-
vestigation Report, pg. 1-2). Roe Morgan was in the military. The family moved
frequently. Roe Morgan drank heavily and was physically abusive to all of the
children. He was transferred overseas and the marriage ended in divorce. Id. When
Jon Morgan entered kindergarten, he was referred for a psychological evaluation
for suspected hyperactivity and behavior problems at school. (Supp.R.Vol. II, Com-
monwealth of Virginia Dept. Of Public Health Psychological Exam). Jon's problems
in kindergarten resulted in a hospitalization at the Psychiatric Institute of
Richmond. (Supp.R.Vol. II) Jon was diagnosed as suffering from situational depres-
sion accompanying his removal from his home in addition to a diagnosis of clinical
hyperactivity. It was also noted that he had a pervasive sense of hopelessness and
despair. Id. During this hospital stay, Jon and his family regularly attended
therapy sessions. Throughout his hospital course, his condition improved and he
seemed to stay more on task following the administration of medication. Id..

Jon Morgan was admitted a second time to the Psychiatric Institute of Richmond on
February 18, 1987. (Supp.R.Vol. II, Discharge Summary of Dr. Dennis L. Beshera,
Admission Date 2/18/87, Discharge Date 3/29/87) The reasons for Jon's second re-
ferral was similar to his first stay. During his admission assessment, doctors
noted that he valued being a family member. Jon's family attended family therapy
sessions on a regular basis and was supportive of the treatment plan. Id. His dia-
gnosis was major depression, single episode and attention deficit disorder. Id.
Jon's *5 condition improved and he was discharged to his parents with a fair prog-
nosis. Id. When Jon returned home, Glenda's marriage to Roe was deteriorating and
Roe was absent from the home much of the time. (R.Vol. VII, p. 344)

Glenda decided to move Jon to Lincoln, Illinois, to live with his grandparents.
Jon's grandparents were aware of Glenda and Roe's problems and suggested to Glenda
that Jon should live with them. During Glenda's childhood and adolescence, her
parents were constantly fighting. Her parents were physically and verbally abusive
to Glenda as she was being raised in their home. (R.Vol. VII, p. 356) Despite
these conditions in the house as she as growing up, Glenda sent Jon to live with
her parents. She felt that her mother and father controlled her mentally and she
did not have the strength to say "no" to them. (R.Vol. VII, p. 357, 358) Jon left
his family to live with his grandparents when he was seven. (R.Vol. VII, p. 348)
He attended school at Park Meadows Baptist Church and Academy. Keith and Lila
Cearlock, along with Brother Bryant, the principal, decided to take Jon off of his
medication. (R.Vol. VII, p. 349) Through Glenda's contact with her parents, she
knew that her parents constantly fought in their home. (R.Vol. VII, p. 358)

Occasionally, Jon would get into trouble at school because he was "too rambunc-
tious." As punishment, he would be paddled by Brother Bryant. (Supp.R.Vol. II,
Resp. Ex. No. 2, p. 3) Keith Cearlock told Thomas Bryant that he would beat Jon
with a belt or a paddle as a form of discipline. Mr. Cearlock also told Brother
Bryant that he required Jon to bend over and grab his ankles as Mr. Cearlock beat

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33955190 (Ill.)                                              Page 4

his grandson. (R.Vol. VII, p. 217)

Jon moved back to Virginia with his mother for his 5th and 6th grade school years. His mother, Glenda, had remarried. However, her new husband, Linwood Ashworth, was laid off from his job and became physically abusive to Jon and his siblings. (R.Vol.VII, p. 353) Jon returned to *6 Lincoln to live with his grandparents at the start of his 7th grade year. Relations were still poor between Keith and Lila Cearlock. Keith and Lila argued over punishing Jon. Lila would tell Glenda about how Keith would not punish Jon as much as Lila believed he should be punished. (R.Vol. VII, p. 359). As a means of discipline, Jon's grandfather made Jon fetch a razor strip and bend over and grab his ankles when he was beaten. This occurred a couple of times every three weeks. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 5) Jon was very unhappy about moving back to his grandparents home. He preferred to stay with his mother and sisters "where I belonged with my true family." *Id.* p. 4). The Cearlocks constantly belittled Jon's mother and father. His grandfather often told Jon that he was sorry that he married his grandmother and only married her for sex. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 4) Jon continued to attend Park Meadows school. In the six years he attended Park Meadows, Brother Bryant never saw Jon getting into any fights. When Jon was disciplined, he would acknowledge his wrong-doing and accept his punishment. (R.Vol.VII, p. 201, 202) Brother Bryant also ob-served Jon control his anger. (R.Vol. VII, p. 204) Jon was very active in church and spoke to the congregation about becoming a foreign missionary following a church conference. (R.Vol. VII, p. 215) Jon was an honor roll student at Park Meadows school.

Jon was not involved in drinking or drug use. (R.Vol. VII, p. 213) Jon could not and did not watch R rated movies or listen to rock music. *Id.* The church prohib-ited co-ed swimming so Jon could not go to a public swimming pool, he could not be within 18 inches of a girl nor could he wear shorts or a tank top. (Supp.R.Vol. II, Resp. Ex. No. 2, p.4) In February of 1995, Jon kissed a girl on a Saturday night away from school grounds following a basketball game. (R.Vol. VII, p. 365) One of Jon's classmates tattled to Brother Bryant and Jon faced suspension from school. (R.Vol. VII, p. 324) Jon was given a punishment by Brother Bryant that he would not accept in full so he was *7 expelled from school. (R.Vol. VII, p. 176) After the expulsion, Glenda and her parents fought about where Jon should go to school. Lila and Brother Bryant believed the public school was evil and that he should not go there. (Supp.R.Vol. 2, Resp. Ex. No. 2, p. 4) Lila and Keith were fighting constantly. Glenda asked her father to bring her son home.

Jon packed and his grandfather drove him to Virginia. Prior to their arrival, Gl-enda realized that she could not afford to have Jon in her home. After Jon arrived in Virginia, his mother told him he could not stay. Jon cried and was very upset. (R.Vol. VII, p. 370)

After they returned from Virginia, Jon's grandfather resorted to more physical vi-olence in the home. In April of 1995, Jon's grandfather hit him in the head and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

back with closed fists. Keith Cearlock told Pastor Davis that he would get Jon in his sleep if Jon ever struck him. (R.Vol. VI, p. 146)

On April 27, 1995, Jon came home from school and fell asleep on his bed. His grandfather woke him and demanded an explanation about a detention Jon had received for tardiness. Jon was now attending Lincoln High School. Jon's grandparents screamed at him and Jon yelled back. He was ordered to fetch the razor strap for his yelling. His grandfather beat him. (Supp.R.Vol. II, Resp. Ex. No. 2, p. 5) Following the beating with the razor strap, Jon went to the bathroom. He wanted to kill himself. He knew his grandfather kept guns in the closet of his bedroom. Jon returned to the bathroom, loaded the gun and shot at a bottle of Tylex. (R.Vol. VI, p. 43, 44) After doing so, Jon believed his grandfather would kill him. Moments after firing the gun, Jon came out of the bathroom as his grandfather was coming around the corner. His grandmother began to scream. Jon shot his grandfather. His grandmother screamed and he knew he had to shoot her to "get everyone's attention." (Supp.R.Vol. VII, Resp. Ex. No. 2, p. 6)

*8 After shooting his grandparents, Jon wandered in alleys near his home. He returned to his grandparents home 27 minutes after a 911 dispatch. He surrendered himself to the police telling a deputy sheriff "I did it. I killed them." (R.Vol. VII, p. 330) Jon agreed to participate in two show ups for witnesses. He submitted to police interrogation into the early morning hours. He agreed to a video reenactment. He submitted to blood testing and photographing while stripped to his underwear. (R.Vol. VI, p. 108-109)

Jon was evaluated by Dr. Robert Chapman at the request of the Logan County State's Attorney. Dr. Chapman made a diagnosis of attention deficit disorder that included intolerance to frustration, impulsivity and the circumstances in which he perceived himself as being maltreated and abused, physically and psychologically, and harboring the belief that he was in mortal danger of the actions of his grandfather. Dr. Chapman concluded that it was unlikely that Jon acted in a premeditated manner. Dr. Chapman described Jon as remorseful as he sobbed about his grandparents death. (Supp. R. Vol. II, Resp. Ex. No. 2, p. 7)

At the time of the transfer hearing, Jon was in custody at the Mary Davis Detention Center. He had been attending classes, receiving good grades and had not been involved in any disciplinary problems while in detention. (Supp.R. Vol. II, Social Investigation Report, p.3)

### The Suppression Hearing

Jon Morgan's earliest memories of authority figures were his grandparents and the Christian church and school. If church members or students did not do as they had been told, they were looked down on and treated as outcasts. (R.Vol. XII, p. 447-450) In addition to being made an outcast, if students did not follow school authority, they could be punished which included holding one's ankles while suf-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33955190 (Ill.)                                                      Page 7

Following the first interrogation, the Logan County Assistant State's Attorney be-
came involved in investigation and collection of evidence. During his conversa-
tions with other officers, this Assistant State's Attorney never reminded them to
contact Jon's parents or the Lincoln Police Department juvenile officer, Sgt. Dar-
rell Sisk. (R.Vol. X, p. 156) The Assistant State's Attorney encouraged Detective
Harberts to ask Jon if he would participate in a video reenactment at his grand-
parents' home. (R.Vol. XII, p. 399)

At approximately 10:30 p.m., Darrell Sisk, the juvenile police officer, was called
by other officers working on the case. He was asked if he knew Jon Morgan. He was
not told why Jon was being held. Sgt. Sisk did not go to the police station be-
cause he didn't "know the kid." (R.Vol. XI, p. 238) At 10:45 p.m., Detective Har-
berts placed a phone call to Jon's mother. This call came an hour and a half after
Detective Harberts learned that Jon was 14 years old. He left a message on *11 Gl-
enda's answering machine stating his name and that there was an emergency with
Jon. (R.Vol. XI, p. 322). Detective Harberts conducted a second interview without
a parent or juvenile police officer present. (R.Vol. XII, p. 402) At 12:40 a.m.,
Detective Harberts went to Jon's cell and asked if he would be willing to return
to his grandparents house to videotape a reenactment of what occurred. Prior to
leaving, Detective Harberts made no attempt to contact Jon's mother or the juven-
ile officer to be present for the reenactment and further interrogation.

At 3:20 a.m., Glenda Ashworth responded to the message Detective Harberts had left
at her home. (R.Vol. XII, p. 427) She provided Harberts with Jon's history of At-
tention Deficit Disorder and asked whether her son had a lawyer. (R.Vol. XII, p.
428)

Dr. Chapman testified at the Motion to Suppress. He reviewed the audiotaped and
videotaped statements and confession of Jon Morgan made on the night of his ar-
rest. Dr. Chapman was struck by what appeared to be a sense of despair and hope-
lessness and fruitlessness of Jon's life in the situation he was in. To Dr. Chap-
man, Jon appeared to be absolutely devoid of any interest in his own welfare and
appeared to be very compliant with whatever the adult and authority figures asked
of him. (R.Vol. XIII, p. 551)

VI.

ARGUMENT

**A. THE TRIAL COURT DEMONSTRATED THAT IT DID NOT UNDERSTAND THE CRITICAL, NON-
STATUTORY ELEMENT IN THE TRANSFER PROCEEDING THAT JON MORGAN WOULD BE SENTENCED TO
MANDATORY LIFE IN PRISON IF CONVICTED OF TWO FIRST-DEGREE MURDERS, MOREOVER, THE
BODY OF TRANSFER LAW DEVELOPED IN THE FIRST DISTRICT APPELLATE COURT CONFLICTS
WITH THE APPELLATE COURT'S RUING IN THIS CASE AND DEMONSTRATES THAT THE TRIAL
COURT ABUSED ITS DISCRETION IN TRANSFERRING JON MORGAN'S CASE TO CIRCUIT COURT FOR
PROSECUTION AS AN ADULT.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fering a beating with a paddle. (R.Vol. XII, p. 454) Jon learned never to question
and **9 always to obey authority figures. (R.Vol. XII, p. 452) Jon Morgan's 7th &
and 8th grade teacher acknowledged that all children at the academy were very
aware of the negative consequences that flowed from not submitting to authority
figures. She had observed Jon submit to his grandparents' authority. She taught
Jon Morgan about the duties of a police officer in a 7th grade social studies
class. In a book used by the class, the chapter on policemen stated:
"A policeman is your friend...the main responsibility of policemen is protection
of law abiding people. Laws are needed to punish evil doers who have no self-
control. Policemen enforce those laws...a policeman must have a servant's heart.
He is a minister of God (Romans, 13). He is a public servant to help and protect
others. In a community, they are looked upon as leaders and respected. Policemen
with Christian character are needed today to maintain well-ordered, peaceful com-
munities..." (Supp.R.Vol. IV, People's Exhibit No. 16, p. 23)

After Jon Morgan returned to the scene and surrendered himself to a detective, he
was placed under arrest and handcuffed. The Lincoln Police Department had a policy
for juvenile offenders stating that handcuffs should not be placed on any juvenile
except, when in the officer's opinion, they are needed to prevent violence or es-
cape. No officer deemed Jon to be violent or an escape risk. (R.Vol. XII, p. 369;
Supp.R. Vol. IV, Defense Ex. No. 3)

After Jon was placed in a squad car, he sat there waiting for police to tell him
what to do. Jon was removed from the car and submitted to two identification pro-
cedures. During the second one, he was positioned over a pool of his grandmother's
blood. (R.Vol. XII, p. 372) Jon Morgan was transported to the Logan County Jail
where an officer collecting booking information learned that he was 14 years old.
Jon was placed in a holding cell usually reserved for adult prisoners. (R.Vol.
XII, p. 468) Detective Harberts arrived at the jail to get a statement from Jon at
the direction of the Logan County State's Attorney. When Detective Harberts
learned that Jon was 14, he did not make any effort to contact Jon's mother, fath-
er or a juvenile police officer. (R.Vol. X, p. 144) **10 Detective Harberts did not
tell Jon the purpose of his detention. He did not tell Jon that he could be de-
tained for a maximum of 6 hours, he did not tell Jon how long the detention was
expected to last.

When the interrogation began, Detective Harberts did not tell Jon that he could be
tried as an adult. (R.Vol. XII, p. 387) Harberts knew that the policy of the Lin-
coln Police Department was that parents were to be contacted when a juvenile is
taken into custody. (R.Vol. XII, p. 388) If Jon had been given the chance, he
would have talked with his mother or father. He would have listened to any advice
his mother offered. (R.Vol. XII, p. 520) Officer Kearns noticed that Jon made ex-
treme efforts to comply with every request he made. (R.Vol. X, p. 151) At the end
of the first interrogation, Detective Harberts asked Jon about his mother. (R.Vol.
XII, p. 396) Jon gave his mother's name and phone number. Harberts made no effort
to call her. (R.Vol. XII, p. 397)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33955190 (Ill.)                                                                  Page 8

**\*12** This Court has held that a "critical, non-statutory element" that must be con-
sidered in a case such as this, is that conviction on two first-degree murders
"would result in a mandatory sentence of natural life imprisonment." *People v.
Clark*, 119 Ill.2d 1, 14, 518 N.E.2d 138, 144 (1987). In this case, Jon Morgan's
attorney at the transfer hearing provided a memorandum of law to the court which
attempted to make the court aware of the potential life sentence without parole.
Counsel's efforts to educate the court were in vain as demonstrated by Judge
Coogan's findings. Judge Coogan stated that he was "..well-aware that if the minor
stood convicted of a couple of first degree murders, that a sentence of mandatory
imprisonment would be imposed." (R. Vol. VII, p. 450)

The appellate court's opinion cites *People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d
190 (1995) in an effort to absolve the trial court. In *Cooks* the court found that
the requirement that the juvenile court consider the potential mandatory life sen-
tence was satisfied by a single mention in defense counsel's closing arguments
that the juvenile, if convicted, would spend the rest of his natural life in a
penitentiary. However, in *Cooks*, the trial court made no statement on the record
of any consideration of the *Clark* factor. *People v. Cooks*, *supra*, 648 N.E. 2d at
198. This case is obviously distinguished because Judge Coogan referred to the
sentence of "mandatory·imprisonment" upon a conviction of "a couple of first-de-
gree murders." The trial court silence in *Cooks* stands in contrast to Judge
Coogan's affirmative misstatement concerning this factor. Here, the appellate
court also observed that a trial court is presumed to know the law regarding po-
tential sentences facing a defendant. In this case, that presumption carries no
weight when Judge Coogan affirmatively stated his misunderstanding of the law. He
was critically wrong on this crucial factor.

The body of law regarding transfer developed in the First District Appellate Court
is in conflict with the trial court's ruling in this case. The First District
cases demonstrate that the trial **\*13** court abused its discretion in transferring
this case to the circuit court for prosecution. In *In Re D.B.*, 202 Ill.App. 3d
194, 559 N.E.2d 873 (1990), the First District determined that a minor's conduct
regarding a home invasion, residential burglary and first-degree murder was pre-
meditated. In that case, the defendants discussed the burglary five times before
carrying it out. One of the minor's timed the victim with a stop watch and determ-
ined that she stayed on her porch for at least 17 minutes at a time. When they put
their plan into action, the minors checked to make sure that the victim was on her
porch and each burglar had an assigned task. In contrast, Jon Morgan obtained a
gun to kill himself under circumstances where he may have been easily detected,
fired. the gun out of frustration and anger at a Tylex bottle and became panicked
and fearful at the consequences in doing so. In his state of panic and fear, he
shot his grandfather. He shot his grandmother "to get everybody's attention." This
is not a premeditated act. Furthermore, the sole fact relied upon by Judge Coogan
to make a finding of premeditation does not exist in the record. The judge relied
on statements he attributed to Jon that the record demonstrated were never made.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The only comment that Judge Coogan made when considering Jon Morgan's age is that
if Jon were four months older at the time of the alleged offense, there would have
been an automatic transfer. This analysis is wholly inadequate given First Dis-
trict case law which establishes that both chronological age and experience of the
minor must be evaluated. In *In the Interest of L.J.*, 274 Ill.App.3d 977, 654
N.E.2d 671 (1st Dist., 1995) and *People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d
190 (1st Dist., 1995) mark examples of juveniles with life experiences far beyond
the stated age of each minor. L.J. was aged beyond his years due to his contact
with the police on numerous occasions and his admitted membership in a notorious
street gang. Furthermore, L.J. was not attending school. The court concluded that,
while it is true that L.J. was a minor in terms of his **14** chronological age, in
reality he had plainly ceased being a minor. Michael Cooks sold drugs for the
Gangster Disciples and had dropped out of school. He had a long history of contact
with the juvenile justice system. The record demonstrates that Jon Morgan led a
life far different from L.J. and Cooks.

In *People v. D.B., supra,* the First District Appellate Court affirmed the trial
court's denial of the State's motion to permit the prosecution of the minor as an
adult even though the minor's acts were aggressive and premeditated. One of the
factors that persuaded the appellate court to affirm the denial of the motion to
transfer was the evidence from D.B.'s teacher that D.B. was "neither violent nor
ever a problem to other students." *People v. D.B., supra*, 559 N.E.2d at 875. Jon
Morgan's principal testified that he did not remember a single fight involving Jon
Morgan when he was a student at Park Meadows. The appellate court found that D.B.
did not exhibit the experience of someone well beyond his years. He possessed the
emotions of a young man at a tender age. Here, Dr. Chapman observed that Jon Mor-
gan appeared remorseful and cried and sobbed about his grandparents deaths.
(Supp.R. Vol. II, Resp. Ex. No. 2, p. 6) Finally, in *D.B.*, the court observed that
the respondent had never been exposed to any juvenile programs. Thus, it would be
premature to predict that D.B. would not be amenable to treatment and rehabilita-
tion in the juvenile system. *D.B., supra* at 879. Jon Morgan had not been exposed
to any juvenile programs because he had no prior history of criminality which
would have resulted in exposure to the juvenile justice system. For the short time
he had been in custody prior to the hearing, he was doing well at the Mary Davis
home. It was premature for Judge Coogan to predict that Jon Morgan would not be
amenable to treatment and rehabilitation in the juvenile justice system. Jon Mor-
gan's track record while in juvenile detention, albeit a short one, demonstrated
the capacity for rehabilitation. Judge Coogan did make a number of specific find-
ings that weighed in favor of keeping Jon Morgan in the juvenile court **15** system.
The court observed that this case was a "major tragedy" because his parents were
unwilling and unable to raise him. Because of his unstable family life, Judge
Coogan concluded that Jon did not have the parental support needed to "survive"
and that "Jon may have very well been short changed in his life." (R.Vol. VIII, p.
448) The transfer of Jon Morgan, who was short changed in his life due to the
failing of his parents and other care-takers, to be prosecuted as an adult where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33955190 (Ill.)                                                                    Page 10

he faced life imprisonment if convicted, constitutes an abuse of discretion. This
is especially true where the record overwhelmingly demonstrated Jon's potential
for rehabilitation.

**B. DUE TO THE COERCIVE NATURE OF JON MORGAN'S ENCOUNTER WITH THE POLICE, THE FAIL-
URE OF THE POLICE TO CONTACT A JUVENILE POLICE OFFICER OR JON'S PARENTS, THE CIR-
CUMSTANCES OF HIS DETENTION AND INTERROGATION, JON'S LACK OF EXPERIENCE WITH THE
POLICE, HIS EMOTIONAL CHARACTERISTICS AND EDUCATION ABOUT POLICE OFFICERS, THE
STATEMENTS JON MORGAN MADE IN POLICE CUSTODY WERE NOT VOLUNTARY.**

Recently, courts in the First and Second Districts have created a significant body
of law regarding the voluntariness of a juvenile's confession that stands in con-
flict with the Fourth District's opinion in this case. See *In Re G.O.*, 304
Ill.App.3d 719, 710 N.E. 2d 140 (1999); *In Re V.L.T.*, 292 Ill.App.3d 728, 686
N.E.2d 49; *In Re A.R.*, 295 Ill.App.3d 527, 693 N.E.2d 869 (1998); *In Re LaShun H.*,
284 Ill.App.3d 545, 672 N.E.2d 331 (1996); *People v. Montanez*, 273 Ill.App.3d 844,
652 N.E.2d 1271 (1995); *In Re J.J.C.*, 294 Ill.App.3d 227, 689 N.E.2d 1172 (1998).

In Jon Morgan's case, the coercive circumstances of Jon Morgan's custody began mo-
ments after he presented himself to the police. Detective Harberts demanded to
know why he shot his grandparents. He was required to participate in two suggest-
ive show ups. During the second show up, Detective Harberts directed Jon to stand
over a pool of blood on the ground where his *16 grandmother had fallen. He was
handcuffed in violation of the Lincoln Police Department policy regarding juven-
iles. He was taken to the jail and confined in a cell ordinarily used for the con-
finement of adult prisoners in violation of the Juvenile Court Act. *705 ILCS
405/5-7(2)(c)(vi)* Even though the Logan County State's Attorney and the Assistant
State's Attorney were involved in the investigation and collection of evidence,
there was no suggestion to the interrogating detectives to contact Jon Morgan's
parents or the juvenile police officer for the Lincoln Police Department. They did
nothing to ensure that Jon was detained according to the Juvenile Court Act.

In *People v. R.B.*, 232 Ill.App.3d 583, 597 N.E.2d 879 (1992), the court stated
that the failure to telephone a juvenile's parents or the absence of a parent
during questioning is a factor in determining voluntariness. The court noted where
the State failed to take appropriate steps to ensure that a juvenile defendant had
the opportunity to confer with an interested adult, either a parent or a youth of-
ficer, this court has held that the police conduct rendered the confession inad-
missible. *People v. R.B., supra*, 597 N.E.2d at 879.

In *People v. Montanez*, 273 Ill.App.3d 844, 652 N.E.2d 1271 (1995), the court
stated that the purpose of the "notice" requirement is to permit, where possible,
a parent to confer and counsel with the juvenile before interrogation and confes-
sion. In that case, an attempt was made to contact a youth officer before the
statement was taken but the interrogation went forward anyway within minutes. The
court observed that these circumstances demonstrate that the intended fulfillment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of notice was a tragic charade. *Id.* at 1275.

In addition to the violations of the Juvenile Court Act and Lincoln Police Depart-
ment policy, the record established a host of other circumstances that contributed
to the involuntariness of Jon Morgan's statements. The appellate court's opinion
lists some of those circumstances. (Appendix, **\*17** p. 50) However, the appellate
court observed that "if the trial court gave little weight to Jon's personality
traits and past experience, this court should be guided by that finding, given the
standard of review." (Appendix, p. 52) However, the trial court made no reference
to Jon's personality traits and past experience. The trial court's docket entry
focused on the absence of overt threats and abuse and the court's belief that Jon
did seem to want to tell what happened. Both of these points missed the mark. The
benchmark for voluntariness is whether the defendant's will was overborne at the
time, not whether he would have confessed in the absence of interrogation. *People
v. Brown*, 169 Ill.2d 132, 144, 661 N.E.2d 287 (1996). The absence of overt coer-
cion or threats does not mean that Jon Morgan's statements were not voluntary un-
der the circumstances. *In Re L.L.*, 295 Ill.App.3d 594, 693 N.E.2d 908 (1998). The
trial court's docket entry is strangely silent on many of the circumstances of in-
voluntariness established in the record. The night time interrogation, the failure
of the detectives to tell Jon Morgan that he could be tried as an adult, their
complete disregard for his youth, and an upbringing that predisposed him to seek
approval from adults in authority all combined with the violations of the Juvenile
Court Act to render Jon Morgan's statements involuntary. Justice Wolfson stated
the matter quite succinctly in *In Re G.O., supra*, 710 N.E. 2d 140:
"Without advice and counsel of an adult who eared about him, alone in a large room
populated by police officers, experiencing custodial interrogation for the first
time in his life...13 year old G.O. was not a free agent."

When the host of other factors are considered in this case, Jon Morgan was not a
free agent and his statements were not voluntary.

**\*18** In a 7th grade social studies class, Jon learned that "a policeman is your
friend. A policeman must have a servant's heart. He is a minister of God (Romans,
13)...in the community they are looked upon as leaders and respected."
(Supp.R.Vol. IV, People's Ex. 16, p. 23) What Jon didn't know was that April 27,
1995, Detective Harberts was not acting as his friend. The detective was a servant
of prosecutors who encouraged Detective Harberts to gain incriminating evidence
from Jon Morgan without any regard for the Juvenile Court Act, the policies of the
Lincoln Police Department or Jon Morgan's youth. The trial court's finding that
Jon Morgan's statements were voluntary is against the manifest weight of the evid-
ence and in conflict with established law of the First and Second Districts.

**\*19 VII.**

CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the reasons articulated in the foregoing instrument, the petitioner, JON R. MORGAN, respectfully requests that this Court allow his petition for leave to appeal.

Appendix not available.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Respondent, v. Jon R. MORGAN, Defendant-Petitioner.
1999 WL 33955190 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2000 WL 34213340 (Ill.)                                                     Page 1


For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

Supreme Court of Illinois.
PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
Jon Roe MORGAN, Defendant-Appellant.
Nos. 88508 & 88513, Cons.
December 28, 2000.

Appeal from the Appellate Court Fourth Judicial District No. 4-96-0996
Original Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan
County, Illinois. No. 95 CF 101
The Honorable Gerald G. Dehner, Judge Presiding.   .

Brief and Argument for Plaintiff-Appellee
James E. Ryan, Attorney General, State of IllinoisJoel D. Bertocchi, Solicitor
General, State of IllinoisWilliam L. Browers, David H. Iskowich, Assistant Attor-
neys General, 100 West Randolph Street, 12th Floor, Chicago, Illinois 60601, (312)
814-5643, Counsel for Plaintiff-Appellee
ORAL ARGUMENT REQUESTED

*1 *POINTS AND AUTHORITIES*


I. THE APPELLATE COURT PROPERLY HELD THAT THE TRANSFER OF JON MORGAN FROM JUVENILE
COURT TO THE ADULT DIVISION WAS APPROPRIATE IN LIGHT OF ALL STATUTORY FACTORS CON-
SIDERED BY THE JUVENILE COURT ... 8

705 ILCS 405/5-4(3)(b) ... 8

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29,
1999) (Unpublished Order pursuant to Supreme Court Rule 23) ... 8-9

*People v. Taylor*, 76 Ill.2d 289, 391 N.E.2d 366 (1979) ... 9

*People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d 190 (1st Dist. 1995) ... 9

*People v. Fuller*, 292 Ill.App.3d 651, 686 N.E.2d 6 (1st Dist. 1997) ... 9

A. The Juvenile Court's Decision to Allow Jon Morgan's Transfer to the Adult Divi-
sion Was Made Following a Thorough Review of All Pertinent Factors Set Forth By
Statute, is Amply Supported by the Record, and Does Not Constitute An Abuse of
Discretion ... 9

705 ILCS 405/5-4(3)(b)(ii) ... 9, 10

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT H

Black's Law Dictionary (4th ed. 1957) ... 11

*People v. Stewart*, 105 Ill.2d 22, 473 N.E.2d 840 (1984) ... 11, 12

*People v. Brooks*, 187 Ill.2d 91,718 N.E.2d 88 (1999) ... 13

*People v. Haynes*, 174 Ill. 2d 204, 673 N.E.2d 318 (1996) ... 13

*People v. D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990) ... 14

*People v. Beck*, 190 Ill.App.3d 748, 546 N.E.2d 1127 (5th Dist. 1989) ... 14

*People v. Howard*, 42 Ill.App.3d 381,355 N.E.2d 543 (1st Dist. 1976) ... 14

*People v. L.J.*, 274 Ill.App.3d 977, 654 N.E.2d 671 (1st Dist. 1995) ... 14, 15

*People v. Luckett*, 295 Ill. App.3d 342, 692 N.E.2d 1345 (3rd Dist. 1998) ... 14, 15

*People v. Martin*, 285 Ill.App.3d 623, 674 N.E.2d 90 (1st Dist. 1996) ... 14-15

**\*2 B. The Juvenile Court Did Not Abuse Its Discretion in Determining That Jon Morgan's Age Weighed in Favor of a Transfer to Adult Court ... 15**

*People v. Ulmer*, 158 Ill.App,3d 148, 510 N.E.2d 1296 (2nd Dist. 1987) ... 16

705 ILCS 405/5-4(3)(b)(iii) ... 16

*People v. Ollins*, 231 Ill. App.3d 243, 606 N.E.2d 192 (1st Dist, 1992) ... 16

*People v. Brown*, 301 Ill.App.3d 995, 705 N.E.2d 162 (2nd Dist. 1998) ... 16-17

*People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367 (1984) ... 17

*In the Interest of L.J.*, 274 Ill. App.3d 977, 654 N.E.2d 671 (1st Dist. 1995) ... 17

*People v. D.B.*, 101 Ill. App.3d 194, 559 N.E.2d 873 (1st Dist. 1990) ... 17-18

*In the Interest of Bums*, 67 Ill.App.3d 361,385 N.E.2d 22 (4th Dist. 1978) ... 17-18

*People v. Taylor*, 76 Ill.2d 289, 391 N.E.2d 371 (1979) ... 18

**C. The Juvenile Court Did Not Commit an Abuse of Discretion When It Ordered Transfer of Jon Morgan to Adult Court Notwithstanding Evidence of His Troubled Past and History of Dysfunction in the Morgan Family ... 19**

705 ILCS 405/5-4(3)(b)(iv) ... 19

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                         Page 3

*People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d 190 (1st Dist. 1995) ... 19

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme Court Rule 23) ... 19

*People v. Illgen*, 145 Ill.2d 353, 583 N.E.2d 515 (1991) ... 20

**D. The Juvenile Court Did Consider Jori Morgan's Potential for Rehabilitation and the Likely Effectiveness of Any Facilities for Treatment in Light of Morgan's Present Circumstances, and, Therefore, Did Not Abuse Its Discretion In Measuring These Factors in Favor of a Transfer to Adult Court ... 20**

705 ILCS 405/5-4(3)(b)(v) ... 20

*People v. Clark*, 119 Ill.2d 1,518 N.E.2d 138 (1987) ... 20, 21

**\*3 E. The Juvenile Court Did Not Abuse Its Discretion in Finding That The Balance of Society's interests in incarcerating Jon Morgan Outweighed Morgan's Interests, and Therefore Properly Declined to Retain Jurisdiction ... 22**

705 ILCS 405/5-4(3)(b)(vi) ... 22

*People v. Fuller*, 292 Ill.App.3d 651,686 N.E.2d 6 (1st Dist. 1997) ... 22, 23

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme Court Rule 23) ... 22

**F. The Juvenile Court Did Not Misunderstand the Import of the Non-Statutory Factor for Determining the Propriety of Juvenile Transfer As Set Forth in *People v. Clark* ... 23**

*People v. Ollins*, 231 Ill.App.3d 243, 606 N.E.2d 192 (1st Dist. 1992) ... 23

*People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d 190 (1st Dist. 1995) ... 23-24

*People v. Clark*, 119 Ill.2d 1,518 N.E.2d 138 (1987) ... 24

**G. The Facts Recited by the Juvenile Court, Prior to Undertaking a Statutory Analysis of the Transfer Provisions, Were Not Relied Upon by the Court, in Isolation, to Effect a Transfer to Adult Court ... 24**

**II. THE STATEMENTS MADE BY JON MORGAN WHILE IN POLICE CUSTODY WERE VOLUNTARY ... 26**

*Miranda v. Arizona*, 384 U.S. 436 (1966) ... 26

*People v. Prim*, 53 Ill.2d 62, 289 N.E.2d 601 (1972) ... 26

*In re G.O.*, 191 Ill.2d 37, 727 N.E.2d 1003 (2000) ... 26

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)

*Fare v. Michael C.*, 442 U.S. 707 (1979) ... 26

*People v. Lash*, 252 Ill.App.3d 239, 624 N.E.2d 1129 (1st Dist. 1993) ... 26-27

*People v. Oaks*, 169 Ill.2d 409, 662 N.E.2d 1328 (1996) ... 27

   A. Morgan's Age, Education, Emotional Characteristics, and Experience in the Juvenile Court System Do Not Lend Weight to His Theory that His Statements Were Involuntary ... 27

      *People v. Brooks*, 187 Ill.2d 91,718 N.E.2d 88 (1999) ... 29

*4 *People v. Haynes*, 174 Ill. 2d 204, 673 N.E.2d 318 (1996) ... 29-30

*In re J.J.C.*, 294 Ill. App.3d 227, 689 N.E.2d 1172 (2nd Dist. 1998) ... 30-31

*People v. Phillips*, 226 Ill. App.3d 878, 589 N.E.2d 1107 (2nd Dist. 1992) ... 30-31

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme Court Rule 23) ... 31

   B. An Analysis of the Totality of the Circumstances Regarding Morgan's *Miranda* Waiver Reveals that his Encounter with Police Was Not "Coercive" ... 32

      *Miranda v. Arizona*, 384 U.S. 826 (1966) ... 32, 35, 36

*Inre G.O.*, 191 Ill.2d 37, 727 N.E.2d 1003 (2000) ... 33, 35

705 ILCS 405/5-7(2)(c)(iii) ... 33

705 ILCS 405/5-7(2)(C)(iv) ... 33

405 ILCS 5-6(2) ... 33

*People v. Daniel*, 238 Ill.App.3d 19, 606 N.E.2d 94 (1st Dist. 1992) ... 33

*People v. Pico*, 287 Ill. App.3d 607, 678 N.E.2d 780 (1St Dist. 1997) ... 34

*People v. McGhee*, 154 Ill. App.3d 232, 507 N.E.2d 33 (1st Dist. 1987) ... 34-35

*Fare v. Michael C.*, 442 U.S. 707 (1979) ... 35

*People v. Montanez*, 273 Ill. App.3d 844, 652 N.E.2d 1271 (1st Dist. 1995) ... 36

*Gallegos v. Colorado*, 370 U.S. 49 (1962) ... 36

*In re V.L.T.*, 292 Ill. App.3d 728, 686 N.E.2d 49 (2nd Dist. 1997) ... 37

                    Conclusion ... 38

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                                    Page 5

## *5 NATURE OF THE ACTION

In 1996, a jury sitting in the Circuit Court of Logan County convicted Ion Roe Morgan of first degree murder for the shooting death of his grandmother, Lila Cearlock, and second degree murder for the shooting death of his grandfather, Keith. The trial court thereafter sentenced him to consecutive prison terms totaling 75 years. The Illinois Appellate Court, Fourth District, affirmed the second degree murder conviction but reversed the first degree murder conviction and remanded for a new trial. The appellate court found that, with respect to the first degree murder conviction, defendant was improperly denied a second degree murder instruction as to the felony murder charge, and that the felony murder charge was flawed because the underlying felonies - aggravated battery and aggravated discharge of a firearm - did not constitute acts that were independent of the murder, but, rather, merged with the homicides and therefore could not act as the predicate felonies for that murder charge.

In addition, the appellate court reversed the trial court's admission of Son Morgan's initial statements, made to police shortly after the murders. The court also reversed the trial court's decision to disallow the introduction of evidence concerning prior violent conduct committed by the victims, Keith and Lila Cearlock, on Jon Morgan's mother, Glenda Ashworth. These issues are the subject of the State's appeal, which is consolidated with Morgan's appeal of the issues that follow and is being briefed pursuant to a separate briefing schedule.

In this appeal, Jon Morgan contests the appellate court's endorsement of the juvenile court's decision to transfer him to adult court to stand trial for the Cearlock murders, as well as the appellate court's affirmance of the trial court's decision to deny his amended motion to suppress. Morgan filed his own petition for leave to appeal with respect to these issues. On February 2, 2000, this *6 Court granted both the State's and defendant's petitions and ordered that the cases be consolidated. No issues are raised as to the sufficiency of the pleadings.

### ISSUES PRESENTED FOR REVIEW

I. Whether the appellate court's decision to uphold the juvenile court's transfer of Jon Morgan to the adult division was erroneous?

II. Whether the appellate court's decision to affirm the trial court's, denial of Jon Morgan's amended motion to suppress statements made while in custody was erroneous?

### STANDARD OF REVIEW

When measuring the juvenile court's determination to allow a transfer of a juvenile defendant to adult court, a reviewing court must ask whether the trial court committed an abuse of discretion, *People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367 (1984), although that discretion is "limited and controlled by the standards set

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

forth in the Juvenile Court Act." *M.D.*, 461 N.E.2d at 372; 705 ILCS 405/5-4(3)(b).

The People disagree with Morgan's assertion that this Court reviews *de novo* the issue of the voluntariness of his statements made while in custody. This Court has held that, when assessing the voluntariness of statements made while in custody, a reviewing court's role is limited to whether the trial court's finding is against the manifest weight of the evidence. *People v. Oaks*, 169 Ill. 2d 409; 662 N.E.2d 1328, 1344 (1996). And, while measuring the voluntariness of a juvenile's confession, in particular, requires great care, *People v. Simmons*, 60 Ill.2d 173, 326 N.E.2d 383,386 (1975), statements made by juveniles are generally subjected to the same test as those of adult defendants. *People v. Prude*, 66 Ill.2d 470, 363 N.E.2d 371 (1977)

## *7 STATEMENT OF FACTS

The People generally agree with Jon Morgan's characterization of the facts which were developed in proceedings below. Where further explanation or clarification is required, however, the People have included such explanation and clarification in the main body of their argument.

## *8 ARGUMENT

**I. THE APPELLATE COURT PROPERLY HELD THAT THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT WAIVED JURISDICTION AND FOUND THAT JON MORGAN SHOULD BE TRANSFERRED TO THE ADULT DIVISION FOR PROSECUTION AS AN ADULT.**

Morgan's first assignment of error is that the appellate court erred when it affirmed the trial court's decision to allow a transfer of Morgan to the adult division of the Logan County Circuit Court. Morgan contends, as he did in the court below, that the trial court abused its discretion when it "failed to adequately consider all necessary statutory factors," and "ignored evidence that reflected favorably upon Jon Morgan's potential for rehabilitation." Def. Br. at 32. The statute governing juvenile transfers, 705 ILCS 405/5-4(3)(b), mandates that the court "shall consider among other matters," in its determination to transfer, the following: (i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority; and (vii) whether the minor possessed a deadly weapon when committing the offense.

Both the trial and appellate courts correctly set forth the standards under which the above factors are to be considered. While a mere recitation of the above-mentioned statutory factors, in the record, is not sufficient to uphold a trans-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fer, neither does the trial court have to "enunciate a formal statement of reasons or conventional findings of fact to support the decision." *People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist, (Sept. 29, 1999) (Unpublished Order *9 pursuant to Supreme Court Rule 23), at 16; *see also People v. Taylor*, 76 Ill.2d 289, 391 N.E.2d 366 (1979). Instead, the trial judge must take care to "preserve a record sufficiently explicit so that his exercise of discretion may be reviewed meaningfully." *Taylor*, 391 N.E.2d at 371. All factors need not be resolved against the juvenile for a trial court to find that such a transfer is warranted. *People v. Cooks*, 271 Ill.App.3d 25,648 N.E.2d 190, 197 (1st Dist. 1995). This Court's function is not to reweigh all of the factors, but to determine whether an abuse of the trial court's discretion occurred. *People v. Fuller*, 292 Ill. App.3d 651,686 N.E.2d 6, 11 (1st Dist. 1997). For the reasons set forth below, the record in the case at bar reveals that the trial court undertook a thorough review of the statutory factors at issue and arrived at a well-reasoned decision to transfer Jon Morgan to the adult court. In the words of *Taylor*, the record here was sufficiently explicit for the appellate court to measure the propriety of the trial court's discretion in waiving jurisdiction. The appellate court's finding that the trial court did not abuse its discretion in handing Jon Morgan over to be tried as an adult was proper in light of the evidence adduced at the transfer hearing.

## A. The Juvenile Court's Decision to Allow Jon Morgan's Transfer to the Adult Division Was Made Following a Thorough Review of All Pertinent Factors Set Forth By Statute, is Amply Supported by the Record, and Does Not Constitute An Abuse of Discretion.

Morgan maintains that the trial court abused its discretion, in part, in deciding to send the case to the adult division where the evidence developed at the transfer hearing "does not establish that the alleged offense occurred in an aggressive or premeditated manner." Def. Br. at 33; 705 ILCS 405/5-4(3)(b)(ii). The People disagree. First, the facts adduced at the transfer hearing showed that the acts committed by Morgan were aggressive. Following a beating by Keith Cearlock, Morgan retreated to the bathroom, and, after a short time, made a conscious decision to arm himself with a pistol. Once armed and back in the bathroom, Morgan loaded the pistol and fared a round at a Tilex *10 bottle. Morgan exited the bathroom, even though he believed that his firing of the gun would provoke his grandfather to visit more abuse upon him. He encountered Keith Cearlock and shot him immediately. Morgan then turned his attention on his grandmother, who, the evidence showed, was shot in the back as she tried to flee from the house. Morgan testified that he tried to fire another round at her, but the gun jammed instead.

Such facts bespeak an individual whose conduct must be defined, if anything, as "aggressive." Morgan obtained a gun and fired it in the bathroom, thus drawing attention to himself, and, despite his belief that such activities would raise the irc of his grandfather, nevertheless left the safety of the bathroom, while armed with both the gun and the knowledge that his grandparents were about. After shooting his grandfather, Morgan's aggressiveness did not abate, as he mined his atten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                                      Page 8

tion to his grandmother, whom he shot in the back. Still unsated, however, Morgan
pursued her and attempted to shoot her again, and the only thing that prevented
him from doing so was an unforeseen jamming of the pistol.

Morgan, in his brief, tries to explain away the aggressive nature of his actions
by arguing that "[k]illing, by its nature, is aggressive," Def. Br. at 38, as if
this truism should excuse him from suffering the adverse application of section
(b)(ii) of the statutory transfer requirements. The facts in this case demonstrate
that the violence meted out by Jon Morgan was a direct consequence of his aggress-
ive desire to cause harm. Although the People agree that Morgan was not "lying in
wait" for his grandparents in order to shoot them, Def. Br. at 34, the circum-
stances were, in fact, worse, as Morgan confronted his grandparents directly and
shot them as he burst from the bathroom, evincing a violent, aggressive nature
that the trial court properly considered in its consideration of the transfer
statute. The facts, in the end, show that Morgan turned a run-of-the-mill argument
with his grandparents into an explosively violent and incendiary situation by arm-
ing himself with a handgun *11 and bursting out of the bathroom in an aggressive
peremptory attack. The trial court's finding that Jori Morgan's behavior was ag-
gressive was, therefore, not an abuse of discretion.

Second, the People disagree with Morgan's contention that the violence committed
on Keith and Lila Cearlock was not premeditated. Premeditation has been defined as
a "prior determination to do an act, but such determination need not exist for any
particular period before it is carded into effect." Black's Law Dictionary, at
1343 (4th ed. 1957); *People v. Stewart*, 105 Ill.2d 22, 473 N.E.2d 840, 865 (1984).
One of the indicators of premeditation examined by the juvenile court was Morgan's
prior discussions, with certain individuals, of his desire to visit harm upon
people whom that trial court, in its broad discretion, interpreted as meaning
Keith and Lila Cearlock.

Morgan claims, however, that the record is silent with respect to any desire, on
his part, to kill or otherwise harm his grandparents. The record developed at the
transfer hearing, however, when taken as a whole, reveals that Morgan made state-
ments to a number of individuals which the trial court, in the exercise of its
discretion, interpreted as indicative of a very real desire of Jon Morgan to
either hurt or kill Keith and Lila Cearlock. Brother Bryant testified, for ex-
ample, that other students told him that Jon, on one occasion, complained that"I
have been hurt all my life. I'm not going to be hurt anymore. From now on I will
do the hurting." (Vol. VII, R. 178).

Brother Bryant further testified that he knew o fa physical altercation that oc-
curred between Jon Morgan and Lila Cearlock which involved a shoving match follow-
ing an argument over a television remote control. Morgan pushed his grandmother's
hand away, slammed the remote control down on a table, and shoved her up against a
wall. (Vol VII, R. 173).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

After the Cearlock murders became known throughout town, Eric Gill, a classmate of
Morgan's, went to Brother Bryant and told him that, within a couple of weeks of
the murders, Morgan told Gill that he was "going to kill [his] grandmother." (Vol.
VII, R. 186). Bryant testified **12** that Gill, however, told him that he could not
recall if Morgan said anything about killing his grandfather. (Vol. VII, R. 186).

Eric Gill testified that one day, about six weeks before he shot the Cearlocks,
Morgan entered the boys' locker room at school and said "some day I wish I would
kill them." (Vol. VII, R. 321-322). Gill, however, acknowledged that he was not
sure to whom Morgan was referring.

In light of the above excerpts considered by the juvenile court in determining
that Morgan contemplated causing harm to Keith and Lila Cearlock, it is apparent
that the court's discretion in this regard was not made on an "erroneous inter-
pretation of fact." Def. Br. at 33. The discretion was exercised based on a fair
interpretation of the testimony which provided insight into Morgan's very real de-
sire to harm his grandparents. Furthermore, even if the premeditation was only mo-
mentary, such premeditation could still be properly found by the trier of fact, as
this Court has held that premeditation "need not exist for any particular period
before it is carried into effect." Stewart, 473 N.E.2d at 865.

Therefore, even if the testimony of the aforementioned witnesses does not support
the trial court's finding of premeditation, the court still acted within its dis-
cretion in finding the act premeditated, as the record also showed that Morgan
armed himself, entered the bathroom, and exited after shooting a Tilex bottle,
knowing that his grandparents were in the house, and, most importantly, knowing
that if he ever fought back, "his grandfather would kill him." Def. Br. at 34.
Overall, the juvenile court did not abuse its discretion in finding that, by a
preponderance of the evidence with respect to Morgan's prior comments, the murders
were premeditated.

Morgan also refers this Court to the conclusions drawn by Dr. Chapman to bolster
his argument that shooting his grandparents was not premeditated. Dr. Chapman
opined that Morgan suffered from attention deficit disorder, and that it was
"unlikely he acted in a premeditated manner **13** at the time of the alleged shoot-
ings but was acting in a state of sudden and intense passion provoked by strong
[sic] provcation at the time of the alleged offense." (C. 1034); Def. Br. at 27.
At the transfer hearing, counsel emphasized the Chapman report as well as other
psychological examinations to argue that Morgan's mental state at the time of the
crime precluded any finding of premeditation.

While such testimony may have gone "unrebutted," Def. Br. at 35, such an observa-
tion is not sufficient for Morgan to meet his burden of proof to show that the
trial court abused its discretion in not affording such information the weight
which he predictably ascribes to it. It is the responsibility of the trier of
fact, not this Court or any other reviewing court, to detennine the credibility of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                                    Page 10

witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences therefrom. *People v. Brooks*, 187 Ill.2d 91,718 N.E.2d 88 (1999). The credibility and weight to be given to psychiatric testimony, in particular, are for the trier of fact to determine. *People v. Haynes*, 174 Ill. 2d 204, 673 N.E.2d 318, 331 (1996). In finding Jon Morgan's acts to be premeditated, the juvenile court implicitly rejected Dr. Chapman's conclusions regarding Morgan's state of mind on the day he shot his grandparents and found that the act was, in fact, premeditated.

Moreover, Morgan's reference to his actions after the shootings does not support his argument that the shootings were not premeditated. The People disagree that the degree of Morgan's premeditation can be measured by what course of action he took *after* the killings. That Morgan panicked, roamed the streets, and eventually turned himself in to the police does not diminish the premeditation of the act itself. Rather, Morgan's surrender after the murders reflects his consciousness of guilt for having committed such an aggressive, premeditated act. This Court, **14 therefore, should reject Morgan's reliance on his allegedly aberrant behavior, shown after the murders, with which he supports his argument that the shootings were not premeditated.

Morgan's reference to cases in which premeditation was found after more meticulous planning and plotting, *.e.g.*, *People v. D.B.*, 202 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990), *People v. Beck*, 190 Ill. App.3d 748, 546 N.E.2d 1127 (5th Dist. 1989), *People v. Howard*, 42 Ill. App.3d 381,355 N.E.2d 543 (1st Dist. 1976), does not, in any way, cast doubt on the trial court's finding, in the case at bar, that the acts committed by Morgan were premeditated. Indeed, the premeditation factor has been found in cases where premeditation was formed in a lesser amount of time, or even on the spur of the moment, by the juvenile defendant. *See, e.g.*, *People v. L.J.*, 274 Ill.App.3d 977, 654 N.E.2d 671,672 (1st Dist. 1995), (trial court's decision to deny transfer to juvenile court reversed; clear premeditation found where defendant, a gang member, shot victim following a brief argument and on the instructions of another gang member.); *People v. Luckett*, 295 Ill. App.3d 342, 692 N.E.2d 1345, 1348 (3rd Dist. 1998) (premeditation found where defendant shot the victim during a drug deal because he thought that the victim made "a suspicious movement.")

The facts guiding the appellate court's decision in *People v. Martin*, 285 Ill.App.3d 623,674 N.E.2d 90 (1st Dist. 1996), are similar to the case at bar. In *Martin*, the defendant was threatened by the victim, Harper, on the day of the murder, and had "exchanged words" with Harper earlier that day. *Martin*, 674 N.E.2d at 92. Following the initial altercation, the defendant armed himself with a .38 pistol, and, when the defendant encountered Harper again, later in the day, Harper picked up a bottle and held it at his side, and, at the same time, accused the defendant of breaking car windows. *Martin*. 674 N.E.2d at 92. After Harper turned to walk away, defendant shot him in the back. *Martin*, 674 N.E.2d at 93. The trial court found, as part of its analysis of the propriety of a transfer to adult

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court, that the murder was committed in a premeditated manner: the defendant re-
trieved the gun after **15** the initial encounter, and, later, shot the victim in
the back. *Martin*, 674 N.E.2d at 100. In the case at bar, the facts are similar.
Morgan armed himself and barricaded himself in the bathroom. Although he may have
considered suicide, he decided against it, and exited the safety of the bathroom
to initiate what he knew would be a direct confrontation with his grandparents.
Morgan immediately shot his grandfather, and then shot his grandmother, in the
back, as she fled. Such actions bespeak a premeditated plan to commit murder, not-
withstanding the rapid sequence of events that led to the premeditation, as was
also evidenced in *L.J.*, *Lucked*, and *Martin*. The juvenile court's finding that the
murders of Keith and Lila Cearlock were both aggressive and premeditated, there-
fore, was not an abuse of discretion, and the juvenile court properly weighed
those considerations into its overall decision, based upon the other factors set
forth by statute, to transfer Jon Morgan to the adult division.

### B. The Juvenile Court Did Not Abuse Its Discretion in Determining That Jon Mor-gan's Age Weighed in Favor of a Transfer to Adult Court.

Morgan's next assignment of error, with respect to the transfer heating, is that
the trial court abused its discretion when it determined that his age when the
murders were committed -- 14 years and 8 months -- weighed in favor of transfer to
the adult division, as Morgan was only four months away from the mandatory age for
automatic transfer to adult court. (Vol. VIII, R. 447). Morgan complains that the
court failed to consider his age in light of his experiences, and that the court's
analysis was "wholly inadequate given that both chronological age and experience
of the minor must be evaluated when addressing this statutory factor." Def. Br. at
38.

The People disagree with Morgan's argument that the juvenile court did not con-
sider his life history as it related to his young age. The record reveals that the
trial court explicitly lent weight to Morgan's life history in making its ultimate
decision to transfer Morgan to the adult division. (Vol. **16** VIII, R. 448) ("We
have considered the minor's background. He has had a very unusual life and it
looks like a sad life..."). Even if the trial court did not specifically apply
this analysis to Morgan's age, that does not mean that the trial court failed to
measure his maturity in light of his life experiences. *See People v. Ulmer*, 158
Ill.App.3d 148, 510 N.E.2d 1296, 1298-1299 (2nd Dist. 1987) (For sentencing pur-
poses, "there is nothing in the record to indicate that [the trial court] failed
to consider mitigation evidence. It must...be presumed that the trial court con-
sidered the mitigation evidence that was presented.") Similarly, it must be pre-
sumed, in the case at bar, that the trial court considered Morgan's life history,
as it related to his age, in measuring the propriety of a transfer to the adult
division. The mere fact that the trial court did not refer to Morgan's background
with the kind of specificity urged by Morgan does not necessarily mean that the
trial court did not consider that background in its analysis of Morgan's age at
the time he murdered his grandparents.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                    Page 12

Even if this Court finds the trial court's treatment of the age issue to be less than thorough, it should still be upheld. The statute governing transfer states that the juvenile court must consider "the age of the minor." 705 ILCS 405/5-4(3)Co)(iii). The juvenile court did so, and found that Morgan was so close to being 15 years old that, given another four months, the transfer to adult court "would be automatic." (Vol. VIII, R. 447). For every case given by Morgan, in his brief, which shows a more thorough analysis of age related to life experience, there are cases showing that more cursory inquiries into the age factor are entirely appropriate and dispositive. *See, e.g.*, *People v. Ollins*, 231 Ill.App.3d 243,606 N.E.2d 192, 197 (1st Dist. 1992) (age of minor defendant "was 14 years and 4 months at the time of the incident. . . [which] would place the defendant only eight months short of an automatic transfer.); *People v. Brown*, 301 Ill. App.3d 995,705 N.E.2d 162, 169 (2nd Dist. 1998) (although defendant emphasized that he was only 14 at the time the offenses **\*17** occurred, the appellate court "note[d] that he was barely six weeks shy of his 15th birthday when he committed the crimes charged, which would have garnered an automatic transfer.")

Morgan makes much of his lack of experience in the criminal justice system, and his having been deprived "of many of the experiences of young persons his age" as indicators that he was too immature to be tried as an adult. Def. Br. at 39-40. Morgan further explains that he attended a Christian school and was taught about moral purity on a daily basis, in contrast to other transfer cases where the juvenile subjects participated in such activities as sex, drinking, and gang involvement. *See, e.g.*, *People v. M.D.*, 101 Ill.2d 73,461 N.E.2d 367 (1984); *In the Interest of L.J.*, 274 Ill. App.3d 977, 654 N.E.2d 671 (1st Dist. 1995). This analysis cannot succeed. Morgan's exposure to religion and his lack of a criminal record matter very little when contrasted to the brutal nature of the crimes at issue, which involve the deliberate shooting of his grandparents. Moreover, certain statements, made by Morgan himself, belie his argument that, as a 14-year-old, he was too sheltered and unaware of adult activities to warrant a transfer to adult court. Indeed, these statements speak to the violent tendencies of Jon Morgan, despite his young age. ("I have been hurt all my life. I'm not going to be hurt anymore. From now on I will do the hurting.") (Vol. VII, R. 178); ("I intend to commit every sin that I want to commit. I'm going to do anything and everything I want to do, and when I hit rock bottom, then I will call on God.") (Vol. VII, R. 180-181).

Two cases cited by Morgan, *People v. D.B.*, 101 Ill.App.3d 194, 559 N.E.2d 873 (1st Dist. 1990), and *In theInterest of Bums*, 67 Ill.App.3d 361,385 N.E.2d 22 (4th Dist. 1978), do not support his proposition that the trial court should have taken a closer look at his age in light of his life experiences. The juvenile defendants in *D.B.* and *Bums* were involved in the crimes of home invasion/murder and armed robbery/murder, respectively. In *D.B.*, it is true that the court found that the juvenile "did not exhibit the experience of someone well beyond his years." *D.B.*, 385 N.E.2d **\*18** at 878. Yet, at the same time, the appellate court also found that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                              Page 13

the juvenile did not "personally kill" the victim, but was charged on an account-
ability theory, and "played only a passive role in the acts that made this crime
particularly violent and offensive." *D.B.*, 385 N.E.2d at 878-880. The juvenile in
*D.B.* also had a supportive family and was not "an otherwise violent or dangerous
person." *D.B.*, 385 N.E.2d at 879. In the case at bar, it is undisputed that Morgan
was the sole assailant, whose decision to shoot his grandparents resulted in a
double homicide, and his ominous proclamations about hurting people and committing
"every sin that [he] want[s] to commit," surely evince a personality that is in-
clined to violence.

The defendant in *Bums*, as in *D.B.*, did not actually kill the victim, as nothing
suggested that she "carried a knife or stabbed the murder victim, or that she en-
couraged the murderer or participated in the murder;...her companion admitted to
stabbing the victim, and the State's eyewitness said that the defendant was very
frightened and asked her companion not to stab the victim." *Bums*, 385 N.E.2d at
24. As noted, the Cearlock murders were deliberately formulated and carried out by
one individual - Jon Morgan.

The People do not deny that some analyses, in other cases, of the age factor, have
been undertaken in light of the defendant's life experiences. But the trial
court's decision not to expound on Morgan's age as it related to his life experi-
ences does not necessarily mean that the trial court failed to undertake such an
analysis in deciding to transfer Morgan, and, therefore, does not warrant re-
versal. After all, the law does not require that a "mathematical formula" govern
the trial court's decision to allow a transfer to adult court. *People v. Taylor*,
76 Ill.2d 289, 391 N.E.2d 371, 373 (1979). The appellate court should be affirmed.

**\*19 C. The Juvenile Court Did Not Commit an Abuse of Discretion When It Ordered
Transfer of Jon Morgan to Adult Court Notwithstanding Evidence of His Troubled
Past and History of Dysfunction in the Morgan Family.**

To a certain degree, Morgan's dysfunctional childhood might be viewed as a reason
to keep him in the juvenile court, 705 ILCS 405/5-4(3)(b)(iv), but, then again,
all statutory factors for transfer need not be resolved against the juvenile for a
trial court to find that such a transfer is warranted. *People v. Cooks*, 271 Ill.
App.3d 25, 648 N.E.2d 190, 197 (1st Dist. 1995). Morgan overlooks the possibility
that the trial court, in its exercise of discretion, may have weighed this factor
in his favor. When viewed in this context, Morgan's whole argument here, that the
trial court abused its discretion in sending him to adult court even in the face
of such a "sad" and "unusual" life, must fail in light of the *Cooks* rule that a
transfer can still be warranted even if a statutory factor is measured in favor of
the juvenile defendant. The record shows that the trial court was concerned about
the difficulties in Morgan's life, but, as the appellate court rightly held, "the
other factors outweighed this concern." *People v. Morgan*, No. 4-96-0996, Illinois
Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme
Court Rule 23), at 20-21.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The record also shows that the trial court's final decision was undertaken with a conscientious, reasoned, and fair assessment of Jon Morgan's life up to the point he killed Keith and Lila Cearlock. Indeed, the trial court knew that its role in the transfer proceedings was "to balance the best interest of the alleged juvenile offender against society's legitimate interest in being protected from criminal victimization perpetrated by the minor." (Vol. VIII, R. 449). The trial court prefaced these remarks by citing the well-established rule that "it is not necessary that all the factors be resolved against a juvenile in order to allow a transfer." (Vol. VIII, R. 447). It is clear, in light of these comments, that the trial court did not just brush off the sometimes sad and dysfunctional family life of Jori Morgan; instead, the record reveals that the trial court made its decision in **20 consideration of all statutory factors. It cannot be said that the trial court's analysis here, which was conducted with the utmost gravity and solemnity, was so arbitrary or fanciful or capricious that no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill.2d 353,583 N.E.2d 515 (1991). The appellate court should be affirmed.

### D. The Juvenile Court Did Consider Jon Morgan's Potential for Rehabilitation and the Likely Effectiveness of Any Facilities for Treatment in Light of Morgan's Present Circumstances, and, Therefore, Did Not Abuse its Discretion in Measuring These Factors in Favor of a Transfer to Adult Court.

Morgan's next assignment of error is that the trial court failed to consider his potential for rehabilitation in its decision to order that he stand trial as an adult. 705 ILCS 405/5-4(3)(b)(v). This contention is without merit and does not demonstrate that the trial court abused its discretion. In considering this factor, the trial court stated as follows:
The next factor is whether or not there is [sic] facilities particularly available to the juvenile court for the treatment and rehabilitation of the minor. As Mrs. Turner has testified here today, and the court is well aware, I don't believe there are any unique facilities particularly available to the juvenile that are not available to an adult. In fact, if the minor were transferred over and did stand convicted in an adult court, he would go into the Juvenile Division to begin with anyway. (Vol. VIII, R. 448).

In the court below, Morgan argued that the trial court did not engage in the kind of analysis undertaken in *People v. Clark*, 119 Ill.2d 1, 518 N.E.2d 138 (1987), but, instead, merely summarized the testimony of the juvenile probation officer, Kim Turner, and only stated that there were no unique facilities available to Morgan that were not available to an adult. Morgan argues, further, that the trial court should not have ruled as it did without determining how Morgan's attention deficit disorder and other emotional problems would be addressed in the juvenile and adult facilities, because it is possible that "there are different theories of treatment in the adult as opposed to the juvenile division of the Department of Corrections." Def. Br. at 49.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*21** Morgan's argument here must fail. The trial court, during the course of the transfer hearing, was provided with very detailed information about Morgan's social history and background, and the probation officer provided an even more detailed basis for her conclusion that a transfer to adult court was appropriate. Turner testified that the chances of rehabilitating Morgan were "unlikely," and that there was no kind of rehabilitation plan that could be developed for this particular juvenile. (Vol. VII, R. 269-270). Turner was subjected to rigorous cross-examination, and did specifically address how Morgan's attention deficit disorder and other emotional problems could be addressed in an adult facility as opposed to a juvenile center. In particular, Turner testified that Morgan would receive treatment in the juvenile division of the Illinois Department of Corrections, and that, with respect to attention deficit disorder, the juvenile division would have the ability to "deal with that disorder," and would be able to do "much more than that I'm sure." (Vol. VII, R. 271-272).

In *Clark*, on the other hand, the probation officer who recommended the transfer "did not know the defendant" and "had not interviewed the defendant," and, in the end, rested his opinion in favor of a transfer solely on the nature of the offense committed by the juvenile; nor did the officer ever provide any basis for his conclusion that there were no juvenile facilities available for the defendant. *Clark*, 518 N.E.2d at 142. In *Clark*, this Court determined that, in light of the insufficient consideration that had been given to the defendant's background and rehabilitative potential, the transfer hearing was not adequate, and characterized it as being in "stark contrast to the extensive hearings generally held on the State's motion for transfer for trial under the Criminal Code." *Clark*, 518 N.E.2d at 146.

The appellate court in the case at bar, in rejecting Morgan's argument, held that the trial court "heard lengthy testimony and strenuous cross-examination on this issue and was within its discretion to conclude that, because Jon, if convicted, would remain in a juvenile correctional facility until at **\*22** least the age of 18, retention of juvenile jurisdiction would not affect the services available to him in the near furore." The trial court did not abuse its discretion in its consideration of this particular factor, and the appellate court's decision should be affirmed.

### E. The Juvenile Court Did Not Abuse Its Discretion in Finding That The Balance of Society's Interests in Incarcerating Jon Morgan Outweighed Morgan's Interests, and Therefore Properly Declined to Retain Jurisdiction.

Next, Morgan alleges that the trial court erred when it concluded that society's interest in incarcerating him beyond his 21st birthday outweighed his own interests. 705 ILCS 405/5-4(3)Co)(vi). An analysis of this factor actually involves a "balancing of the other factors" considered by the trial court. *People v. Fuller*, 292 Ill. App.3d 651,686 N.E.2d 6, 12 (1st Dist. 1997). Specifically, Morgan contends that the trial court failed to give sufficient weight to Morgan's sometimes turbulent and dysfunctional childhood. According to Morgan, such evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence should have compelled a finding that he was a candidate for rehabilitation, rather than long incarceration, and that the trial court abused its discretion when it found, in light of this evidence, that society's interests should prevail.

This argument has no merit. The record shows, and Morgan cannot deny, that the trial court gave much consideration to Morgan's upbringing in its overall weighing of the statutory factors for transfer. The trial court's consideration of this material, however, does not. automatically translate into a favorable ruling for Morgan, and Morgan offers nothing to support such a contention. The appellate court found that, although there are some facts in Morgan's favor, such as his lack of criminal history and family problems, "[b]alanced against Jon, of course, are the lack of certainty that he would be rehabilitated before he reaches the age of majority and the seriousness of his offense." *People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme Court Rule 23), at 22-23.

**\*23** After considering the statutory factors for transfer, this Court should find that there was no abuse of discretion, as the trial court properly considered all the relevant factors and was keenly aware of Morgan's emotional problems and life history, which, although those factors are to be taken into consideration, do not always save the day for juvenile defendants. *See, e.g., Fuller*, 686 N.E.2d at 9 (juvenile was "severely emotionally disturbed," and a "violent person who came from a violent, severely unstable, dysfunctional family;" trial court was "particularly aware" of those problems, but transfer to adult court still upheld for the benefit and safety of society). This Court should not reweigh all the factors akeady considered by the trial court, but, rather, must decide whether the trial court abused its discretion in finding that the factors in Morgan's case demanded transfer. The trial court's meaningful analysis, and ultimate decision, to strike the balance for the interests of society, in light of Morgan's lack of potential for rehabilitation and the deliberate violence perpetrated on two elderly relatives, did not constitute an abuse of discretion, and the appellate court should be affirmed.

**F. The Juvenile Court Did Not Misunderstand the Import of the Non-Statutory Factor for Determining the Propriety of Juvenile Transfer As Set Forth in *People v. Clark*.**

The trial court is presumed to know the law regarding potential sentences for a criminal defendant. *People v. Ollins*, 231 Ill. App.3d 243, 606 N.E.2d 192, 198 (1st Dist. 1992). That presumption is evident in the case at bar, where the prosecutor (Vol. VIII, R. 410), Morgan's attorney (Vol. VIII, R. 416-417), and counsel for Morgan's parents (Vol. VIII, R. 436, 441-442), all made reference to the mandatory life sentence faced by Morgan if he were convicted as an adult. The appellate court's decision in *People v. Cooks*, 271 Ill.App.3d 25, 648 N.E.2d 190 (1st Dist. 1995), is instructive in this regard, and effectively precludes Morgan's attempt to show, in this instance, that the trial court committed an abuse

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34213340 (Ill.)                                        Page 17

of discretion. In *Cooks*, the court found that a single **24** reference, made by
counsel, to the mandatory life term of imprisonment faced by the defendant was
sufficient to show that the trial court considered this factor, even though the
trial court made no specific reference thereto. *Cooks*, 648 N.E.2d at 198.

The *Cooks* scenario, coupled with the general rule that the trial court is not ob-
ligated to make specific factual findings as to each factor, *Cooks*, 648 N.E.2d at
198, compels a finding here that the trial court did not misunderstand the poten-
tial sentence facing Jon Morgan if he were to be convicted in adult court, nor did
it misinterpret or misunderstand the cautionary language in *People v. Clark*, 119
Ill.2d 1,518 N.E.2d 138 (1987), that the trial court be aware of a mandatory life
sentence for convictions of more than one first degree murder. The trial court did
not commit an abuse of discretion in this regard, and the appellate court's de-
cision finding the same should be affirmed.

**G. The Faets Recited by the Juvenile Court, Prior to Undertaking a Statutory Ana-
lysis of the Transfer Provisions, Were Not Relied Upon by the Court, in Isolation,
to Effect a Transfer to Adult Court.**

Morgan next complains that the trial court, before its statutory analysis, listed
a series of facts which it believed weighed in favor of a transfer to adult court.
Morgan believes that the trial court's reliance on these factors was improper be-
cause none of them supported transfer. This claim must be measured in light of the
abuse of discretion standard for adjudicating the propriety of the trial court's
decision to allow transfer. Under this standard, Morgan's contention is without
merit. As the People outlined above, the statements made by Morgan regarding his
desire to harm his grandparents, and his thoughts about shooting other people re-
flected an overall violent disposition which the trial court properly took into
account when determining whether to transfer him to adult court. The trial court
also undertook a thorough evaluation of the statutory factors and the record is
clear that it is upon those statutory factors that the trial court based its ulti-
mate decision. The trial court's reference to certain facts prior to undertaking a
statutory analysis of the transfer provisions **25** was not done, in isolation, to
effect a transfer. Rather, the transfer was based on, and supported by, the trial
court's careful and conscientious analysis of the statutory factors as applied to
the facts of the case. The appellate court should be affirmed.

**26 II. THE STATEMENTS MADE BY JON MORGAN WHILE IN POLICE CUSTODY WERE VOLUNTARY.**

Morgan's next argument is that the statements elicited from him at the police sta-
tion were not voluntary. Morgan approaches this issue from two angles. First, he
contends that his age, experience, and emotional characteristics compel a finding
that his statements were involuntarily given despite his waiver of his *Miranda*
rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Second, Morgan attacks the volun-
tariness of his statements by pointing to his encounter with police at the sta-
tion, which included a failure of the interviewing officers to contact a juvenile

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

officer or his parents. Morgan's claim in this instance must be rejected, and the appellate court must be affirmed.

It is well-established that, the "totality of the circumstances" test governs the question of whether a defendant's *Miranda* waiver has been given knowingly and voluntarily. *Miranda*, 384 U.S. at 475-477 (1966); *People v. Prim*, 53 Ill.2d 62, 289 N.E.2d 601,606 (1972). No single factor in this analysis is dispositive. *In re G.O.*, 191 Ill.2d 37, 727 N.E.2d 1003, 1012 (2000).

Although the People realize that special concern applies when a juvenile defendant is the subject of a custodial interrogation involving a waiver of *Miranda*, the United States Supreme Court has never assented to promulgate a broad-based rule that exempts juveniles from the normal rules that govern the propriety of a *Miranda* waiver. *See, e.g., Fare v. Michael C.*, 442 U.S. 707, 723 (1979), rejecting broad-based rule that "juvenile's request for almost anyone. . .considered trustworthy enough to give him reliable advice would trigger the rigid rule of *Miranda*." While assessing the voluntariness of a juvenile's confession "requires great care," *People v. Lash*, 252 Ill. App.3d 239,624 N.E.2d 1129, 1132 (1st Dist. 1993), statements made by juveniles are not to be automatically viewed with suspicion, and are "generally subjected to the same test as adult defendants." *Lash*, 624 N.E.2d at 1132. Any analysis of the totality of the circumstances regarding *27 the voluntariness of a minor's statements includes the following concerns: the existence of any promises, threats or physical coercion; whether the accused received his constitutional rights; the duration of the questioning; and the age, education, and intelligence of the defendant. *Lash*, 624 N.E.2d at 1133.

The State bears the burden of showing that a statement was made voluntarily, but the trial court need be convinced only by a preponderance of the evidence that such statements are, in fact, made on a voluntary basis. *Lash*, 624 N.E.2d at 1132. It is well-established that, with respect to such matters, it is within the province of the trial court to resolve any conflicts in the evidence and to determine the credibility of the witnesses. *Lash*, 624 N.E.2d at 1132. On appeal, the trial court's findings with respect to the voluntariness of confessions cannot be reversed unless such findings are against the manifest weight of the evidence. *People v. Oaks*, 169 Ill.2d 409, 662 N.E.2d 1328, 1344 (1996).

### A. Morgan's Age, Education, Emotional Characteristics, and Experience in the Juvenile Court System Do Not Lend Weight to His Theory that His Statements Were Involuntary.

Morgan contends that his youth and inexperience are significant factors that mandate a finding that his statements were not voluntary. Morgan also lists, as a factor supporting suppression, that he was predisposed to seek approval from adults and other authority figures because of his home life and participation in church activities, and that this "learned behavior" caused him to be unduly influenced by interrogating officers. These contentions are without merit. The record

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in this case shows that Morgan's statements were taken in full compliance with procedural safeguards and that, notwithstanding his young age, each of the statements given by him was elicited with the utmost care and concern for his constitutional right against self-incrimination.

**\*28** For instance, it is undisputed that Morgan was read his constitutional rights before he gave his statement to the police, told the officers that he understood those rights, and agreed to talk to the officers. (Vol. X., R. 116-118, 150); (Vol. XI, R. 194, 212, 230-231, 288-290). The record evidences that no threats, promises, or untoward coercion were exercised against Jon Morgan, and the interrogating officers conducted their questioning in a mild-mannered and conversational tone of voice. (Vol. X, R. 116, 119, 125-126, 129); (Vol. XI, R. 194-195, 221,224, 291,306, 315, 332). Morgan, himself, admitted on the stand that the officers did not bully him, beat him, threaten him, promise him anything, yell at him, or call him names. (Vol. XII, 505-506). Morgan was not deprived of such necessities as bathroom breaks, food, and drink, and such amenities were offered to him, although he denied the need for any. (Vol. XI, 224-225, 288); (Vol. XII, R. 515-516). Following transport to the police station, Morgan was not handcuffed during either of the interviews or during the videotaped re-enactment of the shootings at the scene of the crime. (Vol. X, R. 115, 122-125, 127-128, 144); (Vol. XI, R. 192, 285,335-336, 350). The trial court, in denying Morgan's motion to suppress, noted that each of these concerns had been included in that decision. (C. 12-15).

In light of these factors, Morgan's continued reliance on his age and inexperience to escape the consequences of his criminal conduct must be rejected. Morgan claims that he was so beholden to strict rules at home and at church that he feared the "negative consequences" that resulted fi:om not following all rules. Def. Br. at 57. Apparently, Morgan implies here that, because he feared the "negative consequences" of not making statements to police, he was involuntarily coerced into making such statements. But there is no evidence in the record to support such a leap. And, again, the record shows that such a contention is simply not true: Morgan admitted that he felt free to decline to answer certain questions and that he did not feel compelled to answer questions simply **\*29** because the interrogator, Detective Harberts, as a policeman, was an authority figure. (Vol. XII, R. 495, 496-498).

Furthermore, even if this Court were to give any undue weight to Morgan's argument that he was so programmed to follow rules that he could not have made such statements on a voluntary basis, the People note that Morgan showed no such compunction for flouting rules or authority figures in the past, as he admitted to challenging Pastor Bryant's authority on at least one occasion. (Vol. XII, R. 493-494). And, presumably, Morgan would not have committed a double homicide had he been so entirely committed to following rules and respecting authority that his statements following the murders cannot be deemed to have been given voluntarily.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Morgan continues, also, to make much of Dr. Chapman's testimony in this regard.
Dr. Chapman, who watched the video-taped crime scene recreation and listened to
the audio-taped interrogation at police headquarters, opined that Morgan was com-
pliant and cooperative and appeared to be trying.to please the interrogating of-
ficers, who, in such a scenario, could be defined as "authority figures." (Vo.
XIII, R. 551). Morgan's behavior, in this respect, was purportedly the kind of
"learned behavior" that was shaped by his life history and upbringing. (Vol. XIII,
R. 555). Dr. Chapman also testified, however, that just because Morgan had learned
to comply with directions did not mean that he would automatically comply with
whatever was asked of him, (Vol. XIII, R. 606), and he further acknowledged that
Morgan talked to the police because, quite simply, "he wanted to talk to the po-
lice." (Vol. XIII, R. 612).

It is the responsibility of the trier of fact, not this Court or any other review-
ing court, to determine the credibility of witnesses, to weigh their testimony, to
resolve conflicts in the evidence, and to draw reasonable inferences therefrom.
*People v. Brooks*, 187 Ill.2d 91, 718 N.E.2d 88 (1999). The credibility and weight
to be given to psychiatric or psychological testimony is not different than **\*30**
any other kind of evidence in this regard: both are for the trier of fact to de-
termine. *People v. Haynes*, 174 Ill. 2d 204, 673 N.E.2d 318, 331 (1996). Indeed,
the trial court specifically indicated in the record that, although it did con-
sider Dr. Chapman's testimony, it was certainly under no obligation "to give it
the weight that the Defendant would perhaps wish," (C. 15), and concluded that "it
would appear from all the other evidence, that the Court cannot conclude similarly
as the doctor." (C. 12).

Morgan's reliance on *In re J.J.C.*, 294 Ill. App.3d 227, 689 N.E.2d 1172 (2nd Dist.
1998), does not provide any extra ammunition for his ongoing attack against the
propriety and voluntariness of his custodial interrogation. The juvenile in *J.C.C.*
had been diagnosed with ADHD and was prescribed certain medications which he had
ceased taking about two months before the interrogation at issue. *J.J.C.*, 689
N.E.2d at 1180. The juvenile's "vulnerability" was enhanced by withdrawal symptoms
related to his psychotropic medication, as well as by the juvenile's "other psy-
chiatric disorders," both of which factored into the appellate court's ultimate
decision to reverse the trial court's denial of his motion to suppress his confes-
sion. *J.J.C.*, 689 N.E.2d at 1180.

In the case at bar, Morgan attempts to draw a parallel between J.J.C.'s pharma-
ceutically-derived "vulnerability" and his own apparent "despair, lack of emotion,
and compliant behavior." Def. Br. at 58. This cannot succeed. Police officers are
not physicians, social workers, or pharmacists, and should not be expected, after
a juvenile suspect waives his *Miranda* rights, to divine the medical, pharmaceutic-
al, or social history of a minor. Just because the interrogating officers noted
that Morgan was "sad" and full of"despair" does not mean that they should have
jumped to the quasi-psychiatric conclusion that he was somehow "vulnerable."
*People v. Phillips*, 226 Ill. App.3d 878, 589 N.E.2d 1107, 1113 (2nd Dist. 1992)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(police are "not required, as a prerequisite *31 to accepting a defendant's waiver, to conduct a mental examination of the defendant in order to ascertain his ability to comprehend kis constitutional rights.")

Furthermore, the fact that Jon Morgan had a sad and despairing attitude during the interview is hardly surprising given the circumstances: he had just gunned down his grandparents. The emotions he displayed, it could be argued, are the reasonably expected results of such an excessive and violent course of action. Moreover, there is no evidence that Morgan was suffering from withdrawal symptoms related to psychotropic medication, as was the juvenile in *J.J.C*. Even the court in *J.J.C.* recognized that "evidence of a limited mental capacity alone does not indicate that respondent was incapable of waiving his constitutional rights and making a voluntary confession." *J.J.C.*, 689 N.E.2d at 1180. Morgan's sad and compliant demeanor at the police station simply does not rise to the level of the readily apparent psychiatric disorders witnessed by the officers in *J.J.C.*, and any comparison to that case should be rejected. The *J.J.C.* court noted that the juvenile's minimal prior contacts with the police weighed into its decision to find that the juvenile's statements were made involuntarily. However, this observation is only one factor to be measured in light of the "totality of the circumstances."

The record in this case shows that Jon Morgan was treated with respect, dignity, and fairness while in police custody and especially during the interrogation, and that his "will was not overcome, particularly in light of his level of intelligence and his admitted desire to unburden himself by telling someone in authority what he had done." *People v. Morgan*, No. 4-96-0996, Illinois Appellate Court, 4th Dist. (Sept. 29, 1999) (Unpublished Order pursuant to Supreme Court Rule 23), at 49.

In sum, the issue at bar is precisely the kind of situation where the trial court's judgment should be afforded a degree of deference, as the reliability and credibility of each witness who testified at the suppression hearing – from Detective Harberts and Deputy Spickard, to Jon Morgan *32 and Dr. Chapman - was considered and weighed by the trial court, which, in the end, found that Morgan did voluntarily confess to the officers and that, as a result, his waiver of his *Miranda* privilege was proper. Morgan may have been 14 years old at the time he made his statements to police, but this does not necessarily indicate that his statements were given involuntarily or while under duress. The trial court's decision not to grant Morgan's motion to suppress in light of his age and life experiences was not against the manifest weight of the evidence, and should be affirmed accordingly.

### B. An Analysis of the Totality of the Circumstances Regarding Morgan's *Miranda* Waiver Reveals that his Encounter with Police Was Not "Coercive."

Morgan's characterization of his custodial interrogation as "oppressive, intimidating, and coercive," Def. Br. at 61, could, perhaps, remind one of the chronicles

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the infamous *autos da fé* implemented by Tomás de Torquemada during the Inquisition. The record, however, reveals nothing so outrageous. Rather, the totality of the circumstances involving Morgan's waiver of his Miranda rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), shows that there was no undue coercion, threats, or any other type of untoward behavior on the part of the Lincoln Police Department.

First, Morgan, as he did in the court below, continues to attack the Lincoln Police Department's use of handcuffs. Morgan was handcuffed after he surrendered himself to police at the Cearlock house. However, the arresting officers were not aware of Morgan's age when they took him into custody, and, from their experiences with other youthful offenders, believed that Morgan was actually between 17 and 19 years old. (Vol. X, R. 109-111); (Vol. XI, R. 277). Detective Harberts believed that Morgan, because he had just fatally shot two people, was a definite safety risk. (Vol. XII, R. 414). Furthermore, following transport to the police station, Morgan was not handcuffed during either of the interviews or during the videotaped re-enactment of the shootings **33** at the scene of the crime. (Vol. X, R. 115, 122-125, 127-128, 144); (Vol. XI, R. 192,285, 335-336, 350). The record shows, therefore, that Morgan was handcuffed just briefly, during the ride to the police station. Once there, the handcuffs were taken off and he was offered use of the bathroom, food, and drink. (Vol. XI, 224-225, 288); (Vol. XII, R. 515-516). In *In re G.O.*, 191 Ill.2d 37, 727 N.E.2d 1003, 1012 (2000), the fact that the juvenile defendant was not handcuffed, during questioning, weighed in favor of allowing the admission of the defendant's statements. Similarly, in this case, the record is clear that Morgan was not handcuffed during questioning, a factor which, as in *G.O.*, should weigh in favor of the trial court's finding that Morgan's statements were made voluntarily and without undue coercion.

In further support of his theory that his statements were not given voluntarily due to the coercive nature of his interrogation, Morgan points to the fact that he was confined in violation of certain provisions of the Juvenile Court Act, specifically 705 ILCS 405/5-7(2)(C)(iii) (juvenile must be informed of the purpose of the detention and the fact that it cannot exceed six (6) hours), and (vi) (no minor less that 16 years of age may be confined in a jail or place ordinarily used for the confinement of prisoners in a police station), as well as 705 ILCS 405/5-6(2) (law enforcement officer must immediately make a reasonable attempt to notify a parent or other person legally responsible for the minor's care or the person with whom the minor resides.) These provisions, however, are of questionable applicability when a juvenile is in temporary custody under the Juvenile Court Act. In this case, Jori Morgan was formally arrested for a double homicide, and the provisions cited by him are not applicable. *People v. Daniel*, 238 Ill.App.3d 19,606 N.E.2d 94, 104 (1st Dist. 1992) (defendant in was not arrested pursuant to a petition in the juvenile court, but was simply arrested for murder and "was therefore subject to the jurisdiction of the criminal courts.") But **34** see *People v. Pico*, 287 Ill.App.3d 607, 678 N.E.2d 780, 783 (1st Dist. 1997) (minor is entitled to protections of Juvenile Court Act until he has been charged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as an adult).

If the above provisions do apply, it is apparent that the police acted in substantial compliance with them during their interrogation of Morgan. Police knew that Morgan had just shot his grandparents, whom the police reasonably believed to be his legal guardians, with whom he resided in Lincoln. It is understandable, against this backdrop, that the police did not contact anyone prior to the first interview: Morgan had killed the very people referred to in the statute. Then, prior to the second interview and videotaped re-creation, police did make a reasonable attempt to notify Morgan's mother in Virginia. (Vol. XI, R. 322). Morgan was transferred from the Logan County jail to a Department of Corrections juvenile facility in Galesburg shortly thereafter.

As the People noted above, not only did the police reasonably believe that the deceased Cearlocks were Morgan's legal guardians (Morgan having told them that he thought they were his legal guardians (Vol. XII, R. 384, 515)), but they also made reasonable efforts to notify Morgan's mother, Glenda Ashworth, prior to the second interview and after they learned about her from Morgan. The record shows that police called and left a message with her at 10:45 p.m. that evening, and she called back at 3:20 a.m. Detective Harberts testified that, at no point during the course of his conversation with Ashworth, did she request an attorney for her son. (Vol. XII, R. 406). Harberts informed Ashworth that she needed to talk to the State's Attorney about any specific matters in the case, and, until he talked to Ashworth, Harberts was under the impression, given by Jon Morgan, that the Cearlocks were his legal guardians. (Vol. XII, R. 406-407).

Even if the Lincoln police violated the applicable statute, such a violation does not mandate a *per se* finding of constitutional deprivation, but, instead, is to be gauged in the context of the "totality of the circumstances" test. **\*35** *People v. McGhee*, 154 Ill. App.3d 232, 507 N.E.2d 33, 35 (1st Dist. 1987). The trial court also recognized this, and included it in its analysis of the totality of the circumstances, and its thorough analysis of this and other factors was not against the manifest weight of the evidence. (C. 14) ("higher Courts, on review, have made it clear that such a violation [of the Juvenile Court Act] does not cause a *per se* suppression and is *one factor of many* that the Court is to consider in ruling on the Motion to Suppress.") (Emphasis added). This Court has held as follows: a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. Nevertheless, we believe that this is a factor that may be relevant in determining whether a juvenile's confession was voluntary. This is particularly tree in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another "concerned adult," or the police prevent the juvenile's parents from speaking with him. While not dispositive, this is one of many factors to be examined when determining whether a juvenile's confession was voluntary. *G.O.*, 727 N.E.2d at 1013.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The facts in the case at bar weigh in favor of the trial court's decision to deny
Morgan's motion to suppress. As the People have noted throughout this section,
there is no evidence that Morgan did not understand his rights or the interroga-
tion process. Morgan never asked to speak with his parents or any other adult, and
police made reasonable efforts to contact Ms. Ashworth. The People also note that,
even if Morgan had asked to speak with his mother, such a request does not auto-
matically trigger *Miranda's* protections. *See Fare v. Michael C.*, 442 U.S. 707, 723
(1979) (rejecting broad-based rule that "juvenile's request for almost any-
one...considered trustworthy enough to give him reliable advice would trigger the
rigid rule of *Miranda*.")

Furthermore, there was no violation of the provision requiring that a juvenile de-
fendant be taken before a youth officer. The Lincoln Police Department has only
one designated youth officer, (Vol. XI, R. 240), and has adopted a policy whereby
the officer on duty assumes the role of the youth *36 officer if the actual youth
officer, himself, is not available. (Vol. XI, R. 238-239, 242). At the time Morgan
contends he should have been brought before a youth officer, Detective Harberts
was the shift commander on duty, and, because the official youth officer, Darrell
Sisk, was not on duty, Harberts assumed the duties of the youth officer. (Vol. XI,
R. 242).

Morgan's reliance on *People v. Montanez*, 273 Ill. App.3d 844, 652 N.E.2d 1271 (1st
Dist. 1995), to bolster his contention that the officers' alleged failure to prop-
erly contact Ashworth and a juvenile officer rendered his subsequent confession
inadmissible, is misguided. Unlike the instant case, the mother of the juvenile
defendant in *Montanez* was denied repeated requests to see the juvenile, even when
she came, herself, to the police station. *Montanez*, 652 N.E.2d at 1272. In the
case at bar, reasonable efforts were made to contact Glenda Ashworth, and she was
finally contacted. Moreover, as noted above, official policy in effect at the time
Morgan was arrested dictated that, if the youth officer was unavailable or not on
duty, the shift commander, in this case Detective Harberts, was to assume the du-
ties of the youth officer. And, in *Gallegos v. Colorado*, 370 U.S. 49 (1962), an-
other case cited by Morgan in support of his argument for suppression, the United
States Supreme Court found the facts surrounding the defendant's confession -- a
five-day isolated detention without being presented to the court, refusal of po-
lice to allow the defendant's mother to see him during the period of isolation,
and no warnings or admontions of his rights -- were so harrowing that the confes-
sion itself was obtained in violation of due process. *Gallegos*, 370 U.S. at 54-55.
The facts in Morgan's case, on the other hand, show that the police were conscien-
tious in giving Morgan his *Miranda* warnings, he was detained only a short time be-
fore giving his confession, and he was not denied the opportunity to see his moth-
er or any other concerned adult.

Finally, Morgan contends that the manner in which the police read him his *Miranda*
warnings should be weighed in favor of suppression, maintaining that the officer
read him the warnings "just *37 like he would read them to any adult defendant."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In support, he cites to *In re V.L.T.*, 292 Ill. App.3d 728, 686 N.E.2d 49 (2nd Dist. 1997), where the officers "read respondent her rights, speaking slowly and clearly and explaining each sentence." *V.L.T.*, 686 N.E.2d at 52. Morgan's attempt to utilize the manner in which he was read his fights as a factor to be weighed against denying the motion to suppress must be rejected. Morgan is not mentally retarded, in the view of the trial court, which observed his demeanor and testimony first-hand, is "of average intelligence, appeared emotionally stable, articulate and familiar with the English language." (C. 12-13). Nor has Morgan pointed to any case which mandates that *Miranda* warnings, when read to a minor, be given slowly or more clearly than is normal, or with explanations and commentary.

In sum, the trial court's detailed and exhaustive conclusion that Morgan's confession was voluntary was not against the manifest weight of the evidence. The trial court heard the witnesses, weighed their testimony, and, most importantly, was able to measure the intellect, demeanor, and maturity of Jon Morgan in arriving at its overall conclusion that his statements were given freely and voluntarily. The trial court's decision in this regard should be affirmed.

#### *38 CONCLUSION

Wherefore, based on the foregoing reasons, the People of the State of Illinois respectfully request that this Honorable Court affirm the appellate court's decision affirming the trial court's decision to transfer Jon Morgan to be tried as an adult, as well as the trial court's decision to deny his motion to suppress statements made by him following transport to police headquarters.

PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. Jon Roe MORGAN, Defendant-Appellant.
2000 WL 34213340 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2 of 31 E-FILED
Wednesday, 13 August, 2008  03:10:32 PM
Clerk, U.S. District Court, ILCD

Westlaw.

2000 WL 34029407 (Ill.)

For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

Supreme Court of Illinois.
PEOPLE OF THE STATE OF ILLINOIS, et al., Appellants,
v.
Jon R. MORGAN, et al., Appellees.
Nos. 88508, 88513.
August 2, 2000.

Appeal from the Appellate Court of Illinois, Fourth Judicial District, Case No.
4-96-0996
Heard on Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan
County, Illinois Case No. 95-CF-101, The Honorable Gerald Dehner Judge Presiding.

Brief and Argument for Defendant-Appellee
Jon Morgan - Defendant-Appellee.Counsel for Defendant-Appellee: D. Peter Wise,
Gates, Wise & Schlosser, P.C., Attorneys at Law, 1225 South Sixth Street, Spring-
field, Illinois 62703, (217) 522.9010

## *1 *POINTS AND AUTHORITIES*

I.

THE APPELLATE COURT PROPERLY HELD THAT JON MORGAN COULD NOT BE FOUND GUILTY OF
FELONY MURDER ON THE UNDERLYING OFFENSES OF AGGRAVATED BATTERY AND AGGRAVATED DIS-
CHARGE OF A FIREARM, ABSENT CONDUCT WITH A FELONIOUS PURPOSE OTHER THAN THE
KILLING ITSELF.

720 ILCS 5/9-1(a)(1) ... 16

720 ILCS 5/9-1(a)(2) ... 17

720 ILCS 5/9-1(a)(3) ... 17

*People v. Alejos*, 97 Ill.2d 502,455 N.E.2d 48 (1983) ... 26, 27

*People v. Drakeford*, 139 Ill.2d 206, 564 N.E.2d 792 (1990) ... 26

*People v. Kidd*, 295 Ill.App.3d 160, 692 N.E.2d 455, 459 (4th Dist. 1998) ... 22-24

*People v. Morgan*, 307 Ill.App.3d 707, 718 N.E.2d 206, 212 (4th Dist. 1999) ... 18

*People v. Porter*, 168 Ill.2d 201, 659 N.E.2d 915 (1995) ... 24, 25

*People v. Ray*, 80 Ill.App.3d 151, 399 N.E.2d 977 (5th Dist. 1980) ... 28

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT I

2000 WL 34029407 (Ill.)                                           Page 2

*People v. Szerletich*, 86 Ill.App.3d 1121, 408 N.E.2d 1098 (4th Dist. 1979) ... 28

*People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903 (1975) ... 18-20

*People v. Williams*, 164 Ill.App.3d 99, 517 N.E.2d 745 (4th Dist. 1987) ... 20-22

### *2 II.

**THE APPELLATE COURT PROPERLY FOUND THAT THE TRIAL COURT ERRED IN BARRING SECOND DEGREE MURDER INSTRUCTIONS.**

### III.

**THE APPELLATE COURT PROPERLY CONCLUDED THAT THE QUESTION DETECTIVE HARBERTS ASKED JON MORGAN AFTER THE DETECTIVE LEARNED THAT JON MORGAN HAD ADMITTED THAT HE HAD SHOT HIS GRANDPARENTS AND HAD GIVEN A GUN AND AMMUNITION TO THE POLICE WAS INTERROGATION THAT REQUIRED MIRANDA WARNINGS. FURTHER, THE COURT PROPERLY RULED THAT JON MORGAN WAS IN CUSTODY DURING THIS INTERROGATION.**

*Gallegos v. Colorado*, 370 U.S. 49, 52-53(1962) ... 40

*Haley v. Ohio*, 332 U.S. 596, 599 (1948) ... 40

*People v. Acebo*, 182 Ill. App.3d 403, 537 N.E. 1113, 1114 (3rd Dist. 1989) ... 32, 35-39, 44-49

*People v. Brown*, 136 Ill.2d 116, 124-125, 554 N.E.2d 216, 220 (1990) ... 40

*People v. Clark*, 84 Ill.App. 3d 637, 405 N.E. 1192 (1980) ... 35, 36, 39

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court., 4th Dist. (September 29, 1999), slip op ... 35, 36

*People v. Winchel*, 159 Ill. App. 3d 892, 909, 512 N.E.2d 1298, 1308 (1987) ... 33

*Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980) ... 33

### IV.

**THE APPELLATE COURT PROPERLY RULED THAT THE TRIAL COURT ABUSED ITS DISCRETION WHEN RULING THAT GLENDA ASHWORTH COULD NOT TESTIFY ABOUT THE ABUSE SHE SUFFERED AT THE HANDS OF HER PARENTS IN WAYS THAT WERE *3 ASTONISHINGLY SIMILAR TO THE ABUSE SUFFERED BY JON MORGAN. FURTHERMORE, THE APPELLATE COURT PROPERLY RULED THAT DR. STUART HART SHOULD HAVE BEEN ALLOWED TO TESTIFY TO STATEMENTS MADE TO HIM BY GLENDA ASHWORTH RECOUNTING HER ABUSE WHEN HE EXPLAINED HIS OPINIONS TO THE JURY.**

*People v. Bartall*. 98 Ill.2d 294, 456 N.E.2d 59 (1983) ... 45

*People v. Cloutier*, 156 Ill.2d 43, 622 N.E2d 744 (1993) ... 48

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                                    Page 3

*People v. Illgen*, 145 Ill. 2d 353, 583 N.g.2d 515 at 522 (1991) ... 44

*People v. Keefe*, 209 Ill. App.3d 744, 567 N.E.2d 1052, (1st Dist. 1991) ... 44

*People v. Morgan*, No. 4-96-0996, Illinois Appellate Court., 4th Dist. (September 29, 1999), slip op ... 43

*People v. Pasch* 152 Ill.2d 133, 175 604 N.E.2d 294, 310-311 (1992) ... 48

*People v Robinson*, 163 Ill. App.3d 754, 773, 516 N.E.2d 1292. 1306 (1987) ... 44

*People v. Sutherland*, 155 Ill.2d 1, 21-22, 16 N.E.2d 1, 10 (1992) ... 47

### *4 STATEMENT OF FACTS

The State's brief contains only a cursory, statement of facts that do not tully establish the testimony in the complicated and lengthy proceedings in the trial court. Jon Morgan as defendant-appellee sets forth the following facts necessary, to address to the issues raised by the appellant in its brier:

On April 27, 1995, Jon Morgan was fourteen years old. (R. Vol. XXIII p. 706). He was in the ninth grade. Jon had lived with his mother and sisters in Virginia until he was sent to live with his grandparents in the first grade. He lived with his grandparents in Lincoln until the fourth grade. *Id.* at 707. In the fifth and sixth grade he lived with his mother in Richmond, Virginia and then was sent back to live with his grandparents in Lincoln, Illinois. Jon remembered being institutionalized when he was in kindergarten in the Psychiatric Institute in Ricthmond. He was there as a result of his attention deficit disorder. *Id.* at 707, 708.

Jon began the first grade at the Park Meadows School in Lincoln, Illinois. This school is a private church operated school. The church was a big part of his life. Everything that he did was based on what authority figures in the church and school wanted him to do. *Id.* 712. Brother Bryant was the administrator for the Park Meadows Baptist Church School. Jon referred to Mr. Bryant as "Brother Bryant" because that is what he was required to do. The rules were enforced at the church school by detentions or paddlings by Brother Bryant. Brother Bryant would have Jon bend over and touch his ankles and swat him five or ten times. This happened two or three times a week. *Id.* at 714. Jon described his infractions that resulted in paddlings as being too hyper or too talkative in school. While in the first through fourth grades, Jon was disciplined at home by beatings administered by his grandfather with a belt. His grandfather would have Jon bend over and touch *5 his ankles. Jon would be beaten at home if he had been in trouble at school. Additionally, he would receive beatings if he was hyper or having problems with school work or watching television. *Id.* at 716.

Jon was not allowed to watch cartoons when he was living with his grandparents. He would receive a beating for doing so. *Id.* 717. When Jon had difficulty with school

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

work he would seek help from his grandmother. If he was frustrated, his grandmother would hit him. *Id.* at 718. This happened frequently, *Id.* at 718. If Jon cried when he was being beaten with the belt. his grandfather would beat him again until he quit crying, *Id.* at 719. Jon's grandparents did not allow him to participate in any activities outside of the church. He was not allowed to play with children outside of the church, *Id.* at 719, 720. If Jon played with children outside of the church his grandparents would scream at him and then he would receive a beating. Id. at 723. Jon indicated that his grandfather would usually do the beatings, but they were always *brought on by his grandmother's screaming at his grandfather to take care of Jon or handle Jon. Id.* at 723. (emphasis added) After his grandmother would scream those things, his grandfather would pull off his belt or have Jon fetch a belt. Then he would receive a beating. *Id.* at 723. Jon loved his grandmother and he wanted her to love him. To Jon it seemed like there were times that she did not love him because of the way that she treated him. Jon described her treatment of him as unfair. She treated him unfairly because she would get Jon's grandfather to beat him. *Id.* at 726. Jon was afraid of his grandmother during the first through fourth grades because she was always the one that got his grandfather to beat him. He was afraid of his grandfather because he was the one who administered the beatings, *Id.* at 726, 727. Sometimes these beatings would leave marks. Jon would try to cover them up. After he had received a beating, he would go into the bathroom and look in the mirror to see what had happened. **\*6** Sometimes he would use his grandmother's make-up to cover the bruises. *Id.* at 727. As Jon advanced from the first grade to the fourth grade his grandmother and grandfather became more hostile towards him. *Id.* at 728, 729. He was receiving three or tour beatings a week. In addition to the beatings at home, he was receiving two or three beatings at school, *Id.* at 729, 730.

When Jon was living with his grandparents in the first through fourth grades, he never discussed the way he was being treated by his grandmother and grandfahther with anyone. He did not do so because it hurt him and it was something that was happening inside the home. Jon felt that because his grandparents were beating him and they were "authority". their conduct wasn't necessarily wrong. Jon concluded that "maybe I deserved what was happening to me there." *Id.* at 734.

After Jon finished the fourth grade, he moved back to his mother's house in Virginia. He was there for his fifth and sixth grade years, *Id.* at 731. His mother had remarried. Her new husband's name was Lynwood Ashworth. His three sisters also lived in the home.

After moving to Virginia, home life was good at first. *Id.* at 734. Later Lynwood began having problems with his job and after losing his job, he started drinking. Lynwood would get drunk and take out his frustrations on Jon and his sisters. He began beating Jon with a leather belt and Jon recalled on two or three times that Lynwood picked him up and threw him across the room to a fireplace. Lynwood's treatment of Jon and his sisters and his mother got worse as time went by. *Id.* at 737.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                      Page 5

Jon's mother sent him back to Lincoln, Illinois to live with his grandparents when he began the seventh grade. He was re-enrolled in the Park Meadows School. *Id.* at 739. During the first week or two of moving back to Lincoln from Virginia, Jon's grandparents treated him fairly well. *7 Jon was relieved to get away from the beatings that Jon, his mother, and his sisters suffered at the hands of Lynwood. *Id.* at 750.

A few weeks after returning to Lincoln, the beatings by his grandparents started again. They continued in the same fashion: his grandmother would scream at his grandfahther to have him beat Jon. If his grandfather wasn't there, she would tell him later and have him "take care of me" as she put it. *Id.* at 753. When Jon had returned from Virginia, he had gotten into "habits" like watching television and playing Nintendo. His grandparents did not approve of those habits. He brought a Nintendo to Illinois from Virginia. They would yell at him about how the Nintendo was possessed by a demon and he would become an evil sinner. *Id.* at 751. After he returned to Lincoln, his grandparents would not allow him to listen to music out-side of the church. He was not allowed to watch television other than Christian videos and was not able to have friends outside of the church school. *Id.* at 740. His grandparents would say negative things about people outside of the church, telling Jon that they were sinful, evil and they were a bad influence. If he were to associate with persons outside of the church Jon would become a bad person. *Id.*

His grandmother began to strike him in addition to yelling at him. She would wield whatever she had in her hands such as a ruler or a pair of scissors and would strike Jon with it. This would happen if he was getting frustrated with his home-work. *Id.* at 753. His grandmother also struck him with the razor straps. When Jon was in the eighth grade, Jon would be strapped by his grandfather from twice a day to two or three times a week. *Id.* at 754. The same pattern that had continued throughout the years persisted in the eighth grade. Jon's grandmother would yell at his grandfather until he would beat Jon with the razor straps. In addition to the physical abuse, Jon's grandmother and grandfather would say negative things about his mother and father. His gandparents did not like *8 his mother and father and would describe them as "no good". They told Jon that his mother was a whore because she had been married two different times. His grandparents told him that he was going to be trash like her and that he wouldn't be able to support his children and that Jon would have to send his children off to his mother because he would not be able to take care of them. *Id.* at 756.

On two occasions Jon tried to speak to Brother Bryant about the physical abuse Jon suffered at the hands of his grandparents. Brother Bwant cut him off and told Jon that he was eighty percent of the problem that his grandparents were having in their relationship, *Id.* at 757. Jon never tried to contact any outside agencies for help. The only thing he knew outside of home was the church. When he was turned down by Brother Bryant, Jon did not feel he had any place to turn. *Id.* at 757, 758.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                    Page 6

Between the eighth and ninth grade Jon received a phone call from his father. They spoke on the phone for an hour. His father gave Jon a phone number. *Id.* at 762. Jon placed the scrap of paper with his father's phone number on the night stand next to his bed. A day or two later Jon was in his room reading when his grandmother came in to see what he was doing. She saw that he was reading a book that was unacceptable to her and began to yell about that. Next, she saw the phone number on the night stand and looked at it. She demanded to know whose phone number it was and Jon told her that it was his father's phone number. She ripped up the paper, telling him that he did not need the phone number. *Id.* at 762-764.

Jon's grandmother would yell at him when he was reading books that were not "Christian books." On one occasion he was reading a book about Vietnam that his grandfather had given him. When she learned that he was reading this book, she began yelling and telling Jon that these types *9 of books would ruin his mind and that they were "worldly". She then yelled at Jon's grandfather for giving him the book. Finally, she yelled at his grandfather telling him that he should not let Jon get away with reading that type of book and Jon received a beating by his grandfather for reading the book that his grandfather had given to him. *Id.* at 764.

Jon was expelled from the church school because after a basketball game he went to the house of a girl he had seen at the game. He was talking to her on the front porch of her home and before he left he gave her a kiss. *Id.* at 742. Later he told Eric Gill what had happened and Eric Gill told his mother, who in return told Brother Bryant. Brother Bryant called Jon into his school office and told him that he was expelled from school for kissing the girl. *Id.* at 743. Additionally, his grandparents yelled and screamed at him and he received a beating with the razor straps that always hung on a hook by the basement stairs, *Id.* at 744.

After he was expelled from school, he began to home school. His grandmother accused him of cheating on tests even though Jon assured her that he was not. When she accused him of cheating, she would yell at his grandfather about her concerns that Jon was cheating. Jon's grandmother would yell at him to beat Jon for the cheating that never occurred, *Id.* at 749, 750. At the urging of his grandmother, Jon's grandfather beat him with the razor straps, despite Jon's protestations that he did not cheat on his tests, *Id.* 749, 750.

During the time he was home schooling, Jon did tell his mother that his grandparents were physically abusing him. He hadn't done so before because he didn't think that she would believe him. His mother immediately ordered his grandfather to bring him home to her in Virginia. When Jon arrived in Virginia, she told him that she couldn't support him and that she could not handle Jon and his sisters in the same small house. Jon's mother told him that he had to go back to Lincoln. *10 Jon and his grandfather returned the next day. *Id.* at 760.

Jon was afraid of his grandfather. His grandfaher had a very bad temper. His

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                           Page 7

grandfather threatened Jon by telling him that if he ever fought back during a beating then his grandfather would kill him while Jon was sleeping. This was a very common retrain. *Id.* at 766. Jon believed his grandfather's threats because his grandfather was a very serious person and he was never hesitant about beating Jon. Jon never resisted any beatings because he thought his grandfather would carry out his threat.

Jon was equally afraid of his grandmother. He was afraid of her because his grandfather would never beat Jon without his grandmother pushing him into it. Her yelling and screaming would incite his grandfather to beat Jon. To Jon it seemed as if his grandmother and grandfather were one person. Both of them had to be there for Jon to get a beating. There was never a beating from his grandfather without his grandmother pushing him into it. *Id.* at 767.

In early April of 1995, Jon asked his grandfather if he could travel to Bloomington to go to the mall with Steve Powell and one of Steve's friends. His grandfather denied the request stating he did not know the third boy who was from outside the church. Jon reacted in a typically juvenile way by kicking a box of Legos. Jon's grandmother began hollering and screaming at his grandfather to come out of the bedroom and take care of Jon for throwing a temper tantrum. His grandfather came out of his bedroom and began beating Jon with his fists. He was beating Jon by making a fist with the knuckle of his middle finger extended. Jon's grandfather described this as an eagle punch. After being hit in the face a couple of times, Jon covered up so that the blows would rain down on the back of his head and his back. After Jon got away, his grandfather stopped swinging. Jon had his hands at his sides and his grandfather told him to go to his room. As Jon started walking his **11 grandfather sucker-punched him in the jaw. *Id.* at 775. Jon's grandfather followed him to his bedroom. He told Jon that he was lucky that he didn't fight back because if he had his grandfather would have killed him while he was sleeping.

In the spring of 1995, Jon began to attend Lincoln High School. On April 27 Jon had returned home from school at 6 o'clock in the evening. He laid down on his bed and went to sleep. He woke up because his grandfather was dragging him out of bed by his toot. His grandfather told him to come into the kitchen. Jon's grandfather was very angry, and Jon did not know why. Jon's grandparents showed him a notice from school that he had received an in school suspension for being tardy. They both started yelling at him. As had happened so many times in the past, his grandmother was yelling at Jon about the detention and yelling at his grandfather to do something about it. *Id.* at 783. His grandfather told Jon to go fetch the razor strap and Jon complied. He was then ordered to bend over and touch his ankles. Jon was beaten five times. He was then told to sit in the chair and he complied. His grandparents continued to yell at him. Jon yelled back telling his grandparents that he was tired of them talking about his mother and father in a way that "put them down and put him down." *Id.* at 786. When Jon was yelling back, his grandfather rose up out of his chair and swung at Jon with his fist. Jon jumped back when

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his grandfather swung at him. Jon was afraid of both his grandmother and grandfather at that moment. His grandmother was screaming at both Jon and his grandfather. Jon's grandfather stepped to the side of the table and swung at Jon again and this time connecting with Jon's chin. Jon went down to the ground and crawled away to the bathroom. *Id.* at 787. Jon went to the bathroom because it was the safest place he knew. It was the only other room in the house that had a lock on the door other than his grandmother's bedroom, *Id.* at 787.

**\*12** After a while, Jon left the bathroom to get a gun. He got a gun to protect himself from his grandfather. Jon didn't know what he would do with the gun. He thought that if his gnandfather saw the gun he would leave him alone. To get the gun, Jon snuck out of the bathroom into his grandfather's room where he knew there was a gun on the top shelf. Jon and his grandfather had previously shot targets with it. *Id.* at 789. Jon went back into the bathroom and started loading the gun. He began to think about how things had been "with me and my life....I thought about my mom, not being able to go to my mom's. I didn't know where my dad was or anything and I didn't--the church had kind of rejected me because I wasn't like them, I guess. And I was--worried about what my grandpa and grandma was doing to me. So I thought--I thought about killing myself." *Id.* at 790. Without any rational explanation Jon shot a bottle of Tilex cleaner that was sitting by the tub. After shooting the bottle, Jon heard his grandmother scream and he got scared about what his grandparents would do because his grandfather had just beat him. Jon stepped out of the bathroom with the gun pointing to the ground. His grandfather was coming around the comer and Jon noticed he was very, angry. His face was red. The blood vessels were coming out of his head and neck and his fists were balled up. *Id.* at 791, 792. His grandmother was screaming. When Jon saw his grandfather's face, he believed that he was going to be beaten to death. Jon looked at the gun and shot it at him. He did this so his grandfather couldn't get to him. *Id.* at 794. Jon's grandmother began to move towards the door. He shot at her. At that point in time, he was thinking that she was just like his grandfather. She was just as dangerous because his grandfather had never beat him without her forcing or pushing him into it. He repeated that he believed that in his mind that they were one person and it took both of them for him to get a beating.

**\*13** Jon followed her as she went through the door. Jon was shaking the top of the gun and pulling the trigger with the gun pointed toward tile ground trying to get it unjammed. Jon tried to get the gun unjammed by shaking the top of the chamber of the gun so he could empty it. *Id.* at 797. Jon did not try to fire additional shots at his grandmother. He did not tell the police that he tried to fire additional shots at his grandmother. Jon went back to his bedroom to change his pants and shirt. He did not know why he did this. He then went to his grandmother's room to look for another gun. He could not explain why. He then left his house to go to Steve Powell's house. He wanted to talk to Steve and get some help. When Steve wasn't home, he decided to go back to his house. On the way home he continued to try to unjam the gun. When he was doing this two rounds fired from the gun. *Id.* at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                      Page 9

799. Jon returned to his home. walked under the tape, and told the first police officer that he saw that he was the one that shot these people and gave the officer the gun and the bullets.

Jon Morgan called witnesses to corroborate the beatings that he suffered at the hands of his grandmother and grandfather. Jenny Goldman, a former babysitter, was called to testify to welts she had seen on Jon Morgan's back and buttocks in 1998. (R. Vol. XXIV, p. 10-15). The defendant also called Barbara Blaum, an expert witness, to testify that leather fibers on the razor strap found in the Cearlock home were optically similar to leather fibers found on the jeans Jon was wearing at the time of the shooting. (R. Vol. XXIV, p. 36-55).

Jon Morgan also called Dr. Stuart Hart, a psychologist, who gave expert testimony about how Jon's experiences affected his perception of danger that evening. Dr. Hart reviewed extensive materials concerning Jon's background. In addition, he reviewed interviews of members of Jon's family. (R. Vol. XXV p. 162). Dr. Hart also had numerous face to face and telephone conferences with Jon Morgan. *Id.* at 164. Prior to testifying, Dr. Hart spent approximately eighty-five hours **14** interviewing Jon and his family, examining all manner of records, reports and other documents, *Id.* at 168. Dr. Hart related the history of the relationship between Jon and his grandparents. He also testified concerning Jon's history with Lynwood Ashworth. *Id.* at 171. Based on the information that Dr. Hart developed, he understood that there were very few times when Jon's grandfather beat Jon with a razor strap or physically attacked him which were not proceeded by his grandmother encouraging his grandfather to do so. This was significant to Dr. Hart because it would make it reasonable and quite likely that Jon would believe that his grandparents were very sol idly connected.

Dr. Hart described Jon's view of his grandparents as almost "of one piece" very reasonable. *Id.* at 177. Dr. Hart described the psychological term spuming. He indicated that one of the most powerful ways to mistreat a person is rejection. One way rejection occurs is through spuming which is the degrading and criticizing of a person in very strong ways. Another term that Dr. Hart described was terrorizing. Terrorizing occurs through physical mistreatment that strips the integrity of the person who is mistreated. Threats to further terrorize increase the power of terrorizing, *Id.* at 194. Dr. Hart observed that in Jon's relationship with his grandparents and in his church, he experienced both spuming and terrorizing at the hands of his grandparents and Brother Bryant. *Id.* at 195. Jon.was also isolated from the type of social opportunity that would have allowed him to have the kind of social support he needed and which would have allowed Jon to have some breadth of perspective on life and to learn other ways to solve problems. *Id.* at 195.

Dr. Hart then discussed the psychological phenomenon known as battered person. A battered person is a person who has been seriously physically or psychologically abused by someone intentionally and the abuser is in a close intimate relationship with the abused person. Dr. Hart cited Jon Morgan as an example of a battered per-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                    Page 10

son. Additionally, Dr. Hart indicated that the perception **15** of fear of a person who is clinically categorized as a battered person is not the same as a perception of a person who is not so classified. *Id.* at 201. Dr. Hart testified to a reasonable degree of psychological certainty that Jon's lifetime experiences as a battered person affected Jon's perception of danger on the evening of April 27. 1995. According to Dr. Hart the history of battering, physical abuse, and emotional abuse would greatly increase Jon's perception of imminence of the danger he faced that evening at the hands of his grandmother and grandfather. *Id.* at 206-208. Jon's age also factored into Dr. Hart's opinions about how Jon perceived danger and threats at the hands of his grandparents on the evening of April 27, 1995. He indicated that fourteen year olds, in the best conditions, are merely on their way to making good decisions under difficult conditions. Jon's life experiences had not prepared him to make good decisions under difficult conditions. *Id.* at 206.

Jon Morgan planned to call his mother, Glenda Ashworth, to corroborate his testimony regarding the conduct of his grandparents. The State objected and the trial court ruled that her testimony would be too remote. The trial judge made his ruling based on an offer of proof which indicated that when Glenda grew up in her parents home, she was subjected to beatings with the same belt and razor strap that Jon was beaten with. Glenda's offer of proof indicated that as a girl of tour, five and six years old she remembered her pants being pulled down prior to being beaten with a belt or razor strap. When she was older, Glenda was told to go fetch the razor strap prior to suffering a beating. For as long as Glenda could remember, both her mother and father constantly referred to her as stupid and were always putting her down. Glenda's mother would make abusive comments such as, "Why aren't you as smart as your brother?", or "You're stupid like your father." According to Glenda, her mother's nagging would be punctuated with, "Wait until your dad gets home." Her father's arrival would usually result in some type of beating. Glenda could only **16** remember one occasion when her mother had not pushed her father to punish her. Glenda's father told her hundreds of times that if she resisted him, he would kill her in her sleep. (R.Vol. Ill, C717).

Dr. Stuart Hart also testified in an offer of proof that information that Glenda Ashworth had provided him in a telephone interview would have helped him explain his opinions. (R. Vol. XXVI, p. 451-455). Dr. Hart indicated that the information that Glenda provided him corroborated information that was given to him by Jon. The information that Glenda provided corroborated Jon's statements to Dr. Hart in several respects. First, she was able to describe the mistreatment Jon suffered in her own home. Second, she described her experiences as a child with the Cearlocks which Jon experienced in equal ways. During Dr. Hart's interview of Glenda, she described frequent beatings with the belt and constantly being criticized. Her experiences closely paralleled what Jon had told him. *Id.* at 454, 455. The passage of time between Glenda's experiences in the Cearlock home and Jon's experiences added credibility to Jon's description of his life experiences. The cross genera-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tional abuse enhanced the credibility of Jon's description of the abuse he
suffered at the hands of his grandparents, *Id.* at 455.

ARGUMENT

I.

**THE APPELLATE COURT PROPERLY HELD THAT JON MORGAN COULD NOT BE FOUND GUILTY OF
FELONY MURDER ON THE UNDERLYING OFFENSES OF AGGRAVATED BATTERY AND AGGRAVATED DIS-
CHARGE OF A FIREARM, ABSENT CONDUCT WITH AFELONIOUS PURPOSE OTHER THAN THE KILLING
ITSELF.**

The State charged Jon Morgan with eight counts of first degree murder after he
fatally shot his grandparents, Lila and Keith Cearlock. Counts I and II charged
Jon pursuant to *17720 ILCS 5/9- 1(a)(1)* with intentional murder of the Cearlocks.
(C.42-43) Counts III and IV charged Jon pursuant to *720 ILCS5/9-1(a)(2)* with know-
ing murder of the Cearlocks. (C.44-45) Counts V and VI charged Jon pursuant to *720
ILCS 5/9-1(a)(3)* with felony murder of the Cearlocks, with aggravated battery as
the predicate offense. (C.46-47) Counts VII and VIII charged Jon pursuant to *720
ILCS 5/9-1(a)(3)* with felony murder of the Cearlocks, with aggravated discharge of
a firearm as the predicate offense. (C.48-49)

There was no question at trial that Jon intentionally and knowingly shot the Cear-
locks. Jon invoked a psychological defense, including expert testimony, to show
that he deliberately killed the Cearlocks in self-defense or due to sudden and in-
tense passion resulting from serious provocation. (C. 126-130: C.248; C.307-314)

The interdependent questions before the trial court were: one, what charges to
send to the jury; and two, what instructions to give the jury on those charges.
Jon moved to dismiss the felony murder counts V -VIII. Jon argued that aggravated
battery, and aggravated discharge of a firearm could not be used as predicate
felonies to support felony murder charges in his case because his conduct in com-
mitting those felonies was inherent in the killings themselves. (C.318-326). The
trial court rejected Jon's argument and denied his motion to dismiss the felony
murder counts. (C.30)

The state filed a motion to bar second degree murder instructions as to the felony
murder counts. The state maintained that second degree murder instructions are
never applicable ·to felony murder charges. (C.315) In opposition to the state's
motion, Jon reiterated that the felony murder charges should not be sent to the
jury based upon aggravated battery and aggravated discharge of a firearm; and
that, if they were, then second degree murder instructions should be given with
respect to those charges (C.315; C .349-359) The court granted the state's motion
and refused to give *18 second degree murder instructions on the felony murder
counts V-VIII (C.30; C.315; VoI.XXIX, R.25-42)

**A. The Appellate Court Properly Determined What Issues Should Be Sent To The Jury**

© 2008 Thomson/West. No Claim ·to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                       Page 12

### And What Instructions Should Be Given

On appeal, the reviewing court properly reversed Jon's first degree murder convic-
tion of Lila Cearlock and held that the predicate felony underlying a charge of
felony murder must involve conduct with a felonious purpose other than the killing
itself. *People v. Morgan*, 307 Ill.App.3d 707, 718 N.E.2d 206, 212 (4th Dist. 1999)
The appellate court held that the trial court erred in instructing the jury that
Jon could be convicted of first degree murder on a felony murder theory. *Morgan*,
718 N.E.2d at 212. In so holding, the appellate court accepted Jon's argument that
the predicate felonies underlying the felony murder charges merged with the inten-
tional and knowing murder charges and should not have been sent to the jury. *Mor-
gan*, 718 N.E.2d at 213.

The rationale for the appellate court's limitation of the application of the
felony murder rule is sound. First, this limitation promotes the rationale of the
felony murder rule "to deter individuals from committing forcible felonies by
holding them responsible if death occurs." *Morgan*, 718 N.E.2d at 211. Second, this
limitation reduces the likelihood that all deliberate killings and fatal shootings
will be charged as felony murder which would effectively eliminate the second de-
gree murder statute and the need for the state to prove an intentional or knowing
killing in most murder cases. *Morgan*, 718 N.E.2d at 211.

B. **The Appellate Court's Decision Is Not In Conflict With This Court's 1975 De-
   cision in *People v. Viser* Nor With Subsequent Binding Precedent.**

In its brief to this Court, the state argues that the appellate court's holding,
which limits **\*19** application of the felony murder rule to predicate offenses in-
volving conduct with a felonious purpose other than the killing itself, is in dir-
ect conflict with this Court's holding in *People v. Viser.* 62 Ill.2d 568, 343
N.E.2d 903 (1975) (Appellant's Brief at 21) The state's also argues that the ap-
pellate court "strayed from *Viser's* well-worn path" and established a rule
"contrary to *Viser*." However, a thorough review of this Court's decision in *Viser*
reveals that the state's argument is misplaced. *Viser* does not have a well-worn
path nor is the appellate court's decision in conflict with *Viser*. Rather, it is
the state's position - that second degree murder instructions are never available
for a felony murder charge - that is in conflict with this Court's decision in
*Viser*. The *Viser* Court concluded that failure to give voluntary manslaughter in-
structions, now second degree instructions, on the felony murder charges would
have been reversible error.

*Viser* is factually distinguishable from the case at bar. In *Viser*, the defendants
were charged by indictment with intentional murder, knowing murder, or felony
murder predicated on aggravated battery. *Viser*, 343 N.E.2d at 907-08. On appeal,
the defendants' attacked the jurisdiction of the trial court and the sufficiency
of the indictment rather than jury instructions, and the Court's holding was lim-
ited to that issue. *Viser*, 343 N.E.2d at 909 ("We hold, therefore, that the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                    Page 13

dictment did not improperly charge the offense of murder").

The appellate court narrowly interpreted *Viser* as holding "that an unjustified at-
tack on the person killed may be the basis for a charge of felony murder, reject-
ing a *per se* rule that aggravated battery necessarily merges into the crime of
murder" Such a narrow interpretation is warranted. The appellate court in this
case recognized that its decision may seem inconsistent with *Viser*. but that ap-
parent inconsistency is erased after considering that, in addition to a self de-
fense instruction, the *Viser* jury received two voluntary manslaughter instructions
on the felony murder charges – the **20** equivalent of the second degree instruc-
tions Jon requested. *Viser*, 343 N.E.2d at 911. In tact, the *Viser* Court noted that
"it would have been error for the court to refuse to give both instructions."
*Viser*, 343 N.E.2d at 911.

Since the *Viser* Court required the giving of voluntary manslaughter instructions
on a felony murder charge, it implicitly adopted Jon' alternative position that,
after the trial court denied his motion to dismiss the felony murder charges, the
trial erred in refusing second degree murder instructions on the felony murder
counts.

In distinguishing *Viser*, the appellate court was correct in recognizing that *Viser*
"did not consider the question presented here – whether the predicate felony un-
derlying a charge of felony murder must have an independent felonious intent."
*Morgan*, 718 N.E.2d at 213.

The appellate court's narrow interpretation of the holding in *Viser* is also con-
sistent with binding precedent. Alter this Court's ruling in *Viser*, the fourth
district appellate court rejected the state's argument that second degree instruc-
tions are never available to a felony murder charge, and the trial court was not
tree to ignore binding precedent.

In *People v. Williams*, 164 Ill.App.3d 99, 517 N.E.2d 745 (4th Dist. 1987), the
fourth district addressed the question of whether a defendant charged with felony
murder could receive a voluntary manslaughter instruction, now a second degree
murder instruction. In that case, the defendant was charged with several counts of
murder. One of the murder charges was based upon a felony murder theory with the
predicate felony being aggravated battery. *Williams*, 517 N.E.2d at 750. The trial
judge gave voluntary manslaughter instructions on all of the murder counts except
felony murder, finding that voluntary manslaughter was not a defense to felony
murder. *Williams*, 517 N.E.2d at 750.

**21 The appellate court reversed the defendant's conviction or" felony murder. The
appellate court acknowledged "that in most instances, the reduction in culpability
due to passion should not be available as a partial defense to a felony murder
charge," it held that, under the facts of that case. a manslaughter instruction on
the felony murder count was required. *Williams*, 517 N.E.2d at 751. Initially, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                    Page 14

appellate court noted that an unreasonable belief in self-defense and provocation are not defenses available to reduce the seriousness of an aggravated battery charge. Perfect self-defense is a complete defense to aggravated battery, but unreasonable self-defense is not. Furthermore. acting under provocation is never a defense to aggravated battery. The appellate court wrote:

Therefore, a defendant facing two people in mutual combat can be seriously provoked, and if he kills both, he is guilty of two counts of voluntary manslaughter. It would be absurd to state that under the identical facts, if one of the victims dies and one lives, he is now guilty of murder because as to the one that lives, he is guilty of aggravated battery, and hence, under the felony murder doctrine, the affirmative defense of provocation is inapplicable. We agree with defendant that such a result is contrary to common sense, *Id.*, 517 N.E. 2d at 751.

The court then held that, under the defendant's version of the killing, the jury could have found that the defendant did not form any felonious intent until after he had been provoked by the victim. Since, under the defendant's version of the killing, the defendant did not form the felonious intent until after he was provoked, the court held the defendant was entitled to a voluntary manslaughter instruction.

In reversing the defendant's conviction on the felony murder count, the appellate court wrote:

We hold that where evidence has been presented that the provocation occurs prior to the time that a defendant forms the felonious intent or commits a forcible' felony, the partial affirmative defense of voluntary manslaughter based upon provocation should be available, and the jury should be instructed accordingly. **22** *Williams*, 517 N.E.2d at 752 *See also People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903.911 (1975) (it can be reversible error to refuse a voluntary manslaughter instruction on a charge of felony murder, where the predicate felony is aggravated battery).

More recently, in *People v. Kidd*. 295 Ill.App.3d 160. 692 N.E.2d 455.459 (4th Dist. 1998). the fourth district Appellate court revisited its holding in Williams and addressed the issue of whether a prosecutor may avoid the provocation defense in an intentional or knowing murder case by charging felony murder based upon an aggravated battery, of the person killed. . In that case, a fist fight between the defendant and the victim resulted in the victim's death. The defendant was charged in a two count indictment with one count of first degree murder (felony murder) based upon the forcible felony of aggravated battery and one count of aggravated battery. The defendant was convicted of both counts and sentenced to 25 years in prison.

On appeal, the defendant argued that the trial court erred in refusing to instruct the jury on second degree murder. *Kidd*, 692 N.E.2d at 459. In reversing the defendant's conviction, the appellate court stated:

It is not the law that a prosecutor may avoid the provocation defense in an inten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                             Page 15

tional or knowing murder case by charging felony murder based upon an aggravated battery upon the person killed. The procedure to be followed in that situation was addressed in *Villiams*, where the court concluded there should be an instruction on the defense, even though provocation is not a defense to aggravated battery and is not usually a defense to felony murder

*Kidd*, 692 N.E.2d at 459.

In *Kidd*, the appellate court rejected the state's argument that, in 1987, when the legislature adopted the second degree murder statute, it specifically provided that the defense of provocation applied only to intentional or knowing murder and could never apply to felony murder. *23*Kidd*, 692  N.E.2d at 459. The appellate court recognized the infirmity in the state's position and noted that it would effectively eliminate the second degree murder statute in intentional or knowing murder cases at the discretion of the prosecutor and wrote:
Did the legislature really intend an illusory second degree murder statute, one that exists at the choice of the prosecutor and will be applied only in cases in which it could be of no benefit to the defendant? We should avoid a construction of a statute that renders any part of it meaningless. The courts presume the General Assembly, in passing legislation, did not intend absurdity, inconvenience or injustice, and a statute will be interpreted so as to avoid a construction that would raise doubts as to its validity. A court should avoid an interpretation under which a statute is "explained away, or rendered insignificant, meaningless, inoperative, or nugatory." In order to give some meaning to the second degree murder statute, there must be some limit on a prosecutor's ability to charge felony murder in cases such as this.

*Kidd.*, 602 N.E.2d at 459-60.

The holdings in *Williams* and *Kidd* reject the state's position in the case at bar - that second degree murder instructions are never appropriate for felony murder charges. These cases are controlling in Jon's case, and the appellate court properly rebuked the trial court for ignoring binding precedent. *Morgan*, 718 N.E.2d at 717 ("because of our system of precedent, the circuit court may not disregard binding authority from its home district. The trial court's disregard of the decision of this court in *Kidd*, therefore, constitutes error, particularly when the trial court found the evidence sufficient to warrant giving a second degree murder instruction as the other counts").

Based on the foregoing, the appellate court properly reversed Jon's first degree murder conviction of Lila Cearlock and the appellate court's decision in this regard should be affirmed. This case should be remanded to the trial court for a new trial.

  **C. Alternatively, This Court Should Reverse It Decision In *People v. Viser* in Light Of Illinois' Subsequent Fundamental Change In Homicide Law And Subsequent**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Decisions Of This Court Limiting The State's Ability. To Nullify The Second Degree Murder Statute.**

**\*24** To the extent that this Court interprets *Viser* to hold that aggravated battery is a proper predicate for a felony murder charge where the aggravated battery is inherent in the killing itself *Viser* should be overruled.

*Viser* was a case of first impression decided in 1975. *Viser*, 343 N.E.2d at 908. In rejecting the defendants merger theory, the *Viser* court indicated that such a theory was applied injurisdictions in which the offense of murder was divided into degrees. *Viser*, 343 N.E.2d at 908-909. The *Viser* Court repeatedly pointed out that the unique characteristic of felony murder is that it does not include an intention to kill. *Viser*, 343 N.E.2d at 910-911. If *Vise* means what the state now argues it means, *Viser* should be overruled because it is no longer applicable to Illinois' current homicide laws. First, Illinois has changed to a classification of degrees of murder, which the *Viser* Court recognized supported a doctrine of merger. As Justice Steigmann explained in his concurring opinion, Illinois homicide law underwent a fundamental change with the enactment in 1986 of Pubic Act 84-1450, which changed the name of the offense of murder to first degree murder and abolished the offense of voluntary manslaughter and substituted for it the offense of second degree murder. *Morgan*, 718 N.E.2d at 216-217. Second, as pointed out by Justice Steigmann, the newly created second degree murder was not simply a renaming of voluntary, manslaughter, rather it created a entirely new offense: the lesser mitigated offense. *Morgan*, 718 N.E.2d at 216. Subsequent to changes in Illinois' homicide law and recent pronouncements by this Court, the continued viability of an expansive interpretation of the *Viser* holding is in serious question.

In *People v. Porter*, 168 Ill.2d 201, 659 N.E.2d 915 (1995), the defendant was charged with tour counts of first degree murder, all arising out of the death of his mother. At trial, the jury found the defendant guilty but mentally ill of two counts of second degree murder and guilty but mentally **\*25** ill of two counts of first degree murder. *Porter*, 659 N.E.2d at 916. One of the first degree convictions was based upon a charge of felony murder. *Porter*, 659 N.E.2d at 920. The second degree convictions were based on the jury's finding that at the time of the killing the defendant was acting under a sudden and intense passion. *Porter*, 659 N.E.2d at 921. The defendant was sentenced to death based upon the first degree murder convictions, and he appealed directly to this Court. In reversing the defendant's convictions, this Court held that the jury's verdicts were inconsistent. This Court explained that the offense of second degree murder is simply first degree murder plus mitigation. *Porter*, 659 N.E.2d at 921. The court reasoned that when a defendant is charged with first degree murder and presents the defense of provocation the jury must decide:
(1) whether the State proved all of the elements of first degree murder and, if so
(2) whether the mitigating factor of serious provocation was present at the time of the murder, If the jury finds that serious provocation was present, then the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                              Page 17

defendant is guilty of second degree murder. However, if the jury, determines that serious provocation was not present, tile defendant is guilty of first degree murder. Consequently, a .jury must find either "provoked" second degree murder of "unprovoked" first degree murder. A single murder cannot be both provoked and un-provoked at the same time. The jury's verdicts were therefore both legally and lo-gically inconsistent.

*Porter*, 659 N.E.2d at 291.

Although Porter addressed the provocation prong of the second degree murder stat-·ute, its holding is equally applicable when the second degree finding is an un-reasonable belief of self defense. In this case, the jury was presented with the mitigating factor of unreasonable belief in self defense. The jury had to decide: (1) whether the state proved all of the elements of first degree murder and, if so, (2) whether the mitigating. factor of unreasonable belief in self-defense was present at the time of the murder. If the jury found that the unreasonable belief in the need for self-defense was present, Jon is guilty of second degree murder. If the jury found the unreasonable belief in self'-*26 defense was not present, Jon is guilty of first degree murder. A single murder cannot be both pursuant to and not pursuant to an unreasonable belief in the need for self defense at the same time.

If Jon were found guilty of second degree murder on Counts I through IV, the jury, would necessarily have found Jon committed the underlying felonies of aggravated battery and aggravated discharge of a firearm. Therefore, without a second degree instruction on the felony murder counts, the jury was required to convict Jon of first degree murder on Counts V through VIII.

Under the foregoing scenario. Jon would be sentenced on first degree murder with the result being that the state would have successfully eliminated second degree murder as a possible defense in this case. This Court has previously held that it is improper for the state to attempt to eliminate second degree murder as an available defense.

In *People v. Drakeford*, 139 Ill.2d 206, 564 N.E.2d 792 (1990), the defendant was found guilty of second degree murder and armed violence. Under the armed violence statute, a defendant is guilty of a class X felony if while armed with a dangerous weapon he commits a felony defined by Illinois law. *Drakeford*, 564 N.E.2d at 794. The defendant stabbed the victim to death. The armed violence conviction was pre-dicated on the defendant committing the felony of aggravated battery while armed with a knife, *Id.*, 564 N.E.2d at 793. Relying on its decision in *People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983), this Court held that a defendant cannot be sentenced for armed violence predicated on the felony of aggravated battery when the defendant is simultaneously convicted of second degree murder for the same act which supports the aggravated battery. This Court explained its reasoning as fol-lows:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lastly, if we were to hold that a defendant could be sentenced for armed violence predicated on aggravated battery where there was a simultaneous conviction for **27 second degree murder arising out of the same act, we would render ineffective tile second degree murder statute. To commit aggravated battery causing great bodily harm, a specific intent crime, the defendant must act "intentionally" or "knowingly". . . Logically, ally time a defendant commits second degree murder based on an unreasonable belief of self-defense, the defendant will also possess the intent or knowledge necessary for a conviction on aggravated battery, causing great bodily harm. Thus, in the future, prosecutors will seek sentencing on the Class X armed violence predicated on aggravated battery conviction rather than on the Class I second degree conviction murder conviction. This result would effectively nullify the second degree murder statute.

*Drakeford*, 564 N.E.2d at 796-97.

In the instant case, the state, as in *Drakefora*, successfully nullified the second degree murder statute. By charging Jon with felony murder based upon aggravated battery and aggravated discharge of a firearm--two felonies that are always present when a defendant shoots someone-- and then arguing that he is not entitled to a second degree murder instruction on the felony murder counts, the state effectively eliminated the application of his defenses.

There were two courses of action available to the appellate court to remedy this problem: it could adopt a rule requiring the application of a merger doctrine to all predicate felonies where there is insufficient evidence of an independent felonious intent or it could have adopted a rule allowing second degree murder instructions on felony murder where there is insufficient evidence of an independent felonious intent. The appellate court chose the better view in granting the trial court the power to determine whether there is sufficient evidence of an independent felonious intent and delineated a realistic, workable procedural framework in which to apply the merger doctrine.

Based on the foregoing, the appellate court properly reversed Jon's first degree murder conviction of Lila Cearlock and the appellate court's decision in this regard should be affirmed. This **28 case should be remanded to the trial court for a new trial.

### D. The Cases Relied Upon By The State Are Not Controlling Nor Persuasive.

The state cites three cases where the appellate courts have purportedly rejected the argument advanced by Jon and, in substance, accepted by the reviewing court. *People v. Thurman*, 223 Ill.App.3d 196, 584 N.E.2d 1069 (3d Dist. 1991 ): *People v. Ray*, 80 Ill.App.3d 151, 399 N.E.2d 977 (5th Dist. 1980) *People v. Szerletieh*, 86 Ill.App.3d 1121, 408 N.E.2d 1098 (4th Dist. 1979). Those cases are not controlling nor are they particularly persuasive.

The reviewing court in *Thurman* noted that "[w]hile we find merit in defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument, our supreme court has specifically held that a charge of felony murder can be based on aggravated battery." *Thurman,* 584 N.E.2d at 1074. In its written decision, the appellate court in this case specifically distinguished *Thurman,* finding that court was not asked to consider the need for jury instructions on second degree murder in the circumstances presented here. *Morgan,* 718 N.E.2d at 214. As discussed more fully above, the *Viser* decision, upon which *Thurman* relies, did not involve the need for mitigating jury instructions in the circumstances presented here.

The other cases cited by the state, *Ray* and *Szerletich,* were decided prior to the fundamental change in Illinois' homicide law. For reasons more fully described above, those pre-1986 cases are not controlling, in addition, the reviewing courts in Ray and *Sterletich* were not asked to consider the need for mitigating jury instructions in the circumstances presented here.

Based on the foregoing, the appellate court properly reversed Jon's first degree murder conviction of Lila Cearlock and the appellate court's decision in this regard should be affirmed. This case should be remanded to the trial court for a new trial.

                                **\*29 II.**

**THE APPELLATE COURT PROPERLY FOUND THAT THE TRIAL COURT ERRED IN BARRING SECOND DEGREE MURDER INSTRUCTIONS.**

The state's argument that the appellate court's decision is in conflict with the plain language of the Illinois' murder statutes is erroneous. The appellate court's decision is consistent with the language of the first degree murder statute and the second degree murder statute.

  **A. The Plain Language Of The First And Second Degree Murder Statutes Does Not Preclude The Giving Of Second Degree Murder Instructions In This Case.**

The first degree murder statute provides that:
(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
(i) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
(3) he is attempting or committing a forcible felony *other than second degree murder.*

720 ILCS 5/9-1(a) (emphasis added).

The second degree murder statute states, in relevant part, that:
Aperson commits the offense of second degree murder when he commits the offense of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                        Page 20

first degree murder as defined in paragraph (1) or (2) of subsection (a) of sec-
tion 9-1 of this Code and either of the following mitigating factors are present:
(1) At the time of the killing he is acting under a sudden and intense passion
resulting from serious provocation by the individual killed. . .; or
(2) At the time of the killing he believes the circumstances to be such that, if
they existed, would justify or exonerate the killing under the principles stated
*30 in Article 7 of the Code, but his belief is unreasonable.

720 ILCS 5/9-2 (emphasis added).

In this case, there is no question that, when Jon deliberately shot Keith and kiln
Cearlock, he *committed* the offenses of intentional and knowing first degree murder
as defined in paragraph (1) or (2) of subsection (a) of section 9-1 of the first
degree murder statute. Nevertheless, the second degree murder statute provides
that a person who commits an intentional or knowing murder commits the lesser mit-
igated offense of second degree murder if he presents sufficient evidence that the
deliberate killings were based upon an unreasonable belief in self defense or ser-
ious provocation. In other words, the second degree murder statute provides that
the felonious conduct inherent in an intentional or knowing murder constitutes the
lesser mitigated offense of second degree murder upon proot of the required mitig-
ating factors.

The state argues that the "language of the second degree murder statute cannot be
more clear and unambiguous: a second degree murder instruction cannot apply when
felony murder is the charge." (Appellant's brief at 25) However, in making such an
assertion, the state attempts rewrite the second degree murder statute by repla-
cing the term "commits" with the term "is charged with" so that it would read: "A
person commits the offense of second degree murder when he **commits** [is charged
with] the offense of first degree murder as defined in paragraph (1) or (2) of
subsection (a) of section 9-1 of this Code and either of the following mitigating
factors are present. . . The second degree murder statute does not mention the
word charge, rather it focuses on a defendant's conduct.

In the case at bar, there is no question that Jon committed the offenses of inten-
tional or knowing murder. This is true of every count in the indictment, including
the felony murder counts. The exact same conduct which supports counts I through
IV supports counts V through VIII. Simply *31 put, charging the same conduct as
felony murder as opposed to intentional or knowing murder does not change the con-
duct itself Accordingly, in *each* count of the indictment, Jon is charged with com-
mitting the offense of intentional or knowing murder as defined in paragraphs (1)
and (2) of subsection (a) of section 9-1 of the Criminal Code. Under the plain
language of the second degree murder statute. Jon is entitled to receive a second
degree murder instruction as to each count of the indictment, including the felony
murder charge.

The State argues that, if the state legislature had intended to limit the scope of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                              Page 21

the felony murder rule by proscribing certain aggravated batteries and aggravated discharges of a firearm from serving as underlying felonies, it would have done so. (Appellant's brief at 22) In reading the first degree murder statutes in conjunction with each other, it is clear that the legislature did just that and specifically limited application of the felony murder rule to those "forcible felonies other than second degree murder." Since the legislature established a lesser mitigated offense of second degree murder for an intentional or knowing murder upon sufficient proof of mitigation, the appellate court properly interpreted the clause "forcible felonies other than second degree murder," in holding that the predicate felony underlying a charge of felony murder must involve conduct with a felonious purpose other than the killing itself. Any other interpretation would eviscerate the second degree murder statute.

Based upon the foregoing, the appellate court's reversal of Jon's first degree murder conviction of Lila Cearlock should be affirmed, and this case remanded for a new trial.

### B. The Trial Court's Instructional Error Was Not Harmless Beyond A Reasonable Doubt.

The charging and instructional errors combined with the evidentiary errors set forth *32 below brief denied Jon a fair trial on the first degree murder charges involving his grandmother, Lila Cearlock. In closing argument, the prosecutor urged jurors not to look beyond the felony murder counts (R.Vol. XXX, p. 164-166). Furthermore, the prosecutor exhorted the jurors to disregard evidence of Jon's mental state. (R.Vol. XXX, p. 190, 193, 202).

The appellate court's harmless error analysis is right on the mark.
"The instructional error had the affect of preventing the jury, from considering mitigating defenses to the charge of felony murder. Had the jury been properly instructed, it would have been required to consider any evidence of mitigation or imperfect self defense as to each of the three theories of murder charged. *Morgan*, 718 N.E.2d at 206.

Due to the instructional and evidentiary errors it is impossible to discern the basis for the jury's verdict. As a result, the Fourth District Appellate Court held "that it is reversible error for a trial court to deny the defendant's motion to dismiss a charge of felony murder where the State has failed to present evidence of an independent felonious purpose. In this case. the prosecutor succeeded in diluting the intent requirement for knowing or intentional murder by charging felony murder and, as a result, Jon was denied a fair trial." *Morgan*, 918 N.E.2d at 206. The court properly ruled that this alone was not harmless error. The evidentiary errors discussed below magnify the instructional error, as welt as the prejudice suffered by Jon. The evidentiary errors allowed the State to direct the jury, during closing argument to ignore the evidence developed at trial regarding Jon's mental state.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Put simply, the State was allowed to tell the jury to ignore Jon's entire defense. The appellate court properly held that Jon was denied a fair trial. This case should be remanded for a full, fair and impartial trial.

*33 III.

**THE APPELLATE COURT PROPERLY CONCLUDED THAT THE QUESTION DETECTIVE HARBERTS ASKED JON MORGAN AFTER THE DETECTIVE LEARNED THAT JON MORGAN HAD ADMITTED THAT HE HAD SHOT HIS GRANDPARENTS AND HAD GIVEN A GUN AND AMMUNITION TO THE POLICE WAS INTERROGATION THAT REQUIRED MIRANDA WARNINGS, FURTHER, THE COURT PROPERLY RULED THAT JON MORGAN WAS IN CUSTODY DURING THIS INTERROGATION.**

The appellate court properly ruled that the trial court's order denying Jon Morgan's motion to suppress his responses to police questioning manifestly erroneous. This questioning occurred after Jon had surrendered a gun and ammunition to the police and admitted that he had shot his grandparents. The appellate court correctly ruled that Detective Harberts' question to Jon Morgan was interrogation that required *Miranda* warnings. The Appellate Court noted that *Miranda* safeguards are required whenever a person in custody is subjected to either express questioning or its functional equivalent, Interrogation includes any words or action on the part of the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. *People v. Morgan*, No. 4-96-0996, Illinois Appellate Court., 4th Dist. (September 29, 1999), slip op. at 27-28 (unpublished material pursuant to Illinois Supreme Court Rule 23), citing *People v. Winchel*, 159 Ill. App. 3d 892, 909. 512 N.E.2d 1298, 1308 (1987) quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-30t (1980). In this case. Detective Harberts subjected Jon Morgan to custodial interrogation when the detective asked him "Why did you do it?" while Jon Morgan was in police custody.

When police officers first arrived at 1206 Seventh Street (the Cearlock home) they believed a murder/suicide had resulted in two persons being shot. (R. Vol. XI, p. 271 ). One body was in the *34 house, the other was in the front yard. Detective Harberts searched the area inside the home where one body had been discovered and did not see a gun. He learned that no other officer had seen a weapon lying near the body nor had a weapon been removed by emergency medical personnel. Detective Harberts concluded that a third person had to be responsible for the shooting and he instructed officers to seek witnesses. (R. Vol. XI, p. 272).

At this time Jon Morgan walked underneath the police tape that had been stretched around the yard. Deputy Spickard was stationed in the backyard to make sure that no pedestrians came into the yard. (R. Vol. X, p. 168, 169). He knew there had been a shooting, *Id.* at 175. Jon Morgan approached Deputy Spickard stating "I did it. I killed them." Jon handed him a gun and a box of ammunition. *Id.* at 177.

Based on don's words and actions, Deputy Spickard knew he had a suspect in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shooting. *Id.* He took Jon by the elbow, directing him to "come with him". (R. Vol. XII, p. 458). The deputy firmly gripped Jon's arm. Deputy Spickard acknowledged that if Jon had tried to walk away he would have stopped him. (R. Vol. X, p. 177).

The deputy walked towards the house with Jon Morgan in his grasp. Officer Kerns saw them and the deputy told Officer Kerns what had happened. Officer Kerns summoned Detective Harberts who was leading the investigation. (R. Vol. X, p. 136). Detective Harberts came over to the group. By this time, there were three police officers within arms reach of Jon Morgan. Two of them were in uniform and cawing service weapons. There were at least a half dozen police officers in the yard. There were tour or five police cars in the yard and street with emergency lights on. (R. Vol. X, p. 137). Officer Kerns acknowledged that he would have stopped Jon Morgan if had attempted to walk away. (R. Vol. X, p. 165).

**\*35** Detective Harberts walked up to tile group of officers and Jon Morgan. Deputy Spickard told him what had happened, specifically telling Detective Harberts that Jon Morgan surrendered a gun

and ammunition to him and then stated that he had shot and killed his grandparents. Deputy Spickard acknowledged that he was conveying Jon Morgan into Detective Harberts' custody. Harberts confirmed that Jon was not tree to leave and he would have restrained Jon if he had attempted to pull tree of Spickard's grip and walk away.

Detective Harberts acknowledged that his investigation now focused on Jon Morgan. (R. Vol. XII, p. 366). He had tbund a third person that he had theorized was responsible for the shootings, The detective then asked Jon a question that focused specifically on Jon's involvement in the shooting that was being investigated. He asked "Why did you shoot these two people?" Jon answered. "They pissed me off. I couldn't take it anymore, so I shot them." (R. Vol. XII, 9. 367). After Jon gave his answer, Detective Harberts instructed Officer Kerns to place Jon under arrest. The appellate court properly concluded that the detective's question was interrogation rather than general, on-the-scene questioning as argued by the State. The appellate court keyed on Detective Harberts acknowledgment that Jon was the focus of his investigation when Detective Harberts asked his question. Furthermore, it was important to the appellant court that Detective Harberts knew Jon had admitted the shootings. These factors weighed heavily in favor of viewing the question as interrogation, not merely routine investigative questions. *People v. Morgan supra*, slip op. 29-30 *People v. Clark*, 84 Ill.App. 3d 637, 405 N.E.2d 1192 (1980).

The appellate court relied on this tact to make the distinction between investigation and interrogation. In *Clark*, police officers investigating a shooting found the deceased slumped in an automobile, and saw two women standing nearby. One of the women, the defendant, was identified **\*36** as the decedent's wife. The police asked her to sit in the police car and permitted her friend to accompany her. *Clark, supra* 405 N.E.2d at 1194. While the defendant and her friend were seated in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)                                                              Page 24

the police car, an officer asked, "[W]hat happened?" The defendant responded, "I shot my husband." *Id.* At this point, the officer asked the friend to leave the police car. Without giving *Miranda* warnings, the officer asked the defendant, "What do you mean you shot your husband? What happened?" In response, the defendant made incriminating statements. *Id.*

The First District Appellate Court held that the statements given in response to the second questions should have been suppressed as they were the result of custodial interrogation. *Id.* at 1194. 1195. The court remarked that the officer was aware that the defendant had shot her husband and the investigation was focused on her conduct at the time of the second question, *Id.* Thus. the second question was more than a "general on-the-sdene inquiry." and took place when a person would not reasonably believe they were free to leave, *Id.*

In its opinion the Fourth District highlighted the parallels between the facts of the present case and *Clark*.
"Harberts had precisely the same information at this stage of the investigation [when he asked Jon Morgan, "Why did you shoot those people?"] as the officer in Clark had when he asked the follow up question that crossed the line between investigation and interrogation. Harberts' question was not asked merely to obtain general background information, but focused on the suspect's 'conduct involving the shooting'. *Clark*, 84 Il. App.3d at 60, 405 N.E.2d at 1194. We conclude that the question posed to Jon by Harberts was interrogation rather than general on-the-scene investigation. *Morgan, supra* at 31.

The State's efforts to describe Detective Harberts' question as routine on-the-scene police questioning are not compelling. The State claims that Detective Harberts' question was not interrogation, rather "it was an on-the-scene question which was asked to further the investigative **\*37** goals of securing the crime scene and sorting out the facts." (Appellant's brief p. 30). Law enforcement officers had been at 1206 Seventh Street for a half an hour before Jon Morgan ducked under the police tape. They had their cars parked in the street and in the yard. They had been through the house where they had found one person who had been shot. Police tape secured the yard where another body had been found. Deputy Spickard had been posted in the backyard to prevent on lookers from disturbing the investigation. The scene of the investigation was secure. Jon Morgan's response ·to Deputy Spickard's question would not have made the scene of the investigation any more secure.

When officers initially arrived, they hypothesized that a murder/suicide had taken place since one body had been found by the police inside the home and the other outside the home. Detective Harberts dismissed this hypothesis when he did not find a gun in the area of the home where u body had been found and when he learned that no other officer or emergency medical person had removed a gun. Harberts concluded that there had to be a third person who was responsible for the shootings and instructed the officers to canvass the crowd and neighborhood for witnesses.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This is the point in time when he was summoned by Officer Kerns and told by Deputy Spickard that Jon Morgan had surrendered a weapon and ammunition and had admitted that he had shot his grandparents. Detective Harberts had sorted out the facts so that when he learned what Jon had said and done, he focused on Jon as a suspect. Furthermore, Jon's response prompted Harberts to order Kerns to arrest Jon. Apparently, Harberts had sufficiently sorted out the facts and no further general-on-the-scene questions were necessary.

The State relies on *People v. Acebo,* 182 Ill. App.3d 403, 537 N.E. 1113, 1114 (3rd Dist. 1989) to establish Harberts' question as general-on-the-scene questioning. In that case, a deputy was *38 investigating an automobile accident. He found a pick-up truck on the side of the road. A bystander told him that the occupants of the truck may have gone to a nearby care to use a phone. The deputy went to the cafe, but it was closed. The owner of an adjacent tavern told him there were two people behind the care. The deputy went behind the cafe where he saw a person crouched behind a garbage can. After the deputy ordered that person to come out from hiding, he saw another person come from between a storage shed and the cafe and walk away from the area. The deputy ordered that person to stop. After ordering both individuals to place their hands on the building and patting them down, the deputy asked each suspect for their name and asked which of them was the driver of the truck involved in the accident. The defendant admitted that he was the driver. He was charged with driving under the influence of alcohol. *Acebo, supra,* 537 N.E. 2d at 1114.

The defendant moved to suppress his statement that he was driving, alleging that he was in custody and should have been read *Miranda* warnings. The trial court granted that motion. The Third District Appellate Court reversed, ruling that the deputy's questions regarding who was driving the truck involved in the accident were merely preliminary, questions regarding the accident. *Id.*

Detective Harberts' question was tar from preliminary. The deputy in *Acebo* did not even know which of the two persons he had discovered were driving the truck. When Detective Harberts questioned Jon Morgan, he had ruled out one theory regarding the shootings and believed that a third person was responsible. He had then learned that Jon had admitted his involvement and surrendered a weapon. The knowledge that Detective Harberts had at the point in time he questioned Jon was far different from the information the deputy in *Acebo* was acting on when he questioned the eventual defendant.

*39 The appellate court correctly ruled that Jon Morgan was in police custody when Detective Harberts interrogated him regarding Jon's motivation for shooting his grandparents. A number of factors exist to support that conclusion. The first factor was the extensive police presence at the Cearlock home. Police tape ringed the yard. Nearly a half a dozen police cars were present with their emergency lights glaring. Second, Deputy Spickard realized he had a suspect in the shooting after Jon's statements and his surrender of a weapon. As a result, Deputy Spickard

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

restrained Jon firmly by the elbow directing Jon to "come with him". Third, when
Deputy Spickard was gripping him by the elbow, Jon did not feel as if he could
walk away. Fourth, Deputy Spickard would have stopped him if Jon tried to leave.
Fifth, a number of officers materialized around Deputy Spickard and Jon. Two of
them carried weapons. Sixth. Officer Kerns testified that he would have stopped
Jun if he had tried to walk away. Seventh, Deputy Spickard testified that he was
conveying Jon to Detective Harberts' custody. Finally, Harberts testified that he
would not have allowed Jon to leave. but stated that he could not determine if
Deputy Spickard was conveying Jon into his custody. Harberts inability to make
this determination was nothing more than a self serving attempt to wiggle off of
the hook.

The determination of whether a person is in custody "depends on an objective eval-
uation of the circumstances surrounding the interrogation." *Clark, supra* 804 Ill.
App.3d at 640, 405 N.E.2d at 1194.
"The test is whether, under the circumstances, a person would reasonably believe
that he was not tree to leave the scene of the questioning, so that he was de-
prived of his freedom of action in a significant way during the questioning."
*Clark*, 84 Ill. App.3d at 640, 405 N.E.2d at 1194.

Factors relevant to the determination of whether Jon Morgan was in custody in-
clude:
*40 "The location. length, mood, and mode of the interrogation; the number of po-
lice officers present; any indicia of formal arrest or evidence of restraint; the
intentions of the officers: and the extent of the knowledge of the officers in the
focus of their investigation." *People v. Brown*, 136 Ill.2d 116, 124-125. 554
N.E.2d 216, 220 (1990).

Additionally, special care must be taken when scrutinizing in the record when a
juvenile is involved. *Haler v. Ohio*, 332 U.S. 596, 599 (1948), *Gallegos v. Color-
ado*, 370 U.S. 49, 52-53(1962). The appellate court properly applied these factors
to determine that Jon Morgan was in custody when he was interrogated by Detective
Harberts. The State contends that Jon was not restrained in any way. This argument
ignores the uncontradicted testimony that Deputy Spickard gripped Jon firmly by
the arm and ordered Jon to "go with him" and the unequivocal testimony of other
law enforcement officers that Jon would have been restrained if he had attempted
to leave the area. The appellate court properly ruled that Harberts' question to
Jon should have been proceeded by *Miranda* warnings.

The State's harmless error analysis regarding the admissibility of Jon's answer to
Deputy Spickard's question is flawed by factual references that are not supported
by citations to the record on appeal. (Appellant's brief p. 32-33). The State's
brief misrepresents .the facts developed at trial.

There is no question that Jon shot his grandmother in the back as she was moving
toward the door. (R. Vol. XXIII p. 794-795). Contrary to the State's assertion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Jon tried to shoot her again as she lay on the ground, Jon testified that he had the gun "pointing down in front of me and I was shaking the --the chamber of the top of the gun or something and was pulling the trigger to try to get it to release the chamber or--I don't --empty the thing, clip or something so it wouldn't be jammed." (R. Vol. XXIII p. 796-797). Jon did not try to fire addition- al shots at his grandmother. *Id.* at 797. He did not tell the police that he tried to fire additional shots at his grandmother, *Id.* After the *41 shootings, Jon Mor- gan entered the home and went to his bedroom to change his pants and his shirt. Jon had no idea why he changed his clothes. *Id.* at 798. After he changed his clothes, he went to his grandmother's bedroom door only to find that it was locked. Jon acknowledged that he went to his grandmother's bedroom to look for a 38 caliber pistol. He could not explain why he wanted that gun. *Id.* These facts establish Jon's inexperience with firearms and his confusion and panic during and after the shooting. These facts do not establish Jon as the cold blooded execu- tioner the State portrays in its harmless error analysis.

At trial, Detective Harberts testified that he interrogated Jon after the shooting and Jon told him that he attempted to shoot his grandmother when she was outside. However, Detective Harberts acknowledged that he did not take any notes during this interrogation. (R. Vol. XXII p. 530, 578). During the second interview which was audio taped, Jon gave a statement consistent with his trial testimony that he didn't know what he would have done if he injammed the gun when he was outside. (R. Vol. XXXIV p. 57).

In its harmless error analysis the State uses Jon's words that he shot his grand- parents because they "pissed him off" and that "he couldn't take it anymore" in the same prejudicial way as that phrase was used at trial. Jon Morgan gave a clas- sically juvenile and unfortunate answer to Detective Harberts' question. A lengthy trial was held in this case to establish Jon's state of mind at the time he shot his grandparents.

The State used this inadmissible phrase as a mantra to smear the state of mind evidence. For instance, in the State's closing argument, the prosecutor argued, "and now we get into the significant undermining of any suggestion that self de- fense is even at play here." Detective Harberts asked one simple question, why did you shoot these people?... And what did Jon Morgan say? Well, it was-*42 what were the first words out of his mouth? Nobody put those words in his mouth. The true expression of the emotion felt at the time he gunned down Keith and gila Cearlock, "Why did you shoot those people? "Because they pissed me off. I couldn't take it anymore, so I shot them." (R, vol. XXX p. 174). The prosecutor continued to repeat the phrase "they pissed me off." *Id.* (R. Vol. XXX p. 199).

The jury's verdict of second degree murder regarding the shooting of Keith Cear- lock demonstrated that Jon had a subjective tear that he would suffer death or great bodily harm at the hands of his grandfather. He testified at length about he viewed his grandmother and grandfather as one when it came to the beatings he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suffered because his grandmother always incited his grandfather to act. Dr. Hart
testified that this was a reasonable view for Jon to take given his grandmother's
role in the beatings. Jon's self defense argument regarding his grandmother would
have been unquestionably stronger without the inadmissible statement regarding his
motivation. The appellate court properly rejected the State's argument that Jon's
statement to Harberts was harmless error.

*43 IV.

**THE APPELLATE COURT PROPERLY RULED THAT THE TRIAL COURT ABUSED ITS DISCRETION WHEN
RULING THAT GLENDA ASHWORTH COULD NOT TESTIFY ABOUT THE ABUSE SHE SUFFERED AT THE
HANDS OF HER PARENTS IN WAYS THAT WERE ASTONISHINGLY SIMILAR TO THE ABUSE SUFFERED
BY JON MORGAN. FURTHERMORE, THE APPELLATE COURT PROPERLY RULED THAT DR. STUART
HART SHOULD HAVE BEEN ALLOWED TO TESTIFY TO STATEMENTS MADE TO HIM BY GLENDA ASH-
WORTH RECOUNTING HER ABUSE WHEN HE EXPLAINED HIS OPINIONS TO THE JURY.**

Glenda Ashworth, Jon Morgan's mother, was prepared to testify to the physical and
emotional abuse suffered by her at the hands of her parents, Keith and Lila Cear-
lock. The State moved to exclude her testimony after jury selection, but before
the commencement of evidence. Jon Morgan presented a written offer of proof in
which Glenda Ashworth described being beaten with a razor strap as a child in the
same manner in which Jon testified he had been beaten. She described being punched
by her lather. Her tether would make a fist with the knuckle of his middle finger
extended. Jon described exactly the same fist when recounting how his grandfather
would punch him. Gienda stated in the offer of proof how Lila Cearlock would nag,
push and prompt Keith Cearlock until he would beat Glenda. She stated that her
parents constantly insulted and belittled her. Jon testified to the same emotional
abuse.

The trial court rejected the offer of proof based on the remoteness of the events
Glenda Ashworth described, "the fact that one was a female [child] being raised
[by the Cearlocks]. The other is a male," and the tact that "there is nobody
[alive] now who can honestly...rebut" Ashworth's allegations. (R.Vol. XX p. 249).

*44 The appellate court properly ruled that the trial court's ruling on the ad-
missibility of this evidence was an abuse of discretion. First. the gender based
reason for the ruling is patently arbitrary. Second, an opposing party's ability
to confront evidence is not a proper basis to exclude admissible evidence. Third,
the admissibility of evidence can not be controlled solely by the passage of time.
*People v. Illgen*, 145 Ill.2d 353, 583 N.E.2d 515 at 522 (1991).

The appellate court framed its analysis of this issue with the general principles
of relevancy. These principles state that evidence is generally admissible if it
tends to make a tact of consequence to the determination of the action more prob-
able than it would be without the evidence. *Morgan*, at 59-60. (citation omitted)
The appellate court properly found that Glenda Ashworth's testimony clearly fit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that description.

Jon asserted, and attempted to prove, that he could not be guilty of the first de-
gree murder of Keith or Lila Cearlock because he acted in self defense. The key
element in that defense is that Jon Morgan believed that his life and safety were
in imminent danger. *People v. Keefe*, 209 Ill. App.3d 744. 567 N.E.2d 1052, (1st
Dist. 1991 ). Jon Morgan, obviously, had to introduce evidence that he believed
that his safety was in imminent danger at the hands of his grandparents. Jon's
tear is clearly of "consequence to the determination" of this prosecution. There-
fore, any evidence which tended to make that fear more probable in the jury's mind
is relevant.

The appellate court observed that when a defendant is attempting to prove self de-
fense, he should be given substantial latitude. *People v. Robinson*, 163 Ill.
App.3d 754, 773, 516 N.E.2d 1292, 1306 (1987). In addition, it is "generally a de-
fendant's right to present evidence of a victim's character for violence when the
defendant alleges that he acted in self defense" because "such evidence tends to
show circumstances confronting the defendant, the extent of the apparent danger,
*45 and the motive influencing him." *Robinson*, 163 Ill. App.3d at 773, 561 N.E.2d
at 1306. Further. the defendant's own account of the threats he faced "could not
have been as comprehensive or as probatively as forceful as his witnesses testi-
mony, which therefore would not have been merely cumulative. *Robinson*, 163 Ill.
App.3d at 774. 516 N.E.2d at 1307. The appellate court correctly ruled in light of
*Robinson* and the cases discussing the general principles of relevance that Glenda
Ashworth's corroborative testimony was admissible.

The remoteness in time of Glenda's experiences in the Cearlock household goes to
the weight to be given her testimony by the trier of fact, not to its admissibil-
ity. *People v. Illgen*, 145 Ill.2d 353, 583 N.E.2d 515 (1991). *Illgen* stated a gen-
eral rule that more recent acts have "more probative value" than less recent acts.
*Illgen, supra* 583 N.E.2d at 522. *Illgen* also stated the rule that the admissibil-
ity of evidence can nut be controlled solely by the passage of time. *Id.* The ap-
pellate court properly ruled that the trial court's refusal to admit Glenda's
testimony based on its belief that too much time had passed between Glenda's beat-
ings and the beatings suffered by Jon was an abuse of discretion. Under *Illgen*,
the trial court's ruling was an error of law.

While it is conceded that Glenda's beatings occurred at least nineteen years prior
to the shootings, the astonishing similarities between Glenda's treatment and
Jon's treatment at the hands of Keith and Lila Cearlock bolsters the relevance of
this evidence and overwhelms any remoteness problems. *People v. Bartall*, 98 Ill.2d
294, 456 N.E.2d 59 (1983). The trial court acknowledged these similarities, but
rejected the evidence nonetheless. This was an abuse of discretion.

The remoteness challenge to relevancy is also destroyed by the use that this evid-
ence was to be put. Jon was not trying to prove that, on the day of the shootings,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his grandparents had acted in exact conformity with their actions towards Glenda. Rather, he is trying to prove that he had in the *46 past been similarly mistreated and that his-testimony regarding his fear of death or great bodily harm should be believed. He is not trying to convince a jury, that his grandparents were criminals, but rather to convince the jury that he had not made up his testimony of his repeated abuse at the hands of his grandparents. In that context, the remoteness of his mother's experience had little or no bearing on the relevance of that experience. Finally, the appellate court noted that Dr. Hart's testimony suggests that the intergenerational nature of the victim's conduct makes Ashworth's testimony more credible rather than less so. *Morgan, supra* at 61. During the testimony of defense expert psychologist, Stuart Hart, the State objected to any testimony by Dr. Hart regarding his interview with Glenda Ashworth. The trial court sustained the objection and the defense made an offer of proof. Dr. Hart testified that he interviewed Glenda by phone for an hour and forty-five minutes for the purpose of learning about Jon's experiences with her parents and also her experience as a child of the Cearlocks. The information he obtained from Ashworth corroborated what Jon had told him. and he relied on this information in forming his opinion. He described the Cearlock's treatment of their daughter and grandson as displaying a "repetitive and persistent pattern," noting Keith's continued use of the razor strap and knuckle punch, the constant criticism, and unending discord between Keith and Lila Cearlock. Dr. Hart stated that the significance of the information provided by Ashworth was that it "added credibility to Jon's description of his own life experiences." The trial court dismissed the offer of proof indicating that the offer contained "nothing the court hasn't heard before, so it is denied." (R. Vol. XXVI p.455, 460).

During his conversation with Glenda, Dr. Hart was able to corroborate many of the experiences testified to by Jon. The abuse suffered by Glenda confirmed in Dr. Hart's mind that Jon had indeed suffered the same type of abuse. In Dr. Hart's words, Glenda's information confirmed *47 a repetitive and persistent pattern of severe mental, emotional, and physical abuse. Dr. Hart's observation that parental physical abuse is often "cross generational" adding further corroborative force to his conversation with Glenda.

Glenda's information also gave Dr. Hart a better understanding of Jon's psyche. Glenda's experiences gave important insight into Jon's early developmental experiences and Jon's home life as very young child. This information was crucial to Dr. Hart's testimony regarding Jon's perception of the threat on the day of the shootings. Obviously, with the stated goal of helping the jury to see what Jon saw, Dr. Hart's testimony was relevant. Given the use that Dr. Hart intended to put this testimony, the alleged remoteness was meaningless fact as noted above, the length of time between the beatings Glenda suffered and the beatings Jon suffered actually enhanced the probative value of the testimony. The appellate court was correct ira observing that the information obtained from Glenda was important to Dr. Hart in two ways. First, it corroborated and supported Jon's version of the cru-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 34029407 (Ill.)

cial and operative facts of his own abuse. Second, it provided important diagnostic insights into Jon's psychological make up. Both the corroborative component and the diagnostic component were equally important to the jury's understanding of Jon's defense and were clearly relevant. The appellate court correctly relied on *People v. Sutherland*, 155 Ill.2d 1, 21-22, 610 N.E.2d 1, 10 (1992) for the proposition that Illinois has adopted Rule 703 of the Federal Rules of Evidence. That rule states that an expert witness may base his or her opinion on information which has not been admitted into evidence, so long as that information is reliable and is of the type reasonably relied on by experts in the field. *Id.* The very court correctly noted that *Sutherland* supports Jon's argument that Hart should have been allowed to explain his reliance on the family history provided by Ashworth. "By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury **48** in assessing the value of his opinion." (*Morgan, supra* at 62, quoting *People v. Pasch* 152 Ill.2d 133. 175, 604 N.E.2d 294, 310-311 (1992)).

The State's citation to *People v. Cloutier*, 156 Ill.2d 43, 622 N.E.2d 744 (1993) is misplaced. In that case. the defendant attempted to cross examine an expert medical examiner about sexual assault findings in previous autopsies performed by the expert. This effort was cut short by an objection from the State. The objection was sustained. *Cloutier, supra* 622 N.E.2d at 783.

The trial court's ruling was affirmed on appeal since the defendants questions concerned the expert's experience with other victims. In addition, the expert witness specifically disclaimed any recall of the number of forced sex victims who had not suffered injury, to their genitalia as a result of such conduct. *Id.* at 784. This holding has nothing to do with the evidentiary issue in the present case. The State did not ask the trial court to rule that Dr. Hart could not give his ultimate opinion regarding the reasonableness of Jon's tear of imminent death or great bodily harm. The trial court's ruling prevented Dr. Hart from fully and persuasively explaining his opinion to the jury. The appellate court properly ruled that this was error.

The appellate court properly ruled that with respect to Lila Cearlock, the excluded testimony of Glenda Ashworth and Dr. Hart was not harmless error. The State's closing argument demonstrates that Glenda's testimony and the information she provided to Dr. Hart were crucial to Jon's case. In the State's closing argument, the prosecutor made much of Jon's inability to corroborate his beatings and the legitimacy of his fear. The prosecution urged the jury, to ignore Jon's claim of self defense as unbelievable and unsubstantiated. In "repeatedly emphasizing the improperly excluded evidence" the State recognized the importance of any testimony that supported Jon's claims of repeated beatings. *People v. Keefe*, 209 Ill. App.3d 744. **49**567 N.E.2d 1052 (1st Dist. 1991). The appellate court specifically commented on the State's closing argument regarding the lack of corroboration of "any actual abuse of Jon Morgan by Keith and Lila Cearlock" and the State's position that such evidence was "[J]ust not there." The appellate court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

also properly observed that the State further argued that there was no evidence to support the allegations that the razor strap was ever used on Jon. *Morgan, supra* at 63, 64. The appellate court summarized its harmless error analysis as follows: "With respect to Lila...the excluded testimony went to the heart of the defense theory of the case and would have corroborated Jon's testimony, particulary regarding his tear of her."

This is the correct analysis and the appellate court must be affirmed.

## CONCLUSION

Appellee, Jon Morgan, respectfully requests this court affirm the decision of the Fourth District Appellate Court granting Jon Morgan a new trial.

PEOPLE OF THE STATE OF ILLINOIS, et al., Appellants, v. Jon R. MORGAN, et al., Appellees.
2000 WL 34029407 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2001 WL 34150387 (Ill.)                                                                Page 1

For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

Supreme Court of Illinois.
PEOPLE OF THE STATE OFF ILLINOIS, Plaintiff-Appellant,
v.
Jon Roe MORGAN, Defendant-Appellee.
Nos. 88508, 88513.
February 9, 2001.

Appeal from the Appellate Court Fourth Judicial District No. 4-96-0996
Original Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan
County, Illinois. No. 95 CF 101, The Honorable Gerald G. Dehner, Judge Presiding.

Reply Brief and Argument for Plaintiff-Appellant
James E. Ryan, Attorney General, State of Illinois, Joel D. Bertocchi, Solicitor
General, State of Illinois, William L. Browers, David H. Iskowich, Assistant At-
torneys General, 100 West Randolph Street, 12th Floor, Chicago, Illinois 60601,
(312) 814-5643, Counsel for Plaintiff-Appellee
**ORAL ARGUMENT REQUESTED**

*1 I.

THE APPELLATE COURT ERRED IN FINDING THAT THE DEFENDANT COULD NOT BE FOUND GUILTY
OF FELONY MURDER BASED ON THE UNDERLYING OFFENSES OF AGGRAVATED BATTERY AND AG-
GRAVATED DISCHARGE OF A FIREARM.

First, the People reiterate here that the purpose of the felony murder rule is to
deter violent conduct by imposing the harshest sanction under State law - the
charge of murder - on those who participate in violent conduct resulting in death,
whether intentional or not. *People v. Pugh*, 261 Ill.App.3d 75, 634 N.E.2d 34, 35
(5th Dist. 1994). In the case at bar, the record shows that Jon Morgan particip-
ated in violent conduct in committing an aggravated battery and an aggravated dis-
charge with a firearm against his grandparents, Keith and Lila Cearlock.

Second, Morgan's agreement with the appellate court's holding that *People v.
Viser*, 62 Ill.2d 658, 343 N.E.2d 903 (1975), "did not consider the question
presented here - whether the predicate felony underlying a charge of felony murder
must have an independent felonious intent" - is simply wrong. That holding was the
central theme of *Viser*. Appellee's Brief at 20; *Morgan*, 718 N.E.2d at 213. This
Court succinctly outlined the defendants' position in *Viser* as follows:
It is the position of the defendants that "aggravated battery, as an included of-
fense of murder, cannot be the underlying felony in a felony murder charge where
the aggravated battery is alleged to have been committed against the person who

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT J

2001 WL 34150387 (Ill.)                                              Page 2

eventually dies." *Viser*, 343 N.E.2d at 908.

The People fail to see how Morgan's claim, in the court below, was any different than the one posited by the defendants and rejected by this Court in *Viser*. If *Viser* were so different from a factual standpoint, it follows that the appellate court, in *Morgan*, would not have gone to such great lengths to attempt to distinguish that case. And, that the *Viser* opinion approached this issue with respect to the wording of the indictment, is of no moment. If felony murder had not been charged *2 in *Viser*, there would have been no instruction for it. And, were the jury not in possession of an instruction on felony murder, the defendants in *Viser* could not have been convicted of felony murder; hence there would have been no incentive to raise the issue on appeal. Essentially, the felony murder jury instructions in the case at bar had their origins in the charging instrument, for had felony murder not been charged, the jury would have had no opportunity to apply those instructions to this case. This difference, therefore, is inconsequential to the overall question regarding the applicability of felony murder to a defendant who has committed an aggravated battery or an aggravated discharge of the firearm.

Third, while the *Viser* court did hold it would have been error for the court to refuse to give instructions for voluntary manslaughter based on (1) "unreasonable belief in justifying circumstances, and (2) "sudden and intense passion resulting from serious provocation," *Viser*, 343 N.E.2d at 911, it is apparent that Morgan has viewed this statement solely within the context of felony murder. There is no indication in *Viser* that this Court intended its caveat regarding voluntary manslaughter instructions to encompass felony murder at all. It must be remembered that the *Viser* jury was also instructed on intentional and knowing murder, *Viser*, 343 N.E.2d at 910-911, and this Court's reference to *People v. Craven*, 54 Ill.2d 419, 299 N.E.2d 1 (1973), in this vein, is instructive. In *Craven*, the trial court refused the defendant's request to give jury instructions for the "sudden and intense passion resulting from serious provocation" aspect of voluntary manslaughter. *Craven*, 299 N.E.2d at 4. There is nothing in *Craven*, however, that would indicate that the jury was ever instructed on felony murder; indeed, *Craven's* recitation of the pertinent part of the voluntary manslaughter statute which was applied at trial indicates that only intentional and knowing murder can support a voluntary manslaughter instruction, the very point which the People argued in their. opening brief. *Craven*, 299 N.E.2d at 4. It follows, therefore, that *Viser* referenced *Craven*, in this *3 part of its opinion, to garner support for its holding that voluntary manslaughter instructions were properly given - but only for the intentional and knowing murder counts.

Fourth, the *Morgan* court's recognition that its holding, on the surface, appeared to be inconsistent with *Viser* is quite an understatement. The People continue to maintain that the *Morgan* court's holding is directly and plainly inconsistent with *Viser*. Nevertheless, Morgan argues that this Court should uphold this "apparent inconsistency" in rejecting *Viser's* teachings because "that apparent inconsistency is erased after considering that, in addition to a self defense instruction, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Viser* jury received two voluntary manslaughter instructions on the felony murder
charges – the equivalent of the second degree murder instructions Jon requested."
Appellee's Brief at 19-20. The People disagree with Morgan's reading of *Viser*,
which never made clear that the jury "received two voluntary manslaughter instruc-
tions on the felony murder charges. . .", Appellee's Brief at 19; nor did it
"require[] the giving of voluntary manslaughter instructions on a felony murder
charge. . . ." Appellee's Brief at 20. Again, *Viser's* reference to *Craven*, wherein
voluntary manslaughter instructions were given for the intentional and knowing
murder counts, shows that this Court, in neither of those cases, ever contemplated
the tendering of voluntary manslaughter instructions for felony murder. Indeed, it
is not even clear whether felony murder was even charged in *Craven* in the first
place.

As the People noted above, a reading of the jury instructions like those given in
Craven reveals that only intentional and knowing murder were listed as the pos-
sible murder counts for which voluntary manslaughter could apply. *Craven*, 299
N.E.2d at 4 ("a person who **intentionally or kowingly** kills an individual commits
voluntary manslaughter. . .) (emphasis added). *Viser's* reliance on *Craven*, which
contemplated no felony murder charge, must lead this Court to conclude that
*Viser's* endorsement of the trial court's giving of two voluntary murder instruc-
tions had nothing *4 to do with the felony murder count, but, rather, with only
the intentional and knowing murder charges. As in *Viser* and *Craven*, Jon Morgan's
jury *did* receive second degree murder instructions at his trial – only not for
felony murder, which is entirely consistent with the plain statutory construction.

Fifth, the People respectfully disagree with Justice Steigmann's concurring opin-
ion that the newly created second degree murder provision "was not simply a renam-
ing of voluntary manslaughter, rather it created an entirely new offense: the
lesser mitigated offense." Appellee's Brief at 24; *Morgan*, 718 N.E.2d at 216. The
new second degree murder statute was a renaming "voluntary manslaughter," and
shifted the burden of proof from the State to the defendant. *People v. Austin*, 133
Ill.2d 118, 549 N.E.2d 331, 333, n. 1 (1989) ("elements of the new offense [second
degree murder] are essentially the same as the old, except the General Assembly
added a section clearly explaining both the State's and defendant's burdens of
proof at a murder trial.") *See also People v. Tenner*, 157 Ill.2d 341, 626 N.E.2d
138, 152 (1993) ("elements of the two offenses [second degree murder and voluntary
manslaughter] are essentially the same; the difference between the two statutes
concerns the parties' burdens of production and persuasion.") As noted, the
primary difference between the voluntary manslaughter provision and its current
form is that the second degree murder statute sought to compel the defendant to
meet his burden to show a mitigated mental state. *People v. Jeffries*, 164 Ill.2d
104, 646 N.E.2d 587, 599 (1995) (General Assembly specified that the defendant
"shall have the burden of proof regarding the mitigating factors.")

Sixth, Morgan's reference to *People v. Porter*, 168 Ill.2d 201, 659 N.E.2d 915
(1995), is misplaced. In *Porter*, the defendant was convicted by inconsistent ver-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                         Page 4

dicts where the jury returned a total of four verdicts on four counts of murder:
two convictions of second degree murder based on sufficient provocation, and two
convictions of first degree murder where no sufficient provocation *5 was found to
trigger the second degree murder provision. This Court found that the verdicts
were inconsistent, since a single murder cannot be both provoked and unprovoked at
the same time. *Porter*, 659 N.E.2d at 921. Morgan asserts that, if he were found
guilty of second degree murder on Counts I through IV (intentional and knowing
murder), "the jury would necessarily have found Jon committed the underlying
felonies of aggravated battery and aggravated discharge of a firearm." Appellee's
Brief at 26. Therefore, according to Morgan, "without a second degree instruction
on the felony murder counts, the jury was required to convict Jon of first degree
murder on Counts V through VIII." Def. Br. at 26. Such verdicts, he opines, are
inconsistent and would violate *Porter's* bar against inconsistent verdicts. This
view is wholly speculative, and, at best, presents a logical inconsistency, rather
than a legal inconsistency, which would not require a new trial.

In *People v. Frias*, 99 Ill.2d 193, 457 N.E.2d 1233 (1983), the defendant was
charged with intentional and knowing murder, as well as one count of armed viol-
ence based on the felony of murder. *Frias*, 457 N.E.2d at 1234. The jury found the
defendant not guilty of murder, but guilty of armed violence. This Court reversed
and remanded for a new trial, finding that the verdict reached by the jury was
"legally inconsistent," and could not stand: the jury, having acquitted the de-
fendant of murder, could not utilize that felony to convict the defendant under
the armed violence statute. *Frias*, 457 N.E.2d at 1235-1236. In *People v. Barnard*,
104 Ill.2d 218, 470 N.E.2d 1005 (1984), on the other hand, the defendant was
charged with three counts of murder and three counts of armed violence. The jury
acquitted the defendant of the armed violence charges, but found him guilty of
murder. *Barnard*, 470 N.E.2d at 1006. This finding, while logically inconsistent,
was entirely appropriate and did not require reversal, because a "finding of not
guilty of armed violence based on murder is not a finding that the defendant did
not commit murder." *Barnard*, 470 N.E.2d at 1007.

*6 In Morgan's case, the verdicts were entirely consistent. First, it can be in-
ferred that, because the jury found Morgan guilty of the second degree murder of
Keith Cearlock, it did not even consider the felony murder provision, which, of
course, did not include a second degree murder instruction. It follows that it is
more likely than not that, with Lila Cearlock, the jury also disregarded the
felony murder instructions and looked solely to Counts I through IV, which did
contain instructions for second degree murder.

And, in light of *Frias* and Barnard, Morgan's hypothetical in this instance is not
fatal, and, as a result, *Porter* is inapplicable. Assuming, *arguendo*, that a find-
ing of second degree murder as to Counts I through IV would necessarily require
the jury to conclude that Morgan did commit an aggravated battery and an aggrav-
ated discharge ora firearm, which should then result in convictions of felony
murder, such a verdict could not be overturned because it is only logically,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                    Page 5

rather than legally, inconsistent. This is so because a finding of second degree murder on the intentional and knowing murder counts is not the same as a finding that the defendant did not commit a felony murder, which is different in that no mental state is required. While such a verdict may be puzzling, it may be "an expression of lenity which, of course, does not render the verdicts legally inconsistent." 470 N.E.2d at 1007.

Seventh, Morgan's reference to *People v. Drakeford*, 139 Ill.2d 206, 564 N.E.2d 792 (1990), is misguided. In *People v. Alejos*, 97 Ill.2d 502, 455 N.E.2d 48 (1983), this Court held that second degree murder cannot act as the predicate felony for armed violence because such a charge would not serve the deterrent effect of the armed violence statute, which is to "discourage those who contemplate a felonious act beforehand from carrying a weapon when they set forth to perform the act." *Alejos*, 455 N.E.2d at 51. In *Drakeford*, the defendant was found guilty of armed violence predicated on aggravated battery, a Class X felony, and second degree murder, a Class I felony, and *7 was sentenced for the Class X felony, even though the second degree murder and the aggravated battery arose from the same act. *Drakeford*, 564 N.E.2d at 795. This Court held that, in light of *Alejos*, "the State may not utilize the armed violence statute to enhance a defendant's penalty if a defendant's act [aggravated battery] constitutes second degree murder." *Drakeford*, 564 N.E.2d at 795.

*Drakeford* dealt exclusively with the sentencing implications of the State's application of the armed violence statute, where the State essentially used one felony, aggravated battery, to overcome the *Alejos* bar against utilizing second degree murder to trigger the armed violence statute and the resulting Class X sentence. This Court found that such events would be contrary to the purpose behind the armed violence statute, which is to deter persons from carrying dangerous weapons when they commit a felony; this purpose is not served if an aggravated battery arising from the same act as the second degree murder can be used to trigger the Class X sentencing provision. *Drakeford*, 564 N.E.2d at 797. This Court, in *Drakeford*, indicated that it arrived at its holding after taking into consideration that fact that the legislature had not amended the armed violence statute after *Alejos*, and had, therefore, implicitly accepted the rationale of *Alejos* "that conduct constituting second degree murder is not subject to the armed violence statute." *Drakeford*, 564 N.E.2d at 796.

The case at bar is different, as Morgan has pinpointed no legislative act or omission which, as it did in *Drakeford*, might lend weight to his proposition that the legislature never intended to dilute the second degree murder provision by allowing the State to charge felony murder based on aggravated battery and aggravated discharge of a firearm, where those felonies merge with the act of murder itself. Indeed, this whole line of argument is foreclosed by *Viser*, which rejected a *per se* rule that aggravated battery cannot merge with the murder, itself, in order to trigger the felony murder rule, and further found that the legislature, in passing the felony murder law, cannot have *8 intended to deter rape, robbery, or burg-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                            Page 6

lary, for example, but not the underlying assault, especially when aggravated battery is, itself, named as a forcible felony which triggers the felony murder rule. *Viser*, 343 N.E.2d at 909. If *Viser* did not exist, Morgan's argument may be right. However, in the end, Morgan's reference to *Drakeford* boils down to the same tired attack against *Viser*, which should be rejected by this Court.

The People also emphasize that Jon Morgan did receive instructions for second degree murder for Counts I through IV; it is simply false for Morgan to claim that "the state effectively eliminated the application of his defenses." Appellee's Brief at 27. Indeed, the jury convicted him of second degree murder for the shooting of Keith Cearlock.

Eighth, Morgan's reliance on *People v. Williams*, 164 Ill.App.3d 99, 517 N.E.2d 745 (4th Dist. 1987), is not helpful, and the People continue to challenge the validity of that decision. In *Williams*, the court held that "where evidence has been presented that the provocation occurs prior to the time that a defendant forms a felonious intent or commits a forcible felony, the partial affirmative defense of voluntary manslaughter based upon provocation should be available, and the jury should be instructed accordingly." *??* 517 N.E.2d at 752. This theory is problematic, however, because, under Illinois law, provocation cannot diminish the class of any offense apart from first degree murder. The felony murder doctrine, on the other hand, removes the mental requirement and requires the trier of fact to focus on the commission of one or more of a number of enumerated felonies, rather than on the ultimate, resulting homicide. What *Williams* has, in essence, accomplished, is to diminish the class of the underlying felony in a felony murder based on the partial affirmative defense of provocation.

To the extent that *Williams* or Jon Morgan, himself, suggests that an imperfect self-defense instruction be available in a felony murder case, that would be impossible in light of the rule that, **9** if the jury is to be instructed on voluntary manslaughter, or second degree murder, it must also be instructed on complete self-defense outlined in 720 ILCS 5/7-1. If Morgan had been entitled to an instruction for imperfect self-defense on the felony murder counts, he would have, by law, been entitled to an instruction for complete self-defense. *People v. Timberson*, 188 Ill.App.3d 172, 544 N.E.2d 64, 66-67 (5th Dist. 1989) (holding that defendant was entitled to an instruction on complete self-defense, *i.e.*, a finding of not guilty, where the jury, in convicting him of second degree murder, found that the defendant believed he was justified in the killing, but that his belief was unreasonable). This rule had its origins, to a large extent, in *People v. Lockett*, 82 Ill.2d 546, 413 N.E.2d 378, 382 (1980), where this Court held that: "It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

belief was unreasonable. So long as some evidence is presented from which a jury
could conclude that defendant had a subjective belief, the jury should determine
if the belief existed and, if so, whether that belief was reasonable or unreason-
able."

See also People v. Everette, 141 Ill.2d 147, 565 N.E.2d 1295, 1299 (1990).

Jon Morgan was not entitled to an instruction for imperfect self-defense because
it would have meant that he was entitled to one for complete self-defense as well.
This, as set forth by statute, is impossible: in killing the Cearlocks, Morgan
committed two felonies, aggravated battery and aggravated discharge of a firearm,
which foreclosed the possibility of a complete self-defense instruction under 720
ILCS 5/7-4(a), because use of force in defense of a person is not allowed when the
person is "attempting to commit, committing, or escaping after the commission of,
a forcible felony."

### *10 II.

#### THE APPELLATE COURT ERRED WHEN IT FOUND THAT THE TRIAL COURT WAS WRONG TO BAR
#### SECOND DEGREE MURDER INSTRUCTIONS FOR THE FELONY MURDER COUNTS.

Jon Morgan received second degree murder instructions for the intentional and
knowing murder counts. He did not receive them, however, for the felony murder
counts. For the State to proceed only with felony murder is not a novel course of
action, and it has been upheld even where the defendant, like Jon Morgan, com-
plains that only applying felony murder strips the defense of the second degree
murder mitigating mental state. See People v. Rixie, 190 Ill.App.3d 818, 546
N.E.2d 52, 61 (2nd Dist. 1989) (State's nol-pros of murder charge and proceeding
with felony murder charge not improper; the jury was "properly instructed on the
remaining charge of felony murder. . .Simply because the defendant may have been
guilty of a lesser offense to murder, had it been charged, does not require a
finding of prejudice because he was not so charged.") In the case at bar, however,
it must be remembered that Morgan was the beneficiary of second degree murder in-
structions for intentional and knowing murder. If it was proper for the prosecutor
in Rixie to nol-pros the murder counts, thereby precluding the defendant from
presenting evidence of a lesser mitigating offense, it was even more proper in
this case for the prosecutor to allow the intentional and knowing murder counts to
go to the jury - with second degree murder instructions - and to argue against the
giving of such instructions for the felony murder counts.

Further, the People take issue with Morgan's assertion that the People have at-
tempted to "rewrite" the second degree murder statute by replacing the term
"commits" with the term "is charged with." The People also disagree with the
statement that "there is no question that Jon committed the offenses of intention-
al or knowing murder" for "every count in the indictment, including the felony
murder counts." Def. Br. at 30. This is not a correct statement of the law. *11

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                           Page 8

Mental state is irrelevant in a felony murder analysis. *People v. Williams, et al.*, 315 Ill.App.3d 22, 732 N.E.2d 767, 777 (1st Dist. 2000). This is especially relevant in the case at bar because the offense of second degree murder requires a mental state (intent to commit murder or knowing such acts create a strong probability of death) and felony murder requires no mental state. Furthermore, second degree murder requires proof of a mitigating defense. Since second degree murder requires proof of additional facts and a more culpable mental state than felony murder, which requires none, it cannot be a lesser-included offense of felony murder. *See* 720 ILCS 5/2-9(a) (West 2000); *Williams*, 732 N.E.2d at 777. Hence, the trial court properly excluded second degree murder instructions for the felony murder counts.

Moreover, Morgan has overstated the effect of the prosecutor's argument to the jury to "disregard evidence of Jon's mental state." Def. Br. at 32. What Morgan and the appellate court ignore is that this prosecutorial tactic did not work for the Keith Cearlock murder charges. Whether the jury disregarded Morgan's mental state for Lila is unknown because the jury returned a general guilty verdict on those counts. With respect to this general verdict, *People v. Thurman*, 223 Ill.App.3d 196, 584 N.E.2d 1069 (3rd Dist. 1991), is instructive. In *Thurman*, the defendant was charged with intentional murder, knowing murder, and felony murder based on aggravated battery. The defendant argued that the charge of felony murder should not have been based on aggravated battery because "every murder involves an aggravated battery," which would preclude defendants "from proving mitigating factors to reduce first degree murder to second degree murder." *Thurman*, 584 N.E.2d at 1074. The Appellate Court correctly followed *People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903 (1975), as the Appellate Court in the instant case should have done, and rejected the defendant's argument "that felony murder cannot be based on aggravated battery." *Thurman*, 584 N.E.2d at 1074.

*12 *Thurman's* utility does not cease there, however, as that court took a step further and found that, even if the felony murder charge were improper, the defendant's conviction would still stand because he was convicted by a general verdict, and it is well-settled "that a defendant convicted by a general verdict is guilty of any good count in the indictment to which proof is applicable." *Thurman*, 584 N.E.2d 1074. In their original brief, the People argued that there was sufficient proof to find Jon Morgan guilty of, at least, knowing murder. Therefore, even if it was improper for the State to charge felony murder and go to trial without affording Morgan a second degree instruction for those counts, such error mattered very little where the jury returned a general verdict. The appellate court, if it was uncomfortable with the lack of second degree instructions for felony murder, should have, at least, upheld Morgan's conviction of first degree murder based on the general verdict returned by the jury. The appellate court should be reversed as to its finding that Morgan is entitled to a new trial for the first degree murder of Lila Cearlock.

                              **\*13 III.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THE APPELLATE COURT ERRED WHEN IT REVERSED THE TRIAL COURT'S DECISION TO DENY DE-
FENDANT'S MOTION TO SUPPRESS HIS INITIAL STATEMENT TO POLICE.

The question posed to Jon Morgan by Harberts - "why did you shoot these two
people" - was made as part of the ongoing police investigation. While it is true
that police had been at the crime scene for half an hour before Morgan approached
them, police still did not have any suspect, had two unexplained dead bodies on
the premises, and was, in Morgan's own words, in the process of "canvass[ing] the
crowd and neighborhood for witnesses." Appellee's Brief at 37. In other words,
despite their numbers at the crime scene, police were still not sure, apart from
what they could see, exactly what transpired. Indeed, the fact that the police
were still canvassing the crowd and neighborhood for witnesses demonstrates that
they were quite befuddled by the entire scene. Then, the police encounter Jon Mor-
gan, a 14-year-old who wished to surrender to the police and to tell them what
happened. (Vol. XII, R. 487, 490). In light of these facts, the trial court was
correct not to suppress the statement made by Morgan in this instance. The police
were continuing to canvass the neighborhood, did not have the benefit of knowing
exactly what happened at the Cearlock residence, and were suddenly confronted by a
teenager who admitted that he shot the Cearlocks. These circumstances surely il-
lustrate a situation where the question asked of Jon Morgan was made in the course
of "on-the-scene questioning," rather than as part of a custodial interrogation,
as in *People v. Clark*, 84 Ill.App.3d 637, 405 N.E.2d 1192 (1st Dist. 1980).

Other facts support the trial court's finding that the single question asked of
Morgan was not made in the course of a custodial interrogation. There were no
threats or coercion. There was no search. There were no handcuffs involved. And,
as the People outlined in their opening brief, although Detective Harberts testi-
fied that he would not have allowed Morgan to leave, he was not **14 sure whether
or not he was actually in custody. Morgan describes this testimony as "self
serving." Appellee's Brief at 39. On the contrary, it is a perfect indication of
the still ongoing confusion at the crime scene when the police suddenly en-
countered Jon Morgan carrying a handgun and confessing that he killed the Cear-
locks. Such confusion, when coupled with the continuing, ongoing investigation,
obviously led the trial court to conclude that the statement elicited from Morgan
at this juncture was not made in the course of a custodial interrogation, much
like the court in *People v. Acebo*, 182 Ill.App.3d 403, 537 N.E.2d 1113 (3rd Dist.
1989), concluded. This is precisely the kind of judgment that the trial court is
in a superior position to make, and was not against the manifest weight of the
evidence. The trial court's decision to deny Morgan's motion to suppress in this
instance should have been affirmed.

With respect to Morgan's argument against the People's harmless error analysis, it
is not true that the People's brief "misrepresents the facts developed at trial."
Appellee's Brief at 41. During this interview at the police station, Morgan told
Detective Harberts that, upon shooting his grandmother, he followed her as she
fled from the house. (Vol. XXII, R. 530). Although Morgan did deny, on cross-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                                              Page 10

examination, that he tried to shoot his grandmother once she was outside and on
the ground, (Vol. XXIII, R. 863-864), this was contradicted by Morgan's prior
statement to Harberts that Morgan went after his grandmother with the intent to
shoot her again, and, when he approached her prone figure, Morgan related that "he
stood over her attempting to shoot her more with the gun, but the gun apparently
was jammed." (Vol. XXII, R. 530). Harberts also testified that Morgan told him
that he returned to the house to get the second gun after the first gun jammed in
order to "shoot his grandmother some more." (Vol. XXII, R. 531). Morgan could not
explain why he went back to get another gun. (Vol. XXII, R. 866-867). The jury's
verdict with respect to Lila Cearlock indicates **15** that Detective Harbert's
testimony carded more weight than Morgan's claim that he was only lying to Har-
berts during the interview.

The People also disagree with Morgan's assertion that the People, in their harm-
less error argument, "uses Jon's words against him because they shot his grandparents because they
'pissed him off' and that 'he couldn't take it anymore' in the same prejudicial
way as that phrase was used at trial." Appellee's Brief at 41. Actually, the
People never argued such a thing. Instead, the People argued that even if it were
improper to use Morgan's words against him, the weight of the other evidence,
which included an earnest description of Morgan's actions, in Morgan's own words,
given by Detective Harberts, made any error harmless beyond a reasonable doubt. It
is notable, in this regard, that all Morgan could do to refute Harberts' testimony
was to claim that he Iied to Detective Harberts, (Vol. XXIII, R. 866), or that he
could not recall his purpose in retrieving the other gun from the house. (Vol.
XIII, R. 866-867). Detective Harberts' description of Jon Morgan's deliberate and
cold-blooded stalking of his grandmother, related to him by Morgan, at the police
station, rendered harmless any reference to the statements made by Morgan immedi-
ately after he surrendered.

**16** IV.

THE APPELLATE COURT ERRED WHEN IT REVERSED THE TRIAL COURT'S DECISION TO EXCLUDE
    EVIDENCE OF PRIOR VIOLENT CONDUCT BY THE VICTIMS, KEITH AND LILA CEARLOCK.

While the People agree that the "admissibility of evidence cannot be controlled
solely by the passage of time," Appellee's Brief at 44, it is equally well-settled
that other occurrences "which are close in time to the charged offense will have
more probative value than those which are remote." *People v. Illgen*, 145 Ill.2d
353, 583 N.E.2d 515, 522 (1991). When this axiom is viewed in light of the rule
that a trial court's decision on the admissibility of evidence will not be dis-
turbed absent an abuse of discretion, the evidentiary decision made by the trial
court to exclude testimony about 19-year-old physical abuse, which was not even
directed toward Jon Morgan, but, rather, toward his mother, was reasonable. On ap-
peal, a reviewing court may disturb the trial court's decision only if it is ar-
bitrary, fanciful, or unreasonable, or if no reasonable person would take the view
adopted by the trial court. *Illgen*, 583 N.E.2d at 522.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)                                        Page 11

Jon Morgan claimed that, when he shot his grandparents, he was acting in self-
defense. In order to bolster this effort, Morgan had to show that he had a reason-
able belief that such conduct was necessary to defend himself against the imminent
use of unlawful force. His answer to this problem, amazingly, was to introduce
evidence that 19 years before, the victims physically harmed a third party -- Mor-
gan's mother, Glenda Ashworth -- who was unrelated to the facts and circumstances
of the crimes at issue here. The trial court's decision to disallow Glenda Ash-
worth's testimony was made after a conscientious and thorough analysis and proper
application of the law. (Vol. XX, R. 249) ("I think there is enough to similarity.
I think there is remoteness. . . . I can certainly understand where the defense is
coming from in urging that that be used as corroboration.")

**17** Morgan argues that he was trying to prove "that he had in the past been simil-
arly mistreated and that his testimony regarding his fear of death or great bodily
harm should be believed." Appellee's Brief at 45-46. In light of the trial testi-
mony, however, the Ashworth testimony would have been irrelevant for measuring
Morgan's mental state at the time he shot the Cearlocks. In Morgan's first state-
ment at the police station, he explained that he was tired of his grandparents ob-
sessing over a tardy slip he had received that day at school. (Vol. XXII, R.
525-526). Morgan got a pistol and bullets from his grandfather's room, went into
the bathroom, and loaded the pistol. (Vol. XXII, R. 526-528). He shot the Tilex
bottle and then exited the bathroom. (Vol. XXII, R. 528-529). When Keith Cearlock
came around the comer, he shot him in the head, (Vol. XXII, R. 529), and then he
turned his attention to his grandmother, and, after shooting her in the back,
tried to shoot her several more times as she lay on the ground, but the gun
jammed. (Vol. XXII, R. 529-530). Morgan went back to the house to retrieve another
pistol, but could not find one. (Vol. XXII, R. 530-531). He said that, in the
past, he had considered killing his grandparents. (Vol. XXII, R. 534-535).

In his second, taped interview, and in the video re-enactment, Morgan related vir-
tually the same facts, adding that he had thought about killing his grandparents
for 10 to 15 minutes before he went to get the pistol, (Vol. XXXIV, R. 55), and
that his grandparents had yelled at him that night but had not hit him. (Vol.
XXXIV, R. 70). The week before, his grandfather had punched or hit him. (Vol.
XXXIV, R. 70).

At trial, Morgan changed tactics, and claimed that he had been the subject of in-
numerable beatings by his grandparents. He claimed to have been contemplating sui-
cide while he waited in the bathroom. (Vol. XXIII, R. 790). Aider shooting the
Tilex bottle "for some reason or another," he became scared of his grandparents'
reaction to this and exited the bathroom. (Vol. XXIII, R. 790-792). Morgan shot
his grandfather, in the head, as he came around the corner because he was afraid
**18** his grandfather would lose control. (Vol. XXIII, R. 792-794, 800-801). He was
also afraid of his grandmother, apparently, so he shot her in the back as she
fled. (Vol. XXIII, R. 794-796). Morgan denied trying to fire additional rounds in-
to his grandmother after she had collapsed on the ground. (Vol. XXIII, R.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)    Page 12

796-797). Morgan explained that he had never reported the abuse he suffered at the hands of his grandparents because he did not want to "disrespect them." (Vol. XXIII, R. 803-804).

In short, Morgan's pretrial statements indicate that he shot his grandparents deliberately and because he was upset over their reaction to a tardy slip. Then, at trial, Morgan testified that he was afraid of his unarmed grandparents when they responded to a shot he fired in the bathroom. Under either scenario, it strains the imagination to determine exactly how Morgan's claim of self-defense would have been bolstered by Glenda Ashworth's testimony of abuse from 19 years before. Under either scenario described by Morgan, there can be no doubt that the Cearlocks were not the aggressors, and that, at most, they were responding to a shot fired by Morgan in the bathroom.

Nor was it an abuse of discretion for the trial court to exclude Dr. Hart's proposed testimony regarding Glenda Ashworth's claims of prior abuse. The People never claimed that *People v. Cloutier*, 156 Ill.2d 483, 622 N.E.2d 774 (1993), was exactly on point with respect to the case at bar. The People were only reciting the well-established rule that a trial court may reject evidence on the grounds of relevance if it is remote, uncertain, or speculative. *Cloutier*, 622 N.E.2d at 784; *see also People v. Enis*, 139 Ill.2d 264, 564 N.E.2d 1155, 1165 (1990); *People v. Dukett*, 56 Ill.2d 432, 308 N.E.2d 590 (1974). It is equally well-settled that expert testimony is not to be considered as an elixir for factual disputes and should be gauged for relevance in light of the facts of the case. *Cloutier*, 622 N.E.2d at 784. The trial court's finding that Dr. Hart's opinions with respect to abuse that Glenda Ashworth suffered 19 years prior to trial were remote, uncertain, or speculative, was not an abuse of discretion.

*19 The proposed Ashworth testimony, therefore, was properly denied, and the trial court's decision to do so was not so arbitrary or unreasonable that the appellate court should have substituted its judgment for that of the trial court. And, as the People explained in their opening brief, if it was erroneous for the trial court to disallow her testimony, or the corresponding testimony from Dr. Hart, such error, in light of the evidence showing that Morgan shot Lila Cearlock in a deliberate fashion in the back as she fled from the house, was harmless beyond a reasonable doubt.

*20 *CONCLUSION*

Wherefore, based on the foregoing reasons, and the reasons already set forth in their opening brief, the People of the State of Illinois respectfully request that this Honorable Court reverse the appellate court's decision to award Jon Morgan a new trial for the death of Lila Cearlock.

PEOPLE OF THE STATE OFF ILLINOIS, Plaintiff-Appellant, v. Jon Roe MORGAN, Defendant-Appellee.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150387 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**E-FILED**
Wednesday, 13 August, 2008  03:11:52 PM
Clerk, U.S. District Court, ILCD

Westlaw.

2001 WL 34150388 (Ill.)                                                      Page 1

For Opinion See 758 N.E.2d 813, 724 N.E.2d 1273

Supreme Court of Illinois.
PEOPLE OF THE STATE OF ILLINOIS, Appellants,
v.
Jon R. MORGAN, et al., Appellees.
Nos. 88508, 88513.
March 2, 2001.

Appeal from the Appellate Court of Illinois, Fourth Judicial District Case No.
4-96-0996
Heard on Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan
County, Illinois Case No. 95-CF-101, The Honorable Gerald Dehner Judge Presiding

Reply Brief Defendant Appellant
Jon R. Morgan, Defendant-AppellantD. Peter Wise, Gates, Wise & Schlosser, P.C.,
1231 South Eighth Street, Springfield, Illinois 62703, 217/522-9010, Attorney for
Defendant-Appellant
**Oral Argument Requested**

*1 *ARGUMENT*

**I. JON MORGAN'S PANICKED AND IRRATIONAL BEHAVIOR AT THE TIME OF THE SHOOTING
COUPLED WITH HIS CAPACITY FOR REHABILITATION, AND THE TROUBLED AND DYSFUNCTIONAL
CIRCUMSTANCES OF HIS YOUTH DEMONSTRATE THAT THE APPELLATE COURT ERRED WHEN AFFIRM-
ING THE JUVENILE COURT'S DECISION TO TRANSFER JON MORGAN'S CASE FOR PROSECUTION AS
AN ADULT.**

In its opinion, the appellate court conceded that the shooting of Jon's grandfath-
er was not a premeditated act, *People v. Morgan*, 4-96-0996, Illinois Appellate
Court, 4th Dist. (September 29, 1999) (unpublished order pursuant to Supreme Court
Rule 23), p. 20. However, without analysis and in total disregard of the facts,
the Court describes Jon's shooting of his grandmother as a planned act. Jon Morgan
told Dr. Chapman that after he panicked and shot his grandfather, his grandmother
screamed and he knew he had to shoot her "to get everybody's attention". This
bizarre explanation is the essence of a juvenile mind. Moreover, this evidence
demonstrates that the two shootings were part of a single unplanned and panicked
act.

Recently, in *People v. Williams*, 193 Ill.2d 1, 737 N.E.2d 230 (2000), this Court
defined premeditation in the context of the death penalty statute. The Court's
analysis regarding premeditation is relevant here. In *Williams*, this Court held
that the evidence presented at trial was insufficient to support a finding that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT K

the defendant was eligible for the death penalty based on 720 ILCS 5/9-1 (b)(11) which is focused on premeditation because there was no evidence that the defendant planned out the murder for some time in advance *2 of the act. *Willliams*, supra, 737 N.E.2d 230, 245. Jon Morgan's acts were not part of some preconceived plan, scheme or design. After retreating into the bathroom to avoid a beating by his grandfather, Jon contemplated suicide. He snuck out of the bathroom to his grand-father's room where he knew there was a pistol in the closet. He returned to the bathroom and loaded the gun. Rather than shooting himself, he shot a bottle of Tylex cleaning solution which was in the tub. After this totally irrational act, he did not "burst" out of the bathroom as the State's brief suggests. Nor did he leave the "safety" of the bathroom as suggested in the State's brief. Had he not left that room he would have been trapped there where his tears of retaliation by his grandfather for shooting the gun could have easily been carried out. He left the bathroom. Jon Morgan told Dr. Chapman that he was panicked and fearful when he saw his grandfather. After firing the shot that wounded his grandfather, he became even more irrational, thirsting that he had to shoot his grandmother to get every-body's attention. He shot his grandmother only moments after shooting his grand father. This was not a preconceived plan, scheme or design. It was bizarre, fear-ful and panicked conduct by a juvenile.

Moreover, Judge Coogan, the juvenile court judge, made this critical finding of aggressive and premeditated conduct on alleged statements by Jon Morgan that were, in fact, never made. The Appellate Court did not address this problem. The juven-ile court judge made a specific factual finding that "he [Jon Morgan] talked about killing his grandparents in the past, and the grandparents did end up dead at his hands and the court is going to find *3 that it was in a premeditated manner." (R.Vol. VIII, p. 447). At the transfer hearing, Brother Bryant, the pastor of the Park Meadows Baptist Church and Academy, testified that a student, Eric Gill, told him that a few weeks prior to the shooting Jon burst into a restroom stating that he was going to kill his grandmother. (R. Vol. VII, p. 185, 186). Eric Gill testi-fied at the transfer hearing. He stated that he recalled approximately two months before Jon left Park Meadows in February of 1995 that he walked into the locker room prior to a basketball practice one clay and made the statement "someday I wish I could kill them." (R. Vol. VII, p. 321, 322). Jon did not tell Eric or anyone else who he was referring to, nor did Eric or anyone else ask. Eric testi-fied that he did not know who Jon was referring to. (*Id.*) Finally, Eric Gill test-ified that when he told Pastor Bryant about this incident, he did not say that Jon said "I wish I could kill my grandparents." (*Id.* at 324), The juvenile court judge based the finding of premeditation on an erroneous finding of fact. Discretion ex-ercised on an erroneous interpretation of fact is subject to keener scrutiny by a reviewing court. *In Re: J.O.*, 269 Ill.App.3d 287, 645 N.E.2d 1035, 1038 (1st Dist. 1995).

Neither the juvenile court judge nor the Appellate Court properly considered Jon's age in light of his experiences which demonstrate that he was a naive youth that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150388 (Ill.)                                                    Page 3

came from a dysfunctional family rather than a street hardened adult. This Court has found that it was an abuse of discretion to deny the State's motion to permit the prosecution of a minor as an adult where the minor's life experience was that of someone well beyond 15 years of age. In *People v. M.D.*, 101 Ill.2d 73, 461 N.E.2d 367 (1984), this Court noted that the minor had **4** come into contact with the police on numerous occasions including a term of probation for burglary. In addition, the minor had admitted to drinking alcohol until he was intoxicated, using marijuana and enjoying sex with two different girlfriends. These facts led this Court to conclude that although the respondent was still young in years, he was no stranger to adult experiences.

Jon Morgan's life was far different. He had no experience with the criminal justice system, he was not a gang member, he did not consume alcohol or drugs, nor was he sexually active. He had always done well in school and he lived a sheltered life. He was expelled from his school for refusing to be disciplined for kissing a girl. According to Brother Bryant, Jon had no history, of fighting at Park Meadows School. Jon was not a violent person. Brother Bryant had observed Jon's ability to control his anger in confrontational situations such as athletic events.

With this in mind, the State's brief takes Jon Morgan's comments to Brother Bryant completely out of context. According to Brother Bryant, when Jon was expelled from the church school for kissing a girl he told Brother Bryant "I have been hurt all my life. I'm not going to be hurt anymore. From now on I will do the hurting." (R. Vol. VII, p. 178; State's Brf., p. 17). In addition, Brother Bryant claimed that Jon told him, "I intend to commit every sin that I want to commit. I am going to do anything and everything I want to do, and when I hit rock bottom, then I will call on God." (R. Vol. VII, p. 180, 181; State's Brf., p. 17). Given Jon's lack of any history of violence, his statement that I will now do the hurting does **5** not imply any physical violence. Given his upbringing, any simple act of disobedience would be hurtful ill Jon's mind. In addition, sinning for Jon Morgan was playing basketball in shorts rather than in the required sweatpants. Sinning was listening to rock and roll music. In this light, no reasonable person would infer a future act of violence from his statements.

Jon's past history demonstrates that dysfunctional caretakers neglected his needs. Despite this, Jon Morgan was able to accomplish many things that demonstrate an overwhelming likelihood of rehabilitation. Jon Morgan's father abandoned him when he was an infant. At five his mother sent him to live with his grandparents. This is so even though they physically and mentally abused her when she was growing up in their home. His grandparents rejected him and sent him back to live with his mother and stepfather. Jon's new stepfather abused him and his mother sent him back to his grandparents. Once more he was abused by them and once more he was sent back to his mother. However, upon Jon's arrival in Virginia his mother told him there was no room for him and that he was not wanted in his mother's house. He had to return to Lincoln with his grandfather. A few tumultuous weeks later the shootings occurred.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 34150388 (Ill.)                                                    Page 4

As a youth and adolescent Jon Morgan had no control over how he was treated by his parents, stepfather, or grandparents. The activities that he could control demonstrate he can function quite well. He was a good student. He did not use drugs or alcohol. He was law abiding. He was nonviolent. He responded well to discipline. He was earning good grades while in the custody of the juvenile department of corrections awaiting trial.

*6 Against this record, the Appellate Court could only state "We read the juvenile court's comments as concluding that, tile sad and tragic circumstances of his upbringing, notwithstanding, the other factors outweigh this concern." (*Mowan*, supra at 20.) The Appellate Court did not identify these "other factors."

The Juvenile Court judge abused his discretion when he failed to consider Jon Morgan's capacity to be rehabilitated, and his history and circumstances when considering whether Jon could be treated and rehabilitated within the juvenile justice system. The Appellate Court cited only phantom concerns about a "lack of certainty" that Jon would be rehabilitated before he obtained the age of 21. No facts in the record support this concen. The Appellate Court's lack of analysis compels reversal.

## II. JON MORGAN'S AGE, EMOTIONAL CHARACTERISTICS AND LACK OF EXPERIENCE WITH THE POLICE COUPLED WITH THE COERCIVE NATURE OF HIS ENCOUNTER WITH THE POLICE RENDER THE STATEMENTS HE MADE WHILE IN CUSTODY INVOLUNTARY.

The State claims that Jon Morgan's statements were taken "in full compliance" with procedural safeguards and that, not withstanding his young age, each of his statements were elicited "with the utmost care and concern for his constitutional right against self-incrimination" is directly contradicted by the record. The procedural safeguards due Jon Morgan are established by both the policy of the Lincoln police department and the Illinois legislature. The Lincoln police department and the Illinois legislature have created rules to reduce the coercive atmosphere inherent in police/juvenile encounters. Within an hour of Jon Morgan being taken into custody, the Lincoln Police had managed flagrant violations of both *7 the Juvenile Court Act and Lincoln police department policy. Jon Morgan was handcuffed after arrested. Detective Harberts did not believe that Jon was a threat to his safety or the safety of any other officer. Jon did not resist being handcuffed. Department policy stated that handcuffs should not be placed on any juvenile except, when in the officer's opinion, they are needed to prevent violence or escape. Detective Harberts testified that Jon did not try to escape nor did he present a risk of violence to any officer or member of the public, yet he was handcuffed. Handcuffing a juvenile is a factor in determining the voluntariness of a juvenile confession. *In Re: G.O.*, 191 Ill.2d 37, 54, 727 N.E.2d 1003, 1012 (2000). Both the Juvenile Court Act and the policy of the Lincoln police department state that "no minor tinder 16 years old may be confined in a jail or a place ordinarily used for the confinement of prisoners in a police station." 705 ILCS 405/5-7(2)(C)(vi); Supp. R. Vol. IV; Def's Brf. Ex. 3. The Juvenile Court Act also requires a police

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

officer taking a minor into custody to make an immediate and reasonable attempt to
notify the minor parents or other person legally responsible for the minor's care
or the person with who the minor resides. 705 ILCS 405/5-6(1). The same statutory
provision requires that the minor be taken to the juvenile police officer for the
jurisdiction. Detective Harberts did neither. The State attempts to excuse this
glaring omission by offering the anemic excuse that the Lincoln police department
has only one designated youth officer and adopted a policy whereby the officer on
duty assumes the role of youth officer if the actual youth officer is not avail-
able. (State's Brf., p. 36). Applying this excuse, the State suggests that Detect-
ive Harberts, the officer on duty, who was **8** attempting to gain incriminating
statements from Jon Morgan could also serve as the statutory mandated youth of-
ficer who has the duty to be interested in the minor's welfare. *In Re: Lashun H.*,
284 Ill.App.3d 545, 672 N.E.2d 331, 334 (1st Dist. 1996). This is preposterous.
Moreover, the State's argument ignores the fact that the youth officer, Sargent
Sisk, was available. He was called at 10:30 p.m. He was home in bed. Since he
didn't, know Jon Morgan he rolled over and went back to sleep. Detective Harberts
made no effort to call Jon's mother until he had obtained two lengthy and incrim-
inating statements from him. This occurred even though Jon Morgan gave Detective
Harberts his mother's phone number within minutes of being taken into custody. (R.
Vol. XII, p. 397).

These coercive circumstances were aggravated by Jon's youth and lack of experience
with the police. Jon Morgan had no prior contact with the police other than a vis-
it by local officers to his seventh grade social studies class. There, Jon learned
that police officers were servants of God who should be trusted, respected and
obeyed. Kim Ball, Jon's classroom supervisor in seventh grade, acknowledged that
children at the church school were very. aware of the negative consequences that
flowed from not obeying authority figures. The coercive circumstances of Jon Mor-
gan's custody along with his youth and inexperience rendered his statements invol-
untary.

Appendix not available.

PEOPLE OF THE STATE OF ILLINOIS, Appellants, v. Jon R. MORGAN, et al., Appellees.
2001 WL 34150388 (Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 1

▷
People v. Morgan
Ill.,2001.

Supreme Court of Illinois.
The PEOPLE of the State of Illinois, Appellant and
Cross-Appellee,
v.
Jon Roe MORGAN, Appellee and Cross-Appellant.
**Nos. 88508, 88513.**

Oct. 18, 2001.

Defendant, who was transferred from juvenile court, was convicted following jury trial in the Circuit Court, Logan County, Gerald G. Dehner, J., of first degree murder of his grandmother and second degree murder of his grandfather. Defendant appealed. The Appellate Court, Garman, J., affirmed second degree murder conviction, reversed first degree murder conviction, and remanded case for new trial as to murder of grandmother, 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206.Granting petitions for review filed by both parties and consolidating appeals, the Supreme Court, Thomas, J., held that: (1) defendant was properly transferred from juvenile court; (2) defendant's confession was voluntary; (3) any error in failing to suppress defendant's initial statement at crime scene was harmless; (4) forcible felonies of aggravated battery and aggravated discharge of firearm could not serve as predicate felonies for charges of felony murder, but any error in instructing jury on felony murder with respect to killing of grandmother was harmless; (5) provocation defense of second degree murder is not available to a charge of felony murder, abrogating *People v. Williams,* 164 Ill.App.3d 99, 115 Ill.Dec. 334, 517 N.E.2d 745;*People v. Kidd,* 295 Ill.App.3d 160, 229 Ill.Dec. 682, 692 N.E.2d 455; and (6) evidence of physical and psychological mistreatment of defendant's mother by victims 20 to 25 years prior to charged murders was not admissible to support claim of self-defense.

Appellate Court judgment affirmed in part and reversed in part; Circuit Court judgment affirmed.

Freeman, J., filed a dissenting opinion in which McMorrow, J., joined.

West Headnotes

**[1] Infants 211 ⟿68.7(2)**

211 Infants
   211VI Crimes
      211k68 Rights and Privileges as to Prosecutions
         211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
            211k68.7(2) k. Grounds, Objections, and Matters Considered; Discretion. Most Cited Cases
Decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion, although that discretion is limited and controlled by the Juvenile Court Act. S.H.A. 705 ILCS 405/1-1 et seq., 5-805.

**[2] Infants 211 ⟿68.7(1)**

211 Infants
   211VI Crimes
      211k68 Rights and Privileges as to Prosecutions
         211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
            211k68.7(1) k. In General. Most Cited Cases
Purpose of a proceeding on whether to transfer juvenile to criminal court is to balance best interests of a juvenile offender, particularly as offender's interests relate to his potential for rehabilitation, against society's legitimate interest in being protected from criminal victimization perpetrated by minors; in striking this balance, a juvenile court judge is to weigh the facts of the alleged crime, particularly whether the crime was committed in an aggressive and premeditated manner. S.H.A. 705

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT L

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

ILCS 405/5-805.

**[3] Infants 211 ☞68.7(3)**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
            211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
                211k68.7(3) k. Hearing, Evidence, and Determination. Most Cited Cases
State's evidence of premeditation supported finding of probable cause in proceeding on petition to transfer juvenile for trial as an adult for murders of grandparents; juvenile told detective that he had thought about killing grandparents a few times previously, thought about killing them for about 15 minutes before he got gun, was attempting to shoot grandmother again when gun jammed and then went into house to get another gun so he could shoot her some more, and juvenile did not mention in initial interviews that grandfather had hit him with razor strap prior to murders. S.H.A. 705 ILCS 405/5-805.

**[4] Infants 211 ☞68.7(3)**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
            211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
                211k68.7(3) k. Hearing, Evidence, and Determination. Most Cited Cases
In a hearing under the Juvenile Court Act for transfer of juvenile for trial as an adult, state need only present evidence sufficient to sustain a finding of probable cause. S.H.A. 705 ILCS 405/5-805.

**[5] Infants 211 ☞68.8**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions

211k68.8 k. Review. Most Cited Cases
In reviewing a juvenile court's order transferring a minor for trial as an adult, state Supreme Court does not reweigh the statutory factors governing transfer; rather, Supreme Court must determine if there was sufficient evidence in the record as to each statutory factor to support transfer order. S.H.A. 705 ILCS 405/5-805.

**[6] Infants 211 ☞68.7(2)**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
            211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
                211k68.7(2) k. Grounds, Objections, and Matters Considered; Discretion. Most Cited Cases
A statutorily proper evaluation of a minor's history, at hearing on motion to transfer minor to criminal court, includes receipt and review of information concerning the minor's familial support for any possible treatment or rehabilitation, in addition to any prior involvement in the juvenile justice system. S.H.A. 705 ILCS 405/5-805.

**[7] Infants 211 ☞68.7(2)**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
            211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
                211k68.7(2) k. Grounds, Objections, and Matters Considered; Discretion. Most Cited Cases
In evaluating information concerning type of facilities available for treatment or rehabilitation of minor, at hearing on motion to transfer minor to criminal court, juvenile judge must evaluate the likely effectiveness of those facilities in light of the history and present circumstances of the minor.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

S.H.A. 705 ILCS 405/5-805.

**[8] Infants 211 ☞68.7(3)**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
          211k68.7 Waiver of Juvenile Court Jurisdiction; Transfer to Adult Court
            211k68.7(3) k. Hearing, Evidence, and Determination. Most Cited Cases
Juvenile court did not, in transferring minor for trial as adult on charges of murdering grandparents, improperly weigh governing statutory factors; in addition to finding probable cause that minor acted with premeditation, court received evidence about his unusual and sad life, his lack of prior contact with police, his potential for rehabilitation, any facilities available for treatment and rehabilitation, and minor's interests versus those of society and simply found that those factors did not outweigh factors supporting transfer. S.H.A. 705 ILCS 405/5-805.

**[9] Infants 211 ☞68.8**

211 Infants
    211VI Crimes
        211k68 Rights and Privileges as to Prosecutions
          211k68.8 k. Review. Most Cited Cases
Where a juvenile judge, at hearing on motion to transfer minor to criminal court, considers evidence on the statutory factors and any other relevant evidence, the resulting decision is a product of sound, judicial discretion and will not be disturbed on review. S.H.A. 705 ILCS 405/5-4(3)(b) (1994 Bar Ed.).

**[10] Criminal Law 110 ☞1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
          110XXIV(L)13 Review De Novo
            110k1139 k. In General. Most Cited Cases

**Criminal Law 110 ☞1158.13**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
          110k1158.8 Evidence
            110k1158.13 k. Admission, Statements, and Confessions. Most Cited Cases
        (Formerly 110k1158(4))
In reviewing a trial court's ruling concerning whether a confession is voluntary, the trial court's factual findings will be reversed only if those findings are against the manifest weight of the evidence, but trial court's ruling on the ultimate question of whether the confession was voluntary is reviewed de novo.

**[11] Criminal Law 110 ☞519(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
          110k519 Voluntary Character in General
            110k519(1) k. What Confessions Are Voluntary. Most Cited Cases
In determining whether a confession is voluntary, courts look to the totality of circumstances, including factors such as party's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; other relevant factors include duration and legality of detention, duration of questioning, and any mental or physical abuse by the police, including any threats or promises on part of police.

**[12] Criminal Law 110 ☞519(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
          110k519 Voluntary Character in General
            110k519(1) k. What Confessions Are Voluntary. Most Cited Cases
No single factor is dispositive in determining vol-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 4

untariness of a confession.

**[13] Criminal Law 110 ⬤⟹519(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k519 Voluntary Character in General
                110k519(1) k. What Confessions Are
Voluntary. Most Cited Cases
Test for voluntariness of a confession is whether
the individual made his confession freely and vol-
untarily, without compulsion or inducement of any
kind, or whether the individual's will was overborne
at the time of the confession.

**[14] Criminal Law 110 ⬤⟹527**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k527 k. Children. Most Cited Cases

**Infants 211 ⬤⟹174**

211 Infants
    211VIII Dependent, Neglected, and Delinquent
Children
        211VIII(C) Evidence
            211k173 Admissibility
                211k174 k. Admissions, Declarations,
and Confessions. Most Cited Cases
Confession of 14-year-old minor to killing grand-
parents was voluntary, though minor was brought to
police station in handcuffs and was not told his de-
tention in holding cell could not exceed six hours,
where minor orally waived *Miranda* rights, had
normal reading, writing, and verbal skills, was not
physically or mentally abused by police and did not
receive threats or promises from them, refused to
answer one of interrogating officer's questions, and
never asked to speak with a concerned adult, and
officers did not prevent any concerned adult from
speaking with him. S.H.A. 705 ILCS 405/5-410.

**[15] Criminal Law 110 ⬤⟹527**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k527 k. Children. Most Cited Cases

**Infants 211 ⬤⟹174**

211 Infants
    211VIII Dependent, Neglected, and Delinquent
Children
        211VIII(C) Evidence
            211k173 Admissibility
                211k174 k. Admissions, Declarations,
and Confessions. Most Cited Cases
Courts considering the voluntariness of juvenile
confessions consider whether the juvenile had an
opportunity to consult with an adult interested in
his welfare, known as a "concerned adult," either
before or during the interrogation. S.H.A. 705 ILCS
405/5-6(1) (1994 Bar Ed.).

**[16] Criminal Law 110 ⬤⟹527**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k527 k. Children. Most Cited Cases

**Infants 211 ⬤⟹174**

211 Infants
    211VIII Dependent, Neglected, and Delinquent
Children
        211VIII(C) Evidence
            211k173 Admissibility
                211k174 k. Admissions, Declarations,
and Confessions. Most Cited Cases
In determining whether a juvenile had an opportun-
ity to confer with a concerned adult either before or
during interrogation, in context of deciding whether
confession was voluntary, courts consider whether
the police prevented the juvenile from conferring
with a concerned adult and whether the police frus-
trated the attempts of a concerned adult to confer
with the juvenile. S.H.A. 705 ILCS 405/5-6(1)
(1994 Bar Ed.).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

**[17] Criminal Law 110 ⬤⮞527**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k527 k. Children. Most Cited Cases

**Infants 211 ⬤⮞174**

211 Infants
    211VIII Dependent, Neglected, and Delinquent
Children
        211VIII(C) Evidence
            211k173 Admissibility
                211k174 k. Admissions, Declarations,
and Confessions. Most Cited Cases
Juvenile's opportunity to confer with concerned
adult either before or during interrogation is particu-
ularly relevant, for purposes of determining volun-
tariness of confession, in situations where a juven-
ile has demonstrated trouble understanding the in-
terrogation process or has asked to speak with
either his parents or a concerned adult, or where the
police have prevented the juvenile's parents from
speaking with him. S.H.A. 705 ILCS 405/5-6(1)
(1994 Bar Ed.).

**[18] Criminal Law 110 ⬤⮞527**

110 Criminal Law
    110XVII Evidence
        110XVII(T) Confessions
            110k527 k. Children. Most Cited Cases
A juvenile's confession should not be suppressed
simply because he was denied the opportunity to
confer with a concerned adult either before or dur-
ing his interrogation. S.H.A. 705 ILCS 405/5-6(1)
(1994 Bar Ed.).

**[19] Criminal Law 110 ⬤⮞1169.2(6)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1169 Admission of Evidence
                110k1169.2 Curing Error by Facts Es-
tablished Otherwise

                    110k1169.2(6) k. Admissions, De-
clarations, and Hearsay; Confessions. Most Cited
Cases
Any error in failing to suppress defendant's initial
statement at crime scene to police officer that he
had shot grandparents because "they pissed me off.
I couldn't take it anymore so I shot them," was
harmless in murder prosecution, where defendant
repeated that statement two more times at police
station after receiving *Miranda* warnings.

**[20] Homicide 203 ⬤⮞587**

203 Homicide
    203III Homicide in Commission of or with In-
tent to Commit Other Unlawful Act
        203III(B) Murder
            203k582 Predicate Offenses or Conduct
                203k587 k. Dangerousness of Offense
in General. Most Cited Cases
    (Formerly 203k18(1))
Where the acts constituting forcible felonies arise
from and are inherent in the act of murder itself,
those acts cannot serve as predicate felonies for a
charge of felony murder. S.H.A. 720 ILCS 5/2-8,
9-1(a)(3).

**[21] Homicide 203 ⬤⮞597**

203 Homicide
    203III Homicide in Commission of or with In-
tent to Commit Other Unlawful Act
        203III(B) Murder
            203k593 Particular Offenses and Conduct
                203k597 k. Assault or Battery. Most
Cited Cases
    (Formerly 203k18(1))

**Homicide 203 ⬤⮞609**

203 Homicide
    203III Homicide in Commission of or with In-
tent to Commit Other Unlawful Act
        203III(B) Murder
            203k593 Particular Offenses and Conduct
                203k609 k. Weapons Offenses. Most

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 6

Cited Cases
    (Formerly 203k18(1))
Forcible felonies of aggravated battery and aggravated discharge of firearm arose from and were inherent in act of murder itself and thus could not serve as predicate felonies for charges of felony murder arising from fatal shootings of defendant's grandparents. S.H.A. 720 ILCS 5/2-8, 9-1(a)(3).

**[22] Criminal Law 110 ⚖➔1172.8**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1172 Instructions
                110k1172.8 k. Effect of Verdict or Determination. Most Cited Cases
Any error in instructing jury on felony murder, with aggravated battery and aggravated discharge of firearm alleged as underlying felonies, was not reversible error in prosecution arising from killing of defendant's grandmother that also included a first degree murder charge on theory of knowing and intentional murder; jury was presumed to have found defendant guilty of the more serious crime, i.e., knowing and intentional murder, when it returned general verdict form finding defendant guilty of first-degree murder. S.H.A. 720 ILCS 5/2-8, 9-1(a)(3).

**[23] Criminal Law 110 ⚖➔878(2)**

110 Criminal Law
    110XX Trial
        110XX(K) Verdict
            110k878 Several Counts
                110k878(2) k. Construction, Operation, and Sufficiency of General Verdict. Most Cited Cases
Where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count.

**[24] Statutes 361 ⚖➔181(1)**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k181 In General
                    361k181(1) k. In General. Most Cited Cases
Primary rule in statutory construction is to ascertain and give effect to the intent of the legislature.

**[25] Statutes 361 ⚖➔188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k188 k. In General. Most Cited Cases
Courts must give the language of a statute its plain and ordinary meaning.

**[26] Statutes 361 ⚖➔205**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
                361k205 k. In General. Most Cited Cases
In construing a legislative act, courts should consider each section in connection with other sections.

**[27] Homicide 203 ⚖➔580**

203 Homicide
    203III Homicide in Commission of or with Intent to Commit Other Unlawful Act
        203III(B) Murder
            203k580 k. In General. Most Cited Cases
            (Formerly 203k23(1))
Provocation defense of second degree murder is not available to a charge of felony murder; abrogating *People v. Williams,* 164 Ill.App.3d 99, 115 Ill.Dec. 334, 517 N.E.2d 745; *People v. Kidd,* 295 Ill.App.3d 160, 229 Ill.Dec. 682, 692 N.E.2d 455.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

S.H.A. 720 ILCS 5/9-1(a)(3), 9-2.

**[28] Criminal Law 110 ☞338(1)**

110 Criminal Law
   110XVII Evidence
      110XVII(D) Facts in Issue and Relevance
         110k338 Relevancy in General
            110k338(1) k. In General. Most Cited
Cases

**Criminal Law 110 ☞661**

110 Criminal Law
   110XX Trial
      110XX(C) Reception of Evidence
         110k661 k. Necessity and Scope of Proof.
Most Cited Cases
It is within the trial court's discretion to decide
whether evidence is relevant and admissible.

**[29] Criminal Law 110 ☞1153.3**

110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1153 Reception and Admissibility of
Evidence
            110k1153.3 k. Relevance. Most Cited
Cases
   (Formerly 110k1153(1))
A trial court's decision concerning whether evid-
ence is relevant and admissible will not be reversed
absent a clear abuse of discretion.

**[30] Criminal Law 110 ☞1147**

110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1147 k. In General. Most Cited Cases
An abuse of discretion will be found only where the
trial court's decision is arbitrary, fanciful, or un-
reasonable or where no reasonable person would
take the trial court's view.

**[31] Criminal Law 110 ☞338(1)**

110 Criminal Law
   110XVII Evidence
      110XVII(D) Facts in Issue and Relevance
         110k338 Relevancy in General
            110k338(1) k. In General. Most Cited
Cases
Evidence is considered relevant if it has any tend-
ency to make the existence of any fact that is of
consequence to the determination of an action
either more or less probable than it would be
without the evidence.

**[32] Criminal Law 110 ☞383**

110 Criminal Law
   110XVII Evidence
      110XVII(H) Materiality
         110k383 k. Importance or Certainty of
Evidence. Most Cited Cases

**Criminal Law 110 ☞384**

110 Criminal Law
   110XVII Evidence
      110XVII(H) Materiality
         110k384 k. Remoteness of Evidence.
Most Cited Cases
A trial court may reject evidence on the grounds of
relevancy if the evidence is remote, uncertain, or
speculative.

**[33] Homicide 203 ☞1054**

203 Homicide
   203IX Evidence
      203IX(D) Admissibility in General
         203k1049 Self-Defense
            203k1054 k. Previous Hostile Acts or
Conduct of Victim. Most Cited Cases
   (Formerly 203k191, 203k188(2))
Evidence concerning physical and psychological
mistreatment of defendant's mother by his maternal
grandparents 20 to 25 years prior to charged
murders of grandparents was not admissible to sup-
port claim of self-defense, though alleged mistreat-
ment of mother was similar to the mistreatment that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 8

defendant allegedly received from grandparents; there was no evidence defendant was aware of mother's childhood experiences, and there were no conflicting accounts of what happened on day of killings since all were based on defendant's statements and testimony. S.H.A. 720 ILCS 5/9-1(a).

**[34] Homicide 203 ☞583**

203 Homicide
 203III Homicide in Commission of or with Intent to Commit Other Unlawful Act
  203III(B) Murder
   203k582 Predicate Offenses or Conduct
    203k583 k. In General. Most Cited Cases
 (Formerly 203k18(1))
Predicate felony underlying a charge of felony murder must have an independent felonious purpose. S.H.A. 720 ILCS 5/2-8, 9-1(a)(3).

**\*\*817\*409\*\*\*409** James E. Ryan, Attorney General, Springfield, William G. Workman, State's Attorney, Lincoln (Joel D. Bertocchi, Solicitor General, William L. Browers and David H. Iskowich, Assistant Attorneys General, Chicago, Norbert J. Goetten, Robert J. Biderman, David E. Mannchen, Office of the State's Attorneys Appellate Prosecutor, Springfield, of counsel), for the People.
**\*410** D. Peter Wise, of Gates, Wise & Schlosser, P.C., Springfield, for appellee and cross-appellant.
**\*\*818 \*\*\*410** Justice THOMAS delivered the opinion of the court:
Defendant, Jon Roe Morgan (Jon), was charged with the murders of his grandparents, Keith and Lila Cearlock. At the time of the murders, Jon was 14 years old. Jon's case was transferred from juvenile court to the adult division of the criminal court. Following a jury trial, Jon was convicted of the second degree murder of Keith Cearlock and the first degree murder of Lila Cearlock. Jon was sentenced to consecutive prison terms of 58 years for the first degree murder conviction and 17 years for the second degree murder conviction, for a total of 75 years' imprisonment.

On appeal, the appellate court affirmed Jon's second degree murder conviction, reversed Jon's first degree murder conviction, and remanded for a new trial as to the murder of Lila Cearlock. 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206. Jon and the State each filed petitions for leave to appeal the appellate court's decision. See 177 Ill.2d R. 315. This court granted both petitions and consolidated the appeals.

BACKGROUND

On April 27, 1995, around 8:30 p.m., officers responded to a report of shots fired at Seventh and Washington Streets in Lincoln, Illinois. Upon arriving at the scene, Officer Tim Kerns observed an elderly woman lying facedown in the front yard of 1206 Seventh Street, with a gunshot wound in her back. Inside the home, Officer Kerns saw an elderly man lying on his back with a gunshot wound in his left temple. The man and woman, who later died of their injuries, were identified as Keith and Lila Cearlock.

After the crime scene had been secured with tape **\*411** around the perimeter of the house, one of the officers, Deputy Sheriff Bob Spickard, noticed a young man, later identified as Jon, walking across the grass and through the crime scene tape. Spickard ordered Jon to stop, but Jon nonetheless approached Spickard and handed him a gun and a box of bullets. Jon said to Spickard, "I did it. I killed them." Upon hearing this, Spickard took Jon to the front of the house, where Detective Michael Harberts and other officers were standing. Spickard told Harberts that Jon had turned over the gun and ammunition and had admitted to the shooting. Harberts then asked Jon, "Why did you shoot these two people?" Jon responded, "They pissed me off. I couldn't take it anymore so I shot them." Harberts then instructed Officer Kerns to arrest Jon. Jon was handcuffed and placed inside a squad car. Before being transported to the Logan County jail, Jon was taken out of the squad car two separate times so that witnesses could identify him. At the jail, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 9

officers learned that Jon was 14 years old.

Around 9:05 p.m., Harberts interviewed Jon. Jon told Harberts that the deceased were his grandparents and that they were his legal guardians. Harberts attempted to tape record the interview, but later discovered that the tape had not recorded. With Jon's consent, Harberts then interviewed Jon a second time.

At trial, Jon testified that, on the day of the shootings, he came home from school and fell asleep on his bed. Keith awakened Jon around 6:30 p.m., demanding an explanation concerning a detention for tardiness that Jon had received. Keith screamed at Jon for 10 to 15 minutes. Lila also yelled at Jon about the detentions. Keith then directed Jon to get Keith's razor strap, told Jon to bend over and grab his ankles, and, using all his strength, hit Jon with the razor strap across his buttocks five times. Keith and Lila then continued to yell at Jon, so Jon **819 ***411 yelled back at them. Keith then swung his fist at Jon. Jon jumped out of the way and ran to the bathroom.

*412 Jon went into the bathroom, then went to Keith's closet shelf to get a gun to protect himself from Keith. Jon took the gun and a box of ammunition back to the bathroom and loaded eight bullets into the gun. At that point, Jon started thinking about killing himself. For some reason, Jon fired at a bottle of Tilex cleaner that was on the bathtub. Jon then stepped out of the bathroom and saw Lila screaming. Jon claimed that although he then became scared, he still was not thinking about killing his grandparents.

Jon saw Keith coming around the corner and could see that Keith was very angry. Thinking that Keith was going to beat him to death, Jon lifted the gun and shot Keith so that Keith could not get to him. After Jon shot Keith, Lila started to turn around and run toward the front door. Jon thought Lila was just as dangerous as Keith because Keith beat Jon only when Lila pressured Keith to do so. Jon followed Lila as she started to run out the front door and shot

Lila in the back. Lila managed to make it out the front door, but collapsed in the front yard. Jon followed Lila out the door and attempted to shoot her again, but his gun jammed.

Jon then went back inside the house and broke the lock on the door to Lila's room in order to look for her gun. When he could not find Lila's gun, Jon changed his clothes and left the house, still carrying Keith's gun and the box of bullets. Jon walked toward a friend's house and, as he was walking, attempted to unjam the gun. The gun accidentally discharged two times. Jon testified that he walked to his friend's house because he wanted some help and needed to talk to someone. When he learned that his friend, Steve Powell, was not home, he decided to walk back home. Jon testified that he felt he needed some help and thought that the police would be at his house and could help him. Jon said that he returned home in order to turn himself in for the shootings.

*413 Testimony concerning Jon's upbringing revealed that Jon was born on August 20, 1980, to Glenda and Roe Morgan. Roe drank heavily and was physically abusive toward his children. When Jon was in kindergarten in Virginia, he was referred for a psychological evaluation for behavior problems at school, including impulsiveness, aggressiveness, and hyperactivity. Jon was hospitalized at the Psychiatric Institute of Richmond (the Psychiatric Institute) from March 31, 1986, through May 16, 1986. Jon was diagnosed as suffering from Attention Deficit Disorder (ADD) and depression. Jon was prescribed an antidepressant to target his depression and hyperactivity.

Jon was admitted to the Psychiatric Institute a second time on February 18, 1987, where he remained until March 29, 1987. Jon's discharge summary indicated that Glenda claimed Jon had become so aggressive that he was unmanageable. Jon was defiant toward parental authority, had dropped his newborn sister on the floor, and was aggressive toward his other siblings. Jon again was diagnosed with ADD and depression. Jon continued taking his

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 10

antidepressant medication both during his hospital-ization and upon discharge. Following Jon's second discharge from the Psychiatric Institute, Glenda Ashworth decided to send Jon to live with her par-ents, Keith and Lila Cearlock, in Lincoln, Illinois. At the time, the marriage of Glenda and Roe was breaking up, and Glenda felt that the Cearlocks offered a more stable home. Jon had no contact with his father from the time of his parents' divorce until his arrest for the Cearlocks' murders.

**820 ***412 Jon moved in with the Cearlocks .when he was seven years old and began attending school at Park Meadows Baptist Church and Academy (Park Meadows). The Cearlocks and the principal of Park Meadows agreed that Jon should be taken off his medication. Jon testified that, when he got into trouble at Park Meadows, he would *414 receive detentions or was paddled by the prin-cipal. Jon also testified that Keith frequently beat him with a razor strap, usually at the urging of Lila.

Jon moved back home with Glenda, now remarried to Linwood Ashworth, for his fifth- and sixth-grade school years. Linwood, however, began drinking and became physically abusive toward Jon and his sisters, so Glenda sent Jon back to Lincoln to live with the Cearlocks. Jon testified that Keith and Lila had a very poor relationship and slept in separate bedrooms. Jon also testified that Keith and Lila were negative and constantly criticized Jon. Keith frequently told Jon if he ever fought back when Keith was beating him, Keith would kill Jon while Jon was sleeping. Jon believed Keith.

When Jon returned to the Cearlocks' home the second time, Jon again attended Park Meadows. Jon did well in school and was on the honor roll nearly every quarter. However, on February 7, 1995, Jon was expelled from Park Meadows after another stu-dent saw Jon kissing a girl outside the girl's house. According to school policy, students could be ex-pelled for kissing. Despite the policy, Jon initially was told that he could serve a suspension. Jon re-fused to agree to the terms of the suspension. The principal of Park Meadows tried to arrange for Jon

to attend a school in Oklahoma, but Keith would not agree. After Keith later changed his mind about the Oklahoma school, Jon refused to go.

Following Jon's expulsion, Glenda asked Keith to . bring Jon home. Keith drove Jon to Virginia, but before Jon arrived, Glenda changed her mind and decided that she could not afford to have Jon in her home. When Keith and Jon arrived in Virginia, Gl-enda told Jon that he could not stay. Jon was very upset with this news. Keith and Jon returned to Lin-coln, and Jon attended the public high school from March 17, 1995, until the time of the murders.

*415 At his trial, Jon testified that he did not tell the police that Keith beat him because he did not want to disrespect his grandparents and did not want to reveal his personal problems. Jon admitted that he did not bring up the beatings until he met with Dr. Robert Chapman, who interviewed Jon at the request of the State to determine Jon's fitness to stand trial. Jon also agreed that he never told Har-berts that Keith had threatened to kill him.

As noted, Jon was convicted of the first degree murder of Lila Cearlock and the second degree murder of Keith Cearlock. Jon appealed his convic-tions to the appellate court. In that appeal, Jon claimed that: (1) it was improper to try him as an adult; (2) certain statements were admitted into evidence erroneously; (3) the trial court erroneously excluded testimony concerning prior violent con-duct by the Cearlocks; (4) the trial court erred in re-fusing to dismiss the felony murder counts; and (5) he should have received second degree murder in-structions with respect to the felony-murder counts. 307 Ill.App.3d at 708-09, 240 Ill.Dec. 725, 718 N.E.2d 206.

The appellate court agreed with Jon that his initial statement to Harberts at the scene of the crime should have been suppressed. See 307 Ill.App.3d at 710, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23). The appel-late court also agreed that Jon could not be found guilty of felony murder where the underlying felon-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813

197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405

**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 11

ies did not have an independent felonious purpose. **821***413307 Ill.App.3d at 712-15, 240 Ill.Dec. 725, 718 N.E.2d 206. In addition, the appellate court held that Jon should have received second degree murder instructions as to the charges of felony murder. 307 Ill.App.3d at 715-17, 240 Ill.Dec. 725, 718 N.E.2d 206. Finally, the appellate court agreed with Jon that the trial court had improperly excluded the testimony of Glenda and Dr. Hart concerning Glenda's childhood. See 307 Ill.App.3d at 710, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23). The appellate court affirmed*416 Jon's conviction for the second degree murder of Keith, reversed his conviction for the first degree murder of Lila, and remanded for a new trial.

We first address the issues raised by Jon in his appeal. In this court, Jon again contends that his transfer from juvenile court was erroneous. Jon also argues that his motion to suppress the statements he made while in police custody should have been granted.

### TRANSFER FROM JUVENILE COURT

Jon's transfer hearing took place over three days and included the testimony of seven witnesses. At the transfer hearing, Detective Harberts testified on behalf of the State. Harberts testified that after he asked Jon why he had shot the people, Harberts told another officer to place Jon under arrest. At the time, Harberts did not know Jon's age. At the jail, Harberts read Jon his *Miranda* rights, and Jon told Harberts what had happened that evening.

Jon explained that he had received a detention that day for tardiness, and his grandparents were complaining to him about the detention. Jon became angry because his grandparents kept going on about the detention, so after several minutes of criticism, he went into the bathroom. He then left the bathroom and went to his grandfather's bedroom to get his grandfather's gun and ammunition. Jon took the gun and the ammunition back into the bathroom

and loaded the gun. Jon saw a Tilex bottle sitting on the bathtub and decided to shoot it.

After Jon shot the Tilex bottle, he walked out of the bathroom and down the hall toward the living room. Jon's grandmother, Lila, was in the living room and saw Jon with the gun in his right hand. Lila screamed and backed up. Jon's grandfather, Keith, then came around the corner quickly. As Keith's head came into view, Jon raised the gun and shot Keith in the left side of the head. Keith fell to the floor and Lila attempted to run out the *417 front door. Jon shot Lila in the upper left shoulder and the upper left area of her back. Lila made it out the door, but after going several steps, she fell down by a tree. Jon told Harberts that he chased Lila and attempted to pull the trigger again, but the gun jammed. Jon stood over Lila where she had fallen and attempted to unjam the gun so he could continue shooting her.

Jon then went back into the house to get Lila's gun because he wanted to shoot her some¹ more. Jon could not find the gun so he went into his bedroom and changed his clothes. Jon left the house with the gun and the bullets and went to his friend Steve Powell's home. Jon discovered that Steve Powell was not home, so he decided to return to his grandparents' home and give himself up.

Harberts asked Jon if he recalled what he had said when Harberts asked Jon why he had shot the two people. Jon said he recalled saying that "they pissed me off. I couldn't take it anymore, so I shot them." Harberts then asked Jon if he previously had thought about killing his grandparents. Jon said that he had thought about **822 ***414 it a few times. Harberts asked Jon if he had figured out how he would kill his grandparents, and Jon replied that he would use a gun. When Harberts asked Jon if he had thought about killing other people, Jon responded that he had, and said that he would use a gun. Jon explained that he thought about killing other people if people made him mad. Harberts asked Jon if Jon would want to kill him if he made Jon mad. Jon said that he would not want to kill Harberts if

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 12

he made him mad one time, but if Harberts made him mad several times, Jon would want to kill him.

Jon denied any history of mental illness in his family and said that he had not consumed any illegal drugs or alcohol. After Harberts concluded his interview with Jon, he discovered that the tape of the interview did not record**\*418** and asked Jon if he would do a second interview. Jon agreed, and a tape was made of the second interview.

During the second interview, Harberts again read Jon his *Miranda* rights. Jon generally repeated the statements he had made in the first interview. Jon said that he did not start out the evening planning to kill his grandparents. He began thinking about it when his grandfather was talking to him and telling him that people would not hire him because he was late and that teachers would not like him because he was tardy. Jon said that at that time, "it entered my mind that I was getting sick of this." Jon thought about it for 15 minutes before he went and got the gun. Harberts asked Jon if Jon remembered telling Harberts during the first interview that Jon had thought about killing other people. The following exchange then took place:

"[Harberts]: When I talked to you earlier you told me that at times you thought about killing other people, can you tell me about that?

[Jon]: No sir.

[Harberts]: You don't remember saying that?

[Jon]: I don't want to talk about that."

Harberts further testified that on May 10, 1995, he had a conversation with Pastor Davis, the pastor of the church that Jon and his grandparents attended. Pastor Davis told Harberts that, on April 2, 1995, he had a conversation with Keith Cearlock and asked Keith how Jon was doing since he had been expelled. Keith told Pastor Davis that Jon was not doing well and that Lila was afraid that Jon was going to physically harm her. Pastor Davis said that Keith told Jon that if Jon hit him, Keith would not

hit back, but instead would get Jon while he was sleeping.

Pastor Thomas Bryant then testified on behalf of the State. Bryant is the associate pastor and the principal of Park Meadows. Bryant testified that, on April 19, 1995, he, his wife, and Lila Cearlock were in his wife's office **\*419** when Lila told them that Jon had slammed her hand down on the table and had shoved her up against the wall during a dispute over a television remote. On April 22, 1995, Bryant had a conversation with Keith concerning the incident with the remote and told Keith that Keith needed to discipline Jon or get him out of the home before somebody was hurt. Keith responded that he "sure wouldn't paddle" Jon because Jon was too big and strong. Bryant testified that, several times over the preceding year, Keith mentioned that he did not spank Jon anymore because he felt Jon was too big.

Bryant testified that, on February 7, 1995, Jon had been expelled from Park Meadows. Bryant explained that there were several incidents leading to the expulsion. Jon had a long history of discipline**\*\*823 \*\*\*415** problems. After Jon was expelled, however, a group of students asked Bryant to reconsider the expulsion. Bryant told the students that they could ask Jon about coming back to school. The students then spoke with Jon and told Bryant that he had said, "I have been hurt all my life. I'm not going to be hurt anymore. From now on I will do the hurting." Bryant also had a conversation with Jon about returning to school. When Jon refused to agree to the conditions necessary for his return to school, Bryant told Jon not to turn his back on God. Jon responded that he intended "to commit every sin that I want to commit. I'm going to do anything and everything I want to do, and when I hit rock bottom, then I will call on God."

The next witness to testify on behalf of the State was Kim Turner, a juvenile probation officer for Logan County. Turner prepared a social investigation report of Jon based upon police reports, interviews with Jon and his mother and father, psychiatric information, and school records. Turner noted

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 13

that Jon had been hospitalized in the Psychiatric In-
stitute when he was five years old and again when
he was six years old. Aside from an **\*420** evalu-
ation concerning his fitness to stand trial, however,
Jon had no other psychiatric treatment or evalu-
ations since he was six years old.

Turner said that, when Jon first moved in with his
grandparents, records showed that Jon's mother said
Jon had become so aggressive that he was unman-
ageable. The discharge summary from Jon's first
stay at the Psychiatric Institute indicated that Jon
"was assaultive toward his classmates, constantly
goading and threatening them." Jon also had ad-
mitted that he could harm his mother. Jon's dis-
charge summary from his second stay at the Psychi-
atric Institute noted that Jon had been "quite hos-
tile, threatening, and even aggressive toward
peers." In addition, Jon had been aggressive to-
ward his siblings.

Turner testified that she did not believe that Jon had
an appropriate support system available to him, as
his grandparents had been killed and his parents
were not an option for placement. Turner checked
with a program that takes more violent offenders,
but the director of admissions indicated that Jon
would not be appropriate for their facility. Turner
said that, based upon Jon's lack of support, the lack
of a treatment plan, and the nature of his criminal
offenses, Jon's chance of rehabilitation was un-
likely. She did not think that a plan of rehabilitation
could be developed, in light of Jon's inability to
change his behavior in the past.

Turner testified that, if Jon was committed to the
Department of Corrections through the juvenile
court, he would go to the reception center for the
Juvenile Department of Corrections, which
provides treatment for any psychological or psychi-
atric disorders. The facility also would be able to
deal with Jon's ADD. If Jon was sentenced to the
Department of Corrections as an adult, he still
would first go to the Juvenile Department of Cor-
rections, and would be held there until the age of 21
unless there was some problem. If Jon was a secur-

ity risk **\*421** or a real problem, he could be trans-
ferred to the adult Department of Corrections at age
17 or age 18. If Jon was sentenced through the ju-
venile system, he would be released at the age of
21. Turner said that the adult division of the De-
partment of Corrections had the same services
available as the juvenile division as far as treatment
for any psychiatric or psychological disorders.

In Turner's interview with Jon, Jon told her that his
grandfather's usual form of punishment was
grounding, although in the past his grandfather had
used a strap to spank him. Jon did not tell Turner
that **\*\*824 \*\*\*416** his grandfather had spanked him
on the night of the killings. On cross-examination,
Turner said that, in preparing her report, she took
into account the fact that Jon had no prior history
with the police.

Jon's mother, Glenda Ashworth, then testified on
his behalf. Glenda said that Jon was put on medica-
tion for his ADD after both of his stays at the Psy-
chiatric Institute. The Cearlocks did not like the
fact that Jon was on medication and took Jon off his
medication. Glenda said that Jon told her that on
the night of the shootings Lila had been nagging
him all night about his detention. Keith then told
Jon that he would never amount to anything, and
Jon smarted off. Keith then hit Jon five times with
his razor strap. Jon then got the gun and went into
the bathroom. While in the bathroom, the gun went
off, and the Cearlocks came running down the hall.
Jon then stepped into the hallway and shot them.

In addition to the foregoing testimony, a report pre-
pared by Dr. Robert Chapman was admitted into
evidence at the transfer hearing. Dr. Chapman had
conducted a psychiatric evaluation of Jon to de-
termine his fitness to stand trial. Jon told Dr. Chap-
man that his grandparents constantly were negative
and complaining. Jon said that his grandparents did
not like Jon's father because Jon's father was not
"Christian perfect." Dr. **\*422** Chapman noted that
the records from the Psychiatric Institute showed
that Jon had been in the institute for three months
when he was five years old and for two months

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405

Page 14

when he was six years old. Jon was placed on anti-depressant medication during both stays.

Jon told Dr. Chapman about the events leading to the murders. Jon told Dr. Chapman that, after Keith hit Jon with the razor strap, Jon went into the bathroom, left the bathroom to get Keith's gun, and then returned to the bathroom and began loading the gun out of anger. Jon then shot a Tilex bottle and came out of the bathroom again. Lila saw Jon and began backing away. Jon told Dr. Chapman, "I knew I had to do something or they would call the police." Jon said he panicked, and when Keith came around the corner, Jon shot him. As Lila turned to run, Jon shot her in the back, then tried to shoot her some more but the gun jammed. Jon claimed that although it had been hard for him to remember he had received a spanking from Keith on the day of the murders because he tried to put that "stuff" out of his mind, he later remembered the spanking and told his attorney.

In his interview with Dr. Chapman, Jon denied that he had ever thought about killing his grandparents before. Jon claimed that he retrieved Keith's gun in order to shoot himself. After Jon impulsively shot the Tilex bottle, he knew he "had to do something" because he believed Keith would kill him. Jon said that he shot Lila because he "knew he had to shoot her to get everybody's attention." Jon also admitted to intrusive thoughts of shooting the people at church. Dr. Chapman opined that Jon had not acted in a premeditated manner at the time of the shootings, but instead had acted in a state of sudden and intense passion.

[1] The decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion, although that discretion is limited and controlled by the *423 Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1-1 et seq. (West 1994)). *People v. M.D.*, 101 Ill.2d 73, 83, 77 Ill.Dec. 744, 461 N.E.2d 367 (1984). Under the provisions of the Act in effect at the time of Jon's transfer, a juvenile court judge could enter an order permitting a minor 13 years of age or older to be prosecuted under the

criminal laws of the state if the judge **825 ***417 found that it was "not in the best interests of the minor or of the public to proceed under this Act." 705 ILCS 405/5-4(3)(a) (West 1994) (repealed by Pub. Act 90-590, art. 2001, § 2001-15, eff. January 1, 1999, now 705 ILCS 405/5-805 (West 2000)). Pursuant to section 5-4(3)(b) of the Act (705 ILCS 405/5-4(3)(b) (West 1994) (repealed by Pub. Act 90-590, art. 2001, § 2001-15, eff. January 1, 1999, now 705 ILCS 405/ 5-805 (West 2000))), a trial court was to consider, among other matters, seven factors in reaching a decision on whether to prosecute a particular minor as an adult. *M.D.*, 101 Ill.2d at 83-84, 77 Ill.Dec. 744, 461 N.E.2d 367. Those seven factors were:

"(i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority; [and] (vii) whether the minor possessed a deadly weapon when committing the alleged offense." 705 ILCS 405/5-4(3)(b) (West 1994).

Looking at the statutory factors, the juvenile court in this case found that the grand jury would be expected to return an indictment. The court also found that the alleged offenses had been committed in an aggressive and premeditated manner. Third, the court noted that, if Jon were four months older, he automatically would be transferred to adult court. With regard to Jon's history, *424 the fourth factor, the court stated that Jon had an unusual and a sad life, and that his parents and grandparents had failed him by not seeing that his medication and his treatment for ADD were continued. The court next

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 15

found that there were not any facilities unique to juveniles that were not available to adults, and that, in any event, even if Jon should be convicted in adult court, he first would go to the juvenile division. As to the sixth factor, whether it was in the interest of the minor and the public that custody continue past Jon's minority, the court observed that if Jon should be convicted in juvenile court, he would be released at age 21 whether or not he was rehabilitated. Finally, the court found that Jon did have a deadly weapon when committing the offenses. The court then stated that after balancing the statutory factors, along with the fact that if Jon "stood convicted of a couple first degree murders, that his sentence of mandatory imprisonment would be imposed," the court concluded that it was in the best interest of the public that Jon be transferred to the adult division of the courts. On appeal, the appellate court affirmed the transfer from juvenile court to adult court.

As noted, Jon argues that the appellate court erred in affirming his transfer from juvenile court to the circuit court. Jon contends that the juvenile court abused its discretion in its consideration of the factors set forth in section 5-4 of the Act (705 ILCS 405/5-4 (West 1994)). Jon argues that a balancing of those factors weighs against transfer. Jon also maintains that the juvenile court misunderstood the sentence that would be imposed if Jon was tried and convicted as an adult.

[2] It is clear that the purpose of a transfer proceeding is to balance the best interests of a juvenile offender, particularly as the offender's interests relate to his potential for rehabilitation, against society's**826 ***418 legitimate interest in being protected from criminal victimization *425 perpetrated by minors. *People v. Clark,* 119 Ill.2d 1, 12, 115 Ill.Dec. 613, 518 N.E.2d 138 (1987). In striking this balance, a juvenile court judge is to weigh the facts of the alleged crime, particularly whether the crime was committed in an aggressive and premeditated manner. *Clark,* 119 Ill.2d at 12, 115 Ill.Dec. 613, 518 N.E.2d 138.

Jon argues that the juvenile court judge in this case improperly considered that the crime had been committed in an aggressive and premeditated manner. Jon denies that there was evidence he had previously talked about killing his grandparents. In support of this argument, Jon notes that he was not lying in wait for his grandparents, that he actually was contemplating suicide when he retrieved the gun, and that he irrationally shot the Tilex bottle, causing him to panic and believe that Keith would kill him. Jon further claims there was a lack of planning as to how he was going to escape, evidenced by his changing of clothes and walking toward Steve Powell's house. Jon also cites two cases where a juvenile's acts were found to be premeditated, and notes that in those cases, in contrast to his case, the defendants planned the crime, armed themselves, and made specific plans to cover up their conduct. See *People v. D.B.,* 202 Ill.App.3d 194, 147 Ill.Dec. 533, 559 N.E.2d 873 (1990); *People v. Beck,* 190 Ill.App.3d 748, 138 Ill.Dec. 72, 546 N.E.2d 1127 (1989). Finally, Jon observes that the appellate court in this case conceded that the shooting of Keith was not a planned act.

[3] We find sufficient evidence in the record to support the trial court's finding that the offenses in this case occurred in an aggressive and premeditated manner. In contrast to Jon's statements to Dr. Chapman, Detective Harberts testified that when he first interviewed Jon, Jon told Harberts that he had thought about killing his grandparents a few times previously, but figured he would use a gun. During the second interview, Jon told Harberts that he did not start the evening planning to kill his grandparents, but began thinking about it when *426 Keith was yelling at Jon about his tardiness. Jon never told Harberts that Keith had beaten him with a razor strap prior to the shootings. Jon said that he thought about killing his grandparents for around 15 minutes before he got the gun. Jon also said that he chased Lila out of the house and attempted to shoot her again, but the gun jammed. Jon then went into the house to retrieve Lila's gun so that he could shoot her some more.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

[4] In a transfer hearing under the Act, the State need only present evidence sufficient to sustain a finding of probable cause. *People v. Taylor,* 76 Ill.2d 289, 304, 29 Ill.Dec. 103, 391 N.E.2d 366 (1979). Here, the State presented evidence that Jon had thought of killing his grandparents before, had thought about how he would kill them, and had thought about killing them for approximately 15 minutes prior to obtaining the gun. With regard to Lila, the State presented evidence that Jon tried to shoot her even after she had fallen, and even tried to find Lila's gun so that he could continue shooting her after Keith's gun jammed. Moreover, although Jon contends that he was so afraid of his grandparents that he acted impulsively, Jon did not tell the officers or Kim Turner that Keith had hit him with a razor strap prior to the murders. Thus, while Jon's actions may not have been as planned as those of the defendants in *D.B.* and *Beck,* we find the State's evidence of premeditation was sufficient to sustain a finding of probable cause.

**\*\*827 \*\*\*419** In addition to the facts of the alleged crime, including premeditation and aggressiveness, a juvenile court judge is to consider the age of the offender and his previous history, is to ascertain the availability of treatment and rehabilitative services for the juvenile, and is to determine whether the best interests of the minor and of the public may require that the minor continue in custody beyond his minority. *Clark,* 119 Ill.2d at 13, 115 Ill.Dec. 613, 518 N.E.2d 138. This court has declined to pre- scribe a mathematical **\*427** formula to govern a judge's discretion in weighing each factor. *Taylor,* 76 Ill.2d at 305, 29 Ill.Dec. 103, 391 N.E.2d 366.

Jon, however, argues that the juvenile court erred in considering these factors. For example, Jon claims that the juvenile court failed to consider his age in light of his sheltered life experiences, his lack of a prior criminal history, and his tragic life. Jon distin- guishes his case from those where juvenile defend- ants were found to be so "streetwise" and experi- enced beyond their years that they had ceased being children. See *People v. M.D.,* 101 Ill.2d 73, 86, 77

Ill.Dec. 744, 461 N.E.2d 367 (1984) (juvenile was "not a stranger to adult experiences," including drinking alcohol, using marijuana, and having sex); *In re L.J.,* 274 Ill.App.3d 977, 980, 211 Ill.Dec. 209, 654 N.E.2d 671 (1995) (L.J. had life experi- ences of someone "way beyond his age" and, in reality, had ceased being a minor).

Rather, Jon claims his case is similar to *People v. D.B.,* 202 Ill.App.3d 194, 147 Ill.Dec. 533, 559 N.E.2d 873 (1990), where the denial of the State's motion to transfer was affirmed, based in part upon the fact that the juvenile did not exhibit the experi- ence of someone well beyond his years. Jon also finds close parallels between his case and that of the minor in *In re Burns,* 67 Ill.App.3d 361, 366, 24 Ill.Dec. 255, 385 N.E.2d 22 (1978), where the court found that the juvenile's history of neglect, depriva- tion, emotional impoverishment and chaos favored treatment as a seriously troubled adolescent rather than as an adult.

While we do not read the trial court's ruling as granting the State's motion for transfer simply be- cause Jon was only four months shy of an automat- ic transfer, we note that this case is not as similar to *D.B.* and to *Burns* as Jon represents. In fact, one highly significant difference is that in both *D.B.* and *Burns,* the juveniles did not personally participate in the killing of the victims, but instead were held legally accountable. See *D.B.,* 202 Ill.App.3d at 202, 147 Ill.Dec. 533, 559 N.E.2d 873 ("although legally accountable for the murder, respondent did not personally kill"); **\*428***Burns,* 67 Ill.App.3d at 364, 24 Ill.Dec. 255, 385 N.E.2d 22 ("even though [Burns] may be legally accountable for the murder which occurred, the evidence also suggests that [Burns] did not premeditate, or even take part in, the actual stabbing"). Therefore, we are not per- suaded that Jon's case is so similar to *D.B.* and *Burns* that Jon's transfer was an abuse of discretion.

[5] In any event, in reviewing a juvenile court's or- der transferring a minor, this court does not re- weigh the factors. Rather, to affirm an order trans- ferring a minor to criminal court, this court must

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 17

determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order. *Clark,* 119 Ill.2d at 18, 115 Ill.Dec. 613, 518 N.E.2d 138. Here, the juvenile court received extensive evidence concerning Jon's history, as presented through the testimony of Kim Turner and Glenda Ashworth, and the report of Dr. Chapman. There was significant testimony concerning Jon's sheltered background, his lack of prior contact with the police, and his shuttling between his **828 ***420 mother's home and his grandparents' home. Consequently, there was sufficient evidence in the record as to Jon's age and history.

Jon also contends that the juvenile court failed to consider Jon's potential for rehabilitation, and failed to receive and evaluate information about the type of facilities available for treatment and rehabilitation. Jon further claims that the juvenile court failed to make any meaningful analysis of Jon's interest versus society's interests.

[6][7] As discussed, a statutorily proper evaluation of a minor's history also includes receipt and review of information concerning the minor's familial support for any possible treatment or rehabilitation, in addition to any prior involvement in the juvenile justice system. *Clark,* 119 Ill.2d at 17, 115 Ill.Dec. 613, 518 N.E.2d 138. A juvenile judge also must receive and evaluate information concerning the type of facilities available for the treatment or rehabilitation of the minor, *429 and must evaluate the likely effectiveness of those facilities in light of the history and present circumstances of the minor. *Clark,* 119 Ill.2d at 17, 115 Ill.Dec. 613, 518 N.E.2d 138.

Here, although Jon disputes the juvenile court's weighing of these factors, it is clear from the record that Turner's testimony presented information concerning the type of facilities available for Jon's treatment or rehabilitation, as well as the likely effectiveness of those facilities in light of Jon's history and present circumstances. Turner was of the opinion that Jon did not have familial support for any possible treatment or rehabilitation. In fact,

Turner's opinion was that Jon's chance of rehabilitation was unlikely given Jon's lack of support, the lack of a treatment plan, and the nature of his criminal offenses. Turner also stated that Jon would first go to the Juvenile Department of Corrections, where he would receive treatment for any psychiatric disorders and for his ADD. The adult division of the Department of Corrections had the same services available.

[8][9] In light of this information, we find no merit to Jon's claim that the juvenile court failed to consider his sheltered life experiences, his lack of a prior criminal history, and his tragic life. Nor do we find support for Jon's contention that the juvenile court failed to consider Jon's potential for rehabilitation, and failed to receive and evaluate information about the type of facilities available for treatment and rehabilitation. The juvenile court simply found that these factors did not outweigh the factors supporting a transfer. Where a juvenile judge considers evidence on the statutory factors and any other relevant evidence, the resulting decision is a product of sound, judicial discretion and will not be disturbed on review. *Clark,* 119 Ill.2d at 14, 115 Ill.Dec. 613, 518 N.E.2d 138.

We also find no merit to Jon's claim that the juvenile court failed to make any meaningful analysis of Jon's interests versus society's interests. With regard to this *430 factor, the juvenile court noted that there was a lot of argument concerning whether Jon could be rehabilitated before he reached majority, and noted that if Jon went through the juvenile court, he would be released whether he had been rehabilitated or not, and there would be no continued supervision. Although it is clear from the record that Jon had suffered a tragic life and had been failed by his parents and grandparents, the fact remains that he committed two homicides and had admitted to intrusive thoughts of killing those who angered him. Indeed, it is worth noting that in a later version of the Act, the legislature amended the statute on discretionary transfers to add: "In considering these factors, the court shall give

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 18

***421 greater weight to *the seriousness of the alleged offense* and the minor's prior record of delinquency than to the other factors listed in this subsection." (Emphasis added.) 705 ILCS 405/5-805 (West 2000). Here, there was sufficient probable cause to establish that Jon's interests did not outweigh society's interest in requiring that Jon continue in custody beyond his minority.

In addition to Jon's claim that the juvenile court erred in weighing the statutory factors, Jon also argues that the juvenile court misunderstood the sentence that would be imposed if Jon should be tried and convicted as an adult. The juvenile court stated that if Jon was convicted of a couple of first degree murders, a sentence of mandatory imprisonment would be imposed. Jon notes that if he was convicted of one first degree murder in criminal court, mandatory imprisonment would be imposed (see 730 ILCS 5/5-8-1(a)(1) (West 1994)). However, he would face mandatory *life* imprisonment if convicted of two first degree murders (see 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1994)). Jon argues that this court's decision in *Clark*"mandates that the court be aware and evaluate a mandatory life sentence without the possibility of parole upon conviction for two first degree murders."

*431 We decline to attribute great weight to the trial court's statement that if Jon should be convicted of a couple of first degree murders, a sentence of mandatory imprisonment would be imposed. As the appellate court observed in affirming the juvenile court's decision to transfer, a court is presumed to know the law regarding a potential sentence, and both the State and defense counsel had informed the juvenile court of the proper sentence. 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23). Further, this case is distinguishable from our decision in *Clark,* where we found that there was "not one scintilla of evidence in the record of the transfer proceeding that would have apprised anyone that the transfer could result in a term of natural life imprisonment." *Clark,* 119 Ill.2d at 16, 115

Ill.Dec. 613, 518 N.E.2d 138. Here, in contrast, there is evidence in the record of proceeding that Jon's transfer could result in a term of natural life imprisonment. Consequently, we agree with the appellate court that the juvenile court did not abuse its discretion in granting the State's motion to transfer.

## MOTION TO SUPPRESS STATEMENTS MADE WHILE IN POLICE CUSTODY

Jon's second argument on appeal is that the appellate court erred in affirming the trial court's denial of his motion to suppress the statements that Jon made while in police custody. At the hearing on Jon's motion to suppress, Sergeant Darrell Sisk testified that he is the juvenile officer for the Lincoln city police department. Sisk said that, on the evening of April 27, 1995, he received a telephone call from another officer asking if he knew the minor, Jon, that they had as a suspect. Sisk responded that he did not know the minor. Sisk said that he was not told the nature of the juvenile's crime and was not asked to come down to the station.

Detective Harberts testified at the hearing on Jon's motion to suppress. To the extent that Harberts' testimony**432 is duplicative of his testimony at the transfer hearing, it will not be repeated here. Harberts said that when Spickard and Harberts approached him at the crime scene, Jon was not handcuffed or restrained in any way. When Harberts instructed Officer Kerns to handcuff Jon and place him in a police **830 ***422 car, Harberts believed Jon to be 18 or 19 years old.

After Jon had been transported to the Logan County jail, Harberts went to Jon's holding cell and asked Jon's name, age, and relationship to the victims. Harberts then asked Jon if he would be willing to come to Harberts' office for an interview, and, when Jon agreed, Harberts took Jon, unrestrained, to his office. Jon sat at Harberts' desk, across from Harberts. Harberts asked Jon if he needed something to drink or eat, or needed to use the restroom. Jon responded "no," and then agreed to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

speak with Harberts. Harberts read Jon his *Miranda* rights and asked Jon if he understood each right. Jon responded affirmatively. Harberts said Jon was very cooperative throughout the interview. Jon never asked Harberts to stop questioning him, did not ask for any adult presence, and did not request a lawyer. Harberts did not threaten or coerce Jon, nor did he promise Jon anything. This interview began at 9:05 p.m. and ended at 9:27 p.m. At the end of the interview, Jon told Harberts his mother's name and gave Harberts her telephone number.

Harberts testified that, at 10:45 p.m., he attempted to call Glenda Ashworth. He reached Glenda's answering machine and left a message. After leaving a message for Glenda, Harberts discovered that his interview with Jon did not record on the tape. Harberts asked Jon if he would allow Harberts to tape a second interview, and Jon agreed. During this second interview, Harberts again read Jon his *Miranda* rights. Jon did not ask for any adult or for a lawyer. This interview took place between 11:07 p.m. and 11:30 p.m. Later, around 12:40 a.m., Jon *433 agreed to accompany the officers back to his grandparents' residence and led the officers through a video reenactment of what had occurred earlier that day. Jon was not shackled during the reenactment.

On cross-examination, Harberts agreed that, after Spickard and Jon walked up to him at the Cearlocks' home, he would not have let Jon walk away. Harberts also testified that he did not give Jon any *Miranda* warnings before he asked Jon why he had shot the people. Harberts also said that, when Jon was in the holding cell at the station, he did not tell Jon that Jon could be detained for a maximum of six hours. Harberts testified that Jon told him that the Cearlocks were Jon's legal guardians. When Harberts began interviewing Jon, he did not tell Jon that Jon could be charged or tried as an adult.

Glenda Ashworth testified that, on April 27, 1995, she was working a 7 p.m. to 7 a.m. shift. Glenda said that she ran home around 4 a.m. on April 28, 1995, because her daughter was afraid someone

was trying to break into the house. After she calmed her children, Glenda noticed the light on her answering machine flashing. Glenda played the message, then called Harberts, who told Glenda what had happened and asked her who had custody of Jon. Glenda told Harberts that she had custody, and also told Harberts about Jon's medical history and his ADD. Glenda asked Harberts if Jon had a lawyer. Harberts told Glenda that she would have to talk to the State's Attorney. On cross-examination, Glenda acknowledged that she had signed a document giving her parents custody and guardianship of Jon, but said that the document was used only to get Jon into school.

Jon testified at the hearing on his motion to suppress that he was 15 years old. Jon said that when his grandparents punished him, he would be grounded, or he would be yelled at, or he would be spanked. Jon explained *434 that his grandfather would have Jon bend over and grab **831 ***423 his ankles, and then would whip Jon with a razor strap.

Jon testified that, when he left Steve Powell's house on April 27, 1995, he decided to walk back to the Cearlock's house because he needed to get some help and thought the police would be there. Jon thought the police could help him. At the time, Jon said he felt confused, scared, hopeless, upset, angry and sad. Jon said that he gave the gun to Spickard and told Spickard that he was the one that had shot the Cearlocks. Jon made that statement because that was what had happened, and because he had to get some help. Jon said that, after he gave the gun to Spickard, he did not feel like he could walk away because Spickard was holding Jon's elbow and told Jon to come with him. Jon said it did not cross his mind to run because he thought the officers could help him. Jon said that he answered Harberts' question about why Jon had done it because he did not feel like he had a choice. Jon testified that he did not understand the significance of answering the question.

Jon said that he did not see a tape recorder during

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

the first interview with Harberts. Jon denied that Harberts read Jon his *Miranda* rights before the first interview. Jon testified that when Harberts began asking him questions, Jon answered the questions because Harberts was the boss and Jon was supposed to tell Harberts what Harberts wanted to know. Harberts did not ask Jon where his mom or dad were and did not tell Jon that a juvenile police officer was supposed to be there.

For the second interview, Harberts placed a tape recorder on the desk, turned the recorder on, and read Jon his *Miranda* warnings. Jon claimed that he did not understand his *Miranda* warnings and only indicated that he understood them because he "was just going along with what [Harberts] was saying." Jon said that he did not feel that he had the right to tell Harberts he *435 did not want to answer any questions. Jon also said that he participated in the video reenactment because the officers wanted him to, and Jon felt that he did not have a choice.

On cross-examination, Jon agreed that he understood he had committed a crime and agreed that he wanted to confess to the crime. Jon also agreed that, during the second interview, when Harberts asked him a question that he did not want to answer, he felt free to say no to Harberts. Jon said that the officers did not threaten him or make any promises to him. Jon testified that he was doing well in school before he was expelled from Park Meadows.

Dr. Robert Chapman testified that Jon found it difficult and confining to follow the rules of the church and the school. Jon said he was subjected to harsh criticism by his grandparents and frequently was subjected to physical discipline. Lila would impulsively slap Jon with her hand or with objects. Keith would make Jon bend over and grab his ankles, then would beat Jon on the buttocks with a board or strap.

Dr. Chapman's opinion was that Jon suffered from ADD. Dr. Chapman said that taking into account Jon's age, his background, his ADD, and the circumstances, Jon was substantially impaired in his capacity to appreciate the gravity of the situation in waiving his *Miranda* rights. Dr. Chapman testified that, on the day of the shootings, Jon was not suffering from any psychosis or delusions.

On cross-examination, Dr. Chapman said that Jon was able to understand the words used by the police officers in giving the *Miranda* warnings. Dr. Chapman explained that his opinion related to Jon's inability to appreciate the legal significance**832 ***424 of talking to the police. Dr. Chapman agreed that Jon talked to the police because Jon wanted to talk to the police.

*436 Pastor Thomas Bryant testified that Jon's reading and writing skills were normal, as were Jon's verbal skills. Pastor Bryant said that Jon's demeanor in the video of the reenactment and in the audio tape of his second interview with Harberts was Jon's normal demeanor, which was very calm. Pastor Bryant said that Jon was very honest and truthful in admitting when he had done something wrong. Pastor Bryant denied that Jon had signs of ADD during his years at Park Meadows, and said that Jon was never referred to any special school or program for ADD.

Following a hearing on Jon's motion to suppress, the trial court found that Jon was of average intelligence, appeared emotionally stable, and was articulate and familiar with the English language. The trial court concluded that Jon was aware of his *Miranda* rights, understood them, and knowingly waived them. The trial court noted that no threats or promises were made to Jon, nor was he abused or denied access to food, drink or the bathroom during his interrogation. Further, at one point, Jon indicated to the officer that he did not wish to answer a particular question. The trial court stated that, "[w]ith regard to the violation of the Juvenile Court Act, the Courts certainly do not condone such violation but higher Courts, on review, have made it clear that such a violation does not cause a per se suppression * * *." The trial court concluded that Jon's statements were made voluntarily. The appellate court affirmed the trial court's denial of Jon's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 21

motion to suppress the statements made while in police custody.

On appeal to this court, Jon argues first that his age, experience and emotional characteristics establish that his statements were involuntary, even though he had been given and had waived his *Miranda* rights. Second, Jon argues that the circumstances of his arrest, including the officers' failure to·contact Jon's parents or a juvenile**437** officer, also establish that Jon's statements were not voluntary and should have been suppressed.

[10] In reviewing a trial court's ruling concerning whether a confession is voluntary, the trial court's factual findings will be reversed only if those findings are against the manifest weight of the evidence. *In re G.O.*, 191 Ill.2d 37, 50, 245 Ill.Dec. 269, 727 N.E.2d 1003 (2000). However, a trial court's ruling on the ultimate question of whether the confession was voluntary is reviewed *de novo. G.O.*, 191 Ill.2d at 50, 245 Ill.Dec. 269, 727 N.E.2d 1003.

[11][12][13] In determining whether a confession is voluntary, courts look to the totality of the circumstances, including factors such as the party's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. *G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. Other factors include the duration and the legality of the detention, the duration of the questioning, as well as any mental or physical abuse by the police, including the existence of threats or promises on the part of the police. *G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. No single factor is dispositive. *G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession. *G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003.

**833 ***425 [14] Upon review, we agree with the trial court that the totality of the circumstances indicate that Jon's confession was voluntary. We first consider Jon's age, experience, and emotional characteristics. On this point, the record indicates that Jon was an average student with normal reading, writing and verbal skills. Jon was not physically or mentally abused by the police during his interviews, nor did the police make any threats or promises.

Although Dr. Chapman testified that Jon was unable to appreciate the gravity of the situation in waiving his *Miranda* rights and was so conditioned to pleasing *438 authority figures that he automatically would answer the officers' questions, there was ample evidence in the record to the contrary. For example, as the trial court noted, Jon did not hesitate in refusing to answer one of Harberts' questions concerning Jon's thoughts of killing others. Similarly, there was evidence that Jon had defied authority figures in the past. Jon had refused to serve his suspension for kissing a girl, and had refused to go to the school in Oklahoma. Keith had told Pastor Davis that Lila was afraid of Jon, and Lila herself told Pastor Bryant that Jon had slammed her hand and had shoved her up against a wall. When Pastor Bryant told Jon not to turn his back on God, Jon told Pastor Bryant that he would commit every sin he wanted to commit. Similarly, when the other students at Park Meadows asked Jon to reconsider serving his suspension, Jon refused, saying he now would do the hurting. In addition, as the trial court noted, Jon "indeed did seem to want to tell what had happened," both when he first walked up to Spickard at the crime scene and during his interviews with Harberts.

We next consider Jon's claim that the coercive nature of his encounter with the police establishes that his statements were not voluntary. In support of his claim that Jon's encounter with the police was coercive, Jon notes that he was handcuffed when he was taken from the crime scene to the police station, in violation of the Lincoln police department's policy that a juvenile should be handcuffed only when necessary to prevent violence or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 22

escape. Likewise, Jon observes that both the Act and the policy of the Lincoln police department state that no minor under 16 years of age may be confined in a jail or a place ordinarily used for the confinement of prisoners in a police station, and that when a minor of appropriate age is detained in a jail cell, he should be told the purpose of his detention, the time it is expected to last, and that the detention cannot exceed six hours. See *439705 ILCS 405/5-7(2)(c)(iii), (2)(c)(vi) (West 1994) (repealed by Pub. Act 90-590, art. 2001, § 2001-15, eff. January 1, 1999, now 705 ILCS 405/5-410 (West 2000)). Jon argues that, in violation of the Act and the policy, he was detained in a prisoner holding cell and was not told that his detention could not exceed six hours. Finally, Jon notes that he was not advised he could consult with his parents before being questioned, he was not advised that he could be tried as an adult, and Harberts did not make a reasonable attempt to notify Jon's parents or other person legally responsible for Jon's care or take Jon to the juvenile officer for jurisdiction, as required under the Act. See 705 ILCS 405/5-6(1) (West 1994).

The trial court found that the violations of the Act did not require suppression of Jon's statements, as Jon's waiver of *Miranda* was knowingly and intelligently made, and Jon had voluntarily confessed. We agree with the trial court. Although Jon was handcuffed when he first was taken to the police station from the crime scene, Harberts testified that at the time, he thought Jon was 18 or 19 years old. Likewise, although Jon was not told that his detention could not exceed six hours, **834 ***426 there is no evidence or allegation that Jon was detained for more than six hours. We do not deem any of these purported violations significant enough to render Jon's statements coerced or involuntary.

[15][16][17][18] Possibly more significant in this case is the officers' failure to contact Jon's parents or a juvenile officer prior to questioning Jon. With regard to the confession of a juvenile, this court has recognized that the taking of such a confession is a

" 'sensitive concern.' " *G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003, quoting *People v. Prude*, 66 Ill.2d 470, 476, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977). Consequently, courts considering the voluntariness of juvenile confessions consider whether the juvenile had an opportunity to consult with an adult interested in his welfare, known as a "concerned adult," either before or *440 during the interrogation. *G.O.*, 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. In determining whether a juvenile had an opportunity to confer with a " concerned adult," courts consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the attempts of a concerned adult to confer with the juvenile. *G.O.*, 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. The "concerned adult" factor is particularly relevant in situations where a juvenile has demonstrated trouble understanding the interrogation process, has asked to speak with either his parents or a concerned adult, or where the police have prevented the juvenile's parents from speaking with him. *G.O.*, 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003. Nonetheless, a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a concerned adult either before or during his interrogation. *G.O.*, 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003.

In *G.O.*, we found that a juvenile's confession was voluntary even though he was not provided with an opportunity to confer with a concerned adult because: the juvenile never requested to speak with a concerned adult; the police never frustrated an attempt by a concerned adult to speak with the juvenile; the juvenile's detention was valid; the juvenile was informed of his *Miranda* rights and indicated that he understood those rights; the juvenile was intelligent and did well in school; the juvenile was questioned only for a short period of time on three or four occasions; and no coercion or physical threats occurred, nor were any promises made. *G.O.*, 191 Ill.2d at 56, 245 Ill.Dec. 269, 727 N.E.2d 1003.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Based upon the foregoing considerations, we find that any failure to contact Jon's parents or a juvenile officer prior to questioning Jon did not render his statements involuntary. With regard to Jon's parents, we note that Jon told Harberts that his grandparents were his legal guardians. As Harberts believed that those legally responsible for Jon's care were deceased, we do not attribute*441 great weight to the fact that Harberts did not immediately attempt to contact Jon's parents. In fact, after Harberts had interviewed Jon the first time and obtained information concerning Jon's mother, Harberts telephoned Glenda.

In addition, as in *G.O.,* Jon never requested an opportunity to speak with a concerned adult and the officers did not prevent any concerned adult from speaking with Jon. Jon's detention was valid, and he was informed of his *Miranda* rights. Further, although Jon now claims that he did not understand those rights, the trial court found, and we agree, that Jon did understand his *Miranda* rights. Pastor Bryant testified that Jon was intelligent and did well in school. Jon was not handcuffed in the jail, and was questioned **835 ***427 on only two occasions for approximately 30 minutes each time. No physical coercion or threats occurred, and no promises were made. Under the circumstances, we find that the totality of circumstances indicates that Jon's confession was the result of his own decision and was not the result of compulsion or inducement, nor was Jon's will being overborne at the time of his confession. For these reasons, we affirm the trial court's decision denying Jon's motion to suppress the statements he made while in custody. We now turn to the issues raised in the State's appeal.

MOTION TO SUPPRESS JON'S INITIAL STATEMENT

In his motion to suppress, Jon also claimed that his initial statement to Detective Harberts at the scene of the crime should be suppressed. As noted above, when Spickard brought Jon over to Harberts, Harberts asked Jon why he had shot the people. Jon re-

sponded it was "because they pissed me off. I couldn't take it anymore so I shot them." Jon argued that this statement should have been suppressed because he had not been given his *Miranda* warnings before Harberts asked the question. *442 The trial court denied Jon's motion to suppress this statement, finding that the question was an appropriate on-scene general investigative question. The appellate court reversed the trial court, finding that the question was not a general on-scene investigative question, but instead was an interrogation. See 307 Ill.App.3d at 710, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23). The appellate court further found that Jon was in custody at the time the question was asked, so that the failure to give *Miranda* warnings rendered Jon's answer to the question inadmissible.

The State appeals the appellate court's decision with regard to Jon's initial statement to Detective Harberts. The State maintains that Harberts' question was not interrogation. The State further argues that, in any event, Jon was not in custody when the question was asked, so that *Miranda* warnings were not required.

[19] We need not address whether the appellate court properly found that Harberts' question was interrogation and that Jon was in custody because we find that, even if the trial court erroneously denied Jon's motion to suppress his initial statement to Harberts, any error was, at most, harmless. During Jon's first and second interviews with Harberts, after Jon had received his *Miranda* warnings, Jon repeated the initial statement he had made to Harberts at the scene. Specifically, during the second, taped interview, the following exchange took place:

"[Harberts]: OK. Then you walked over to me and [Spickard] told me that you had just walked up and said that you had shot them or killed the, and, uh, you had given him the gun, and I asked you why. Can you tell my [sic] why?

[Jon]: Yes sir, I said cause they pissed me off. I was upset and sick and tired of being treated the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 24

way I was. I couldn't take it any longer."

Even if the initial statement to Harberts had been admitted into evidence erroneously, it is difficult to *443 conceive of any prejudice to Jon when he repeated the statement to Harberts two more times after receiving his *Miranda* warnings. Although Jon claimed that any statements he made were coerced because he was conditioned to respond to authority, we find no evidence in the record that Jon's response to Harberts was not voluntary. It is noteworthy that the response came shortly after Jon of his own initiative confessed to Spickard that he was the shooter. Consequently,,**836 ***428 the subsequent reading of *Miranda* warnings cured the condition that the appellate court found made the initial voluntary but unwarned statement inadmissible. See *People v. Wilson,* 164 Ill.2d 436, 452, 207 Ill.Dec. 417, 647 N.E.2d 910 (1995) (reading of *Miranda* warnings cured prior voluntary but unwarned statement), citing *Oregon v. Elstad,* 470 U.S. 298, 311-12, 105 S.Ct. 1285, 1294-95, 84 L.Ed.2d 222, 233-34 (1985).

In *Wilson,* this court held that, once a defendant is warned of his rights, he is free to exercise his own decision of whether to make a second statement. *Wilson,* 164 Ill.2d at 452, 207 Ill.Dec. 417, 647 N.E.2d 910. We noted that two hours had passed from the end of the defendant's first, unwarned statement until he was read his *Miranda* warnings, and during that two-hour time period, the defendant was not subject to police interrogation, force, threats, harassment or questioning. *Wilson,* 164 Ill.2d at 452, 207 Ill.Dec. 417, 647 N.E.2d 910.

Here, Jon's initial statement to Harberts was made shortly after Harberts arrived on the scene at 8:38 p.m. Jon received his *Miranda* warnings and was interviewed the first time from 9:05 p.m. until 9:37 p.m., and received the second set of *Miranda* warnings and was interviewed the second time from 11:07 p.m. until 11:30 p.m. Jon was not subjected to police interrogation, force, threats or harassment prior to the first interview or between the time of the first and second interviews. Jon was free to

make his own decision of whether to repeat his initial statement during the first and second interviews. As *444 those statements, which repeated and in fact enlarged upon Jon's initial response to Harberts, were admissible, we find that any purported error in admitting Jon's initial statement to Harberts was harmless.

### FELONY MURDER

The State next appeals the appellate court's finding that Jon could not be found guilty of felony murder based upon the underlying offenses of aggravated battery and aggravated discharge of a firearm. Jon was indicted on eight counts: Counts I and II charged the first degree murders of Lila and Keith, respectively, with intent to kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 1994)); counts III and IV charged the first degree murders of Lila and Keith, respectively, by knowingly committing an act causing great probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1994)); counts V and VI charged the first degree murders of Lila and Keith, respectively, by attempting or committing a forcible felony, namely aggravated battery (720 ILCS 5/9-1(a)(3) (West 1994)); and counts VII and VIII charged the first degree murders of Lila and Keith, respectively, by attempting or committing a forcible felony, namely, aggravated discharge of a firearm (720 ILCS 5/9-1(a)(3) (West 1994)).

Prior to trial, Jon moved to dismiss the counts against him charging felony murder, arguing that felony murder was not appropriate because the predicate felonies, aggravated battery and aggravated discharge of a firearm, were not independent of the murders themselves. The trial court denied the motion to dismiss those counts. On appeal, however, the appellate court concluded that felony murder was limited to cases in which the predicate felony consisted of conduct other than that inherent in the killing itself. 307 Ill.App.3d at 714, 240 Ill.Dec. 725, 718 N.E.2d 206. The appellate court therefore held that the trial court had erred in instructing the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 25

jury that Jon could be convicted *445 of first degree murder on a felony-murder theory. **837***429307 Ill.App.3d at 714, 240 Ill.Dec. 725, 718 N.E.2d 206. However, because Jon was found guilty of first degree murder only with regard to Lila, the appellate court's finding of reversible error was limited to Jon's conviction for Lila's murder.

With regard to felony murder, the Criminal Code of 1961 (the Code) provides:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\* \* \*

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 1996).

The Code defines "forcible felony" as, *inter alia,* "aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 1996).

In 1975, this court addressed whether aggravated battery could be the underlying felony in a felony-murder charge where the aggravated battery was alleged to have been committed against the person who eventually died. *People v. Viser,* 62 Ill.2d 568, 577, 343 N.E.2d 903 (1975). The defendants in *Viser* had claimed that the indictments against them failed to properly charge murder where they alleged that the defendants had each caused the death of the victim, Hector Jordan, as they were attempting to commit or were committing a forcible felony upon Hector Jordan, namely, aggravated battery. *Viser,* 62 Ill.2d at 577, 343 N.E.2d 903. The defendants argued that the indictments would have been proper only if the indictments had charged that the defendants killed Hector Jordan while committing an aggravated battery upon the surviving victim, Harold

Smith. *Viser,* 62 Ill.2d at 578, 343 N.E.2d 903.

Upon review, this court noted that, at common law, *446 any unlawful killing occurring during the commission of any felony was murder. *Viser,* 62 Ill.2d at 578, 343 N.E.2d 903. We noted that the Code limited the offense underlying felony murder to " 'a forcible felony other than voluntary manslaughter [now second degree murder],' " and further noted that aggravated battery is a forcible felony. *Viser,* 62 Ill.2d at 578-79, 343 N.E.2d 903, quoting Ill.Rev.Stat.1973, ch. 38, par. 9-1(a)(3). This court concluded that what the legislature intended in establishing the offense of felony murder "was to deter the commission of any of the enumerated forcible felonies, including aggravated battery, by holding the perpetrator responsible for murder if death results." *Viser,* 62 Ill.2d at 580, 343 N.E.2d 903. Consequently, the indictment charging the defendants with felony murder based upon the aggravated battery of the deceased victim was not improper. *Viser,* 62 Ill.2d at 580, 343 N.E.2d 903.

The State argues that the appellate court's ruling in this case was in direct conflict with our decision in *People v. Viser,* 62 Ill.2d 568, 343 N.E.2d 903 (1975). The appellate court acknowledged that its decision might seem inconsistent with the *Viser* opinion, but claimed that the court in *Viser* did not consider whether the predicate felony underlying a charge of felony murder must have an independent felonious purpose. 307 Ill.App.3d at 714, 240 Ill.Dec. 725, 718 N.E.2d 206. The appellate court held that the predicate felony underlying a felony-murder charge must have a felonious purpose other than the killing itself. 307 Ill.App.3d at 714, 240 Ill.Dec. 725, 718 N.E.2d 206.

The appellate court was correct that *Viser* did not address the precise issue **838 ***430 presented in this case. In *Viser,* the aggravated battery serving as the predicate felony for the felony-murder charge against defendants was based upon an incident where the defendants struck and beat the victim. *Viser,* 62 Ill.2d at 576, 343 N.E.2d 903. The victim died two weeks after the beating "of pancreat-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813

197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405

**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

itis caused by severe abdominal injuries he received" during the beating. *Viser*, 62 Ill.2d at 576, 343 N.E.2d 903. The charges of felony murder arose *447 from the cause and effect relationship between the crime committed-aggravated battery-and the resulting murder. See *People v. Shaw*, 186 Ill.2d 301, 322, 239 Ill.Dec. 311, 713 N.E.2d 1161 (1999) ("Felony murder depends solely on a cause and effect relationship between the crime committed and the resulting murder to impose liability").

Here, the cause and effect relationship between the crime committed and the resulting murder is not so clear. The forcible felonies underlying the charges of felony murder in this case-aggravated battery and aggravated discharge of a firearm-were acts that were inherent in, and arose out of, the fatal shootings of Keith and Lila. It is arguable that it was not the predicate felonies which resulted in and caused the murders of Keith and Lila, but rather that it was the murders of Keith and Lila which gave rise to the predicate felonies.

As the appellate court observed, every shooting necessarily encompasses conduct constituting aggravated battery, *i.e.*, great bodily harm, as well as conduct constituting aggravated discharge of a firearm, *i.e.*, discharging a firearm in the direction of another. 307 Ill.App.3d at 712, 240 Ill.Dec. 725, 718 N.E.2d 206. Potentially, then, all fatal shootings could be charged as felony murder based upon aggravated battery and/or aggravated discharge of a firearm. The result could be to "effectively eliminate the second degree murder statute" and also to "eliminate the need for the State to prove an intentional or knowing killing in most murder cases." 307 Ill.App.3d at 712, 240 Ill.Dec. 725, 718 N.E.2d 206.

[20][21] Given the foregoing considerations, we agree with the appellate court that where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder. Because the predicate felonies in this case arose from and were inherent in the murders of

Keith and Lila, the jury should not have been instructed that Jon could be convicted of first degree *448 murder on a felony-murder theory. Accordingly, we affirm the appellate court's finding that the trial court erred in instructing the jury on felony murder.

Our inquiry, however, does not end there. The appellate court concluded that the trial court's error in instructing the jury on felony murder constituted reversible error with regard to Jon's conviction for the first degree murder of Lila.

[22][23] We disagree with the appellate court's conclusion that the error in this case constituted reversible error. In this case, although the jury was instructed that Jon had been charged with two types of first degree murder, knowing or intentional murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 1996)) and felony murder (720 ILCS 5/9-1(a)(3) (West 1996)), only general verdict forms were used at Jon's trial. The jury received three verdict forms for each victim: (1) not guilty; (2) guilty of first degree murder; and (3) guilty of second degree murder. It is well settled that " 'where an indictment contains several counts arising out of a single transaction, and a general verdict is returned[,] the effect is that the defendant is guilty as charged in each count * * *.' " **839***431*People v. Thompkins*, 121 Ill.2d 401, 455, 117 Ill.Dec. 927, 521 N.E.2d 38 (1988), quoting *People v. Lymore*, 25 Ill.2d 305, 308, 185 N.E.2d 158 (1962). Thus, a general verdict finding a defendant guilty of murder, where the defendant was charged with intentional, knowing, and felony murder, raises the presumption that the jury found the defendant committed the most serious crime alleged, intentional murder. *Thompkins*, 121 Ill.2d at 456, 117 Ill.Dec. 927, 521 N.E.2d 38. In this case then, we must presume that the jury found Jon guilty of the most serious crime alleged, intentional or knowing murder, so that any error in instructing the jury on felony murder did not deprive Jon of a fair trial. We therefore reverse the appellate court's finding that Jon's conviction must be reversed and remanded for a new trial.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 27

As a final matter, we note that our presumption that **\*449** the jury found Jon guilty of intentional or knowing murder rather than felony murder is supported by the fact that the jury found Jon guilty of the second degree murder of Keith Cearlock. As more fully set forth below, second degree murder instructions were given only on the charges of intentional or knowing murder and not on the felony-murder charges. Consequently, in convicting Jon of second degree murder, the jury must have believed Jon was guilty of the intentional or knowing murder of Keith, but that one of the mitigating defenses set forth in the second degree murder statute was present. See 720 ILCS 5/9-2(a)(1), (a)(2) (West 1996). The jury therefore rejected the State's felony-murder theory as to Keith.

Had the jury believed that Jon was guilty of first degree felony murder with regard to Lila, it would have followed that Jon was guilty of first degree felony murder with regard to Keith. The charges as to both Keith and Lila were identical. The felony-murder charges were based upon the predicate felonies of aggravated battery and aggravated discharge of a firearm, felonies which were inherent in both killings. Thus, if the jury believed that the killing of Lila occurred while Jon was attempting or committing aggravated battery or aggravated discharge of a firearm, it would follow that Jon also killed Keith while attempting or committing aggravated battery or aggravated discharge of a firearm. Because the jury instead found Jon guilty of second degree murder with regard to Keith, we see no reason to disregard the presumption that Jon was found guilty of intentional murder with regard to Lila.

## SECOND DEGREE MURDER INSTRUCTIONS

The State next challenges the appellate court's finding that the trial court erroneously barred second degree murder instructions on the felony-murder counts. Relying on *People v. Williams,* 164 Ill.App.3d 99, 115 Ill.Dec. 334, 517 N.E.2d 745 (1987), and **\*450** *People v. Kidd,* 295 Ill.App.3d

160, 229 Ill.Dec. 682, 692 N.E.2d 455 (1998), the appellate court held that a defendant is entitled to an instruction on second degree murder where the intent to kill or to use deadly force in a felony-murder case is formed after the formation of his belief in the need for self-defense. 307 Ill.App.3d at 715-16, 240 Ill.Dec. 725, 718 N.E.2d 206. The appellate court found that this error constituted reversible error with regard to Jon's conviction for the first degree murder of Lila.

The State argues that pursuant to the plain language of the second degree murder statute (720 ILCS 5/9-2 (West 1996)), it is clear that second degree murder does not apply to a felony-murder count. The second degree murder statute provides:

> **\*\*840 \*\*\*432** "(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:
>
> (1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or
>
> (2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." 720 ILCS 5/9-2(a) (West 1996).

The State contends that because the second degree murder statute, by definition, does not encompass felony murder, the appellate court committed reversible error when it found that the jury should have been given second degree murder instructions for the felony-murder counts.

In *Williams* and in *Kidd,* the appellate court held

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 28

that, where provocation occurs prior to the time that a defendant forms a felonious intent or commits an aggravated battery, he is entitled to a jury instruction on *451 second degree murder. *Kidd,* 295 Ill.App.3d at 165, 229 Ill.Dec. 682, 692 N.E.2d 455; *Williams,* 164 Ill.App.3d at 110, 115 Ill.Dec. 334, 517 N.E.2d 745. The court in *Kidd* stated that barring a second degree murder instruction in a felony-murder case would effectively eliminate the second degree murder statute in intentional or knowing murder cases. *Kidd,* 295 Ill.App.3d at 165, 229 Ill.Dec. 682, 692 N.E.2d 455. The second degree murder statute would be eliminated because prosecutors that had sufficient evidence to defeat a claim of provocation would charge knowing or intentional murder, while prosecutors that did not have sufficient evidence to defeat a claim of provocation would simply bar that claim by charging a defendant with felony murder. *Kidd,* 295 Ill.App.3d at 165-66, 229 Ill.Dec. 682, 692 N.E.2d 455. The *Kidd* court also noted that in *Viser,* an instruction on the provocation defense was given. *Kidd,* 295 Ill.App.3d at 165, 229 Ill.Dec. 682, 692 N.E.2d 455.

In reversing the trial court's order denying defendant's request for a second degree murder instruction on the felony-murder charges, the appellate court in this case held that the trial court had erred in declining to follow the precedent set by the court in *Williams* and in *Kidd.* Because we find the holdings in *Williams* and *Kidd* to be erroneous, however, we reverse the appellate court's finding that the trial court should have followed the precedent set forth in those cases and should have given second degree murder instructions on the felony-murder counts.

[24][25] The primary rule in statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Hickman,* 163 Ill.2d 250, 261, 206 Ill.Dec. 94, 644 N.E.2d 1147 (1994). In addition, courts must give the language of a statute its plain and ordinary meaning. *People v. Tucker,* 167 Ill.2d 431, 435, 212 Ill.Dec. 664, 657 N.E.2d 1009

(1995). Here, the second degree murder statute states that a defendant commits second degree murder when he commits first degree murder as set forth in sections 9-1(a)(1) or (a)(2) of the Code and certain mitigating factors are present. Nowhere does the second degree *452 murder statute reference section 9-1(a)(3) of the Code, felony murder.

[26][27] In addition, in construing a legislative act, courts should consider each section in connection with other sections. **841 ***433 *Bubb v. Springfield School District 186,* 167 Ill.2d 372, 382, 212 Ill.Dec. 542, 657 N.E.2d 887 (1995). Section 9-1(a)(3) of the Code states that a person commits first degree murder if in performing the acts which caused the death, "he is attempting or committing a forcible felony *other than second degree murder.*" (Emphasis added.) 720 ILCS 5/9-1(a)(3) (West 1996). It would be anomalous, then, to give a second degree murder instruction with regard to a charge of felony murder. Pursuant to the plain language of the statute, it is clear that the provocation defense of second degree murder is not available to a charge of felony murder. Accordingly, we reverse the appellate court's finding that a second degree murder instruction should have been given on the charges of felony murder, and affirm the trial court's order declining to give that instruction.

### PRIOR VIOLENT CONDUCT

The final argument raised in the State's appeal is that the appellate court erred when it reversed the trial court's ruling excluding evidence of prior violent conduct by Keith and Lila Cearlock. Following jury selection, but prior to the commencement of trial, the State moved to exclude testimony by Glenda Ashworth concerning the physical and emotional abuse she suffered as a child from her parents, Keith and Lila Cearlock. In addition, during the testimony of one of Jon's expert witnesses, Dr. Stuart Hart, the State objected to any testimony concerning Dr. Hart's interview with Glenda. The trial court sustained the objection, so Jon made an offer of proof concerning Dr. Hart's testimony. Jon

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

also presented a written offer of proof of Glenda's testimony.

In the written offer of proof, Glenda indicated that as young as ages four to six, she was beaten with a belt or *453 razor strap. As she grew older, she had to retrieve the razor strap prior to being beaten. In addition, Keith and Lila constantly put Glenda down and referred to her as stupid. Lila spanked Glenda with a belt or with a yardstick or flyswatter. Glenda claimed that when Keith beat her, he beat her with his full strength. Glenda also claimed that Lila pushed Keith into punishing Glenda.

When Glenda was around 13 to 16 years old, Keith broke several yardsticks beating her, and began using boards to beat her. Glenda also said that Keith told her that if she resisted him, he would kill Glenda in her sleep. Glenda believed Keith. Glenda said that when Keith brought Jon to Virginia in March or April 1995, Keith admitted to Glenda that he had been whipping Jon. Glenda asked Jon about the whippings, and Jon told her that everything was all right. Glenda stated that she allowed Jon to live with her parents even though they had abused her because she was looking for her parents' approval.

In the offer of proof concerning Dr. Hart's testimony, Dr. Hart testified that he interviewed Glenda over the telephone for approximately 1 hour and 45 minutes to see what Glenda knew about Jon's experiences with the Cearlocks and to learn about Jon's early development and experiences with Glenda and about Glenda's experiences as the Cearlocks' child. Glenda told Dr. Hart that, as a child, she experienced physical and psychological mistreatment by the Cearlocks which brought her to the point of considering suicide. Dr. Hart testified that Glenda described a repetitive and persistent pattern of frequent beatings with a belt, of repeated criticism, and of battling between Keith and Lila.

Dr. Hart agreed that he had to consider the passage of time and that changes may occur within people or families, but he did not believe any substantial changes had occurred in the Cearlock home. Dr.

Hart found it significant*454 that the experiences **842 ***434 described by Jon were very similar to Glenda's experiences as a child. On cross-examination, Dr. Hart testified that he had never contacted or spoken with Glenda's brother Doug in order to corroborate her statements about her childhood.

In ruling on the offer of proof concerning Glenda's testimony, the trial court considered the fact that there was a period of 20 to 25 years between the abuse allegedly suffered by Glenda and the abuse to which Jon testified. In addition, the trial court stated that there was no one that could rebut the testimony set forth in Glenda's offer of proof. The trial court also stated, "this court, anyway, does not have the indicia of reliability that the court believes it should have." The trial court declined to find a nexus between Glenda's testimony concerning events of 25 years ago and Jon's testimony of events in the past couple years, and therefore denied the offer of proof. The trial court also held that Jon could not directly or indirectly bring in Glenda's testimony through the testimony of Dr. Hart. After Jon made his offer of proof concerning Dr. Hart's testimony, the trial court stated the offer contained "nothing the Court hasn't heard before," and denied the offer of proof.

On appeal, the appellate court held that it was error for the trial court to exclude the evidence presented in the offers of proof. See 307 Ill.App.3d at 710, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23). The appellate court, citing *People v. Lynch,* 104 Ill.2d 194, 199-201, 83 Ill.Dec. 598, 470 N.E.2d 1018 (1984), observed that where a theory of self-defense is raised, evidence of a victim's violent or aggressive character is relevant (1) to show that the defendant's knowledge of the victim's behavior and tendencies affected the defendant's perceptions of and reactions to the victim's actions, and (2) to support the defendant's version of events where there are conflicting accounts. Despite its citation to *Lynch,* the appellate court then stated *455 that the testi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 30

mony of Glenda and Dr. Hart was not offered for either of the two purposes permitted by *Lynch,* but instead was offered to corroborate Jon's account of his life in the Cearlock home. See 307 Ill.App.3d at 710, 240 Ill.Dec. 725, 718 N.E.2d 206 (unpublished material under Supreme Court Rule 23).

Relying on *People v. Robinson,* 163 Ill.App.3d 754, 114 Ill.Dec. 898, 516 N.E.2d 1292 (1987), the appellate court held that Glenda's corroborative testimony was admissible. The appellate court also stated that Jon's lack of knowledge concerning his mother's childhood experiences had no bearing on the purpose for which her testimony was offered. Likewise, the appellate court held that Dr. Hart's testimony should have been admitted to explain his reliance on the family history provided by Glenda. In support of its finding, the appellate court noted that an expert witness may base his opinion on information that has not been admitted into evidence. The appellate court further concluded that the error was harmless with respect to the verdict of second degree murder as to Keith, but was prejudicial error with regard to the verdict of first degree murder as to Lila.

[28][29][30][31][32] It is within the trial court's discretion to decide whether evidence is relevant and admissible. *People v. Hayes,* 139 Ill.2d 89, 130, 151 Ill.Dec. 348, 564 N.E.2d 803 (1990). A trial court's decision concerning whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion. *Hayes,* 139 Ill.2d at 130, 151 Ill.Dec. 348, 564 N.E.2d 803. An abuse of discretion will be found only where the trial court's decision is "arbitrary, fanciful or unreasonable" or where no reasonable man would take **\*\*843 \*\*\*435** the trial court's view. *People v. Illgen,* 145 Ill.2d 353, 364, 164 Ill.Dec. 599, 583 N.E.2d 515 (1991), quoting *People v. M.D.,* 101 Ill.2d 73, 90, 77 Ill.Dec. 744, 461 N.E.2d 367 (1984), quoting *Peek v. United States,* 321 F.2d 934, 942 (9th Cir.1963). Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action

either more or less probable than it would be **\*456** without the evidence. *Illgen,* 145 Ill.2d at 365-66, 164 Ill.Dec. 599, 583 N.E.2d 515. However, a trial court may reject evidence on the grounds of relevancy if the evidence is remote, uncertain or speculative. *People v. Cloutier,* 156 Ill.2d 483, 501, 190 Ill.Dec. 744, 622 N.E.2d 774 (1993).

[33] For the reasons that follow, we cannot conclude that the trial court's ruling excluding the proffered testimony was so arbitrary, fanciful or unreasonable that no reasonable man would take the view adopted by the trial court. In so holding, we find the appellate court's reliance on *People v. Robinson,* 163 Ill.App.3d 754, 114 Ill.Dec. 898, 516 N.E.2d 1292 (1987), to be misplaced.

In *Robinson,* the court held that, where a theory of self-defense is raised, a victim's violent and aggressive character is relevant to show who was the aggressor. *Robinson,* 163 Ill.App.3d at 772, 114 Ill.Dec. 898, 516 N.E.2d 1292. The *Robinson* court noted that it generally is a defendant's right to present evidence of a victim's character for violence when the defendant alleges that he acted in self-defense against the victim, because such evidence tends to show circumstances confronting the defendant, the extent of the defendant's apparent danger, and the motive influencing the defendant. *Robinson,* 163 Ill.App.3d at 773, 114 Ill.Dec. 898, 516 N.E.2d 1292. Accordingly, the defendant in *Robinson* should have been permitted to introduce evidence of prior threats and violence by the victim against the defendant, even where the victim was killed when the defendant and a third man struggled over a shotgun. *Robinson,* 163 Ill.App.3d at 774, 114 Ill.Dec. 898, 516 N.E.2d 1292.

Here, in contrast to *Robinson,* Jon was allowed to testify concerning his grandparents' aggressive and violent character. Jon also testified concerning how his knowledge of that violent and aggressive character affected his perceptions of and reactions to his grandparents' behavior after he fired the gun at the Tilex bottle. Jon claimed that when he saw Keith coming toward him, he thought Keith was going to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

beat him to death, and *457 shot Keith " [s]o he couldn't get to me." Jon further claimed that he shot Lila because " [s]he was just as dangerous as my grandpa" and because Keith would never beat Jon without Lila forcing him into it. The trial jury apparently found Jon to be credible, as the jury found Jon guilty of second degree murder with respect to Keith.

Although the appellate court claimed that the testimony of Glenda and Dr. Hart was not offered for either of the two purposes permitted by *Lynch,* the testimony clearly was offered to corroborate Jon's claim of self-defense. With that in mind, we fail to see how Glenda's testimony concerning her childhood many years earlier was relevant to Jon's claim of self-defense. Under *Lynch,* one of the purposes for which the Cearlocks' violent and aggressive character could be introduced was to show how Jon's knowledge of their character affected his perceptions and reactions. Because there was no testimony that Jon was aware of his mother's childhood experiences, however, testimony concerning Glenda's childhood could not have affected Jon's perceptions and reactions.

**844 ***436 Likewise, the other purpose for which evidence of a victim's propensity for violence can be admitted under *Lynch* is to support a defendant's version of events where there are conflicting accounts of what happened. Here, too, the account of Glenda's childhood was not relevant to Jon's claim of self-defense because there were no conflicting accounts of what had happened. In fact, all accounts of what had happened were based upon Jon's statements and testimony.

As noted, relevant evidence must have a tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. We agree with the trial court that any nexus between testimony *458 concerning Glenda's childhood and Jon's claim of self-defense was remote at best. Indeed, with regard to Lila, we fail to see how the information concerning Glenda's child-

hood was relevant at all.

When Lila saw Jon with the gun, she screamed and began to run out of the house, at which point Jon shot her in the back. Jon then followed Lila as she made it out of the house, and attempted to shoot her some more when she fell face forward into the grass, but his gun jammed. Jon then went inside the house to look for Lila's gun, so that he could go back outside and continue shooting her. We find no nexus between Glenda's childhood and Jon's pursuit of a fleeing Lila. Even if Jon feared Lila because she goaded Keith into beating Jon, that threat had been removed when Keith was shot first.

Under the circumstances, we disagree with the appellate court that the testimony of Glenda and Dr. Hart should have been admitted to corroborate Jon's account of life in the Cearlock home. Consequently, we reverse the appellate court's finding that it was prejudicial error to exclude the evidence set forth in Jon's offers of proof, and affirm the trial court's ruling excluding the evidence.

## CONCLUSION

[34] For the foregoing reasons, we disagree with the appellate court's holding that the trial court had committed reversible error in denying Jon's motion to suppress his initial statement to Harberts. We agree with the appellate court's holding that the predicate felony underlying a charge of felony murder must have an independent felonious purpose, but disagree with the appellate court's holding that Jon's conviction for the first degree murder of Lila must be reversed due to the trial court's error in denying Jon's motion to dismiss the felony-murder counts and in instructing the jury on felony murder. We also disagree with the appellate court's holding that the trial court should have given second degree murder *459 instructions on the counts of felony murder. Finally, we disagree with the appellate court's holding that the testimony set forth in Jon's offers of proof should have been admitted at trial. We agree with the appellate court's holding that Jon

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 32

was properly transferred from juvenile court and that the trial court properly denied Jon's motion to suppress statements he made while in police custody.

For the reasons stated, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court is affirmed.

*Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed.*

Justice GARMAN took no part in the consideration or decision of this case.

Justice FREEMAN, dissenting:

I respectfully dissent from the opinion of the court. Unlike my colleagues, I believe **\*\*845 \*\*\*437** that the circuit court erred in denying defendant's motion to suppress the statements he made while in police custody.

The totality of the circumstances surrounding a confession is to be considered in the determination of whether a juvenile confessed to a crime following a knowing and voluntary waiver of his *Miranda* rights. *Fare v. Michael C.,* 442 U.S. 707, 724-25, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197, 212 (1979). Factors to consider include the juvenile's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of the questioning. *In re G.O.,* 191 Ill.2d 37, 54, 245 Ill.Dec. 269, 727 N.E.2d 1003 (2000). Other factors also include the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by police such as threats or promises. *In re G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003. This court has held that the test for voluntariness is whether **\*460** the juvenile " 'made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [juvenile's] will was overcome at the time he or she confessed.' " *In re G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003, quoting *People v. Gilliam,* 172 Ill.2d 484, 500, 218 Ill.Dec. 884, 670 N.E.2d 606 (1996). Critically, this court has been mindful of the fact that "the taking of a ju-

venile's confession is 'a sensitive concern.' " *In re G.O.,* 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003, quoting *People v. Prude,* 66 Ill.2d 470, 476, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977). We have noted that the " 'greatest care' " must be used in order to assure that the confession was not coerced or suggested and that " 'it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " *People v. Simmons,* 60 Ill.2d 173, 180, 326 N.E.2d 383 (1975), quoting *In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967). As we explained in *In re G.O.,* this specialized concern has led this court to include another factor in the inquiry, *i.e.,* whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. *In re G.O.,* 191 Ill.2d at 54-55, 245 Ill.Dec. 269, 727 N.E.2d 1003. This factor also includes whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents' attempt to confer with the juvenile. *In re G.O.,* 191 Ill.2d at 55, 245 Ill.Dec. 269, 727 N.E.2d 1003.

The court today lists the factors that lead it to conclude that the circuit court correctly denied defendant's motion to suppress. First among these are the defendant's age, experience, and emotional characteristics. 197 Ill.2d at 437, 259 Ill.Dec. at 425, 758 N.E.2d at 833. The court finds significant the fact that defendant was of average intelligence, with normal reading, writing, and verbal skills. 197 Ill.2d at 437, 259 Ill.Dec. at 425, 758 N.E.2d at 833. In my view, however, the record contains evidence which does not support the court's conclusion.

Defendant was 14 years of age at the time of his arrest. He had no prior experience with the legal system or with police interrogation. The record reveals that **\*461** defendant's only brush with the law came when he and another youth were caught trespassing on private property by a police officer. Defendant was not arrested but, instead, was warned by the officer and told to go home. Such an interaction can

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813                                              Page 33
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

hardly be deemed as "experience" that would pre-pare a juvenile for the complexities of a double murder investigation interrogation.

As for defendant's emotional characteristics, the court's opinion is devoid of any details with respect to this factor. I find this lack of detail troubling in light of the **846 ***438 evidence contained in the record pertaining to defendant' emotional health. According to the testimony, defendant was treated for psychiatric problems at the time he entered kindergarten. Defendant's problems, discovered when he was five years old, eventually required hospitalization at the Psychiatric Institute of Richmond. Defendant was treated with antidepressants and was later discharged when he was no longer considered a danger to himself or others. Defendant was readmitted to the same psychiatric institute later when the problems continued. The reason for the readmission was aggression, academic deterioration, and suicidal tendencies. Defendant was ultimately diagnosed with major depression and attention deficit disorder. These conditions were treated successfully with medication.

The record reveals, however, that when defendant's mother sent defendant to live with the victims, the course of defendant's psychiatric treatment changed, and the medicine, which had controlled defendant's condition, was discontinued. Defendant was enrolled at Park Meadows Baptist Church and Academy. According to the principle of the academy, when defendant was disciplined, he would acknowledge his wrongdoing and accept his punishment. Defendant appeared to accept the discipline without any signs of outward rebellion. Dr. Chapman, who interviewed defendant to determine his fitness to *462 stand trial, testified that defendant lacked the ability to appreciate the gravity of the situation when he waived his *Miranda* rights. Dr. Chapman stated that defendant's behavior with the authorities the night of his arrest was consistent with his past behavior of trying to please authority figures. In light of these facts, I cannot agree that the evidence supports the conclusion that defend-

ant's age, experience, and emotional characteristics weigh in favor of the finding of a voluntary and knowing confession. Contrary to the court's view, these factors should weigh in favor of suppressing the confession.

The court next notes that although defendant was handcuffed when he was first taken to the police station from the crime scene, in violation of Lincoln police policy, this fact is not relevant because Detective Harberts testified that, at the time, he believed defendant to be 18 or 19 years old. Although the court does not consider this fact "significant enough" to render defendant's statements coerced or involuntary (197 Ill.2d at 439, 259 Ill.Dec. at 425-426, 758 N.E.2d at 833-834), I disagree. The record contains several photographs that depict defendant at the time of his arrest. The photographs, in my view, tend to show a young boy of high school age. Given the fact that the victims in this case were known by police to have been defendant's grandparents, I cannot conceive of a police officer not ascertaining whether the alleged perpetrator in his custody was a juvenile. This fact, in conjunction with the officer's failure to contact defendant's parents or a juvenile officer prior to questioning, raises a serious question as to whether the police that night were as mindful of the fact that "the taking of a juvenile's confession" is as " 'sensitive [a] concern' " as this court has deemed it to be. *In re G.O.*, 191 Ill.2d at 54, 245 Ill.Dec. 269, 727 N.E.2d 1003, quoting *People v. Prude*, 66 Ill.2d 470, 476, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977).

In this case, when Harberts discovered that defendant was only 14 years old, he called the Logan County *463 State's Attorney for advice. The State's Attorney's merely advised Harberts to make sure that defendant received his *Miranda* rights and to find out if the victims were his guardians. Harberts began his interrogation shortly after 9 p.m. At that time, Harberts did **847 ***439 not tell defendant that he could consult with his parents, nor did he advise defendant that he could be tried as an adult. Harberts waited until 1 to 1 1/2 hours later to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 34

attempt to call defendant's mother. When he finally did telephone defendant's mother, he received only an answering machine, on which he left a short message stating only his name and that defendant was with him and there was an emergency. When defendant's mother returned the call, she advised Harberts that defendant suffered from attention deficit disorder and that she wanted defendant to be provided with a lawyer. This request was not complied with. Moreover, Harberts did not advise defendant that he could call the city of Lincoln's juvenile officer.[FN1] The behavior of Harberts certainly suggests that the " 'greatest care' " might not have been used to assure that the confession was not coerced or suggested and that " 'it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " *People v. Simmons,* 60 Ill.2d 173, 180, 326 N.E.2d 383 (1975), quoting *In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967). This is yet another factor that should weigh in favor of suppressing the confession.

> FN1. The record reveals that a member of the Lincoln police department eventually telephoned the youth officer, Sergeant Sisk at 10:30 p.m. Sisk, who was at home sleeping, was asked if he knew the defendant. He stated that he did not know "this kid" and went back to bed. Sisk was not told by the officer that the "kid" in question had been arrested in the shooting deaths of two people and was currently in custody. This evidence hardly establishes confidence in the way in which law enforcement officials attempted to protect this juvenile's rights.

The foregoing facts, viewed under the totality of the *464 circumstances, compel me to conclude that defendant's statement should have been suppressed. As the United States Supreme Court has recognized:

> "[A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible

only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325, 328 (1962).

In this case, defendant's age, experience, and the lack of a concerned adult's presence, not to mention the evidence of record concerning defendant's mental characteristics, raise a genuine doubt whether the confession which ensued was the product of free will. For this reason, I disagree with the court's conclusion that the circuit court did not err in denying defendant's motion to suppress.

Given my position on the issue of the admissibility of defendant's confession, I could end this dissent here. However, I wish to also point out my disagreement with the court's conclusion that the circuit court's error in instructing the jury on felony murder does not constitute reversible error with regard to defendant's conviction for the first degree murder of Lila. See 197 Ill.2d at 448, 259 Ill.Dec. at 430, 758 N.E.2d at 838. The court bases this conclusion on the fact that the jury's return of the general verdict raises a presumption that the jury found defendant guilty of the most serious crime charged, which, in this case, would be intentional murder. See 197 Ill.2d at 448, 259 Ill.Dec. at 430-431, 758 N.E.2d at 838-839.

I assume that when the court states that the error does not constitute reversible **848 ***440 error (197 Ill.2d at 448, 259 Ill.Dec. at 430, 758 N.E.2d at 838), the court means that any error which occurred in this case was harmless. However, the court's harmless error analysis fails to consider that the prosecutor in this case *465 argued repeatedly to the jury that it should first consider the felony murder theory because, if the jury found the underlying felony proved, then it need not deal with the considerable amount of evidence relating to defend-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

758 N.E.2d 813
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405
**197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405**

Page 35

ant's mental state. Given the State's argument, I believe that the court's reliance on the presumption is inappropriate. The State's argument demonstrates that the erroneous instruction may have played a part in the jury's decision to convict defendant of first, as opposed to second, degree murder. In this respect, I agree with the conclusions reached by the appellate court with respect to this issue:

"The State * * * presented general verdict forms, which obscure the basis for the jury's verdict, and repeatedly encouraged the jury to deal only with the felony murder counts and to disregard evidence of [defendant's] mental state. * * *

* * * In this case, the prosecutor succeeded in diluting the intent requirement for knowing or intentional murder by charging felony murder and, as a result, [defendant] was denied a fair trial." *People v. Morgan,* 307 Ill.App.3d 707, 717, 240 Ill.Dec. 725, 718 N.E.2d 206 (1999).

For this reason, I disagree with the court's conclusion that the error in this case was not "reversible error."

Justice McMORROW joins in this dissent.
Ill.,2001.
People v. Morgan
197 Ill.2d 404, 758 N.E.2d 813, 259 Ill.Dec. 405

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

E-FILED
Wednesday, 13 August, 2008  03:13:14 PM
Clerk, U.S. District Court, ILCD

## IN THE CIRCUIT COURT
## FOR THE ELEVENTH JUDICIAL CIRCUIT
## LOGAN COUNTY, ILLINOIS

FILED
JUN 2 6 2002
Carla Linder
Clerk of the Circuit Court
Logan County, Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1995-CF-101 |
| | ) | |
| JON R. MORGAN, | ) | |
| | ) | |
| Defendant. | ) | |

### PETITION FOR POST-CONVICTION RELIEF

NOW COMES the Defendant, **Jon R. Morgan,** by and through his Court-appointed counsel,

PATRICK T. TIMONEY, pursuant to 725 ILCS 5/122-1 *et seq.*, and in support of his Petition for

Post-Conviction Relief, states as follows:

1.      That on April 28, 1995, proceedings were initiated against Defendant, Jon R. Morgan,

pursuant to the Juvenile Court Act, alleging the offenses of First Degree Murder.  Subsequently, a

Petition filed pursuant to Section 5-4 of the Juvenile Court Act, seeking to have Defendant tried as

an adult was granted.  Thereafter, Defendant was indicted on eight counts of First Degree Murder,

in violation of certain Sections of the Illinois Criminal Code (720 ILCS 5/*et seq.*)

2.      That a jury trial commenced on August 26, 1996, in McLean County, Illinois, and on

September 20, 1996, a jury verdict of guilty was rendered  for the offenses of First Degree Murder

as to Lila Cearlock, and a verdict of Second Degree Murder as to Keith Cearlock.  Thereafter,

judgments were entered on the verdicts.

3.      That on November 26, 1996, Defendant, Jon R. Morgan, was sentenced on the charge

of First Degree Murder to fifty-eight (58) years in the Illinois Department of Corrections, consecutive

to a term of seventeen (17) years on the charge of Second Degree Murder.

EXHIBIT M



4.    Subsequently, on December 16, 1996, a Notice of Appeal was filed with the Clerk of the Court and the Office of the Appellate Defender was appointed to represent the Defendant on appeal.

5.    That on September 29, 1999, the Illinois Appellate Court for the Fourth District of Illinois issued an Opinion, in Docket No. 4-96-0996, affirming the conviction of the Defendant, Jon R. Morgan, on the charge of Second Degree Murder, and reversing the conviction of the Defendant, Jon R. Morgan, on the charge of First Degree Murder. The Appellate Court thereafter remanded for a new trial.

6.    That on October 18, 2001, the Illinois Supreme Court, in Docket Nos. 88508 and 88513, issued an Opinion in which the judgment of the Appellate Court was affirmed, in part, and reversed, in part. The judgment of the Circuit Court was affirmed. A mandate on the decision of the Illinois Supreme Court was returned on November 26, 2001.

7.    That on April 23, 2002, Defendant, Jon R. Morgan, filed a Motion for Extension of Time to file a Petition for Post-Conviction Relief. Further, on June 11, 2002, Defendant's *pro se* Motion for Extension of Time to file a Petition for Post-Conviction Relief was denied. Thereafter, the undersigned counsel was appointed to represent the Defendant in filing a Petition for Post-Conviction Relief on or before June 26, 2002.

8.    That counsel for Defendant, Jon R. Morgan, in drafting this Petition, does not have the benefit of reviewing any portions of the trial and/or appellate proceedings and respectfully reserves the right to amend this Petition to include any subsequently revealed denial of Defendant's Constitutional rights under the Constitution of the United States and/or the State of Illinois.

9.    That Defendant, Jon R. Morgan, asserts that there was a substantial denial of his Constitutional rights under the Constitution of the United States and of the State of Illinois in the



proceedings which resulted in his conviction:

(a)    That Defendant was denied his right to counsel, in violation of the Fifth Amendment of the United States Constitution and in violation of the Constitution of the State of Illinois;

(b)    That Defendant was denied the effective assistance of trial and appellate counsel, in violation of the Sixth Amendment of the United States Constitution, and in violation of the Constitution of the State of Illinois;

(c)    That Defendant was denied Due Process of Law, as guaranteed by the Seventh and Fourteenth Amendments of the United States Constitution, and as guaranteed by the Constitution of the State of Illinois; and

(d)    That Defendant was denied his right to present evidence, as guaranteed by the United States Constitution and the Constitution of the State of Illinois.

WHEREFORE, Defendant, **Jon R. Morgan**, prays this Court enter an Order vacating the judgment and sentence imposed and discharging the Defendant or, in the alternative, to grant the Defendant a new trial.

Respectfully submitted,

**Jon R. Morgan**, Defendant

By: _____
        Patrick T. Timoney
        His Attorney

**PATRICK T. TIMONEY** (6204653)
Attorney for Defendant
808 South 2nd Street
Springfield, IL 62704
Phone: (217) 522-1944
          (217) 732-1944



## PROOF OF SERVICE

Service of the foregoing document was made by hand delivering a true copy thereof, in a sealed envelope, addressed to:

Logan County State's Attorney's Office
Logan County Courthouse
Lincoln, IL 62656

by the undersigned this _26th_ day of June, 2002.

**PATRICK T. TIMONEY** (6204653)
Attorney for Defendant
808 South 2nd Street
Springfield, IL 62704
Phone: (217) 522-1944
     (217) 732-1944



I hereby certify the document to which this
certificate is attached is a true and complete
copy of this original on file and of record
in my office.

Date: 6/17/08

CARLA BENDER
Clerk of the Circuit Court in the
State of Illinois and County of Logan

E-FILED
Wednesday, 13 August, 2008  03:13:36 PM
Clerk, U.S. District Court, ILCD

## IN THE CIRCUIT COURT
### FOR THE ELEVENTH JUDICIAL CIRCUIT
### LOGAN COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,          )
                                          )
    Plaintiff,         )
                                          )
    v.                 )    Case No.  1995-CF-101
                                          )
JON R. MORGAN,                            )
                                          )
    Defendant.         )

*FILED*

*JAN 0 5 2005*

*Carla Bender*
*Clerk of the Circuit Court*
*Logan County, Illinois*

### AMENDED PETITION FOR POST-CONVICTION RELIEF

NOW COMES the Defendant, **Jon R. Morgan**, by and through his Court-appointed counsel, PATRICK T. TIMONEY, pursuant to 725 ILCS 5/122-1 *et seq.*, and in support of his Amended Petition for Post-Conviction Relief, states as follows:

1.    That on April 28, 1995, proceedings were initiated against Defendant, Jon R. Morgan, pursuant to the Juvenile Court Act, alleging the offenses of First Degree Murder.  Subsequently, a Petition filed pursuant to Section 5-4 of the Juvenile Court Act, seeking to have Defendant tried as an adult was granted.  Thereafter, Defendant was indicted on eight counts of First Degree Murder, in violation of certain Sections of the Illinois Criminal Code (720 ILCS 5/*et seq.*)

2.    That a jury trial commenced on August 26, 1996, in McLean County, Illinois, and on September 20, 1996, a jury verdict of guilty was rendered  for the offenses of First Degree Murder  as to Lila Cearlock, and a verdict of Second Degree Murder as to Keith Cearlock. Thereafter, judgments were entered on the verdicts.

3.    That on November 26, 1996, Defendant, Jon R. Morgan, was sentenced on the charge of First Degree Murder to fifty-eight (58) years in the Illinois Department of Corrections, consecutive to a term of seventeen (17) years on the charge of Second Degree Murder.

EXHIBIT N



4.      Subsequently, on December 16, 1996, a Notice of Appeal was filed with the Clerk of the Court and the Office of the Appellate Defender was appointed to represent the Defendant on appeal.

5.      That on September 29, 1999, the Illinois Appellate Court for the Fourth District of Illinois issued a Decision, in Docket No. 4-96-0996, affirming the conviction of the Defendant, Jon R. Morgan, on the charge of Second Degree Murder, and reversing the conviction of the Defendant, Jon R. Morgan, on the charge of First Degree Murder. The Appellate Court thereafter remanded for a new trial.

6.      That on October 18, 2001, the Illinois Supreme Court, in Docket Nos. 88508 and 88513, issued an Opinion in which the judgment of the Appellate Court was affirmed, in part, and reversed, in part. The judgment of the Circuit Court was affirmed. A mandate on the decision of the Illinois Supreme Court was returned on November 26, 2001.

7.      That on April 23, 2002, Defendant, Jon R. Morgan, filed a Motion for Extension of Time to file a Petition for Post-Conviction Relief. Further, on June 11, 2002, Defendant's *pro se* Motion for Extension of Time to file a Petition for Post-Conviction Relief was denied. Thereafter, the undersigned counsel was appointed to represent the Defendant in filing a Petition for Post-Conviction Relief on or before June 26, 2002.

8.      That on June 26, 2002, a Petition for Post-Conviction Relief was filed by counsel in drafting said petition was without the benefit of reviewing any portions of the trial and/or appellate proceedings and therefore respectfully reserved the right to amend said Petition to include specifics of any subsequently revealed denial of Defendant's rights under the United States and/or Illinois Constitutions.

9.      That Defendant, Jon R. Morgan, more specifically asserts that there was a substantial denial of his rights under the Constitution of the United States and of the State of Illinois in the



proceedings which resulted in his conviction in the following way:

(a)    That Defendant was denied his right to counsel under the Fifth Amendment of the United States Constitution and of the Illinois Constitution in that defendant who was a juvenile at the time, was subjected to custodial interrogation without the presence of legal representation, his parent and/or guardian or juvenile officer;

(b)    That Defendant was denied the effective assistance of trial and appellate counsel, in violation of the Sixth Amendment of the United States Constitution, and in violation of the Constitution of the State of Illinois in that defendant was represented by the same counsel at trial and at the Appellate Court level and said counsel failed to preserve issues for appeal at the trial level and further failed to raise issues on appeal including, but not limited to counsels own ineffective assistance of counsel;

(c)    That Defendant was denied his right to present evidence, as guaranteed by the United States Constitution and the Constitution of the State of Illinois in that defendant was not allowed to present evidence at trial, specifically testimony from defendant's mother and Dr. Hart concerning the abusive history and character of the victims, Keith and Lila Cearlock;

(d)    That Defendant was sentenced in violation of the United States Constitution and the Constitution of the State of Illinois in that defendant was sentenced to consecutive sentences for offenses which occurred at the same time and arose from the same or related course of conduct;

(e)    That Defendant was denied due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution, and as guaranteed by the Constitution of the State of Illinois in that errors which occurred at trial, sentencing and on appeal so infected the entire process that the resulting conviction, sentence and/or appeal violates due process.


WHEREFORE, Defendant, **Jon R. Morgan**, prays this Court enter an Order vacating the judgment sentence imposed and discharging the Defendant or, in the alternative, to grant the Defendant a new trial.

Respectfully submitted,

**Jon R. Morgan**, Defendant

By: _____
Patrick T. Timoney
His Attorney

**A-17**

## PROOF OF SERVICE

Service of the foregoing document was made by hand delivering a true copy thereof, in a sealed envelope, addressed to:

Logan County State's Attorney's Office
Logan County Courthouse
Lincoln, IL 62656

by the undersigned this ___4th___ day of January, 2005.

RECEIVED
DEC 1 2 2007
CRIMINAL APPEALS

**PATRICK T. TIMONEY** (6204653)
Attorney for Defendant
808 South 2nd Street
Springfield, IL 62704
Phone: (217) 522-1944
         (217) 732-1944



1995CF000101D 001
PEOPLE
VS.                                      HUYETT, TIMOTHY
MORGAN, JON R K60696                     TIMONEY, PATRICK PD
--------------------------------------------------------------------------------
ENTERED   JDG CR  TEXT                                           CHANGED USER
--------------------------------------------------------------------------------

10/05/2004 DLC VD  SA/PD and deft appear.
                   Hearing set on State's motion to Dismiss for 1-5-05 at 9:00am.
                   Notice given in open court.
                   Order of Habeas Corpus handed to IDOC. Copy filed. Copy to SA.
                   Deft remanded to the custody of the Il Dept of Corrections.

1/05/2005 DLC VD   SA/PD and deft appear.
                   Amended Petition for Post Conviction Relief and Affidavit filed.
                   Amended Motion to Dismiss Defendant's Petition for Post Conviction
                   Relief filed by SA.  Hearing held on Motion to Dismiss.  Arguments of
                   SA and Mr. Timoney.  As to paragraph 9(a) the Court finds that res
                   judicata applies and this sub paragraph is denied.  As to Paragraph
                   9(b) the Court finds that said allegations are non specific and amount
                   to mere conclusions and is dismissed.  As to Paragraph 9(c) the
                   Court finds that res judicata applies and this sub paragraph is
                   denied.  As to Paragraph 9(d) involes a matter that would have been
                   addressed on appeal and is waived and this paragraph is denied.
                   As to Paragraph 9(e) the Court finds that said allegations are non
                   specific and non factual and are mere conclusions and said sub
                   paragraph is dismissed.  The Court finds that no showing of a
                   substantial constitutional issue has been made in this Petition.  The
                   Post Conviction Petition is hereby dismissed.  Defendant advised of
                   Appeal rights.  Clerk directed to file notice of appeal and Appellate
                   Defender appointed to represent defendant.
1/05/2005      MK  Notice of Appeal filed.  Appointment of Counsel on Appeal filed.
                   Copy mailed to Appellate Court, Appellate Defender, deft., and S.A.

1/12/2005      MK  Letter to counsel filed.

1/21/2005      MK  Letter from Appellate Defender filed.

1/24/2005      MK  Docketing Order filed.

3/03/2005      MK  Report of Proceedings filed by Valerie Davis (one volume).

3/08/2005      MK  Clerk's Certificate of Mailing filed as to appeal record.

3/11/2005      MK  Letter showing receipt of appeal record filed.

6/15/2006      MK  Clerk's Certificate of Mailing filed as to People's exhibit 80, 80(a),
                   and 81 mailed to Appellate Defender's Office.

6/21/2006      MK  Return receipt filed.

7/12/2006      MK  People's exhibit 80, 80(a), and 81 returned by the Appellate Defender:
                   they are not going to supplement these to record.

3/12/2008      MK  Mandate ret'd:  Affirmed.

6/06/2008      SM  Letter requesting copies of post-conviction petition from the Office
                   of the Attorney General filed.  Due to the Appellate Court still
                   having the documents we could not fulfill this request.  Clerk spoke
                   with Craig Hulfachor on this matter.  Clerk is to provide the
                   documents when the file is returned from the Appellate Court.

6/16/2008      BJ  Appeal returned and Original Documents returned to folder. Transcripts
                   stored in small vault in basement.

EXHIBIT O

E-FILED
Wednesday, 13 August, 2008  03:14:38 PM
Clerk, U.S. District Court, ILCD

FILE COPY

No. 4-05-0009

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT



RECEIVED
MAR 1 4 2007
SAAP Fourth District

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan County, Illinois. |
| Respondent-Appellee, | ) ) | |
| -vs- | ) ) | No. 95-CF-101 |
| JON MORGAN, | ) ) | Honorable David L. Coogan, |
| Petitioner-Appellant. | ) ) | Judge Presiding. |

**BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT**

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT P

*People v. Morris*, 237 Ill.App.3d 140, 177 Ill.Dec. 822, 603 N.E.2d 1196
(2d Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*People v. O'Neal*, 125 Ill.2d 291, 126 Ill.Dec. 71, 531 N.E.2d 366
(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Phelps*, 211 Ill.2d 1, 284 Ill.Dec. 268,
809 N.E.2d 1214 (2004) . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Powell*, 159 Ill.App.3d 1005, 111 Ill.Dec. 727,
512 N.E.2d 1364 (1st Dist., 1st Div. 1987) . . . . . . . . . . . 30

*People v. Radford*, 359 Ill.App.3d 411, 296 Ill.Dec. 272,
835 N.E.2d 127 (1st Dist., 1st Div. 2005) . . . . . . . . . . . 26

*People v. Rucker*, 260 Ill.App.3d 659, 198 Ill.Dec. 684,
633 N.E.2d 146 (2d Dist. 1994) . . . . . . . . . . . . . . . . . 29

*People v. Schoultz*, 289 Ill.App.3d 392, 224 Ill.Dec. 885,
682 N.E.2d 446 (4th Dist. 1997) . . . . . . . . . . . . . . . . . 29

*People v. Sergeant*, 326 Ill.App.3d 974, 260 Ill.Dec. 859,
762 N.E.2d 518 (1st Dist., 5th Div. 2001) . . . . . . . . . . . 24

*People v. Tigner*, 194 Ill.App.3d 600, 141 Ill.Dec. 311,
551 N.E.2d 304 (1st Dist., 1st Div. 1990) . . . . . . . . . . . 26

730 ILCS 5/5-8-2(a) (West 1995) . . . . . . . . . . . . . . . . . . 26

730 ILCS 5-8-1(a)(1)(c)(ii) (West 1995) . . . . . . . . . . . . . . 28

### C.

### This Court Should Vacate Jon Morgan's Consecutive Sentences and Order That They Be Served Concurrently.

*In re T.E*, 85 Ill.2d 326, 53 Ill.Dec. 241, 423 N.E.2d 910 (1981) . . . . . 32

*People v. Arna*, 168 Ill.2d 107, 212 Ill.Dec. 963, 658 N.E.2d 445
(1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*People v. Bole*, 155 Ill.2d, 184 Ill.Dec., 613 N.E.2d . . . . . . . . . . . . . . 32

*People v. Land*, 304 Ill.App.3d 169, 237 Ill.Dec. 841,
710 N.E.2d 471 (4th Dist. 1999) . . . . . . . . . . . . . . . . 31, 32

*People v. Moore*, 250 Ill.App.3d, 906, 189 Ill.Dec. 615,
620 N.E.2d 583 (4th Dist. 1993) . . . . . . . . . . . . . . . . . 32

730 ILCS 5/5-8-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## II.

**POST-CONVICTION COUNSEL FAILED TO RENDER THE REASONABLE LEVEL OF ASSISTANCE APPLICABLE IN POST-CONVICTION PROCEEDINGS, AND THIS CAUSE MUST BE REVERSED AND REMANDED FOR FURTHER STAGE-TWO PROCEEDINGS.**

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*People v. Davis*, 156 Ill.2d 149, 189 Ill.Dec. 49, 619 N.E.2d 750 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Flores*, 153 Ill.2d 264, 180 Ill.Dec. 1, 606 N.E.2d 1078 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Gaines*, 105 Ill.2d 79, 85 Ill.Dec. 269, 473 N.E.2d 868 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Moore*, 177 Ill.2d 421, 226 Ill.Dec. 804, 686 N.E.2d 587 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Turner*, 187 Ill.2d 406, 241 Ill.Dec. 596, 719 N.E.2d 725 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*People v. Whitfield*, 217 Ill.2d 177, 298 Ill.Dec. 545, 840 N.E.2d 658 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Elliott*, 299 Ill.App.3d 766, 234 Ill.Dec. 303, 702 N.E.2d 643 (4th Dist. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Jennings*, 345 Ill.App.3d 265, 280 Ill.Dec. 616, 802 N.E.2d 867 (4th Dist. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

*People v. Morgan*, 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206 (4th Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Morgan*, 197 Ill.2d 404, 259 Ill.Dec. 405, 758 N.E.2d 813 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

725 ILCS 5/122-2 (West 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Supreme Court Rule 651(c) . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

# POINTS AND AUTHORITIES

## I.

**JON MORGAN'S CONSECUTIVE SENTENCES FOR FIRST AND SECOND DEGREE MURDER WERE NOT AUTHORIZED BY LAW BECAUSE, AS DEMONSTRATED BY THE JURY VERDICT, THE OFFENSES WERE NOT PART OF A SINGLE COURSE OF CONDUCT, AS REQUIRED FOR MANDATORY CONSECUTIVE SENTENCING UNDER 730 ILCS 5/5-8-4.**

*People v. Thompson*, 209 Ill.2d 19, 282 Ill.Dec. 183,
805 N.E.2d 1200 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Arrington*, 297 Ill.App.3d 1, 231 Ill.Dec. 658,
696 N.E.2d 1229 (2d Dist. 1998) . . . . . . . . . . . . . . . . . . . . . 21

*People v. Hemphill*, 259 Ill.App.3d 474, 197 Ill.Dec. 676, 631 N.E.2d
898 (4th Dist. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Hummel*, 352 Ill.App.3d 269, 287 Ill.Dec. 369,
371 815 N.E.2d 1172 (3d Dist. 2004) . . . . . . . . . . . . . . . 20, 21

*People v. Laboy*, 227 Ill.App.3d 654, 169 Ill.Dec. 692, 592 N.E.2d 179
(1st Dist., 5th Div. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Matthews*, 273 Ill.App.3d 148, 209 Ill.Dec. 897,
652 N.E.2d 437 (4th Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Peacock*, 359 Ill.App.3d 326, 295 Ill.Dec. 563,
833 N.E.2d 396 (4th Dist. 2005) . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Wilder*, 325 Ill.App.3d 987, 260 Ill.Dec. 79,
760 N.E.2d 496 (1st Dist., 5th Div. 2001) . . . . . . . . . . . . . . . 21

730 ILCS 5/5-8-4(a) (West 1995) . . . . . . . . . . . . . . . . . . . . . . . 20

730 ILCS 5/5-8-4(b) (West 1995) . . . . . . . . . . . . . . . . . . . . . . . 21

## A.

**In 1995, Consecutive Sentences Were Prohibited for Offenses Which Were Not Committed as Part of a Single Course of Conduct Unless the Trial Court Expressly Found That Such a Sentence Was Necessary to Protect the Public.**

*People v. Bole* 155 Ill.2d 188, 184 Ill.Dec. 423,
613 N.E.2d 740 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Cooper*, 239 Ill.App.3d 336, 179 Ill.Dec. 873,
606 N.E.2d 705 (5th Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Kagan*, 283 Ill.App.3d 212, 218 Ill.Dec. 713,
669 N.E.2d 1239 (2d Dist. 1996) . . . . . . . . . . . . . . . . . . . . . 23

*People v. Pippen*, 324 Ill.App.3d 649, 258 Ill.Dec. 492,
    756 N.E.2d 474 (4th Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Sergeant*, 326 Ill.App.3d 974, 260 Ill.Dec. 859,
    762 N.E.2d 518 (1st Dist., 5th Div. 2001) . . . . . . . . . . . . . . . . . 23

*People v. Wilder*, 325 Ill.App.3d 987, 260 Ill.Dec. 79,
    760 N.E.2d 496 (1st Dist., 5th Div. 2001) . . . . . . . . . . . . . . . 23

730 ILCS 5/5-8-4 (a) (West 1995) . . . . . . . . . . . . . . . . . . . . . . . 22, 23

730 ILCS 5/5-8-4 (b) (West 1995) . . . . . . . . . . . . . . . . . . . . . . . 22, 23

**B.**

**Jon Morgan's Offenses Did Not Qualify for Mandatory Consecutive Sentencing Because His Offenses Were Not Committed as Part of a Single Course of Conduct, and He Was Not Eligible for Consecutive Sentences under Any Other Statutory Provision.**

*People v. Bell*, 196 Ill.2d 343, 256 Ill.Dec. 306,
    751 N.E.2d 1143 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*People v. Williams*, 60 Ill.2d 1, 322 N.E.2d 819 (1975) . . . . . . . . . . . 26

*People v. Arrington*, 297 Ill.App.3d 1, 231 Ill.Dec. 658,
    696 N.E.2d 1229 (2d Dist. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Collins*, 366 Ill.App.3d 885, 304 Ill.Dec. 478,
    853 N.E.2d 10 (1st Dist., 3d Div. 2006) . . . . . . . . . . . . . . . . . 26

*People v. Fritz*, 225 Ill.App.3d 624, 167 Ill.Dec. 666,
    588 N.E.2d 307 (3d Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Hummel*, 352 Ill.App.3d 269, 287 Ill.Dec. 369,
    371 815 N.E.2d 1172 (3d Dist. 2004) . . . . . . . . . . . . . . . . . . . . 26

*People v. Ingram*, 84 Ill.App.3d 495, 39 Ill.Dec. 885,
    405 N.E.2d 864 (2d Dist. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Kagan*, 283 Ill.App.3d 212, 218 Ill.Dec. 713,
    669 N.E.2d 1239 (2d Dist. 1996) . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Laboy*, 227 Ill.App.3d 654, 169 Ill.Dec. 692, 592 N.E.2d 179
    (1st Dist., 5th Div. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Magnus*, 262 Ill.App.3d 362, 199 Ill.Dec. 73,
    633 N.E.2d 869 (1st Dist., 2d Div. 1994) . . . . . . . . . . 25, 27, 28

*People v. Morgan*, 44 Ill.App.3d 459, 3 Ill.Dec. 113,
    358 N.E.2d 280 (5th Dist. 1976) . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Morgan*, 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206
    (4th Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# NATURE OF THE CASE

The petitioner-appellant, Jon R. Morgan, appeals from a judgment dismissing his petition for post-conviction relief prior to a stage-three evidentiary hearing under the Post-Conviction Hearing Act. No issue is raised concerning the sufficiency of the charging instrument, but the sufficiency of the amendments to the petitioner's post-conviction petition are at issue.

# ISSUES PRESENTED FOR REVIEW

## I.

Whether Jon Morgan's consecutive sentences for first and second degree murder were not authorized by law because, as demonstrated by the jury verdict, the offenses were not part of a single course of conduct, as required for mandatory consecutive sentencing under 730 ILCS 5/5-8-4.

## A.

Whether in 1995, consecutive sentences were prohibited for offenses which were not committed as part of a single course of conduct unless the trial court expressly found that such a sentence was necessary to protect the public.

## B.

Whether Jon Morgan's offenses did not qualify for mandatory consecutive sentencing because his offenses were not committed as part of a single course of conduct, and he was not eligible for consecutive sentences under any other statutory provision.

## C.

Whether this Court should vacate Jon Morgan's consecutive sentences and order that they be served concurrently.

## II.

Whether post-conviction counsel failed to render the reasonable level of assistance applicable in post-conviction proceedings, and whether this cause must be reversed and remanded for further stage-two proceedings.

## JURISDICTION

Jon Morgan appeals the stage-two dismissal of his post-conviction petition on January 5, 2005. (Vol. XXXVI, R. 16-19) Timely notice of appeal was filed later that same day. (Vol. VI, C. 1411) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651(a).

## STATUTE INVOLVED

Sec. 5-8-4. Concurrent and Consecutive Terms of Imprisonment. (a) When multiple sentences of imprisonment are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to sentence in this State or in another state, or for a sentence imposed by any district court of the United States, the sentences shall run concurrently or consecutively as determined by the court. When a term of imprisonment is imposed on a defendant by an Illinois circuit court and the defendant is subsequently sentenced to a term of imprisonment by another state or by a district court of the United States, the Illinois circuit court which imposed the sentence may order that the Illinois sentence be made concurrent with the sentence imposed by the other state or district court of the United States. The defendant must apply to the circuit court within 30 days after the defendant's sentence imposed by the other state or district of the United States is finalized. The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12-13 or 12-14 of the Criminal Code of 1961 [720 ILCS 5/12-13 or 720 ILCS 5/12-14], in which event the court shall enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record. 730 ILCS 5/5-8-4 (West 1995)

# STATEMENT OF FACTS

**Trial and Direct Appeal**

"[I]t is clear from the record that Jon [Morgan] had suffered a tragic life and had been failed by his parents and grandparents." *People v. Morgan*, 197 Ill.2d 404, 430, 259 Ill.Dec. 405, 420, 758 N.E.2d 813, 828 (2001). Jon spent his early childhood in the care of his mother Glenda and his abusive, alcoholic father. (Vol. XXIV, R. 535; Vol. XXXI, R. 706-07) Between the ages of five and six, Jon was twice admitted to an inpatient psychiatric facility. (Vol. XXXI, R. 708-09) When Jon was seven, Glenda sent the boy to live with her parents, Keith and Lila Cearlock, a fundamentalist couple with a troubled relationship. (Vol. XXIV, R. 535; Vol. XXVI, R. 848; Vol. XXXI, R. 706-07, 728) While living with the Cearlocks, Jon was not allowed to play with children outside the church, watch cartoons, or wear shorts or tank tops. (Vol. XXXI, R. 717, 719-20, 723, 728)

The Cearlocks enrolled Jon in a school run by their pastor, "Brother Bryant." (Vol. XXXI, R. 713) After consulting with Brother Bryant, the Cearlocks removed Jon from all psychotropic medication and relied instead on screaming, grounding, and beatings three to four times a week to control behavior such as "being hyper" or talking in school, having trouble with homework, playing with children outside the church, or watching television. (Vol. XXXI, R. 714-18, 723, 729) Jon was hit on the buttocks with a foot-and-a-half long board at school and a razor strap at home. (Vol. XXVI, R. 862, 887; Vol. XXXI, R. 713-16) Jon's grandmother was the stricter of the two grandparents, and she would often goad her husband into hitting Jon. (Vol. XXXI, R. 723) These beating sometimes left marks on his legs, lower

back, and buttocks which a babysitter once saw him covering with makeup. (Vol. XXXI, R. 727; Vol. XXXII, R. 13-15) Evidence that the Cearlocks also had abused Glenda as a child was excluded at trial. (Vol. III, C. 717-21; Vol. XXII, R. 248-50; Vol. XXXI, R. 700; Vol. XXXIV, R. 384-92, 460)

Jon lived with his mother and her new husband in Virginia during fifth and sixth grades, but his lot did not improve. (Vol. XXIV, R. 535-36; Vol. XXXI, R. 706-07) Glenda's new husband was also an abusive alcoholic, and Jon was returned to the Cearlocks. (Vol. XXIV, R. 536; Vol. XXXI, R. 706-07, 731-38) Jon's grandfather continued to beat Jon at his grandmother's urging, and on a few occasions Mrs. Cearlock herself hit the boy. (Vol. XXXI, R. 744-45, 749-50, 753-55) The couple told Jon that his mother was a "whore" for being married more than once and that he would grow up to be "trash like her," unable to take care of his own children. (Vol. XXXI, R. 756) Jon felt that his grandmother intentionally tried to irritate him at times, and this made him angry. (Vol. XXXI, R. 851-53) According to Jon, his grandmother would appear to be pleasant at church and in public, but at home she would be a "bitch" to him and his grandfather. (Vol. XXXI, R. 873, 876-77)

Despite the challenges he faced, Jon did relatively well in school, receiving good grades and generally controlling his temper, and the paddlings at school stopped. (Vol. XXXI, R. 739) At fourteen, however, Jon was expelled from Brother Bryant's school when he refused to submit to an in-school suspension, a suspension which consisted of isolation from other students, watching and writing reports on dozens of "preaching videos," and reading a book. (Vol. XXVI, R. 864-67; Vol. XXXI, R. 741-43, 745-47) Jon's

-11-

infraction had been kissing a girl while off school grounds. (Vol. XXVI, R. 864; Vol. XXXI, R. 742-43) Afraid of Lincoln public schools, the Cearlocks initially "home schooled" Jon by leaving him in the house alone to work on assignments while the Cearlocks were at work.   (Vol. XXXI, R. 748-49) When Jon's mother learned of the conditions in the Cearlock home, she made arrangements to return Jon to Virginia, but in the time it took for Jon's grandfather to reach the east coast, Glenda had changed her mind and refused to take the boy back. (Vol. XXXI, R. 758-60)  Upon his return, Jon was enrolled in Lincoln Community High School. (Vol. XXIV, R. 536)

During the ensuing two weeks, conditions continued to deteriorate in the Cearlock house. One evening when Jon kicked a box of Legos in anger, his grandfather punched him in the face and back. (Vol. XXVI, R. 845-46; Vol. XXXI, R. 773-75, 881) As Jon lay crying in his room, his grandfather told him that if he ever fought back he would kill him in his sleep. (Vol. XXXI, R. 766-68, 776) According to the pastor of the Cearlocks's church, Mr. Cearlock confirmed that he would "come after [Jon] with a board in his sleep if the boy ever fought back." (Vol. XXIV, R. 490)  Although Jon never mentioned the abuse he was experiencing to anyone outside the home, he did tell his friend Steve Powell about his grandfather punching him. (Vol. XXVI, R. 845-46; Vol. XXXI, R. 881) Jon also talked to Steve about hating or disliking his grandmother, but he never threatened violence against her. (Vol. XXVI, R. 844-45)

What transpired the night of the shootings was gleaned from Jon's pre-trial statements and his trial testimony. When Jon received an in-school suspension for several tardies, notice was sent to the Cearlocks. (Vol. XXIV,

R. 525-26) When Mr. Cearlock arrived home that evening, he dragged Jon from his bed and the two grandparents began berating the boy. (Vol. XXIV, R. 526; Vol. XXXI, R. 781-83) According to Jon, he was ordered to bend over and touch his ankles and was beaten with the razor strap. (Vol. XXXI, R. 784-85) When Jon responded to denigrating comments about himself and his mother, Jon's grandfather slammed his fists on the kitchen table and swung at Jon. (Vol. XXXI, R. 785-87) Jon ducked to avoid the blow and crawled to the bathroom. (Vol. XXXI, R. 786-88)

After using the toilet, Jon retrieved a gun from his grandfather's closet, returned to the bathroom, and thought about killing himself. (Vol. XXIV, R. 527-28; Vol. XXXI, R. 788-90) While sitting in the bathroom, Jon shot a Tilex bottle sitting on the bathtub. (Vol. XXIV, R. 527-28; Vol. XXXI, R. 790-91, 849) When he emerged from the bathroom moments later, Mrs. Cearlock screamed, and when an angry Mr. Cearlock rounded the corner of the hallway, Jon shot him in the left temple. (Vol. XXIV, R. 529; Vol. XXXI, R. 791-92, 794) According to Jon, he was afraid his grandfather would kill him. (Vol. XXXI, R. 793-94) Jon shot Mrs. Cearlock in the back seconds later as she ran from the house, then followed her to the front yard where she collapsed. (Vol. XXII, R. 310; Vol. XXIII, R. 337; Vol. XXIV, R. 530; Vol. XXXI, R. 794-96) Once outside, the gun jammed. (Vol. XXII, R. 310; Vol. XXIII, R. 338; Vol. XXIV, R. 530; Vol. XXXI, R. 796) At trial, Jon denied trying to shoot his grandmother again, but witnesses standing down the street testified that he had, and Detective Mike Harberts testified that Jon had admitted doing so in his original unrecorded statement. (Vol. XXII, R. 310; Vol. XXIII, R. 338; Vol. XXIV, R. 530, 539; Vol. XXXI, R. 796-97)

-13-

The Cearlocks subsequently died from their wounds. (Vol. XXIII, R. 442, 450, 454)

Jon returned to the house, changed clothes, unsuccessfully searched for his grandmother's gun, grabbed a box of bullets, and walked to a friend's house. (Vol. XXIV, R. 530-32; Vol. XXXI, R. 798-99) When Jon discovered his friend was not there, he returned home, handed the gun and bullets to a police officer, and stated that he had shot his grandparents. (Vol. XXIII, R. 354-55 Vol. XXIV, R. 533-35; Vol. XXXI, R. 799-800) When the officer asked why, Jon replied, "They pissed me off. I couldn't take it anymore so I shot them." (Vol. XXIII, R. 356; Vol. XXIV, R. 499, 514) This Court held on direct appeal that this statement should not have been admitted at trial. *Morgan*, 197 Ill.2d at 441-42, 259 Ill.Dec. at 427, 758 N.E.2d at 835. Jon cooperated with police and subsequently waived his *Miranda* rights and made three statements admitting his conduct. (Vol. XXIV, R. 522-36, 540, 547-48, 561) In one of those statements, Jon stated that he had thought about shooting his grandparents before that night. (Vol. XXXI, R. 872)

The parties presented conflicting expert testimony regarding Jon's mental state, with the defense expert attributing Jon's actions to his history as a "battered person" and the State expert testifying that Jon acted out of anger and suffered from childhood onset conduct disorder. (Vol. XXV, R. 614, 618; Vol. XXXIII, R. 198-210) A third doctor, who had conducted Jon's original fitness evaluation, testified in surrebuttal that Jon did not have a conduct disorder. (Vol. XXVI, R. 1018-19) Jon testified that he did not tell police about the abuse he had suffered or his grandfather's threat to kill

him because he "didn't want to disrespect [his] grandparents" or talk about such personal problems with strangers. (Vol. XXXI, R. 803-04, 829) He did, however, mention to one officer the incident where his grandfather had punched him, he revealed details of the abuse to a psychiatrist who conducted a fitness evaluation several days later, and he subsequently discussed the abuse with defense and State psychiatrists. (Vol. XXXI, R. 845, 872, 903, 909-923; Vol. XXXVIII, C. 70)

An expert testified that leather fiber found on the buttocks area of the jeans Jon had been wearing that night were consistent with the razor strap. (Vol. XXXII, R. 41-46, 50-54) According to the expert, some degree of force would be necessary for such fiber transfer. (Vol. XXXII, R. 41-43) State and defense experts disagreed as to whether denim fibers on the strap matched Jon's jeans. (Vol. XXVI, R. 913; Vol. XXXII, R. 52-54) Photos of Jon in his underwear hours after his arrest did not reveal any bruises on his back or legs. (Vol. XXIV, R. 556) Four students from Brother Bryant's school testified that they had never seen bruises on Jon while the boys changed in the locker room. (Vol. XXIV, R. 506-07, 517-19, 531-33, 549-50)

Jon was transferred to adult court (Vol. IX, R. 450), and based on the foregoing evidence was convicted of second degree murder for shooting Keith Cearlock and first degree murder for shooting Lila Cearlock (Vol. IV, C. 979-81; Vol. XXIX, R. 3-4). The jury had been instructed on both felony and intentional theories of first degree murder as well as second degree murder. (Vol. IV, C. 873-76) The trial court sentenced Jon to consecutive

58 and 17 year terms of imprisonment respectively, citing deterrence as the reason for the lengthy sentences. (Vol. VI, C. 1266; Vol. XXX, R. 212-13)

Trial counsel represented Jon on direct appeal and raised five issues: (1) Jon's transfer to adult court; (2) the admissibility of Jon's statements to police; (3) the exclusion of evidence regarding the Cearlocks's abuse of Jon's mother; (4) the propriety of charging Jon with felony murder when the predicate felonies and murders shared the same felonious purpose; and (5) the trial court's refusal to give second degree murder instructions on the felony murder counts. *People v. Morgan*, 307 Ill.App.3d 707, 708-09, 240 Ill.Dec. 725, 728-29, 718 N.E.2d 206, 208-09 (4th Dist. 1999). This Court agreed that Jon's initial on-scene statement to police should have been excluded, that the abuse evidence should have been admitted, that the jury should have received second degree instructions on the felony murder counts, and that the felony murder charges should have been dismissed as lacking an independent felonious purpose. *Morgan*, 197 Ill.2d at 458-59, 259 Ill.Dec. at 436, 758 N.E.2d at 844; *Morgan*, 307 Ill.App.3d at 717-18, 240 Ill.Dec. at 734, 718 N.E.2d 206 at 215. This Court determined that the errors did not require reversal of the second degree conviction, but it reversed Jon's first degree conviction and remanded for a new trial. *Morgan*, 307 Ill.App.3d at 717-18, 240 Ill.Dec. at 734, 718 N.E.2d 206 at 215.

Both the State and the defendant's petitions for leave to appeal were granted, and on October 18, 2001, the Illinois Supreme Court reversed this Court's decision. *Morgan*, 197 Ill.2d at 410, 458-59, 259 Ill.Dec. at 410, 436, 758 N.E.2d at 818, 844. The court held that (1) failure to suppress

Jon's on-scene statement was harmless, (2) the evidence regarding the Cearlocks's abuse of their daughter was properly excluded, and (3) defendants are never entitled to second degree instructions on the charge of felony murder. *Morgan*, 197 Ill.2d at 442, 451, 458, 259 Ill.Dec. at 427, 432, 436, 758 N.E.2d at 835, 840, 844. The supreme court agreed that the predicate felony upon which a felony murder charge is based must have an independent felonious purpose, but it declined to reverse Jon's conviction on prejudice grounds because it presumed that the jury had convicted Jon of intentional rather than felony first degree murder. *Morgan*, 197 Ill.2d at 448-49, 458, 259 Ill.Dec. at 431, 436, 758 N.E.2d at 839, 844.

**Post-Conviction Proceedings**

On April 18, 2002, Jon mailed a motion for extension of time to file a post-conviction petition, and in response the trial court appointed an attorney to assist with the preparation of that petition, an attorney different than the attorney who had represented Jon at trial and on direct appeal. (Vol. I, C. 39P; Vol. VI, C. 1382) Two months later, counsel filed an initial petition which contained only general allegations that Jon had been deprived of his Fifth Amendment right to counsel, his Sixth Amendment right to the effective assistance of trial and appellate counsel, his Seventh and Fourteenth Amendment right to due process, and his constitutional right to present evidence. (Vol. VI, C. 1386-88) Thereafter, the State filed a motion to dismiss, denying the allegations and asserting that the petition was legally insufficient for failure to identify any specific claims of error. (Vol. VI, C. 1392)

-17-

Post-conviction counsel responded two-and-a-half weeks later with an amended petition, which (1) clarified that the Fifth Amendment claim was based on the lack of an attorney, parent, or interested adult at Jon's interrogation; (2) alleged that appellate counsel had rendered ineffective assistance by not raising his own ineffectiveness for failing to preserve unspecified trial errors; (3) asserted that Jon was deprived of his constitutional right to present testimony regarding the Cearlocks's history of abusing Jon's mother; (4) added a claim that Jon's consecutive sentences were unconstitutional because the "offenses . . . occurred at the same time and arose from the same or related course of conduct;" and (5) made a general Fourteenth Amendment due process claim.    (Vol. VI, C. 1404) Attached was an affidavit signed by Jon which mirrored the language of the petition. (Vol. VI, C. 1406-07) Counsel filed a 651(c) certificate in conjunction with this petition, alleging that he had consulted with the defendant, examined the court file and relevant transcripts, and made any necessary amendments to the petition. (Vol. VI, C. 1408) The State filed an amended motion to dismiss, noting that the suppression and evidentiary issues regarding prior abuse were *res judicata*, again arguing that the conclusory nature of the due process and Sixth Amendment claims did not warrant an evidentiary hearing, and asserting that the consecutive sentence issue was forfeited for failure to raise it on direct appeal.  (Vol. VI, C. 1409-10)

The State reiterated those arguments four days later at the second-stage hearing on the motion to dismiss, and further argued that consecutive sentences were mandatory under 730 ILCS 5/5-8-4(a) (West 1995).  (Vol.

-18-

XXXVI, R. 4-9) Post-conviction counsel responded to the lack of detail in support of the due process and ineffectiveness assistance claims by stating, "The details of each specific issue can be presented at an evidentiary hearing.    The question here today is whether or not he has made a substantial showing, and I believe that we have." (Vol. XXXVI, R. 13-14) The trial court granted the motion to dismiss, agreeing with the State's analysis of the issues. (Vol. XXXVI, R. 16-19) The instant appeal followed.

## ARGUMENT

### I.

**JON MORGAN'S CONSECUTIVE SENTENCES FOR FIRST AND SECOND DEGREE MURDER WERE NOT AUTHORIZED BY LAW BECAUSE, AS DEMONSTRATED BY THE JURY VERDICT, THE OFFENSES WERE NOT PART OF A SINGLE COURSE OF CONDUCT, AS REQUIRED FOR MANDATORY CONSECUTIVE SENTENCING UNDER 730 ILCS 5/5-8-4.**

Although the trial court and parties in the instant case believed that Jon Morgan was subject to mandatory consecutive sentences for first and second degree murder under 730 ILCS 5/5-8-4(a) (West 1995), which required mandatory consecutive sentences if the two shootings were part of a single course of conduct, the jury verdict demonstrates that the shootings of Keith and Lila Cearlock were not part of a single course of conduct, with the jury accepting that Jon's shooting of Keith was motivated by an unreasonable belief in the need for self-defense, but rejecting that same proposition as applied to Lila. Because the imposition of mandatory consecutive sentences were not authorized by law, Jon's consecutive sentences are void and should be ordered to run concurrently.

**Standard of Review**

The standard of review ordinarily applied to a trial court's decision to order consecutive sentences is abuse of discretion. *See People v. Laboy*, 227 Ill.App.3d 654, 664, 169 Ill.Dec. 692, 699, 592 N.E.2d 179, 186 (1st Dist., 5th Div. 1992); *see also People v. Hemphill*, 259 Ill.App.3d 474, 477, 197 Ill.Dec. 676, 679, 631 N.E.2d 898, 901 (4th Dist. 1994). That standard, however, is tempered by the rule that "consecutive sentences are to be imposed sparingly, and a reviewing court will vacate such sentences if the record does not support their imposition." *People v. Hummel*, 352 Ill.App.3d

269, 271, 287 Ill.Dec. 369, 371 815 N.E.2d 1172, 1174 (3d Dist. 2004), *citing People v. Arrington*, 297 Ill. App.3d 1, 5, 231 Ill. Dec. 658, 671, 696 N.E.2d 1229, 1232 (2d Dist. 1998). Furthermore, because all sentences must be authorized by law, those which are imposed outside statutory guidelines necessarily constitute an abuse of discretion. *See People v. Matthews*, 273 Ill.App.3d 148, 149, 209 Ill.Dec. 897, 898, 652 N.E.2d 437, 438 (4th Dist. 1995). A sentence which is not authorized by statute is void and may be attacked "'at any time or in any court, either directly or collaterally.'" *People v. Peacock*, 359 Ill.App.3d 326, 336-37, 295 Ill.Dec. 563, 572, 833 N.E.2d 396, 405 (4th Dist. 2005), *quoting People v. Thompson*, 209 Ill.2d 19, 27, 282 Ill.Dec. 183, 187-88, 805 N.E.2d 1200, 1204-05 (2004), (in context of reversing the trial court's imposition of extended-term sentences because the record did not demonstrate a substantial change in the defendant's criminal objective); *accord People v. Wilder*, 325 Ill.App.3d 987, 996, 260 Ill.Dec. 79, 87, 760 N.E.2d 496, 505 (1st Dist., 5th Div. 2001) (reaching propriety of consecutive sentences under 730 ILCS 5/5-8-4(b) under same rationale).

## A.

**In 1995, Consecutive Sentences Were Prohibited for Offenses Which Were Not Committed as Part of a Single Course of Conduct Unless the Trial Court Expressly Found That Such a Sentence Was Necessary to Protect the Public.**

Jon Morgan was convicted of first and second degree murder based on shootings which occurred on April 27, 1995. (Vol. I, C. 42-43; Vol. XXII, R. 314) The sentencing statute applicable at the time provided, in relevant part, as follows:

(a) . . . The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, . . . in which event the court shall enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record.  730 ILCS 5/5-8-4(a)(b).

Consecutive sentences for the triggering offenses set forth in subsection (a) are only mandatory if committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective.  *People v. Pippen*, 324 Ill.App.3d 649, 655, 258 Ill.Dec. 492, 497-98, 756 N.E.2d 474, 479-80 (4th Dist. 2001), *citing People v. Bole*

-22-

155 Ill.2d 188, 198-99, 184 Ill.Dec. 423, 428, 613 N.E.2d 740, 745 (1993). Where offenses are not committed as part of a single course of conduct, the trial court has the discretion to impose consecutive sentences under subsection (b), but only upon a finding that such sentences are necessary to protect the public. *E.g., People v. Sergeant*, 326 Ill.App.3d 974, 987, 260 Ill.Dec. 859, 871-72, 762 N.E.2d 518, 529-30 (1st Dist., 5th Div. 2001), *citing People v. Kagan*, 283 Ill.App.3d 212, 222-23, 218 Ill.Dec. 713, 720, 669 N.E.2d 1239, 1246 (2d Dist. 1996), and *People v. Cooper*, 239 Ill.App.3d 336, 358-61, 179 Ill.Dec. 873, 889-91, 606 N.E.2d 705, 721-23 (5th Dist. 1992).

Thus, under the foregoing statutory scheme, the trial court could only impose consecutive sentences on Jon Morgan if:

- under subsection (a) of Section 5-8-4, the triggering offense which he committed, second degree murder, "w[as] committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective;" or

- under subsection (b) of Section 5-8-4, the offenses were not part of a single course of conduct and the trial court set forth a finding on the record that consecutive sentences were necessary to protect the public.

730 ILCS 5/5-8-4 (a)(b); *See, e.g.*, Wilder, 325 Ill.App.3d at 1003, 260 Ill.Dec. at 93, 760 N.E.2d at 510. In all other circumstances, "[t]he court shall not impose a consecutive sentence." 730 ILCS 5/5-8-4 (b).

-23-

**B.**

**Jon Morgan's Offenses Did Not Qualify for Mandatory Consecutive Sentencing Because His Offenses Were Not Committed as Part of a Single Course of Conduct, and He Was Not Eligible for Consecutive Sentences under Any Other Statutory Provision.**

The question of whether a defendant's actions are "part of a single course of conduct during which there was no substantial change in the nature of the criminal objective" under subsection (a) is governed by the "independent motivation" test, *People v. Bell*, 196 Ill.2d 343, 348, 256 Ill.Dec. 306, 308, 751 N.E.2d 1143, 1145 (2001), which asks whether the the offenses were part of a course of conduct "guided by an 'overarching criminal objective,'" in which case subsection (a) applies, or whether the acts were "independently motivated," in which case it does not. *See, e.g.*, *Sergeant*, 326 Ill.App.3d at 988, 260 Ill.Dec. at 873, 762 N.E.2d at 531. As part of this inquiry, courts look to whether the criminal objective for the first offense was satisfied before the defendant embarked on the second. *See People v. Fritz*, 225 Ill.App.3d 624, 629, 167 Ill.Dec. 666, 670, 588 N.E.2d 307, 311 (3d Dist. 1992). For purposes of imposing consecutive sentences, the presence or absence of an independent criminal motivation must be supported by the record. *See Kagan*, 283 Ill.App.3d at 220, 218 Ill.Dec. at 719, 669 N.E.2d at 1245; *People v. Morgan*, 44 Ill.App.3d 459, 467, 3 Ill.Dec. 113, 120, 358 N.E.2d 280, 287 (5th Dist. 1976).

Shifts in criminal objectives can occur in an instant. In *People v. Morris*, the defendant tracked her husband to the home of a suspected paramour, Amelia Woods. *Morris*, 237 Ill.App.3d 140, 141, 177 Ill.Dec. 822, 824, 603 N.E.2d 1196, 1198 (2nd Dist. 1992). Upon entering the home,

-24-

Morris shot and killed her husband, and when Woods jumped behind a bed in response, Morris attempted to shoot her as well, but the gun misfired. *Morris*, 237 Ill.App.3d at 141-42, 177 Ill.Dec. at 824, 603 N.E.2d at 1198. Morris was convicted of murder and attempt (murder) and was sentenced to consecutive terms of imprisonment. *Morris*, 237 Ill.App.3d at 141, 177 Ill.Dec. at 823, 603 N.E.2d at 1197. On appeal, she argued that consecutive sentences were prohibited because her actions were part of a single course of conduct. *Morris*, 237 Ill.App.3d at 145-46, 177 Ill.Dec. at 826, 603 N.E.2d at 1200. Despite the close proximity in time and space between Morris's attacks on the two victims, the appellate court held that the trial court could have properly concluded that the shootings were motivated by different criminal objectives. *Morris*, 237 Ill.App.3d at 149, 177 Ill.Dec. at 828, 603 N.E.2d at 1202. Similarly, in *People v. Magnus*, the trial court properly found that the defendant had independent criminal motivations for shooting two victims within seconds of each other. *Magnus*, 262 Ill.App.3d 362, 371, 199 Ill.Dec. 73, 80, 633 N.E.2d 869, 876 (1st Dist., 2d Div. 1994). Pointing to the trial court's verdicts of second and first degree murder respectively, the appellate court noted that the first shooting was motivated by the defendant's desire to protect his brother, while the second was the result of the defendant wanting to execute a rival gang member. *Magnus*, 262 Ill.App.3d at 370, 199 Ill.Dec. at 79, 633 N.E.2d at 875.

Additional examples of such shifts occurring in temporal and spacial proximity to each other include theft-related cases where the defendant's motivation shifts from avoiding detection to avoiding apprehension. In such cases, offenses against a second victim which are associated with an escape

attempt are generally not viewed as being a part of the original overarching criminal objective but rather as being independently motivated. *See People v. Radford*, 359 Ill.App.3d 411, 421, 296 Ill.Dec. 272, 281, 835 N.E.2d 127, 136 (1st Dist., 1st Div. 2005) (extended term case[1] affirming finding of separate courses of conduct where motivation shifted from robbing one victim to anger at a second victim for blocking his escape route); *Hummel*, 352 Ill.App.3d at 273, 287 Ill.Dec. at 372-73, 815 N.E.2d at 1175-76, *citing People v. Williams*, 60 Ill.2d 1, 15, 322 N.E.2d 819 (1975), (affirming finding of separate courses of conduct where motivation shifted from shoplifting to battery in order to effectuate escape); *People v. Ingram*, 84 Ill.App.3d 495, 501, 39 Ill.Dec. 885, 889, 405 N.E.2d 864, 868 (2nd Dist. 1980) (affirming finding of separate courses of conduct where motivation shifted from committing robbery of a gas station to concealment of the crime); *see also Laboy*, 227 Ill.App.3d at 665, 169 Ill.Dec. at 700, 592 N.E.2d at 187 (affirming finding of separate courses of conduct where defendant did not begin sexual assault until attempt robbery of victim and her boyfriend complete); *People v. Tigner*, 194 Ill.App.3d 600, 610, 141 Ill.Dec. 311, 317, 551 N.E.2d 304, 310 (1st Dist., 1st Div. 1990), (affirming finding of separate courses of conduct where defendant's decision to rob victim occurred immediately after sexual assault was complete).

---

[1]The independent motivation test used to evaluate the propriety of consecutive sentences is also used to determine the propriety of extended-term sentencing under 730 ILCS 5/5-8-2(a) (West 1995), *Bell*, 196 Ill.2d at 354-55, 256 Ill.Dec. at 311, 751 N.E.2d at 1149, and those cases thus are relevant on the question of whether a particular fact pattern constitutes a change in criminal objective, *see People v. Collins*, 366 Ill.App.3d 885, 900, 304 Ill.Dec. 478, 491, 853 N.E.2d 10, 23 (1st Dist., 3d Div. 2006).

The parties and the trial court in the instant case proceeded as if Jon's two offenses were part of a single course of conduct. The prosecutor asserted that the shootings arose out of a single course of conduct and argued that the law clearly required mandatory consecutive sentences. (Vol. XXX, R. 169-70, 203) Defense counsel also believed that the offenses were part of a single course of conduct, but he argued that the triggering factor of serious bodily harm was inherent in second degree murder and thus constituted an improper double enhancement, (Vol. V, C. 1130-32; Vol. XXX, R. 190-91), an argument which was subsequently rejected in the unrelated case of *People v. Phelps*, 211 Ill.2d 1, 14, 284 Ill.Dec. 268, 276, 809 N.E.2d 1214, 1222 (2004). Without an express finding of single course of conduct, and mentioning only deterrence of others in aggravation, the court imposed consecutive sentences of 58 years for first degree and 17 years for second degree murder. (Vol. XXX, R. 213)

Despite the assumptions of the attorneys and the trial court, however, the jury verdict established that the two shootings were not committed as part of a single course of conduct during which the criminal objective remained the same. *See Arrington*, 297 Ill.App.3d at 5, 231 Ill.Dec. at 661, 696 N.E.2d at 1232 (jury verdict pointed to as evidence of motivation in case reversing trial court's imposition of consecutive sentences); *Magnus*, 262 Ill.App.3d at 370, 199 Ill.Dec. at 79, 633 N.E.2d at 875 (same in affirming the trial court's finding). The defense theory at trial was that Jon had shot both of his grandparents out of fear that he would be beaten or even killed for having discharged a gun in the house; the State's theory was that Jon had shot the couple out of anger. (Vol. XXVIII, R. 164-65, 168, 198-99,

-27-

229-30, 279-80)  As a result, the jury was given both first and second degree murder instructions.  (Vol. IV, C. 873-76)  By returning a guilty verdict of second degree murder as to Keith Cearlock (Vol. IV, C. 979), the jury determined that the first shooting was indeed motivated by an unreasonable belief in the need for self-defense. The jury, however, rejected the notion that Jon's criminal objective remained the same by the time he shot his grandmother, as evidenced by the verdict of first degree murder for the shooting of Lila Cearlock.  (Vol. IV, C. 980)

On direct appeal, the Illinois Supreme Court noted this change in objective in the context of evaluating the prior abuse testimony of Jon's mother, noting "Even if Jon feared Lila because she goaded Keith into beating Jon, that threat had been removed when Keith was shot first." *Morgan*, 197 Ill.2d at 458, 259 Ill.Dec. at 436, 758 N.E.2d at 844. As the appellate court stated in the analogous case of *People v. Magnus*, where two shootings in rapid succession resulted in convictions for second and first degree murder respectively, "[i]n assessing differing degrees of culpability, the [trier-of-fact] implicitly found that defendant's motivation changed between the killings." *Magnus*, 262 Ill.App.3d at 370, 199 Ill.Dec. at 79, 633 N.E.2d at 875.  Just as in *Magnus* and *People v. Morris*, discussed *supra* at 24-25, Jon's criminal objective changed after the initial shooting of his grandfather, and he therefore was not eligible for mandatory consecutive sentences under subsection (a) of Section 5-8-4.

Nor did Jon qualify for consecutive sentencing under any other provision of the Illinois Code. Jon was not subject to the mandatory consecutive sentencing provisions of 730 ILCS 5-8-1(a)(1)(c)(ii) (West 1995),

because one of his two convictions was for second degree murder. *See People v. Schoultz*, 289 Ill.App.3d 392, 398, 224 Ill.Dec. 885, 889-90, 682 N.E.2d 446, 450-51 (4th Dist. 1997). Neither was he subject to discretionary consecutive sentencing under subsection (b) of Section 5-8-4, which only permits the imposition of consecutive sentences if the trial court determines that such a sentence is necessary to protect the public. The trial court did not make the predicate finding necessary for the imposition of discretionary consecutive sentences under subsection (b). (Vol. XXX, R. 231)

Indeed, such a finding of necessity would not have been supported by the record. Consecutive sentences should be utilized sparingly and are subject to modification on appeal where the record does not support the necessity of such a sentence. *People v. O'Neal*, 125 Ill.2d 291, 298-99, 126 Ill.Dec. 71, 74, 531 N.E.2d 366, 369 (1988). Accordingly, discretionary sentences imposed under subsection (b) are subject to reversal when imposed on young defendants with mitigating factors. *See O'Neal*, 125 Ill.2d at 300-01, 126 Ill.Dec. at 74-75, 531 N.E.2d at 369-70 (consecutive sentences for murder, rape, and kidnaping reversed where 19-year-old eighth grade dropout was the son of public aid recipient, had overcome a drug problem, had one prior conviction for robbery, had been sexually exploited by co-defendant whom he killed, and had not harmed rape victim further after he shot his co-defendant); *People v. Rucker*, 260 Ill.App.3d 659, 662-64, 198 Ill.Dec. 684, 687-88, 633 N.E.2d 146, 149-50 (2d Dist. 1994) (consecutive sentences for armed robbery reversed where 17-year-old remorseful high school student had no record of delinquency and good academic record prior to suffering depression which gave rise to his crimes).

Indeed, such records are insufficient to support consecutive sentencing even when the defendant is a well-educated, otherwise high-functioning adult. *See People v. Powell*, 159 Ill.App.3d 1005, 1007-08, 1012-13, 111 Ill.Dec. 727, 729, 731, 512 N.E.2d 1364, 1366, 1369 (1st Dist., 1st Div. 1987) (consecutive sentences reversed where, following a reprimand at work, 30-year-old physically disabled defendant armed himself with a gun and contemplated suicide, but instead returned to work and shot three co-workers in the head). Far more mitigating factors were present in the instant case than in the foregoing cases which resulted in reversals on appeal. Fourteen-year-old Jon was far younger than these defendants, had a good academic record, had no prior delinquency adjudications, had a history of mental health issues, and had been subject to childhood abuse not only by a parent, but by the persons whom he shot. (Vol. V, C. 1017-18, 1029-34) This was not an act of random violence which the public need fear, but rather a one-time response to family abuse that the defendant will not face after completing his 58 year sentence. The act itself was impulsive, and Jon cooperated with the police from the beginning. (Vol. V, C. 1034; Vol. XXIV, R. 561; Vol. XXIV, R. 522-36, 540, 547-48, 561) Trial court expressly found that the offenses were not brutal and heinous, and it cited only the deterrence of others as a factor in aggravation. (Vol. XXX, R. 213) Based on these factors, Jon would not have been eligible for discretionary consecutive sentences.

## C.

### This Court Should Vacate Jon Morgan's Consecutive Sentences and Order That They Be Served Concurrently.

Consecutive sentences which do not comport with the statutory requirements of 730 ILCS 5/5-8-4 are void and may be corrected at any time. *See People v. Arna*, 168 Ill.2d 107, 112-13, 212 Ill.Dec. 963, 966, 658 N.E.2d 445, 448 (1995). The defendant respectfully requests that this Court reconsider its opinion to the contrary in *People v. Land*, where it held that the improper imposition of consecutive sentences under subsection (a) of Section 5-8-4 was not void since the trial court, in theory, could have imposed consecutive sentences under subsection (b). *Land*, 304 Ill.App.3d 169, 173-74, 237 Ill.Dec. 841, 843-44, 710 N.E.2d 471, 473-74 (4th Dist. 1999). As Justice Cook noted in dissent, "[t]he supreme court and this court have not hesitated to reverse and remand cases where the trial court has erroneously sentenced a defendant to concurrent sentences, where the statute mandates consecutive sentences . . . despite rules that limit the State's right to appeal and prohibit the appellate court from increasing a defendant's sentence on review." *Land*, 304 Ill.App.3d at 174-75, 237 Ill.Dec. at 844, 710 N.E.2d at 474 (Cook, J., dissenting). While void judgments do indeed involve questions regarding the jurisdiction of the court over the parties and subject matter, *Land*, 304 Ill.App.3d at 174, 237 Ill.Dec. at 844, 710 N.E.2d at 474, "[t]he established rule is that where a court having jurisdiction over both the person and the offense imposes a sentence in excess of what the statute permits, the legal and authorized portion of the sentence is not void, but the excess portion of the sentence

-31-

is," *In re T.E*, 85 Ill.2d 326, 333, 53 Ill.Dec. 241, 244, 423 N.E.2d 910, 913 (1981); *Land*, 304 Ill.App.3d at 175, 237 Ill.Dec. at 844, 710 N.E.2d at 474 (Cook, J., dissenting).

The proper remedy when a defendant has been sentenced incorrectly pursuant to Section 5-8-4(a) is vacation of the sentence and a remand for resentencing, and this Court should do so in the instant case. *See Bole*, 155 Ill.2d at 199, 184 Ill.Dec. at 428, 613 N.E.2d at 745; *People v. Moore*, 250 Ill.App.3d, 906, 918, 189 Ill.Dec. 615, 624, 620 N.E.2d 583, 592 (4th Dist. 1993), *rev'd on other grounds, Moore*, 177 Ill.2d 421, 437, 226 Ill.Dec. 804, 813, 686 N.E.2d 587, 596 (1997). On remand, the trial court may not increase the term of either sentence unless justified by conduct subsequent to the original sentence. *Moore*, 177 Ill.2d at 433-34, 436, 226 Ill.Dec. at 811-12, 686 N.E.2d at 594-95.

## II.

### POST-CONVICTION COUNSEL FAILED TO RENDER THE REASONABLE LEVEL OF ASSISTANCE APPLICABLE IN POST-CONVICTION PROCEEDINGS, AND THIS CAUSE MUST BE REVERSED AND REMANDED FOR FURTHER STAGE-TWO PROCEEDINGS.

Despite having at his disposal the meritorious consecutive sentencing argument set forth in Argument I, post-conviction counsel made a legally incorrect sentencing argument which guaranteed a stage-two dismissal of the claim, and in so doing evinced a fundamental misunderstanding of the Post-Conviction Hearing Act. This level of representation did not satisfy the reasonableness standard for post-conviction proceedings, and this cause should be reversed and remanded.

**Standard of Review**

The standard of review applied to the stage-two dismissal of a post-conviction petition is *de novo*. *E.g.*, *People v. Whitfield*, 217 Ill.2d 177, 182-83, 298 Ill.Dec. 545, 549, 840 N.E.2d 658, 662 (2005).

**Analysis**

Although a petitioner has no constitutional right to the assistance of counsel in a post-conviction proceeding, he is entitled to a "reasonable level of assistance" from an appointed attorney. *People v. Turner*, 187 Ill.2d 406, 410, 241 Ill.Dec. 596, 598-99, 719 N.E.2d 725, 727-28 (1999). Reasonable assistance requires that the attorney ascertain the bases of the post-conviction petitioner's complaints, shape those complaints into appropriate legal form, and present them to the court, *see People v. Davis*, 156 Ill.2d 149, 162, 189 Ill.Dec. 49, 56, 619 N.E.2d 750, 757 (1993), a standard echoed in Supreme Court Rule 651(c), which provides as follows:

-33-

> The record filed in [the circuit] court shall contain
> a showing, which may be made by the certificate
> of petitioner's attorney, that the attorney has
> consulted with petitioner either by mail or in
> person to ascertain his contentions of deprivation
> of constitutional right, has examined the record of
> the proceedings at the trial, and has made any
> amendments to the petitions filed *pro se* that are
> necessary for an adequate presentation of
> petitioner's contentions.  134 Ill.2d R. 651(c).

If the record does not affirmatively show that the foregoing requirements were met by appointed counsel, then the defendant was denied a reasonable level of assistance and the dismissal of the petition must be reversed and the case remanded for further proceedings.  *See People v. Jennings*, 345 Ill.App.3d 265, 271-75, 280 Ill.Dec. 616, 621-25, 802 N.E.2d 867, 872-76 (4th Dist. 2003).

The record in the instant case affirmatively demonstrates that Jon Morgan's appointed post-conviction attorney did not render a reasonable level of representation or comply with the requirements of Supreme Court Rule 651(c), despite the filing of a 651(c) certificate.  First, post-conviction counsel failed to amend the post-conviction petition to include a patently meritorious argument that Jon's consecutive sentences should be ordered concurrent, as set forth *supra* at 20-30.  Instead, post-conviction counsel made a legally incorrect argument which guaranteed denial of relief, asserting in the amended petition that Jon's consecutive sentences were

improper because the "offenses . . . occurred at the same time and arose from the *same* or related *course of conduct.*" (Vol. IV, C. 1404) As set forth *supra* at 22-23, if the two shootings were part of the same course of conduct, consecutive sentences were mandatory.

Furthermore, post-conviction counsel failed to present the argument in the manner necessary to avoid forfeiture. Jon's consecutive sentencing claim was vulnerable to dismissal on forfeiture grounds because it was not dependent on matters outside the record and Jon's attorney failed to correctly challenge the sentence at trial or on appeal. *See, e.g., Turner,* 187 Ill.2d at 413, 241 Ill.Dec. at 600, 719 N.E.2d at 729 (issues evident from record on direct appeal normally forfeited on post-conviction). Forfeiture, however, easily would have been avoided by an allegation that Jon's attorney had been ineffective for failing to identify and preserve the consecutive sentences issue. *See People v. Flores,* 153 Ill.2d 264, 277, 180 Ill.Dec. 1, 7, 606 N.E.2d 1078, 1084 (1992) (noting ease with which forfeited trial issues can be raise in post-conviction petition by alleging appellate counsel's ineffectiveness).

Such an argument would have entitled Jon to relief. The test for evaluating the effectiveness of Jon's attorney, who represented him both at trial and on appeal, is the following two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984): (1) whether the attorney rendered deficient representation, and (2) whether a reasonable probability exists that, but for counsel's errors, the result would have been different. *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068, 80 L.Ed.2d 693,

698; *People v. Elliott*, 299 Ill.App.3d 766, 774, 234 Ill.Dec. 303, 308, 702 N.E.2d 643, 648 (4th Dist. 1998). If appellate counsel fails to make a clearly meritorious argument on appeal that the defendant should not have received consecutive sentences, and that argument is based on the law in existence at the time appellate counsel represented the defendant, both prongs of *Strickland* are met, and the defendant is entitled to post-conviction relief. *See People v. Moore*, 177 Ill.2d 421, 437, 226 Ill.Dec. 804, 813, 686 N.E.2d 587, 596 (1997). If that argument is dependent on a predicate finding that trial counsel was ineffective for not raising the issue in a post-trial motion, but that same attorney represented the defendant both at trial and on appeal, principles of forfeiture and *res judicata* do not apply. *See, e.g., People v. Gaines*, 105 Ill.2d 79, 91, 85 Ill.Dec. 269, 276, 473 N.E.2d 868, 875 (1984) (appellate counsel cannot be expected to raise his own ineffectiveness at trial).

Jon Morgan would have been able to satisfy this standard had the post-conviction petition been properly amended. As set forth *supra* at 20-30, Jon had a clearly meritorious consecutive sentencing argument at his disposal, yet the attorney who represented him at trial and on appeal failed to raise the issue. *See People v. Morgan*, 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206 (4th Dist. 1999); *People v. Morgan*, 197 Ill.2d 404, 259 Ill.Dec. 405, 758 N.E.2d 813 (2001). The prejudice to Jon, up to 17 additional years in prison, was substantial. As a result of post-conviction counsel's failure to make these necessary amendments to the petition, the trial court granted the State's motion to dismiss, finding, *inter alia*, that the consecutive sentencing issue was forfeited because it could have been

raised on direct appeal, and meritless because such sentences were mandatory at the time. (Vol. XXXVI, R. 18) Failure to make such an amendment to the petition cannot be characterized as reasonable. *See* *Jennings*, 345 Ill.App.3d at 274-75, 280 Ill.Dec. at 624, 802 N.E.2d at 875 (failure to raise disparate sentencing claim).

In addition to not making a necessary amendment to the petition, post-conviction counsel evinced a fundamental misunderstanding of the requirements of the Post-Conviction Hearing Act, explaining the lack of detail and supporting materials as follows: "The details of each specific issue can be presented at an evidentiary hearing. The question here today is whether or not he has made a substantial showing, and I believe that we have." (Vol. XXXVI, R. 13-14) A simple review of the Act, however, reveals that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2002). Based on post-conviction counsel's errors, this cause should be reversed and remanded for the appointment of counsel and the opportunity to further amend the petition.

## CONCLUSION

For the foregoing reasons, Jon Morgan, petitioner-appellant, respectfully requests that this Court vacate his consecutive sentences and remand for concurrent sentencing. This Court also should reverse and remand for the appointment of counsel and the opportunity to amend his post-conviction petition.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

## CERTIFICATE OF COMPLIANCE

I certify that this Brief and Argument conforms to the requirements of Rules 341(a) and (b). The length of this Brief is 38 pages.

JACQUELINE L. BULLARD
Assistant Defender

-38-

**RECEIVED**

JUL 2 8 2008

**CRIMINAL APPEALS**

NO.  4-05-0009

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Plaintiff-Appellee,<br><br>       vs.<br><br>JON MORGAN,<br><br>    Defendant-Appellant. | )  Appeal from the Circuit Court of<br>)  the Eleventh Judicial Circuit<br>)  Logan County, Illinois<br>)<br>)  No.  95-CF-101<br>)<br>)  Honorable<br>)  David Coogan<br>)  Judge Presiding. |

---

<u>BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE</u>

Timothy J. Huyett
State's Attorney
Logan County Courthouse
601 Broadway, Room 31
Lincoln, Illinois  61656


Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
David E. Mannchen
Staff Attorney
State's Attorneys Appellate
      Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

**FILE COPY**

EXHIBIT Q

NO.  4-05-0009

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) the Eleventh Judicial Circuit |
| Plaintiff-Appellee, | ) Logan County, Illinois |
| | ) |
| vs. | ) No.  95-CF-101 |
| | ) |
| JON MORGAN, | ) Honorable |
| | ) David Coogan |
| Defendant-Appellant. | ) Judge Presiding. |

BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE

Timothy J. Huyett
State's Attorney
Logan County Courthouse
601 Broadway, Room 31
Lincoln, Illinois  61656

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
David E. Mannchen
Staff Attorney
State's Attorneys Appellate
        Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

<u>POINTS AND AUTHORITIES</u>                    <u>PAGE</u>

I

THE TRIAL COURT DID NOT ERR IN DISMISSING THE
DEFENDANT'S POST-CONVICTION PETITION WHICH
ALLEGED ERROR IN THE IMPOSITION OF CONSECUTIVE
SENTENCES FOR FIRST AND SECOND DEGREE MURDER  . . . . . . 2

<u>People v. Steidl</u>, 177 Ill.2d 239, 685 N.E.2d 1335
    (1997) . . . . . . . . . . . . . . . . . . . 2

<u>People v. Free</u>, 122 Ill.2d 367, 522 N.E.2d 1184
    (1988) . . . . . . . . . . . . . . . . . . . 2

<u>People v. House</u>, 174 Ill.App.3d 219, 528 N.E.2d
    449 (4th Dist. 1988) . . . . . . . . . . . . 2

<u>People v. Rissley</u>, 206 Ill2d. 403, 795 N.E.2d 174
    (2003) . . . . . . . . . . . . . . . . . . . 3

<u>People v. Rish</u>, 344 Ill.App.3d 1105, 802 N.E.2d
    826 (3rd Dist. 2003) . . . . . . . . . . . . 3

<u>People v. Reed</u>, 335 Ill.App.3d 1038, 782 N.E.2d
    955 (4th Dist. 2003) . . . . . . . . . . . . 3

<u>People v. Thompson</u>, 335 Ill.App.3d 1027, 782
    N.E.2d 946 (4th Dist. 2003) . . . . . . . . . . . 3

<u>People v. Griffin</u>, 321 Ill.App.3d 425, 748 N.E.2d
    1235 (4th Dist. 2001) . . . . . . . . . . . . 3

<u>People v. Madej</u>, 193 Ill.2d 395, 739 N.E.2d 423
    (2000) . . . . . . . . . . . . . . . . . . . 4

People v. Johnson, 327 Ill.App.3d 252, 762 N.E.2d

    1180 (4th Dist. 2002) . . . . . . . . . . . . . . . 4

People v. Land, 304 Ill.App.3d 169, 710 N.E.2d 471

    (4th Dist. 1999) . . . . . . . . . . . . . . . . . 4

People v. Hall, 291 Ill.App.3d 411, 683 N.E.2d 1274

    (1st Dist. 1997) . . . . . . . . . . . . . . . . . 4

People v. Davis, 156 Ill.2d 149, 619 N.E.2d 750

    (1993) . . . . . . . . . . . . . . . . . . . . . . 4

People v. Arna, 168 Ill.2d 107, 658 N.E.2d 445

    (1995) . . . . . . . . . . . . . . . . . . . . 4, 5

People v. Davis, 344 Ill.App.3d 400, 800 N.E.2d

    539 (4th Dist. 2003) . . . . . . . . . . . . . . . 5

People v. Daniel, 311 Ill.App.3d 276, 723 N.E.2d

    1279 (2nd Dist. 2000) . . . . . . . . . . . . . . 6

People v. Wilder, 325 Ill.App.3d 987, 760 N.E.2d

    496 (1st Dist. 2001) . . . . . . . . . . . . . . . 6

People v. Kessinger, 133 Ill.App.3d 831, 479 N.E.2d

    466 (4th Dist. 1985) . . . . . . . . . . . . . 6, 7

People v. Boyd, 347 Ill.App.3d 321, 807 N.E.2d 639

    (1st Dist. 2004) . . . . . . . . . . . . . . . . . 7

People v. Morris, 237 Ill.App.3d 140, 603 N.E.2d

    1196 (2nd Dist. 1992) . . . . . . . . . . . . . . 11

People v. Magnus, 262 Ill.App.3d 362, 633 N.E.2d 869

    (1st Dist. 1994) . . . . . . . . . . . . . . 11, 12

730 ILCS 5/5-8-4 . . . . . . . . . . . . . . . . . . . 3

730 ILCS 5/5-8-4(a) . . . . . . . . . . . . . . . . . 4

730 ILCS 5/5-8-4(b) . . . . . . . . . . . . . . . . . 4

II

THE DEFENDANT WAS AFFORDED REASONABLE ASSISTANCE
OF COUNSEL IN THE POST-CONVICTION PETITION
PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . 13

People v. Moore, 189 Ill.2d, 521, 245 Ill.Dec. 95,
        727 N.E.2d 348 (2000) . . . . . . . . . . . . . 13

People v. Guest, 166 Ill.2d 381, 211 Ill.Dec. 490,
        655 N.E.2d 873 (1995) . . . . . . . . . . . . . 13

People v. Wright, 149 Ill.2d 36, 171 Ill.Dec. 424,
        594 N.E.2d 276 (1992) . . . . . . . . . . . . . 13

## NATURE OF THE CASE

In 1996, defendant was convicted of one count of first degree murder and one count of second degree murder and was sentenced to consecutive terms of 58 years and 17 years, respectively.  On appeal, the Fourth District affirmed the defendant's conviction for second degree murder but reversed the first degree murder conviction.  People v. Morgan, 307 Ill.App.3d 707, 718 N.E.2d 206 (4th Dist. 1999).  The case was appealed by both the defendant and the State to the Supreme Court which affirmed both of defendant's convictions.  People v. Morgan, 197 Ill.2d 404, 758 N.E.2d 813 (2001).  In 2002, defendant filed a post-conviction petition and counsel was appointed.  The post-conviction petition was thereafter dismissed on the State's motion.  The defendant now appeals.

ARGUMENT

I

THE TRIAL COURT DID NOT ERR IN DISMISSING THE DEFENDANT'S POST-CONVICTION PETITION WHICH ALLEGED ERROR IN THE IMPOSITION OF CONSECUTIVE SENTENCES FOR FIRST AND SECOND DEGREE MURDER.

The defendant contends that the consecutive sentences imposed on his convictions for first and second degree murder were improper and void since they were not committed as part of a single course of conduct. The State maintains that the trial court properly rejected the defendant's post-conviction petition alleging error in the imposition of consecutive sentences.

This court should refuse to consider the defendant's allegation of error. It is well established that issues that were raised and decided on direct appeal are res judicata and that all issues that could have been raised on direct appeal but were not are deemed to have been waived in post-conviction petition proceedings. See, People v. Steidl, 177 Ill.2d 239, 685 N.E.2d 1335 (1997); People v. Free, 122 Ill.2d 367, 522 N.E.2d 1184 (1988). The defendant did not challenge the imposition of consecutive sentences on direct appeal thereby forfeiting or waiving any allegation of error. See, People v. House, 174 Ill.App.3d 219, 220, 528 N.E.2d 449, 450 (4th Dist. 1988).

On the merits, defendant's petition was properly

2

dismissed without an evidentiary hearing.  Defendant is not entitled to an evidentiary hearing as of right.  Instead, a hearing is required only if the petition, supported by the record or accompanying affidavits, makes a substantial showing of a constitutional violation.  People v. Rissley, 206 Ill2d. 403, 412, 795 N.E.2d 174, 179 (2003); People v. Rish, 344 Ill.App.3d 1105, 1110, 802 N.E.2d 826, 831 (3rd Dist. 2003). The dismissal of a post-conviction without a hearing is reviewed de novo.  Rissley.  Defendant's petition was properly dismissed under this standard.

The defendant's only claim is based on an alleged violation of 730 ILCS 5/5-8-4.  This claim of a statutory violation may not be raised in these proceedings.  A post-conviction proceeding may only be used to establish a substantial violation of the defendant's constitutional rights.  Statutory issues are not of constitutional magnitude and, thus, not subject to scrutiny under the Post-Conviction Hearing Act.  People v. Reed, 335 Ill.App.3d 1038, 1039, 782 N.E.2d 955, 956-957 (4th Dist. 2003); People v. Thompson, 335 Ill.App.3d 1027, 1029, 782 N.E.2d 946, 948 (4th Dist. 2003); People v. Griffin, 321 Ill.App.3d 425, 428, 748 N.E.2d 1235, 1238 (4th Dist. 2001).  The defendant's petition was properly dismissed on this basis alone.

Nor is there any merit to the defendant's claim that his sentences were void. A judgment is void where the court entering it lacks jurisdiction or lacks the inherent power to

3

enter the particular order involved. <u>People v. Madej</u>, 193 Ill.2d 395, 401, 739 N.E.2d 423, 427 (2000); <u>People v. Johnson</u>, 327 Ill.App.3d 252, 256, 762 N.E.2d 1180, 1183 (4th Dist. 2002); <u>People v. Land</u>, 304 Ill.App.3d 169, 174, 710 N.E.2d 471, 474 (4th Dist. 1999); <u>People v. Hall</u>, 291 Ill.App.3d 411, 416, 683 N.E.2d 1274, 1277 (1st Dist. 1997). Once a court has acquired jurisdiction, no subsequent error or irregularity will oust the jurisdiction thus acquired. A court may not lose jurisdiction because it makes a mistake in determining either the facts, the law, or both. <u>People v. Davis</u>, 156 Ill.2d 149, 155, 619 N.E.2d 750, 754 (1993); <u>Hall</u>, 291 Ill.App.3d at 416, 683 N.E.2d at 1277. The court here had jurisdiction over the case and the defendant. The court also had the inherent authority to impose consecutive sentences by virtue of 730 ILCS 5/5-8-4(a) and 5/5-8-4(b). Its order was thus not void. <u>Land</u>, 304 Ill.App.3d at 174, 710 N.E.2d at 474. This is true even if the court applied the consecutive sentences improperly. The court had jurisdiction and authority to impose consecutive sentences. This included the power to make a mistake in the application of the law. This would not render the sentence void or allow the defendant to challenge his sentence in this collateral proceeding. The trial court thus properly dismissed defendant's post-conviction petition.

The defendant's sentences need not be vacated based on <u>People v. Arna</u>, 168 Ill.2d 107, 658 N.E.2d 445 (1995), cited

4

by defendant. In <u>Arna</u>, the defendant had been convicted of two counts of attempt murder and had been given concurrent sentences. On appeal the appellate court vacated the concurrent sentences and ordered the sentences to run consecutively. On appeal, to the supreme court, the defendant contended that the appellate court lacked the authority to increase the defendant's sentence. The supreme court found that the mandatory consecutive sentencing provisions applied to the defendant's offense and that the concurrent term was void since it was a sentence not authorized for the defendant's offenses. <u>Arna</u>, 168 Ill.2d at 113, 658 N.E.2d at 448. This holding cannot render the consecutive sentences imposed here void. The consecutive sentences were authorized by law. Merely because the court allegedly misapplied one section of the statute to impose the sentence would not render the consecutive sentences void as beyond the authority of the court. See, <u>People v. Davis</u>, 344 Ill.App.3d 400, 405, 800 N.E.2d 539, 544-545 (4th Dist. 2003)(<u>Arna</u> should not be construed as allowing collateral attack of any sentencing error a trial court makes in applying provisions of the Unified Code).

The sentence need not be disturbed on the basis of defendant's argument that it was unlikely that the court would, in fact, have imposed consecutive sentences as a matter of discretion or that a discretionary consecutive term might have been deemed an abuse of discretion. This consideration

is immaterial.  The trial court clearly had the power and authority to impose a discretionary consecutive sentence had it chosen to do so.  This authority is all that is required when determining if a sentence is void as being beyond the authority of the trial court.

Finally, there is no merit in the defendant's contention that he was not subject to a mandatory consecutive sentence. The defendant's argument is that there was no single course of conduct because there was a change in objective between the shooting of his grandfather and the shooting of his grandmother.  The determination of whether a defendant's actions constituted a single course of conduct is generally a question of fact that will not be disturbed unless the conclusion reached by the trial court is against the manifest weight of the evidence.  So long as the trial court's conclusion is supported by the record and is not unreasonable or arbitrary it should not be reversed.  People v. Daniel, 311 Ill.App.3d 276, 287, 723 N.E.2d 1279, 1289-1290 (2nd Dist. 2000); People v. Wilder, 325 Ill.App.3d 987, 1002, 760 N.E.2d 496, 509 (1st Dist. 2001).

In this case, the defendant's argument essentially is that the trial court erred in applying the facts of this case to determine that he was eligible for a mandatory consecutive sentence.  This alleged mistaken assessment of the facts could not provide any grounds for post-conviction petition relief. See, People v. Kessinger, 133 Ill.App.3d 831, 834, 479 N.E.2d

6

466, 468 (4th Dist. 1985)(even if court erred in imposing extended term, post-conviction petition relief not available); People v. Boyd, 347 Ill.App.3d 321, 331, 807 N.E.2d 639, 648 (1st Dist. 2004) (alleged excessiveness of a sentence that is within the statutory limits when imposed does not create a constitutional issue that may serve as a basis for post-conviction relief).

Moreover, the trial court's determination was reasonable. The evidence supported the conclusion that this was a single course of conduct. In his first statement to the police, the defendant said that he shot his grandparents because "they pissed him off and he couldn't take it anymore." (R. Vol. XXIII, 356; Vol. XXIV, 514) In his first statement at the police station, the defendant stated that his grandparents were angry and yelling at him because of a tardy notice for being late to class. (R. Vol. XXIV, 525-526) After this had gone on for several minutes, the defendant went to the bathroom. He then got a pistol and bullets from his grandfather's room, returned to the bathroom, and loaded the pistol. (R. Vol. XXIV, 526-528) The defendant shot a Tilex bottle in the bathroom and immediately left the bathroom. (R. Vol. XXIV, 528-529) He saw his grandmother standing at the end of the hallway. She screamed and backed up. At this time the defendant's grandfather came around the corner and the defendant shot him in the head. (R. Vol. XXIV, 529) He then chased his grandmother as she ran towards the front door and

7

shot her in the back.    He tried to shoot her several more times as she ran and fell on the ground but the gun jammed. (R. Vol. XXIV, 529-530) The defendant stated that he had thought about killing his grandparents in the past. (R. Vol. XXIV, 534-535) He went into his grandmother's room to look for another gun to shoot her some more but he could not find it. (R. Vol. XXIV, 530-531)

In his second taped statement, to the police, the defendant again stated that his grandparents had made a "big thing" about the tardy slip. (R. Vol. XXXVIII, 55)  The defendant stated that he got mad because of how they were making such a big deal about this. (R. Vol. XXXVIII, 55) The defendant stated that he thought about killing his grandparents for 10 or 15 minutes before he went to get the gun and that he used the .22 on the spur of the moment because it was the only gun available. (R. Vol. XXXVIII, 60, 65) He saw his grandparents in the hallway and jumped out of the way as his grandfather came around the corner.  The defendant shot his grandfather as he came around the corner, then shot his grandmother as she fled from the house. (R. Vol. XXXVIII, 55-56)  The defendant again said that he tried to shoot his grandmother as she lay on the ground but that the gun jammed. (R. Vol. XXXVIII, 56-57) He tried to find a gun in her room to shoot her with but couldn't find it. (R. Vol. XXXVIII,  57)

During the video-taped re-enactment, the defendant said he loaded the gun in the bathroom and shot the Tilex bottle.

8

(R. Vol. XXXVIII, 66-67) This grabbed his grandparents' attention. (R. Vol. XXXVIII, 67) The defendant shot his grandfather in the head right when he saw him come around the corner. (R. Vol. XXXVIII, 67) He shot his grandmother in the back as she was trying to get out of the door and tried to shoot her again but the gun jammed. (R. Vol. XXXVIII, 67-68) Defendant broke down the door to his grandmother's room to look for another gun but could not find it. (R. Vol. XXXVIII, 68) During the video-taped interview, the defendant said his grandparents had yelled at him that night but had not hit him. (R. Vol. XXXVIII, 70) His grandfather had hit or punched him the week before. (R. Vol. XXXVIII, 70)

At trial defendant embellished on these previous statements by claiming that he had been subjected to mistreatment and beatings at the hands of his grandparents on numerous instances in the past and that his grandfather had in fact beat him with a razor strap on the night of the shootings. The defendant further claimed that he was contemplating suicide at the time he got the gun and loaded it in the bathroom. (R. Vol. XXXI, 790) He instead shot the Tilex bottle "for some reason or other." (R. Vol. XXXI, 790-791) He got scared because of what his grandparents were going to do because of this and stepped out of the bathroom. (R. Vol. XXXI, 791-792) His grandmother started screaming when she saw the gun. (R. Vol. XXXI, 791) The defendant shot his grandfather as he walked around the corner because he was

9

afraid that his grandfather would loose control and would not stop. (R. Vol. XXXI, 792-794, 800-801) He also shot his grandmother in the back as she was running out of the house because he was afraid of her. (R. Vol. XXXI, 794-796, 802) The defendant admitted trying to unjam the gun but denied trying to fire additional bullets at his grandmother. (R. Vol. XXXI, 796-797) The defendant further admitted looking for the other gun but stated that he did not know why he was looking for it. (R. Vol. XXXI, 798-799) The defendant had not told the police of his grandparents' mistreatment of him because "he didn't want to disrespect them." (R. Vol. XXXI, 803-804)

Based on this evidence, the sentencing judge could reasonably conclude that this was all one single, continuing incident that was triggered by defendant's intent to kill his grandparents because of their mistreatment of him and because of his alleged fear of what they would do to him that night. The court could also determine that there was a single course of conduct from the time the defendant loaded the gun to when he shot his grandfather and then shot his grandmother as she ran away. Any differences in the defendant's state of mind based on how reasonable his fear of his grandparents was at the time of the shooting would not change the fact that the overall objective was to kill his grandparents. This would only serve to make the consecutive sentences mandatory under 730 ILCS 5/1-5-4(a). The court's determination that defendant was eligible for a mandatory consecutive term was thus not

unreasonable and cannot be deemed to have rendered the sentence void so as to be able to be challenged in these collateral proceedings.

The defendant's sentences need not be vacated under People v. Morris, 237 Ill.App.3d 140, 141-142 603 N.E.2d 1196, 1198 (2nd Dist. 1992), and People v. Magnus, 262 Ill.App.3d 362, 371, 633 N.E.2d 869, 876 (1st Dist. 1994), relied upon by defendant.    In Morris, the court held that consecutive sentences were available to a defendant who had shot and killed one individual and attempted to kill another in a single course of conduct because there had been a change in criminal objective between the two shootings. Morris, 237 Ill.App.3d at 141-142 603 N.E.2d at 1198.

In Magnus, the defendant contended that he could not be sentenced to consecutive terms for the two counts of second degree murder because the offenses were committed in a single course of conduct in which there had been no change in the criminal objective.    The First District rejected this contention finding that the evidence showed that, in the first murder, the defendant had been acting out of the belief that his brother was in danger.    As to the second, however, the evidence showed that the murder was gang-related and that the defendant had made a separate choice to shoot the second victim who was standing passively by when shot.    Consecutive sentences were thus possible on a discretionary basis.    262 Ill.App.3d at 371, 633 N.E.2d at 876.    The First District

11

further found that, even assuming that there had been no change in criminal objective, the consecutive sentences were proper on a mandatory basis since the defendant was guilty of a Class 1 felony and had inflicted sever bodily injury by murdering the victim.   262 Ill.App.3d at 371-372, 633 N.E.2d at 876-877.

Contrary to defendant's assertion, these cases do not show that consecutive sentences were barred in this case or that the imposition of consecutive sentences was somehow void. Instead, these cases demonstrate that consecutive sentences, either on a discretionary basis or as mandatory, were in fact a possible and appropriate sentence for the defendant's conduct.

The trial court therefore did not err in dismissing the defendant's post-conviction petition challenging the imposition of consecutive sentences.   The order dismissing defendant's petition should therefore be affirmed by this court.

12

ARGUMENT

II

THE DEFENDANT WAS AFFORDED REASONABLE ASSISTANCE OF COUNSEL IN THE POST-CONVICTION PETITION PROCEEDINGS.

The defendant contends that he is entitled to a new post-conviction petition hearing with a new attorney because of the ineffectiveness of his post-conviction petition counsel in these proceedings. The defendant contends that his post-conviction petition counsel, Patrick Timoney, was ineffective because of the manner in which he phrased the challenge to the defendant's consecutive sentences, the failure to allege ineffective assistance of appellate counsel for not challenging the consecutive sentences, and the manner in which Mr. Timoney argued the defendant's post-conviction petition in these proceedings. The State maintains that the defendant is not entitled to another post-conviction petition hearing.

It is well established that a defendant in post-conviction proceedings is not constitutionally entitled to effective assistance of counsel. Instead, the defendant is only entitled to a reasonable level of assistance. People v. Moore, 189 Ill.2d, 521, 541, 245 Ill.Dec. 95, 727 N.E.2d 348, 358 (2000); People v. Guest, 166 Ill.2d 381, 412, 211 Ill.Dec. 490, 655 N.E.2d 873, 887 (1995); People v. Wright, 149 Ill.2d 36, 63, 171 Ill.Dec. 424, 594 N.E.2d 276, 288 (1992). The performance of Mr. Timoney was adequate under this standard.

13

No incompetency should be found based on the manner in which Mr. Timoney phrased or argued the challenge to the defendant's consecutive sentences. These were merely matters of judgment or discretion on the part of counsel that should not be found to have been unreasonable merely because he, or another attorney, might have phrased the issue or argument somewhat differently.

Nor could a different phraseology or argument have changed the outcome of the proceedings. Whether or not the trial court had properly applied the mandatory consecutive sentencing provisions, the sentences imposed on the defendant were not void and were not subject to challenge in these proceedings. (Argument I) There is nothing that could or should have been argued that could have entitled defendant to relief. Defendant's claim that his post-conviction attorney did not provide reasonable assistance when he attempted to challenge the consecutive sentences, an issue never raised by the defendant, should thus be rejected by this court.

14

CONCLUSION

Wherefore, the PEOPLE OF THE STATE OF ILLINOIS respectfully request this court to affirm the trial court order dismissing the defendant's post-conviction petition and that costs be assessed pursuant to 55 ILCS 5/4-2002.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS

Timothy J. Huyett
State's Attorney
Logan County Courthouse
601 Broadway, Room 31
Lincoln, Illinois  61656

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
David E. Mannchen
Staff Attorney
State's Attorneys Appellate
        Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

15

NO. 4-05-0009

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) the Eleventh Judicial Circuit |
| Plaintiff-Appellee, | ) Logan County, Illinois |
| | ) |
| vs. | ) No.  95-CF-101 |
| | ) |
| JON MORGAN, | ) Honorable |
| | ) David Coogan |
| Defendant-Appellant. | ) Judge Presiding. |

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341(a) and (b).  The length of this brief, excluding the appendix, is 18 pages.

_David E. Mannchen_

David E. Mannchen, Staff Attorney
State's Attorneys Appellate
     Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782-8076

COUNSEL FOR PLAINTIFF-APPELLEE

NO: 4-05-0009

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court of |
| | ) | the Eleventh Judicial Circuit |
| Plaintiff-Appellee, | ) | Logan County, Illinois |
| | ) | |
| Vs. | ) | No. 95-CF-101 |
| | ) | |
| JON MORGAN, | ) | Honorable |
| | ) | David Coogan |
| Defendant-Appellant. | ) | Judge Presiding. |

## NOTICE AND PROOF OF SERVICE

TO:  Darryl Pratscher, Clerk,       Daniel D. Yuhas, Deputy Dfndr.
Fourth District Appellate Court    Office of the St.Apel.Dfndr.
201 W. Monroe, P.O. Box 19206      Fourth District
Springfield, IL 62794-9206         400 West Monroe, Suite 303
P.O. Box 5240
Springfield, IL  62705-5240

The undersigned certifies that two copies of Plaintiff-Appellee's Brief and Argument were delivered to the Clerk of the Appellate Court; and three copies of same were served upon the defendant's Attorney of Record by enclosing said copies in an envelope addressed as indicated above, and by depositing said envelope, with postage fully prepaid, in the U.S. Mail in Springfield, Illinois, on this 18th day of April, 2007.

Subscribed and sworn to
before me on this 18th
day of April, 2007.

_Shirley Bagby_
NOTARY PUBLIC

_Carol Smith_
Carol Smith, Secretary
State's Attorneys Appellate
Prosecutor

OFFICIAL SEAL
SHIRLEY BAGBY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1-27-2011

**RECEIVED**

JUL 2 8 2008

**CRIMINAL APPEALS**

E-FILED
Wednesday, 13 August, 2008  03:15:31 PM
Clerk, U.S. District Court, ILCD

FILE COPY RECEIVED

No. 4-05-0009

IN THE

MAY – 4 2007

APPELLATE COURT OF ILLINOIS     SAAP Fourth District

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan County, Illinois. |
| Respondent-Appellee, | ) ) | |
| -vs- | ) ) | No. 95-CF-101 |
| JON MORGAN, | ) ) | Honorable David L. Coogan, |
| Petitioner-Appellant. | ) ) | Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT R

## ARGUMENT
### I.

**JON MORGAN'S CONSECUTIVE SENTENCES FOR FIRST AND SECOND DEGREE MURDER WERE NOT AUTHORIZED BY LAW BECAUSE, AS DEMONSTRATED BY THE JURY VERDICT, THE OFFENSES WERE NOT PART OF A SINGLE COURSE OF CONDUCT, AS REQUIRED FOR MANDATORY CONSECUTIVE SENTENCING UNDER 730 ILCS 5/5-8-4.**

The State reframes the question presented as involving the propriety of the trial court's dismissal of Jon Morgan's post-conviction petition. (State's brief at 2, 12) The defendant, however, did not argue that the petition was sufficient to survive a stage-two dismissal. Indeed, he could not give post-conviction counsel's failure to adequately amend the petition, as discussed in Argument II of the defendant's original brief. Rather, the defendant argued that the consecutive nature of his sentences was void and as such was subject to correction at any time. (Def.'s brief at 20-21, 31-32)

On the merits, the State asserts that the two shootings were in fact part of a single course of conduct, thus rendering Jon subject to the mandatory consecutive sentencing provisions of 730 ILCS 5/5-8-4(a), despite a jury verdict which demonstrated beyond a reasonable doubt that Jon's criminal objective had changed after shooting his grandfather. (State's brief at 6) The State's argument is based on the premise that Jon's "overall objective was to kill his grandparents." (State's brief at 10) The State, however, cites no case law for the proposition that an intent to kill more than one person transforms a series of shootings into a single course of conduct, even where the defendant clearly possessed different criminal objectives for each shooting. (State's brief at 10) Indeed, such an argument is inconsistent with the independent motivation test applied in *People v.*

-1-

## II.

**POST-CONVICTION COUNSEL FAILED TO RENDER THE REASONABLE LEVEL OF ASSISTANCE APPLICABLE IN POST-CONVICTION PROCEEDINGS, AND THIS CAUSE MUST BE REVERSED AND REMANDED FOR FURTHER STAGE-TWO PROCEEDINGS.**

Despite clear statutory language which mandated consecutive sentences if Jon Morgan's convictions were part of a single course of conduct, post-conviction counsel filed an amended post-conviction petition asserting that mandatory consecutive sentencing did *not* apply because the "offenses . . . occurred at the same time and arose from the same or related course of conduct." (Vol. IV, C. 1404) The State characterizes this argument as a flaw in "the manner in which [counsel] phrased or argued the challenge to the defendant's consecutive sentences." (State's brief at 13-14) According to the State, Jon is not entitled to relief "merely because . . . another attorney[] might have phrased the issue or argument somewhat differently." (State's brief at 14) Post-conviction counsel did not engage in mistaken phraseology. Rather, as discussed in the defendant's original brief at 34-37, he presented the antithesis of the very argument which would have garnered his client relief, and in the process provided the trial court with its grounds for denial.

In the alternative, the State argues that even if the consecutive sentencing argument had been presented correctly, the defendant would not have been entitled to relief because the sentences were not "void" and did not present a question of constitutional magnitude. (State's brief at 14) As set forth in the defendant's original brief at 35-36, however, counsel could easily have avoided any question of forfeiture and rendered the question

# CONCLUSION

For the foregoing reasons, Jon Morgan, petitioner-appellant, respectfully requests that this Court vacate his consecutive sentences and remand for concurrent sentencing. This Court also should reverse and remand for the appointment of counsel and the opportunity to amend his post-conviction petition.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

# CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief and Argument conforms to the requirements of Rules 341(a) and (b). The length of this Reply Brief is 5 pages.

JACQUELINE L. BULLARD
Assistant Defender

E-FILED
Wednesday, 13 August, 2008  03:16:00 PM
Clerk, U.S. District Court, ILCD

NO. 4-05-0009

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
NOV 8 - 2007
CLERK OF THE
APPELLATE COURT, 4TH DIST.

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| JON R. MORGAN | ) | No. 95CF101 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | David L. Coogan, |
| | ) | Judge Presiding. |

---

ORDER

In September 1996, a jury convicted defendant, Jon R. Morgan, of the first degree murder (720 ILCS 5/9-1(a) (West 1994)) of his grandmother, Lila Cearlock, and the second degree murder (720 ILCS 5/9-2(a)(1) (West 1994)) of his grandfather, Keith Cearlock. The trial court later sentenced defendant to consecutive prison terms of 58 years for first degree murder and 17 years for second degree murder, for a total of 75 years in prison.

Defendant appealed, and this court affirmed his second degree murder conviction, reversed his first degree murder conviction, and remanded for a new trial as to the first degree murder charge regarding Lila. People v. Morgan, 307 Ill. App. 3d 707, 718 N.E.2d 206 (1999).

After both defendant and the State filed petitions for leave to appeal, the supreme court accepted the case, disagreed in part with this court's decision, and affirmed the trial court's judgment. People v. Morgan, 197 Ill. 2d 404, 758 N.E.2d

813 (2001).

In June 2002, defendant filed a petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 through 122-8 (West 2002)), and in January 2005, defendant filed an amended postconviction petition. Later in January 2005, the State filed an amended motion to dismiss defendant's amended petition. Still later in January 2005, following a hearing on the State's amended motion, the trial court granted it and dismissed defendant's amended postconviction petition.

Defendant appeals, arguing that (1) his consecutive sentences for first and second degree murder are void because they were not authorized by law and (2) his postconviction counsel failed to render the reasonable level of assistance applicable in postconviction proceedings. We disagree and affirm.

## I. BACKGROUND

In April 1995, defendant, who was then 14 years old, was residing in Lincoln with the Cearlocks. On April 27, 1995, defendant and Keith argued about a notice of detention Keith received from defendant's school. Keith punished defendant by beating him on the buttocks with a razor strap. Defendant then obtained Keith's gun, loaded it, and shot Keith. Lila, who was standing in the hallway when defendant shot Keith, began screaming and ran. Defendant shot her in the back as she ran out of the house.

The State originally filed charges against defendant in

- 2 -

A-2

Logan County juvenile court.  After the State filed a petition to try defendant as an adult, which the trial court granted, the State charged him with four counts of first degree murder regarding Lila and four counts of first degree murder regarding Keith. The jury found defendant guilty of the first degree murder of Lila and the second degree murder of Keith.  As earlier stated, the trial court later sentenced defendant to consecutive terms of 58 and 17 years in prison, respectively.

Defendant appealed, arguing that the trial court erred by (1) granting the State's motion to try him as an adult, (2) admitting in evidence certain statements he made, (3) excluding testimony regarding the Cearlocks' prior violent conduct, (4) refusing to dismiss the felony murder counts, and (5) refusing to give an instruction on second degree murder as to the felony murder counts.  This court rejected all of defendant's arguments except his last, concluding that the trial court erred by not instructing the jury on second degree murder regarding Lila. Morgan, 307 Ill. App. 3d at 717, 718 N.E.2d at 215.  Accordingly, this court affirmed the judgment of the trial court in part, reversed in part, and remanded for a new trial regarding Lila's death.

The supreme court disagreed with this court's conclusion that the trial court should have instructed the jury on second degree murder regarding Lila's death but otherwise affirmed this court's judgment.  Morgan, 197 Ill. 2d at 458, 758 N.E.2d at 844.

- 3 -

**A-3**

In April 2002, defendant pro se filed a motion for extension of time to file a postconviction petition. The trial court granted that motion and also appointed counsel to represent defendant regarding any such petition. In June 2002, defendant's court-appointed counsel filed a postconviction petition on defendant's behalf. In December 2003, the State moved to dismiss defendant's petition.

In January 2005, defendant filed an amended post-conviction petition, alleging that (1) he was denied his right to counsel under the fifth amendment because he was subjected to custodial interrogation without the presence of legal representation, his parent, or guardian; (2) he was denied the effective assistance of trial and appellate counsel because (a) he was represented by the same counsel at trial and before the appellate court, (b) counsel failed at the trial level to preserve issues for appeal, and (c) counsel also failed to raise issues on appeal, including but not limited to counsel's own ineffective assistance; (3) he was denied his right to present evidence at trial, specifically, testimony concerning the abusive history and character of the Cearlocks; (4) his sentence violated the United States and Illinois constitutions because he was sentenced to serve consecutive sentences for offenses that occurred at the same time and arose from the same or related course of conduct; and (5) he was denied due process of law because of "errors which occurred at trial, sentencing[,] and on appeal [that] so infected the entire process that the resulting conviction, sentence[,]

- 4 -

**A-4**

and/or appeal violates due process."

In January 2005, when defendant's postconviction counsel filed an amended postconviction petition on defendant's behalf, counsel also filed his certificate pursuant to Supreme Court 651(c) (134 Ill. 2d R. 651(c)).

In January 2005, the State filed an amended motion to dismiss defendant's amended petition.  Following a hearing later that month, the trial court granted the State's motion and dismissed defendant's amended petition.  In so ruling, the court noted that it had read the opinions of the appellate court and supreme court, as well as each of the allegations of deficiencies defendant set forth in his amended petition.  The court determined that defendant's claim regarding his custodial interrogation was barred by res judicata, as were his contentions regarding the evidence he wished to present concerning the Cearlocks' alleged history of abusing defendant.  The court also deemed defendant's contentions regarding ineffective assistance of counsel as "nonspecific and non[]factual allegations" that were "mere conclusions."  Last, the court stated that it believed the law required defendant to receive consecutive sentences, but in any event defendant forfeited that issue by not raising it in the appellate court or supreme court.  Ultimately, the court determined that defendant's amended petition did not contain a showing of substantial constitutional issues that were violated at defendant's trial.

This appeal followed.

- 5 -

## II. ANALYSIS

### A. Proceedings Under the Act

A defendant may proceed under the Act by alleging that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1 (West 2004).  In noncapital cases, the Act establishes a three-stage process for adjudicating a postconviction petition (725 ILCS 5/122-1 through 122-8 (West 2004); People v. Jones, 213 Ill. 2d 498, 503, 821 N.E.2d 1093, 1096 (2004)). At the first stage, the trial court, without input from the State, examines the petition only to determine if it pleads a constitutional deprivation unrebutted by the record, rendering the petition neither frivolous nor patently without merit. People v. Phyfiher, 361 Ill. App. 3d 881, 883, 838 N.E.2d 181, 184 (2005).

If a petition is not dismissed at stage one, it proceeds to stage two, where section 122-4 of the Act provides for the appointment of counsel for an indigent defendant who wishes counsel to be appointed.  725 ILCS 5/122-4 (West 2004).  At the second stage, the State has the opportunity to answer or move to dismiss the petition (725 ILCS 5/122-5 (West 2004)), and the trial court determines whether the petition alleges a substantial showing of a constitutional violation (Phyfiher, 361 Ill. App. 3d at 883, 838 N.E.2d at 184).  A defendant is not entitled to an evidentiary hearing as a matter of right (People v. Makiel, 358

- 6 -

**A-6**

Ill. App. 3d 102, 105, 830 N.E.2d 731, 736 (2005)), and nonspe-
cific and nonfactual assertions are insufficient to require an
evidentiary hearing (People v. Broughton, 344 Ill. App. 3d 232,
236, 799 N.E.2d 952, 956 (2003)).  If the allegations of the
petition, supported by the record and accompanying affidavits,
demonstrate a substantial violation of a constitutional right,
the petition proceeds to stage three for an evidentiary hearing.
Phyfiher, 361 Ill. App. 3d at 883, 838 N.E.2d at 184.

  B. Defendant's Claim That His Consecutive Sentences Are Void

        Defendant first argues that the trial court erred by
imposing consecutive sentences for his conviction of the first
degree murder of Lila and the second degree murder of Keith.
Specifically, he contends that consecutive sentences were not
authorized by law because the offenses were not part of a single
course of conduct, as required for the imposition of mandatory
consecutive sentences under section 5-8-4(a) of the Unified Code
of Corrections (730 ILCS 5/5-8-4(a) (West 1994)).  Defendant
finally asserts that he may raise this argument at any time
because the consecutive sentences he received are void.

        The State responds by asserting that (1) the trial
court did not err by imposing consecutive sentences under section
5-8-4(a) of the Corrections Code and (2) even if the trial court
erred by thinking consecutive sentences were required, the
court's judgment, at most, amounted to a sentencing error that
did not render defendant's consecutive sentences void.  We agree
with the State.

- 7 -

**A-7**

In People v. Land, 304 Ill. App. 3d 169, 710 N.E.2d 471 (1999), the defendant presented this court with the same argument defendant here raises. In that case the defendant was convicted in 1991 of three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12-14(b)(1)), and the trial court sentenced him to 20 years in prison on each conviction, with those sentences to run consecutively. In February 1998, the defendant pro se filed a petition for postconviction relief, alleging that the trial court erroneously sentenced him to mandatory consecutive sentences, pursuant to section 5-8-4(a) of the Corrections Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005-8-4(a)). Land, 304 Ill. App. 3d at 171, 710 N.E.2d at 472. The trial court dismissed the defendant's petition as frivolous and patently without merit.

On appeal, the defendant argued to this court that because the trial court erroneously imposed consecutive sentences under the belief that it was required to do so under section 5-8-4(a) of the Corrections Code, those sentences were void. Land, 304 Ill. App. 3d at 173-74, 710 N.E.2d at 473-74. This court rejected that argument, explaining as follows:

> "A void judgment is one entered by a
> court without jurisdiction of the parties or
> the subject matter or that lacks the inherent
> power to make or enter the particular order
> involved. [Citations.] In this case, the
> trial court had jurisdiction over both the

- 8 -

**A-8**

parties and subject matter regarding criminal
matters.  In addition, the trial court,
within its discretion, _could_ _have_ _imposed_
consecutive sentences pursuant to section 5-
8-4(b) of the Corrections Code had it be-
lieved such sentences were necessary to pro-
tect the public.  See Ill. Rev. Stat. 1989,
ch. 38, par. 1005-8-4(b) (now 730 ILCS 5/5-8-
4(b) (West 1996)).  Thus, regardless of
whether the court erroneously imposed manda-
tory consecutive sentences, it did not lack
the inherent power to make or enter the par-
ticular order involved, and the sentencing
order here was not void."  (Emphasis in orig-
inal, and internal quotation marks omitted.)
_Land_, 304 Ill. App. 3d at 174, 710 N.E.2d at
474.

Defendant's situation here is essentially the same as
that of the defendant in _Land_.  Because we adhere to our holding
in _Land_, we reject defendant's argument that his consecutive
sentences are void.

C. Defendant's Claim That His Postconviction Counsel Failed
To Render a Reasonable Level of Assistance

Last, defendant argues that his postconviction counsel
failed to render the reasonable level of assistance applicable in
postconviction proceedings.  Specifically, he contends that his
postconviction counsel failed to amend his postconviction peti-

- 9 -

tion "to include a patently meritorious argument that [defendant's] consecutive sentences should be ordered concurrent [sic] ***." Further, postconviction counsel failed to avoid forfeiture of the consecutive-sentencing argument because he did not allege that defendant's trial and appellate counsel (who were the same) was ineffective for failing to raise the consecutive-sentencing issue in those forums. We do not find this argument persuasive.

Because the right to counsel in postconviction proceedings is wholly statutory, postconviction petitioners are entitled only to the level of assistance provided by the Act. People v. Jennings, 345 Ill. App. 3d 265, 271, 802 N.E.2d 867, 872 (2003). It is well settled that the Act requires counsel to provide a "reasonable level of assistance" to a petitioner in a postconviction proceeding. Jennings, 345 Ill. App. 3d 265, 271, 802 N.E.2d 867, 872 (2003). In Jennings, this court discussed that "reasonable level of assistance," as follows:

> "To assure that reasonable level of assistance, Supreme Court Rule 651(c) requires that postconviction counsel (1) consult with the defendant either by mail or in person and ascertain upon what basis the defendant claims a constitutional deprivation, (2) examine the record of the trial court proceedings, and (3) make any necessary amendments to the defendant's pro se postconviction petition. 134 Ill. 2d R.

- 10 -

**A-10**

651(c).  Counsel may file a certificate to
show that counsel complied with the require-
ments of Rule 651(c), or the record as a
whole may demonstrate that postconviction
counsel complied with those requirements."
<u>Jennings</u>, 345 Ill. App. 3d at 271, 802 N.E.2d
at 872-73.

As earlier noted, defendant's postconviction counsel
filed a Rule 651(c) certificate and, in fact, substantially
amended defendant's postconviction petition.

In effect, defendant is making an ineffective-
assistance-of-counsel argument regarding his postconviction
counsel's failure to raise a claim of ineffective assistance of
trial and appellate counsel.  Claims related to the ineffective
assistance of defendant's trial and appellate counsel are exam-
ined under the two-pronged test set forth in <u>Strickland v.
Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052
(1984).  "To obtain reversal under <u>Strickland</u>, a defendant must
prove (1) his counsel's performance failed to meet an objective
standard of competence and (2) counsel's deficient performance
resulted in prejudice to the defendant."  <u>People v. Thompson</u>, 359
Ill. App. 3d 947, 952, 835 N.E.2d 933, 937 (2005).  To overcome
the deficient-performance prong, the defendant must show that
counsel made errors so serious and his performance was so defi-
cient that he was not functioning as "counsel" guaranteed by the
sixth amendment (U.S. Const., amend. VI).  In addition, the

- 11 -

**A-11**

defendant must overcome the strong presumption that the chal-
lenged action or inaction was the result of sound trial strategy.
Thompson, 359 Ill. App. 3d at 937, 835 N.E.2d at 937.

    To satisfy Strickland's prejudice prong, the defendant
must show that but for counsel's errors, a reasonable probability
exists that the outcome of the proceedings would have been
different.  People v. Johnson, 368 Ill. App. 3d 1146, 1161, 859
N.E.2d 290, 304 (2006).  A "reasonable probability" is one that
is "sufficient to undermine confidence in the outcome" of the
defendant's trial.  Strickland, 466 U.S. at 694, 80 L. Ed. 2d at
698, 104 S. Ct. at 2068.

    After considering the foregoing in light of this
court's discussion in Jennings regarding the reasonable level of
assistance that postconviction counsel should provide under the
Act, we conclude that defendant's postconviction counsel met that
standard.  Despite defendant's assertion that he had a "patently
meritorious argument" that imposition of consecutive sentences in
this case was clearly improper under section 5-8-4(a) of the
Corrections Code, we are not so sure.  Further, even if defendant
is correct that mandatory consecutive sentences were not re-
quired, the trial court still possessed discretion under section
5-8-4(b) of the Corrections Code to impose the same consecutive
sentences that it did in this case.  In any event, defendant
received the reasonable level of assistance from postconviction
counsel to which defendant was entitled.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.  As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

STEIGMANN, P.J., with APPLETON and KNECHT, JJ., concurring.

§ 5-8-4.  Concurrent and Consecutive Terms of Imprisonment.

(a) When multiple sentences of imprisonment are imposed on a defendant at the same time . . . . The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, . . . in which event the court shall enter sentences to run consecutively.  Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record.

730 ILCS 5/5-8-4(a)(b) (West 1995)

A-14

**E-FILED**
Wednesday, 13 August, 2008  03:16:27 PM
Clerk, U.S. District Court, ILCD

No.

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Appellate Court of Illinois,<br>) Fourth Judicial District,<br>) No. 4-05-0009. |
| Respondent-Appellee, | ) |
| | ) |
| | ) There on appeal from the |
| vs. | ) Circuit Court of the<br>) Eleventh Judicial Circuit,<br>) Logan County, Illinois, |
| JON MORGAN, | ) No. 95-CF-101. |
| | ) |
| Petitioner-Appellant. | ) Honorable<br>) David L. Coogan,<br>) Judge Presiding. |

# PETITION FOR LEAVE TO APPEAL

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

*ORAL ARGUMENT REQUESTED*

EXHIBIT T

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
| Respondent-Appellee, | ) ) | No. 4-05-0009. |
| vs. | ) ) ) ) | There on appeal from the Circuit Court of the Eleventh Judicial Circuit, Logan County, Illinois, |
| JON MORGAN, | ) ) | No. 95-CF-101. |
| Petitioner-Appellant. | ) ) ) | Honorable David L. Coogan, Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

To the Honorable Justices of the Supreme Court of the State of Illinois:

May It Please The Court:

## I.

## PRAYER FOR LEAVE TO APPEAL

Now comes the petitioner, Jon R. Morgan, by his attorney, Jacqueline L. Bullard, Assistant Defender, Office of the State Appellate Defender, Fourth Judicial District, and respectfully petitions this Court pursuant to Illinois Supreme Court Rules 315 and 612(b) for leave to appeal from the judgment of the Illinois Appellate Court, Fourth Judicial District, which affirmed the dismissal of his post-conviction petition. Mr. Morgan seeks a reversal of that decision and the amendment of his sentencing order to provided that his sentences for first and second degree murder be served concurrently rather than consecutively.

## II.

## PROCEEDINGS BELOW

On November 6, 2007, the Illinois Appellate Court, Fourth Judicial District, issued

an order affirming the stage-two dismissal of Jon Morgan's post-conviction petition. *People*

*v. Morgan*, (No. 4-05-0009, Nov. 6, 2007) (unpublished order pursuant to Supreme Court

Rule 23) (App. at 1-13).  The instant petition for leave to appeal follows.

## III.

## POINTS RELIED UPON FOR REVERSAL

### A.

**Jon Morgan's Consecutive Sentences for First and Second Degree Murder Were Not Authorized by Law Because, as Demonstrated by the Jury Verdict, the Offenses Were Not Part of a Single Course of Conduct, as Required for Mandatory Consecutive Sentencing under 730 ILCS 5/5-8-4.**

### B.

**In the Alternative, Post-conviction Counsel Failed to Render the Reasonable Level of Assistance Applicable in Post-conviction Proceedings Where He Amended the Petition to Include a Patently Erroneous Legal Argument Which Necessitated Dismissal of the Petition, and this Cause Should Be Reversed and Remanded for Further Stage-two Proceedings.**

## IV.

## STATEMENT OF FACTS

### A.

**This Court Should Grant Leave to Appeal to Determine Whether a Conflict Exists Between *People v. Land*, 304 Ill.App.3d 169 (4th Dist. 1999) and this Court's decision in *In re T.E*, 85 Ill.2d 326 (1981).**

The instant petition raised three important questions, the first of which is whether the

Fourth District Appellate Court's opinion in *People v. Land*, 304 Ill.App.3d 169 (4th Dist.

1999), conflicts with this Court's earlier opinion in *In re T.E*, 85 Ill.2d 326 (1981).  In *Land*,

the appellate court held that where a trial court imposes consecutive sentences based on a

mistaken belief that it is required to do so under 730 ILCS 5/5-8-4(a), that order is not void, but merely voidable, and challenges to the improper consecutive nature of the sentences are subject to forfeiture. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 7-9, *citing Land*, 304 Ill.App.3d at 174 (App. at 7-9). The majority in *Land* reasoned that even if a consecutive sentence is erroneously imposed under subsection (a), the trial court could, in theory, have imposed consecutive sentences under subsection (b) if it had found that consecutive sentences were necessary to protect the public. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 8-9 (App. at 8-9), *citing Land*, 304 Ill.App.3d at 174. According to the *Land* court, "'regardless of whether the court erroneously imposed mandatory consecutive sentences, it did not lack the inherent power to make or enter the particular order involved.'" *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 9 (App. at 9), *quoting Land*, 304 Ill.App.3d at 174. In contrast, in *In re T.E.*, this Court held that despite the existence of statutory authority to impose a term of probation, "[t]he established rule is that where a court having jurisdiction over both the person and the offense imposes a sentence in excess of what the statute permits, the legal and authorized portion of the sentence is not void, but the excess portion of the sentence is void." *In re T.E*, 85 Ill.2d at 333 (permitting attack on an original sentence of indeterminate probation following an appeal from revocation of probation). The dissent in *Land* cited this Court's opinion in *In re T.E.* to no avail. *Land*, 304 Ill.App.3d at 174-75 (Cook, J., dissenting).

The appellate court in the instant case denied the defendant relief based on *Land*. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 9 (App. at 9). The court's continuing adherence to an opinion which conflicts with Illinois Supreme Court precedent merits review or, at a minimum, a remand to the appellate court for reconsideration in light of *In re T.E.*, 85 Ill.2d 326 (1981).

**B.**

**This Court Should Grant Leave to Appeal to Clarify Whether the "Reasonable Representation" Standard Applicable in Post-Conviction Proceedings Is So Lax as to Permit the Mere Amendment of a Post-Conviction Petition, Without Regard to the Substance of Those Amendments.**

As an alternate basis for relief, the defendant argued on appeal that the record did not demonstrate that post-conviction counsel had made those "amendments to the petition[] . . . necessary for an adequate presentation of petitioner's claims," 134 Ill.2d R. 651(c), as required by Supreme Court Rule 651(c). Specifically, the defendant argued that Jon Morgan was ineligible for consecutive mandatory sentences under 730 ILCS 5/5-8-4(a) (West 1995), (App. at 14), because the jury verdicts of second and first degree murder for the shootings of Jon's grandparents demonstrated beyond a reasonable doubt that Jon's offenses were not part of a single course of conduct during which there was no change in his criminal objective. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 7, 10 (App. at 7, 10). Because Jon had been represented by the same attorney at trial and on direct appeal, the defendant argued that post-conviction counsel should have couched the claim in terms of ineffective assistance of counsel in order to avoid forfeiture of the issue. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 7, 10 (App. at 7, 10).

Yet despite the merits of the foregoing argument, set forth fully *infra* at 16-19, post-conviction counsel argued that Jon's consecutive sentences were impermissible because they *were* part of a single course of conduct, a proposition which guaranteed denial of the claim. (Vol. VI, C. 1404) (App. at 17) The remaining claims which counsel included in the petition were either *res judicata* or mere conclusory allegations. *Id.* Granting the defendant's petition for leave to appeal will provide an opportunity to clarify that meaningless amendments and amendments which undercut a defendant's meritorious claims do not satisfy the "necessary amendment" requirement of Supreme Court Rule 651(c).

-4-

**C.**

**This Court Should Grant Leave to Appeal to Determine Whether a Conflict Exists Between the Instant Case and this Court's Decision in *People v. Suarez*, 224 Ill.2d 37 (2007).**

In *People v. Suarez* this Court rejected the application of harmless error analysis to the requirement that the record demonstrate post-conviction counsel's compliance Rule 651(c). *People v. Suarez*, 224 Ill.2d 37, 51 (2007). As this Court observed, "the purpose underlying Rule 651(c) is not merely formal. It is to ensure that all indigents are provided proper representation when presenting claims of constitutional deprivation under the Post Conviction Hearing Act. The fulfillment of this design would not be encouraged if were we to ignore the rule's nonobservance in those cases appealed to this court." *Suarez*, 224 Ill.2d at 48 (citations and internal brackets and quotation marks omitted). The *Suarez* court further observed that courts of review "cannot simply presume . . . that the trial court would have dismissed the petition without an evidentiary hearing if counsel had adequate performed his duties under Supreme Court Rule 651(c). It is the duty of the trial court, and not this court, to determine on the basis of a complete record whether the post-conviction claims require an evidentiary hearing." *Suarez*, 224 Ill.2d at 48 (citations and internal quotations omitted).

The bases for the appellate court's rejection on the defendant's Rule 651(c) argument (1) its conclusion that it was "not so sure" that the defendant's consecutive sentences were improper and (2) the theoretical possibility that the trial court could have imposed discretionary consecutive sentences essentially constitutes a finding of harmless error. Denying the defendant relief based on what the trial court might have done conflicts with *People v. Suarez*, and this Court should either grant review or, at a minimum, remand to the appellate court for reconsideration in light of that case.

# V.

# REASONS FOR GRANTING REVIEW

**Trial and Direct Appeal**

As this Court observed in Jon Morgan's direct appeal, "it is clear from the record that Jon had suffered a tragic life and had been failed by his parents and grandparents." *People v. Morgan*, 197 Ill.2d 404, 430 (2001). Jon spent his childhood alternating between his mother's home, where he endured neglect and physical abuse (Vol. XXIV, R. 535; Vol. XXXI, R. 706-09), and the home of his maternal grandparents, Keith and Lila Cearlock, a fundamentalist couple with a troubled relationship who removed Jon from his prescribed psychotropic medication and relied instead on screaming, grounding, and beatings with a razor strap across the buttocks three to four times a week to control behavior such as "being hyper," having trouble with homework, playing with children outside the church, or watching television. (Vol. XXIV, R. 535; Vol. XXVI, R. 848, 862, 887; Vol. XXXI, R. 706-09, 713-18, 723, 728-29, 756) When Jon was fourteen years old, he shot and killed his grandparents. (Vol. XXIII, R. 442, 450, 454)

What transpired the night of the shootings was gleaned from Jon's pre-trial statements and trial testimony. According to Jon, after he and the Cearlocks argued about detentions Jon had received for tardiness at school, Keith beat him on the buttocks with a razor strap. (Vol. XXIV, R. 525-26; Vol. XXXI, R. 781-85) When Keith swung his fist at Jon for responded to denigrating comments about the boy and his mother, Jon retrieved a gun and ammunition from his grandfather's closet and returned to the bathroom with thoughts of killing himself, but instead shot a Tilex bottle sitting on the bathtub. (Vol. XXIV, R. 527-28; Vol. XXXI, R. 785-91, 849) When Jon emerged from the bathroom moments later, an angry Mr. Cearlock rounded the corner of the hallway and Jon shot him in the left temple. (Vol. XXIV, R. 529; Vol. XXXI, R. 791-92, 794) According to Jon, he was afraid his

grandfather would kill him. (Vol. XXXI, R. 793-94)  Jon shot Mrs. Cearlock in the back seconds later as she ran from the house, then followed her to the front yard and, according to witnesses, tried to shoot her again as she lay on the ground.  (Vol. XXII, R. 310; Vol. XXIII, R. 337-38; Vol. XXIV, R. 530, 539; Vol. XXXI, R. 794-97)

After walking to a friend's house only to discover that he was not home, Jon returned to the scene, handed the gun and ammunition he was carrying to a police officer, and stated that he had shot his grandparents because they "pissed [him] off" and he "couldn't take it anymore." (Vol. XXIII, R. 354-56; Vol. XXIV, R. 499, 514, 530-35; Vol. XXXI, R. 798-800) Jon cooperated with police, waived his *Miranda* rights, and made three statements admitting his conduct. (Vol. XXIV, R. 522-36, 540, 547-48, 561) In one of those statements, Jon stated that he had thought about shooting his grandparents before that night.  (Vol. XXXI, R. 872)  The parties presented conflicting expert testimony regarding Jon's mental state, with the defense expert attributing Jon's actions to his history as a battered person and the State expert testifying that Jon acted out of anger and suffered from childhood onset conduct disorder. (Vol. XXV, R. 614, 618; Vol. XXXIII, R. 198-210) Jon was transferred to adult court and based on the foregoing evidence was convicted of second degree murder for shooting Keith Cearlock and first degree murder for shooting Lila Cearlock. (Vol. IV, C. 979-81; Vol. IX, R. 450; Vol. XXIX, R. 3-4) The trial court sentenced Jon to consecutive 58 and 17 year terms of imprisonment respectively, citing deterrence as the reason for the length of the sentences. (Vol. VI, C. 1266; Vol. XXX, R. 212-13)

Trial counsel represented Jon on direct appeal and raised five issues:  (1) Jon's transfer to adult court; (2) the admissibility of Jon's statements to police; (3) the exclusion of evidence regarding the Cearlocks's abuse of Jon's mother; (4) the propriety of charging Jon with felony murder when the predicate felonies of aggravated battery and aggravated discharge of a firearm shared the same felonious purpose as the murders; and (5) the trial

court's refusal to give second degree murder instructions on the felony murder counts. *People v. Morgan*, 307 Ill.App.3d 707, 708-09 (4th Dist. 1999). Jon prevailed on all but the first issue in the appellate court on direct appeal and was granted a new trial on his first-degree murder conviction. *Morgan*, 197 Ill.2d at 458-59; *Morgan*, 307 Ill.App.3d at 717-18. This Court, however, reversed the appellate court and affirmed both of Jon's convictions, holding that (1) the failure to suppress Jon's on-scene statement was harmless, (2) evidence regarding the Cearlocks's abuse of their daughter was properly excluded, and (3) defendants are never entitled to second degree instructions on the charge of felony murder. *Morgan*, 197 Ill.2d at 442, 451, 458. This Court agreed that the predicate felony upon which a felony murder charge is based must have an independent felonious purpose, but it declined to reverse Jon's conviction on prejudice grounds because it presumed that the jury had convicted Jon of intentional rather than felony first degree murder. *Morgan*, 197 Ill.2d at 448-49, 458.

**Post-Conviction Proceedings**

On April 18, 2002, Jon mailed a motion for extension of time to file a post-conviction petition, and in response the trial court appointed an attorney to assist with the preparation of that petition. (Vol. I, C. 39P; Vol. VI, C. 1382) Two months later, counsel filed an initial petition which contained only broad allegations that Jon had been deprived of his Fifth Amendment right to counsel, his Sixth Amendment right to the effective assistance of trial and appellate counsel, his Seventh and Fourteenth Amendment right to due process, and his constitutional right to present evidence. (Vol. VI, C. 1386-88) Thereafter, the State filed a motion to dismiss, denying the allegations and asserting that the petition was legally insufficient for failure to identify any specific claims of error. (Vol. VI, C. 1392)

Post-conviction counsel responded with an amended petition, which (1) clarified that the Fifth Amendment claim was based on the lack of an attorney, parent, or interested adult

at Jon's interrogation; (2) asserted that Jon was deprived of his constitutional right to present testimony regarding the Cearlocks's history of abusing Jon's mother; (3) made a general Fourteenth Amendment due process claim; (4) alleged that appellate counsel had rendered ineffective assistance by not raising his own ineffectiveness for failing to preserve unspecified trial errors; and (5) added a claim that Jon's consecutive sentences were unconstitutional because the "offenses . . . occurred at the same time and arose from the same or related course of conduct." (Vol. VI, C. 1404) (App. at 14)  Attached was an affidavit signed by Jon which mirrored the language of the petition. (Vol. VI, C. 1406-07) Counsel filed a 651(c) certificate in conjunction with this petition, alleging that he had consulted with the defendant, examined the court file and relevant transcripts, and made any necessary amendments to the petition.  (Vol. VI, C. 1408)  The State filed an amended motion to dismiss, noting that the suppression motion and evidentiary issues regarding prior abuse were *res judicata*, again arguing that the conclusory nature of the due process and Sixth Amendment claims did not warrant an evidentiary hearing, and asserting that the consecutive sentence issue was forfeited for failure to raise it on direct appeal.  (Vol. VI, C. 1409-10)

The State reiterated those arguments four days later at the second-stage hearing on the motion to dismiss, and further argued that consecutive sentences were mandatory under 730 ILCS 5/5-8-4(a) (West 1995). (Vol. XXXVI, R. 4-9) Post-conviction counsel responded to the lack of detail in support of the due process and ineffectiveness assistance claims by stating that "[t]he details of each specific issue can be presented at an evidentiary hearing. The question here today is whether or not he has made a substantial showing, and I believe that we have."  (Vol. XXXVI, R. 13-14) The trial court granted the motion to dismiss, agreeing with the State's analysis of the issues.  (Vol. XXXVI, R. 16-19)

Because, as the trial court correct concluded, the defendant's claims regarding his interrogation and the admissibility of abuse evidence were *res judicata* and his Sixth and

-9-

Fourteenth Amendment claims were conclusory, the defendant on appeal raised only the propriety of Jon's consecutive sentences. *See Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 4-5, 7-9 (App. at 4-5, 7-9) The defendant was not, however, able to rely on the issue as framed by post-conviction counsel, given that post-conviction counsel's argument was based on the proposition that the shootings *were* part of a single course of conduct (Vol. VI, C. 1404) (App. at 14), something which, as discussed fully *infra* at 12, would have rendered consecutive sentencing mandatory. Instead, the defendant argued that the jury verdicts of second and first degree murder demonstrated beyond a reasonable doubt that Jon's criminal objective had changed between the first and second shooting, that the crimes thus were not part of a single course of conduct subject to mandatory consecutive sentencing, and that the trial court's mistaken belief that the offenses were part of a single course of conduct rendered the consecutive nature of the sentence void. *See Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 7-9 (App. at 7-9)

The appellate court rejected the foregoing argument based on its holding, over dissent, in *People v. Land* that where a trial court imposes consecutive sentences based on a mistaken belief that it is required to do so under 730 ILCS 5/5-8-4(a), that order is not void and is subject to forfeiture of the claim. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 7-9, *citing People v. Land*, 304 Ill.App.3d 169, 174 (4th Dist. 1999) (App. at 7-9). The majority in *Land* reasoned that even if a consecutive sentence is erroneously imposed under subsection (a), a trial court could, in theory, impose consecutive sentences under subsection (b) if it finds that consecutive sentences are necessary to protect the public. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 8-9 (App. at 8-9), *citing Land*, 304 Ill.App.3d at 174. "'Thus, regardless of whether the court erroneously imposed mandatory consecutive sentences, it did not lack the inherent power to make or enter the particular order involved.'" *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 9 (App. at 9), *quoting Land*, 304 Ill.App.3d at 174. The

appellate court declined the defendant's request to revisit *Land* based on the reasoning contained in Justice Cook's dissent in that case.

In the alternative, the defendant argued that post-conviction counsel had not rendered a reasonable level of assistance pursuant to Supreme Court Rule 651(c) where he incorrectly framed the consecutive sentencing issue based on a fundamental misunderstanding of the applicable law, and as a result the trial court was not presented with a patently meritorious argument. *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 9-10 (App. at 9-10). The appellate court disagreed and found that post-conviction counsel satisfied the requirements of the rule, noting that counsel had "substantially amended the defendant's post[-]conviction petition." *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 10-12 (App. at 10-12). The appellate court was "not so sure" that Jon was ineligible for mandatory consecutive sentencing under subsection (a) of the consecutive sentencing statute, and it concluded that even if the defendant's consecutive sentencing argument was meritorious, "the trial court still possessed discretion under section 5-8-4(b) of the Corrections Code to impose the same consecutive sentences that it did in this case." *Morgan*, (No. 4-05-0009, Nov. 6, 2007) at 12 (App. at 12) The instant petition for leave to appeal follows.

## VI.

## ARGUMENT

### A.

**Jon Morgan's Consecutive Sentences For First And Second Degree Murder Were Not Authorized by Law Because, as Demonstrated by The Jury Verdict, The Offenses Were Not Part of a Single Course of Conduct, as Required For Mandatory Consecutive Sentencing Under 730 ILCS 5/5-8-4.**

The trial court and parties in the instant case believed that Jon Morgan was subject to mandatory consecutive sentences for first and second degree murder under 730 ILCS 5/5-8-4(a) (West 1995), which required mandatory consecutive sentences if the two shootings

-11-

were part of a single course of conduct. The jury verdicts, however, demonstrate that the shootings of Keith and Lila Cearlock were not part of a single course of conduct, with the jury accepting that Jon's shooting of Keith was motivated by an unreasonable belief in the need for self-defense, but rejecting that same proposition as applied to Lila. Because the imposition of mandatory consecutive sentences were not authorized by law, Jon's consecutive sentences are void and should be ordered to run concurrently.

Jon Morgan was convicted of first and second degree murder based on shootings which occurred on April 27, 1995, (Vol. I, C. 42-43; Vol. XXII, R. 314), and was subject to mandatory consecutive sentencing if those offenses were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. 730 ILCS 5/5-8-4(a) (West 1995) (App. at 14); *see, e.g.*, *Wilder*, 325 Ill.App.3d at 1001-03. If the offenses were not committed as part of a single course of conduct, consecutive sentencing was only permissible if the trial court made an express finding that such a sentence was necessary to protect the public. 730 ILCS 5/5-8-4(b) (West 1995) (App. at 14); *see, e.g.*, *Wilder*, 325 Ill.App.3d at 1001-03. Both the parties and the trial court proceeded as if Jon's two offenses were part of a single course of conduct, with the prosecutor asserting that consecutive sentences were mandatory because the shootings arose out of a single course of conduct and defense counsel implicitly accepting that assertion but arguing that the triggering factor of serious bodily harm was inherent in second degree murder and thus constituted an improper double enhancement, (Vol. V, C. 1130-32; Vol. XXX, R. 169-70, 190-91, 203). (Defense counsel's double enhancement argument was subsequently rejected in the unrelated case of *People v. Phelps*, 211 Ill.2d 1, 14 (2004).) Without an express finding of single course of conduct, and mentioning only deterrence of others in aggravation, the court imposed consecutive sentences of 58 years for first degree and 17 years for second degree murder. (Vol. XXX, R. 213)

Despite the assumptions of the attorneys and the trial court, however, the jury verdicts established that the two shootings were not committed as part of a single course of conduct. *See Arrington*, 297 Ill.App.3d at 5 (jury verdict pointed to as evidence of motivation in case reversing trial court's imposition of consecutive sentences); *Magnus*, 262 Ill.App.3d at 370 (same in affirming the trial court's finding). The question of whether a defendant's actions are "part of a single course of conduct during which there was no substantial change in the nature of the criminal objective" under subsection (a) is governed by the "independent motivation" test, *People v. Bell*, 196 Ill.2d 343, 348 (2001), which asks whether the offenses were part of a course of conduct "guided by an 'overarching criminal objective,'" in which case subsection (a) applies, or whether the acts were "independently motivated," in which case it does not. *See, e.g., People v. Sergeant*, 326 Ill.App.3d 974, 988 (1st Dist 2001). As part of this inquiry, courts look to whether the criminal objective for the first offense was satisfied before the defendant embarked on the second. *See People v. Fritz*, 225 Ill.App.3d 624, 629 (3rd Dist. 1992). For purposes of imposing consecutive sentences, the presence or absence of an independent criminal motivation must be supported by the record. *See Kagan*, 283 Ill.App.3d at 220; *People v. Morgan*, 44 Ill.App.3d 459, 467 (5th Dist. 1976).

The Illinois Appellate Court has recognized that shifts in criminal objectives can occur within seconds, even when two shootings are intimately related. In *People v. Morris*, the appellate court upheld the trial court's finding that the defendant's murder of her husband and attempt murder of his paramour were motivated by different criminal objectives, despite the temporal and spacial proximity of the offenses. *Morris*, 237 Ill.App.3d 140, 149 (2d Dist. 1992). Morris had shot and killed her husband at the home of his paramour, and when the woman jumped behind a bed in response, Morris attempted to shoot her as well, but the gun misfired. *Morris*, 237 Ill.App.3d at 141-42. Similarly, in *People v. Magnus*, the appellate court upheld the trial court's finding independent criminal motivation where the defendant

-13-

shot two victims within seconds of each other, the first in order to protect his brother and the second to execute a rival gang member. *Magnus*, 262 Ill.App.3d 362, 370-71 (1st Dist. 1994). Pointing to the verdicts of second and first degree murder, the appellate court noted that "[i]n assessing differing degrees of culpability, the [trier-of-fact] implicitly found that defendant's motivation changed between the killings." *Magnus*, 262 Ill.App.3d at 370.

Just as in *Magnus*, the jury's verdicts of second and first degree murder reflect its finding that Jon's motivations changed between the shootings. The defense theory at trial was that Jon had shot both of his grandparents out of fear that he would be beaten or even killed for having discharged a gun in the house; the State's theory was that Jon had shot the couple out of anger. (Vol. XXVIII, R. 164-65, 168, 198-99, 229-30, 279-80) By returning a guilty verdict of second degree murder as to Keith Cearlock (Vol. IV, C. 979), the jury determined that the first shooting was indeed motivated by an unreasonable belief in the need for self-defense. The jury, however, rejected the notion that Jon's criminal objective remained the same by the time he shot his grandmother, as evidenced by the verdict of first degree murder for the shooting of Lila Cearlock. (Vol. IV, C. 980) This Court on direct appeal also recognized Jon's change in objective when, in passing on the admissibility of evidence regarding the Cearlock's abuse of Jon's mother, it noted that "[e]ven if Jon feared Lila because she goaded Keith into beating Jon, that threat had been removed when Keith was shot first." *Morgan*, 197 Ill.2d at 458. Because Jon's criminal objective changed after the initial shooting of his grandfather, he therefore was not eligible for mandatory consecutive sentences under subsection (a) of Section 5-8-4. Nor was Jon subject to discretionary consecutive sentencing under subsection (b) of Section 5-8-4, given that the trial court did not make the predicate finding that such a sentence was necessary to protect the public, but instead cited only deterrence of others as a factor in aggravation. (Vol. XXX, R. 213)

-14-

Consecutive sentences which do not comport with the statutory requirements of 730 ILCS 5/5-8-4 are void and may be corrected at any time. *See People v. Arna*, 168 Ill.2d 107, 112-13 (1995). The proper remedy when a defendant has been sentenced incorrectly pursuant to Section 5-8-4(a) is vacation of the sentence and a remand for resentencing, and this Court should do so in the instant case. *See Bole*, 155 Ill.2d at 199. This Court should reject the appellate court's opinion to the contrary in *People v. Land*, where it held that the improper imposition of consecutive sentences under subsection (a) of Section 5-8-4 was not void since the trial court, in theory, could have imposed consecutive sentences under subsection (b). *Land*, 304 Ill.App.3d 169, 173-74 (4th Dist. 1999). As Justice Cook noted in dissent, "[t]he supreme court and [the appellate] court have not hesitated to reverse and remand cases where the trial court has erroneously sentenced a defendant to concurrent sentences, where the statute mandates consecutive sentences . . . despite rules that limit the State's right to appeal and prohibit the appellate court from increasing a defendant's sentence on review." *Land*, 304 Ill.App.3d at 174-75 (Cook, J., dissenting). While void judgments do indeed involve questions regarding the jurisdiction of the court over the parties and subject matter, *Land*, 304 Ill.App.3d at 174, "[t]he established rule is that where a court having jurisdiction over both the person and the offense imposes a sentence in excess of what the statute permits, the legal and authorized portion of the sentence is not void, but the excess portion of the sentence is," *In re T.E.*, 85 Ill.2d 326, 333 (1981); *Land*, 304 Ill.App.3d at 175 (Cook, J., dissenting).

B.

**In the Alternative, Post-conviction Counsel Failed to Render the Reasonable Level of Assistance Applicable in Post-conviction Proceedings Where He Amended the Petition to Include a Patently Erroneous Legal Argument Which Necessitated Dismissal of the Petition, and this Cause Should Be Reversed and Remanded for Further Stage-two Proceedings.**

Despite having at his disposal the meritorious consecutive sentencing argument set forth in Argument I, post-conviction counsel's amendments to Jon Morgan's post-conviction petition were limited to two claims which were *res judicita*, two claims which contained no specific allegation of error whatsoever, and a consecutive sentencing argument which was predicated on the proposition that the shooting of Keith and Lila Cearlock was part of a single course of conduct, a proposition which rendered Jon subject to mandatory consecutive sentencing. In addition, at the stage-two hearing on the motion, counsel made statements which evinced a fundamental misunderstanding of the Post-Conviction Hearing Act. While an attorney appointed to represent a defendant in post-conviction proceedings need not render the level of representation called for under *Strickland v. Washington*, 466 U.S. 668 (1984), post-conviction counsel's representation in the instant case failed to satisfy the reasonableness standard applicable in such proceedings. As a result of counsel's failure to amend the petition in a manner which adequately presented Jon's challenge to the consecutive nature of his sentences, the trial court was deprived of the opportunity to make a fully informed decision on the merits, and this cause should be reversed and remanded for the appointment of counsel and the opportunity to file a properly amended petition.

Although a petitioner has no constitutional right to the assistance of counsel in a post-conviction proceeding, he is entitled to a "reasonable level of assistance" from an appointed attorney. *People v. Turner*, 187 Ill.2d 406, 410 (1999). Reasonable assistance requires that the attorney ascertain the bases of the post-conviction petitioner's complaints, shape those complaints into appropriate legal form, and present them to the court, *see People v. Davis*,

-16-

156 Ill.2d 149, 162 (1993), a standard echoed in Supreme Court Rule 651(c), which provides as follows:

> The record filed in [the circuit] court shall contain a showing,
> which may be made by the certificate of petitioner's attorney,
> that the attorney has consulted with petitioner either by mail
> or in person to ascertain his contentions of deprivation of
> constitutional right, has examined the record of the
> proceedings at the trial, and has made any amendments to the
> petitions filed *pro se* that are necessary for an adequate
> presentation of petitioner's contentions.

134 Ill.2d R. 651(c). If the record does not affirmatively show that the foregoing requirements were met by appointed counsel, then the defendant was denied a reasonable level of assistance and the dismissal of the petition must be reversed and the case remanded for further proceedings. *See People v. Jennings*, 345 Ill.App.3d 265, 271-75 (4th Dist. 2003).

The record in the instant case affirmatively demonstrates that Jon Morgan's appointed post-conviction attorney did not render a reasonable level of representation or comply with the requirements of Supreme Court Rule 651(c), despite the filing of a 651(c) certificate. First, post-conviction counsel failed to amend the post-conviction petition to include a patently meritorious argument that Jon was not subject to mandatory consecutive sentencing as set forth *supra* at 11-15. Instead, post-conviction counsel made a legally incorrect argument which guaranteed denial of relief, asserting in the amended petition that Jon's consecutive sentences were improper because the "offenses . . . occurred at the same time and arose from the *same* or related *course of conduct*." (Vol. IV, C. 1404) (App. at 17) As set forth *supra* at 12, if the two shootings were part of the same course of conduct, consecutive sentences were mandatory. Counsel compounded the error by failing to present

-17-

the argument in the manner necessary to avoid forfeiture. Jon's consecutive sentencing claim was vulnerable to dismissal on forfeiture grounds because it was not dependent on matters outside the record and Jon's attorney failed to correctly challenge the sentence at trial or on appeal. *See, e.g., Turner*, 187 Ill.2d at 413 (issues evident from record on direct appeal normally forfeited on post-conviction). Forfeiture, however, easily would have been avoided by an allegation that Jon's attorney had been ineffective for failing to identify and preserve the consecutive sentencing issue. *See People v. Flores*, 153 Ill.2d 264, 277 (1992) (noting ease with which forfeited trial issues can be raise in post-conviction petition by alleging appellate counsel's ineffectiveness).

Such an argument would have entitled Jon to relief. The test for evaluating the effectiveness of Jon's attorney, who represented him both at trial and on appeal, is the following two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): (1) whether the attorney rendered deficient representation, and (2) whether a reasonable probability exists that, but for counsel's errors, the result would have been different. *Strickland*, 466 U.S. at 687, 694. If appellate counsel fails to make a clearly meritorious argument on appeal that the defendant should not have received consecutive sentences, and that argument is based on the law in existence at the time appellate counsel represented the defendant, both prongs of *Strickland* are met, and the defendant is entitled to post-conviction relief. *See Moore*, 177 Ill.2d at 437. If that argument is dependent on a predicate finding that trial counsel was ineffective for not raising the issue in a post-trial motion, but that same attorney represented the defendant both at trial and on appeal, principles of forfeiture and *res judicata* do not apply. *See, e.g., People v. Gaines*, 105 Ill.2d 79, 91 (1984) (appellate counsel cannot be expected to raise his own ineffectiveness at trial).

Jon Morgan would have been able to satisfy this standard had the post-conviction petition been properly amended. As set forth *supra* at 11-15, Jon had a clearly meritorious consecutive sentencing argument at his disposal, yet the attorney who represented him at trial and on appeal failed to raise the issue. *See People v. Morgan*, 307 Ill.App.3d 707 (4th Dist. 1999); *People v. Morgan*, 197 Ill.2d 404 (2001). The prejudice to Jon, up to 17 additional years in prison, was substantial. As a result of post-conviction counsel's failure to make these necessary amendments to the petition, the trial court granted the State's motion to dismiss, finding, *inter alia*, that the consecutive sentencing issue was forfeited because it could have been raised on direct appeal, and meritless because such sentences were mandatory at the time. (Vol. XXXVI, R. 18) Failure to make such an amendment to the petition cannot be characterized as reasonable. *See Jennings*, 345 Ill.App.3d at 274-75 (failure to raise disparate sentencing claim).

Although the appellate court noted in its order that post-conviction counsel had "substantially amended defendant's post[-]conviction petition," none of the remaining four claims set forth in the amended petition set forth an even colorable argument for relief. Two of the claims in the petition, the propriety of Jon's transfer to adult court and the admissibility of evidence regarding the Cearlock's abuse of Jon's mother, were, as the State correctly noted (Vol. VI, C. 1409-10), *res judicata* by virtue of this Court's opinion on direct appeal. *See Morgan*, 197 Ill.2d at 431, 456. The remaining two claims were mere conclusory allegations that the attorney who represented Jon at trial and on direct appeal had rendered ineffective assistance for failing to raise and preserve issues for appeal and that Jon was deprived of due process based on errors which occurred at trial. (Vol. VI, C. 1404) (App. at 17) In addition, post-conviction counsel evinced a fundamental misunderstanding of the requirements of the Post-Conviction Hearing Act, explaining the lack of detail and supporting materials as follows: "The details of each specific issue can be presented at an evidentiary hearing. The question here today is whether or not he has made a substantial

-19-

showing, and I believe that we have." (Vol. XXXVI, R. 13-14) A simple review of the Act, however, reveals that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2002). Based on post-conviction counsel's errors, this cause should be reversed and remanded for the appointment of counsel and the opportunity to further amend the petition.

## VII.

## CONCLUSION

Jon Morgan, petitioner-appellant, respectfully requests that this Court grant leave to appeal or, in the alternative, a remand to the appellate court for reconsideration in light of this Court's opinion in *In re T.E*, 85 Ill.2d 326 (1981), or *People v. Suarez*, 224 Ill.2d 37 (2007).

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

JACQUELINE L. BULLARD
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

## CERTIFICATE OF COMPLIANCE

I certify that this Petition for Leave to Appeal conforms to the requirements of Rules 315(d) and 341(a). The length of this Petition for Leave to Appeal, excluding any appendix, is 20 pages.

JACQUELINE L. BULLARD
Assistant Defender

-20-

**E-FILED**
Wednesday, 13 August, 2008  03:16:47 PM
Clerk, U.S. District Court, ILCD

105718

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

January 30, 2008

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 105718 - People State of Illinois, respondent, v. Jon R.
          Morgan, petitioner.  Leave to appeal, Appellate
          Court, Fourth District.

The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on March 6, 2008.

EXHIBIT U